Thomas A. Smart
Phillip A. Geraci
KAYE SCHOLER LLP
425 Park Avenue
New York, NY 10022
(212) 836-8000

*Attorneys for Plaintiff JA Apparel Corp.*



RECEIVED
SEP 0 4 2007
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE BATTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JA APPAREL CORP.,                               :

        Plaintiff,                            :    Civil Action No. 07-cv-____

   v.                                          :

JOSEPH ABBOUD, HOUNDSTOOTH CORP., and           :
HERRINGBONE CREATIVE SERVICES, INC.,
                                                :

        Defendants.                           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

07 CIV 7787

### COMPLAINT

       Plaintiff JA Apparel Corp. ("JA Apparel"), for its complaint against defendants

Joseph Abboud ("Mr. Abboud"), Houndstooth Corp. ("Houndstooth") and Herringbone Creative

Services, Inc. ("Herringbone"), for trademark infringement, false designation of origin, unfair

competition, trademark dilution, false and deceptive practices, breach of contract, and declaratory

judgment, pleads and alleges as follows:

31515406.WPD

## NATURE AND BASIS OF THE ACTION

1.      This action seeks to stop Mr. Abboud and his affiliates from unlawfully misappropriating very valuable trademarks, trade names, and designations that Mr. Abboud sold to plaintiff JA Apparel for the handsome sum of $65.5 million.  Having pocketed that payment, Mr. Abboud forfeited all rights to use those trademarks, trade names, and designations – including "Joseph Abboud," "by Joseph Abboud," "designed by Joseph Abboud" and "a new composition by designer Joseph Abboud."  Simply put, Mr. Abboud chose to trademark his name and chose to sell his trademarks and goodwill to plaintiff for $65.5 million.  He therefore chose to lose the right to use those marks and should be enjoined from attempting to do so in violation of plaintiff's contractual, statutory, and common law rights.

2.      Plaintiff sues under the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a) and 1125(c), state common law, and Sections 349, 350 and 360-l of New York General Business Law against defendants Mr. Abboud, Houndstooth, and Herringbone, seeking preliminary and permanent injunctive relief and damages relating to defendants' use of the trademarks, trade names, and designations "a new composition by designer Joseph Abboud" and "Joseph Abboud" in connection with the sale of menswear.  Plaintiff JA Apparel, a leader in the apparel, accessories, and furnishings industry, owns rights in the names, trademarks, trade names, service marks, logos, insignias and designations that contain the words "Joseph Abboud," "designed by Joseph Abboud," "by Joseph Abboud" "or anything similar thereto or derivative thereof" (collectively, "the ABBOUD marks"), for use in connection with a variety of goods and services, including menswear.  Plaintiff has invested substantial efforts and considerable financial resources to advertise and publicize the ABBOUD marks and the ABBOUD marks have achieved substantial sales and widespread recognition and fame.

3.      Upon the very recent expiration of the non-compete provisions of a personal services agreement that Mr. Abboud had with JA Apparel, Mr. Abboud has – with considerable fanfare and a great deal of media attention – launched a new line of menswear aimed squarely at the same retailers and consumers who purchase "Joseph Abboud"-branded apparel and other merchandise. Mr. Abboud has elected to call his new line "jaz," and in the very first media report on the launch of his brand, in *DNR*, the leading publication covering the men's fashion industry, it at first appeared that Mr. Abboud would honor JA Apparel's rights in the ABBOUD marks and was using the name "jaz" to avoid any confusion. Indeed, *DNR*'s August 6, 2007 article on the launch of the new "jaz" menswear line stated that "Abboud, the person, is prohibited from using the Joseph Abboud name on any product or marketing materials."

4.      That statement notwithstanding, Mr. Abboud has already breached – and fully intends on continuing to breach – his contracts and infringe JA Apparel's valuable ABBOUD marks. Mr. Abboud or his representatives demanded that *DNR* issue "a correction" because, as Mr. Abboud or his representatives told *DNR*, "we are free to use his name in marketing materials." They further asserted to the author of the *DNR* article that Mr. Abboud's name is "a very big asset" to them, as well as their future partners and accounts. *DNR* obliged Mr. Abboud, and ran what it called a "Clarification" on the first page of its August 13, 2007 issue. The Clarification stated that "according to [Mr.] Abboud and his attorney, Theodore Dinsmoor, the designer . . . is, in fact, *allowed to use his own name on marketing and advertising materials for Jaz.*" (Emphasis added.)

5.      Mr. Abboud's intent to infringe JA Apparel's valuable ABBOUD marks reflected in the *DNR* Clarification was consistent with the plans announced by Mr. Abboud in an interview with *The Wall Street Journal*, published in its August 6, 2007 edition. There, Mr. Abboud

"and his attorney" stated that Mr. Abboud "plans to promote his new label with the tagline 'a new composition by designer Joseph Abboud.'"

      6.      The comments of Mr. Abboud and his lawyer leave no doubt that it is Mr. Abboud's intention to advertise, market, and promote the so-called "jaz" line of menswear by blatantly and explicitly using the trademark, trade name and designation "Joseph Abboud," in violation of JA Apparel's rights. Indeed, defendants' "jaz" clothing line, which is being offered for the Fall 2008 menswear season, will be manufactured, marketed and sold in affiliation with Jack Victor Ltd. ("Jack Victor"), Alden Street Shirt Co. LLC ("Alden"), Merrill-Sharpe Ltd. ("Merrill"), Cardinal Clothing Canada, Inc. ("Cardinal Clothing"), and J.S. Blank & Co. Inc. ("J.S. Blank"), all of whom are direct competitors of JA Apparel.

      7.      The use by defendants of the trademarks, trade names, and designations "a new composition by designer Joseph Abboud" and "Joseph Abboud" breaches an agreement entered into by Mr. Abboud and Houndstooth with JA Apparel in which Mr. Abboud and Houndstooth sold to JA Apparel the rights to all existing and future ABBOUD trademarks in exchange for $65.5 million (the "Purchase and Sale Agreement"). In ¶ 1.1(a)(A)-(E) of the Purchase and Sale Agreement, Mr. Abboud and Houndstooth sold and assigned all of their right, title and interest in any trade names, trademarks, service marks, logos, insignias, and designations containing the words "Joseph Abboud," "designed by Joseph Abboud," "by Joseph Abboud," or "JA," "or anything similar or derivative thereof, either alone or in combination with other words or symbols." Mr. Abboud intends to breach that agreement by using the trade names, trademarks, and designations "Joseph Abboud" and "a new composition by designer Joseph Abboud," the latter of which is a barely discernable variation of the trade names, trademarks and designations "Joseph Abboud,"

"designed by Joseph Abboud," or "by Joseph Abboud," and is plainly similar to or derived from these trade names, trademarks and designations.

        8.      Defendants' use of the trade name, trademark and designation "a new composition by designer Joseph Abboud" and their publicly stated intention to use "Joseph Abboud" on marketing and advertising materials for "jaz" also constitutes trademark infringement of JA Apparel's ABBOUD marks and unlawfully capitalizes on the goodwill and reputation purchased by, and further enhanced by, plaintiff through its use and promotion of the ABBOUD marks. Defendants' infringement of the ABBOUD marks is likely to cause a not insubstantial number of consumers and others to be confused or mistaken into believing that defendants and their new menswear collection are affiliated with, originate with, are sponsored or approved by, emanate from, or are otherwise associated with JA Apparel and its Joseph Abboud line of products. Additionally, defendants' use of the trademark, trade name, and designation "a new composition by designer Joseph Abboud" or other similar uses of the trademark, trade name and designation "Joseph Abboud" has caused, and unless enjoined will continue to cause, dilution of the distinctive quality of JA Apparel's distinctive ABBOUD marks in that the mark's capacity to identify and distinguish JA Apparel's products will be diminished. Defendants' acts constitute unfair competition under both federal law and state common law. Unless defendants' breach of contract and acts of false designation of origin, infringement, dilution, and unfair competition are preliminarily and permanently enjoined, plaintiff will suffer irreparable injury for which there is no adequate remedy at law.

