UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

JA APPAREL CORP.,                                         :

           Plaintiff,                          :        Civil Action No. 07-cv- ____

    v.                                                :

JOSEPH ABBOUD, HOUNDSTOOTH CORP., and             :
HERRINGBONE CREATIVE SERVICES, INC.,

                                     :

           Defendants.                        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

### DECLARATION OF ERIC SPIEL IN SUPPORT OF PLAINTIFF'S REQUEST FOR AN ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT BE ENTERED

I, Eric Spiel, declare pursuant to 28 U.S.C. § 1746 as follows:

1.  I am the Senior Vice President and Chief Financial Officer ("CFO") of JA Apparel, Corp. ("JA Apparel") and have served in that capacity since February 2004. Prior to that, I was employed at J. Crew as Senior Vice President of Finance and Store Operations. I have been employed in the apparel business in various capacities for eight years and, generally, in the retail and wholesale business for 21 years. As the Senior Vice President and CFO of JA Apparel, I am responsible for financial planning, budgeting, forecasting, capital spending, treasury, financial and strategic reporting and analysis, and human resources, legal and information technology. As a senior member of the company's executive team, I am fully familiar with all aspects of the company's business and with the company's assets, including its intellectual property.

2. Except where otherwise stated, I make this declaration based upon my personal knowledge and the records of JA Apparel. I am over 18 years of age and can competently testify to the matters set forth herein. I submit this declaration in support of JA Apparel's order to show cause why a preliminary injunction should not issue forthwith (a) preliminarily enjoining defendants from manufacturing, advertising, marketing, promoting, or selling any goods or services by using the trade names, trademarks, and designations "a new composition by designer Joseph Abboud" and "Joseph Abboud" "or anything similar or derivative thereof" in connection with a new line of clothing called "jaz," and in marketing and advertising materials for that line, which is being offered for sale for the Fall 2008 menswear season, on the grounds that such use constitutes, *inter alia*, trademark infringement under federal and state law and a breach of contract; and (b) requiring defendants to destroy any and all products, advertising, labels, point of sale material, and promotional matter or materials that contain the trade names, trademarks, and designations "a new composition by designer Joseph Abboud" and "Joseph Abboud" in connection with "jaz" clothing. I also submit this declaration in support of JA Apparel's application by way of order to show cause for expedited discovery in aid of a preliminary injunction.

3. This action arises from defendants' unauthorized use of the trade names, trademarks and designations "a new composition by designer Joseph Abboud" and "Joseph Abboud" "or anything similar or derivative thereof" in connection with a new line of menswear. Mr. Abboud's announced intent to use the trade names, trademarks, and designations "a new composition by designer Joseph Abboud" and "Joseph Abboud" in advertising, marketing and promoting his new menswear line "jaz" constitutes a clear breach of a prior written agreement between JA Apparel, Mr. Abboud and Houndstooth Corp. ("Houndstooth") in which Mr.

Abboud and Houndstooth, among other things, sold all rights to JA Apparel to use the names, trademarks, trade names, service marks, logos, insignias and designations that include the name Joseph Abboud as well as new trade names, trademarks, service marks, logos, insignias and designations containing the words "Joseph Abboud," "designed by Joseph Abboud," "by Joseph Abboud" "or anything similar thereto or derivative thereof" (collectively, "the ABBOUD marks"). (*See* ¶ 10 below for a detailed description of the ABBOUD marks). Defendants' conduct is irreparably injuring, and unless enjoined, will continue to irreparably injure, JA Apparel by unlawfully trading on the goodwill and reputation of the ABBOUD marks, which marks were sold to JA Apparel by Mr. Abboud for $65.5 million.

**JA Apparel, Its Relationship with Designer**
**Joseph Abboud, and the ABBOUD Trademarks**

4.  JA Apparel, founded in 1988, is the owner of the Joseph Abboud brand name and numerous marks that incorporate, or are variations of, that brand name. Since its inception, JA Apparel's retail worldwide sales of its men's and boys' clothing, accessories, and home furnishings have reached approximately $300 million. Although once strictly a menswear line, the Joseph Abboud brand now appears on products such as eyewear, hosiery, jeans, scarves, jewelry, luggage, small leather goods, outerwear, sleepwear, and rainwear, as well as a home collection, including bath accessories, bedding, dinnerware, and flatware, and a large range of other goods.

5.  I understand JA Apparel was formed when Mr. Abboud, a fashion designer, through his wholly-owned corporation, Houndstooth, entered into a joint venture arrangement with GFT USA, Inc. ("GFT"), a subsidiary of the Italian company RCS MediaGroup S.p.A. ("RCS"), to manufacture, market, and sell various products under the Joseph Abboud brand name. When the joint venture was terminated in 1996, JA Apparel became a wholly-owned

subsidiary of GFT. From 1988 onward, JA Apparel used the ABBOUD marks in the manufacture, marketing, and sale of its products and continues such use today.

