# EXHIBIT 11

 **Loan Pullback Adds to Gloom Over Housing** THE OUTLOOK | A2

 **Joseph Abboud Fashions Label Sans His Name** MARKETPLACE | B1

 **How Well Do Target Fund Hit the Mar** INVESTING IN FUNDS

# THE WALL STREET JOURNAL.

## DÉJÀ VU

### Back When Divorcing Was Hard, Some States Found a Way to Profit


By Cynthia Crossen

BEFORE NEVADA, there was Indiana—and South Dakota, Oklahoma and Florida. All of these states figured out how to make money on other states' divorce laws.

Until well into the 20th century, some states made it almost impossible for couples to divorce. In South Carolina, divorce for any reason was prohibited from 1878 to 1949. In New York, the divorce law sponsored by Alexander Hamilton in 1787 that recognized adultery as the only ground for divorce remained in force until 1967. Most states required divorcing couples to be residents for at least a year; Connecticut demanded three years.

At the other end of the spectrum were states like Indiana, which, complained an editorial writer in the mid-19th century, "would untie the knot for the slightest possible reason." The state legislature gave its courts wide latitude in granting divorces. Establishing residency was easy: People simply declared that they lived in Indiana—even if only for a day. Unhappy spouses from Eastern states took the train to Indianapolis, where they bought legal advice, hotel rooms and cab rides.

Many Hoosiers, like many of their fellow Americans, thought divorce was an abomination. People who wanted divorce were them were "the libertine, the egoist, the selfish, sensual seeker of personal and present enjoyment at whatever cost to others," the newspaper editor Horace Greeley argued. In 1858, an Indianapolis newspaper said the city was "overrun by a flock of ill-used and ill-using, petulant, libidinous, extravagant, ill-fitting husbands and wives." Several years later, under pressure from conservatives, Indiana's legislature tightened its laws, and the divorce pilgrims migrated west.

For a few years, they settled in Sioux Falls, S.D. "A queer business has grown up in this Western town," a reporter said, "that of extracting delinquent husbands and wives like teeth, noiselessly, skillfully and without pain." In 1906 Alfred I. duPont moved from Wilmington, Del., to Sioux Falls for six months to get a divorce. "I've been married 20 years or more," he explained, "and at 42 feel like an old man."

IN SIOUX FALLS, as in Indiana, opponents of transient divorce organized a campaign. An influential Episcopal bishop, William Hare, led the troops, declaring that "consecutive polygamy has achieved, under our loose divorce laws, a respectable status." The pro-divorce lobby argued that the legislature, "on merely sentimental grounds," shouldn't "drive out of South Dakota...a business which brings to Sioux Falls over $100,000 a year." But Bishop Hare triumphed, and the Sioux Falls divorce colony died.

It was Nevada, particularly Reno, that most efficiently capitalized on other states' rigorous divorce laws. Because Nevada had earlier wanted its roaming miners to be quickly added to voting and tax rolls, it conferred citizenship on people after six months' residence. It also recognized nine grounds for divorce, including



### What's in a Name? Not Much, He Hopes

*Joseph Abboud, After Selling His Namesake Fashion Label, Starts New Menswear Line*

By RAY A. SMITH

WHEN DESIGNER Joseph Abboud announces his new menswear label today, he'll face an unlikely competitor: Joseph Abboud.

The 57-year-old designer, whose penchant for earth tones and textured fabrics made him a favorite of professional men in the 1990s, sold his trademark for $65 million in 2000. So when he launches his new line, which will include $3,000 shearling coats, he won't be able to use his name. Instead he's chosen the name jaz, which he says is a riff on jazz.

Mr. Abboud faces an unusual challenge in the design world: how to remind consumers and retailers of his past success while distancing his new line from the brand that currently bears his name.

Above, designer **Joseph Abboud**; right, dress shirts and ties from his new menswear label, jaz

Last month, in fact, JA Apparel Corp., the company that owns the Joseph Abboud trademark, put Mr. Abboud on notice as well. In an ad that appeared in a trade publication a few days after his noncompete agreement expired, the company said "the finest trademark lawyers in the world wear Joseph Abboud."

Other designers, including Jil Sander, Helmut Lang, and Roland Mouret, have also taken on investors, encountered disputes, and ended up leaving their namesake businesses. Mr. Mouret just launched a collection in Paris under the name RM.

"Anyone who is going to take a majority stake is going to want to own the name," says Robert Burke, a luxury-goods consultant who advises designers contemplating such deals. For designers, "it's a high risk, but often times today it is a necessary risk."

Mr. Abboud is re-entering the $56 billion U.S. menswear market as a flood of new labels are fighting for floor space amid retail consolidation. He says the higher price points (suits start at $895) and luxurious Italian fabrics in his new line, which will be made in North America and Italy, will distinguish the clothes from those now sold by the Joseph Abboud label, where suits start at

*Please turn to page B3*

### Surveillance Limits Protec For Phone Car

By EVAN PEREZ
And AMOL SHARMA

A NEW LAW EXPANDING the ability to conduct wireta court order fails to resolve cerns faced by phone companies t ensuring prolonged controversy continuing problems in carrying o lance program.

The law, an update of the 1978 F gence Surveillance Act, or FISA, s broadens the government's abili communications, including email, terrorists. It was passed over the grudgingly by the Democratic-co gress, and signed by the president

But the measure lacks a provisi the White House and telecommuni panies: protection from lawsuits phone companies by privacy groups and customers for past cooperation with government spy programs.

