Thomas A. Smart
Phillip A. Geraci
KAYE SCHOLER LLP
425 Park Avenue
New York, NY 10022
(212) 836-8000

*Attorneys for Plaintiff JA Apparel Corp.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JA APPAREL CORP.,                                    :

               Plaintiff,                    :          Civil Action No. 07-cv-___

      v.                                              :

JOSEPH ABBOUD, HOUNDSTOOTH CORP., and      :
HERRINGBONE CREATIVE SERVICES, INC.,

            Defendants.                   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS
APPLICATION FOR AN ORDER TO SHOW CAUSE WHY A
<u>PRELIMINARY INJUNCTION SHOULD NOT BE ENTERED</u>**


KAYE SCHOLER LLP
425 Park Avenue
New York, NY 10022
(212) 836-8000

*Attorneys for Plaintiff JA Apparel Corp.*

31518162.DOC

# TABLE OF CONTENTS

Page

Preliminary Statement ........................................................................................... 1

Statement Of Facts ............................................................................................... 5

    A.    JA Apparel and Its Expansion of, and Success with, the ABBOUD Marks........... 5

    B.    JA Apparel's Relationship and Agreements with Abboud ..................................... 7

    C.    Defendants' Announcement of Their "jaz" Menswear Collection and Their Unauthorized Use of JA Apparel's ABBOUD Marks........................................... 10

    D.    Mr. Abboud's Breach of the Non-Compete Obligations in the Side Letter Agreement........................................................................................................ 13

    E.    The Harm to JA Apparel ..................................................................................... 14

Argument ............................................................................................................. 15

    Point I    JA Apparel Is Likely To Succeed On The Merits Of Its Claims ............. 16

        A.    JA Apparel Is Likely to Prevail on Its Claim for Breach of the Purchase and Sale Agreement................................................................. 16

        B.    Plaintiff Is Likely to Succeed on the Merits of Its Lanham Act Trademark Infringement and False Designation of Origin Claims ......... 17

            1.    The Use of a Previously Sold Personal Name Trademark or Trade Name Constitutes Trademark Infringement Where There Is a Likelihood of Confusion ................................................ 19

            2.    There Is a Strong Likelihood of Confusion Between Plaintiff's ABBOUD Marks and Defendants' Marks................... 25

                (a)    The JA Apparel Marks Are Very Strong .......................... 26

                (b)    Defendants' ABBOUD Mark Is Identical to JA Apparel's ABBOUD Marks.............................................. 27

                (c)    The Parties' Goods and Services Are in Close Proximity and There is No Gap To Bridge ....................... 28

                (d)    Actual Confusion .............................................................. 29

                (e)    Defendants Have Acted in Bad Faith................................ 29

Page

(f)     The Quality of Defendants' Products ............................... 31

(g)     Sophistication of the Relevant Audience ......................... 31

C.     JA Apparel Is Likely to Succeed on Its Claim for Dilution Under
the Lanham Act ....................................................................................... 32

D.     JA Apparel Is Likely To Succeed on Its State Unfair Competition,
Dilution, and General Business Law Claims ............................................ 33

E.     JA Apparel Is Likely to Succeed on Its Claim for Breach of the
Non-Compete Clauses in the Side Letter Agreement ............................... 34

Point II      JA Apparel Is Threatened with Irreparable Injury If a Preliminary
Injunction Is Not Issued ........................................................................... 37

Point III     Alternatively, There Are Fair Grounds for Litigation and the
Balance of Hardships tips Decidedly in JA Apparel's Favor ................... 39

Point IV      The Court Should Enter a Preliminary Injunction Barring
Defendant's Trademark Infringement, Dilution, Unfair
Competition and Breaches of Contract and Requiring Corrective
Measures ................................................................................................... 41

Conclusion ............................................................................................................................ 42

# TABLE OF AUTHORITIES

## CASES

Page(s)

*A.V. by Versace v. Gianni Versace, S.p.A.,*
    2002 U.S. Dist. LEXIS 16323 (S.D.N.Y. Sept. 3, 2002).....................................39

*Allied Maint. Corp. v. Allied Mech. Trades, Inc.,*
    42 N.Y.2d 538, 399 N.Y.S.2d 628 (N.Y. 1977) ...............................................34

*Am. Cyanamid Co. v. Campagna Per Le Farmacie In Italia S.p.A.,*
    847 F.2d 53 (2d Cir. 1988)...............................................................15, 37

*Am. Home Prods. Corp. v. Johnson Chem. Co.,*
    589 F.2d 103 (2d Cir. 1978)...................................................................27

*Banff, Ltd. v. Federated Dep't Stores, Inc.,*
    841 F.2d 486 (2d Cir. 1988)...............................................................25, 31

*Barr v. Sasser,*
    1992 U.S. Dist. LEXIS 21751, 24 U.S.P.Q.2d 1942 (N.D. Okla. 1992) ...........24

*Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.,*
    830 F.2d 1217 (2d Cir. 1987).....................................................25, 28, 29, 30, 31

*Century 21 Real Estate LLC v. Raritan Bay Realty,*
    2007 U.S. Dist. LEXIS 34108 (E.D.N.Y. May 9, 2007) ...................................38

*Charles of Ritz Group, Ltd. v. Quality King Distribs., Inc.,*
    832 F.2d 1317 (2d Cir. 1987)...................................................................26

*Chere Amie, Inc. v. Windstar Apparel, Inc.,*
    191 F. Supp. 2d 343 (S.D.N.Y. 2001)........................................................41

*Chernoff Diamond & Co. v. Fitzmaurice, Inc.,*
    234 A.D.2d 200, 651 N.Y.S.2d 504 (1st Dep't 1996) ......................................40

*Chevron U.S.A., Inc. v. Roxen Serv., Inc.,*
    813 F.2d 26 (2d Cir. 1987).....................................................................35

*Cliffcorn Answering Serv., Inc. v. Deutschel,*
    23 Misc. 2d 254, 198 N.Y.S.2d 952 (N.Y. Sup. Ct. Kings Co. 1960)...............24

*Clinique Labs., Inc. v. Dep Corp.,*
    945 F. Supp. 547 (S.D.N.Y. 1996) ..........................................................33

Page(s)

*Coach Leatherware Co. v. AnnTaylor, Inc.*,
   933 F.2d 162 (2d Cir. 1991)..................................................................................29

*Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*,
   604 F.2d 200 (2d Cir. 1979)..................................................................................19

*Dan-Foam A/S and Tempur-Pedic, Inc. v. Brand Named Beds, LLC*,
   2007 U.S. Dist. LEXIS 33301 (S.D.N.Y. May 4, 2007)......................................33

*DeLong Corp. v. Lucas*,
   176 F. Supp. 104 (S.D.N.Y. 1959) .......................................................................35

*Emilio Pucci Societa A Responsibilita Limitata v. Pucci Corp.*,
   1988 U.S. Dist. LEXIS 14097 (N.D. Ill. Dec. 13, 1988)....................................32

*Equibrand Corp. v. Reinsman Equestrian Products, Inc.*,
   2007 U.S. Dist. LEXIS 36229 (N.D. Tex. May 17, 2007) ...................................22

*Francis S. Denney, Inc. v. I.S. Labs., Inc.*,
   758 F. Supp. 140 (S.D.N.Y. 1990) .......................................................................24

*GTFM, Inc. v. Solid Clothing Inc.*,
   215 F. Supp. 2d 273 (S.D.N.Y. 2002)...................................................................30

*Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*,
   523 F.2d 1331 (2d Cir. 1975)....................................................................19, 31, 33

*Gruner + Jahr USA Publ'g. v. Meredith Corp.*,
   991 F.2d 1072 (2d Cir. 1993)................................................................................18

*Gucci Am., Inc. v. Action Activewear, Inc.*,
   759 F. Supp. 1060 (S.D.N.Y. 1991)......................................................................33

*Guth v. Guth Chocolate Co.*,
   224 F. 932 (4th Cir. 1915) ...............................................................................20, 23

*Harlequin Enters., Ltd. v. Gulf & Western Corp.*,
   644 F.2d 946 (2d Cir. 1981)..................................................................................26

*Harold F. Ritchie Inc. v. Chesebrough-Pond's, Inc.*,
   281 F.2d 755 (2d Cir. 1960)..................................................................................30

*Harsco Corp. v. Segui*,
   91 F.3d 337 (2d Cir. 1996)....................................................................................16

*Hasbro Inc. v. Lanard Toys, Ltd.*,
   858 F.2d 70 (2d Cir. 1988)........................................................................28, 31, 37

Page(s)

*Hazel Bishop, Inc. v. Perfemme, Inc.,*
    314 F.2d 399 (2d Cir. 1963).................................................................................16

*J.H. Goldberg Co., Inc. v. Stern,*
    53 A.D.2d 246, 385 N.Y.S.2d 427 (4th Dep't 1976) ..........................................42

*In re Kenston Mgmt. Co.,*
    137 B.R. 100 (E.D.N.Y. 1992) ............................................................................40

*Kookai, S.A. v. Shabo,*
    950 F. Supp. 605 (S.D.N.Y. 1997) ......................................................................28

*Lazzaroni USA Corp. v. Steiner Foods,*
    2006 U.S. Dist. LEXIS 20962 (D.N.J. April 11, 2006) .....................................24

*LeSportsac, Inc. v. K Mart Corp.,*
    754 F.2d 71 (2d Cir. 1985)..................................................................................40

*Levitt Corp. v. Levitt,*
    1978 U.S. Dist. LEXIS 15820 (E.D.N.Y. Aug. 29, 1978) ...........................20, 21

*Levitt Corp. v. Levitt,*
    593 F.2d 463 (2d Cir. 1979)..............................................3, 20, 21, 25, 30, 40

*Lexington Mgmt. Corp. v. Lexington Capital Partners,*
    10 F. Supp. 2d 271 (S.D.N.Y. 1988)...................................................................18

*Lois Sportswear v. Levi Strauss & Co.,*
    799 F.2d 867 (2d Cir. 1986)..........................................17, 18, 19, 25, 29, 31

*Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.,*
    426 F.3d 532 (2d Cir. 2005).........................................................................15, 27

*Madrigal Audio Labs., Inc. v. Cello, Ltd.,*
    799 F.2d 814 (2d Cir. 1986)................................................................................22

*Manhattan Real Estate Equities Group, LLC v. Pine Equity, NY, Inc.,*
    16 A.D.3d 292, 791 N.Y.S.2d 418 (1st Dep't 2005) ..........................................39

*McNeil Labs., Inc. v. Am. Home Prods. Corp.,*
    416 F. Supp. 804 (D.N.J. 1976) .........................................................................38

*Metlife, Inc. v. Metro. Nat'l Bank,*
    388 F. Supp. 2d 223 (S.D.N.Y. 2005).................................................................34

*Mobil Oil Corp. v. Pegasus Petroleum Corp.,*
    818 F.2d 254 (2d Cir. 1987)....................................................................19, 28, 30

31518162.DOC

v

Page(s)

*Montana Prof'l Sports, LLC v. Leisure Sports Mgmt., Inc.*,
     422 F. Supp. 2d 1271 (M.D. Fla. 2006) ...................................................................41

*MSP Corp. v. Westech Instruments, Inc.*,
     2007 U.S. Dist. LEXIS 57988 (D. Minn. Aug. 6, 2007) ......................................29

*Natural Organics, Inc. v. Nutraceutical Corp.*,
     426 F.3d 576 (2d Cir. 2005) ...................................................................................25

*New Kayak Pool Corp. v. R & P Pools, Inc.*,
     246 F.3d 183 (2d Cir. 2001) .............................................................................25, 37

*New York Real Estate Inst., Inc. v. Edelman*,
     42 A.D.3d 321, 839 N.Y.S.2d 488 (1st Dep't 2007) ...................................35, 39, 42

*Nikon Inc. v. Ikon Corp.*,
     987 F.2d 91 (2d Cir. 1993) ..............................................................................27, 31

*Nipon v. Leslie Fay Cos. (In re Leslie Fay Cos.)*,
     216 B.R. 117 (Bankr. S.D.N.Y. 1997) .................3, 23, 24, 26, 28, 29, 31, 33, 34, 39

*Omega Importing Corp. v. Petri-Kine Camera Co.*,
     451 F.2d 1190 (2d Cir. 1971) ..................................................................................38

*Osgood Heating & Air Conditioning, Inc. v. Osgood*,
     75 U.S.P.Q.2d 1432 (W.D. Tex. 2004) .....................................................................24

*Paddington Corp. v. Attiki Imps. & Distrib., Inc.*,
     966 F.2d 577 (2d Cir. 1993) ...................................................................................30

