Louis S. Ederer (LE 7574)
John Maltbie (JM 3658)
ARNOLD & PORTER LLP
399 Park Avenue
New York, New York 10022
Phone (212) 715-1000
Fax (212) 715-1399

*Attorneys for Defendants and
Counterclaim Plaintiffs Joseph Abboud, Houndstooth
Corp. and Herringbone Creative Services, Inc.*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------- x

JA APPAREL CORP.,

           Plaintiff,

      v.

JOSEPH ABBOUD, HOUNDSTOOTH CORP.,
and HERRINGBONE CREATIVE
SERVICES, INC.,

          Defendants.

----------------------------------------------------------- x
----------------------------------------------------------- x

JOSEPH ABBOUD, HOUNDSTOOTH CORP.,
and HERRINGBONE CREATIVE
SERVICES, INC.,

          Counterclaim Plaintiffs,

      v.

JA APPAREL CORP. and MARTIN STAFF,

          Counterclaim Defendants.

----------------------------------------------------------- x

Civil Action No. 07 CV 07787 (DAB)

**MEMORANDUM OF LAW IN
OPPOSITION TO PLAINTIFF'S
MOTION FOR A PRELIMINARY
INJUNCTION**

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ...................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 3

ARGUMENT ................................................................................................................... 4

I.    THE COURT SHOULD DENY PLAINTIFFS' MOTION FOR A PRELIMINARY
      INJUNCTION ...................................................................................................... 4

    A.    Plaintiff Is Not Likely To Succeed On The Merits Of Its Claims for
            Trademark Infringement, Dilution or Unfair Competition ...................... 4

    B.    Plaintiff Is Not Likely To Succeed On The Merits Of Its Breach of Contract
            Claim .................................................................................................... 17

    C.    The Balance of Hardships Tips Strongly in Abboud's Favor ................ 22

    D.    JA Apparel Has Failed To Show That It Has Been Irreparably Harmed .............. 24

CONCLUSION .............................................................................................................. 25

# TABLE OF AUTHORITIES

**PAGE**

## CASES

Bear U.S.A., Inc. v. Kim, 71 F. Supp. 2d 237 (S.D.N.Y. 1999), Dec'd, 216 F.3d
  1071 (2d Cir. 2000)...............................................................................................4

Bell & Howell: Mamiya Co. v. Masel Supply Co., Corp., 719 F.2d 42 (2d
  Cir.1983 ...........................................................................................................24

Brooks Automation, Inc. v. Blue Shift Technologies, No. 06-P-1063, 2007 WL
  1713370 (Mass. App. Ct. June 14, 2007) ....................................................19

Chatterjee Fund Mgmt., L.P. v. Dimensional Media Assoc., 260 A.D.2d 159, 687
  N.Y.S.2d 364 (1st Dept. 1999) .............................................................12,19

Citibank N.A. v. Citytrust, 756 F.2d 273 (2d Cir. 1985)...................................24

Cowley v. Anderson, 159 F.2d 1 (10th Cir. 1947) .............................................20

De Long Corp. v. Lucas, 278 F.2d 804 (2d Cir. 1960) ................................20,21

Equibrand Corp. v. Reinsman Equestrian Prods., Inc., 2007 WL 1461393 (N.D.
  Tex. May 17, 2007)...........................................................................................15

Gucci v Gucci Shops, Inc., 688 F. Supp. 916 (S.D.N.Y. 1988)......................9,10

Keiser v. Walsh, 118 F.2d 13 (D.C. App. 1941) ...............................................20

Levitt Corp. v. Levitt, 593 F. 2d 463 (2d Cir. 1979).....................................13,14

Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp., 426 F.3d
  532 (2d Cir. 2005).............................................................................................4

Madrigal Audio Labs., Inc. v. Cello, Ltd., 799 F.2d 814
  (2d Cir.1986).........................................................................................8,13,23

Nipon v Leslie Fay Companies, Inc., 216 B.R. 117 (S.D.N.Y. 1997) ..............14

Robin Woods, Inc. v. Robin F. Woods, 815 F. Supp. 856 (W.D. Pa. 1992) ......9

Taylor Wine Co. v Bully Hill Vineyards, Inc., 569 F.2d 731 (2d Cir. 1978) ....12

Timm Medical Tech., Inc. v. Soma Blue, Inc., 2002 WL 64456 (D. Minn. 2002)..............9

Virgin Enters. Ltd. v. Nawab, 335 F.3d 141 (2d Cir. 2003) ...............................................4

World Auto Parts, Inc. v. Labenski, 217 A.D.2d 940, 629 N.Y.S.2d 896 (4th Dept.
    1995) ........................................................................................................................21

Yashiro Co. v. Falchi, No. 99-7541, 1999 U.S. App. LEXIS 18161 (2d Cir. July
    30, 1999) ....................................................................................................................8

## STATUTES

15 U.S.C. § 1115...................................................................................................................6

Federal Rule of Civil Procedure 65.....................................................................................4

## PRELIMINARY STATEMENT

Defendants Joseph Abboud, Houndstooth Corp. and Herringbone Creative Services, Inc. (collectively "Abboud"), by their attorneys Arnold & Porter LLP, submit this brief in opposition to JA Apparel Corp.'s ("JA Apparel") motion for a preliminary injunction.

