Louis S. Ederer (LE 7574)
John Maltbie (JM 3658)
ARNOLD & PORTER LLP
399 Park Avenue
New York, New York 10022
(212) 715-1000
*Attorneys for Defendants and
Counterclaim Plaintiffs Joseph Abboud, Houndstooth Corp.
and Herringbone Creative Services, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x

JA APPAREL CORP.,

        Plaintiff,

        v.

JOSEPH ABBOUD, HOUNDSTOOTH
CORP., and HERRINGBONE CREATIVE
SERVICES, INC.,

        Defendants.
-------------------------------------------------------------
JOSEPH ABBOUD, HOUNDSTOOTH
CORP., and HERRINGBONE CREATIVE
SERVICES, INC.,

        Counterclaim Plaintiffs,

        v.

JA APPAREL CORP. and MARTIN STAFF,

        Counterclaim Defendants.
-------------------------------------------------------------- x

Civil Action No. 07 CV 07787 (DAB)

**DECLARATION OF JOSEPH ABBOUD IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

JOSEPH ABBOUD, pursuant to 28 U.S.C. §1746, declares under penalty of perjury that the following is true and correct to the best of his knowledge:

        1.     I am the individual defendant in this action, and president and owner of the corporate defendants Houndstooth Corp. and Herringbone Creative Services, Inc. I am personally familiar with all of the facts and circumstances relating to this case. I submit this

declaration in opposition to plaintiff JA Apparel Corp.'s motion for a preliminary injunction seeking an order restraining me and my companies from making use of my name in my future business, and for other relief.

## MY UNDERSTANDING OF JA APPAREL'S CLAIMS AND MY POSITION AS TO THEM

2. It is my understanding from reading the complaint and motion papers filed by JA Apparel that I am being accused of infringing JA Apparel's trademarks, including their JOSEPH ABBOUD mark, by using my name to identify myself as the designer of the products that I am advertising, promoting and selling under my own JAZ trademark. In this regard, I would like to say that I have not used, and have no intention of using my name, Joseph Abboud, as a trademark or indicator of source on any product or in any advertising, marketing or promotional materials. Indeed, at present, I have no intention of attaching my name to any products by means of labels, hangtags, packaging or otherwise. My only intention is to use my name in marketing, advertising and promotional materials in a purely informational sense, so as to let the trade and consumers know that I am the designer of the products that I market and sell under my JAZ trademark. I also plan to take all appropriate measures to avoid any confusion between my reference to myself as the designer of my JAZ products and JA Apparel's JOSEPH ABBOUD product line, including the use of an appropriate disclaimer if necessary.

3. To amplify on my position, first as I indicate below in detail, I must note that my 40 year history of personal accomplishment in the apparel industry has established my reputation as a designer of unique and creative menswear and other products. My personal reputation as a designer is completely separate and apart from the JOSEPH ABBOUD brand, which is now owned by JA Apparel. Further, over many years, I have also developed a reputation as a celebrity and personality which is personal to me. As a result, I am well known by many who are not even familiar with my clothing designs for my persona, and I have

deliberately reserved all my personal rights in my reputation as a designer and as a celebrity to myself. I have also taken advantage of that reputation over the past seven years, as permitted by the terms of a July 13, 2000 Personal Services Agreement with JA Apparel (the "Personal Services Agreement").

4. My intention, in developing my own JAZ product line, is to let people know that I have exercised my individual talents, skills and artistic abilities to design the product line and thereby take advantage of my personal accomplishments; my reputation as a designer; and, my celebrity status, to promote and sell the line to informed and discerning buyers of fashionable apparel. Thus, I do not want to confuse anyone into believing that my JAZ product line is in any way associated with JA Apparel or the JOSEPH ABBOUD brand, particularly since I believe that the products being sold under the brand name JOSEPH ABBOUD are inferior and not competitive with my new JAZ product line; and, because to permit such confusion would enable JA Apparel to wrongfully exploit my reputation and celebrity status for its own commercial advantage.

