# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JA APPAREL CORP., <br><br>           Plaintiff, <br><br>     v. <br><br> JOSEPH ABBOUD, HOUNDSTOOTH CORP., and HERRINGBONE CREATIVE SERVICES, INC., <br><br>           Defendants. | Civil Action No. 07 CV 07787 (DAB)(THK) |
| JOSEPH ABBOUD, HOUNDSTOOTH CORP., and HERRINGBONE CREATIVE SERVICES, INC., <br><br>           Counterclaim-Plaintiffs, <br><br>     v. <br><br> JA APPAREL CORP. and MARTIN STAFF, <br><br>           Counterclaim-Defendants. | |

# PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION

## KAYE SCHOLER LLP

425 Park Avenue
New York, New York  10022
(212) 836-8000
*Attorneys for Plaintiff and Counterclaim-Defendant JA Apparel Corp. and Counterclaim-Defendant Martin Staff*

31555776

# TABLE OF CONTENTS

PAGE

I.   JA APPAREL IS LIKELY TO PREVAIL ON ITS CLAIM
     FOR BREACH OF THE PURCHASE AND SALE AGREEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  JA APPAREL IS LIKELY TO SUCCEED ON ITS TRADEMARK AND RELATED CLAIMS . . . . . . 5

III. JA APPAREL IS LIKELY TO PREVAIL ON ITS CLAIM FOR BREACH
     OF THE NON-COMPETE CLAUSES IN THE SIDE LETTER AGREEMENT . . . . . . . . . . . . . . . . 8

IV.  JA APPAREL IS THREATENED WITH IRREPARABLE INJURY AND
     THE BALANCE OF HARDSHIPS WEIGHS IN JA APPAREL'S FAVOR . . . . . . . . . . . . . . . . . . . 9

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

31555776

## TABLE OF AUTHORITIES

PAGE(S)

### CASES

*Apple Computer, Inc. v. Franklin Computer Corp.,*
  714 F.2d 1240 (3d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Brooks Automation, Inc. v. Blue Shift Techs.,*
  69 Mass. App. Ct. 1107, 2007 WL 1713370 (Mass. App. Ct. 2007) . . . . . . . . . . . . . . . . . 9

*Citibank N.A. v. Citytrust,*
  756 F.2d 273 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Clairol, Inc. v. Gillette, Co.,*
  389 F.2d 264 (2d Cir. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Cowley v. Anderson,*
  159 F.2d 1 (10th Cir. 1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Cullman Ventures, Inc. v. Columbian Art Works, Inc.,*
  717 F. Supp. 96 (S.D.N.Y. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.,*
  841 F. Supp. 1339 (E.D.N.Y. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Gucci v. Gucci Shops, Inc.,*
  688 F. Supp. 916 (S.D.N.Y. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Guth v. Guth Chocolate Co.,*
  224 F. 932 (4th Cir. 1915) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Hard Rock Cafe Int'l v. Morton,*
  1999 U.S. Dist. LEXIS 8340 (S.D.N.Y. June 2, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Helene Curtis Indus. v. Church and Dwight,*
  560 F.2d 1325 (7th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Home Box Office, Inc. v. Showtime/The Movie Channel Inc.,*
  832 F.2d 1311 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Keiser v. Walsh,*
  118 F.2d 13 (D.C. Cir. 1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

PAGE(S)

*Lazzaroni USA Corp. v. Steiner Foods*,
2006 U.S. Dist. LEXIS 20962 (D.N.J. April 10, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . .  3, 4

*Levitt Corp. v. Levitt*,
1978 U.S. Dist. LEXIS 15820 (E.D.N.Y. Aug. 29, 1978), *aff'd*, 593 F.2d 463,
468 (2d Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

*Madrigal Audio Labs., Inc. v. Cello, Ltd.*,
799 F.2d 814 (2d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6, 7

