Louis S. Ederer(LE 7574)
John Maltbie (JM 3658)
ARNOLD & PORTER LLP
399 Park Avenue
New York, New York 10022
(212) 715-1000
*Attorneys for Defendants and
Counterclaim Plaintiffs Joseph Abboud, Houndstooth Corp.
and Herringbone Creative Services, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

| | |
|---|---|
| JA APPAREL CORP., | : |
| Plaintiff, | : |
| v. | : Civil Action No. 07 CV 07787 (DAB) |
| JOSEPH ABBOUD, HOUNDSTOOTH CORP., and HERRINGBONE CREATIVE SERVICES, INC., | : |
| Defendants. | : **DECLARATION OF LOUIS S. EDERER IN SUPPORT OF CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS ON COUNTS ONE THROUGH SEVEN AND COUNT NINE OF PLAINTIFF'S COMPLAINT AND IN OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* TO PRECLUDE ADMISSION OF PAROL EVIDENCE** |
| JOSEPH ABBOUD, HOUNDSTOOTH CORP., and HERRINGBONE CREATIVE SERVICES, INC., | : |
| Counterclaim Plaintiffs, | : |
| v. | : |
| JA APPAREL CORP. and MARTIN STAFF, | : |
| Counterclaim Defendants. | : |

------------------------------------------------------------- x

LOUIS S. EDERER, pursuant to 28 U.S.C. §1746, declares under penalty of perjury that the following is true and correct to the best of his knowledge:

1.  I am a member of the firm of Arnold & Porter LLP, attorneys for Defendants Joseph Abboud, Houndstooth Corp. and Herringbone Creative Services, Inc. (collectively "Abboud"). I submit this memorandum of law in support of Abboud's cross-motion for

judgment on the pleadings on counts one through seven and count nine of JA Apparel Corp. ("JA Apparel")'s complaint in this action and in opposition to JA Apparel's motion *in limine* to preclude parol evidence.

## THE PERTINENT PROVISIONS OF THE PURCHASE AND SALE AGREEMENT AND THE PERSONAL SERVICES AGREEMENT

2.   On June 16, 2000, Abboud, Houndstooth and JA Apparel entered into the Purchase and Sale Agreement and the Personal Services Agreement. Attached hereto as Exhibit A is a true and correct copy of the Purchase and Sale Agreement and the pertinent Schedules thereto.

3.   Pursuant to Article 1.1(a)(A) of the Purchase and Sale Agreement, Abboud agreed that on the closing date he would then convey to JA Apparel "The names, trademarks, trade names, service marks, logos, insignias and designations identified on Schedule 1.1(a)(A), and all trademark registrations and applications therefor, and the goodwill related thereto (collectively, the "Trademarks), together with all causes of action (and the proceeds thereof) in favor of [Abboud] heretofore accrued or hereafter accruing with respect to any of the Trademarks, and all other Intellectual Property (as hereinafter defined)." *See*, Exhibit A attached hereto.

4.   Article 3.6(a) of the Purchase and Sale Agreement defines "Intellectual Property" as follows:

> Schedule 1.1(a)(A) sets forth a list of all of the trademark registrations, service mark registrations and applications and copyright registrations and applications currently used by the [Abboud] in connection with the Trademarks (the "Intellectual Property").

*See*, Exhibit A attached hereto.

5.   Pursuant to Article 1.1(a)(B) of the Purchase and Sale Agreement, Abboud agreed that on the closing date he would then convey to JA Apparel "All licenses to the Trademarks

granted by [Abboud] . . . (collectively, the "License Agreements." *See*, Exhibit A attached hereto.

6. Pursuant to Article 1.1(a)(C) of the Purchase and Sale Agreement, Abboud agreed that on the closing date he would then convey to JA Apparel "All rights to use and apply for the registration of new trade names, trademarks, service marks, logos, insignias and designations containing the words 'Joseph Abboud', 'designed by Joseph Abboud,' 'by Joseph Abboud,' 'JOE,' or "JA," or anything similar thereto or derivative thereof, either alone or in conjunction with other words or symbols (collectively, the "New Trademarks"), for any and all products or services." *See*, Exhibit A attached hereto.

