Louis S. Ederer(LE 7574)
John Maltbie (JM 3658)
ARNOLD & PORTER LLP
399 Park Avenue
New York, New York 10022
(212) 715-1000
*Attorneys for Defendants and
Counterclaim Plaintiffs Joseph Abboud, Houndstooth Corp.
and Herringbone Creative Services, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

| | |
|---|---|
| JA APPAREL CORP., | |
| Plaintiff, | |
| v. | Civil Action No. 07 CV 07787 (DAB) |
| JOSEPH ABBOUD, HOUNDSTOOTH CORP., and HERRINGBONE CREATIVE SERVICES, INC., | |
| Defendants. | **DECLARATION OF LOUIS S. EDERER IN SUPPORT OF CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS ON COUNTS ONE THROUGH SEVEN AND COUNT NINE OF PLAINTIFF'S COMPLAINT AND IN OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* TO PRECLUDE ADMISSION OF PAROL EVIDENCE** |
| JOSEPH ABBOUD, HOUNDSTOOTH CORP., and HERRINGBONE CREATIVE SERVICES, INC., | |
| Counterclaim Plaintiffs, | |
| v. | |
| JA APPAREL CORP. and MARTIN STAFF, | |
| Counterclaim Defendants. | |

------------------------------------------------------------- x

# **EXHIBIT C**

July 13, 2000

Mr. Joseph Abboud
c/o Houndstooth Corporation
90 Pine Brook Road
Bedford, New York 10506

Joseph Abboud Worldwide Inc.
49 West 57th Street
New York, New York 10019

Gentlemen:

    Reference is made to the Agreement of Purchase and Sale, dated as of June 15, 2000 (the "Agreement"), among Houndstooth Corporation ("Houndstooth"), Mr. Joseph Abboud ("Abboud") and JA Apparel Corp. (the "Buyer"). Pursuant to the Agreement, on the date hereof the Buyer is acquiring from Houndstooth and Abboud (i) certain names, trade names, service marks, logos, insignias, designations, trademark registrations and applications and the goodwill related thereto (collectively, the "Trademarks"), (ii) all licenses to use the Trademarks granted by Houndstooth, or Abboud (collectively, the "License Agreements") and (iii) all rights to use and apply for the registration of new trade names, trademarks, service marks, logos, insignias and designations containing the words "Joseph Abboud," "designed by Joseph Abboud," "by Joseph Abboud," "JOE" or "JA" or anything similar thereto or derivative thereof, either alone or in conjunction with other words or symbols (collectively, the "New Trademarks" and, collectively with the Trademarks and the License Agreements, the "Assets"). In consideration of the consummation of the purchase and sale of the Assets pursuant to the Agreement, and in order to induce Houndstooth, Abboud and the Buyer to consummate such purchase, the parties hereto have agreed as follows:

1. <u>Personal Services to be Performed by Abboud</u>

    (a) For a period of five (5) years from and after the date hereof (the "Personal Services Period"), Abboud agrees to serve as Chairman Emeritus of the Buyer and to provide the following personal services to the Buyer on an exclusive basis: (a) providing stylistic guidelines in connection with the Black Label collection of apparel marketed under the Trademarks, (ii) providing stylistic ideas and proposals for the design and development of all other collections marketed under the Trademarks and/or the New Trademarks, (iii) providing concepts and ideas in connection with public relations activities and advertising campaigns, (iv) providing suggestions and ideas for the development of new business opportunities and new licensing relationships for the Buyer and (v) upon reasonable prior notice to Abboud consistent with the past



DEFENDANT'S EXHIBIT 13

EXHIBIT Spiel 11 11/5/07

D 00001

practices of the parties, making personal appearances at exhibitions, fashion shows and other events on behalf of the Buyer whenever the Buyer deems it reasonably necessary for the benefit of the brand awareness of the Trademarks and/or the New Trademarks. Subject to reasonable prior notice to Abboud consistent with the past practices of the parties, Abboud agrees to use his reasonable best efforts to make himself available to perform such personal services at the request of the Buyer in New York, New York and at such other places as the Buyer may from time to time reasonably request, in each case during the Personal Services Period.

(b) It is understood and agreed that Abboud's performance of such personal services will be rendered as requested from time to time by the Buyer during the Personal Services Period and that Abboud will not be entitled to engage in other business activities during the Personal Services Period, other than serving as Chairman Emeritus of the Buyer as provided herein, without the prior written consent of the Buyer, which consent shall not be unreasonably withheld in the case of any proposed business activities by Abboud which the Buyer reasonably determines are not in conflict with any of the business activities of the Buyer or any of its affiliated entities then conducted or as then reasonably proposed to be conducted. Further, it is understood and agreed that the Buyer hereby consents to Abboud (i) making media (including television) or celebrity appearances and otherwise acting as a general authority in the fashion business, (ii) serving for compensation on boards of directors, advisory boards and special committees and (iii) acquiring, owning and holding stock in public corporations, in each case as long as such activities do not result in Abboud actually competing with any of the business activities of the Buyer or its affiliated entities as conducted at that time. Any request by Abboud for the Buyer's consent to engage in any other activities during the Personal Services Period shall be directed to and determined by the Chief Executive Officer of GFT Net S.p.A. (or its corporate successor) on behalf of the Buyer.