        9.      On information and belief, Mr. Abboud has also violated the non-compete provisions of the Purchase and Sale Agreement's side letter agreement (the "Side Letter Agreement") he entered into with JA Apparel, which (i) prohibited him, prior to July 13, 2007, from, *inter alia,*

directly or indirectly competing with JA Apparel or associating with any entity that competed with

or proposed to compete with JA Apparel; and (ii) required him prior to such date to obtain written

permission from JA Apparel before becoming associated in any capacity with any person or entity

that competed or proposed to compete with JA Apparel. On information and belief, prior to July 13,

2007, Mr. Abboud breached his obligations by, *inter alia*, designing, producing, developing,

promoting, and negotiating agreements to manufacture, distribute, license, and market a competitive

menswear line, and becoming associated with others who competed or proposed to compete with

JA Apparel, without ever seeking – much less obtaining – JA Apparel's written permission, which

would not have been granted.

## PARTIES

10.    Plaintiff JA Apparel is a corporation organized under the law of the State of

Delaware with a place of business at 650 5th Avenue, New York, New York. JA Apparel is engaged

in the business of the design, manufacturing, sourcing, licensing, and sale of men's apparel and

accessories, boys' apparel, and home furnishings, under the trademarks, trade names and

designations that include the words "Joseph Abboud" and variations thereof in the U.S. and over 30

countries abroad.

11.    On information and belief, defendant Joseph Abboud is an individual residing

at 90 Pine Brook Road, Bedford, New York.

12.    On information and belief, defendant Houndstooth is a corporation organized

under the laws of the State of New York, with its principal place of business at 640 Old Post Road,

Bedford, New York, and is engaged in the business of fashion consulting and design.

13.    On information and belief, defendant Herringbone is a corporation organized

under the laws of the State of New York with its principal place of business at 640 Old Post Road,

Bedford, New York, and is engaged in the business of fashion consulting and design. Mr. Abboud is the principal of Herringbone. On information and belief, Mr. Abboud conducts his design and fashion business through his company Herringbone.

### JURISDICTION AND VENUE

14.     The Court has subject matter jurisdiction over the federal trademark infringement, trademark dilution, false designation of origin and unfair competition claims pursuant to the Lanham Act, 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338(a) and (b). The Court has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367.

15.     The Court has personal jurisdiction over defendants because, upon information and belief, defendants are present and doing business in the State of New York either directly or through their agents or, alternatively, because defendants are subject to personal jurisdiction under the principles set forth in New York Civil Practice Law and Rules § 302.

16.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391 because defendants are subject to personal jurisdiction in this Judicial District and because a substantial part of the events giving rise to plaintiff's claims occurred in this Judicial District.

17.     In addition, jurisdiction and venue are appropriate in this Court with respect to Mr. Abboud and Houndstooth pursuant to the Purchase and Sale Agreement (¶ 9.6) and the Side Letter Agreement (¶ 4(d)) (attached as Exhibits A and B, respectively), which are both at issue in this case. The Purchase and Sale Agreement states that "all actions are to be heard in a federal court in the County and State of New York" and further states that the parties "submit to personal jurisdiction in New York and consent to venue in the County and State of New York." (Exhibit A, ¶ 9.6.) The Side Letter Agreement states that "[a]ll actions and proceedings arising out of or relating to this [Side] Letter Agreement will be exclusively heard and determined in a New York state or

federal court sitting in the City of New York" and the parties "submit to the jurisdiction of such courts . . ." (Exhibit B, ¶ 4(d).)

<u>**ALLEGATIONS COMMON TO ALL CLAIMS**</u>

**A.**    <u>**JA Apparel and the Joseph Abboud Brand**</u>

18.    JA Apparel, founded in 1988, is the owner of the Joseph Abboud brand name and numerous marks that incorporate, or are variations of, that brand name. Although once strictly a menswear line, the Joseph Abboud brand now appears on products such as eyewear, hosiery, scarves, jewelry, jeans, outerwear, sleepwear, rainwear, luggage, and small leather goods, as well as a home collection, including bath accessories, bedding, dinnerware, and flatware, and a large range of other goods.

19.    JA Apparel was formed when Mr. Abboud, a fashion designer, through his wholly-owned corporation, Houndstooth, entered into a joint venture arrangement with GFT USA, Inc. ("GFT"), a subsidiary of the Italian company RCS MediaGroup S.p.A. ("RCS"), to manufacture, market, and sell various products under the Joseph Abboud brand name. When the joint venture was terminated in 1996, JA Apparel became a wholly-owned subsidiary of GFT. From 1988 onward, JA Apparel used the ABBOUD marks in the manufacture, marketing, and sale of its products and continues such use today.

20.    On June 16, 2000, JA Apparel entered into the Purchase and Sale Agreement with Mr. Abboud and Houndstooth pursuant to which Mr. Abboud and Houndstooth sold all the ABBOUD trademarks, and their related goodwill, as well as any license agreements pertaining to those marks to JA Apparel, for a purchase price of $65.5 million. (Exhibit A, at ¶ 1.2.) The Purchase and Sale Agreement provided that every dollar of the $65.5 million payment amount "shall be allocated 100% to [Mr.] Abboud." (*Id.*)

21.    The terms of sale in the Purchase and Sale Agreement make clear that in exchange for the $65.5 million payment by JA Apparel, Mr. Abboud and Houndstooth were selling all of their interest in the ABBOUD trademarks, including new trade names, service marks, logos, insignias, and designations.  The Purchase and Sale Agreement provides:

> 1.1 (a)  Upon the terms and subject to the conditions of this Agreement, on the Closing Date (as hereinafter defined), the Sellers shall sell, convey, transfer, assign and deliver to the Buyer, and the Buyer shall purchase and acquire from the Sellers, all of the Sellers' right, title and interest in and to:
>
>> (A)    The names, trademarks, trade names, service marks, logos, insignias, and designations identified on Schedule 1.1(a)(A) [which includes 11 marks registered in the United States that include JOSEPH ABBOUD and JA] and all trademark registrations and applications therefor, and the goodwill related thereto (collectively, the "Trademarks"), . . .
>>
>> (B)    All licenses to use the Trademarks granted by Houndstooth or Abboud . . . (collectively, the "License Agreements").
>>
>> (C)    All rights to use and apply for the registration of new trade names, trademarks, service marks, logos, insignias, and designations containing the words "Joseph Abboud," "designed by Joseph Abboud," "by Joseph Abboud," "JOE" or "JA," *or anything similar thereto or derivative thereof, either alone or in conjunction with other words or symbols* (collectively, the "New Trademarks"), for any and all products or services.
>>
>> (D)    All books, financial records, invoices, and other documents, records and data files relating primarily to the Trademarks or the License Agreements.
>>
>> (E)    The goodwill of or pertaining to the Trademarks.

(Exhibit A, ¶ 1.1(a)(A)-(E)) (emphasis added).)

22.    JA Apparel paid $65.5 million to Mr. Abboud for the ABBOUD trademarks and their goodwill, as well as licenses and records relating to that intellectual property.  This sale included any trade names, trademarks, service marks, logos, insignias, and designations containing the words "Joseph Abboud," "by Joseph Abboud" or "designed by Joseph Abboud," and "anything similar thereto or derivative thereof, either alone or in combination with other words or

symbols . . ."  The \$65.5 million was not paid for plants, equipment, factories, fabric, thread, real estate, or any other physical assets – Mr. Abboud was paid \$65.5 million for intellectual property and goodwill.