6.   On June 16, 2000, JA Apparel entered into an agreement with Mr. Abboud and Houndstooth pursuant to which Mr. Abboud and Houndstooth sold all the ABBOUD marks, and their related goodwill, as well as any license agreements pertaining to those marks to JA Apparel, for a purchase price of $65.5 million. (The "Purchase and Sale Agreement," attached as Exhibit 1.) The Purchase and Sale Agreement provided that every dollar of the $65.5 million payment amount "shall be allocated 100% to [Mr.] Abboud." (*Id.* at ¶ 1.2.)

7.   The terms of sale in the Purchase and Sale Agreement were clear and explicit that in exchange for the $65.5 million payment, Mr. Abboud and Houndstooth were selling all of their interest in the ABBOUD trademarks, including new trade names, service marks, logos, insignias, and designations. The agreement, in relevant part, states:

> 1.1 (a) Upon the terms and subject to the conditions of this Agreement, on the Closing Date (as hereinafter defined), the Sellers shall sell, convey, transfer, assign and deliver to the Buyer, and the Buyer shall purchase and acquire from the Sellers, all of the Sellers' right, title and interest in and to:
>
> (A)     The names, trademarks, trade names, service marks, logos, insignias and designations identified on Schedule 1.1(a)(A) [which includes 11 marks registered in the United States that include the words Joseph Abboud or JA],[1] and all trademark registrations and applications

---

[1]     Schedule 1.1(a)(A) to the Purchase and Sale Agreement includes numerous marks registered in the United States and abroad. The U.S. trademark registrations listed in Schedule 1.1(a)(A) for the JOSEPH ABBOUD mark are: Reg. Nos. 1,756,084 and 1,675,915. Also included in Schedule 1.1(a)(A) are the following trademark applications for the JOSEPH ABBOUD mark that have since become registered marks: Ser. No. 75,769,266 (Reg. No. 2,345,776), Ser. No. 75,902,628 (Reg. No. 2,471,279), Ser. No. 75,772,376 (Reg. No. 2,357,617), Ser. No. 75,906,922 (Reg. No. 2,408,889) and Ser. No. 75,906,918 (Reg. No 2,408,887). Schedule 1.1(a)(A) further lists Reg. No. 1,773,480 (design mark), Reg. No. 1,802,766 (J.O.E. JUST ONE EARTH AN ENVIRONMENT OF STYLE), Reg. No. 1,648,203 (JA II & design mark), Reg. No. 1,893,638 (JUST ONE EARTH), and Ser. No. 75,906,917 (design mark), along with the following trademark applications that have since become registered marks: Ser. No. 75,772,402 (now Reg. No 2,355,271) (JOSEPH ABBOUD & design), Ser. No. 75,906,921 (now Reg. No. 2,408,888) (design mark), Ser. No. 75,902,629 (now Reg. No. 2,419,195) (design mark), and Ser. No.

(continued...)

therefor, and the goodwill related thereto (collectively, the "Trademarks"),
. . .

(B)    All licenses to use the Trademarks granted by Houndstooth or Abboud . . . (collectively, the "License Agreements").

(C)    All rights to use and apply for the registration of new trade names, trademarks, service marks, logos, insignias and designations containing the words "Joseph Abboud," "designed by Joseph Abboud," "by Joseph Abboud," "JOE" or "JA," or anything similar thereto or derivative thereof, either alone or in conjunction with other words or symbols (collectively, the "New Trademarks"), for any and all products or services.

(D)    All books, financial records, invoices, and other documents, records and data files relating primarily to the Trademarks or the License Agreements.

(E)    The goodwill of or pertaining to the Trademarks.

(Exhibit 1, at ¶ 1.1(a)(A) - (E).)

8.    Thus, by virtue of the Purchase and Sale Agreement, JA Apparel owns numerous trademark registrations and applications for various ABBOUD marks (described in further detail in ¶¶ 10 & 11) under which it currently sells, licenses, and promotes tailored clothing, furnishings, and sportswear for men and boys, casual clothing, a variety of home ware, and numerous other products. JA Apparel has complied with all of its obligations under the Purchase and Sale Agreement.