Under the expansion of surveillance authority since Sept. 11, 2001, some major phone companies have complained that their cooperation has left them vulnerable to legal liabilities. AT&T Inc. and Verizon Communications Inc. have been sued by civil-liberties groups and state-utility regulators. Some phone companies have curtailed their cooperation with intelligence programs in recent months, according to people familiar with the matter. The new l provides a more limited element of leg compelling phone companies to coop

Congress decided to write the law will be in effect for only six months that Congress and the White House wi debating specifics of the program int That sets the stage for further confron as an already fevered presidential ele be heating up.

The Bush administration says the e ping program is essential to fighting t For opponents of the administration, o to spying programs has become a rall

For decades, in criminal probes, ph panies under court orders allowed i tors to place wiretapping equipment in tems or turned over information. Afte attacks, President Bush ordered a ra surveillance programs, most of which not known publicly.

After the New York Times and USA T closed the existence of wiretapping and ing programs in 2005 and last year, Mr. licly acknowledged a portion of its surv which the administration has come to cal rorist Surveillance Program.

DOWJONES

**THE WALL STREET JOURNAL.**

★ ★ ★ ★    $1.50

MONDAY, AUGUST 6, 2007 ~ VOL. CCL NO. 30

Loan Pullback Adds to Gloom Over Housing
THE OUTLOOK | A2



Joseph Abboud Fashions Label Sans His Name
MARKETPLACE | B1

How Well Do Target Funds Hit the Mark?
INVESTING IN FUNDS | R1

## Joseph Abboud Starts a New Line After Selling His Namesake Label


iStockphoto

*Continued from page B1*

$695 and are made in Massachusetts, Asia and Turkey. His plan is to have jaz arrive in stores next July.

The Joseph Abboud brand retains some classic Abboud touches such as warm earth tones and is sold at stores such as Bloomingdale's, Lord & Taylor and Nordstrom. Since the designer's departure, annual sales have grown to $300 million, up from $125 million in 2004.

"We will be interested in what Joseph does when he returns to the market," says Marty Staff, chief executive of JA Apparel. He also vows to be "vigilant" in protecting the label's trademarks.

Mr. Abboud and his attorney say they have no intention of violating the trademarks. "We're well beyond that now. We're focused on jaz," says Mr. Abboud. Still, he plans to promote his new label with the tagline "a new composition by designer Joseph Abboud." Mr. Abboud and his attorney say that language doesn't violate the Joseph Abboud trademark but some lawyers say JA Apparel could argue that the appearance of the Abboud name in promotional material could create confusion between the brands.

Mr. Abboud rose to prominence in the early 1990s. He won back-to-back menswear designer of the year awards from the Council of Fashion Designers of America, outfitted personalities such as broadcaster Bryant Gumbel and appeared regularly on Don Imus's show. One of his two-button cashmere sport coats even turned up on a 1996 episode of "Seinfeld," where a store salesman touted the garment, citing Mr. Abboud by name.

"What Joseph found was a gentleman out there who wanted a touch of Euro flair but still wanted the fit of American clothing. He was the first to really truly mine that," says designer Stan Herman, former president of the Council of Fashion Designers of America.

But things began souring for Mr. Abboud in 2000, when he sold his label to RCS MediaGroup SpA and quickly began feuding with top executives over how much control he would have over the creative process. A series of lawsuits and countersuits followed.

In 2004, Mr. Abboud, RCS MediaGroup, and two RCS executives agreed to drop the suits. A month later, private-equity firm J.W. Childs Associates LP bought the company for $73 million and named Mr. Abboud chief creative director. Under the new arrangement, Mr. Abboud reported directly to Mr. Staff, JA Apparel's chief executive. "Nightmares do end," Mr. Abboud declared at the time.

But before long, Mr. Abboud clashed with the new management over the direction of the brand. Mr. Abboud says he wanted the brand to be classic but with a modern edge and that management wanted it to be a "sex, drugs, rock and roll brand."

Mr. Staff has a different take on the disagreement. "As we have always said, we wanted Joseph to stay and we wish him well," says Mr. Staff. "However, we do not agree with his assessment of the brand. The Joseph Abboud global lifestyle brand embodies sophisticated American style and our double-digit growth since Joseph departed is strong evidence that we are connecting with our customers."

In 2005, Mr. Abboud opted not to renew his contract. A two-year noncompete went into effect. During that period, Mr. Abboud taught at Fordham University (a graduate course called "The Marketing of Creativity") and wrote a memoir that included his observations of the fashion industry, but he missed designing. "It's sort of like breathing to me," he says.

He began thinking about a new men's line and came up with the name jaz in the kitchen one morning when he and his teenage daughters were bouncing names around. "Jazz has classic elements and modern elements, and it's the perfect word for what I am about," he says.

The designer says he has no financial backers or partners. "I wanted to control this brand," he says. "I don't want anyone to tell me where to position it." He says he might eventually have "strategic partners, but they would have to be partners I can communicate with." He says he intends to spend an amount in the "significant seven-figure" range to acquire a shirt factory based in Fall River, Mass., and a sportswear manufacturer in Elmsford, N.Y. Other clothing in the line will be licensed out.

Mr. Abboud plans to offer more clothes in gray, navy and black than he is known for, with a fair amount in trimmer silhouettes, including ties that are 2 1/2 inches wide rather than 3 3/4 inches wide. But the line will also include turtlenecks and men's silk scarves that were signature items for him in the 1990s.

The line is also expected to include woven shirts and dress shirts priced at $145 and up and cashmere and silk blended sweaters made in Italy starting at $395. Plans call for handmade ties to start at $115 and dress coats made in Italy to start at $895. He'll also offer to make clothes to measure.

Mr. Abboud says he has spoken to retailers, telling them he is planning to launch a menswear line, but hasn't shown them any samples or gotten into formal negotiations.

His advice for other designers looking for investors? "Really understand what you are signing away," says Mr. Abboud. "It's not just what you're getting but what you are giving up."