*Park N Fly, Inc. v. Dollar Park and Fly, Inc.*,
     469 U.S. 189 (1985) ..........................................................................................18, 40

*Playtex Prods., Inc. v. First Quality Hygienic, Inc.*,
     965 F. Supp. 339 (E.D.N.Y. 1996) ..........................................................................26

*Polaroid Corp. v. Polarad Elecs. Corp.*,
     287 F.2d 492 (2d Cir. 1961) .........................................................................25, 26, 32

*Power Test Petroleum Distribs. v. Calcu Gas, Inc.*,
     754 F.2d 91 (2d Cir. 1985) ..............................................................................37, 38

*Princeton Graphics Operating, L.P. v. NEC Home Elec. (U.S.A.), Inc.*,
     732 F. Supp. 1258 (S.D.N.Y. 1990) .........................................................................34

*Procter & Gamble Co. v. Quality King Distribs., Inc.*,
     974 F. Supp. 190 (E.D.N.Y. 1997) ...........................................................................34

Page(s)

*Purchasing Associates Inc. v. Weitz,*
    13 N.Y.2d 267-271-272 (1963) ..................................................................35

*RJR Foods, Inc. v. White Rock Corp.,*
    1978 U.S. Dist. LEXIS 15080 (S.D.N.Y. Oct. 6, 1978), *aff'd,* 603 F.2d 1058
    (2d Cir. 1979)........................................................................................27

*Savin Corp. v. Savin Group,*
    391 F.3d 439 (2d Cir. 2004)...................................................17, 26, 29

*Securitron Magnalock Corp. v. Schnabolk,*
    65 F.3d 256 (2d Cir. 1995) .......................................................................34

*Shred-It USA, Inc. v. Mobile Data Shred, Inc.,*
    228 F. Supp. 2d 455 (S.D.N.Y. 2002), *aff'd,* 92 Fed. Appx. 812
    (2d Cir. 2004).........................................................................................16

*Sports Auth. v. Prime Hospitality Corp.,*
    89 F.3d 955 (2d Cir. 1996) .......................................................................19

*Spring Mills, Inc. v. Ultracashmere House, Ltd.,*
    689 F.2d 1127 (2d Cir. 1982)..............................................................27, 30

*Stern's Miracle-Gro Prods., Inc. v. Shark Prods., Inc.,*
    823 F. Supp. 1077 (S.D.N.Y. 1993).........................................................33

*Taylor Wine Co. v. Bully Hill Vineyards, Inc.,*
    569 F.2d 731 (2d Cir. 1978).....................................................................21

*Time, Inc. v. Petersen Publ'g Co.,*
    173 F.3d 113 (2d Cir. 1999).....................................................................17

*Two Pesos, Inc. v. Taco Cabana, Inc.,*
    505 U.S. 763 (1992)...................................................................................40

*Upjohn Co. v. Am. Home Prods. Corp.,*
    598 F. Supp. 550 (S.D.N.Y. 1984) ..........................................................38

*Upjohn Co. v. Riahom Corp.,*
    641 F. Supp. 1209 (D. Del. 1986)............................................................41

*Virgin Enters. Ltd. v. Nawab,*
    335 F.3d 141 (2d Cir. 2003).......................................15, 17, 18, 26, 28, 29

*World Auto Parts v. Labenski,*
    217 A.D.2d 940, 629 N.Y.S.2d 896 (4th Dep't 1995)........................35

Page(s)

*Zeneca, Inc. v. Eli Lilly & Co.,*
  1999 U.S. Dist. LEXIS 10852 (S.D.N.Y. Jul. 19, 1999) ...................................................38

## STATUTES

15 U.S.C. § 1065 ....................................................................................................................18

15 U.S.C. § 1057 ....................................................................................................................18

15 U.S.C. § 1114 ...............................................................................................................17, 18

15 U.S.C. § 1115 ...............................................................................................................18, 26

15 U.S.C. § 1125 ..........................................................................................................18, 32, 33

N.Y. Gen. Bus. Law § 349(a) ...............................................................................................34

N.Y. Gen. Bus. Law §§ 350, 350-a ......................................................................................34

N.Y. Gen. Bus. Law § 360-l ..................................................................................................34

Federal Rule of Civil Procedure 65 .....................................................................................15

## MISCELLANEOUS

*McCarthy on Trademarks* (2007) ..........................................................................22, 26, 27, 29

WEBSTER'S THIRD NEW INT'L DICTIONARY (2002) ...................................................................17

Plaintiff JA Apparel Corp. ("JA Apparel") submits this memorandum of law in support of its application for an order to show cause for a preliminary injunction enjoining defendants Joseph Abboud ("Mr. Abboud"), Houndstooth Corp. ("Houndstooth"), and Herringbone Creative Services, Inc. ("Herringbone"), pending trial, from infringing and diluting JA Apparel's well-known "Joseph Abboud" trademarks, and other trade names, trademarks and designations incorporating the trade name, trademark and designation "Joseph Abboud," engaging in unfair competition and false and deceptive trade practices, and breaching contracts entered into between JA Apparel, Joseph Abboud and Houndstooth.

## PRELIMINARY STATEMENT

This action seeks to stop Mr. Abboud and his affiliates from unlawfully misappropriating very valuable trademarks, trade names, brand names, and designations, all right, title, and interest to which Mr. Abboud sold to JA Apparel for the handsome sum of $65.5 million. Having pocketed that payment, Mr. Abboud forfeited all rights to use the names, trademarks, trade names, service marks, logos, insignias and designations that include "Joseph Abboud" as well as new trade names, trademarks, service marks, logos, insignias and designations containing the words "Joseph Abboud," "designed by Joseph Abboud," "by Joseph Abboud" "or anything similar thereto or derivative thereof" (collectively, "the ABBOUD marks"), as well as "a new composition by designer Joseph Abboud." Simply put, Mr. Abboud chose to trademark his name and Mr. Abboud chose to sell his trademarks, trade names, and designations, and related goodwill, to plaintiff for $65.5 million. He therefore chose to lose the right to use those trademarks, trade names and designations and should be enjoined from attempting to do so in violation of plaintiff's contractual, statutory, and common law rights.

JA Apparel is the owner of numerous United States registrations for the trademark, trade name and designation "Joseph Abboud" for designer goods and services. JA Apparel has

continuously and exclusively used these and other ABBOUD marks since 1988, and it has expended millions of dollars to advertise, market, and promote the ABBOUD marks throughout the United States and worldwide, resulting in a retail value of approximately $300 million in global sales under the marks.  The ABBOUD marks are extremely strong and famous.

JA Apparel has recently learned from articles in *The Wall Street Journal* and the leading menswear trade publication, *DNR*, that Mr. Abboud and his companies Houndstooth and Herringbone have embarked on a campaign to misappropriate JA Apparel's ABBOUD marks by marketing and promoting a forthcoming new menswear line "jaz" with the trade names, trademarks and designations "a new composition by designer Joseph Abboud" and "Joseph Abboud" and using those trade names, trademarks and designations on associated marketing and advertising materials.  (Spiel Dec. ¶¶ 31, 36 & Exs. 8, 11.)[1]  Published reports make clear that defendants believe that they are "allowed to use [the Joseph Abboud] name on marketing and advertising materials for Jaz."  (*Id.* ¶ 35 & Ex. 10.)  Indeed, defendants demanded that a "correction" be published in *DNR* explicitly stating their belief that they are "free to use [the Joseph Abboud] name in marketing materials" and, in their request to *DNR* for a correction, they stated that they viewed the Joseph Abboud name as a "very big asset to [them], [their] partners, and future partners and accounts."  (*Id.* ¶ 34 & Ex. 9 .)  These statements leave no doubt that it is Mr. Abboud's intention to advertise, market, and promote the so-called "jaz" line of menswear by blatantly and explicitly using "Joseph Abboud" in violation of JA Apparel's rights.

Defendants' conduct is in direct breach of an agreement (the "Purchase and Sale Agreement") in which Mr. Abboud and Houndstooth sold to JA Apparel *all* of their interest in

---

[1]      References to "Spiel Dec. ¶ __" are to paragraphs of the August 30, 2007 Declaration of Eric Spiel, JA Apparel's Senior Vice President and Chief Financial Officer, in support of this application for an order to show cause.  References to "Ex. __" are to exhibits attached to Mr. Spiel's declaration.

the ABBOUD trademarks, trade names, and designations, the related goodwill, and "[a]ll rights to use and apply for the registration of new trade names, trademarks, service marks, logos, insignias and designations containing the words *'Joseph Abboud,' 'designed by Joseph Abboud,' 'by Joseph Abboud,' 'JOE' or 'JA,' or anything similar thereto or derivative thereof*, either alone or in conjunction with other words or symbols . . . , for any and all products or services." (Spiel Dec. ¶ 6 & Ex. 1, emphasis added.)   Mr. Abboud intends to breach that agreement by using the trade names, trademarks, and designations "Joseph Abboud" and "a new composition by designer Joseph Abboud," the latter of which is a barely discernable variation of the trade names, trademarks and designations "Joseph Abboud," "designed by Joseph Abboud," and "by Joseph Abboud," and is plainly similar to or derived from these trade names, trademarks and designations.  Accordingly, defendants' proposed use of those terms constitutes a breach of the Purchase and Sale Agreement.

Nor is defendants' conduct rendered lawful by the fact that defendant Mr. Abboud's name is "Joseph Abboud."  Courts repeatedly have enjoined the use of personal names where, as here (for $65.5 million), an individual has contracted away and granted to another the exclusive right to use the individual's name. *See Levitt Corp. v. Levitt*, 593 F.2d 463, 468 (2d Cir. 1979) (where defendant William Levitt had previously sold to plaintiff his business, including use of his personal name as a trade name or trademark, and the related goodwill, the Second Circuit affirmed a wide-ranging injunction prohibiting, *inter alia*, Mr. Levitt from using his name as a part of a trademark); *Nipon v. Leslie Fay Cos. (In re Leslie Fay Cos.)*, 216 B.R. 117, 136 (Bankr. S.D.N.Y. 1997) (court enjoined defendants, including clothing designer Albert Nipon, from using the tagline or phrase "designed by Albert Nipon" in conjunction with the trademark AMERICAN POP, holding that Mr. Nipon had previously sold to Leslie Fay the trademarks in

his name and the related goodwill).

Furthermore, under this Circuit's standard for trademark infringement, it is evident that defendants' use of the trade name, trademark and designation "a new composition by designer Joseph Abboud" infringes JA Apparel's ABBOUD marks:  JA Apparel's marks are strong and enforceable, the similarity of defendants' mark is obvious, the marks are used in connection with almost identical goods, there is evidence of actual confusion, and defendants have acted in bad faith.  Defendants' unauthorized use of the trade names, trademarks and designations "a new composition by designer Joseph Abboud" and "Joseph Abboud" on their "jaz" clothing line and on marketing and advertising materials plainly creates a likelihood of consumer confusion as to the source, origin, sponsorship, license or approval with JA Apparel's line of products branded with the ABBOUD marks.  In addition, defendants' unauthorized use of the "a new composition by designer Joseph Abboud" trade name, trademark and designation and other uses of "Joseph Abboud" dilutes and creates a likelihood of dilution of the distinctive quality of the ABBOUD marks, and constitutes false and deceptive trade practices, which cause irreparable harm to plaintiff and warrants preliminary injunctive relief.

Finally, JA Apparel is likely to succeed in establishing that Mr. Abboud's conduct breaches the non-compete provisions of a side letter agreement to the Purchase and Sale Agreement (the "Side Letter Agreement") that he entered into with JA Apparel in which Mr. Abboud agreed, *inter alia*, to provide consulting services relating to fashion design and brand promotion of the products sold by JA Apparel under the ABBOUD marks.  (Spiel Dec. ¶ 19 & Ex. 6.)  Pursuant to that agreement, Mr. Abboud agreed that, until July 13, 2007 (the "Restricted Period"), he (i) would not, directly or indirectly be associated with any person or entity which competed or proposed to compete with JA Apparel, and (ii) would obtain JA

4

Apparel's written consent before becoming associated with any person or entity that competed or proposed to compete with the company. Incredibly, within three weeks of the expiration of the non-compete provisions, Mr. Abboud had, according to *DNR* and *The Wall Street Journal*, already identified, negotiated, and fully formed licensing partnerships and acquisition agreements with five different companies for his new competitive menswear line, and had already designed, obtained fabrics for, and produced a new line of menswear, including suits, sweaters, shirts, jackets and pants. In other words, although Mr. Abboud was restricted from competing with or associating with anyone who competed with JA Apparel prior to July 13, 2007, his entirely new menswear business somehow sprang to life less than three weeks thereafter. Mr. Abboud could not have done this unless, well before July 13, 2007, he had begun competing with JA Apparel in breach of his non-compete obligations.