On the thinnest of threads, JA Apparel has pieced together claims of trademark infringement and breach of contract, relying on confusing and contradictory reports in two newspaper articles, and the speculative guesses of its Chief Financial Officer as to how Abboud plans to use his name "Joseph Abboud" in connection with the launch of Abboud's new JAZ line of apparel products. Based solely on this, Abboud is accused of blatant trademark infringement, flagrant violation of his June 16, 2000 Purchase and Sale Agreement with JA Apparel (the "Purchase and Sale Agreement"), and violation of the parties' July 13, 2000 Personal Services Agreement (the "Personal Services Agreement"). Instead of contacting Abboud or attempting in any way to confirm its "suspicions", however, JA Apparel rushed to the courthouse and filed this motion, styled as a motion for preliminary injunction, but not seeking any immediate relief. Further, JA Apparel, upon filing the motion, proposed a 2-1/2 month discovery and hearing schedule, so that this motion and this case would be hanging over Abboud while he tried to get his new business off the ground. Obviously, the primary, and transparent purpose of this exercise is to improperly extend the now-expired restricted period in the Personal Services Agreement, and delay the debut of Abboud's recently announced JAZ menswear collection of apparel products.

Had JA Apparel bothered to check with Abboud, it would have learned that Abboud has yet to manufacture, advertise, offer for sale or sell a single product in connection with his new

JAZ collection. Nor did Abboud do anything prior to the expiration of the restricted period that could possibly constitute a breach of his obligations under the Personal Services Agreement. Moreover, JA Apparel would have learned, if it had bothered to ask, that Abboud has no intention of infringing any JOSEPH ABBOUD trademarks owned by JA Apparel, or of even using his name at all on any products, labels or packaging. Thus, this case is not even ripe for adjudication, and should never have been brought. Basically, JA Apparel is seeking this Court's advisory opinion as to how Abboud might or might not be able to use his name in the future.

Nevertheless, in light of the fact that Abboud did assign his JOSEPH ABBOUD trademarks under the Purchase and Sale Agreement, and because he has no desire to cause consumers to be confused as between JA Apparel's JOSEPH ABBOUD products and his new JAZ collection, Abboud welcomes this case, and the opportunity to remove any cloud over the use of his name in his future business. Abboud is, and has always been willing to do only what the established case law clearly allows him to do, namely, use his name "Joseph Abboud" in a purely informational way, to inform the trade and consumers that he is the designer of the JAZ collection of apparel products. As the evidence will show, although Abboud sold his trademarks to JA Apparel, including marks comprising his name, he did not sell the exclusive right to use his name in every way, shape or form, nor any of his formidable individual rights or his reputation as a designer, persona or celebrity. Further, as JA Apparel well knew, throughout the seven years he was bound to JA Apparel under the Personal Services Agreement, Abboud has steadfastly reserved those rights for himself, and continued throughout that time to exploit them, deliberately because he knew he would need to take advantage of these individual rights when the time came for him to go back into business for himself. In these circumstances, the law clearly says that

2

someone who has built up and reserved for himself a personal reputation, separate and apart from any goodwill associated with the trademark rights he has sold, may continue to identify himself individually in connection with his future business. That is all Abboud ever intended to do in connection with his new JAZ line, and all he ever will do.

As noted above, in addition to JA Apparel's trumped up claim for trademark infringement, which is really what this case is about, it also asserts a meritless claim against Abboud for violation of his Personal Services Agreement with JA Apparel, which restricts Abboud from actively competing with JA Apparel for the two (2) year period from July 14, 2005 through July 13, 2007. While JA Apparel does not accuse Abboud of actually associating with other apparel companies during the restricted period, JA Apparel alleges that Abboud's contacts with third parties during this period, in preparation for a future association, violates the Agreement. Nothing, however, in the parties' Personal Services Agreement restricts Abboud from doing this — indeed, if he wanted to, Abboud could have made every conceivable arrangement with other apparel companies prior to the expiration of the restricted period, short of becoming actively involved in their business activities. Therefore, JA Apparel's claim for breach of the Personal Services Agreement should be seen for what it is — nothing more than an excuse for JA Apparel to subpoena and harass other apparel companies which it thinks Abboud may be planning to do business with.

## STATEMENT OF FACTS

The facts relevant to this memorandum of law are set forth in the accompanying declaration of Joseph Abboud (the "Abboud Dec.") and are summarized below.

3

## ARGUMENT

## I. THE COURT SHOULD DENY PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

JA Apparel is only entitled to a preliminary injunction, under Federal Rule 65, upon a showing that (1) it is threatened with irreparable injury absent an injunction, and (2) either (a) it is likely to prevail on the merits, or (b) it has raised serious questions going to the merits and the balance of hardships tips decidedly in its favor. See, e.g., Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp., 426 F.3d 532, 537 (2d Cir. 2005); Virgin Enters. Ltd. v. Nawab, 335 F.3d 141, 145 (2d Cir. 2003); Bear U.S.A., Inc. v. Kim, 71 F. Supp. 2d 237, 250 (S.D.N.Y. 1999), Dec'd, 216 F.3d 1071 (2d Cir. 2000). JA Apparel cannot meet any part of this test.

### A. JA Apparel Is Not Likely To Succeed On The Merits Of Its Claims for Trademark Infringement, Dilution or Unfair Competition

JA Apparel is not likely to succeed on the merits of its claims for trademark infringement, dilution or unfair competition, for the simple reason that Abboud is not using and has no plans to use his name "Joseph Abboud" as a trademark in connection with his new business venture. Abboud Dec. ¶¶2-5, 24-26. Rather, Abboud will be launching a menswear collection in the fall of 2008 that will be sold under his own trademark JAZ, with labels and hangtags featuring the following design, on which the name "Joseph Abboud" does not appear:



See Abboud Dec. Ex. C.