5. Second, contrary to JA Apparel's position, to date I have done nothing at all that would even give JA Apparel any reason to bring this litigation. I have made no use of my name anywhere, in any advertising, on or in connection with any product, or otherwise, much less any use of my name as a trademark. This litigation was brought by JA Apparel based on what they think I plan to do with the use of my name, not based on anything that I have actually done. Nevertheless, while I believe this case should not even be in Court, I would like to bring some closure to this issue so I can get on with my future business, and, accordingly, I welcome the Court's ruling on the issues raised by JA Apparel with respect to my use of my name.

6. It is also my understanding that JA Apparel has alleged that I have breached the terms of the Personal Services Agreement by contacting various parties in the

apparel industry in the months leading up to July 13, 2007, the date that a limited restriction on my participation in the operation of companies deemed to be competitive with JA Apparel was to expire. Apparently, JA Apparel is claiming that my mere contacts and discussions with these parties, in preparation to develop my own apparel business after July 13, 2007, violated the terms of the Personal Services Agreement. Here, I freely admit to making contacts and having discussions with several apparel companies about the prospects of doing business with them after July 13, 2007, because there is nothing in the Personal Services Agreement that prevents me from doing so. All the Personal Services Agreement says is that I cannot "associate as an owner, director, officer, employee, consultant or other participant with, any person, group, business enterprise or other entity which is engaged in or proposes to engage in the business of designing, licensing, manufacturing, marketing or distributing any products or services which are or would be competitive" of JA Apparel (*see* ¶2(a) of the Personal Services Agreement). Thus, my contacts and discussions with apparel companies did not violate this restriction in any way, as I did not participate with such companies in the conduct of their business activities prior to July 13, 2007. Therefore, based upon my understanding, as well as a fair reading of the Personal Services Agreement, the claim against me for violating the Agreement is completely without merit.

### MY BACKGROUND AS A DESIGNER AND PUBLIC FIGURE

7.    As I indicated above, I have dedicated my entire professional life to working in the apparel industry and to developing my talents, skills and artistic abilities as a designer of menswear and other consumer products. Over that period, I have developed a widespread and impeccable reputation as a designer of apparel and fashion items.

8.    I graduated from the University of Massachusetts - Boston with honors in 1972. I also studied at the Sorbonne in Paris during that period.

-4-

9. My career in the fashion industry began over 40 years ago when, in 1968, at the age of 18, I joined the prestigious Boston, Massachusetts menswear retailer, Louis Boston. Over the course of the next twelve years, I served as buyer, merchandiser, and eventually coordinator of promotion and advertising at Louis Boston. Thereafter, in 1981 I began working for Polo Ralph Lauren as a menswear designer, and became the Associate Director of Menswear Design for Polo Ralph Lauren. During that time, I worked with Ralph Lauren himself to develop Polo's menswear collections.

10. In 1987 I launched my own menswear label consisting of my own, unique designs, and enjoyed success with menswear designs that featured rich colors and unusually crafted textures. In 1988 I won the Cutty Sark Award for Most Promising Menswear Designer. Then, in 1989 and again in 1990 the Council of Fashion Designers of America ("CFDA") awarded me with the Menswear Designer of the Year award. I became the first designer to win the coveted award two years in a row. Also, in the late 1980's, I designed menswear for Chanel, the world famous luxury goods company.

11. Since 1990, I have won numerous other awards and honors for my work as a designer in the apparel industry. In 1994 I received a Special Achievement Award from the Neckwear Association of America — an honor that had been presented only twice before, when the association deemed that an individual's work had changed the face of the industry. Additionally, in 1995 I was honored by the United States Department of Commerce "for creative contributions promoting the American fashion and retail industry"; and, "for actively promoting American design to the world, and for bringing the hallmark for excellence to American fashion." Moreover, in 1997 I was presented with the prestigious Michael Award as Menswear Designer of the Year. Also, in 2000 I was honored by the American Jewish Committee for my philanthropic work and my contribution to the fashion industry, with a special proclamation from

Senator John F. Kerry of Massachusetts.

12. Further, separate and apart from my work on the JOSEPH ABBOUD brand, over the years I have personally served as the official designer for NBC's broadcasters at the Olympics, and for the CBS broadcasters at the NCAA College Basketball Championship, popularly known as "March Madness." In addition, I have designed automobile interiors and trim for General Motors and Buick.