*Major League Baseball Properties, Inc. v. Sed Olet Denarius, Ltd.*,
1990 U.S. Dist. LEXIS 13108 (S.D.N.Y. Oct. 5, 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

*Marshak v. Green*,
746 F.2d 927 (2d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

*Muzak Corp. v. Hotel Taft Corp.*,
1 N.Y.2d 42, 150 N.Y.S.2d 171 (N.Y. 1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

*New Kayak Pool Corp. v. R & P Pools, Inc.*,
246 F.3d 183 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

*Nipon v. Leslie Fay Cos., Inc.*,
216 B.R. 117 (Bankr. S.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4, 5, 7

*Pro Hardware, Inc. v. Home Centers of Am., Inc.*,
607 F. Supp. 146 (S.D. Tex. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

*Robin Woods Inc. v. Woods*,
815 F. Supp. 856 (W.D. Pa. 1992), *aff'd*, 28 F.3d 396 (3d Cir. 1994) . . . . . . . . . . . . . . . .  7

*Savin Corp. v. Savin Group*,
391 F.3d 439, 15 U.S.C. § 1115 (b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4, 5

*Scandia Down Corp. v. Euroquilt, Inc.*,
1982 U.S. Dist. LEXIS 17664 (N.D. Ill. Nov. 8, 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

*Taylor Wine Co. v. Bully Hill Vineyards, Inc.*,
569 F.2d 731 (2d Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

*Timm Med. Techs., Inc. v. SOMA Blue, Inc.*,
2002 U.S. Dist. LEXIS 926 (D. Minn. Jan. 15, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

iii

PAGE(S)

*W.W.W. Assocs., Inc. v. Giancontieri,*
   77 N.Y.2d 157, 565 N.Y.S.2d 440 (N.Y. 1990) .................................. 2

*West, Weir & Bartel, Inc. v. Carter Paint Co.,*
   25 N.Y.2d 535, 307 N.Y.S.2d 449 (N.Y. 1969) .................................. 2

*Yashiro Co. v. Falchi,*
   1999 U.S. App. LEXIS 18161 (2d Cir. July 30, 1999) ............................ 8

**STATUTES**

15 U.S.C. § 1115(a)-(b) ........................................................ 4

**OTHER AUTHORITIES**

*McCarthy on Trademarks* (2007) ................................................ 6

Plaintiff JA Apparel Corp. ("JA Apparel") submits this reply memorandum of law in further support of its motion for a preliminary injunction barring defendants Joseph Abboud ("Mr. Abboud"), Houndstooth Corp. ("Houndstooth"), and Herringbone Creative Services, Inc. ("Herringbone") from infringing and diluting JA Apparel's well-known "Joseph Abboud" trademarks, trade names, and designations, engaging in unfair competition and false and deceptive trade practices, and breaching contracts entered into between JA Apparel, Joseph Abboud and Houndstooth.[1]

## I.   JA APPAREL IS LIKELY TO PREVAIL ON ITS CLAIM FOR BREACH OF THE PURCHASE AND SALE AGREEMENT

It speaks volumes that *nowhere* in their 25-page brief do defendants address JA Apparel's claim for breach of the Purchase and Sale Agreement. Nor do they even quote the Agreement's unambiguous language by which Mr. Abboud sold to JA Apparel *"all"* of his "right, title and interest" in the ABBOUD "names, trademarks, trade names, service marks, logos, insignias and designations," the "goodwill related thereto," and *"[a]ll* rights *to use* and apply for the registration of new trade names, trademarks, service marks, logos, insignias and designations containing the words *'Joseph Abboud,' 'designed by Joseph Abboud,' 'by Joseph Abboud,' 'JOE' or 'JA,'* or anything *similar thereto or derivative thereof*, either alone or in conjunction with other words or symbols . . . , for *any and all* products or services." (Spiel Dec. Ex. 1 ¶ 1.1(a)(A), (C)) (emphasis added). Instead, they proffer three baseless arguments, unhinged from contract and trademark law, as to why