7. Pursuant to Article 1.1(a)(D) of the Purchase and Sale Agreement, Abboud agreed that on the closing date he would then convey to JA Apparel "All books, financial records, invoices, and other documents, records and data files relating primarily to the Trademarks or the License Agreements." *See*, Exhibit A attached hereto.

8. Pursuant to Article 1.1(a)(E) of the Purchase and Sale Agreement, Abboud agreed that on the closing date he would then convey to JA Apparel "The goodwill of or pertaining to the Trademarks." *See*, Exhibit A attached hereto.

9. Pursuant to Article 1.1(b) of the Purchase and Sale Agreement, Abboud agreed that on the closing date he would convey and assign to JA Apparel the "Trademarks," "New Trademarks" and "License Agreements." *See*, Exhibit A attached hereto.

10. Article 2.2 of the Purchase and Sale Agreement sets forth the conveyances that Abboud was to make at the "Closing." Specifically, with respect to intellectual property rights, Abboud agreed to convey to JA Apparel "(vii) instruments of assignments in favor of [JA Apparel] with respect to each of the Trademarks, in form and content acceptable to [JA Apparel], duly executed by Houndstooth or Abboud, as the case may be." *See*, Exhibit A attached hereto.

11. At the "Closing", which was held on or about July 13, 2000, Abboud conveyed and assigned to JA Apparel the "Trademarks" set forth on Schedule 1.1(a)(A) of the Purchase and Sale Agreement and the "License Agreements." Abboud did not convey and/or assign to JA Apparel any exclusive right to the use of Abboud's personal name in any way, shape or form, nor did Abboud convey or assign any of his personal or publicity rights, or his individual reputation, persona, likeness or celebrity. Attached hereto as Exhibit B is a copy of the July 13, 2000 Trademark Assignment, a copy of which was obtained from the United States Patent and Trademark Office.

12. At or about the same time as entering into the Purchase and Sale Agreement, Abboud entered into the Personal Services Agreement with JA Apparel. Attached hereto as Exhibit C is a true and correct copy of the Personal Services Agreement.

13. Under the terms of the Personal Services Agreement, Abboud agreed to serve as Chairman Emeritus of JA Apparel for a period of five (5) years (the "Personal Services Period"). *See*, Exhibit C attached hereto at ¶1(a).

14. The Personal Services Agreement specifically prohibited Abboud from engaging in any business activities during the Personal Services Period. *See*, Exhibit C attached hereto at ¶1(b).

15. However, the Personal Services Agreement permitted Abboud to make media and celebrity appearances in his individual capacity, as an authority in the fashion design business, in order to protect, preserve and enhance the value of his personal goodwill and his publicity rights. *See*, Exhibit C attached hereto at ¶1(b).

**DOCUMENTS EVIDENCING THE NEGOTIATIONS LEADING UP TO THE EXECUTION OF THE PURCHASE AND SALE AGREEMENT AND THE PERSONAL SERVICES AGREEMENT**

16. On November 11, 1999, Abboud and Roberto Jorio Fili ("Fili"), the chairman of

JA Apparel signed a letter clarifying "which issues [were] still in negotiation [concerning the purchase of the Abboud trademarks] and which issues need[ed] further discussion and clarification." Attached hereto as Exhibit D is the November 11, 1999 letter.

17. This November 11, 1999, letter set forth "Points of Agreement" which state that JA Apparel would pay Abboud "$50 - $55 million at signing for all *Joseph Abboud trademarks*." (emphasis added). *See*, Exhibit D attached hereto.