(c) Abboud agrees that the purchase price paid by the Buyer for the Assets on the date hereof pursuant to the Agreement provides him with full and fair consideration from the Buyer for the performance of such personal services during the Personal Services Period and that he will not be entitled to any additional compensation from the Buyer or any of its affiliates with respect to the performance of such personal services except as otherwise expressly provided in this Letter Agreement.

(d) During the Personal Services Period, Abboud shall receive all of the benefits and compensation described hereunder. For his service hereunder, Abboud will receive an annual retainer of Twelve Thousand Dollars ($12,000), payable in arrears in semi-annual installments of Six Thousand Dollars ($6,000) each, beginning six (6) months from the date hereof, during the Personal Services Period. Abboud will be entitled to a corporate expense account from the Buyer (including a corporate credit

card) which will be used exclusively for business-related expenses incurred by him in connection with his duties as Chairman Emeritus of the Buyer. Such business-related expenses will be submitted on a monthly basis to the Buyer for its reasonable approval. Abboud shall be entitled to car service transportation and first class travel and overnight accommodation arrangements at the expense of the Buyer whenever he is required to travel at the request of the Buyer in performing such personal services. Abboud shall be entitled to membership club dues of up to Six Thousand Dollars ($6,000) per annum payable by the Buyer on or before the due date(s) thereof. Abboud shall also be entitled to a clothing allowance of up to Ten Thousand Dollars ($10,000) per annum pursuant to which he will be entitled to purchase articles of apparel manufactured by or for the Buyer at a twenty percent (20%) discount to the Buyer's standard wholesale price on an item by item basis. In addition, during the period of his service as Chairman Emeritus of the Buyer, Abboud will also be entitled to receive medical insurance coverage on the same terms and conditions as the Buyer provides from time to time to its senior executive officers, as more particularly described as of the date hereof in Schedule 1(d).

2. **Prohibition of Competing Activities by Abboud.**

(a) For the two-year period immediately following the expiration of the Personal Services Period (the "Restricted Period"), Abboud agrees that he will not, directly or indirectly through any partnership, corporation, limited liability company, trust or other entity, be associated as an owner, director, officer, employee, consultant or other participant with, any person, group, business enterprise or other entity which is engaged in or proposes to engage in the business of designing, licensing, manufacturing, marketing or distributing any products or services which are or would be competitive with the business of the Buyer as then conducted or as such business may be reasonably expected to be conducted in the future anywhere in the world.

(b) In order to enforce the agreement of Abboud set forth in paragraph (a) of this Section 2, Abboud agrees that at all times during the Restricted Period he will be obligated to obtain the prior written consent of the Buyer, which may be granted, withheld or conditioned in the sole discretion of the Buyer, before becoming associated in any capacity with any person, group, business enterprise or other entity, other than the Buyer or any of its affiliated entities, which is engaged in or proposes to engage in the business of designing, licensing, manufacturing, marketing or distributing any products or services which could reasonably be expected to be competitive with the business of the Buyer as then conducted or as then reasonably proposed to be conducted in the future. Any request by Abboud for the Buyer's consent to engage in any activities which require such consent during the Restricted Period shall be directed to and determined by the Chief Executive Officer of GFT Net S.p.A. (or its corporate successor) on behalf of the Buyer.

3

485001.6

(c) Abboud agrees that the purchase price paid by the Buyer for the Assets on the date hereof pursuant to the Agreement provides him with full and fair consideration from the Buyer for the agreement of Abboud set forth in this Section 2 during the Restricted Period and that he will not be entitled to any additional compensation from the Buyer or any of its affiliates with respect to such agreement except as otherwise expressly provided in this Letter Agreement.

(d) Abboud acknowledges that his agreements set forth in this Section 2 were specifically bargained for by the Buyer in connection with the consummation of the transactions contemplated by the Agreement, that the services to be performed by him pursuant to Section 1 above are special and unique and that in the event of any breach by Abboud of his agreements set forth in such Sections the Buyer will not have an adequate remedy at law and therefore will be entitled to obtain equitable relief in the form of a preliminary or permanent injunction from any court of competent jurisdiction in order to enforce such agreements  The parties acknowledge that the Agreement also provides for the indemnification of the Buyer by Houndstooth and Abboud in connection with any breach by Abboud of his agreements set forth in such Sections, subject to the limitations and other provisions of the Agreement contained in Article VIII thereof, and agree that such indemnification will constitute the Buyer's sole remedy at law in case of any such breach..