23.    Thus, by virtue of the Purchase and Sale Agreement, JA Apparel owns numerous trademark registrations and applications for various ABBOUD marks (described in further detail in ¶¶ 37-38) under which it currently sells, licenses, and promotes tailored clothing, furnishings and sportswear for men and boys, casual clothing, a variety of homeware, and numerous other products.

24.    In connection with the Purchase and Sale Agreement, and in consideration of the consummation of the Purchase and Sale Agreement, JA Apparel and Mr. Abboud also entered into the Side Letter Agreement pursuant to which Mr. Abboud agreed to provide consulting services, among other services, relating to fashion design and brand promotion of the products sold by JA Apparel under the ABBOUD marks.  (Exhibit B, ¶ 1.(a).)  Mr. Abboud agreed to render these services for a period of five (5) years (the "Personal Services Period"), which expired on July 13, 2005.  (*Id.*)

25.    Pursuant to the Side Letter Agreement, for the two years following the expiration of the Side Letter Agreement (*i.e.,* until July 13, 2007) (the "Restricted Period"), Mr. Abboud agreed that "he will not, directly or indirectly . . . be associated as an owner, director, officer, employee, consultant or other participant with, any person, group, business enterprise or other entity which is engaged in or proposes to engage in the business of designing, licensing, manufacturing, marketing or distributing any products or services which are or would be competitive with the business of [JA Apparel] as then conducted or as such business may be reasonably expected to be conducted in the future anywhere in the world."  *(Id.* at ¶ 2(a).)

26.    Mr. Abboud further agreed that "at all times during the Restricted Period he will be obligated to obtain the prior written consent of [JA Apparel] . . . before becoming associated in any capacity with any person, group, business enterprise or other entity . . . which is engaged in or proposes to engage in the business of designing, licensing, manufacturing, marketing or distributing any products or services which could reasonably be expected to be competitive with the business of [JA Apparel] as then conducted or as then reasonably proposed to be conducted in the future." (Id. at ¶ 2(b).)

27.    The non-compete obligations in the Side Letter Agreement were a condition of the sale, for which Mr. Abboud received $65.5 million, and Mr. Abboud expressly acknowledged that the purchase price he was receiving in connection with the sale provided him with full and fair consideration for his non-competition obligations. (Id. at ¶ 2(c).)

28.    Mr. Abboud also acknowledged that his non-competition obligations were specifically bargained for in connection with the consummation of the sale transaction and that in the event he breached such obligations, JA Apparel "will be entitled to obtain equitable relief in the form of a preliminary or permanent injunction from any court of competent jurisdiction in order to enforce such agreements." (Id. at ¶ 2(d).)

29.    In addition to the clauses prohibiting Mr. Abboud from competing with or associating with any entity that competed with or proposed to compete with JA Apparel during the Restricted Period, the Side Letter Agreement referred to the Purchase and Sale Agreement and reiterated the fact that Mr. Abboud and Houndstooth had sold to JA Apparel all of the trade names, trademarks, service marks, logos, insignias, designations, trademark registrations, and applications relating to the Joseph Abboud business, and the goodwill related thereto, all licenses to use those trademarks, and all rights to use and apply for the registration of new trademarks containing the

words "Joseph Abboud" and certain abbreviations, and "anything similar thereto or derivative thereof." (Exhibit B, at p. 1.)

30.    Shortly after selling his business in 2000, Mr. Abboud became involved in an acrimonious dispute with the then new owners of JA Apparel (GFT USA/RCS), and JA Apparel's then President & CEO over Mr. Abboud's role in the creative process and in the company. Mr. Abboud brought a lawsuit against JA Apparel, RCS, and GFT alleging fraud and breach of contract, and another lawsuit against JA Apparel's former President & CEO, alleging breach of fiduciary duty, common law fraud, and tortious interference with contract.

31.    In 2003, GFT and RC decided to sell JA Apparel and all of its then wholly-owned subsidiaries. Subsequently, affiliates of J.W. Childs Associates, L.P. ("J.W. Childs") purchased the company for $73 million (and assumed certain debt) in a transaction that closed in March 31, 2004. Both before and after its acquisition by J.W. Childs, JA Apparel continued to own and use the ABBOUD marks.

32.    Mr. Abboud subsequently terminated his litigations against JA Apparel, its former owners and then President & CEO, and was given new responsibilities at JA Apparel by its current owners pursuant to an agreement that Mr. Abboud and the company documented in a June 29, 2004 Letter Agreement ("Letter Agreement") (attached as Exhibit C) in which they "reaffirm[ed] their commitment to the terms of the July 13, 2000 [Side Letter] Agreement," which, as expressed above, incorporates the terms of the Purchase and Sale Agreement, specifically reiterates the fact that JA Apparel acquired the ABBOUD marks, and provides for Mr. Abboud's non-compete obligations. (Exhibit C, ¶ 1, p. 1.)

33.    One provision of the Letter Agreement gave Mr. Abboud the right to purchase $1 million of the common stock of JA Holding, Inc., a company formed by J.W. Childs to facilitate

its acquisition of JA Apparel, which right Mr. Abboud subsequently exercised. (*Id.* at ¶ 3.) At the time of the Letter Agreement, that $1 million of JA Holding common stock represented 2.059% of the fully diluted equity of that company. The Letter Agreement further provided that "if the parties do not mutually agree to extend [Mr. Abboud's] role in JA Apparel Corp., JA Holding, Inc. shall have the right to 'call,' i.e. repurchase, 100% of [Mr. Abboud's] common stock in JA Holding, Inc. at the Cost Price of $1 million; and, [Mr. Abboud] shall have the right to 'put,' i.e. to require JA Holding, Inc. . . . to repurchase, 100% of [Mr. Abboud's] stock in JA Holding, Inc. at the Cost Price of $1 million." (*Id.* at ¶ 4.) The Letter Agreement also gave Mr. Abboud the opportunity to purchase additional JA Holding stock in the event he and JA Apparel agreed that he would continue working for JA Apparel after the July 13, 2005 expiration of the Personal Services Period. (*Id.* at ¶ 5.) Mr. Abboud was also given the aid of designers to assist him with his work and JA Apparel agreed to provide Mr. Abboud with access to its merchandising, marketing, publicity, and advertising services. (*Id.* at ¶¶ 8, 9.)

34.    In Spring 2005, prior to the end of the five-year period set forth in the Side Letter Agreement, Mr. Abboud informed JA Apparel that he did not wish to extend his role in JA Apparel and "put" his stock back to JA Apparel pursuant to the Letter Agreement in exchange for the $1 million that he paid to purchase it. Mr. Abboud left the company, and the Personal Service Period expired on July 13, 2005. At that point, the two-year non-compete clause went into effect, and continued through July 13, 2007. During the Restricted Period, Mr. Abboud never sought, and, accordingly, JA Apparel never granted him, any permission to compete with it or to become associated with anyone who competed with or proposed to compete with JA Apparel.

35.    In 2006, JA Apparel received unsolicited expressions of interest from several companies seeking to discuss a possible acquisition of JA Apparel. In the June 29, 2004 Letter

Agreement, JA Apparel had agreed to give Mr. Abboud an opportunity to bid on the company in the event that JA Apparel's board of directors decided to "conduct a formal auction process with multiple bidders for the sale of JA Apparel." (Exhibit C, ¶ 12.) Discussions with other parties soon followed, and in light of the fact that JA Apparel was in discussions with a number of potential acquirers (although a formal auction process was not being conducted), Mr. Abboud was given the opportunity to make a proposal to acquire JA Apparel. Mr. Abboud and a financial partner of his met with JA Apparel and executed a confidentiality agreement that permitted Mr. Abboud to inspect the confidential strategic, business, and financial information of JA Apparel. Mr. Abboud's discussions concerning a potential acquisition of JA Apparel indicated that Mr. Abboud was considering a price below the amount JA Apparel had determined it would need and substantially below the level at which the discussions with the other interested parties were taking place. Mr. Abboud was informed of that and he did not continue discussions with the company about an acquisition. JA Apparel subsequently decided not to pursue discussions with any parties at that time.