9.    As CFO, I am fully familiar with the assets and all of the finances of JA Apparel. Having been involved in the due diligence and valuations performed in conjunction with the acquisition of JA Apparel by affiliates of J.W. Childs Associates, L.P. ("J.W. Childs") (described in further detail in ¶ 26), I understand that Mr. Abboud was paid $65.5 million for the ABBOUD trademarks, trade names, and designations and the goodwill and records relating to

---

75,878,009 (now Reg. No. 2,400,258) (design mark). *See* Schedule 1.1(a)(A) to Exhibit 1 for a complete list of marks that were transferred to JA Apparel pursuant to the Purchase and Sale Agreement.

that intellectual property. The $65.5 million was not paid for plants, equipment, factories, fabric, thread, real estate, or any other physical assets. Mr. Abboud was paid the very substantial sum of $65.5 million for the intellectual property and goodwill.

**JA Apparel's Marketing, Advertising,**
**Promotion and Sales Efforts Under the ABBOUD Marks**

10. JA has used the "Joseph Abboud" mark on menswear and a wide variety of products for some twenty years. It owns the following valid, subsisting and existing registrations for the name, mark or designation "Joseph Abboud" and for similar or derivative marks, for a variety of designer goods and services: Reg. No. 2,690,336 (JOSEPH ABBOUD), Reg. No. 2,408,887 (JOSEPH ABBOUD), Reg. No. 2,408,660 (JOSEPH ABBOUD), Reg. No. 2,357,617 (JOSEPH ABBOUD), Reg. No. 2,345,776 (JOSEPH ABBOUD), Reg. No. 1,756,084 (JOSEPH ABBOUD), Reg. No. 1,675,915 (JOSEPH ABBOUD), Reg. No. 2,471,279 (JOSEPH ABBOUD), Reg. No. 2,408,889 (JOSEPH ABBOUD), Reg. No. 2,355,271 (JOSEPH ABBOUD & design mark), Reg. No. 3,199,722 (JOSEPH ABBOUD JEANS INC.), Reg. No. 2,976,156 (JOSEPH ABBOUD ENVIRONMENTS & design mark), and Reg. No. 2,796,710 (JOSEPH ABBOUD ENVIRONMENTS). JA Apparel also owns the following three registrations for design marks that are used in connection with the sale of goods and services sold under the Joseph Abboud brand: Reg. No. 2,400,258 (Design only), Reg. No. 2,419,195 (Design only) and Reg. No. 2,408,888 (Design only). (These registrations are attached as Exhibit 2.)

11. In addition to those 16 registrations, JA Apparel owns the following trademarks for ABBOUD marks used in connection with clothing, namely suits, formal and casual wear, footwear, eyewear, jewelry, bedding, and various other personal and home accessories: Ser. No. 78,672,597 (JOSEPH ABBOUD PROFILE), Ser. No. 78,755,967 (JOE JOSEPH ABBOUD), Ser. No. 78,647,513 (JOSEPH ABBOUD JEANS INC. & design mark),

Ser. No. 78,798,209 (JOSEPH ABBOUD SLEEP SPA), Ser. No. 77,140,249 (JOE JOSEPH ABBOUD & design mark), Ser. No. 77,129,927 (JOE JOSEPH ABBOUD), Ser No. 77,004,949 (JOSEPH ABBOUD), and Ser. No. 77,174,024 (JOSEPH ABBOUD GOLF).     (These applications are attached as Exhibit 3.)

12. JA Apparel's tailored clothing, accessories, and furnishings that bear the ABBOUD marks are available for sale at specialty retailers and department stores throughout the United States, including Nordstrom, Saks Fifth Avenue, Neiman Marcus, Lord & Taylor, Bloomingdale's, Macy's Inc., Mitchells/Richards, Parisian/Belk, and Mark Shale, and other better department and specialty stores.  JA Apparel primarily targets 35 to 54 year-old men and its high-end, high quality products are priced accordingly.  For example, the price range of Joseph Abboud suits is $695 to $1,085 and sport coats is $475 to $895.

13. JA Apparel has spent considerable time, money, and effort to promote the Joseph Abboud brand, and its attendant ABBOUD marks, as a symbol of quality and style in the fashion and home furnishings industry.  JA Apparel has made, and continues to make, extensive use of its ABBOUD marks in advertising, marketing, and promoting throughout the United States and the world to identify its tailored clothing, sportswear collections, furnishings, home designs, and licensed products.  JA Apparel spends approximately $6.5 million per year in advertising, marketing, and promoting its products under the ABBOUD marks in a wide range of media, including nationally and internationally circulated newspapers and magazines and the Internet.  JA Apparel advertises, promotes, and markets its line of products in magazines, such as *GQ*, *Esquire*, and *Best Life*.  JA Apparel works closely with its retailing customers, including department stores, to promote, advertise, and market the brand.

14. I attach representative samples of JA Apparel's use of some of its ABBOUD trademarks. (*See* Exhibit 4.).

15. In addition, JA Apparel participates in major fashion trade shows in North America, including the New York Designer's Collective, Chicago Collective, MAGIC, House and Home Chicago, and the Karvet Showroom event in Los Angeles.