## STATEMENT OF FACTS

### A.    JA Apparel and Its Expansion of, and Success with, the ABBOUD Marks

JA Apparel, founded in 1988, is the owner of the Joseph Abboud brand name and numerous marks that incorporate, or are variations of, that brand name. Although once strictly a menswear line, the Joseph Abboud brand now appears on a wide variety of products, including men's and boys' clothing, accessories, and home furnishings. (Spiel Dec. ¶ 4.)

JA Apparel was formed when Mr. Abboud, through his wholly-owned corporation, Houndstooth, entered into a joint venture arrangement with GFT USA, Inc. ("GFT") to manufacture, market and sell various products under the Joseph Abboud brand name. When the joint venture was terminated in 1996, JA Apparel became a wholly-owned subsidiary of GFT. From 1988 onward, JA Apparel used the ABBOUD marks in the manufacture, marketing, and sale of its products and continues such use today. (Spiel Dec. ¶ 5.)

JA Apparel's promotional efforts have been highly successful and the resulting increase

in consumer demand for JA Apparel's clothing line has resulted in a substantial boom to sales. In the United States alone, JA Apparel achieved $95 million in wholesale sales in 2006, and, since the 2004 acquisition of JA Apparel by its current owner, the value of its retail worldwide sales has grown substantially, from under $200 million in 2004 to over approximately $300 million in 2007. Based on the strength, recognition and value of the Joseph Abboud brand name, since the 2004 acquisition, JA Apparel's licensing revenue has increased over 300% and it has added over 25 new license partners. Consumer demand has led JA Apparel to expand its Joseph Abboud product line to eyewear, hosiery, jeans, scarves, jewelry, luggage, small leather goods, outerwear, sleepwear, and rainwear, as well as a home collection, including bath accessories, bedding, dinnerware, and flatware, and a large range of other goods. (Spiel Dec. ¶¶ 4, 16-17.) In addition, JA Apparel's ABBOUD marks have received substantial third party recognition in the media as identifying JA Apparel's products. (*Id.* ¶ 18 & Ex. 5.)

JA Apparel's tailored clothing, accessories, and furnishings bearing the ABBOUD marks are available for sale at specialty retailers and department stores throughout the United States, including Nordstrom, Saks Fifth Avenue, Neiman Marcus, Lord & Taylor, Bloomingdale's, Macy's Inc., Parisian/Belk, and other better department and specialty stores. JA Apparel primarily targets 35 to 54 year-old men and its high-end, high quality products are priced accordingly. For example, the price range of Joseph Abboud suits is $695 to $1,085 and sport coats is $475 to $895. (Spiel Dec. ¶ 12.)

JA Apparel spends $6.5 million per year to advertise, market, and promote its products under the ABBOUD marks in a wide variety of special events, as well as in a wide range of media, including nationally and internationally circulated newspapers and magazines, and the Internet. JA Apparel promotes its line of products in magazines, such as *GQ, Esquire,* and *Best*

*Life*.  JA Apparel participates in major fashion trade shows in North America, including the New York Designer's Collective, Chicago Collective, MAGIC, House and Home Chicago, and the Karvet Showroom event in Los Angeles, as well as working closely with its retailing customers, including department stores, to advertise, market, and promote the brand.  (Spiel Dec. ¶¶ 13, 15.)

**B.     JA Apparel's Relationship and Agreements with Abboud**

On June 16, 2000, JA Apparel entered into the Purchase and Sale Agreement with Mr. Abboud and Houndstooth, in which Mr. Abboud and Houndstooth sold all the ABBOUD trademarks, trade names, and designations, and their related goodwill, as well as any license agreements pertaining to those marks, to JA Apparel for $65.5 million.  (Spiel Dec. ¶ 6 & Ex. 1 at ¶ 1.2.)  The Purchase and Sale Agreement provided that every dollar of the $65.5 million payment amount would "be allocated 100% to Mr. Abboud."  (*Id.*)

The terms of sale in the Purchase and Sale Agreement were clear and explicit – in exchange for $65.5 million, Mr. Abboud and Houndstooth sold *all* of their interest in the ABBOUD marks, including new trade names, service marks, logos, insignias and designations.  The relevant provisions provide as follows:

> 1.1(a)  Upon the terms and subject to the conditions of this Agreement, on the Closing Date (as hereinafter defined), the Sellers shall sell, convey, transfer, assign and deliver to the Buyer, and the Buyer shall purchase and acquire from the Sellers, all of the Sellers' right, title and interest in and to:
>
> > (A) The names, trademarks, trade names, service marks, logos, insignias and designations identified on Schedule 1.1(a)(A) [which includes 11 marks registered in the United States that include the words "Joseph Abboud" or "JA"][2], and all trademark registrations and applications

---

[2]     Schedule 1.1(a)(A) to the Purchase and Sale Agreement includes numerous marks registered in the United States and abroad.  The U.S. trademark registrations listed in Schedule 1.1(a)(A) for the JOSEPH ABBOUD mark are: Reg. Nos. 1,756,084 and 1,675,915.  Also included in Schedule 1.1(a)(A) are the following trademark applications for the JOSEPH ABBOUD mark that have since become registered marks: Ser. No. 75,769,266 (Reg. No. 2,345,776), Ser. No. 75,902,628 (Reg. No. 2,471,279), Ser. No. 75,772,376 (Reg. No. 2,357,617), Ser. No. 75,906,922 (Reg. No. 2,408,889) and Ser. No. 75,906,918 (continued...)

therefor, and the goodwill related thereto (collectively, the "Trademarks"), . . .

(B) All licenses to use the Trademarks granted by Houndstooth or Abboud . . . (collectively, the "License Agreements").

(C) *All rights to use and apply for the registration of new trade names, trademarks, service marks, logos, insignias and designations containing the words "Joseph Abboud," "designed by Joseph Abboud," "by Joseph Abboud," "JOE" or "JA," or anything similar thereto or derivative thereof, either alone or in conjunction with other words or symbols (collectively, the "New Trademarks"), for any and all products or services.*

. . .

(E) The goodwill of or pertaining to the Trademarks.

(Spiel Dec. ¶¶ 6, 7 & Ex. 1 at ¶ 1.1(a)(A)-(E).)  (Emphasis added.)

On July 13, 2000, JA Apparel and Mr. Abboud also entered into the Side Letter Agreement, in which Mr. Abboud agreed to provide, *inter alia*, consulting services relating to fashion design and brand promotion of the products sold by JA Apparel under the ABBOUD marks.  (Spiel Dec. ¶ 19 & Ex. 6.)  Mr. Abboud agreed to render these services for a period of five years.  (*Id.* Ex. 6 at ¶ 1(a).)  Mr. Abboud also agreed, for the two years thereafter (*i.e.* until July 13, 2007), not to compete in the "business of designing, licensing, manufacturing, marketing or distributing" "directly or indirectly" or "be associated with any business" that is "competitive" with the business of JA Apparel.  (*Id.* Ex. 6 at ¶ 2(a)-(b).)  The Side Letter Agreement also required Mr. Abboud to obtain written permission from JA Apparel before becoming associated in any capacity with any person or entity that competed or proposed to compete with JA Apparel.

---

(Reg. No 2,408,887).  Schedule 1.1(a)(A) further lists Reg. No. 1,773,480 (design mark), Reg. No. 1,802,766 (J.O.E. JUST ONE EARTH AN ENVIRONMENT OF STYLE), Reg. No. 1,648,203 (JA II & design mark), Reg. No. 1,893,638 (JUST ONE EARTH), and Ser. No. 75,906,917 (design mark), along with the following trademark applications that have since become registered marks: Ser. No. 75,772,402 (now Reg. No 2,355,271) (JOSEPH ABBOUD & design), Ser. No. 75,906,921 (now Reg. No. 2,408,888) (design mark), Ser. No. 75,902,629 (now Reg. No. 2,419,195) (design mark), and Ser. No. 75,878,009 (now Reg. No. 2,400,258) (design mark).  *See* Schedule 1.1(a)(A) to Spiel. Dec. Ex. 1 for a complete list of marks that were transferred to JA Apparel in the Purchase and Sale Agreement.

(*Id.*)

The non-compete obligations in the Side Letter Agreement were a condition of the sale, for which Mr. Abboud received $65.5 million, and Mr. Abboud expressly acknowledged that the purchase price he was receiving in connection with the sale provided him with full and fair consideration for his non-competition obligations. (Spiel Dec. Ex. 6 at ¶ 2(c).) Moreover, Mr. Abboud acknowledged in the Side Letter Agreement that his non-competition obligations were specifically bargained for in connection with the consummation of the sale transaction and that in the event he breached such obligations, JA Apparel "will be entitled to obtain equitable relief in the form of a preliminary or permanent injunction from any court of competent jurisdiction in order to enforce such agreements." (*Id.* Ex. 6 at ¶ 2(d).) The Side Letter Agreement reiterated that, in the Purchase and Sale Agreement, Mr. Abboud and Houndstooth had sold to JA Apparel *all* of the ABBOUD marks and the goodwill related thereto. (*Id.* Ex. 6 at p. 1.)

Shortly after selling his trademarks, trade names and designations, and related goodwill in 2000 to JA Apparel, Mr. Abboud became involved in an acrimonious dispute with the then owners of JA Apparel (GFT USA/RCS) and JA Apparel's then President and CEO over Mr. Abboud's role in the company's creative process, and instituted litigation against them. In 2003, JA Apparel was sold to affiliates of J.W. Childs Associates, L.P. ("J.W. Childs"), which paid $73 million (and assumed certain debt) for the company, in a transaction that closed in March 2004. (Spiel Dec. ¶¶ 25-26.)

Mr. Abboud subsequently terminated his litigations against JA Apparel, its former owners and then President and CEO, and was given new responsibilities at JA Apparel by its current owners, pursuant to a June 29, 2004 Letter Agreement ("Letter Agreement") in which

Mr. Abboud and JA Apparel "reaffirm[ed] their commitment to the terms of the July 13, 2000 [Side Letter] Agreement" – an agreement that, as noted above, incorporated the terms of the Purchase and Sale Agreement and specifically reiterated that JA Apparel had acquired the ABBOUD marks.   (Spiel Dec. ¶ 27 & Ex. 7 at ¶ 1.)   The Letter Agreement also gave Mr. Abboud equity participation rights in JA Holding, Inc., a company J.W. Childs formed to facilitate its acquisition of JA Apparel, which right Mr. Abboud exercised. (*Id.* ¶ 27 & Ex. 7 at ¶ 3.)  In addition, Mr. Abboud was assigned designers to aid him with his work, and JA Apparel agreed to provide Mr. Abboud with access to its merchandising, marketing, publicity, and advertising services. (*Id.* ¶ 27 & Ex. 7 at ¶¶ 8-9.)

In Spring 2005, prior to the end of the five-year period set forth in the Side Letter Agreement, Mr. Abboud informed JA Apparel that he was not going to extend his role in JA Apparel. (Spiel Dec. ¶ 28.)  The conclusion of the five-year personal services period on July 13, 2007 commenced the running of Mr. Abboud's agreement not to compete for two years, a period that ended on July 13, 2007.  During this period, Mr. Abboud never sought – and JA Apparel never granted him – any permission to compete with it or to become associated with anyone who competed with or proposed to compete with the company. (*Id.*)  Such permission would not have been granted had Mr. Abboud sought it. (*Id.*)

**C.    Defendants' Announcement of Their "jaz" Menswear
       Collection and Their Unauthorized Use of JA Apparel's ABBOUD Marks**

31.    At around the end of the Restricted Period applicable to the non-compete clauses in Mr. Abboud's Side Letter Agreement, JA Apparel received reports from sources in the fashion industry that Mr. Abboud had already entered or was entering into some type of business relationship with one or more companies to launch a new line of apparel.  Thereafter, on August 6, 2007, JA Apparel learned from an article published in *DNR*, the leading magazine of the

men's fashion industry, that defendants had entered into licensing and manufacturing agreements with various companies and individuals to design, manufacture, and market a Fall 2008 menswear collection called "jaz." (Spiel Dec. ¶ 31 & Ex. 8.)