Thus, as noted above, the notion that Abboud is committing, or intends to commit, an infringement of the trademarks he sold to JA Apparel in 2000 is a complete fiction. In fact, this entire action, and this motion, is based not on what Abboud has done, but on what JA Apparel thinks he might do, based on contradictory newspaper articles. Presently, all Abboud has done is announce that he is returning to the fashion design business, with a new label, JAZ. He has also announced that he intends to use his name, "Joseph Abboud", simply to inform the trade and consumers in marketing materials that he is the designer of the JAZ line. Abboud Dec. ¶¶2-5, 24-26. To date, however, Abboud has made no use of his name at all, not in advertising, or on products, or otherwise. Id. Further, Abboud has made clear that he will never use his name, or any of the various designations set forth by JA Apparel in their moving papers, on products, labels or packaging for his new JAZ collection. Id. Thus, at present, there is nothing for Abboud to be enjoined from doing, something that JA Apparel implicitly conceded when it did not press for immediate injunctive relief, even though it styled its motion as one for preliminary injunction.

What Abboud does intend to do is what the law permits — make use of his name in marketing materials in a purely informational sense, i.e., to let the trade and consumers know that he is the designer of the JAZ line. Id. To this end, Abboud has considered using his JAZ trademark with a phrase that he may or may not use — "a new composition by designer Joseph Abboud". This phrase informs the public that the collection is "new"; it ties back to the musical connotation of the JAZ trademark through the use of a play on words, the term "composition"; and it identifies Abboud, personally, as the designer of the JAZ collection. In any event, whatever use of his name he decides to make, Abboud has no interest in causing confusion with JA Apparel's JOSEPH ABBOUD brand, particularly since JA Apparel's products no longer meet

5

the exacting standards originally set by Abboud himself when he still owned the JOSEPH ABBOUD label, and which he will insist on in his new JAZ collection. Abboud Dec. ¶26. To this end, Abboud plans to take all reasonable measures to avoid confusion between his new JAZ line and products sold under the ABBOUD Trademarks, including the use of an appropriate disclaimer if necessary. Id.

Stated in legal terms, what Abboud intends to do in the future is that which Section 33(b)(4) of the Trademark Act gives him the right to do. That section provides that it is a defense to a claim of infringement:

> that the use of the name, term or device charged to be an infringement is a use otherwise than as a mark, of the party's individual name in his own business, or of the individual name of anyone in privity with such party . . . .

15 U.S.C. § 1115(b)(4). As the trademark for Abboud's new collection is JAZ, any reference to Abboud as the designer is precisely the type of use that Section 33(b)(4) of the Lanham Act intends to protect.

None of this, of course, is mentioned in JA Apparel's papers. Instead, JA Apparel suggests, in the vaguest of terms, that Abboud somehow gave up the exclusive right to use his name in every way, shape or form when he sold his trademarks to JA Apparel in 2000. However, this is not at all what the Purchase and Sale Agreement says — rather, it merely says that Abboud sold his trademarks, even scheduling the marks that were being assigned, and says nothing about assigning the exclusive right to use his name. Having no evidence to support its position, JA Apparel resorts to trumpeting, throughout its papers, that it paid Abboud $65.5 million to acquire Abboud's trademarks. Regardless, however, of how much money JA Apparel paid, in order for Abboud to be enjoined from all future use of his name, it must be clear from the parties' agreement that Abboud gave up all rights to the use of his name, whether as a trademark or

6

otherwise. Here, not only did Abboud not do that, but in the Personal Services Agreement, executed in the same time frame as the Purchase and Sale Agreement, he deliberately and consciously reserved all of those rights to himself. Abboud Dec. ¶21, Ex. B at ¶1(b).

While no case in the history of trademark jurisprudence has ever prohibited a party who has sold trademark rights in his name from using his name in future business in a purely informational sense, this case is even more compelling than any case that has come before. As indicated in the Abboud Declaration, over many years, Abboud has built up an impeccable reputation in the apparel industry as a designer. Abboud Dec. ¶¶7-14. In addition, separate and apart from his reputation as a designer, he also built up a widespread reputation as a media celebrity and personality. Abboud Dec. ¶¶15-17. Thus, by the year 2000, when he assigned his trademarks to JA Apparel, and thereafter, Abboud had developed two kinds of reputation for himself, both completely separate and apart from any goodwill that inhered in the trademarks he was selling, and he did not sell these personal rights to JA Apparel. Rather, knowing full well that, one day, he would be free from his relationship with JA Apparel and might want to go into business for himself, Abboud specifically reserved these personal rights. Thus, not only did Abboud, in the parties' Purchase and Sale Agreement, limit the assignment of his name only to trademarks and other source indicators, i.e., the "rights to use and apply for the registration of new trade names, trademarks, service marks, logos, insignias and designations containing the words "Joseph Abboud" (Abboud Dec. ¶19, Ex. A at ¶1(a)(C)), but also, when he entered into the Personal Services Agreement with JA Apparel, he specifically reserved for himself the right to continue make media and personal appearances, and to develop his reputation as an authority

in the apparel business — in other words, to develop and exploit his personal and publicity rights. Abboud Dec. ¶21, Ex. B at ¶1(b).