13. Apart from my work as a designer, I have frequently lectured on fashion and design-related themes, including the business end of the apparel industry. I have held a position with the University of Massachusetts - Boston as a Distinguished Visiting Professor of Marketing; I have taught the Management of Creativity at Sacred Heart University at the graduate level; and I have taught the Marketing of Creativity at Fordham University. I am currently on the Advisory Board for the Laboratory Institute of Merchandising College and serve as the Chairman of Educational Initiatives of the CFDA, which oversees all fashion schools and institutions across the United States including Parsons and Fashion Institute of Technology.

14. In 2004 I published my memoirs, entitled <u>Threads: My Life Behind the Seams in the High-Stakes World of Fashion</u>, detailing my lifetime commitment to the world of fashion.

15. In addition to developing my reputation as a designer, I have also worked hard over many years to build up for myself a widespread reputation as a celebrity and personality, completely apart from my reputation as a designer or fashion industry expert. In furtherance of these efforts, over the years, I have appeared on The Today Show, Fox News, CNN, CNBC, MSNBC, CBS, The Metro Channel, The Mike Barnicle Show, and The O'Reilly Factor, commenting not only on issues relating to fashion and design, but also on topics of the day. Additionally, I made a cameo appearance in an episode of the hit television series

"Seinfeld"; I have been a frequent guest on Don Imus's radio show; and, in 2002, I became the first designer to throw out the opening pitch at Boston's Fenway Park.

16. I am also known for being involved in a number of charitable organizations. Among others, I sit on the boards of the C.J. Foundation for SIDS (Sudden Infant Death Syndrome), the Sean McDonough Foundation (which raises money for children in need as well as those afflicted with serious illnesses in and around the Boston area), the Nomar 5 Foundation (which helps raise money for the under-privileged children of Boston), and CFDA's "Fashion Targets Breast Cancer." I am also the Co-Chairman of Swim Across the Sound, an organization that raises money for cancer; and, I have created the Mohegan Sun/Joseph Abboud Celebrity Tennis Tournament, which has raised nearly a million dollars to benefit the Imus Ranch for children with cancer, the C.J. Foundation for SIDS, and the Northern Westchester Hospital's neonatal unit.

17. Through all of these efforts, I would strongly contend that I am well known by the general population and the consuming public for my celebrity persona, in addition to my excellent reputation as a designer in the apparel industry.

## MY RELATIONSHIP WITH JA APPAREL

18. In 1988 my company, Houndstooth Corp., entered into a joint venture agreement with GFT, USA, Inc., to manufacture, market and sell various products under the JOSEPH ABBOUD brand name and trademark. That joint venture ultimately became the entity, JA Apparel, that is the plaintiff in this action.

19. On June 16, 2000, I, individually, entered into a Purchase and Sale Agreement with JA Apparel (the "Purchase and Sale Agreement"). Under the terms of this Agreement, I agreed to assign the trademarks that I owned for the JOSEPH ABBOUD line, including the trademark JOSEPH ABBOUD, in exchange for $65.5 million. Specifically, I

agreed to assign "[a]ll rights to use and apply for the registration of new <u>trade names</u>, <u>service marks</u>, <u>logos</u>, <u>insignias</u> and <u>designations</u> containing the words "Joseph Abboud", "designed by Joseph Abboud", "by Joseph Abboud", "JOE" or "JA", or anything similar thereto or derivative thereof, either alone or in conjunction with other words or symbols, for any and all products or services." (Emphasis added) (*See* ¶1.1(a)(C) of the Purchase and Sale Agreement). The Purchase and Sales Agreement also has a Schedule 1.1(a)(A) listing the specific Trademarks that I sold to JA Apparel.

20. Contrary to the suggestion of JA Apparel in this case, I did not sell anything to JA Apparel other than my trademarks. I did not sell the exclusive right to the use of my name, Joseph Abboud, in any way, shape or form. I did not agree never to use my name, Joseph Abboud, to identify myself personally. And, I did not assign any of my personal or publicity rights to use my name Joseph Abboud, or my individual reputation, persona, likeness or celebrity, to JA Apparel. Indeed, at no time did JA Apparel even attempt to negotiate with me to acquire my personal or publicity rights, nor did it ever attempt, in the Agreement, to restrict me from using my name to identify myself as an individual, whether to the trade or the general public. A true and correct copy of the Purchase and Sale Agreement is attached hereto as Exhibit A.