---

[1]     Given that JA Apparel agreed, *at the request of defendants*, in the Stipulated Scheduling Order to consolidate its preliminary injunction motion with the trial on the merits (ordered, subject to the Court's schedule, for December 17, 2007), and that it further agreed to push back the trial date by a month at *defendants'* request to allow them to "get up to speed," there is no basis for defendants' contention (Defs. Mem. 1, 5, 22) that JA Apparel delayed in seeking preliminary injunctive relief and that the 2½- month period of discovery is for the purpose of making it difficult for defendants to move ahead with their new business. (*See* p. 10, *infra*). By contrast, in *Citibank N.A. v. Citytrust*, 756 F.2d 273, 274 (2d Cir. 1985), on which defendants rely, plaintiff did not seek an injunction until more than ten weeks after learning of defendant's activity, whereas here, JA Apparel took almost immediate action after learning of defendants' plans in August.

they can exercise precisely those rights they did "sell, convey, transfer, assign and deliver" in the Agreement.

First, defendants struggle to recast their contractual obligations, including using the transparent catch-phrase "in other words," by describing what Mr. Abboud apparently wishes had been included in the executed Purchase and Sale Agreement (as well as in the executed signed Side Letter Agreement). (Defs. Mem. 2, 5, 7-8, 12, 15, 18). But it is black letter law that a contract must be "enforced according to its terms," and that the courts "concern ourselves with what the parties intended, *but only to the extent that they evidenced what they intended by what they wrote*" in the contract. *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 443 (N.Y. 1990); *West, Weir & Bartel, Inc. v. Carter Paint Co.*, 25 N.Y.2d 535, 542, 307 N.Y.S.2d 449, 453 (N.Y. 1969) (emphasis added).[2] Contract disputes are not to be decided based on "in other words"; they are to be decided based on the actual words employed in the contracts.

Second, defendants contend Mr. Abboud can "use his name" "to inform the trade *and con-sumers* in marketing materials that he is the designer of the JAZ line," that he "is responsible for the designs that will make up the JAZ collection," and that he "has the right to use his name as a symbol of his unique talents, skills and artistic abilities." (Defs. Mem. 2, 5, 12, 15) (emphasis added). Defendants, however, concede that they will not and cannot use "any of the various designations" Mr. Abboud sold to JA Apparel "on products, labels or packaging for his new JAZ collection" and that they cannot "use his name as an indicator of source." (*Id*. at 5, 16). But the Purchase and Sale

---

[2]    Defendants' argument (Defs. Mem. 12) that "by law the Agreement must be construed against" JA Apparel because, they assert, JA Apparel's lawyers were the drafters of the Agreement, is belied by the Agreement's express provision: "The parties have participated jointly in the negotiation and drafting of this Agreement. If any ambiguity or question of intent or interpretation arises, this Agreement *shall be construed as if drafted jointly by the parties* and *no* presumptions or burden of proof shall arise favoring or disfavoring any party by virtue of authorship of any of the provisions of the Agreement." (Spiel Dec. Ex. 1 ¶ 9.8) (emphasis added).

Agreement does not differentiate between "labels and packaging" and "marketing materials." To the contrary, it provides that Mr. Abboud sold "all" of his "right, title and interest" to the ABBOUD marks and designations and the related goodwill. Nor is the transfer of rights limited "to trademarks and trademarks alone." (*Id.* at 12). Rather, in addition to "trademarks," Mr. Abboud transferred all "names . . . trade names, service marks, logos, insignias and designations" identified in the Agreement (including eleven federally registered trademarks that include the words "Joseph Abboud" or "JA"), and "anything similar thereto or derivative thereof." (Spiel Dec. Ex. 1 ¶ 1.1(a)(A), (C)).[3]