18. On December 3, 1999, JA Apparel's Italian lawyer sent Abboud a letter in which he indicated that the target of the deal was "all *Joseph Abboud Trademarks* personally owned by Mr. Abboud." (emphasis added). The Italian lawyer also acknowledged Abboud's "well-known reputation and prestige." Attached hereto as Exhibit E is the December 3, 1999 letter.

19. On February 2, 2000, Abboud had a meeting in Milan, Italy, with representatives of JA Apparel, during which JA Apparel representatives reiterated that the object of the deal was the "acquisition of [the Joseph Abboud] trademarks." Attached hereto as Exhibit F is a memo memorializing the February 2, 2000 meeting.

20. On February 10, 2000, JA Apparel's U.S. lawyer, Jeffrey E. LaGueux, Esq., a partner at the law firm of Patterson, Belknap, Webb & Tyler LLP ("LaGueux"), sent a draft letter of intent that he had prepared regarding the proposed acquisition by JA Apparel of the Joseph Abboud Trademarks to Abboud's counsel, Theodore E. Dinsmoor, Esq. ("Dinsmoor"). Attached hereto as Exhibit G is the February 10, 2000 letter.

21. In the February 10, 2000, draft letter of intent, LaGueux indicated that the assets that JA Apparel would purchase consisted of, *inter alia*, "all of Houndstooth's and [Abboud's] right, title and interest in and to all trade names, trademarks and service marks existing as of the Closing . . . (collectively, the "Trademarks"), together with all registrations and applications therefor, the goodwill related thereto and any and all claims for past infringement." *See*, Exhibit

G attached hereto.

22. In addition, in the February 10 letter of intent, JA Apparel proposed that Abboud enter into an indefinite restrictive covenant not to compete against JA Apparel. Specifically, JA Apparel proposed the following language:

> [t]he side letter will also contain a non-competition covenant by [Abboud] which will extend beyond the five-year period of [Abboud's] personal services, pursuant to which he will be prohibited from being associated in any capacity with any enterprise which is engaged in or proposes to engage in the business of designing, licensing, manufacturing, marketing, distributing or otherwise dealing with any products or services which are competitive with the business of [JA] Apparel as then conducted or as may be conducted in the future.

*See*, Exhibit G attached hereto.

23. On February 15, 2000, Dinsmoor responded to LaGueux's February 10 draft letter of intent by indicating, *inter alia*, that Abboud would not agree to an indefinite restrictive covenant and that by virtue of the transaction, JA Apparel should assume responsibility for Abboud's business, Joseph Abboud Worldwide, Inc. Attached hereto as Exhibit H is the February 15, 2000 letter.

24. Thereafter, on February 25, 2000, Fili sent a letter to Abboud in which he made clear that JA Apparel was not interested in acquiring Abboud's design business — Joseph Abboud Worldwide, Inc. — rather, as JA Apparel was, in fact, only interested in purchasing the Joseph Abboud Trademarks. Specifically, Fili stated that:

> Right from the initial steps of our negotiation I have always declared that our objective was and still is the acquisition of the trademark.
>
> This concept, then, has been also repeatedly reaffirmed throughout our correspondence and it has been finally clarified during our last meeting in Milano on the 2nd of February.
>
> It is very discouraging to read that your attorney is re-discussing this point over again, and so therefore I would like, one more time, to amicably go through its main topics:
>
> 2.1 Object of the acquisition are the trademarks;

        2.2 We are not interested in buying companies;

        2.3 We are not interested in the 57th Street premises.

Attached hereto as Exhibit I is the February 25, 2000 letter.

    25.     Further, in his February 25 letter to Abboud, Fili, writing with respect to the scope of the proposed restrictive covenant, recognized a clear distinction between Joseph Abboud the "designer" and the Joseph Abboud Trademark his company was acquiring, when he indicated:

> [W]here, from the very beginning of our discussions it had been made clear that by acquiring for a huge amount the trademarks owned by yourself and Houndstooth[], GFT intends to protect itself for the future with a clause safeguarding its own investment (which incidentally will start being partially profitable on the 5th year) and not allowing the "designer" Joseph Abboud to engage in any activity which could in anyway damage the growth of the business, the integrity of the investment and the consolidation and return of the same. Especially after only 5 years.