(e) In the event that a court of competent jurisdiction would refuse to enforce the agreement of Abboud set forth in this Section 2 because it covers too wide a geographic area, extends for a period of time which is deemed excessive or otherwise, it is the intention of the Buyer and Abboud that such agreement shall be reformed by such court so as to comport with the maximum allowable provisions permitted by applicable law.

3. **Reimbursement of Certain Expenses by The Buyer.**

(a) In consideration of the sale of the Assets by Abboud and Houndstooth to the Buyer pursuant to the Agreement on the date hereof, the Buyer agrees to reimburse Worldwide on a periodic monthly basis for 100% of the rent as of the date hereof ($10,967.09) paid by Worldwide for the third floor offices in 49 West 57th Street in New York City currently occupied by Worldwide for the period from and including the Closing Date (as defined in the Agreement) through and including September 30, 2000 (such period, the "Reimbursement Period"). Such reimbursement will be paid in accordance with Schedule 3(a) annexed hereto.

(b) In consideration of the sale of the Assets by Abboud and Houndstooth to the Buyer pursuant to the Agreement on the date hereof, the Buyer agrees to reimburse Worldwide on a periodic monthly basis for 100% of the base compensation as of the date hereof, paid by Worldwide during the Reimbursement Period to each of

4

485001.6

D 00004

Mark Scarborough, Bob Franceschini, Dominick Leuci, Deborah Koncan, and Amy Vernazza in accordance with Schedule 3(b) annexed hereto for each such individual until the earlier to occur of (i) the date that such individual ceases to be employed by Worldwide for any reason (including, but not limited to, as a result of the discretionary hiring of such individual by the Buyer or one of its affiliates) and (ii) the expiration of the Reimbursement Period.

(c) In consideration of the sale of the Assets by Abboud and Houndstooth to the Buyer pursuant to the Agreement on the date hereof, the Buyer agrees to reimburse Worldwide on a periodic monthly basis for 50% of the rent paid by Worldwide as of the date hereof ($10,967.09 x 50% = $5,483.55) for the third floor offices in 49 West 57th Street in New York City currently occupied by Worldwide for the period from and including October 1, 2000 to and including the earlier to occur of (y) December 31, 2000 and (z) the date that Worldwide subleases, assigns or surrenders its lease with respect to such space such period the "Partial Reimbursement Period"). Such reimbursement will be paid in accordance with Schedule 3(c) annexed hereto. In addition, Abboud agrees to cause Worldwide to use its commercially reasonable efforts to sublease, assign or surrender its lease with respect to such space during the Partial Reimbursement Period and to promptly notify the Buyer if Worldwide is able to effect any such sublease, assignment or surrender.

(d) In consideration of the sale of the Assets by Abboud and Houndstooth to the Buyer pursuant to the Agreement on the date hereof, the Buyer agrees to assume and discharge the Sellers' existing advertising obligations to radio station WFAN-66AM New York for commercials on the "Imus in the Morning" radio show due on October 15, 2000 in the amount of $12,500 and due on February 15, 2001 in the amount of $37,500.

4 Miscellaneous.

(a) This Letter Agreement constitutes the entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes all prior or contemporaneous agreements, whether written or oral, among such parties relating to the subject matter hereof.

(b) This Letter Agreement and the rights and obligations of the parties will be governed by, construed and enforced in accordance with the laws of the State of New York without regard to the choice of law provisions thereof.

(c) This Letter Agreement is personal to the parties hereto and no party may assign its or his rights or delegate its or his obligations hereunder, in whole or in part, to any third party without the prior written consent of the other parties hereto, and

485001.6

D 00005

any such attempted assignment or delegation in the absence of such consent, shall be void and without effect.

(d) All actions and proceedings arising out of or relating to this Letter Agreement will be exclusively heard and determined in a New York state or federal court sitting in the City of New York and by the execution and delivery hereof the parties hereby irrevocably submit to the jurisdiction of such courts in any such action or proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of such action or proceeding.

(e) This Letter Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(f) All notices and other communications hereunder must be in writing and will be deemed given if sent to the respective parties hereto at their addresses as set forth in, and in the manner provided in, the Agreement.

To indicate your agreement to the foregoing, please execute the duplicate copy of this Letter Agreement in the space provided below for such purpose and return it to the undersigned, whereupon this Letter Agreement shall become a binding agreement among the parties.

Very truly yours,
JA APPAREL CORP.

By: _____
Name:
Title:

ACCEPTED AND AGREED TO:

_____
Joseph Abboud

HOUNDSTOOTH CORPORATION

By: _____
Name: Joseph Abboud
Title: President

6

485001.6

D 00006