36.     As a result of his executing the confidentiality agreement, Mr. Abboud gained access to a broad range of strategic, financial and market information concerning JA Apparel and its future plans. That information would be of material value to any person, company, or entity seeking to compete with JA Apparel in the men's clothing business, because it included detailed information concerning, among other things, JA Apparel's revenues and profitability. Mr. Abboud did not have access to this information during the time he was associated with JA Apparel.

**B.    JA Apparel's Famous ABBOUD Marks and JA Apparel's Marketing, Advertising, Promotion and Sales Efforts Under the ABBOUD Marks**

37.    JA has used the "Joseph Abboud" mark on menswear and a wide variety of products for approximately twenty years. It owns the following valid, subsisting and existing registrations for the trade name, trademark and designation "Joseph Abboud" and for similar or derivative marks, for a variety of designer goods and services:    Reg. No. 2,690,336 (JOSEPH ABBOUD), Reg. No. 2,408,887 (JOSEPH ABBOUD), Reg. No. 2,408,660 (JOSEPH ABBOUD), Reg. No. 2,357,617 (JOSEPH ABBOUD), Reg. No. 2,345,776 (JOSEPH ABBOUD), Reg. No. 1,756,084 (JOSEPH ABBOUD), Reg. No. 1,675,915 (JOSEPH ABBOUD), Reg. No. 2,471,279 (JOSEPH ABBOUD), Reg. No. 2,408,889 (JOSEPH ABBOUD), Reg. No. 2,355,271 (JOSEPH ABBOUD & design mark), Reg. No. 3,199,722 (JOSEPH ABBOUD JEANS INC.), Reg. No. 2,976,156 (JOSEPH ABBOUD ENVIRONMENTS & design mark), and Reg. No. 2,796,710 (JOSEPH ABBOUD ENVIRONMENTS).   JA Apparel also owns the following three registrations for design marks that are used in connection with the sale of goods and services sold under the Joseph Abboud brand:  Reg. No. 2,400,258 (Design only), Reg. No. 2,419,195 (Design only) and Reg. No. 2,408,888 (Design only).  (These registrations are attached as Exhibit D.)

38.    In addition to those 16 registrations, JA Apparel owns the following trademark applications for ABBOUD marks used in connection with clothing, namely suits, formal and casual wear, footwear, eyewear, jewelry, bedding, and various other personal and home accessories:  Ser. No. 78,672,597 (JOSEPH ABBOUD PROFILE), Ser. No. 78,755,967 (JOE JOSEPH ABBOUD), Ser. No. 78,647,513 (JOSEPH ABBOUD JEANS INC. & design mark), Ser. No. 78,798,209 (JOSEPH ABBOUD SLEEP SPA), Ser. No. 77,140,249 (JOE JOSEPH ABBOUD & design mark),

Ser. No. 77,129,927 (JOE JOSEPH ABBOUD), Ser. No. 77,004,949 (JOSEPH ABBOUD), and Ser. No. 77,174,024 (JOSEPH ABBOUD GOLF).

39.    JA Apparel's tailored clothing, accessories, and furnishings that bear the ABBOUD marks are available for sale at specialty retailers and department stores throughout the United States, including Nordstrom, Saks Fifth Avenue, Neiman Marcus, Lord & Taylor, Bloomingdale's, Macy's Inc., Mitchells/Richards, and Parisian/Belk and other better department and speciality stores. JA Apparel primarily targets 35 to 54 year-old men and its high-end, high quality products are priced accordingly.

40.    JA Apparel has spent considerable time, money, and effort to promote the Joseph Abboud brand, and its attendant ABBOUD marks, as a symbol of quality and style in the fashion and home furnishings industry. Indeed, JA Apparel spends approximately $6.5 million dollars per year in advertising, marketing and promoting its ABBOUD marks. JA Apparel has made, and continues to make, extensive use of its ABBOUD marks in advertising, marketing and promoting throughout the United States and the world to identify its tailored clothing, sportswear collections, furnishings, home designs, and licensed products. For example, JA Apparel has spent substantial sums to promote its products under the ABBOUD marks during special events, and in a wide range of media, including nationally and internationally circulated newspapers and magazines, as well as the Internet. JA Apparel promotes its line of products in magazines, such as *GQ, Esquire,* and *Best Life.* JA Apparel works closely with its retailing customers, including department stores, to promote and advertise the brand.

41.    In addition, JA Apparel participates in major fashion trade shows in North America, including the New York Designer's Collective, Chicago Collective, MAGIC, Charlotte Collective, House and Home Chicago, and the Karvet Showroom event in Los Angeles.

42.    The Joseph Abboud brand, either through JA Apparel's own sales or through its licensed partners, is a worldwide brand. By the end of 2007, it will be present in over 30 countries. Based on the strength, recognition and value of the Joseph Abboud brand name, since the 2004 acquisition, JA Apparel's licensing revenue has increased over 300% and it has added over 25 new license partners.

43.    JA Apparel's extensive marketing, advertising, and promotion of its ABBOUD-branded merchandise under the ABBOUD marks have been highly successful, as demonstrated by the explosive growth in sales and its customers' strong affinity to the Joseph Abboud brand. In the United States alone, JA Apparel achieved $95 million in net wholesale sales in 2006, and, since the 2004 acquisition by J.W. Childs, the retail value of its worldwide sales has grown substantially from under $200 million in 2004 to approximately $300 million in 2007. The ABBOUD marks have become exceptionally well-known throughout the United States and abroad.

44.    As a result of JA Apparel's substantial use, sales, advertising, and promotion of the ABBOUD marks throughout the United States and abroad, the ABBOUD marks have become famous, have become distinctive of JA Apparel and its merchandise, and have come to serve to identify and indicate the source of JA Apparel's products to consumers, purchasers, and others. JA Apparel has developed for itself and its products branded with the ABBOUD marks substantial goodwill and an excellent reputation among actual and potential purchasers of its products and people associated with the competitive fashion industry. In addition, JA Apparel's ABBOUD marks have received substantial third party recognition in the media as identifying JA Apparel's products.

## C.    Defendants' Announcement of Their "jaz" Menswear Collection and Their Unauthorized Use of JA Apparel's ABBOUD Marks

45.    At around the end of the Restricted Period applicable to the non-compete clauses in Mr. Abboud's Side Letter Agreement, JA Apparel received reports from sources in the fashion industry that Mr. Abboud had already entered or was entering into some type of business relationship with one or more companies to launch a new line of apparel. Thereafter, on August 6, 2007, JA Apparel learned from an article published in *DNR* that defendants had entered into licensing and manufacturing agreements with various companies and individuals to design, manufacture, and market a Fall 2008 menswear collection called "jaz." (The August 6, 2007 *DNR* article is attached as Exhibit E.)

46.    The article reported that Mr. Abboud had already formed licensing partnerships for his new menswear line with (i) Jack Victor for tailored clothing; (ii) Cardinal Clothing for outerwear; and (iii) J.S. Blank for ties. All three of Mr. Abboud's licensees are direct competitors of JA Apparel. All three of Mr. Abboud's licensees are direct competitors of JA Apparel, and Cardinal Clothing had previously been JA Apparel's licensee. Mr. Abboud had also negotiated agreements with (i) Alden to acquire Alden for the production of his new, competitive shirt line; (ii) Merrill to acquire Merrill for the production of his new competitive sportswear line; and (iii) veteran menswear executive Robert Kidder to serve as president of Mr. Abboud's dress shirt subsidiary.