16. JA Apparel's promotional efforts have been highly successful.  In the United States alone, JA Apparel achieved $95 million in wholesale sales in 2006, and, since the 2004 acquisition by J.W. Childs, the retail value of its retail worldwide sales has grown substantially from under $200 million in 2004 to approximately $300 million in 2007.  The ABBOUD marks have become exceptionally well-known throughout the United States and abroad.

17. The Joseph Abboud brand, through JA Apparel's domestic wholesale sales, and through our licensed partners' international sales, is a worldwide brand.  By the end of 2007, it will be present in over 30 countries and it continues to expand.  Based on the strength, recognition and value of the Joseph Abboud brand name, since the 2004 acquisition, our licensing revenue has increased over 300% and we have added over 25 new license partners.

18. As a result of JA Apparel's substantial use, sales, advertising, and promotion of the ABBOUD marks throughout the United States and abroad, the ABBOUD marks have become famous and have come to serve to identify and indicate the source of JA Apparel's products to consumers, purchasers, and others.  JA Apparel has developed for itself and its products branded with the ABBOUD marks substantial goodwill and an excellent reputation among actual and potential purchasers of its products and people associated with the competitive fashion industry.  In addition, JA Apparel's ABBOUD marks have received substantial third party recognition in the media as identifying JA Apparel's products.  (*See* Exhibit 5).

**Mr. Abboud's Non-Competition Obligations**

19. In connection with the Purchase and Sale Agreement, and in consideration of the consummation of the Purchase and Sale Agreement, JA Apparel and Mr. Abboud also entered into a side letter agreement pursuant to which Mr. Abboud agreed to serve as Chairman Emeritus of JA Apparel and to provide, *inter alia*, consulting services relating to fashion design and brand promotion of the products sold by JA Apparel under the ABBOUD marks. (The "Side Letter Agreement," attached as Exhibit 6.)  Mr. Abboud agreed to render these services for a period of five (5) years (the "Personal Services Period"), which expired on July 13, 2005.

20. Pursuant to the Side Letter Agreement, for a period of two years after the end of the Personal Services Period (*i.e.*, until July 13, 2007) (the "Restricted Period"), Mr. Abboud agreed that "he will not directly or indirectly . . . be associated as an owner, director, officer, employee, consultant or other participant with, any person, group, business enterprise or other entity which is engaged in or proposes to engage in the business of designing, licensing, manufacturing, marketing or distributing any products or services which are or would be competitive with the business of [JA Apparel] as then conducted or as such business may be reasonably expected to be conducted in the future anywhere in the world." (Exhibit 6 at ¶ 2(a).)

21. Mr. Abboud further agreed that "at all times during the Restricted Period he will be obligated to obtain the prior written consent of [JA Apparel] . . . before becoming associated in any capacity with any person, group, business enterprise or other entity . . . which is engaged in or proposes to engage in the business of designing, licensing, manufacturing, marketing or distributing any products or services which could reasonably be expected to be competitive with the business of [JA Apparel] as then conducted or as then reasonably proposed to be conducted in the future." (*Id.* at ¶ 2(b).)

22. The non-compete obligations in the Side Letter Agreement were a condition of the sale of intellectual property and goodwill documented in the Purchase and Sale Agreement, for which Mr. Abboud received $65.5 million, and Mr. Abboud expressly acknowledged that the purchase price he was receiving in connection with the sale provided him with full and fair consideration for his non-competition obligations. (*Id.* at ¶ 2(c).)

23. Mr. Abboud also acknowledged that his non-competition obligations were specifically bargained for in connection with the consummation of the sale transaction and that in the event he breached such obligations, JA Apparel "will be entitled to obtain equitable relief in the form of a preliminary or permanent injunction from any court of competent jurisdiction in order to enforce such agreements." (*Id.* at ¶ 2(d).)

24. In addition to the clauses prohibiting Mr. Abboud from competing with or associating with any entity which competed with or proposed to compete with JA Apparel during the Restricted Period, the Side Letter Agreement referred to the Purchase and Sale Agreement and reiterated the fact that Mr. Abboud and Houndstooth had sold to JA Apparel all of the trademarks, trade names, service marks, logos, insignias, designations, trademark registrations, and applications relating to the Joseph Abboud business, and the goodwill related thereto, all licenses to use those trademarks and all rights to use and apply for the registration of new trade names, trademarks and designations containing the words "Joseph Abboud" and certain abbreviations, or "anything similar thereto or derivative thereof." (*Id.* at p. 1.)