The article reported that Mr. Abboud had already formed licensing partnerships for his new menswear line with (i) Jack Victor Ltd. ("Jack Victor") for tailored clothing; (ii) Cardinal Clothing Canada, Inc. ("Cardinal Clothing") for outerwear; and (iii) J.S. Blank & Co. ("J.S. Blank") for ties. All three of Mr. Abboud's licensees are direct competitors of JA Apparel, and Cardinal Clothing had previously been JA Apparel's licensee. Mr. Abboud had also negotiated agreements with (i) Alden Street Shirt, Co. LLC ("Alden") to acquire Alden for the production of his new, competitive shirt line; (ii) Merrill Sharpe Ltd. ("Merrill") to acquire Merrill for the production of his new competitive sportswear line; and (iii) veteran menswear executive Robert Kidder to serve as president of Mr. Abboud's dress shirt subsidiary. (Spiel Dec. ¶¶ 31, 32 & Ex. 8.)

It initially appeared from the *DNR* article that Mr. Abboud was going to honor JA Apparel's rights in the ABBOUD marks and was using the name "jaz" to avoid any confusion. Indeed, the *DNR* article, authored by David Lipke, noted "Abboud, the person, is prohibited from using the Joseph Abboud name on any product or marketing materials." (Spiel Dec. ¶ 33 & Ex. 8.)

Two days after the *DNR* article was published, however, Mr. Lipke forwarded to JA Apparel an email in which defendants asked Mr. Lipke to issue a "correction" because they are free to use [Mr. Abboud's] name in marketing materials, not on clothing." Mr. Abboud or his representatives told Mr. Lipke that they viewed the "Joseph Abboud" name as "a very big asset to us" and to their "partners, future partners and accounts." (Spiel Dec. ¶ 34 & Ex. 9.)

*DNR* obliged Mr. Abboud, and ran what it called a "Clarification" on the first page of its August 13, 2007 issue. The Clarification stated that, "according to [Mr.] Abboud and his attorney, Theodore Dinsmoor, the designer . . . is, in fact, *allowed to use his own name on marketing and advertising materials for Jaz*." (Emphasis added.) (Spiel Dec. ¶ 35 & Ex. 10.)

Defendants also expressed their intent to infringe JA Apparel's rights in an article in *The Wall Street Journal* published on August 6, 2007 in which Mr. Abboud and his attorney stated that Mr. Abboud plans to promote his new label with the tagline "a new composition by designer Joseph Abboud." (Spiel Dec. ¶ 36 & Ex. 11.)

Neither Mr. Abboud, nor any of the other defendants, has any, nor was given any, authorization to use the ABBOUD marks in connection with a clothing line or "for any and all products or services" as set forth in the Purchase and Sale Agreement. (Spiel Dec. ¶¶ 6, 37 & Ex. 1 at ¶ 1.1.(C).) Defendants' use of the trademarks, trade names and designations "a new composition by designer Joseph Abboud" and "Joseph Abboud" on their "jaz" clothing line and on marketing and advertising materials constitutes a breach of the Purchase and Sale Agreement because the phrase "a new composition by designer Joseph Abboud" is a barely discernable variation of the trade names, trademarks and designations "Joseph Abboud," "designed by Joseph Abboud," "by Joseph Abboud" and is plainly "similar thereto" or "derivative thereof" these trade names, trademarks and designations. Because Mr. Abboud assigned the rights in all such trade names, trademarks and designations to JA Apparel, Mr. Abboud cannot use them. (*Id.* Ex. 1 at ¶ 1.1(a)(A)-(E).)

Defendants' "jaz" line of clothing, which will bear the trade name, trademark and designation "a new composition by designer Joseph Abboud," or will otherwise use "Joseph Abboud," will be sold in many of the same department and retail stores that sell JA Apparel's

"Joseph Abboud"-branded products and at similar high price points.  (Spiel Dec. ¶ 38 & Exs. 8, 11.)  Defendants will target a similar audience to that of JA Apparel.  (*Id.* ¶ 39.)  In addition, defendants' "jaz" line will be advertised in advertising channels that will overlap with those of JA Apparel, including many of the same magazines, and will be presented at the same trade shows as JA Apparel's ABBOUD products.  (*Id.* ¶ 40.)

**D.    Mr. Abboud's Breach of the Non-Compete Obligations in the Side Letter Agreement**

The August 6, 2007 *DNR* article, which announced defendants' "jaz" collection, also indicates that Mr. Abboud breached his non-compete obligations in the Side Letter Agreement. According to that article, during the week of July 30, 2007, Mr. Abboud displayed his new clothing collection to a DNR reporter at a meeting at Mr. Abboud's Bedford workspace, which was also attended by ten top executives of the three different licensees of Mr. Abboud's new products and two clothing manufacturers that Mr. Abboud had already negotiated agreements to acquire.  (Spiel Dec. ¶ 42 & Ex. 8.)  Mr. Abboud and his new partners had agreed upon such detailed matters as the allocation of showroom space, channels of distribution, product sourcing, and the prices, fabrics, patterns, and colors of his new menswear line.  (*Id.*)  The breadth and specificity of the description of Mr. Abboud's new business and menswear line is reflective of the extensive relationship he had developed with his new business partners over many months. (Spiel Dec. ¶ 42.)  The process of negotiating agreements with Jack Victor, Cardinal Clothing, J.S. Blank, Alden, Merrill, and Robert Kidder likely took months to accomplish and, thus, would not have been possible for Mr. Abboud to have completed in the less-than-three weeks between the expiration of the Restricted Period on July 13, 2007 and the meeting at his Bedford workspace during the week of July 30, 2007.  (Spiel Dec. ¶¶ 42, 43.)

The August 6, 2007 *DNR* article also featured pictures and descriptions of complete

fashion designs and actual "jaz" garments, including suits and coats, as well as shirts bearing the "jaz" label.  (Spiel Dec. ¶ 44 & Ex. 8.)  Indeed, the article included four color photos of models wearing "jaz" suits, sweaters, shirts, jackets, and pants, all finished and fully tailored.  (*Id.*)  Thus, Mr. Abboud had already identified, negotiated, and fully formed licensing partnerships and acquisition agreements for his new competitive menswear line, and had already designed, obtained fabrics for, and produced a complete line of menswear.  Mr. Abboud could not have done this in the less-than-three-week time period between the expiration of the non-compete period and the publication of the press announcements about his "jaz" line.  (*Id.* ¶¶ 44, 45 & Exs. 8, 11.)  Additionally, Mr. Abboud failed to ask – much less receive – permission from JA Apparel to engage in the conduct described in, and reflected by, the articles.  (*Id.* ¶ 46.)

**E.      The Harm to JA Apparel**

By using the trade names, trademarks and designations "a new composition by designer Joseph Abboud" and "Joseph Abboud," defendants are causing substantial and irreparable injury to JA Apparel and its valuable ABBOUD marks.   Many actual and potential purchasers and consumers, upon encountering defendants' infringing use and their associated promotions, are likely mistakenly to believe that JA Apparel has in some way licensed, approved, or sponsored defendants' products, or that defendants' products are in some way affiliated with or related to JA Apparel or its products sold under the ABBOUD marks.   JA Apparel, however, has no control over the nature or quality of the products manufactured and marketed by defendants, and, as such, there is a real danger that JA Apparel's reputation will be damaged in a way that cannot be measured or quantified.   Irreparable injury is even more likely where, as here, the goods at issue are designer goods because purchasers of such goods have a particularly strong awareness of the brand name.

The mere publicity that has been generated about the launch of Mr. Abboud's new

clothing line has already resulted in confusion as to the source of the "jaz" line of clothing. For example, on August 6, 2007, an investment banker emailed JA Apparel after having received a business news alert about defendant's new "jaz" clothing line, in which he offered his "congratulations" because he mistakenly believed that JA Apparel had acquired Merrill and Alden, not Mr. Abboud and his affiliates. (Spiel Dec. ¶ 48 & Ex. 12.) Further, on August 14, 2007, a representative from a publisher of high-end magazines emailed JA Apparel stating, "I hear that Joseph Abboud is launching a new men's line called Jaz." (*Id.* ¶ 48 & Ex. 13.) Moreover, the very news articles that announced the launch of defendants' new "jaz" line indicate that confusion is likely. The author of the August 6 *DNR* article writes: "The prospect of designer Joseph Abboud's marketing a new men's wear brand that competes in the same zone as the Joseph Abboud brand could be a bit confusing to retailers and consumers." (*Id.* Ex. 8.) Similarly, the reporter for *The Wall Street Journal* observed that "JA Apparel could argue that the appearance of the Abboud name in promotional material could create confusion between the brands." (*Id.* Ex. 11.)

## ARGUMENT

It is well-settled in this Circuit that a plaintiff is entitled to a preliminary injunction under Federal Rule of Civil Procedure 65 upon showing (1) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor; and (2) the threat of irreparable harm. *E.g., Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 537 (2d Cir. 2005); *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 145 (2d Cir. 2003); *Am. Cyanamid Co. v. Campagna Per Le Farmacie In Italia S.p.A.*, 847 F.2d 53, 54-55 (2d Cir. 1988).

As demonstrated below, each of these alternative standards is clearly satisfied here, and JA Apparel is accordingly entitled to a preliminary injunction enjoining defendants from

breaching the Sale and Purchase Agreement, from infringing and diluting the ABBOUD marks, from competing unfairly with JA Apparel, and from breaching the non-compete obligations in the Side Letter Agreement.

**POINT I**

**JA APPAREL IS LIKELY TO
SUCCEED ON THE MERITS OF ITS CLAIMS**

**A.     JA Apparel Is Likely to Prevail on Its Claim
for Breach of the Purchase and Sale Agreement**

To prevail on a claim of breach of contract under the governing New York law (*see* Spiel Dec. Ex. 1 at ¶ 9.6), a plaintiff must demonstrate (1) the existence of a contract, (2) plaintiff's performance, (3) defendant's breach, and (4) damages to the plaintiff.  *See, e.g., Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996); *Shred-It USA, Inc. v. Mobile Data Shred, Inc.*, 228 F. Supp. 2d 455, 462 (S.D.N.Y. 2002), *aff'd*, 92 Fed. Appx. 812 (2d Cir. 2004).  *See also Hazel Bishop, Inc. v. Perfemme, Inc.*, 314 F.2d 399, 404 (2d Cir. 1963) (New York "upholds agreements whereby one party agrees to refrain from the commercial exploitation of his name and vests the exclusive right to the goodwill attached to his name in another") (affirming preliminary injunction).  Here, there is no dispute that the Purchase and Sale Agreement is a valid contract and that JA Apparel performed its obligations under the Agreement – paying Mr. Abboud $65.5 million.  Nor can there be any dispute that JA Apparel is likely to succeed in establishing that Mr. Abboud breached the Agreement.

In the Purchase and Sale Agreement, Mr. Abboud agreed to and did sell "*all*" of his "right, title and interest in and to" the ABBOUD marks, including, *inter alia*, "*all* rights to use" any "*trade names, trademarks*, service marks, logos, insignias and *designations* containing the words 'Joseph Abboud,' '*designed by Joseph Abboud*,' '*by Joseph Abboud*,' . . . or *anything*

*similar thereto or derivative thereof*, either alone or in conjunction with other words or symbols . . ., for any and all products or services." (Spiel Dec. Ex. 1 at ¶ 1.1(a)(D)) (Emphasis added). He sold all those rights and retained none of them. Plainly, Mr. Abboud's use of the trade name, trademark and designation "a new composition by designer Joseph Abboud" is a barely discernable variation – and clearly "similar" to and a "derivative" of – both "designed by Joseph Abboud" and "by Joseph Abboud." Indeed, one of the definitions of "compose" is "to create by mental or artistic labor: *design* and execute or put together." WEBSTER'S THIRD NEW INT'L DICTIONARY p. 466 (2002) (Emphasis added).

In short, JA Apparel is likely to succeed in establishing that Mr. Abboud's use of the trade names, trademarks and designations "a new composition by designer Joseph Abboud" and "Joseph Abboud" is a clear breach of the Purchase and Sale Agreement and is precisely the type of use of the ABBOUD marks that Mr. Abboud agreed never to do in exchange for $65.5 million.