As the Second Circuit has said, "[e]ven when a personal name has become a trade name it continues to serve the important function to its bearer as acting as a symbol of that individual's personality, reputation and accomplishments as distinguished from that of the business, corporation or otherwise, with which he has been associated. Accordingly, though an individual may sell the right to use his personal name, a court will not bar him from using that name unless his intention to convey an exclusive right to the use of [his] own name is clearly shown." Madrigal Audio Labs., Inc. v. Cello, Ltd., 799 F.2d 814, 822 (2d Cir.1986); see also Yashiro Co. v. Falchi, No. 99-7541, 1999 U.S. App. LEXIS 18161, at * 2-3 (2d Cir. July 30, 1999). Indeed, in Madrigal, the Court said that the plaintiff "at most acquired such goodwill as was associated with the use of the trade name 'Levinson' by [defendant Levinson's prior company] and not the right to use Levinson's personal name as a symbol of his individual reputation." 799 F.2d at 825. The Madrigal court went on to say:

> Whether a person who sells the trade name rights to his personal name is barred from using his personal name depends on the terms of the sale. When an individual sells no more than the right to use his name as a trade name or trademark he is precluded only from using his personal name as part of that of another company or on other products, and not from taking advantage of his individual reputation (as opposed to the reputation of the company which bore his personal name as a trade name) by establishing a company which competes against the purchaser of the trade name, or from advertising, in a not overly intrusive manner, that he is affiliated with a new company.

799 F.2d at 825 n.5.

The teaching of Madrigal, then, and all the other cases that deal with this issue, is that if a person who sells a trademark consisting of his personal name has separately built up for himself a reputation both within his field, and, as in this case, outside his field, and, as is the case here,

has not clearly sold those personal rights along with the sale of his trademarks, then in any future business endeavor he has the right to identify himself by name, in order to take advantage of the personal reputation he has built up. See Timm Medical Tech., Inc. v. Soma Blue, Inc., 2002 WL 64456, *6 (D. Minn. 2002) (plaintiff purchased the right to OSBON trademarks and goodwill, but the Court declined to prohibit Osbon from using his personal name as a symbol of his individual reputation and advertising his affiliation with defendants); see also Robin Woods, Inc. v. Robin F. Woods, 815 F. Supp. 856, 871 (W.D. Pa. 1992) (noting that while defendant conveyed her right to affix her name as a trademark, her agreement did not purport to preclude her from taking advantage of her own individual reputation by using her name in connection with a competing business).

Although not involving the sale of marks, perhaps the best case standing for the proposition that an individual has the right to exploit a reputation he has built up for himself over many years is Gucci v Gucci Shops, Inc., 688 F. Supp. 916 (S.D.N.Y. 1988) — a case reference that is conspicuously absent from JA Apparel's papers. After becoming disassociated from the family business, plaintiff Paolo Gucci, for twenty-five years the head designer of the famous GUCCI brand, started designing and selling competitive products under the trademark PAOLO GUCCI. He then brought a declaratory judgment action to confirm his right to use his own name. Although, the court determined that the use of the name "Paolo Gucci" as a trademark would likely cause confusion with the GUCCI mark, it also found that "[t]here was no persuasive evidence . . . that customers are likely to be confused if Paolo Gucci is permitted to identify himself as the designer of products sold under a separate trademark and/or trade name." Id. at 925. Moreover, the court stated:

> Courts have long recognized that "to prohibit an individual from using his true family surname is to 'take away his identity: without it he cannot make known who he is to those who may wish to deal with him; and that is so grievous an injury that courts will avoid imposing it, if they possibly can.'" . . . This is especially so where the second comer has spent his entire mature life working in the relevant business and, as a result, possesses extraordinary experience, skill and a desire to work in his field. Under those circumstances it cannot be said that the individual is entering the particular field "for no apparent reason other than to use a conveniently confusing surname to his advantage."

Id. at 927.

Weighing these considerations, the court ordered that Paolo Gucci was "entitled to use his name to identify himself as the designer of products sold under a separate trademark which does not include the name 'Gucci.'" Id. at 928. Indeed, in that case, the Court allowed Paolo Gucci to use the reference "Designed by Paolo Gucci" on labels and products, in immediate conjunction with his chosen mark, something which Abboud does not purport to do. The court reasoned that "if a consumer is purchasing a suitcase, sold under the trademark of 'American Tourister,' bearing a label stating that is was designed by Paolo Gucci, there is little if any chance that the consumer will be believe[sic] he is purchasing a 'Gucci' product manufactured by the defendant." Id. at 927. Similarly here, Abboud proposes to refer to himself only as the designer of the JAZ line, and then only in marketing materials, and still then only in conjunction with an appropriate disclaimer, where necessary, indicating that he is no longer associated with the makers of the JOSEPH ABBOUD brand, so there is no chance that when a consumer purchases a JAZ item he will think he is buying a JOSEPH ABBOUD product.

If anything, Abboud presents a more compelling case than did Paolo Gucci for being able to refer to himself and the reputation he has worked so hard to build. For over 40 years, Abboud has been developing his talents, skills and artistic abilities as a designer of menswear and other consumer products. Abboud Dec. ¶¶3, 7-17. Over that period, he has developed a widespread

10

and impeccable reputation as a designer of apparel and fashion items, working his way up from a

salesman and buyer at Boston-based department store, Louis Boston, to a menswear designer and

ultimately Associate Director of Menswear Design for Polo Ralph Lauren, and finally to the

designer of his own brand, where he would enjoy unprecedented success, winning the Council of

Fashion Designers of America ("CFDA")'s Menswear Designer of the Year award in 1990 and

1991. Abboud Dec. ¶10. Indeed, Abboud has collected numerous other accolades and awards in

the fashion industry during his career, including the Cutty Sark Award for Most Promising

Menswear Designer (1988); a Special Achievement Award from the Neckwear Association of

America (1994); an award by the United States Department of Commerce "for creative

contributions promoting the American fashion and retail industry" and "for actively promoting

American design to the world, and for bringing the hallmark for excellence to American fashion"

(1995); the prestigious Michael Award as Menswear Designer of the Year (1997); and an honor

from the American Jewish Committee for his philanthropic work and contribution to the fashion

industry (2000). Abboud Dec. ¶¶10-11. Additionally, and beyond his reputation as a designer,

Abboud has built a widespread reputation as a celebrity and public personality. From illustrious

teaching positions to highly visible charity work to scores of media appearances where he

discusses not only fashion but topics of the day, Abboud has become well known to the general

public, over and above his reputation in the fashion industry. Abboud Dec. ¶7-17. This he has

done, as the parties contemplated in the Personal Services Agreement, both before and after he

sold his marks to JA Apparel.