21. At or about the same time, on July 13, 2000, I also entered into the Personal Services Agreement. Under the terms of the Personal Services Agreement, I agreed to serve as Chairman Emeritus of JA Apparel for a period of five years (the "Personal Services Period"), during which time I would continue to oversee and provide stylistic direction to JA Apparel in connection with the design, manufacture and sale of products under the JOSEPH ABBOUD trademark and brand name. The Personal Services Agreement specifically prohibited me from engaging in any other business activities during the Personal Services Period.

-8-

However, so that there was no misunderstanding as to what I had transferred to JA Apparel in the Purchase and Sale Agreement, and what I had reserved for myself, and because it was important for me and my future business endeavors to continue to be able to build and exploit my own celebrity and persona, I deliberately bargained for, and was permitted to make media and celebrity appearances in my individual capacity, as an authority in the fashion design business. (*See* ¶1(b) of the Personal Services Agreement). I deliberately did this in order to protect, preserve and enhance the value of my publicity rights, particularly since I knew that one day I would no longer have any association at all with JA Apparel, and might want to trade on my own individual reputation. A true and correct copy of the Personal Services Agreement is attached hereto as Exhibit B.

22. Under the terms of the Personal Services Agreement, I provided personal services to JA Apparel for a period of five years (the "Personal Services Period", which expired on July 13, 2005). Thereafter, the Personal Services Agreement provided that I would be subject to a limited restriction on my ability to associate with businesses competing with JA Apparel for a two year period commencing July 14, 2005, and expiring July 13, 2007 (the "Restricted Period"). Specifically, during this period I was to refrain from being "associated as an owner, director, officer, employee, consultant or other participant with, any person, group, business enterprise or other entity which is engaged in or proposes to engage in the business of designing, licensing, manufacturing, marketing or distributing any products or services which are or would be competitive" with JA Apparel (*see* ¶2(a) of the Personal Services Agreement). In other words, what I agreed to do during this two year period was to refrain from becoming actively involved as a participant in a business which competed with JA Apparel. However, I did not agree to two things: first, I did not agree to any restrictions on my ability to exploit my own personal or publicity rights; and second, I did not agree to refrain from planning or preparing to

conduct future business.

## MY NEW JAZ CLOTHING LINE

23. My new clothing line, which I plan on introducing at retail in Fall 2008, will be marketed and sold under the trademark JAZ. The JAZ brand will be quintessentially American — a clothing line that will be classic with an edge. In designing the JAZ line, I have focused on creating products that are unique and distinctive and speak to the sophisticated American consumer. The JAZ line will be an upscale menswear line available only at high-end department stores, and will be sold at higher price points than the products that are currently sold under JA Apparel's JOSEPH ABBOUD trademark.

24. As for the use of my name in connection with my JAZ clothing line, contrary to the allegations made by JA Apparel, I have never used or planned on using the name "Joseph Abboud" as part of a trademark in connection with the sale and/or marketing of the JAZ line, or as part of any company name. I can definitively state that the name "Joseph Abboud" will never appear on any product, label, hang tag or packaging. Attached hereto as Exhibit C are copies of designs for proposed labels and hang tags for the JAZ line, and as the Court can see, the name "Joseph Abboud" does not appear on these materials. My only intended use of my name in connection with my JAZ product line is for informational purposes, specifically to inform the public that I have exercised my individual talents, skills and artistic abilities to design the JAZ products that I am marketing and selling. Therefore, in my advertising and promotional materials, I only plan to refer to myself as the designer of the JAZ product line. As I have said previously, I believe I have the right to do this — I deliberately did not sell to JA Apparel any personal rights to use my individual name, and over the past seven years I have continued to build my own personal reputation as a designer and as a celebrity. Further, to the extent appropriate to avoid confusion, I plan to use a disclaimer, in close proximity to my name, to

inform the consuming public that I am no longer affiliated with JA Apparel, the owner of the JOSEPH ABBOUD trademark.