Given that Mr. Abboud expressly transferred the right to use the designations "designed by Joseph Abboud" and "by Joseph Abboud," there is no basis for defendants to argue (Defs. Mem. 2) that he somehow maintained a personal right to sell clothing by "inform[ing] the trade and consumers that he is the designer of the JAZ collection. . . ." That is precisely what he sold for $65.5 million through the Agreement – the right to "designate" himself as the designer of other products or as their source. Thus, even if Mr. Abboud could come up with a way to say that he is the designer of the JAZ line without making trademark use of his name (which is simply not possible), he nonetheless would breach his contractual obligation not to do so. Moreover, in similar circumstances, courts have recognized that, after a defendant has sold trademark rights in his name, any use of the name as an "attention-getting symbol" in packaging, "sales materials," and a "price list" to indicate that the product was the "product of" the defendant – precisely what Mr. Abboud wishes to do here – is an infringing trademark use.[4] Finally, it is not possible to separate Mr. Abboud's personal

---

[3]    *See, e.g, Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y.2d 42, 46, 150 N.Y.S.2d 171, 174 (N.Y. 1956) ("The rules of construction of contracts require us to adopt an interpretation which gives meaning to every provision of a contract or, in the negative, no provision of a contract should be left without force and effect.").

[4]    *Lazzaroni USA Corp. v. Steiner Foods*, 2006 U.S. Dist. LEXIS 20962, *13-14 (D.N.J. April 10, 2006). (continued...)

reputation in his name from the goodwill in his name as a trademark because a designer's reputation

is inseparable from the reputation of the goods he designs and sells. To permit Mr. Abboud to use

"Joseph Abboud" in marketing materials for his JAZ line is to permit him to ride on the very

"goodwill" that he indisputably sold for $65.5 million and which JA Apparel has since enhanced.

(Spiel Dec. Ex. 1 ¶ 1.1(a)(A)).[5] Put another way, if he retained the right to use the Abboud marks

in marketing materials and advertising, then his sale of the goodwill was illusory and JA Apparel did

not receive, as the Lanham Act guarantees to every owner of federally registered trademarks, the

"exclusive right to use the registered mark[s] in commerce." 15 U.S.C. § 1115(a)-(b). In short, Mr.

Abboud cannot eat his $65.5 million cake and have it too.[6]

Finally – and, again, inventing provisions from whole cloth – Mr. Abboud argues that he

"specifically reserved for himself the right to continue [to] make media and personal appearances,

and to develop his reputation as an authority in the apparel business – *in other words*, to develop and

exploit his personal and publicity rights." (Defs. Mem. 7-8) (emphasis added). Mr. Abboud

reserved *no* such rights in the Purchase and Sale Agreement. As for the Side Letter Agreement, as

---

[4](...continued)
*See Clairol, Inc. v. Gillette, Co.*, 389 F.2d 264, 269 (2d Cir. 1968) ("It is elementary that the function of a trademark is to indicate the origin of the products to which it is attached.").

[5]    *See Nipon v. Leslie Fay Cos., Inc.*, 216 B.R. 117, 124 (Bankr. S.D.N.Y. 1997) ("The sale of a trademark includes the sale of the mark along with the goodwill and tangible business assets that go along with the trademark."); *Marshak v. Green*, 746 F.2d 927, 929 (2d Cir. 1984) ("A trade name or mark is merely a symbol of goodwill; it has no independent significance apart from the goodwill it symbolizes . . . a trademark cannot be sold or assigned apart from to [sic] goodwill it symbolizes.").

[6]    Also misplaced is defendants' reliance on the doctrine of trademark fair use. (Defs. Mem. 6). Mr. Abboud transferred far more than simply use of his name "as a mark." 15 U.S.C. § 1115(b)(4). (*See* pp. 1-3, *supra*). In all events, to "meet [their] evidentiary burden of establishing this 'fair use' defense," defendants would have to show that their use of the ABBOUD marks is a "descriptive use rather than trademark use" and that the marks are being used "fairly and in good faith," which they plainly have failed to do. *Cullman Ventures, Inc. v. Columbian Art Works, Inc.*, 717 F. Supp. 96, 132-33 (S.D.N.Y. 1992). *See Lazzaroni*, 2006 U.S. Dist. LEXIS 20962, at *18 (rejecting fair use defense) ("when a corporation adopts a surname as a corporate name or trademark, the name ceases to be a personal name").