*See*, Exhibit I attached hereto.

    26.     Responding to Fili's February 25 letter, Abboud, on March 1, 2000, sent Fili a letter indicating, *inter alia*, that:

> [i]f, for whatever reasons, the corporation does not want to continue with my services after five years, I want the option to practice my skills should I choose to continue working in the future. It goes without saying that at <u>no</u> <u>time</u> will I have any rights to any of the Joseph Abboud Trademarks. Here is where you must separate Joseph Abboud personally from the Joseph Abboud trademarks.
>
>                \* \* \* \*
>
> I will commit to the five years, but I do not believe that any restriction beyond that is reasonable. That does not preclude us from revisiting this issue during the five year term and extending our relationship with mutually agreeable terms. I believe this is the best formula to keep both parties focused on each other for a longer period of time and ensure our mutual commitment to this business.

Attached hereto as Exhibit J is the March 1, 2000 letter.

    27.     On March 9, 2000, LaGueux sent Dinsmoor a revision to the draft letter intent to reflect the points discussed in the parties recent correspondence. Specifically, LaGueux modified the restrictive covenant from an indefinite period to a five year period beyond the five

year personal services period. In addition, language was added to make clear that while JA Apparel would not acquire Abboud's design business — Joseph Abboud Worldwide, Inc., — it would agree to reimburse Joseph Abboud Worldwide, Inc. for certain limited operating expenses. Attached hereto as Exhibit K is the March 9, 2000 letter with attachments.

28.     Thereafter, on March 17, 2000, Abboud, Houdstooth and JA Apparel entered into a letter of intent concerning, *inter alia*, the sale of the Joseph Abboud Trademarks, the five year personal services period, the two year restricted period and JA Apparel's reimbursement to Joseph Abboud Worldwide, Inc. for certain operating entities. Attached hereto as Exhibit L is the March 17, 2000 letter with attachments.

29.     On May 3, 2000, LaGueux sent a draft of the Purchase and Sale Agreement and the Personal Services Agreement to Dinsmoor. The language in the Purchase and Sale Agreement pertinent to JA Apparel's acquisition of the Joseph Abboud Trademarks and the language in the Personal Services Agreement pertinent to Abboud's restricted period, appeared in summary form as follows:

Purchase and Sale Agreement

> Article 1.1(a)(A) - Provides that on the closing date JA Apparel shall acquire from Abboud "[t]he names, trademarks, trade names, service marks, logos, insignias and designations appearing on Schedule 1.1(a)(A), and all trademark registrations and applications therefor, and the goodwill related thereto (collectively, the "Trademarks), together with all causes of action (and the proceeds thereof) in favor of [Abboud] heretofore accrued or hereafter accruing with respect to any of the Trademarks, and all other Intellectual Property (as hereinafter defined)."
>
> Article 1.1(a)(B) - Provides that on the closing date JA Apparel shall acquire from Abboud "[a]ll licenses to the Trademarks granted by [Abboud] . . . (collectively, the "License Agreements")."
>
> Article 1.1(a)(C) - Provides that on the closing date JA Apparel shall acquire from Abboud "[a]ll rights to use and apply for the registration of new trade names, trademarks, service marks, logos, insignias and designations containing the words 'Joseph Abboud', 'designed by Joseph Abboud,' 'by Joseph Abboud,' 'JOE,' or "JA," or anything similar thereto or derivative thereof, either alone or in conjunction with other words or symbols (collectively, the "New Trademarks"),

for any and all products or services."

Article 1.1(a)(D) - Provides that on the closing date JA Apparel shall acquire from Abboud "[a]ll books, financial records, invoices, and other documents, records and data files relating primarily to the Trademarks or the License Agreements."