47.    It initially appeared from the *DNR* article that Mr. Abboud was going to honor JA Apparel's rights in the ABBOUD marks and was using the name "jaz" to avoid any confusion. Indeed, the *DNR* article, authored by David Lipke, noted that "Abboud, the person, is prohibited from using the Joseph Abboud name on any product or marketing materials." (Exhibit E.)

48.    Two days after the *DNR* article was published, however, Mr. Lipke forwarded to JA Apparel an email in which defendants had asked Mr. Lipke to issue a "correction" because

they believe they "are free to use [the Joseph Abboud] name in marketing materials, not on clothing." Indeed, Mr. Abboud or his representatives told Mr. Lipke that they viewed the "Joseph Abboud" name as "a very big asset to us" and to their "partners, future partners and accounts." (The email is attached as Exhibit F.)

49.    *DNR* obliged Mr. Abboud, and ran what it called a "Clarification" on the first page of its August 13, 2007 issue. The Clarification stated that "according to [Mr.] Abboud and his attorney, Theodore Dinsmoor, the designer . . . is, in fact, *allowed to use his own name on marketing and advertising materials for Jaz.*" (Emphasis added.) (The August 13, 2007 *DNR* article is attached as Exhibit G.)

50.    Defendants also expressed their intent to infringe in an article in *The Wall Street Journal* published on August 6, 2007 in which Mr. Abboud and his attorney stated that Mr. Abboud plans to promote his new label with the tagline "a new composition by designer Joseph Abboud." (The August 6, 2007 *The Wall Street Journal article* is attached as Exhibit H.)

51.    Neither Mr. Abboud, nor any of the other defendants, has any, nor was given any, authorization to use the ABBOUD marks in connection with a clothing line or "for any and all products or services," as set forth in the Purchase and Sale Agreement. (Exhibit A, ¶ 1.1.(C).)

52.    Defendants' use of the trademarks, trade names and designations "a new composition by designer Joseph Abboud" and "Joseph Abboud" in connection with their "jaz" clothing line and on marketing and advertising materials constitutes a breach of the Purchase and Sale Agreement because use of the phrase "a new composition by designer Joseph Abboud" in marketing and advertising is a barely discernable variation of the trade names, trademarks and designations "Joseph Abboud," "designed by Joseph Abboud," "by Joseph Abboud" "or anything

similar thereto or derivative thereof," which Mr. Abboud assigned to JA Apparel and which Mr. Abboud therefore cannot use. (Exhibit A, 1.1(a)(A)-(E).)

53. On information and belief, defendants' "jaz" line of clothing, which will bear the trade name, trademark and designation "a new composition by designer Joseph Abboud," or will otherwise use "Joseph Abboud," will be sold in many of the same department and retail stores that sell JA Apparel's "Joseph Abboud"-branded products and defendants will target a similar audience to that of JA Apparel. The "jaz" line, which defendants have called a "luxury collection," will be sold at similarly high price points as are JA Apparel's products. In addition, defendants' "jaz" line will be advertised using the trade name, trademark and designation "a new composition by designer Joseph Abboud" or will otherwise use "Joseph Abboud" in advertising channels that, on information and belief, will overlap with those of JA Apparel, including many of the same magazines, and will be presented at the same trade shows as JA Apparel's ABBOUD products.

**D.    Mr. Abboud's Breach of the Non-Compete Obligations in the Side Letter Agreement**

54. The August 6, 2007 *DNR* article that announced defendants' "jaz" collection also indicates that Mr. Abboud breached his non-compete obligations in the Side Letter Agreement. According to that article, during the week of July 30, 2007, Mr. Abboud displayed his new clothing collection to a *DNR* reporter at a meeting at Mr. Abboud's Bedford workspace, which was also attended by ten top executives of the three different licensees of Mr. Abboud's new products and two clothing manufacturers that Mr. Abboud had already negotiated agreements to acquire. Mr. Abboud and his new partners had agreed upon such detailed matters as the allocation of showroom space, channels of distribution, product sourcing, and the prices, fabrics, patterns, and colors of his new menswear line. (Exhibit E.) On information and belief, the breadth and specificity of the description

of Mr. Abboud's new business and menswear line is reflective of the extensive relationship he had developed with his new business partners over many months.

55.    On information and belief, the process of negotiating agreements with Jack Victor, Cardinal Clothing, J.S. Blank, Alden, Merrill, and Robert Kidder took months to accomplish and, thus, would not have been possible for Mr. Abboud to have completed in the less-than-three weeks between the expiration of the Restricted Period on July 13, 2007 and the meeting at his Bedford workspace during the week of July 30, 2007.

56.    The August 6, 2007 *DNR* article also featured pictures and descriptions of complete fashion designs and actual "jaz" garments, including suits and coats, as well as shirts bearing the "jaz" label. Indeed, the article included four color photos of models wearing "jaz" suits, sweaters, shirts, jackets, and pants, all finished and fully tailored. (Exhibit E.) On information and belief, it takes, at a minimum, six to nine months to develop a clothing line from design to product in hand and, thus, it would not have been possible for Mr. Abboud to have designed, obtained fabrics for, and produced these garments in the brief period between the expiration of the Restricted Period on July 13, 2007 and the photo shoot, which occurred at least several days prior to *DNR's* August 6, 2007 article. Instead, on information and belief, to have such garments ready to be photographed by that time, Mr. Abboud and his associates would have had to begun the process of designing, cutting, and producing them during the Restricted Period, in breach of the non-compete clauses in the Side Letter Agreement.

57.    Mr. Abboud failed to obtain JA Apparel's permission to enter into numerous associations with his current and potential business partners during the Restricted Period. By failing to obtain express written permission from JA Apparel prior to associating himself, in any capacity, with a party that competed, or which proposed to compete with JA Apparel, Mr. Abboud breached

the provision of the non-compete clause in the Side Letter Agreement that required him to obtain JA Apparel's written consent during the Restricted Period prior to becoming associated with such persons.

### E. The Likelihood of Confusion and Injury and Damage to JA Apparel and Its ABBOUD Marks that Results from Defendants' Unauthorized Use of the Trademarks, Trade Names, and Designations "a new composition by designer Joseph Abboud" or "Joseph Abboud"

58.     Defendants are not now, and have never been, authorized by JA Apparel to use the ABBOUD marks that Mr. Abboud and Houndstooth sold to JA Apparel in June 2000. Pursuant to the Purchase and Sale Agreement, and reaffirmed in subsequent agreements, Mr. Abboud and Houndstooth expressly sold to JA Apparel all of the trademarks, service marks, trademark registrations and applications, trade names, names, logos, insignias, and designations relating to the Joseph Abboud business, and the goodwill related thereto, all licenses to use those trademarks, and "[a]ll rights to use and apply for the registration of new trade names, trademarks, service marks, logos, insignias, and designations containing the words "Joseph Abboud," "designed by Joseph Abboud," and "by Joseph Abboud," "or anything similar thereto or derivative thereof, either alone or in conjunction with other words or symbols, for any and all products or services." (Exhibit A, 1.1(a)(A)-(E).) Thus, defendants' use of the trademarks, trade names, and designations "a new composition by designer Joseph Abboud" and "Joseph Abboud" on their "jaz" clothing line and on marketing and advertising materials is in clear breach of this enforceable and valid agreement.