**Mr. Abboud's Departure from JA Apparel**

25. Based on the due diligence work performed in connection with the acquisition of JA Apparel by J.W. Childs, I learned that shortly after selling his intellectual property and goodwill to JA Apparel in 2000, Mr. Abboud became involved in an acrimonious dispute with the then owners of JA Apparel (GFT USA/RCS) and JA Apparel's then President and CEO over Mr. Abboud's role in the creative process and in the company. Mr. Abboud brought a lawsuit against JA Apparel, RCS, and GFT alleging fraud and breach of contract and another lawsuit against JA Apparel's former President and CEO, alleging breach of fiduciary duty, common law fraud, and tortious interference with contract.

26. In 2003, GFT and RCS decided to sell JA Apparel and all of its wholly-owned subsidiaries. Subsequently, affiliates of J.W. Childs purchased the company for $73 million and the assumption of certain debt, in a transaction that closed on March 31, 2004. At this time, Marty Staff became JA Apparel's new President and CEO and I became its CFO. Both before and after its acquisition by J.W. Childs, JA Apparel continued to own and use all of the ABBOUD marks.

27. Mr. Abboud subsequently terminated his litigations against JA Apparel, its former owners and then President and CEO, and was given new responsibilities at JA Apparel by its current owners pursuant to a June 29, 2004 letter agreement ("Letter Agreement") (attached as Exhibit 7) in which they "reaffirm[ed] their commitment to the terms of the July 13, 2000 [Side Letter Agreement]," which, as expressed above, incorporates the terms of the Purchase and Sale Agreement, specifically reiterates the fact that JA Apparel acquired the ABBOUD marks, and provides for Mr. Abboud's non-compete obligations. (Exhibit 7, ¶ 1.) One provision of the Letter Agreement gave Mr. Abboud the right to purchase $1 million of the common stock of JA

Holding, Inc., the parent company of JA Apparel, which was formed by J.W. Childs to facilitate its acquisition of JA Apparel.  Mr. Abboud subsequently exercised this right.  (Exhibit 7, ¶ 3.) At the time of the Letter Agreement, that $1 million of JA Holding common stock represented 2.059% of the fully diluted equity of that company.  The Letter Agreement further provided that "if the parties do not mutually agree to extend [Mr. Abboud's] role in JA Apparel Corp., JA Holding, Inc. shall have the right to 'call,' i.e. repurchase, 100% of [Mr. Abboud's] common stock in JA Holding, Inc. at the Cost Price of $1 million; and, [Mr. Abboud] shall have the right to 'put,' i.e. to require JA Holding, Inc. . . . to repurchase, 100% of [Mr. Abboud's] stock in JA Holding, Inc. at the Cost Price of $1 million." (Exhibit 7, ¶ 4.)  The Letter Agreement also gave Mr. Abboud the opportunity to purchase additional JA Holding stock in the event he and JA Apparel agreed that he would continue working for JA Apparel after the July 13, 2005 expiration of the Personal Services Period.  (*Id.* at ¶ 5.)  Mr. Abboud was also given the aid of designers to assist him with his work and JA Apparel agreed to provide Mr. Abboud with access to its merchandising, marketing, publicity and advertising services.  (*Id.* at ¶¶ 8, 9.)

28. In Spring 2005, prior to the end of the five-year period set forth in the Side Letter Agreement, Mr. Abboud informed JA Apparel that he did not wish to extend his role in JA Apparel and "put" his stock back to JA Apparel pursuant to the Letter Agreement in exchange for the $1 million that he paid to purchase it.  Mr. Abboud left the company, and the Personal Service Period expired on July 13, 2005.  At that point, the two-year non-compete clause went into effect, and continued through July 13, 2007.  During the Restricted Period, Mr. Abboud never sought, and, accordingly, JA Apparel never granted him (nor would it have had he asked), any permission to compete with it or become associated with anyone who competed with or proposed to compete with JA Apparel.

29. In 2006, subsequent to Mr. Abboud's departure from the company, JA Apparel received unsolicited expressions of interest from several companies seeking to discuss a possible acquisition of JA Apparel. We engaged an investment banking firm to advise us concerning these overtures and our banker eventually provided financial information concerning the company to a number of potential acquirers. In the June 29, 2004 Letter Agreement, JA Apparel had agreed to give Mr. Abboud an opportunity to bid on the company in the event that our board of directors decided to "conduct a formal auction process with multiple bidders for the sale of JA Apparel." (Exhibit 7, ¶ 12.) Discussions with other parties soon followed, and in light of the fact that we were in discussions with a number of potential acquirers (although a formal auction process had not been conducted), Mr. Abboud was given the opportunity to make a proposal to acquire JA Apparel. Mr. Abboud and a financial partner of his met with JA Apparel and executed a confidentiality agreement that permitted Mr. Abboud to inspect the confidential strategic, business, and financial information of JA Apparel. Mr. Abboud's discussions concerning a potential acquisition of JA Apparel indicated that Mr. Abboud was considering a price below the amount JA Apparel had determined it would consider and substantially below the level at which the discussions with other interested parties were taking place. Mr. Abboud was informed of that and he did not continue discussions with the company about an acquisition. JA Apparel subsequently decided not to pursue discussions with any parties at that point in time.