**B.      Plaintiff Is Likely to Succeed on the Merits of Its Lanham Act Trademark Infringement and False Designation of Origin Claims**

To prevail on a claim for infringement of a registered trademark under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), a plaintiff must demonstrate that its mark is valid and entitled to protection, and that defendant's use of its mark is likely to cause confusion. *See, e.g., Virgin Enters. Ltd.*, 335 F.3d at 146; *Time, Inc. v. Petersen Publ'g Co.*, 173 F.3d 113, 117 (2d Cir. 1999). Here, JA Apparel is the owner of valid and subsisting federal trademark registration for the ABBOUD marks for a wide variety of goods. (*See* pp. 7-8, *supra*). Registration is *prima facie* evidence of the marks' validity and registered trademarks are presumed to be distinctive and should be "afforded the utmost protection." *Savin Corp. v. Savin Group*, 391 F.3d 439, 457 (2d Cir. 2004) (citing *Lois Sportswear v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986));

*accord, Lexington Mgmt. Corp. v. Lexington Capital Partners,* 10 F. Supp. 2d 271, 277 (S.D.N.Y. 1998); 15 U.S.C. § 1057(b).  Moreover, because the registrations of "Joseph Abboud" are incontestable,[3] they are "*conclusive* evidence" of the marks' "validity . . . and of the registrant's ownership of the mark[s] . . . and . . . *exclusive* right to use the mark[s]." 15 U.S.C. § 1115(b) (Emphasis added).  *See Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 196 (1985); *Gruner + Jahr USA Publ'g. v. Meredith Corp.,* 991 F.2d 1072, 1076 (2d Cir. 1993). (Spiel Dec. ¶ 10 & Ex 2.)

A *prima facie* case for a claim for infringement of a registered trademark under Section 32(1) of the Lanham Act,[4] as well as a Section 43(a)[5] Lanham Act claim for false designation of origin, "is made out by showing the use of one's trademark by another in a way that is likely to confuse consumers as to the source of the product." *Lois Sportswear,* 799 F.2d at 871; *see also Virgin Enters. Ltd.,* 335 F.3d at 146.  In addition, "[t]he public's belief that the mark's owner sponsored or otherwise approved of the use of the trademark satisfies the

---

[3]       A registered mark becomes "incontestable" if it has been in continuous use for five years subsequent to its registration and meets the other requirements of 15 U.S.C. § 1065.

[4]       Section 32 provides, in relevant part:

   Any person who shall, without the consent of the registrant
(a)     use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use *is likely to cause confusion, or to cause mistake, or to deceive* . . . shall be liable in a civil action by the registrant . . . ." (15 U.S.C. § 1114(1)).  (Emphasis added).

[5]       Section 43(a)(1) provides, in relevant part:

   Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin . . . which
   (A) *is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person,* . . .
   shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. (15 U.S.C. § 1125(a)(1)).  (Emphasis added).

confusion requirement." *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 205 (2d Cir. 1979).

Moreover, the confusion actionable under the Lanham Act is not limited to confusion at the instant of sale. Rather, it includes the "initial interest" confusion that occurs when a prospective purchaser mistakenly believes an infringer to be affiliated with, related to or sponsored by the plaintiff, even if that confusion is dispelled prior to purchase. *See Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 260 (2d Cir. 1987). Where initial interest confusion exists, "[t]he harm to [the trademark owner] . . . is the likelihood that a consumer, hearing the [similar] name and thinking it had some connection with [the trademark owner] would consider [the product or service] on that basis. The [similar] name therefore would attract potential customers based on the reputation built up by [the trademark owner] in this country for many years." *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1342 (2d Cir. 1975). *Accord, Sports Auth. v. Prime Hospitality Corp.*, 89 F.3d 955, 964 (2d Cir. 1996).

The Lanham Act also prohibits post-sale confusion, which occurs when a non-purchaser encounters a defendant's infringing mark after a sale to someone else and mistakenly believes that defendants' goods or services emanate from or are in some way affiliated with or sponsored by plaintiff. *See, e.g., Lois Sportswear*, 799 F.2d at 872 (holding that "post-sale confusion" is "clear[ly]" "actionable").

### 1.   The Use of a Previously Sold Personal Name Trademark or Trade Name Constitutes Trademark Infringement Where There Is a Likelihood of Confusion

It is a firmly established proposition of trademark law that the sale of a personal name trademark or trade name bars the seller from creating confusion by again using his name in competition with the purchasers of his former business. As the Second Circuit has explained,

"[t]o protect the property interest of the purchaser, . . . the courts will be especially alert to foreclose attempts by the seller to 'keep for himself the essential thing he sold, and also keep the price he got for it.'" *Levitt Corp.*, 593 F.2d at 468 (quoting *Guth v. Guth Chocolate Co.*, 224 F. 932, 934 (4th Cir. 1915) (party that sold his company, together with the goodwill and right to use the name GUTH, lost the right to use his name as a trademark)).[6]   In *Levitt Corp.*, the defendant, William Levitt, had sold his interest in his company, Levitt and Sons, including the LEVITT marks, and agreed not to use the name LEVITT as a corporate title, trademark or trade name in the construction business.  593 F.2d at 465-66.  Mr. Levitt also agreed not to compete with the purchaser for two years.

Notwithstanding the sale of his business and his agreement not to use the LEVITT marks, Mr. Levitt began a construction venture in Florida, which advertised his intent to build a new "Levittown" in Florida, and which identified him as the founder of the company that had built "Levittowns" in other states.  593 F.2d at 466.  In affirming a wide-ranging injunction against such infringement, Chief Judge Kaufman explained that "when a name is used as a trademark, it risks becoming a symbol of the corporation and losing its individual identity."  *Id.* at 468. "When a business purchases trademarks and goodwill, the essence of what it pays for is the right to inform the public that it is in possession of the special experience and skill symbolized by the name of the original concern, and the sole authority to market its products.  The value of goodwill obviously becomes diluted and sales lost if confusion arises in the mind of the public

---

[6]     The lower court's opinion in *Levitt Corp.*, which was affirmed by the Second Circuit, included a similar statement of the law:  Under circumstances where "[a personal name] has been voluntarily parted with, particularly, when the name has been extended to a corporation identified with the business and the corporation has then been sold, together with the name and its goodwill," the "doctrines of both trademark and contract, grounded in principles of honesty and good faith, limit the seller's right to his own family name." *Levitt Corp v. Levitt*, 1978 U.S. Dist. LEXIS 15820, at *15 (E.D.N.Y. Aug. 29, 1978), *aff'd*, 593 F.2d 463 (2d Cir. 1979).

over the source of the reputable goods or services." *Id.* at 463.

The Second Circuit went on to explain that because "the infringing party has previously sold his business, including use of his name and its goodwill, to the plaintiff, sweeping injunctive relief" was appropriate.  593 F.2d at 468.  In particular, the Court affirmed the district court's injunction: (1) directing that defendants "cease all use of the term 'Levittown' in connection with the development, advertising and marketing" of the Florida project; (2) compelling defendants to remove the name "Levittown" from any existing advertising or other documentation; (3) directing defendants "for a period of two years to refrain from issuing any press release or advertising, or generating any publicity" concerning Levitt's connection with the Florida project; (4) "[d]irecting defendants to refrain permanently in connection with any future residential developments from issuing press releases, brochures, advertising, or publicity concerning [Levitt's] prior connection with or relationship to past projects which were, in fact, developed by Levitt & Sons, Inc. (New York) or its related corporation"; and (5) requiring corrective advertising in the form of a press release.  1978 U.S. Dist. LEXIS 15820, at *18-*20, *aff'd* 593 F.2d 463 (2d Cir. 1979).  In support of this relief, the Court of Appeals quoted its earlier decision in *Taylor Wine Co. v. Bully Hill Vineyards, Inc.*, 569 F.2d 731, 735 (2d Cir. 1978), where the Court stated that "the fact that an alleged infringer has previously sold his business with its goodwill to the plaintiff makes a sweeping injunction more tolerable."  Indeed, the Court in *Levitt Corp.* emphasized, "it is beyond cavil that a district court sitting in equity may devise a remedy that extends or exceeds the terms of a prior agreement between the parties if it is necessary to make the injured parties whole." *Id.* at 469.

In short, as Professor McCarthy writes, "[i]f a person has sold a business which is identified by his personal name, the name is an asset which he has sold, and he cannot keep

commercial control of the name and keep the purchase price too." *McCarthy on Trademarks* § 18:32 (2007). And, as the Second Circuit reiterated in *Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814, 823 (2d Cir. 1986), "an individual who sells a trade name may not thereafter falsely designate the origin of newly-produced products by using his name in such a way as to mislead the public into believing that those products are produced by the company which purchased the trade name."[7]  Indeed, in *Madrigal*, the district court enjoined defendant Levinson from using on product labels or brochures the designation or phrase "Cello by Mark Levinson," which is highly similar to the phrase or designation that Mr. Abboud has announced he intends to use here. Significantly, the defendant Levinson did not even bother to appeal this aspect of the district court's ruling. 799 F.2d at 818-19. Likewise, in *Equibrand Corp. v. Reinsman Equestrian Products, Inc.*, 2007 U.S. Dist. LEXIS 36229, at *43-44, 52 (N.D. Tex. May 17, 2007), the court preliminarily enjoined defendants from using the names, trademarks or logos "'Designed by Dale Martin,' the 'Dale Martin Collection,' the name 'Dale Martin' or any derivation thereof in conjunction with the sale or offer for sale of any saddle, bridles, tack, or other equestrian related products" because defendant Dale Martin had sold the exclusive right to

---

[7]        Although the Second Circuit narrowed the remaining injunctive provisions to permit the defendant, Levinson, to tell a limited number of highly sophisticated customers that he was associated with his new business, it did so because defendant's goods – "high end audio equipment" costing as much as $10,000 – were "distinct" from the plaintiff's goods and there was a total absence of evidence that such limited use of the defendant's name had, or was likely to, cause confusion. 799 F.2d at 821-25. Here, in contrast, the goods are directly competitive and cost far less than $10,000, and there is ample evidence (*see* pp. 28-29) that confusion is likely.  Moreover, Mr. Levinson, unlike Mr. Abboud, received no more than a "token amount" for the transfer of his name as a trademark, which was involuntary and occurred in a bankruptcy proceeding, and there was "little business associated with its use." *Id.* at 825. Moreover, as the Second Circuit stated in *Madrigal*, "[w]hether a person who sells the trade name to his personal name is barred from using the personal name depends on the terms of the sale." *Id.* at 823. Here, under the terms of the sale, Mr. Abboud contracted away the right to use the trade name, trademarks and designations "Joseph Abboud," "by Joseph Abboud," and "designed by Joseph Abboud" or "anything similar thereto or derivative thereof," "or any and all products or services." Thus, the Second Circuit's limited narrowing of the injunction in *Madrigal* provides no support for Mr. Abboud's attempt to use the trade name, trademark and designation "composed by designer Joseph Abboud" and "Joseph Abboud" in connection with the sale of, and in advertising for, his new "jaz" clothing line.

use his name as a trademark or trade name for valuable consideration.

Applying this clear law in a case where, as here, a clothing designer sold all of his rights in the name and its affiliated goodwill and then turned around and tried to use his name in connection with similar goods, the court enjoined the designer from using his name on any merchandise, labels or packaging. *Nipon*, 216 B.R. 117. There, the well-known clothing designer Albert Nipon and his company, Albert Nipon, Inc., had sold to Leslie Fay certain of its assets, including substantially all of the existing trademarks in his name and the related goodwill. *Id.* at 123. Years later, Mr. Nipon entered into a license agreement with American Pop for men's and boys' neckties. *Id.* at 125. Beneath the American Pop trademark, in smaller type, the label read "CREATED BY ALBERT NIPON." *Id.* Albert Nipon also planned to sell watches under the "American Pop" trademark with the same "CREATED BY ALBERT NIPON" label on the watch box. *Id.* In an argument that Mr. Abboud is sure to echo, Mr. Nipon suggested that use of "his own name, and related advertising, [was] a permissible means to inform the public and industry of his association with American Pop." *Id.* at 130.

The court rejected that argument. In holding that this conduct constituted trademark infringement and dilution under the Lanham Act, the court emphasized that, "to protect the property interest of the purchaser . . . the courts will be especially alert to foreclose attempts by the seller to 'keep for himself' the essential thing he sold, and also keep the price he got for it." *Nipon*, 216 B.R. at 124 (quoting *Guth*, 224 F. at 934). Accordingly, the court found that Nipon and American Pop had infringed and diluted plaintiff's trademark and had violated New York state law. The court, therefore, enjoined Nipon from using his name on any merchandise labels for American Pop and "from further marketing of the Nipon Trademarks," holding that Nipon violated the Lanham Act by marketing and selling goods "incorporating the Nipon Trademarks

on their labels, packaging and associated promotional material, including display of goods at apparel trade shows . . ."[8]  *Id.* at 125-26.  Numerous other decisions have enjoined a defendant from using his name as a trade name, trademark, or designation where he had sold it to the plaintiff.  *Accord, Francis S. Denney, Inc. v. I.S. Labs., Inc.*, 758 F. Supp. 140 (S.D.N.Y. 1990); *Lazzaroni USA Corp. v. Steiner Foods*, 2006 U.S. Dist. LEXIS 20962, at *23 (D.N.J. April 11, 2006); *Osgood Heating & Air Conditioning, Inc. v. Osgood*, 75 U.S.P.Q.2d 1432 (W.D. Tex. 2004); *Barr v. Sasser*, 1992 U.S. Dist. LEXIS 21751, 24 U.S.P.Q.2d 1942 (N.D. Okla. 1992); *Cliffcorn Answering Serv., Inc. v. Deutschel*, 23 Misc. 2d 254, 198 N.Y.S.2d 952 (N.Y. Sup. Ct. Kings Co. 1960).