Obviously, therefore, by using his name in advertising and promotional materials to

identify himself as the designer of the JAZ line, Abboud is doing exactly what the case law says

he can do — take advantage of his hard earned reputation, here both as a designer and a media personality, which he specifically reserved to himself and did not assign to JA Apparel. As the case law says, Abboud has the perfect right, in these circumstances, to simply inform consumers that one of the most celebrated American designers in recent history, and the engaging personality that they have come to know, is responsible for the designs that will make up the JAZ collection. See, e.g., Taylor Wine Co. v Bully Hill Vineyards, Inc., 569 F.2d 731 (2d Cir. 1978) (while prohibiting defendant from using his name as a trademark, the court permitted defendant to use his signature on the wine's label in light of the fact that vintners are often more identifiable than their wines).

As noted above, JA Apparel attempts to cloud the issue by repeatedly referring to the $65.5 million Abboud "pocketed" as part of the Purchase and Sale Agreement. However, the issue is not how much money Abboud was paid, but what he sold. In addition to limiting the assignment of his rights to trademarks, and trademarks alone, Abboud also agreed not to compete with JA Apparel for seven years. That is all JA Apparel bargained for, and that is all it is entitled to for its $65.5 million. JA Apparel had sophisticated lawyers (Patterson, Belknap, Webb & Tyler LLP (Abboud Dec. Ex. A at p.19)) representing it in connection with the acquisition of the JOSEPH ABBOUD trademarks, and JA Apparel's lawyers were the drafters of the Purchase and Sale Agreement and the Personal Services Agreement, so by law the Agreement must be construed against the drafter. See, e.g., Chatterjee Fund Mgmt., L.P. v. Dimensional Media Assoc., 260 A.D.2d 159, 687 N.Y.S.2d 364 (1st Dept. 1999). The Purchase and Sale Agreement does not say anywhere that in exchange for $65.5 million, Abboud transferred the exclusive right to use his name, although it could have. Abboud Dec. ¶¶19-20, Ex. A. Nor did JA Apparel even

attempt to negotiate with Abboud to acquire his personal or publicity rights, or to restrict Abboud from using his name to identify himself as an individual, whether to the trade or the general public, even though it knew Abboud could be back in business in seven years. Rather, in the Personal Services Agreement, Abboud deliberately bargained for and reserved these rights to himself, and was specifically permitted to make media and celebrity appearances in his individual capacity, and exploit and develop his personal reputation. Abboud Dec. ¶21, Ex. B at ¶1(b). Abboud did this in order to protect, preserve and enhance the value of his publicity rights, knowing full well that he might be continuing to exploit those rights seven years later, when he was no longer associated with JA Apparel. Id. Accordingly, it cannot be said that Abboud conveyed any rights at all, much less exclusive rights, to the use of his name under the Purchase and Sale Agreement, which is what he would have had to do, under Madrigal and all the applicable case law, for JA Apparel to be entitled to the relief requested here.

Not surprisingly, the cases JA Apparel relies on bear no relation to the issues before the Court on this motion. For example, in Levitt Corp. v. Levitt, 593 F. 2d 463 (2d Cir. 1979), relied on most heavily by JA Apparel, defendant William Levitt, the developer of "Levittown", in addition to selling the marks and trade names incorporating his own last name to the plaintiff company, "explicitly acknowledged that he does not have any right to use the name 'Levitt' as a corporate title, trademark or trade name in the construction business." Levitt, 593 F.2d at 466. The agreement also specifically provided that although Levitt retained the right to use his own name publicly as a corporate officer or director of a business enterprise, he did so "only to the extent that such use would not be likely to create confusion with a corporate title, trademarks, or trade names of Levitt & Sons, Inc." Id. at 466.

13

Levitt, however, soon violated the agreement and, when challenged, entered into a settlement agreement which provided that "any future breaches of contract would subject him to both injunctive relief and liquidated damages." Id. When Levitt breached the agreement again by, among other things, using the names "Levittown, Florida," and "Levitt & Sons" in his new business, the plaintiff moved for a preliminary injunction. Id. Based on Mr. Levitt's egregious conduct, the court enjoined him from publicizing his participation in his own Florida real estate venture for two years, and also permanently enjoined him from "publicizing [his] prior connection with Levitt & Sons and its related corporations." Id. at 467. Given the egregious nature of Levitt's conduct, the Second Circuit held that such injunctive relief was not an abuse of discretion. It is noteworthy, however, that even though the Court penalized Levitt for his conduct, it still could not bring itself to enjoin all future use by Levitt of his own surname, even though plaintiff requested this relief. The Levitt case, therefore, tells us nothing about what this Court should do in the instant case, because, to date, Abboud has done nothing at all, and plans to do nothing to violate his agreements with JA Apparel.

Similarly, Nipon v Leslie Fay Companies, Inc., 216 B.R. 117 (S.D.N.Y. 1997) gives JA Apparel no comfort. In Nipon, designer Albert Nipon sold his company in bankruptcy to Leslie Fay Companies. Among the assets included in the sale were the trademarks ALBERT NIPON, NIPON BOUTIQUE, EXECUTIVE DRESS BY ALBERT NIPON, ALBERT NIPON SUITS, NIPON STUDIO, and NIPON PETITES. Nipon later began to sell ties and watches under the trademark AMERICAN POP, the labels and packaging for which stated, "AMERICAN POP created by Albert Nipon." Defendant came forward with survey evidence showing that 37% of consumers believed that Nipon's new line was associated with the owners of the ALBERT

NIPON brand.  Although the court enjoined Nipon from using this designation, it did so because Nipon was using his name on product labels and product packaging, and was doing so in a typeface similar to that of the Leslie Fay NIPON trademarks.  216 B.R. at 127.  In other words, Nipon was using his name as a trademark or source indicator.  These facts are not present here.