25. In its papers, JA Apparel alleges that at my July 30, 2007 press conference, in which I announced my plans to introduce my JAZ line in Fall 2008, I said that I intended to use JOSEPH ABBOUD as a trademark and infringe upon JA Apparel's JOSEPH ABBOUD mark. I did not. Significantly, JA Apparel's only "evidence" of my alleged statement are confusing and contradictory reports that appeared in the public press. As indicated above, however, I have no intention of using my name, "Joseph Abboud", as a trademark. Rather, as I made clear at the press conference, I have no plans to use my name at all on product, labels, hang tags or product packaging. I do have plans, as I also announced at the press conference, to use my name in marketing materials to identify myself as the designer of the JAZ product line, and in that regard, as I indicated, I might use, in connection with my new JAZ trademark, the phrase "A new composition by designer Joseph Abboud" in advertisements and/or promotional materials in order to inform trade people and consumers that I personally designed the new JAZ product line, and as a play on words with the trademark JAZ. However, to date, no advertisements of any kind have run, as I have not decided whether, or how, I might want to use this phrase.

26. I would also like to make the point that while I never had any intention at all of causing any confusion as between my JAZ product line and JA Apparel's JOSEPH ABBOUD line, that is particularly the case now, given what JA Apparel has done with my former brand. JA Apparel's contention in its papers is that the JOSEPH ABBOUD mark is strong, and that its goods are of high quality. It is my observation, however, based on my many years of experience, that the JOSEPH ABBOUD brand has been mismanaged and devalued by JA Apparel, and has lost significant strength and reputation in the marketplace. Since the

acquisition of JA Apparel in 2004 by its current owners, based on my own examination of the goods, the quality of JOSEPH ABBOUD products has deteriorated, with such products now being made of materials of inferior or lesser quality than before. Moreover, the level of retail outlets for JOSEPH ABBOUD products has gone down significantly, as such products are now widely available at discount retail stores. By contrast, my new JAZ line will be of higher quality, and will be sold at higher price points, and is not intended to compete with the JOSEPH ABBOUD line at all. In fact, I would like to avoid any association with the JOSEPH ABBOUD brand, because, given the state of the brand today, I do not want any consumer to think that my new JAZ line has anything to do with the JOSEPH ABBOUD brand.

27. As for JA Apparel's claim that I violated the Personal Services Agreement, I do not deny that I had contacts and discussions with several third parties in the apparel industry prior to the expiration of the Restricted Period about the prospect of doing business with them after July 13, 2007; however, all of these contacts were in preparation for the development of my business after that date. Thus, prior to July 13, 2007, I did not associate with any third party as an owner, director, officer, employee, consultant or other participant. Further, I did not engage in any competitive business activities of my own. While I did work on sketches and designs for my new JAZ product line, no products intended for sale under the JAZ mark were promoted or sold during the Restricted Period.

28. Weeks after the Restricted Period expired, as part of my plans for my future business, I did proceed to acquire Alden Street Shirt Co., LLC and Merrill-Sharpe, Ltd., both of which I was in contact with prior to the expiration of the Restricted Period. However, I took no position with these companies prior to the end of the Restricted Period.

29. Also, I did not enter into any licensing arrangements during the Restricted Period, although I was in contact with prospective licensees during that time period. Indeed,

while I continue to negotiate with several other potential licensees, as of yet, none of those negotiations have resulted in any signed license agreements, and now that JA Apparel has served subpoenas on these prospective licensees, I may not be able to conclude my negotiations with them. In fact, I have had one prospective licensee tell me that it will not now do business with me, in part because of the pendency of this litigation.

30. I must say that this lawsuit by JA Apparel is based on the thinnest of allegations. JA Apparel has no evidence at all of any intended use by me of my name as a trademark. The fact is that I plan to make no use of my name as a trademark, trade name or other source indicator, <u>ever</u>. The evidence as to my purported violation of the Personal Services Agreement is even thinner. Relying solely on supposition derived from confusing and contradictory reporting in the public press, JA Apparel is essentially saying: "how could Abboud have made all those business arrangements and done all those design sketches in the three weeks following the end of the Restricted Period?" The answer, of course, is that I didn't. What I did was lay the groundwork for doing future business during the Restricted Period, which the Personal Services Agreement did not prohibit me from doing.

31. For all the foregoing reasons, JA Apparel's motion for a preliminary injunction should be denied.

DECLARED UNDER PENALTY OF PERJURY IN NEW YORK, NEW YORK ON OCTOBER 10, 2007.

_____
JOSEPH ABBOUD