31555776                                                                4

reflected by defendants' reflexive resort to the phrase "in other words," it does not reserve Mr. Abboud's "personal and publicity rights." Rather, it merely provides that Mr. Abboud may "(i) mak[e] media (including television) or celebrity appearances and otherwise act[] as a general authority in the fashion business, (ii) serv[e] for compensation on boards of directors, advisory boards and special committees, and (iii) acquir[e], own[] and hold[] stock in public corporations, in each case *as long as such activities do not result in Abboud actually competing with any of the business activities of the Buyer* . . . ." (Spiel Dec. Ex. 6 ¶ 1(b)) (emphasis added). Moreover, this provision is no longer even in effect, the Personal Services Period having expired on July 13, 2005. What governs is the Purchase and Sale Agreement, which, as noted above, contains no reservation of rights.

## II.   JA APPAREL IS LIKELY TO SUCCEED ON ITS TRADEMARK AND RELATED CLAIMS

Defendants do not even attempt to argue that, measured against this Circuit's *Polaroid* test, their conduct will not result in a finding of likelihood of confusion.[7] Nor have defendants met their "heavy burden" of "com[ing] forward with evidence sufficient to demonstrate" that a disclaimer (the terms of which they do not even provide) "would significantly reduce the likelihood of consumer confusion." *Home Box Office, Inc. v. Showtime/The Movie Channel Inc.*, 832 F.2d 1311, 1316 (2d Cir. 1987); *see Nipon*, 216 B.R. at 128 (rejecting use of disclaimer). Defendants also do not dispute JA Apparel's showing that it is likely to succeed on its dilution, unfair competition, and General Business Law claims. (*See* Pl. Mem. 32-34).

---

[7]   *Compare* Defs. Mem. 16 *with* JA Apparel's Memorandum of Law in Support of Its Motion for a Preliminary Injunction ("Pl. Mem.") 25-32. Defendants assert that JA Apparel's ABBOUD marks "have been "devalued" and have "lost significant strength and reputation in the marketplace." (Defs. Mem. 16). Defendants provide no support for this assertion other than Mr. Abboud's self-serving conclusory assertion. Nor do they take issue with the great commercial success that JA Apparel has had in using the marks or that, as a matter of law, JA Apparel's marks are presumed to be distinctive, must be "afforded the utmost protection," and are "incontestable," meaning that the trademark registrations are "conclusive evidence" of JA Apparel's "exclusive right" to use the marks. *Savin Corp. v. Savin Group*, 391 F.3d 439, 457 (2d Cir. 2004); 15 U.S.C. § 1115(b). (*See* Pl. Mem. 7-8, 26-27).

Defendants, instead, contend that the use of Mr. Abboud's name in advertising or marketing materials somehow does not constitute trademark use but, rather, is an exercise of his right to inform consumers and the trade that he is the designer of the JAZ collection. (Defs. Mem. 2, 5). Defendants are mistaken. As Professor McCarthy explains, "merely advertising an infringing mark itself is an act of infringement, apart from any manufacturing or sale." *McCarthy on Trademarks* § 25:26 (2007). *See also, e.g., Hard Rock Cafe Int'l v. Morton*, 1999 U.S. Dist. LEXIS 8340 , *78 (S.D.N.Y. June 2, 1999) ("[a]dvertisements alone can constitute actionable use of a trademark"); *Major League Baseball Properties, Inc. v. Sed Olet Denarius, Ltd.*, 1990 U.S. Dist. LEXIS 13108, *10 (S.D.N.Y. Oct. 5, 1990) ("the use of [plaintiff's] marks in advertising, even without any attempts to sell, may dilute the distinctive quality of plaintiffs' marks").