Article 1.1(a)(D) - Provides that on the closing date JA Apparel shall acquire from Abboud "[t]he goodwill of or pertaining to the Trademarks."

Personal Services Agreement

For the two-year period immediately following the expiration of the Personal Services Period (the "Restricted Period") [*i.e.*, from July 13,2005 - July 13, 2007], Abboud agrees that he will not, directly or indirectly through any partnership, corporation, limited liability company, trust or other entity, be associated as an owner, director, officer, employee, consultant or other participant with, any person, group, business enterprise or other entity which is engaged in or proposes to engage in the business of designing, licensing, manufacturing, marketing or distributing any products or services which are or would be competitive with the business of [JA Apparel] as then conducted or as such business may be reasonably expected to be conducted in the future anywhere in the world.

Attached hereto as Exhibit M is the May 3, 2000 letter with attachments.

30. By letter dated May 19, 2000, Dinsmoor commented on LaGueux's draft of the Agreements and, with respect to the Personal Services Agreement, noted that the agreement should be modified to make clear that Abboud could, *inter alia*, "engage in apparel industry activities and functions and appear and perform as a celebrity in his own right, even though such activities are not tied into [JA Apparel's] operations." Attached hereto as Exhibit N is the May 19, 2000 letter with attachments.

## JA APPAREL'S CONDUCT FOLLOWING THE EXECUTION OF THE PURCHASE AND SALE AGREEMENT AND THE PERSONAL SERVICES AGREEMENT

31. The conduct of JA Apparel following the Purchase and Sale Agreement clearly demonstrates that JA Apparel understood that *all* Abboud had conveyed and/or assigned to it where trademarks and licensing agreements owned by Abboud and the right to apply for future trademarks.

32. On June 16, 2000, JA Apparel and Abboud agreed on the language of the

following press release:

> GFT Net (HdP) and Joseph Abboud have announced that they have signed a contract for *the acquisition of GFT Net of all the trademarks and licensing contracts with the name of Joseph Abboud.*
>
> Joseph Abboud is an award-winning American designer, whose talent and distinctive point of view have earned him accolades on an international basis.
>
> GFT Net, is currently licensed to produce and distribute the Men's formal, sportswear and golf lines with the trademark Joseph Abboud through JA Apparel, a company controlled by GFT USA. With this agreement, GFT Net sets the objective of further reinforcing its existing activity and developing new product lines in new markets, within a global strategy.
>
> On the basis of a signed contract, *GFT Net will acquire the trademarks and licensing agreements registered in the name of Joseph Abboud and his company Houndstooth Corp. for a compensation of $65 million.* The acquisition will be carried out during the month of July, once the necessary approvals have been attained by anti-trust authorities.
>
> For GFT Net, *the acquisition of one of the most successful U.S. trademarks* of the last few years, with total sales estimated over $250 million, represents a significant step in their own strategy, to be realized both by external growth as well as by maximizing the value of the trademarks in their portfolio.

Attached hereto as Exhibit O is the June 19, 2000 press release.

33. On July 6, 2000, JA Apparel issued a press release in which it announced that it had recently acquired the "Joseph Abboud fashion label." In the press release, the following statement was made:

> Prior to the acquisition, GFT.Net (Hdp) was the licensee for the Joseph Abboud core men's apparel business (which consists of tailored clothing, sportswear, furnishings and golf apparel) and produced and distributed these lines through its JA Apparel Corp. division. All other Joseph Abboud licensees were controlled by licensor [Joseph Abboud] Worldwide, the New York-based designer company. *Under the terms of the acquisition, Hdp purchased all existing trademarks and licensing agreements and all future trademarks bearing the Joseph Abboud name.* The net result of the acquisition, according to Fili, will be to effectively bring all brand manufacturing, marketing and strategy together under one organization.

Attached hereto as Exhibit P is the July 6, 2000 press release (emphasis added).