59.     By using the trademarks, trade names, and designations "a new composition by designer Joseph Abboud" and "Joseph Abboud" on the "jaz" clothing line and on marketing and advertising materials, defendants are causing substantial and irreparable injury to JA Apparel and its valuable ABBOUD trademarks. Many actual and potential purchasers and consumers, upon

encountering defendants' trademark, trade name, and designation "a new composition by designer Joseph Abboud" or "Joseph Abboud" on their "jaz" clothing line and on marketing and advertising materials, and associated promotions, are likely to mistakenly believe that JA Apparel has in some way licensed, approved, or sponsored defendants' products, or that defendants' products have originated with, or are in some way affiliated with or related to, JA Apparel or its products sold under the ABBOUD marks. However, JA Apparel has no control over the nature or quality of the products manufactured and marketed by defendants under the infringing mark, and, as such, there is a real danger that defendants' use will reflect adversely on JA Apparel as the perceived source of origin or sponsor thereof. This mistaken perception is sure to damage JA Apparel's reputation and hamper its efforts to maintain and develop the reputation of the ABBOUD marks and products in a way that cannot be measured or quantified.

60.    The value associated with a trademark is especially significant in the fashion industry and among designers because consumers of designer products have a strong awareness of the status of the brand name. A consumer who is aware of JA Apparel's ABBOUD marks and product lines could easily be misled by Mr. Abboud's and the other defendants' flagrant use of the trademarks, trade names, and designations "a new composition from designer Joseph Abboud" and "Joseph Abboud" in their advertising, promotional, and marketing efforts.

61.    The use by defendants of the trademarks, trade names, and designations "a new composition by designer Joseph Abboud" and "Joseph Abboud" in connection with the "jaz" Fall 2008 menswear collection, in breach of the parties' Purchase and Sale Agreement, and in violation of JA Apparel's trademark and common law rights, has irreparably harmed, and will continue to harm, JA Apparel, and has caused, and will continue to cause, confusion because consumers will believe that JA Apparel has in some way licensed, approved, or sponsored

defendants' products, or that defendants' products are in some way affiliated with or related to JA Apparel or its products sold under the ABBOUD marks. Unless defendants' conduct is enjoined, JA Apparel will suffer irreparable injury for which there is no adequate remedy at law.

## FIRST CLAIM FOR RELIEF (AGAINST ALL DEFENDANTS)

### Trademark Infringement Under 15 U.S.C. § 1114(1)

62.    JA Apparel repeats and realleges paragraphs 1 through 61 of this Complaint as if set forth in full.

63.    Defendants' conduct infringes plaintiff's federally registered trademarks in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114(1).

64.    Defendants' use of the trademarks, trade names and designations "a new composition by designer Joseph Abboud" and "Joseph Abboud" on their "jaz" clothing line and on marketing and advertising materials is identical or nearly identical and confusingly similar to, and a colorable imitation of, the ABBOUD marks owned by JA Apparel, and infringes JA Apparel's trademark rights and interests in those marks. Defendants' unauthorized use of the ABBOUD marks is likely to cause confusion and mistake and to deceive the public as to the approval, sponsorship, license, source or origin of defendants' products.

65.    These wrongful acts were committed with knowledge that such imitation was intended to cause confusion, or to cause mistake, or to deceive.

66.    As a result of defendants' conduct, JA Apparel has been damaged and is entitled to damages, including but not limited to, defendants' profits from the sale of all infringing goods, actual damages, statutory damages, treble damages, corrective advertising damages, costs of litigation, and attorneys' fees.

67.    Defendants' willful and deliberate acts described above have caused irreparable injury to JA Apparel's goodwill and reputation, and, unless enjoined, will cause further irreparable injury, whereby JA Apparel has no adequate remedy at law.

## SECOND CLAIM FOR RELIEF (AGAINST ALL DEFENDANTS)

### False Designation of Origin Under 15 U.S.C. § 1125(a)

68.    JA Apparel repeats and realleges paragraphs 1 through 67 of this Complaint as if set forth in full.

69.    Defendants' conduct alleged above constitutes unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C.§ 1125(a).

70.    By their unauthorized use of the trademarks, trade names and designations "a new composition from designer Joseph Abboud" and "Joseph Abboud" on the "jaz" clothing line and on marketing and advertising materials, defendants have infringed JA Apparel's ABBOUD marks, falsely designated the origin of their products, and competed unfairly with plaintiffs, in violation of 15 U.S.C. § 1125(a).

71.    On information and belief, defendants' acts of false designation of origin and unfair competition have been done willfully and deliberately.

72.    JA Apparel has been damaged and/or is likely to be damaged by the wrongful conduct of defendants.

73.    Defendants' violations of 15 U.S.C. § 1125(a) entitle JA Apparel to recover damages, including but not limited to, defendants' profits from the sale of all infringing goods, actual damages, treble damages, corrective advertising damages, litigation costs, and attorneys' fees.

74.     Defendants' willful and deliberate acts described above have caused irreparable injury to plaintiffs' goodwill and reputation, and, unless enjoined, will cause further irreparable injury, whereby plaintiffs have no adequate remedy at law.

### THIRD CLAIM FOR RELIEF (AGAINST ALL DEFENDANTS)

### Trademark Dilution Under 15 U.S.C. § 1125(c)

75.     JA Apparel repeats and realleges paragraphs 1 through 74 of this Complaint as if set forth in full.

76.     The ABBOUD marks are distinctive and famous within the meaning of 15 U.S.C. § 1125(c), and were distinctive and famous prior to the date of defendants' conduct challenged herein.

77.     Defendants' conduct alleged above violates 15 U.S.C. § 1125(c), as amended by the Trademark Dilution Revision Act of 2006, in that it is likely to dilute and is diluting the distinctive quality of the ABBOUD trademarks. Defendants' use of the trademarks, trade names and designations "a new composition by designer Joseph Abboud" and "Joseph Abboud" on the "jaz" clothing line and on marketing and advertising materials is likely to create and has created an association between defendants' products and the ABBOUD marks owned by JA Apparel, which impairs the distinctiveness of JA Apparel's marks and lessens the capacity of the marks to identify and distinguish products marketed and sold by plaintiff and its licensees under those marks.

78.     On information and belief, defendants willfully and in bad faith intended to profit from the ABBOUD trademarks by trading on the valuable reputation of JA Apparel and the ABBOUD marks and causing dilution of the distinctive quality of these famous marks.

79.     Defendants' violations of 15 U.S.C. § 1125(c) entitle JA Apparel to recover damages, including but not limited to, defendants' profits from the sale of all infringing goods, actual damages, treble damages, corrective advertising damage, costs of suit, and attorneys' fees.

80.     Defendants' willful and deliberate acts described above have caused irreparable injury to plaintiff's goodwill and reputation, and, unless enjoined, will cause further irreparable injury, whereby plaintiff has no adequate remedy at law.

### FOURTH CLAIM FOR RELIEF (AGAINST ALL DEFENDANTS)

### Trademark Dilution Under New York Gen. Bus. Law § 360-l

81.     JA Apparel repeats and realleges paragraphs 1 through 80 of this Complaint as if set forth in full.

82.     This claim is for injury to goodwill and business reputation pursuant to New York General Business Law Section 360-1, as amended.

83.     The ABBOUD marks are distinctive within the meaning of New York General Business Law Section 360-1.

84.     Defendants' conduct alleged above causes injury to the goodwill and business reputation of JA Apparel and its ABBOUD marks and creates a likelihood of dilution of the distinctive quality of those marks in violation of New York General Business Law Section 360-1.

85.     Defendants' acts described above have caused injury and damages to plaintiff, and has caused irreparable injury to plaintiff's goodwill and business reputation and, unless enjoined, will cause further irreparable injury, whereby plaintiff has no adequate remedy at law.