30. As a result of his executing the confidentiality agreement, Mr. Abboud gained access to a broad range of strategic, financial, and market information concerning JA Apparel and its future plans. That information would be of material value to any person, company, or entity seeking to compete with JA Apparel in the men's clothing business, because it included

detailed information concerning, among other things, our revenues, profitability, and future strategic plans. Mr. Abboud did not have access to this information during the time he was associated with JA Apparel.

**Defendants' Announcement of Their "jaz" Menswear**
**Collection and Their Unauthorized Use of JA Apparel's ABBOUD Marks**

31. At around the end of the Restricted Period applicable to the non-compete clauses in Mr. Abboud's Side Letter Agreement, we received reports from sources in the fashion industry that Mr. Abboud had already entered or was entering into some type of business relationship with one or more companies to launch a new line of apparel. Thereafter, on August 6, 2007, JA Apparel learned from an article published in *DNR*, the leading magazine of the men's fashion industry, that defendants had entered into licensing and manufacturing agreements with various companies and individuals to design, manufacture, and market a Fall 2008 menswear collection called "jaz." (The August 6, 2007 *DNR* article is attached as Exhibit 8.)

32. The article reported that Mr. Abboud had already formed licensing partnerships for his new menswear line with (i) Jack Victor Ltd. ("Jack Victor") for tailored clothing; (ii) Cardinal Clothing Canada, Inc. ("Cardinal Clothing") for outerwear; and (iii) J.S. Blank & Co. ("J.S. Blank") for ties. All three of Mr. Abboud's licensees are direct competitors of JA Apparel, and Cardinal Clothing had previously been JA Apparel's licensee. Mr. Abboud had also negotiated agreements with (i) Alden Street Shirt, Co. LLC ("Alden") to acquire Alden for the production of his new, competitive shirt line; (ii) Merrill Sharpe Ltd. ("Merrill") to acquire Merrill for the production of his new competitive sportswear line; and (iii) veteran menswear executive Robert Kidder to serve as president of Mr. Abboud's dress shirt subsidiary.

33. It initially appeared from the *DNR* article that Mr. Abboud was going to honor JA Apparel's rights in the ABBOUD marks and was using the name "jaz" to avoid any

confusion.  Indeed, the *DNR* article, written by reporter David Lipke, noted that "Abboud, the person, is prohibited from using the Joseph Abboud name on any product or marketing materials." (Exhibit 8, p.12.)

34. Two days after the *DNR* article was published, however, Mr. Lipke forwarded to JA Apparel an email from defendants in which defendants asked Mr. Lipke to issue a "correction" because they believed that they "are free to use [the Joseph Abboud] name in marketing materials."  Moreover, Mr. Abboud or his representatives told Mr. Lipke that they viewed the "Joseph Abboud" name as "a very big asset to us" and to their "partners, future partners and accounts."  (Mr. Lipke's email to JA Apparel is attached as Exhibit 9.)

35. *DNR* obliged Mr. Abboud, and ran what it called a "Clarification" on the first page of its August 13, 2007 issue.  The Clarification stated that "according to [Mr.] Abboud and his attorney, Theodore Dinsmoor, the designer . . . is, in fact, *allowed to use his own name on marketing and advertising materials for Jaz*." (Emphasis added) (The August 13, 2007 *DNR* article is attached as Exhibit 10.)

36. Defendants also expressed their intent to infringe JA Apparel's rights in an article in *The Wall Street Journal* published on August 6, 2007 in which Mr. Abboud and his attorney stated that Mr. Abboud plans to promote his new label with the tagline "a new composition by designer Joseph Abboud."  (The August 6, 2007 *The Wall Street Journal* article is attached as Exhibit 11.)

37. Neither Mr. Abboud, nor any of the other defendants, has any, nor was given any, authorization to use the ABBOUD marks in connection with a clothing line or "for any and all products or services" as set forth in the Purchase and Sale Agreement.  (Exhibit 1, ¶ 1.1.(C).) Defendants' use of the trade names, trademarks and designations "a new composition by

designer Joseph Abboud" and "Joseph Abboud" on their "jaz" clothing line and on marketing and advertising materials constitutes a breach of the Purchase and Sale Agreement because "a new composition by designer Joseph Abboud" is a barely discernable variation of the trade names, trademarks and designations "Joseph Abboud," "designed by Joseph Abboud," "by Joseph Abboud" "or anything similar thereto or derivative thereof," which Mr. Abboud assigned to JA Apparel and which Mr. Abboud therefore cannot use.  (Exhibit 1, ¶ 1.1(a)(A)-(E).)