Likewise, here, it is undisputed that Mr. Abboud sold to JA Apparel, in return for $65.5 million, "all right, title and interest in and to" the ABBOUD "trade names, trademarks, service marks, logos, insignias and designations," including "Joseph Abboud," "designed by Joseph Abboud" and "by Joseph Abboud" in conjunction with "any and all products or services."  (Spiel Dec. ¶¶ 6, 7 & Ex. 1.)  Despite the explicit language of the Purchase and Sale Agreement, defendants have chosen to use the trademarks, trade names, and designations "Joseph Abboud" and "a new composition by designer Joseph Abboud," the latter of which is a barely discernable variation of "Joseph Abboud," "designed by Joseph Abboud" and "by Joseph Abboud."  Having accepted $65.5 million for his voluntary sale of his marks, Mr. Abboud cannot "keep for himself

---

[8]    Significantly, the defendants in *Nipon* placed disclaimers on the tie and watch packaging stating "THIS GARMENT IS NOT LICENSED OR UNDER THE AUTHORIZATION OF THE OWNER OF THE ALBERT NIPON REGISTERED TRADEMARKS."  The disclaimer was printed on a hangtag pinned to the ties and was on a sticker affixed to the front of the watch boxes in a similar size font as the "created by Albert Nipon" label.  The same disclaimer, in smaller font than the "created by Albert Nipon" label, also appeared on the back of the box.  Nonetheless, the court held that defendants had "not met the heavy burden of providing sufficient evidence that their disclaimer significantly reduces the likelihood of consumer confusion."  216 B.R. at 125, 128.  In particular, because the "Albert Nipon name carrie[d] a strong reputation" in the fashion industry, the use of a disclaimer along with any mention of his name on garments, ties or watches did not mitigate a finding of confusion.  *Id.* at 128.

the essential thing he sold." *Levitt Corp.*, 593 F.2d at 468.  As explained below, JA Apparel is likely to succeed in establishing that his use of the ABBOUD marks creates a likelihood of confusion as to source, origin, affiliation and/or sponsorship and, accordingly, is likely to prove its Lanham Act claims.

### 2.     There Is a Strong Likelihood of Confusion Between <u>Plaintiff's ABBOUD Marks and Defendants' Marks</u>

In evaluating the issue of likelihood of confusion, the Second Circuit has consistently applied the factors first set forth by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961):  (1) the strength of plaintiff's mark; (2) the degree of similarity between the two marks; (3) the proximity of the parties' products or services; (4) the likelihood that the prior owner will bridge the gap between the parties services or products; (5) actual confusion; (6) defendant's bad faith in adopting its mark; (7) the quality of defendant's products or services; and (8) the sophistication of the relevant consumers.  *See also Natural Organics, Inc. v. Nutraceutical Corp.*, 426 F.3d 576, 578 (2d Cir. 2005); *New Kayak Pool Corp. v. R & P Pools, Inc.*, 246 F.3d 183, 185 (2d Cir. 2001); *Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 491 (2d Cir. 1988); *Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1225-29 (2d Cir. 1987).[9]

No single *Polaroid* factor is decisive; indeed, each factor must be evaluated in the context of how it bears on the ultimate issue of likelihood of confusion, and the test should not be applied as if it were a "rigid formula." *Lois Sportswear*, 799 F.2d at 872; *see also Polaroid*, 287 F.2d at 495.  Instead, because each case presents its own circumstances, the *Polaroid* factors should serve "as a useful guide" in determining the ultimate issue of likelihood of confusion. *Id.*

---

[9]      Although originally confined to products that were not competing, the *Polaroid* test has since been extended to the evaluation of likelihood of confusion between competing products and services as well. *See Banff*, 841 F.2d at 490.

Applying the pertinent *Polaroid* factors here, it is clear that defendants' use of the ABBOUD marks is likely to cause confusion.

(a)    <u>The JA Apparel Marks Are Very Strong</u>

JA Apparel's federally registered trademarks for the ABBOUD marks are presumed to be distinctive and should be "afforded the utmost protection." *Savin*, 391 F.3d at 457. (*See* pp. 7-8, *supra*). Moreover, because its registrations for the JOSEPH ABBOUD mark are incontestable, they are "conclusive evidence" of JA Apparel's "exclusive right" to use the mark. 15 U.S.C. § 1115(b). (*See* pp. 7-8, *supra*). (Spiel Dec. ¶ 10 & Ex. 2.)

The commercial success of the ABBOUD marks is also evidence of their strength. JA Apparel and its predecessor have spent substantial sums promoting the brand and have achieved remarkable sales and sales growth, and widespread recognition by third parties. (Spiel Dec. ¶ 18 & Ex. 5.) As the Second Circuit held in *Charles of Ritz Group, Ltd. v. Quality King Distribs., Inc.*, 832 F. 2d 1317, 1321 (2d Cir. 1987), the "commercial success" of a product "reinforces the strength of [its] mark." *See also Playtex Prods., Inc. v. First Quality Hygienic, Inc.*, 965 F. Supp. 339, 341-42 (E.D.N.Y. 1996); *McCarthy on Trademarks* § 11:73 at 11-149.

Moreover, that defendants are attempting to capitalize on the ABBOUD marks' goodwill by using them, in breach of Mr. Abboud's express agreement not to do so, is significant evidence of the ABBOUD marks' strength. *See, e.g., Virgin Enters.*, 335 F.3d at 148 ("A mark's fame also gives unscrupulous traders an incentive to seek to create consumer confusion by associating themselves in consumers' minds with a famous mark"). *Accord, Harlequin Enters., Ltd. v. Gulf & Western Corp.*, 644 F.2d 946, 950 (2d Cir. 1981). JA Apparel purchased the marks for a whopping $65.5 million – a figure further indicative of the marks' strength. *See Nipon*, 216 B.R. at 127 (that Leslie Fay had purchased Nipon trademarks for $1 million was a "strong" indication and "quantifiable evidence" of the mark's strength). Indeed, defendants admit that using the

"Joseph Abboud" name in "marketing materials" is "a very big asset" to them, their "partners, future partners and accounts." (Spiel Dec. ¶ 34 & Ex. 9.) This further demonstrates the strength of the marks.

> **(b)     Defendants' ABBOUD Mark Is
> Identical to JA Apparel's ABBOUD Marks**

Whether two marks are confusingly similar is judged not by "whether the consumer will know the difference if [s]he sees the competing products on the same shelf," but "whether [s]he will know the difference if [defendant's product] is singly presented and [s]he has heard of [plaintiff's product].'" *Spring Mills, Inc. v. Ultracashmere House, Ltd.*, 689 F.2d 1127, 1133 (2d Cir. 1982) (*quoting Am. Home Prods. Corp. v. Johnson Chem. Co.*, 589 F.2d 103, 107 (2d Cir. 1978)). *See also Louis Vuitton Malletier*, 426 F.3d at 538. Moreover, where, as here, the parties compete in the same marketplace – selling the same types of goods to the same purchasers and, in many cases, selling identical goods (*see* p. 28, *infra*) – "the degree of similarity of marks needed to cause likely confusion is less than in the case of dissimilar goods. . . ." *McCarthy on Trademarks* § 24:22 at 24-47; *see, e.g., Louis Vuitton Malletier*, 426 F.3d at 538 n.3 (emphasizing that "'similarity of the marks' test – especially when the comparison is between marks on identical product types (here, handbags) – does not require an identity of marks"); *Nikon Inc. v. Ikon Corp.*, 987 F.2d 91, 95 (2d Cir. 1993); *RJR Foods, Inc. v. White Rock Corp.*, 1978 U.S. Dist. LEXIS 15080, at *7 (S.D.N.Y. Oct. 6, 1978), *aff'd*, 603 F.2d 1058 (2d Cir. 1979).

It cannot be disputed that the trade name, trademark and designation "Joseph Abboud" is identical to plaintiff's ABBOUD marks and that the trade name, trademark and designation "composition by designer Joseph Abboud" is a barely discernable variation on the trade names, trademarks and designations "Joseph Abboud," "designed by Joseph Abboud" and "by Joseph

Abboud." This factor strongly weighs in favor of a finding likelihood of confusion.

**(c)     The Parties' Goods and Services Are in
<u>Close Proximity and There is No Gap To Bridge</u>**

As the Second Circuit has explained, "competitive proximity must be measured with reference to the first two *Polaroid* factors" – the stronger the plaintiff's mark and the greater degree of similarity with the defendant's mark, then the greater the disparity in products and competitive environments that the law will protect against. *Mobil Oil Corp.*, 818 F.2d at 258. *Accord Hasbro Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 76 (2d Cir. 1988); *Centaur Commun's*, 830 F.2d at 1226. When weighing this factor, courts also consider whether the prior user may wish to enter the defendant's market in the future – that is, whether there is a "likelihood of bridging the gap." *Hasbro*, 858 F.2d at 77; *see also Virgin Enters.*, 335 F.3d at 149-151; *Kookai, S.A. v. Shabo*, 950 F. Supp. 605, 608 (S.D.N.Y. 1997). However, where the parties compete in the same market, as here, there is no "gap to bridge," and this factor weighs in favor of a likelihood of confusion. *See Kookai*, 950 F. Supp. at 608 (because "the fashion wear of both [parties] compete[s] directly against one another" and "targeted the same audience," "there is no 'gap' to bridge" and factor "tips in favor of plaintiff.")

Here, plaintiff's marks are very strong and defendants are using virtually identical marks on similar products. In addition, both parties are selling their products with designer labels at similar price points and through the same advertising and distribution channels and, indeed, in some of the same retail outlets. (Spiel Dec. ¶ 38.) Where products "retail within a few dollars of each other, and are promoted at the same trade shows . . . they are in close proximity with each other." *Nipon*, 216 B.R. at 129. In short, because both parties sell at the same stores and consumers and advertise goods at the same trade shows to the same buyers, there is no doubt their products are in close proximity.

### (d)    Actual Confusion

"It is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source." *Savin Corp.*, 391 F.3d at 459 (citing *Lois Sportswear*, 799 F.2d at 875) (affirming preliminary injunction despite absence of actual confusion); *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 170-71 (2d Cir. 1991) (same).  Here, given the fact that defendants' "jaz" menswear line has not yet been sold in the marketplace, the absence of any evidence of consumers' actual confusion regarding defendants' products in retail venues is not surprising and should not be weighed against a finding of likelihood of confusion. *See Nipon*, 216 B.R. at 130 (evidence of actual confusion not required particularly "when, as here, the second comer is still introducing the mark into the marketplace and thus opportunities for confusion are limited" (internal citations omitted); *MSP Corp. v. Westech Instruments, Inc.*, 2007 U.S. Dist. LEXIS 57988, at *23 (D. Minn. Aug. 6, 2007) (lack of evidence of actual confusion "is not dispositive at the preliminary injunction stage, particularly when the defendant has not yet sold any of its product").  *Accord Centaur Commun's*, 830 F.2d at 1227. Significantly, however, in the very short time since the public announcement of defendants' "jaz" line of clothing, there have already been actual instances of confusion as to the source of the new menswear collection by an investment banker and a representative of a company that publishes high-end magazines.  This evidence of actual confusion weighs in favor of a finding of a likelihood of confusion.  (*See* pp. 14-15 *supra*.)

### (e)    Defendants Have Acted in Bad Faith

It is not necessary to show intent in order to establish a likelihood of confusion.  *See Virgin Enters.*, 335 F.3d at 151 (bad faith factor is not of high relevance to the issue of likelihood of confusion); *Lois Sportswear*, 799 F.2d at 875. *Accord McCarthy on Trademarks* § 23:107 at

23-270).    It is, however, well-settled that a knowing or deliberate violation of another's trademark rights constitutes compelling evidence of likelihood of confusion.    *Centaur Commun's*, 830 F.2d at 1228; *Spring Mills*, 689 F.2d at 1135-36.    As the Second Circuit has stated, "[w]here a second-comer acts in bad faith and intentionally copies a trademark or trade dress . . . a presumption arises that the copier has succeeded in causing confusion." *GTFM, Inc. v. Solid Clothing Inc.*, 215 F. Supp. 2d 273, 297 (S.D.N.Y. 2002) (citing *Paddington Corp. v. Attiki Imps. & Distrib., Inc.*, 966 F.2d 577, 586-87 (2d Cir. 1993)).    Accordingly, "the second comer has a duty to so name and dress his product as to avoid all likelihood of consumers confusing it with the product of the first comer." *Mobil Oil Corp.*, 818 F.2d at 259 (quoting *Harold F. Ritchie Inc. v. Chesebrough-Pond's, Inc.*, 281 F.2d 755, 758 (2d Cir. 1960)).