Further, in Equibrand Corp. v. Reinsman Equestrian Prods., Inc., 2007 WL 1461393 (N.D. Tex. May 17, 2007), the Court determined that the defendant Dale Martin, who had sold "all right, title and interest in and to all of the assets, business, goodwill and rights of [Martin] used in and/or produced by [Martin's company Dale Martin Saddlery]," and further agreed "not to operate any business with a similar name which could reasonably be expected to confuse the public," had likely transferred an exclusive right to use his name to the plaintiff and therefore enjoined the company that had subsequently hired Martin from using the Dale Martin name. Equibrand, 2007 WL at *15.  Nevertheless, the Court explicitly noted that the injunctive relief granted was limited to preventing Martin's employer from using DALE MARTIN as a trademark on its products.  Id.  In other words, even there, where it appeared that Martin may have assigned all rights to the use of his name, the Court still was not prepared to enjoin him from using his name in an informational way.

Accordingly, in the instant case, more compelling than any case that has come before it because of what Abboud has done to build up and exploit his individual name and persona, Abboud has every right to use his name to identify himself as the designer of the products he will market and sell under the JAZ trademark.  He also has the right to use his name as a symbol of his unique talents, skills and artistic abilities that only he can exercise in the design of products he will market and sell.  He further has the right to use his name to signify his personal

15

accomplishments in the fashion industry, his reputation for designing quality products and his renown as a successful fashion designer. And he has the right to refer to himself as the celebrity that the public has come to know. He has the right to do all of these things, so long as he does not use his name as an indicator of source, which he will not do, and makes clear that he is not associated with the owners of the JOSEPH ABBOUD brand, which he will do.

Further, since this is a case where Abboud and his companies (which, by the way, are called "Houndstooth" and "Herringbone", and do not use or incorporate the name "Abboud" as part of their business name) are not intending to use the name "Joseph Abboud" as a trademark or indicator of source in any way, there is no need here for Abboud to run through the traditional Polaroid confusion analysis and respond to Plaintiff's contention that Abboud's use of his name is likely to cause confusion with JA Apparel's JOSEPH ABBOUD mark. Nevertheless, with respect to two of the Polaroid factors, strength and quality of the goods, Abboud feels compelled to respond in this way. Not only is it Abboud's intention to refrain from using his name as an indicator of source, but in addition Abboud would deliberately like to avoid any association with the JOSEPH ABBOUD brand, because, given the state of his former brand today, he wants no consumer to think that his new JAZ line has anything to do with that brand. While JA Apparel contends that the JOSEPH ABBOUD mark is strong, and that its goods are of high quality, Abboud is informed and believes, and will prove at trial if necessary, that the JOSEPH ABBOUD brand has been mismanaged and devalued by JA Apparel, and has lost significant strength and reputation in the marketplace. Once known as a higher end line, its price points have gone down, and it is now widely available in off price retail outlets. In addition, JA Apparel has increasingly used inferior materials, and the quality of JOSEPH ABBOUD products

16

has noticeably declined. Abboud's new JAZ line, on the other hand, will be high end in quality, and will be sold at higher price points, and is not intended to compete with the JOSEPH ABBOUD line. Abboud Dec. ¶¶23,26. Given the negative connotation that the JOSEPH ABBOUD mark now carries in the trade and among consumers, simply put, Abboud wants no association with it at all.

### B.  Plaintiff Is Not Likely To Succeed On The Merits Of Its Breach of Contract Claim

JA Apparel is also not likely to succeed in establishing that Abboud has breached the parties' July 13, 2000 Personal Services Agreement. Importantly, JA Apparel does not allege that Abboud actively competed with JA Apparel during the restricted period. Rather, relying only on what it read in the press about Abboud's July 30, 2007, press conference, in which he announced his plans to introduce the JAZ line in Fall 2008, JA Apparel takes the position that it is obvious, since Abboud could not possibly have completed everything that he announced at his press conference in a three week period, Abboud had to have been in contact with prospective business partners and working on new designs during the restricted period. In other words, JA Apparel charges Abboud with planning and preparing to associate with apparel companies during the restricted period, and claims this violates the terms of the Personal Services Agreement.

Abboud admits that he made contact, during the restricted period, with several third parties about the possibility of doing business with him after the restricted period expired. Abboud Dec. ¶27. He also admits that he worked on sketches and designs for his new clothing line during the restricted period. Id. He did not, however, execute any agreements with any third parties, or promote or sell any products during the restricted period. Abboud Dec. ¶¶27-29. Abboud's conduct during the restricted period, therefore, is not in violation of the parties'

17

Personal Services Agreement, which says only that he cannot be an active participant in a competing enterprise during that period.