Defendants also rely on the Second Circuit's decision in *Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814 (2d Cir. 1986). But, as we showed (Pl. Mem. 22), *Madrigal* supports finding trademark infringement here. In *Madrigal*, defendant Levinson was enjoined from using on product labels *or brochures* the designation or phrase "Cello by Mark Levinson," which is highly similar to the phrase or designation that Mr. Abboud has announced he intends to use here – "composition by designer Joseph Abboud" in "marketing materials." 799 F.2d at 818-19. Defendants ignore that such materials include a brochure, which was enjoined in *Madrigal*. They also ignore that Mr. Levinson's business and his name had been purchased for only a "token amount" (*id.* at 825), indicating that he had not sold the exclusive right to use his name; nor was there any evidence that he had assigned to the plaintiff the right to use the designation "designed by" defendant as Mr. Abboud has done here. And, to top things off, defendants also ignore *Madrigal*'s key holding – that "an individual who sells a trade name may *not* thereafter falsely designate the origin of newly-produced products by using his name in such a way as to mislead the public into believing that

those products are produced by the company which purchased the trade name." *Id.* at 823 (emphasis added). Yet that is exactly what defendants have announced they intend to do here.

Also unavailing is defendants' reliance on *Gucci v. Gucci Shops, Inc.*, 688 F. Supp. 916 (S.D.N.Y. 1988), which defendants assert is the "best case standing for the proposition that an individual has the right to exploit a reputation he has built up for himself over many years." (Defs. Mem. 9). *Gucci* simply did not involve the sale of a name or trademark; its holding is thus utterly irrelevant. As noted above, where, as here, a designer has sold his interest in his name, trademark and related goodwill, the law is clear that he cannot then "us[e] his name in such a way as to mislead the public." *Madrigal*, 799 F.2d at 823.[8] As the Second Circuit held in *Madrigal*, "[w]hether a person who sells the trade name rights to his personal name is barred from using the personal name depends on the terms of the sale." *Id.* at 823. Here, under the "terms of the sale" in the Purchase and Sale Agreement, Mr. Abboud sold the right to use the very trade names, trademarks, and designations that he has announced he will use. By contrast, in *Gucci*, the court held that plaintiff could design products for "American Tourister" bearing a label stating that it was "*designed by* Paolo Gucci" because he had *not*, as Mr. Abboud has done here, sold his right to use that designation.[9]

---

[8]     *Accord, Levitt Corp. v. Levitt*, 1978 U.S. Dist. LEXIS 15820, *15 (E.D.N.Y. Aug. 29, 1978) (where "[a personal name] has been voluntarily parted with, particularly, when the name has been extended to a corporation identified with the business and the corporation has then been sold, together with the name and its goodwill," the "doctrines of both trademark and contract, grounded in principles of honesty and good faith, limit the seller's right to his own family name."), *aff'd*, 593 F.2d 463, 468 (2d Cir. 1979) (where "the infringing party has previously sold his business, including use of his name and its goodwill, to the plaintiff, sweeping injunctive relief is more tolerable"); *Nipon*, 216 B.R. at 124 ("to protect the property interest of the purchaser, then, the courts will be especially alert to foreclose attempts by the seller to keep for himself the essential thing he sold, and also keep the price he got for it").

[9]     *Compare Gucci*, 688 F. Supp. at 927, *with* Spiel Dec. Ex. 1 ¶ 1.1(a)(A), (C)). Defendants' reliance on other decisions is similarly misplaced. In *Taylor Wine Co. v. Bully Hill Vineyards, Inc.*, 569 F.2d 731, 735 (2d Cir. 1978), the Second Circuit held that where, as here, "an alleged infringer has previously sold his business with its goodwill to the plaintiff . . . a sweeping injunction [is] more tolerable." In *Robin Woods Inc. v. Woods*, 815 F. Supp. 856, 858, 873 (W.D. Pa. 1992), *aff'd*, 28 F.3d 396 (3d Cir. 1994), the court
(continued...)