34. On August 8, 2002, in a letter to the *Westchester County Times* to notify them of

-10-

certain "inaccurate and misleading statements" in their August 2002 article entitled "Joseph Abboud's Master Plan", Robert J. Wichser, then President and Chief Operating Officer of JA Apparel made, *inter alia*, the following statement:

> The Joseph Abboud brand is produced by JA Apparel - a wholly owned division of GFT NET since July 2000, *when the latter acquired all existing trademarks, license agreements and new trademarks bearing the Joseph Abboud name.*"

Attached hereto as Exhibit Q is the August 8, 2002 letter (emphasis added).

35. On November 5, 2002, Jeffrey E. LaGueux, then counsel for JA Apparel, sent a letter to Donald L. Kreindler, then counsel for Abboud, in which he made the following statement:

> The Personal Services Agreement and the related Purchase and Sale Agreement were heavily negotiated by the parties over an extended period of time . . . . *JA Apparel paid a generous price for the trademarks purchased pursuant to the Purchase and Sale Agreement* subject to several conditions, one of which was that Mr. Abboud enter into the Personal Services Agreement.

Attached hereto as Exhibit R is the November 5, 2002 letter (emphasis added).

36. On September 18, 2003, then counsel for JA Apparel, in a Statement of Undisputed Facts filed in support of JA Apparel's Motion for Summary Judgment in the case captioned *Joseph Abboud and Houndstooth Corp. v. Robert J. Wichser and JA Apparel Corp., et al.*, Index Nos. 604033/02 and 602211/03 (NY Sup, Cty of NY), made the following statement:

> *JA Apparel paid Mr. Abboud $65.5 million for his trademarks.*

Attached hereto as Exhibit S is the September 18, 2003 Statement of Undisputed Facts filed in support of JA Apparel's Motion for Summary Judgment (emphasis added).

37. On or about February 14, 2004, as memorialized in a Stock Purchase Agreement, JA Holding, Inc., a company owned by JW Childs Equity Partners, purchased JA Apparel from GFT (USA) Corp. In the February 14, 2004 Stock Purchase Agreement, it was disclosed that JA Apparel owned certain "intellectual property", including, *inter alia*, the following:

> *(ii) trademarks, service marks, trade names, trade dress, logos, business and product names, designs, slogans, goodwill and registrations and applications for registration thereof;*

Nowhere in the Stock Purchase Agreement is there any indication that JA Apparel was the owner of the personal name "Joseph Abboud." Attached hereto as Exhibit T (at ¶2.19) are the pertinent provisions from the February 14, 2004 Stock Purchase Agreement (emphasis added).

38. The February 14, 2004 Stock Purchase Agreement includes a schedule of disclosures, including Schedule 2.19(b), which contains the following list of the intellectual property owned by JA Apparel:

> Software License Agreement, dated as of June 3, 1994, between GFT (U.S.A.) Corp. and Application Consultants.
>
> See shrinkwrap software license agreements attached to Schedule 2.19(c).
>
> josephabboud.com - domain name.
>
> josephabboud.org - domain name.
>
> josephabboud.net - domain name.
>
> Corporate names of each of the companies.
>
> *List of existing trademark registrations annexed hereto.*
>
> RLM Apparel Software Systems, Inc. System/38 Integrated Apparel System IIAS) Package Contract #311, dated as of April 26, 1985, by and between RLM and GFT (U.S.A.) Corporation.

Notably, Schedule 2.19(b) does not indicate that JA Apparel was the owner of the personal name "Joseph Abboud." Attached hereto as Exhibit Q (at ¶2.19) are the pertinent provisions from the February 14, 2004 Disclosure Schedules to the Stock Purchase Agreement (emphasis added).

DECLARED UNDER PENALTY OF PERJURY THIS 14th DAY OF FEBRUARY, 2008.

*[signature]*
LOUIS S. EDERER