### FIFTH CLAIM FOR RELIEF (AGAINST ALL DEFENDANTS)

#### Trademark Infringement and Unfair Competition Under State Common Law

86.     JA Apparel repeats and realleges paragraphs 1 through 85 of this Complaint as if set forth in full.

87.     Defendants' use of the trademarks, trade names, and designations "a new composition by designer Joseph Abboud" and "Joseph Abboud" on the "jaz" clothing line and on marketing and advertising materials, as alleged above, constitutes trademark infringement and unfair competition in violation of common law.

88.     On information and belief, defendants' acts of common law trademark infringement and unfair competition have been done willfully and deliberately and defendants have profited and been unjustly enriched by sales that defendants would not otherwise have made but for their unlawful conduct.

89.     Defendants' acts described above have caused injury and damages to plaintiff, and have caused irreparable injury to plaintiffs' goodwill and reputation and, unless enjoined, will cause further irreparable injury, whereby plaintiffs have no adequate remedy at law.

### SIXTH CLAIM FOR RELIEF (AGAINST ALL DEFENDANTS)

#### Deceptive Acts and Practices Under New York Gen Bus. Law §§ 349-350

90.     JA Apparel repeats and realleges paragraphs 1 through 89 of this Complaint as if set forth in full.

91.     This claim is for false advertising and deceptive acts and practices under New York General Business Law Sections 349 and 350, *et seq.*

92.     Defendants' use of the trademarks, trade name and designations "a new composition by designer Joseph Abboud" and "Joseph Abboud" on the "jaz" clothing line and on

marketing and advertising materials, as alleged above, constitutes false advertising and deceptive acts and practices in violation of New York General Business Law Sections 349 and 350, *et seq.*

93.     On information and belief, defendants' unlawful conduct has been willful and deliberate and defendants have profited and been unjustly enriched by sales that defendants would not otherwise have made but for their unlawful conduct.

94.     Defendants' intentional and wrongful acts described above have caused injury and damages to plaintiff, and have caused irreparable injury to plaintiff's goodwill and reputation and, unless enjoined, will cause further irreparable injury, whereby plaintiff has no adequate remedy at law.

## SEVENTH CLAIM FOR RELIEF (AGAINST MR. ABBOUD AND HOUNDSTOOTH)

### Breach of Contract (Purchase and Sale Agreement)

95.     JA Apparel repeats and realleges paragraphs 1 through 94 of this Complaint as if set forth in full.

96.     This claim is for breach of contract under state common law.

97.     The Purchase and Sale Agreement constitutes a binding contract between Mr. Abboud, Houndstooth and JA Apparel.

98.     JA Apparel has performed all of its obligations to Mr. Abboud and Houndstooth under the terms of the Purchase and Sale Agreement. On or about the time of the closing of that Agreement, in June 2000, JA Apparel paid $65.5 million to Mr. Abboud in exchange for the intellectual property assets and goodwill that Mr. Abboud and Houndstooth sold to JA Apparel.

99.     Mr. Abboud and Houndstooth have materially breached the terms of the Purchase and Sale Agreement by virtue of the acts alleged above.   In particular, in

paragraph 1.1(a)(C), Mr. Abboud and Houndstooth sold and assigned all of their right, title and

interest in any trade names, trademarks, service marks, logos, insignias, and designations containing

the words "Joseph Abboud," "designed by Joseph Abboud," "by Joseph Abboud," or "JA," "or

anything similar thereto or derivative thereof," either alone or in combination with other words or

symbols. Defendants intend to use, in connection with their "jaz" clothing line and on marketing

and advertising materials, the trademarks, trade names and designations "Joseph Abboud" and "a

new composition by designer Joseph Abboud," the latter of which is a barely discernable variation

of the trademarks, trade names, and designations "Joseph Abboud," "designed by Joseph Abboud,"

or "by Joseph Abboud," and plainly is similar to or derived from these trade names, trademarks and

designations. Hence, the use of the trademarks, trade names and designations "a new composition

by designer Joseph Abboud" and "Joseph Abboud" on the "jaz" clothing line and on marketing and

advertising materials by Mr. Abboud and Houndstooth is a clear breach of the Purchase and Sale

Agreement.

100.    As a direct and proximate result of Mr. Abboud and Houndstooth's breach

of contract described above, by which Mr. Abboud and Houndstooth have gained unfair competitive

damages, JA Apparel has suffered and will continue to suffer monetary damages, including but not

limited to substantial lost revenue.

101.    As a direct and proximate result of Mr. Abboud and Houndstooth's breach

of contract described above, JA Apparel has suffered and will continue to suffer irreparable injury

to its goodwill and reputation.

102.    Defendants' intentional and wrongful acts described above have caused injury

and damages to plaintiff, and have caused irreparable injury to plaintiff's goodwill and reputation

and, unless enjoined, will cause further irreparable injury, whereby plaintiff has no adequate remedy at law.

## EIGHTH CLAIM FOR RELIEF (AGAINST MR. ABBOUD)

### Breach of Contract (Side Letter Agreement - Non-Compete Provision)

103.    JA Apparel repeats and realleges paragraphs 1 through 102 of this Complaint as if set forth in full.

104.    The Side Letter Agreement constitutes a binding contract between Mr. Abboud and JA Apparel.

105.    JA Apparel has performed all of its obligations to Mr. Abboud under the terms of the Side Letter Agreement.

106.    On information and belief, Mr. Abboud has materially breached the terms of the Side Letter Agreement by virtue of the acts alleged above, including without limitation, prior to July 13, 2007, (i) designing a competitive line of menswear; (ii) obtaining fabrics for the new line; (iii) producing competitive garments; (iv) negotiating a license agreement with a competitor of JA Apparel for tailored clothing; (v) negotiating a license agreement with a competitor of JA Apparel for outerwear; (vi) negotiating a license agreement with a competitor of JA Apparel for neckwear; (vii) negotiating an agreement to acquire a manufacturer of men's shirts; (viii) negotiating an agreement to acquire a men's sportswear company; (ix) calling on retailers and wholesalers regarding distribution of the competitive line; (x) promoting the competitive line to members of the fashion press; (xi) recruiting employees for his competitive venture; (xii) engaging persons to provide marketing, public relations, advertising, legal and financial services for his competitive venture; and (xiii) associating himself with individuals and entities that competed and/or proposed to compete with JA Apparel.

107.    On information and belief, in addition to engaging in wrongful competitive activities in breach of the Side Letter Agreement prior to July 13, 2007, Mr. Abboud breached his obligation to obtain the written consent of JA Apparel during the Restricted Period prior to becoming associated in any capacity with any person or entity that was engaged in or proposed to engage in the business of designing, licensing, manufacturing, marketing or distributing products which were competitive with the products of JA Apparel.

108.    As a direct and proximate result of these breaches of contract, by which Mr. Abboud has gained unfair competitive advantages, JA Apparel has suffered and will continue to suffer harm to its goodwill and monetary damages, including but not limited to substantial lost revenue.

109.    As a direct and proximate result of these breaches of contract, JA Apparel has been and will continue to be irreparably harmed.

110.    Defendants' intentional and wrongful acts described above have caused injury and damages to plaintiff, and have caused irreparable injury to plaintiff's goodwill and reputation and, unless enjoined, will cause further irreparable injury, whereby plaintiff has no adequate remedy at law.

### NINTH CLAIM FOR RELIEF (AGAINST MR. ABBOUD AND HOUNDSTOOTH)

### Declaratory Judgment (Breach of Purchase and Sale Agreement)

111.    JA Apparel repeats and realleges paragraphs 1 through 110 of this Complaint as if set forth in full.

112.    There is an actual controversy among JA Apparel, Mr. Abboud and Houndstooth concerning the ownership of and right to use the trademarks, trade names, and

designations "a new composition by designer Joseph Abboud" and "Joseph Abboud" in connection with defendants' new "jaz" clothing line and in marketing and advertising materials for that line.