38. Based on the published reports and my knowledge of the industry, defendants' "jaz" line of clothing, which will bear the trade names, trademarks, and designations "a new composition by designer Joseph Abboud" and "Joseph Abboud," will be sold in many of the same department and retail stores that sell JA Apparel's "Joseph Abboud"-branded products, including, in particular, Nordstrom, which is our largest customer.  The August 6, 2007 *DNR* article states that, like JA Apparel's products, the "jaz" line will be sold at high-end retailers like Nordstrom, Neiman Marcus, and Saks Fifth Avenue.  (Exhibit 8, p. 12.)  Furthermore, based on my knowledge of our competitors and the industry and from internet research, I understand that defendants' licensees and newly-acquired companies also have either sold their products to and/or manufactured products for Lord & Taylor, Macy's, Bloomingdale's, Mitchells/Richards, and Mark Shale, which are all stores that JA Apparel sells to, in addition to several of the stores referred to in the *DNR* article.  Defendants' "jaz" clothing line will also be offered at price points similar to the price points of JA Apparel's merchandise, as reported by both the *DNR* and *The Wall Street Journal* articles.  (Exhibit 8, p. 12, Exhibit 11, pp. 1-2.)

39. In addition, based on my knowledge of where defendants' licensees and newly-acquired companies sell their products and at what price points those products are sold, defendants will target a similar audience to that of JA Apparel.  I am familiar with the Jack

Victor product line and understand that they target males in a similar age and demographic sector as those targeted by JA Apparel.

40. Defendants' "jaz" line will be advertised using the trade name, trademark and designation "a new composition by designer Joseph Abboud" or will otherwise use "Joseph Abboud" in advertising channels that, to my understanding, will overlap with those used by JA Apparel, including many of the same magazines and trade shows. For example, from my knowledge of our competitors, as well as from research conducted on the Internet, I understand that Jack Victor advertises its clothing line in magazines and trade publications such as *GQ* and *Esquire*, as well as on the Internet. Additionally, Jack Victor, like JA Apparel, participates in major trade shows in North America, including the New York Designer's Collective, Chicago Collective, and MAGIC. Similarly, Alden exhibits its shirts at the New York Collective trade show, and Cardinal Clothing's principal trade shows are the New York Collective, Chicago Collectives, and Magic. Finally, I understand that Merrill attends the New York Collective, Chicago Collective, and Magic trade shows and J.S. Blank attends the Chicago Collective trade show. All of these trade shows overlap with those attended by JA Apparel.

41. The value associated with a trademark is especially significant in the fashion industry and among designers because consumers of designer products have a strong awareness of the status of the brand name. Designers frequently use their surname to identify their goods and services. A consumer who is aware of JA Apparel's ABBOUD marks and product lines could easily be misled by defendants' use of the trade names, trademarks and designations "Joseph Abboud" and "a new composition by designer Joseph Abboud," which are plainly "similar thereto" or "derivative" of the very marks that Mr. Abboud sold us for $65.5 million.

**Mr. Abboud's Breach of the Non-Compete Obligations in the Side Letter Agreement**

42. The August 6, 2007 *DNR* article that announced defendants' "jaz" collection also indicates that Mr. Abboud breached his non-compete obligations in the Side Letter Agreement. According to that article, during the week of July 30, 2007, Mr. Abboud displayed his new clothing collection to a *DNR* reporter at a meeting at Mr. Abboud's Bedford workspace, which was also attended by ten top executives of the three different licensees of Mr. Abboud's new products and two clothing manufacturers that Mr. Abboud had already negotiated agreements to acquire. The *DNR* article also reported that Mr. Abboud and his new partners had agreed upon such detailed matters as the allocation of showroom space, channels of distribution, product sourcing, and the prices, fabrics, patterns and colors of his new line. (Exhibit 8, pp. 10, 12.) I believe the breadth and specificity of the description of Mr. Abboud's new business and menswear line is reflective of the extensive relationship he had developed with his new business partners over many months.

43. Furthermore, in my experience, the process of reviewing and selecting prospective licensees and manufacturers, and negotiating the terms of new agreements between them, is complex and time-consuming. I do not believe that the partnerships formed between Mr. Abboud and Jack Victor, Cardinal Clothing, J.S. Bank, Alden, Merrill, and Robert Kidder could have been completed in the less than three weeks that had elapsed since the expiration of the Restricted Period. Accordingly, I believe that Mr. Abboud engaged in such activities during the Restricted Period, in breach of the non-compete clauses in the Side Letter Agreement.