Here, defendants' bad faith and intent could not be clearer.    Not only did they know of the ABBOUD marks and JA Apparel's rights in those marks, it was Mr. Abboud himself who sold those marks to JA Apparel and pocketed $65.5 million for doing so.    As even clearer evidence of intent to infringe, Mr. Abboud and his attorney requested *DNR* to publish a "Clarification" on the first page of its August 13, 2007 issue that explicitly stated that they believe they "are free to use [Joseph Abboud's] name on marketing and advertising materials." (Spiel Dec. ¶ 35 & Ex. 10.)    Mr. Abboud has announced to the media his "plans to promote his new label with the tagline 'a new composition by designer Joseph Abboud.'"    (*Id.* ¶ 36 & Ex. 11.)    Thus, unlike in cases where the defendants were found to have acted in bad faith based on mere actual or constructive knowledge of the plaintiff's right, here, defendants proceeded full speed ahead with the clear and deliberate attempt to use the goodwill in the very trademarks, trade names and designations they sold to the plaintiff.    If that is not bad faith, nothing is.    *See, e.g., Levitt Corp.*, 593 F.2d at 468.

### (f)   The Quality of Defendants' Products

JA Apparel has no control over the production, advertising, or marketing of the defendants' goods, and cannot attest to the quality of the goods, their advertising and marketing materials, or the promotions connected to them. But assuming that defendants' products are of comparable quality to JA Apparel's, that would not negate a likelihood of confusion because "a junior user's product of equal quality to a senior user's product injures the senior user by the increased tendency of similar quality products to promote consumer confusion." *Hasbro, Inc.*, 858 F.2d at 78. *See also Nikon Inc.*, 987 F.2d at 95; *Banff*, 841 F.2d at 492; *Centaur Commun's*, 830 F.2d at 1228; *Lois Sportswear*, 799 F.2d at 875.

### (g)   Sophistication of the Relevant Audience

It is "unnecessary to examine whether or not the consumers of apparel and men's neckwear are sophisticated" where the marks "are so similar, even a sophisticated consumer group would be confused." *Nipon,* 216 B.R. at 132. However, "[a]ssuming, *arguendo,* the purchasers are sophisticated, many courts have found that purchasers of designer goods are often more vulnerable to confusion by similar marks because of their strong awareness of the status of the brand name. A consumer who is aware of the designer[] could easily be misled by the neckwear label or watch packaging that boldly use the full distinct name . . . . 'It is the "subliminal confusion" apparent in the . . . relationship . . . between the . . . entities and the products that can transcend the competence of even the most sophisticated consumer.'" *Id.* at 132, citing *Grotrian*, 523 F.2d at 1341. Thus, in this case "even though the goods are 'designer,' the consumer purchaser is not necessarily an especially sophisticated one and, thus, the likelihood of confusion is not mitigated by this factor." *Nipon,* 216 B.R. at 132 (court prohibited a fashion designer from using his name and noted that "[i]n this industry, the [designer's] name carries a strong reputation.") Any confusion likely to be created by similar marks "is heightened by the defendant's reference to its reputation as a creator

and designer of fashion. . . .  Any reference to a fashion reputation is, if anything, going to increase the confusion resulting from the use of very similar marks." *Emilio Pucci Societa A Responsibilita Limitata v. Pucci Corp.*, 1988 U.S. Dist. LEXIS 14097, at *12 (N.D. Ill. Dec. 13, 1988).

*   *   *

In sum, weighing all of the *Polaroid* factors, it is clear that JA Apparel is likely to succeed at trial on its claim that the use of the trademarks, trade names and designations "a new composition by designer Joseph Abboud" and "Joseph Abboud" in connection with defendants' "jaz" Fall 2008 menswear collection and its associated packaging and advertising will likely confuse consumers into believing that defendants' goods originate with, or are licensed, approved, or sponsored by, or otherwise associated with or related to, JA Apparel and its ABBOUD marks.

### C.    JA Apparel Is Likely to Succeed on Its Claim for Dilution Under the Lanham Act

Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c) forbids "dilution" of "famous" marks and provides for injunctive relief against a defendant "who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." 15 U.S.C. § 1125(c)(1).  To succeed on a claim for dilution, the plaintiff must show that (1) its mark is famous and distinctive; (2) defendant adopted the mark after plaintiff's mark became famous; and (3) defendant's use caused likelihood of dilution of plaintiff's mark.

A mark is "famous" if it is "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A).  Here, there cannot be any dispute that the ABBOUD marks are famous and that

defendants adopted the marks after they became famous.[10]  JA Apparel's ABBOUD marks satisfy the fame requirement because the JOSEPH ABBOUD mark is incontestable and has been registered on the Principal Register for several years and JA Apparel has spent millions of dollars in connection with its advertisement and promotion of products bearing the JOSEPH ABBOUD trademark in a wide range of media.[11]  Nor can there be any dispute as to the likelihood of dilution by blurring.  As explained above in connection with defendants' trademark infringement, the factors typically used to assess dilution by blurring under 43(c) – the similarity of the marks and products, the sophistication of the purchasers, and the renown of the senior and junior marks (see 15 U.S.C. § 1125(c)(1)) – all weigh heavily in favor of finding dilution.  *See Nipon*, 216 B.R. at 133; *Clinique Labs., Inc. v. Dep Corp.*, 945 F. Supp. 547, 563 (S.D.N.Y. 1996).

### D.  JA Apparel Is Likely To Succeed on Its State Unfair Competition, Dilution, and General Business Law Claims

Because under New York law JA Apparel's unfair competition claim "is governed by essentially the same considerations as its infringement claim," for the same reasons that it is likely to succeed on its federal claims, it is likely to succeed on its common law unfair competition claim.  *Grotrian*, 523 F.2d at 1342 n.21; *see also Stern's Miracle-Gro Prods., Inc. v. Shark Prods., Inc.*, 823 F. Supp. 1077, 1093 (S.D.N.Y. 1993); *Nipon*, 216 B.R. at 134; *Gucci Am., Inc. v. Action Activewear, Inc.*, 759 F. Supp. 1060, 1063 (S.D.N.Y. 1991).  Similarly, JA

---

[10]     The Trademark Dilution Revision Act of 2006 ("TDRA") sets out four factors that courts may use in "determining whether a mark possesses the requisite degree of recognition" to be considered "famous": "(1) [t]he duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties; (2) [t]he amount, volume, and geographic extent of sales of goods or services offered under the mark; (3) [t]he extent of actual recognition of the mark;" and (4) whether the mark is federally registered.  15 U.S.C. § 1125(c)(2)(A).  *See Dan-Foam A/S and Tempur-Pedic, Inc. v. Brand Named Beds, LLC*, 2007 U.S. Dist. LEXIS 33301, at *81 n.216 (S.D.N.Y. May 4, 2007) ("The TDRA simply requires that a mark 'possess the requisite degree of recognition,' and provides that 'the court *may* consider all relevant factors,' including those factors listed therein.").

[11]     *See* pp. 6-7, *supra*; *see also* Spiel Dec. ¶ 18 & Ex. 5.

Apparel is likely to succeed on its state law statutory claims for deceptive trade practices,[12] false advertising,[13] and dilution.[14]

### E. JA Apparel Is Likely to Succeed on Its Claim for Breach of the Non-Compete Clauses in the Side Letter Agreement

JA Apparel is likely to succeed in establishing that Mr. Abboud breached the non-compete provisions of the Side Letter Agreement he entered into with JA Apparel, which prohibited him, prior to July 13, 2007, from, *inter alia*, directly or indirectly competing with JA Apparel or becoming associated with any entity that competed with or proposed to compete with JA Apparel. JA Apparel is also likely to succeed in demonstrating that Mr. Abboud breached the non-compete provisions in the Side Letter Agreement by failing to obtain the company's written permission before associating in any capacity with any entity that competed or proposed to compete with JA Apparel.

Non-competition agreements that are entered into in connection with the sale of a business

---

[12]    N.Y. GEN. BUS. LAW § 349(a) ("[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful"). *See Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995); *Procter & Gamble Co. v. Quality King Distribs., Inc.*, 974 F. Supp. 190, 201 (E.D.N.Y. 1997).

[13]    N.Y. GEN. BUS. LAW §§ 350, 350-a ("[f]alse advertising" (*i.e.*, "advertising [that] is misleading in a material respect") in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful"). *See Princeton Graphics Operating, L.P. v. NEC Home Elec. (U.S.A.), Inc.*, 732 F. Supp. 1258, 1267 (S.D.N.Y. 1990) ("the standards for a violation under section 350-d [which grants a private right of action under section 350] are substantially the same as under section 43(a)" of the Lanham Act).

[14]    N.Y. GEN. BUS. LAW § 360-l ("[l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark"). *See Allied Maint. Corp. v. Allied Mech. Trades, Inc.*, 42 N.Y.2d 538, 545, 399 N.Y.S.2d 628, 1165 (N.Y. 1977) (statute "does not require a showing of confusion or competition to obtain an injunction"). Because JA Apparel is likely to succeed on proving that defendants have violated the federal dilution statute, it is likely to succeed in showing that they violated the New York Anti-Dilution Statute. *See Nipon*, 216 B.R. at 134 ("The federal and New York state dilution statues differ only by New York's predatory intent factor.... Because I found that [defendants] violated the federal dilution statue, so too have they violated the New York statute.") *See also Metlife, Inc. v. Metro. Nat'l Bank*, 388 F. Supp. 2d 223, 236-37 (S.D.N.Y. 2005) (granting preliminary injunction).

are routinely enforced so that the purchaser of assets is not deprived of the full value of the goodwill it has acquired in connection with the purchase. *See Purchasing Associates Inc. v. Weitz*, 13 N. Y. 2d 267-271-272 (1963); *New York Real Estate Inst., Inc. v. Edelman*, 42 A.D. 3d 321, 321, 839 N.Y.S.2d 488, 489 (1st Dep't 2007). As the Second Circuit has noted, it is an "unassailable statement of New York law that 'where the sale of a business includes the transfer of its good will, a reasonable covenant restricting the seller's right to compete with the purchaser will be enforced.'" *Chevron U.S.A., Inc. v. Roxen Serv., Inc.*, 813 F.2d 26, 28 (2d Cir. 1987) (quoting opinion of lower court). Moreover, New York courts have held that while mere planning may not in itself constitute competition, affirmative steps that go beyond the planning stage do constitute competition and, as such, are violative of a non-competition agreement. *See World Auto Parts v. Labenski*, 217 A.D.2d 940, 629 N.Y.S.2d 896 (4th Dep't 1995) (holding that defendant breached non-compete provision by "attending trade shows, distributing his business card and discussing with competitors his plans to re-enter . . . business when the non-compete provision expired"); *DeLong Corp. v. Lucas*, 176 F. Supp. 104, 122-23 (S.D.N.Y. 1959) (finding that defendant's development and engineering of devices during the period in which he was restricted from working constituted affirmative steps that went beyond the planning stage and, as such, were in violation of his non-compete agreement).

Inasmuch as Mr. Abboud specifically acknowledged in the Side Letter that the $65.5 million dollars he was receiving in connection with the overall transaction provided him with "full and fair consideration" for his non-competition agreement, there can be no question that the restrictions Mr. Abboud agreed to here are enforceable. (Spiel Dec. ¶ 19 & Ex. 6 at ¶ 2(c)). Nor can there be any doubt that Mr. Abboud violated the terms of the non-competition agreement, for which he was so handsomely paid. Specifically, *DNR* reported that during the week of July 30,

2007, Mr. Abboud disclosed that he had already negotiated and fully formed partnerships for his new menswear line with Jack Victor, Cardinal Clothing and J.S. Blank, and would soon acquire Alden and Merrill.  Mr. Abboud and his partners had agreed upon such detailed matters as allocation of showroom space, channels of distribution, product sourcing, and the prices, fabrics, patterns, and colors of his new line.  (*Id.* ¶ 42 & Ex. 8.)  Moreover, although less than three weeks had elapsed since the end of the Restricted Period, the August 6, 2007 *DNR* article reported that Mr. Abboud had already designed a complete line of menswear – complete with suits, blazers, pants, ties, sportswear, and outerwear. (*Id.* ¶ 44 & Ex. 8.)