To determine whether Abboud has violated the Personal Services Agreement, the Court must examine the pertinent language of the Agreement. Under the Agreement, Abboud undertook that when his personal services commitment to JA Apparel ended on July 13, 2005, he would be subject to a limited restriction on his ability to participate in the business of other apparel companies for a two-year period. Abboud Dec. ¶22, Ex. B at ¶2(a). Specifically, Abboud was to refrain from being "associated as an owner, director, officer, employee, consultant or other participant with, any person, group, business enterprise or other entity which is engaged in or proposes to engage in the business of designing, licensing, manufacturing, marketing or distributing any products or services which are or would be competitive" of JA Apparel. Id. In other words, <u>what Abboud agreed to do, and all he agreed to do during this two-year period, was to refrain from taking any position with, or otherwise actively participate in any business that might be considered competitive with JA Apparel</u>. Abboud, however, did not agree to any restrictions on his ability to <u>prepare</u> to associate once the restricted period expired, and nowhere does the Personal Services Agreement say that, during the restricted period, he cannot speak to third parties about doing future business once the restricted period ended. And, of course, there is no limitation on Abboud's right to work on sketches and designs during this period, so long as he does not use them to offer any products for sale, or sell any products which, of course, he did not do.

In particular, as the evidence will show, at no point prior to July 13, 2007 did Abboud associate with any third party as an owner, director, officer, employee, consultant or other

participant, nor did he engage in any business activities of his own, except to prepare to do business after July 13, 2007. Abboud Dec. ¶¶6, 27-29. During that time period, and indeed to date, no products intended for sale under the JAZ trademark have been manufactured, ordered or delivered, and Abboud does not even plan to launch his line at retail until the Fall of 2008. Abboud Dec. ¶23. Further, to date, there has been no advertising, marketing, or promotion of any JAZ products. Abboud Dec. ¶27. While Abboud is currently in negotiation with several other potential licensees, none of those negotiations have resulted in any signed agreements. Abboud Dec. ¶29.

Once again, as with the Purchase and Sale Agreement, JA Apparel was the drafter of the Personal Services Agreement. If JA Apparel had wanted to prevent Abboud from planning and preparing to compete with it once the restricted period expired, it could have done so. As with any agreement, the Personal Services Agreement must be construed against its drafters. Chatterjee, 687 N.Y.S.2d at 365. Otherwise, JA Apparel would have the benefit of a longer restricted period than it bargained for, that is, two years plus however long it might take Abboud to prepare to compete after the two year period expires. That is not what either party bargained for, and not what JA Apparel proposed to Abboud when it drafted the Personal Services Agreement.

Although ultimately it is the language of the parties' Personal Services Agreement that controls, the case law also supports Abboud on this issue. Courts have recognized that the mere planning to compete during a non-compete period does not constitute competition. See, e.g., Brooks Automation, Inc. v. Blue Shift Techs., No. 06-P-1063, 2007 WL 1713370 at *2 (Mass. App. Ct. June 14, 2007) (finding that a party who, in preparation for competing once his non-

compete period ended, had developed a business plan, began crafting an invention based on trade show presentations he observed, incorporated a business entity and filed a provisional patent application did not violate the parties' non-compete agreement); Cowley v. Anderson, 159 F.2d 1, 5 (10th Cir. 1947) (mere planning to compete during the non-compete period does not amount to competition); and Keiser v. Walsh, 118 F.2d 13, 14 (D.C. App. 1941) (noting that preparing and planning to compete did not constitute competition).

On the other hand, the cases relied on by JA Apparel are inapposite. In De Long Corp. v. Lucas, 278 F.2d 804, 808-09 (2d Cir. 1960), the Court, most importantly, acknowledged the general rule that a party may plan and prepare to engage in a competing business during a non-compete period. In De Long, defendant had entered into a non-compete in which he agreed not to compete with plaintiff for two years, or assist anyone else in competing with plaintiff during that period. Notwithstanding this, during the non-compete period he entered into an agreement with a competitor, developed devices and improvements on competitive products, and sought to build a "patent fence" around those devices. This allowed his new business partner to outbid the plaintiff on a very valuable construction contract, and, ultimately, to exclude plaintiff completely from an entire segment of business that plaintiff had pioneered. No wonder, then, that defendant was found to have violated the non-compete.

The instant case is in sharp contrast. Abboud did not associate with JA Apparel's competitors or prospective competitors during the restricted period. Further, unlike De Long, Abboud filed a trademark application to register JAZ in March 2004, and that application was published for opposition in September 2005. JA Apparel, knowing full well what Abboud was

doing, initially opposed Abboud's JAZ application, and then withdrew that opposition.[1] Nothing about the De Long case, then, has anything to do with the situation here, other than the general proposition that preparation to compete does not violate an agreement not to compete.

Similarly, JA Apparel's reliance on World Auto Parts, Inc. v. Labenski, 217 A.D.2d 940, 629 N.Y.S.2d 896 (4th Dept. 1995), is misplaced. That was a case where the defendant entered into a "Retirement Agreement", so although the language of the non-compete is not set out in the decision, obviously the parties' intention was that defendant would simply disappear from the landscape entirely. Further, before violating the non-compete, defendant in World Auto Parts also leaked trade secrets he learned of when he worked for the plaintiff to competitors. Once again, the circumstances surrounding the World Auto Parts decision have nothing to do with the instant case.

In the end, JA Apparel's claim for violating the Personal Services Agreement should be seen for what it is — a hold-up. This case is not, and has never been about Abboud's alleged violation of the Personal Services Agreement. This case is about whether, and how, Abboud can use his name in the future. This is evident from JA Apparel's moving brief alone — 33 pages are spent arguing the trademark issues, and only 3 pages are spent arguing the non-compete claim. It is now painfully obvious that the sole reason JA Apparel brought the breach of the Personal Services Agreement claim is so it could drop subpoenas on Abboud's new and prospective business partners, and try to intimidate them into not doing business with Abboud. Abboud will demonstrate at trial that this is part of an overall pattern — on several occasions following the expiration of the restricted period, JA Apparel's president, Martin Staff, has contacted third

---

[1] All of this information is publicly available on the U.S. Trademark Office website, and the Court can take judicial notice of these filings.

parties and attempted to convince them not to do business with Abboud. Indeed, JA Apparel's approach to the Personal Services Agreement claim fits neatly within its overall strategy — sue Abboud based on pure conjecture and rumor, move for a preliminary injunction without seeking a restraining order, and then suggest that the preliminary injunction motion not be heard for 2-1/2 months, all so that Abboud will have difficulty moving ahead with his new business venture. JA Apparel's breach claim is not serious, and it should be treated that way by this Court.