III.   **JA Apparel Is Likely to Prevail on its Claim for Breach of the Non-compete Clauses in the Side Letter Agreement**

Unable to rebut JA Apparel's showing that Mr. Abboud breached the Side Letter Agreement's non-compete provision, defendants ignore the provision's language and then mischaracterize it by asserting that, "in other words," it only barred Mr. Abboud from "taking any position with, or otherwise *actively participat[ing]* in any business that might be considered competitive with JA Apparel." (Defs. Mem. 18) (emphasis added).  Defendants then reason that because Mr. Abboud allegedly did not "execute any agreements with any third parties, or promote or sell any products during the restricted period," he did not breach the provision.  (*Id.* at 17).

In its actual language – not "in other words" – the provision states that during the Restricted Period Mr. Abboud "will not, *directly or indirectly* through any partnership, corporation, limited liability company, trust or other entity, *be associated as an owner, director, officer, employee, consultant or other participant* with, *any* person, group, business enterprise or other entity which *is engaged in or proposes to engage in* the business of designing, licensing, manufacturing, marketing or distributing any products or services which are *or would be* competitive with the business of the Buyer as then conducted or as such business may be reasonably expected to be conducted in the future any-

---

[9](...continued)
enjoined the defendant from, *inter alia*, "manufacturing, promoting or selling any dolls by reference to . . . the name 'Robin Woods'" and acknowledged that "[i]t is 'well-settled that a person who has adopted and used his surname as a trade-mark, or trade-name may transfer the same with the good will of a business and thereby divest himself of the right to use his name in connection with such a business.'" (quoting *Guth v. Guth Chocolate Co.*, 224 F. 932, 933 (4th Cir. 1915)).  In *Timm Med. Techs., Inc. v. SOMA Blue, Inc.*, 2002 U.S. Dist. LEXIS 926, *13 (D. Minn. Jan. 15, 2002), the court held that the defendants were "*not* entitled to market their products using the Osbon name." (emphasis added).  As for its statement that defendants could "use Julian Osbon's personal name to advertise the fact that he is now affiliated with defendants," there is no indication that the defendant's grant of rights in that case was as broad as Mr. Abboud's grant of rights, which includes not just "trade names and trademarks" (*id.* at *2), but also "designations containing the words 'Joseph Abboud,' 'designed by Joseph Abboud,' 'by Joseph Abboud,' 'JOE' or 'JA,' or anything similar thereto or derivative thereof." (Spiel Dec. Ex. 1 ¶ 1.1(a)(A), (C)).  Finally, unlike here, in *Yashiro Co. v. Falchi*, 1999 U.S. App. LEXIS 18161, *2 (2d Cir. July 30, 1999), "the licensing agreement conveyed to Yashiro only the *non-exclusive* right to use the mark 'Carlos Falchi' by itself." (emphasis by the Court).

where in the world." (Spiel Dec. Ex. 6 ¶ 2(a)) (emphasis added). By "associat[ing]" himself "as an owner [or] officer" of Herringbone and Houndstooth, companies "engaged in or [that] propose[] to engage in" a business that "would be competitive" with JA Apparel, and by negotiating license contracts during the Restricted Period (Abboud Dec. ¶ 6), Mr. Abboud plainly breached the provision.