113.    As set forth more fully above, under the terms of the Purchase and Sale Agreement, JA Apparel, rather than defendants, owns all rights that exist in and to the ABBOUD marks, logos, insignias, and designations, all licenses to use the marks, logos, insignias, and designations, and all rights to use and apply for the registration of marks, logos, insignias, and designations containing the words "Joseph Abboud," "designed by Joseph Abboud," "by Joseph Abboud," or "JA," "or anything similar thereto or derivative thereof," either alone or in conjunction with other words or symbols, for any and all products or services.

114.    By virtue of the acts alleged more fully above, Mr. Abboud and Houndstooth have breached JA Apparel's contractual rights.  Specifically, Mr. Abboud has entered into agreements with Jack Victor, Cardinal Clothing, J.S. Blank, Alden and Merrill to produce, market and/or sell his new menswear collection in connection with the trademarks, trade names, and designations "a new composition by designer Joseph Abboud" and "Joseph Abboud" in violation of the terms of the Purchase and Sale Agreement.

115.    JA Apparel is entitled to a declaration that, pursuant to the Purchase and Sale Agreement, it owns all existing rights in and to the trademarks, trade names and designations "a new composition by designer Joseph Abboud" and "Joseph Abboud" for use with any products or services and in advertising and marketing and that the use of the trademarks, trade names and designations "a new composition by designer Joseph Abboud" and "Joseph Abboud" by defendants is in breach of the Purchase and Sale Agreement.

## TENTH CLAIM FOR RELIEF (AGAINST MR. ABBOUD)

### Declaratory Judgment (Breach of Side Letter Agreement - Non-Compete Provision)

116.    JA Apparel repeats and realleges paragraphs 1 through 115 of this Complaint as if set forth in full.

117.    There is an actual controversy between JA Apparel and Mr. Abboud in that Mr. Abboud has announced that he has been working with Jack Victor, Alden, Merrill, Cardinal Clothing, and J.S. Blank, each of which is a direct competitor of JA Apparel, in breach of the Side Letter Agreement.

118.    Mr. Abboud agreed that prior to July 13, 2007, he would not, *inter alia*, compete with or associate with any entity that competed with or proposed to compete with JA Apparel, without express written permission from JA Apparel.

119.    On information and belief, Mr. Abboud has materially breached the terms of the Side Letter Agreement by virtue of the acts alleged above, including without limitation, prior to July 13, 2007, (i) designing a competitive line of menswear; (ii) obtaining fabrics for the new line; (iii) producing competitive garments; (iv) negotiating a license agreement with a competitor of JA Apparel for tailored clothing; (v) negotiating a license agreement with a competitor of JA Apparel for outerwear; (vi) negotiating a license agreement with a competitor of JA Apparel for neckwear; (vii) negotiating an agreement to acquire a manufacturer of men's shirts; (viii) negotiating an agreement to acquire a men's sportswear company; (ix) calling on retailers and wholesalers regarding distribution of the competitive line; (x) promoting the competitive line to members of the fashion press; (xi) recruiting key employees for his competitive venture; (xii) engaging persons to provide marketing, public relations, advertising, legal and financial services for his competitive

venture; and (xiii) associating himself with individuals and entities that competed and/or proposed to compete with JA Apparel.

120. On information and belief, in addition to engaging in wrongful competitive activities in breach of the Side Letter Agreement prior to July 13, 2007, Mr. Abboud also breached his obligation to obtain the written consent of JA Apparel during the Restricted Period prior to becoming associated in any capacity with any person or entity that was engaged in or proposed to engage in the business of designing, licensing, manufacturing, marketing or distributing products which were competitive with the products of JA Apparel.

121. JA Apparel is entitled to a declaration that Mr. Abboud has breached the terms of the non-compete clause in the Side Letter Agreement.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays that this Court enter judgment against defendants as follows:

(A) Ordering that defendants be adjudged to have violated Sections 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a), to have committed acts of trademark infringement and unfair competition in violation of state common law, to have caused trademark dilution in violation of New York Gen. Bus. Law § 360-l, to have committed unfair competition and deceptive acts and in violation of New York Gen. Bus. Law §§ 349 and 350, *et seq.*, and to have committed breaches of contract in violation of state common law;

(B) Ordering an accounting of all gains, profits, savings and advantages realized by defendants from their aforesaid acts of false designation of origin, trademark infringement, unfair competition, dilution, deceptive acts and practices and breach of contract;

(C)     Awarding such damages as plaintiff shall establish in consequence of defendants' aforesaid acts of false designation of origin, trademark infringement, unfair competition, dilution, deceptive acts and practices and breach of contract, including three times the amount found as actual damages by the trier of fact to properly compensate plaintiff for its damages, pursuant to 15 U.S.C. § 1117(a), and, pursuant to New York Gen. Bus. Law § 349(h), statutory damages of $1,000 for each violation, together with appropriate interest thereon;

(D)     Awarding punitive damages on plaintiff's common law claims in an amount to be determined by the trier of fact for defendants' willful and unauthorized use of plaintiff's mark;

(E)     Granting a preliminary and permanent injunction restraining defendants, their officers, directors, agents, employees, servants, attorneys, successors, assigns and others controlling, controlled by or affiliated with them and all those in privity or active concert or participation with any of the foregoing, and all those who receive actual notice by personal service or otherwise:

(i)     from using, orally or in writing, the trade names, trademarks and designations "a new composition by designer Joseph Abboud" and "Joseph Abboud," or any other name, word, mark or designation confusingly similar to or dilutive of plaintiff's ABBOUD marks, for any and all products or services;

(ii)     from using, orally or in writing, or applying for registration of, any "trade names, trademarks, service marks, logos, insignias, and designations containing the words 'Joseph Abboud,' 'designed by Joseph Abboud,' 'by Joseph Abboud,' . . . or 'JA,' or anything similar thereto or derivative thereof, either alone or in conjunction with other words or symbols, . . . for any and all products or services";

(iii)    from representing that the "jaz" product line originates with, is sponsored by, emanates from, or otherwise is associated with plaintiff or the source of the Joseph Abboud brand;

(iv)    from otherwise competing unfairly with plaintiff; and

(v)    from competing with plaintiff for a period of time equal to the number of months, weeks and days that the Court determines that Mr. Abboud was in breach of the non-competition obligations of his Side Letter Agreement prior to July 13, 2007.

(F)    Ordering that, pursuant to Section 34(a) of the Lanham Act, 15 U.S.C. § 1116(a), defendants shall serve upon plaintiff within thirty (30) days after service on defendants of an injunction, or such extended period as the Court may direct, a report in writing under oath setting forth in detail the manner and form in which defendants have complied with the injunction;

(G)    Ordering defendants to recall from publication, distribution or dissemination, and deliver up for destruction, all advertising, marketing, promotional pieces and other items, the dissemination of which by defendants would violate the injunction herein granted;

(H)    Awarding plaintiffs their costs and expenses of this action;

(I)    Declaring that this is an exceptional case, pursuant to 15 U.S.C. § 1117, because of the willful and deliberate nature of defendants' acts of false designation of origin and unfair competition, and awarding plaintiffs their reasonable attorneys' fees;

(J)    Awarding plaintiffs their reasonable attorneys' fees; and

(K)    Granting such other and further relief as this Court may deem just and proper.

31515406.WPD

Dated: September 4, 2007
       New York, New York

                                    KAYE SCHOLER LLP


                                    By:  ___s/_____
                                          Thomas A. Smart
*Of counsel:*                             Phillip A. Geraci
John D. Geelan                            425 Park Avenue
Richard A. De Sevo                  New York, New York  10022
Victoria Haje                       (212) 836-8000
Patricia Ryder                      *Attorneys for Plaintiff JA Apparel Corp.*