44. The August 6, 2007 *DNR* article also featured pictures and descriptions of complete fashion designs and actual "jaz" garments, including suits and coats, as well as shirts bearing the "jaz" label. Indeed, the article included four color photos of models wearing "jaz"

suits, sweaters, shirts, jackets, and pants, all finished and fully tailored. (Exhibit 8, pp. 10-12.) Based on my extensive experience in the apparel business, I believe that it would not have been possible for Mr. Abboud to have designed, obtained fabrics for, and produced these garments — indeed, a complete line of menswear — in the less-than-three weeks between the expiration of the Restricted Period on July 13, 2007 and the photo shoot, which occurred at least several days prior to *DNR's* August 6, 2007 article. Indeed, it is my understanding that it takes, at a minimum, six to nine months to develop a clothing line from design to product in hand. Thus, to have such garments ready to be photographed by *DNR* before the publication of its article, I believe Mr. Abboud and his associates would have had to begun the process of designing, cutting, and producing them well before the expiration of the Restricted Period, in breach of the non-compete clauses in the Side Letter Agreement.

45. In all events, based on my experience in the apparel industry, it seems clear that Mr. Abboud's new menswear business did not spring to life in the period between July 13, 2007, when the Restricted Period expired and the meeting with *DNR* in Bedford during the week of July 30, 2007.

46. Moreover, Mr. Abboud failed to obtain JA Apparel's permission before he entered into numerous associations with his current and potential business partners during the Restricted Period. By failing to obtain express written permission from JA Apparel prior to associating himself, in any capacity, with a party that competed, or which proposed to compete with JA Apparel, Mr. Abboud further breached the provision of the non-compete clause contained in the Side Letter Agreement that required him to obtain JA Apparel's written consent during the Restricted Period prior to becoming associated with such persons.

**The Irreparable Harm to JA Apparel Caused by Defendant's Breach of**
**Contract and Acts of Trademark Infringement, Dilution and Unfair Competition**

47. By using the trademarks, trade names, and designations "a new composition by designer Joseph Abboud" and "Joseph Abboud" in connection with defendants' "jaz" menswear collection and on marketing and advertising materials, defendants are causing substantial and irreparable injury to JA Apparel and its valuable ABBOUD marks. Many actual and potential purchasers and consumers, upon encountering defendants' trademarks, trade names and designations "a new composition by designer Joseph Abboud" and "Joseph Abboud" on defendants' "jaz" clothing line and on associated marketing and advertising materials, are likely to mistakenly believe that JA Apparel has in some way licensed, approved, or sponsored defendants' products, or that defendants' products are in some way affiliated with or related to JA Apparel or its products sold under the ABBOUD marks. However, JA Apparel has no control over the nature or quality of the products manufactured and marketed by defendants under the infringing mark, and, as such, there is a real danger that defendants' use will reflect adversely on JA Apparel as the perceived source of origin or sponsor thereof. This mistaken perception is sure to damage JA Apparel's reputation and hamper our efforts to maintain and develop the reputation of the ABBOUD marks and products in a way that cannot be measured or quantified.

48. Indeed, although Mr. Abboud's "jaz" line is not yet available to consumers, JA Apparel has already received communications that evidence confusion. Specifically, on August 6, 2007, the day of the press announcement, an investment banker emailed Marty Staff offering Mr. Staff his "[c]ongratulations" for having acquired "Merrill Sharpe, [and Alden] Shirt Company." Further, on August 14, 2007, a representative from a parent company of several high-end magazines emailed JA Apparel, stating "I hear that Joseph Abboud is launching a new

men's line called Jaz. Can you send me more info on it?" (The August 6, 2007 email to Marty Staff is attached as Exhibit 12 and the August 14, 2007 email is attached as Exhibit 13.)

49. The use by defendants of the trademarks, trade names and designations "a new composition by designer Joseph Abboud" and "Joseph Abboud" in connection with the "jaz" Fall 2008 menswear collection, in breach of the parties' Purchase and Sale Agreement, and in violation of JA Apparel's trademark and common law rights, has irreparably harmed, and will continue to harm, JA Apparel, and has caused, and will continue to cause, consumers to believe mistakenly that defendants' "jaz" line of clothing is associated with, sponsored by or approved by the company that puts out the Abboud brand, *i.e.*, JA Apparel. Unless defendants' conduct is enjoined, JA Apparel will suffer irreparable injury for which there is no adequate remedy at law.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 30th day of August, 2007 at New York, New York.

_____
Eric Spiel