The breadth and specificity of the description of Mr. Abboud's new business relationships in the *DNR* article are reflective of the extensive relationships he had developed with his new business partners over many months. (Spiel Dec. ¶ 42.)   Indeed, the process of reviewing and selecting prospective licensees and negotiating the terms of new license agreements is complex and often time-consuming.   (*Id.* ¶ 43.)   Thus, it is obvious that Mr. Abboud's selection of his licensees and manufacturers of his competitive line of clothing, as well as the process of negotiating agreements with each of them, could not have been completed in the less than three weeks that had elapsed since the expiration of the Restricted Period.  These activities, therefore, must have taken place well before the July 13, 2007 expiration of the Restricted Period. (*Id.* ¶ 45.)

Similarly, the pictures and descriptions of complete fashion designs and actual "jaz" garments, including fully tailored suits and coats, as well as shirts, sweaters, jackets and pants bearing the "jaz" label, is reflective of many months of work.  (Spiel Dec. ¶ 44.)   Indeed, typically it takes, at a minimum, six to nine months to develop a clothing line from design to product in hand.  (*Id.*)  Thus, would not have been possible for Mr. Abboud to have designed,

obtained fabrics for, and produced these garments in the brief period between the expiration of the Restricted Period on July 13, 2007 and the photo shoot, which occurred at least several days before *DNR*'s August 6, 2007 article.  Instead, to have such garments ready to be photographed by *DNR* by that time, he and his associates would have had to begin the process of designing, cutting, and producing them many months earlier.    (*Id.*)    In all events, it is clear that Mr. Abboud's new menswear business did not spring to life in the brief period between the expiration of the Restricted Period (July 13, 2007) and the meeting with *DNR* in Bedford during the week of July 30, 2007.

Moreover, Mr. Abboud failed to obtain JA Apparel's permission before he entered into numerous associations with his current and potential business partners during the Restricted Period.  (Spiel Dec. ¶ 46.)  By failing to obtain express written permission from JA Apparel prior to associating himself with a party that competed, or which proposed to compete with JA Apparel, Mr. Abboud breached the provision of the non-compete clause in the Side Letter Agreement that required him to obtain JA Apparel's written consent during the Restricted Period before becoming associated in any capacity with such persons.

## POINT II

### JA APPAREL IS THREATENED WITH IRREPARABLE INJURY IF A PRELIMINARY INJUNCTION IS NOT ISSUED

It is black letter law that proof of a likelihood of confusion establishes the threat of irreparable injury if a preliminary injunction is not granted.  *See, e.g.*, *New Kayak Pool Corp.*, 246 F.3d at 185; *Am. Cyanamid Co.*, 847 F.2d at 55; *Hasbro*, 858 F.2d at 73.  That is because, unless the infringer is preliminarily enjoined, the trademark owner "will lose control over the reputation of its trademark pending trial."  *Power Test Petroleum Distribs. v. Calcu Gas, Inc.*, 754 F.2d 91, 95 (2d Cir. 1985).

In addition to loss of control over its trademarks, JA Apparel will be irreparably injured if defendants are not preliminarily enjoined because it will be extremely difficult to calculate lost sales resulting from defendants' infringing use of JA Apparel's ABBOUD trademarks. (Spiel Dec. ¶ 47.) *See also, e.g., Power Test Petroleum Distribs.*, 754 F.2d at 95; *Zeneca, Inc. v. Eli Lilly & Co.*, 1999 U.S. Dist. LEXIS 10852, at *113 (S.D.N.Y. Jul. 19, 1999) ("[t]he likelihood of customer confusion, impairment of plaintiff's reputation and good will and probable diversion of customers, combined with the difficulty of proving actual monetary damages arising from Lanham Act injuries, justifies a presumption of irreparable injury once the violation has been established") (citing *Upjohn Co. v. Am. Home Prods. Corp.*, 598 F. Supp. 550, 555 (S.D.N.Y. 1984)). By definition, the consumer will have been confused and thus will not know that the product he purchased was not the product he thought he was purchasing. This further exacerbates the normally difficult problem of proving lost sales due to infringement or false advertising and furnishes an independent ground for a finding of irreparable harm. *See McNeil Labs., Inc. v. Am. Home Prods. Corp.*, 416 F. Supp. 804, 809 (D.N.J. 1976) ("Nor would it be a simple matter to calculate in damages the value of the customers who would be forever lost to [the plaintiff's product] were we to permit [the defendant] to continue to market [its infringing product].") Indeed, by its very nature, the risk of confusion is an injury that is irreparable. *Omega Importing Corp. v. Petri-Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971); *see also Century 21 Real Estate LLC v. Raritan Bay Realty*, 2007 U.S. Dist. LEXIS 34108, at *7 (E.D.N.Y. May 9, 2007).

If defendants are permitted to trade on the goodwill and value of the very ABBOUD marks they sold to JA Apparel, many of defendants' sales will be based on the erroneous assumption that defendants are affiliated with JA Apparel, or people dissatisfied with

defendants' products might incorrectly attribute that dissatisfaction to plaintiff.   Because consumers are sensitive to designer names as brand names, seeing the Joseph Abboud name in connection with defendants' "jaz" line will likely cause consumers to believe mistakenly that the same company that puts out the Joseph Abboud brand is the source, sponsor or licensor of the "jaz" brand.  *See Nipon*, 216 B.R. at 128; *A.V. by Versace v. Gianni Versace, S.p.A.*, 2002 U.S. Dist. LEXIS 16323, at *43 (S.D.N.Y. Sept. 3, 2002).

Furthermore, courts have held that breach of a non-compete provision protecting a buyer's goodwill presumptively results in irreparable harm, thereby entitling plaintiff to an injunction.  *See New York Real Estate Inst.*, 42 A.D. 3d at 321, 839 N.Y.S.2d at 489; *Manhattan Real Estate Equities Group, LLC v. Pine Equity, NY, Inc.*, 16 A.D.3d 292, 292, 791 N.Y.S.2d 418, 419 (1st Dep't 2005).

## POINT III

### ALTERNATIVELY, THERE ARE FAIR GROUNDS FOR LITIGATION AND THE BALANCE OF HARDSHIPS TIPS DECIDEDLY IN JA APPAREL'S FAVOR

Because JA Apparel has demonstrated that it is likely to succeed on the merits of its claims, it is not necessary to consider the alternate standard of whether the balance of hardships tips decidedly in its favor and whether there are fair grounds for litigation.  Nevertheless, JA Apparel has satisfied this alternative standard as well.

The reputation and goodwill enjoyed by JA Apparel as a result of its investment of time, money, and effort over the years to establish its well-known ABBOUD marks is at stake and threatened by defendants' unauthorized use of the trade names, trademarks and designations "a new composition by designer Joseph Abboud" and "Joseph Abboud" on their "jaz" clothing line and on marketing and advertising materials for that line.  (Spiel Dec. ¶¶ 47, 49.)  By comparison,

the harm that defendants could suffer if an injunction were granted is the loss of revenue from their unauthorized use of JA Apparel's ABBOUD marks.  Defendants have no right to reap profits from the investment sown by plaintiff through its efforts to market and promote the ABBOUD marks for twenty years.  *See, e.g., LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 79 (2d Cir. 1985)  (finding that "the true hardships tip markedly in favor of [plaintiff]" and affirming order enjoining defendant from selling infringing products during pendency of suit, in light of potential harm to goodwill and reputation of plaintiff's trademark rights).

Mr. Abboud can hardly be heard to complain that it would be inequitable to enjoin him from exercising the very trademark rights that he voluntarily relinquished and sold for $65.5 million.  *See Chernoff Diamond & Co. v. Fitzmaurice, Inc.*, 234 A.D.2d 200, 203, 651 N.Y.S.2d 504, 506 (1st Dep't 1996) (granting injunction where, "considering that the restriction was freely bargained for as part of a negotiated contract, it cannot be said that the equities favor defendant"); *In re Kenston Mgmt. Co.*, 137 B.R. 100, 111 (E.D.N.Y. 1992).  There simply is nothing inequitable about stopping someone from "keep[ing] for himself the essential thing he sold, and also keep[ing] the price he got for it." *Levitt Corp.*, 593 F.2d at 468.

Finally, in addressing the balance of hardships, the Court should consider where the public interest lies.  Courts have consistently recognized the paramount right of the public to be free from confusion in the marketplace, noting that it can only advance the public interest to halt the confusing adoption of infringing trademarks. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 784, fn. 19 (1992) (Scalia, J., concurring); *Park 'N Fly*, 469 U.S. at 198.

## POINT IV

### THE COURT SHOULD ENTER A PRELIMINARY INJUNCTION BARRING DEFENDANT'S TRADEMARK INFRINGEMENT, DILUTION, UNFAIR COMPETITION AND BREACHES OF CONTRACT AND REQUIRING CORRECTIVE MEASURES

As demonstrated above, JA Apparel has established its entitlement to a preliminary injunction barring defendants' trademark infringement, dilution, unfair competition, and breaches of contract. Corrective measures should also be ordered to attempt to undo the harm and confusion that has already occurred and to prevent additional harm and confusion.

It is well-established that a court may order corrective action at the preliminary injunction stage where, as here, there is clear infringement of a trademark or trade name. *See Chere Amie, Inc. v. Windstar Apparel, Inc.*, 191 F. Supp. 2d 343 (S.D.N.Y. 2001); *Montana Prof'l Sports, LLC v. Leisure Sports Mgmt., Inc.*, 422 F. Supp. 2d 1271, 1277 (M.D. Fla. 2006); *see also Upjohn Co. v. Riahom Corp.*, 641 F. Supp. 1209, 1226-27 (D. Del. 1986). In particular, in addition to ordering defendants to cease trademark infringement, dilution, unfair competition, and breaches of contract, *pendente lite*, the Court should require defendants (i) to destroy and recall from publication and dissemination all advertising, marketing or promotional materials, labels and point of sale materials, that contain any infringing ABBOUD mark (including "a composition by designer Joseph Abboud" and "Joseph Abboud") or similar marks or designations; and (ii) to recall from distribution all products in connection with which defendants have used any infringing ABBOUD mark (including "a composition by designer Joseph Abboud and "Joseph Abboud") or similar marks or designations. (*See* Order to Show Cause pp. 2-3 ¶ B-D.)

Finally, Mr. Abboud acknowledged in the Side Letter Agreement that his non-competition obligations were specifically bargained for in connection with the consummation of the sale

transaction and that in the event he breached such obligations, JA Apparel "will be entitled to obtain equitable relief in the form of a preliminary or permanent injunction from any court of competent jurisdiction in order to enforce such agreements." (Ex. 6 at ¶ 2(d).)   In accordance with well-settled New York law, the court should enforce the Side Letter and grant an injunction here. *See New York Real Estate Inst., Inc.*, 42 A.D.3d at 321, 839 N.Y.S.2d at 489 (stating that in addition to the legal presumption of irreparable injury from the breach of a non-competition agreement designed to protect a buyer's goodwill, the court was also bound to enforce the parties' agreement that the buyer would be entitled to an injunction in the event of such a breach). Accordingly, the Court should bar defendants from competing with JA Apparel for the period of time the Court determines he breached the non-competition provisions of his Side Letter Agreement prior to July 13, 2007.  (*See* Order to Show Cause p. 3 ¶ E.)  *See New York Real Estate Inst., Inc.,* 42 A.D. 3d at 321, 839 N.Y.S.2d at 489-90 (finding that where a party breaches an agreement not to compete and the time period during which competition was precluded has since expired, such time period may be extended for the length of time that the offending party was in violation of the agreement); *J.H. Goldberg Co., Inc. v. Stern*, 53 A.D.2d 246, 252, 385 N.Y.S.2d 427, 432 (4th Dep't 1976) (same).

## CONCLUSION

For all the foregoing reasons, the Court should grant JA Apparel's motion for a preliminary injunction.

Dated: September 4, 2007
      New York, New York

*Of counsel:*                                                    KAYE SCHOLER LLP
John D. Geelan
Richard A. De Sevo                               By: _____s/_____
Victoria Haje                                                       Thomas A. Smart
Patricia Ryder                                                     Phillip A. Geraci
                                     425 Park Avenue
                                     New York, New York  10022
                                     (212) 836-8000

                                     *Attorneys for Plaintiff  JA Apparel Corp.*