### C.    The Balance of Hardships Tips Strongly in Abboud's Favor

Although as indicated above, JA Apparel is not likely to succeed on the merits of its claims, should the Court believe there are fair grounds for litigation on any issue, it should nevertheless deny JA Apparel's motion. In this case, the balance of hardship not only tips, but topples in Abboud's favor.

As noted, to date Abboud has done nothing for which he even deserved to be sued, much less hit with a preliminary injunction. He has not advertised, sold or offered for sale any products, and JA Apparel's allegations as to how Abboud intends to use his name going forward are based on rumor and innuendo. Under these circumstances, injunctive relief against Abboud would do nothing more than further delay his entry into the apparel business, now not contemplated until Fall 2008, which is exactly what JA Apparel is trying to accomplish.

In the meantime, while, by virtue of this motion, it is attempting to prevent Abboud from exploiting the very publicity rights that Abboud has reserved for himself, JA Apparel, on the other hand, is continuing to exploit these very same rights itself by engaging in a nefarious marketing campaign designed to cause consumers and the trade to believe that Abboud is still associated with JA Apparel. As set out in Abboud's counterclaims, JA Apparel, for some time now, has been, through advertising materials and websites, trying to create the impression that he

is still involved in designing JA Apparel's JOSEPH ABBOUD line. For example, if the Court were so inclined, it could visit today the website <www.douknowjoe.com>, where the viewer can find out all about "Joe", a character who doles out fashion tips and hangs out with fashion models and musicians. Not coincidentally, these campaigns began around the time Abboud's personal services commitment to JA Apparel expired. These violations of Abboud's carefully maintained, meticulously developed publicity rights are actually happening right now, in contrast to what JA Apparel is accusing Abboud of doing, none of which has ever happened.

As the Court in Madrigal found, a party acquiring a trademark consisting of a person's name does not also acquire that person's reputation and, as such, cannot take advantage of that reputation in a misleading way:

> [I]t is unclear that Levinson could have sold his personal name after becoming associated with Cello. Levinson held a reputation for skill as a designer of audio products. Madrigal might commit a fraud of sorts on the public if it represented itself as possessing Levinson's personal skill when that skill was, in fact, dedicated to Cello.

Madrigal, 799 F.2d at 823.

Thus, while Abboud's efforts to launch a new business will be delayed or crippled if the Court grants injunctive relief, JA Apparel suffers not at all if an injunction is not entered. JA Apparel knows, and concedes, that Abboud has the right to compete with it, and, reading between the lines of its briefing, knows that Abboud has, and has reserved, the right to use his name in his new business, so long as he does not use it as a trademark. So, while Abboud does not object to, and indeed welcomes this Court's advisory opinion as to how he can use his name in the future, he should not be enjoined at this time from doing anything, when the sole purpose of this suit is to throw a monkey wrench into his legitimate business plans.

**D.    JA Apparel Has Failed To Show That It Has Been Irreparably Harmed**

JA Apparel also does not meet "perhaps the single most important prerequisite" for issuance of a preliminary injunction (<u>Bell & Howell: Mamiya Co. v. Masel Supply Co., Corp.</u>, 719 F.2d 42 (2d Cir.1983)), because it has failed to show that it has been irreparably harmed. A key component of irreparable harm is a showing that the claimed harm is imminent and is urgently needed. As noted above, JA Apparel has submitted no proof of that, and indeed, the facts are just the opposite. JA Apparel, looking for any excuse to sue Abboud, filed suit based on rumor and innuendo, without having any evidence that Abboud has actually done anything. In fact, as indicated above, Abboud has yet to do anything as far as the use of his name is concerned.

Further, JA Apparel's claims of imminent harm are belied by their own approach to this motion. JA Apparel did not seek a temporary restraining order when it brought the instant motion, and instead of asking for the usual 10-14 day turnaround on the preliminary injunction hearing, proposed a 2-1/2 month discovery schedule leading up to the hearing. In effect, JA Apparel has conceded that the harm it complains of is not imminent, and its strategy here is painfully apparent — sue Abboud, have the case hang over him for a while, and subpoena the parties he is trying to do business with, all in an attempt to set Abboud back in the development of his business. In any event, JA Apparel's self-imposed delay in calling for a hearing on its preliminary injunction motion is evidence, in and of itself, that the harm it complains of is not imminent, and therefore not irreparable. <u>See, e.g.</u>, <u>Citibank N.A. v. Citytrust</u>, 756 F.2d 273, 276 (2d Cir. 1985) (delay in seeking injunctive relief in a trademark case neutralizes presumption that infringement alone will cause irreparable harm).

## CONCLUSION

For the foregoing reasons, this Court should deny JA Apparel's motion for a preliminary injunction in all respects.

Dated:  New York, New York
       October 10, 2007

Respectfully submitted,

ARNOLD & PORTER LLP

By: _____
     Louis S. Ederer (LE 7574)
     John Maltbie (JM 3658)
     399 Park Avenue
     New York, New York 10022
     (212) 715-1000

*Attorneys for Defendants and Counterclaim Plaintiffs Joseph Abboud, Houndstooth Corp. and Herringbone Creative Services, Inc.*