In addition, Mr. Abboud admittedly contacted several competitors during the Restricted Period regarding the possibility of doing business with them, and worked on sketches and designs for his new clothing line. (Abboud Dec. ¶¶ 27-29).[10]  This conduct clearly goes beyond mere planning and, thus, was prohibited by the non-compete provision and constitutes breach of the Side Letter Agreement.  (*See* Pl. Mem.34-37).  Nor do any of the decisions by non-New York courts applying non-New York law on which Mr. Abboud relies provide any support for his position.  For example, in *Brooks Automation, Inc. v. Blue Shift Techs.*, 69 Mass. App. Ct. 1107, 2007 WL 1713370 (Mass. App. Ct. 2007) (unpublished), the court found that a former employee's actions could not reasonably be construed as directly or indirectly competing with his former employer because, unlike here, the former employee had no product, no investors, no funding, no marketing, and no employees, and was not working for another company.  (*See* Abboud Dec. ¶ 27-29).[11]

## IV.   JA APPAREL IS THREATENED WITH IRREPARABLE INJURY AND THE BALANCE OF HARDSHIPS WEIGHS IN JA APPAREL'S FAVOR

Faced with the clear law that where a trademark owner shows a substantial likelihood of success, irreparable harm is presumed (*see, e.g., New Kayak Pool Corp. v. R & P Pools, Inc.*, 246 F.3d 183, 185 (2d Cir. 2001)), defendants argue that an injunction would "delay[] or cripple[]" their

---

[10]   The third-party document productions JA Apparel recently obtained indicate that Mr. Abboud did much more than that during the Restricted Period – he engaged in substantial negotiations with license partners and took active steps to acquire and fund competing businesses, among other prohibited conduct.

[11]   Neither of the other cases on which defendants rely, *Cowley v. Anderson*, 159 F.2d 1 (10th Cir. 1947), and *Keiser v. Walsh*, 118 F.2d 13 (D.C. Cir. 1941), even involved non-compete agreements.

effort "to launch a new business." (Defs. Mem. 23). But, because a defendant cannot avoid an injunction by "construct[ing] its business around its infringement" (*Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3d Cir. 1983)), courts have held that harm to a trademark infringer's business merits little or no equitable consideration.[12]

Nor is there any basis for defendants' contention that there is no threat of "imminent harm" to JA Apparel in the absence of an injunction. (Defs. Mem. 24). Defendants assert both in their brief and publicly that Mr. Abboud "has the right" and is " free to use" Mr. Abboud's name "in advertising and promotional materials" and, indeed, believe that "use his name in marketing materials . . . is a very big asset to us, our partners and future partners and accounts." (Spiel Dec. Ex. 9; Defs. Mem. 11). Indeed, Mr. Abboud "welcomes this case" so that the issues can be resolved. (Defs. Mem. 2). As for defendants' argument that JA Apparel's preliminary injunction did not "seek[] any immediate relief" (*id.*), suffice it to say that it *did* seek such relief and that the truncated discovery period that JA Apparel sought was extended to 2½ months at *defendants'* request to permit the preliminary injunction motion to be consolidated with the trial on the merits.

## CONCLUSION

JA Apparel's motion for an injunction should be granted.

Dated: October 24, 2007
New York, New York

*Of counsel:*

John D. Geelan
Richard A. De Sevo
Victoria Haje
Patricia Ryder

KAYE SCHOLER LLP

By: _____
Thomas A. Smart
Phillip A. Geraci
425 Park Avenue
New York, New York  10022
(212) 836-8000
*Attorneys for Plaintiff and Counterclaim-Defendants*

---

[12]    *See, e.g., Helene Curtis Indus. v. Church and Dwight*, 560 F.2d 1325, 1333 (7th Cir. 1977); *Dial-A-Mattress Operating Corp. v. Mattress Madness*, Inc., 841 F. Supp. 1339, 1357 (E.D.N.Y. 1994); *Pro Hardware, Inc. v. Home Centers of Am., Inc.*, 607 F. Supp. 146, 154-55 (S.D. Tex. 1984); *Scandia Down Corp. v. Euroquilt, Inc.*, 1982 U.S. Dist. LEXIS 17664, *9 (N.D. Ill. Nov. 8, 1982).