Louis S. Ederer(LE 7574)
John Maltbie (JM 3658)
ARNOLD & PORTER LLP
399 Park Avenue
New York, New York 10022
(212) 715-1000
*Attorneys for Defendants and*
*Counterclaim Plaintiffs Joseph Abboud, Houndstooth Corp.*
*and Herringbone Creative Services, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x

JA APPAREL CORP.,

      Plaintiff,

      v.

JOSEPH ABBOUD, HOUNDSTOOTH
CORP., and HERRINGBONE CREATIVE
SERVICES, INC.,

      Defendants.
--------------------------------------------------------------

JOSEPH ABBOUD, HOUNDSTOOTH
CORP., and HERRINGBONE CREATIVE
SERVICES, INC.,

      Counterclaim Plaintiffs,

      v.

JA APPAREL CORP. and MARTIN STAFF,

      Counterclaim Defendants.
-------------------------------------------------------------- x

Civil Action No. 07 CV 07787 (DAB)

**DECLARATION OF LOUIS S. EDERER IN SUPPORT OF CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS ON COUNTS ONE THROUGH SEVEN AND COUNT NINE OF PLAINTIFF'S COMPLAINT AND IN OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* TO PRECLUDE ADMISSION OF PAROL EVIDENCE**

# EXHIBIT F

TCA Translation                                                                 TCA Translation

D00012999
## J. ABBOUD
### Memo Milan meeting of 2/2/2000

Present:   J. Abboud, J. Anton, B. Lucas (Assistant J. Anton)
           R. Jorio Fili, E. Vasco, G. Valerio, P. Vigitello
           B. Wichser, M. Mora (only presentation of the Business Plan)

First of all, Wichser presented the J. Abboud Business Plan, version with development all Europe.
Next the negotiation started.

J. Anton:   starts out by saying that Mr. J. Abboud is no pressing need to sell his companies. However, should he sell his business, he intends to obtain a certain amount for it.

Anton continues presenting the validity, in his opinion, of the Earn Out formula proposed by him (based 50% on profitability and 50% on sales growth). On the other hand, Valerio presents the reasons for which it is not possible to accept the formula proposed by Anton, which would lead to total amounts (price+Earn Out) which are not justified in terms of return on investment.

The parties decide that there are no alternatives, except to determine a price, immediately, for 100% of the business, because it is agreed that the Earn Out formula does not work since J. Abboud does not agree to cooperate with minority interests. Anton reminds those present that the initial request for 100% was $60 million + $25 million (minimum guaranteed Earn Out) = $85 million.

J. Abboud:  At this point he asks, in the event of acquisition of 100%, whether GFT plans for him to have an active role, or only personal appearance.

R. Jorio F.: In case of 100%, the company certainly needs J. Abboud not only for personal appearance, but with a more active role, which could consist of stylistic guidelines on the Top of the Range collection, ideas/suggestions (mood) concerning the other collections, the image for advertising and also for scouting of new licensees, taking advantage of his broad knowledge and personal relations.
A totally different issue is the decision-making process, in which the last word is always and only up to GFT.
If Abboud agrees, we have nothing against proposing to him to be the Honorary Chairman of the company.

J. Abboud:  accepts R. Jorio Fili's proposal, specifying that, above all, the role described frees him from the anxiety of pursuing a strategy that would assure him an Earn Out and having to discuss possible alternatives/changes in strategy throughout.

CONFIDENTIAL PURSUANT TO COURT ORDER

Translated by:
TCA - Translation Co. of America
10 West 37th Street
New York, N.Y. 10018


PLAINTIFF'S EXHIBIT
LaGueux 6
N/5/05 LAH
(212) 583-7054


DEFENDANT'S EXHIBIT
162

CONFIDENTIAL                                                                    KSC00004221

D00013000

R.Iorio F.: stresses that GFT wants to buy only the trademarks and not the two companies currently owned by J.Abboud and needs to sign an "exclusive" consulting contract with J.Abboud.

Tactical presentations by both parties follow, in order to define the price with a certain method.

The final positions may be summarized as follows:

|  | J.A. | GFT |
|---|---|---|
| - Base price | 55 | 50 |
| - Earn Out ($10 million) adjusted | 6 | 6 |
| - Compensation ($10 million) adjusted | 6 | 4 |
|  | 67 | 60 |

J.Abboud explains his request clearly, while GFT does not. J.Abboud asks GFT to explain.

**Lunch break**

HDP and GFT decide to appear at the negotiation table, proposing:
price $60 million + $500,000/year for five-year consulting contract (=$2.5 million) equivalent in total, if paid immediately, to $61 million adjusted.

J.Abboud: when the negotiations resume, declares that he is not against closing immediately for 100%, accepting the position of Honorary Chairman, which gives him a less stressful role which he still wants, but he declares that he would also like to be in charge of design. His proposal for 100% starting from that indicated above, is as follows:

$67 million + $3 million for him to get out definitively
Total $70 million.

R.Iorio F.: asks J.Abboud to talk to him in private; when they come back, they announce that they reached an agreement on the following basis:

- $65 million all included (compensation package paid in advance for 5 years)

- Small fees -> Honorary Chairman ($10-15,000/year) [handwritten] Tel RJF 2/3 -> 12,000

- Medical insurance package

---

Translated by:
TCA - Translation Co. of America
10 West 37th Street
New York, N.Y. 10018

CONFIDENTIAL PURSUANT TO COURT ORDER

(212) 563-7054

CONFIDENTIAL

KSC00004222

TCA Translation                                                                                TCA Translation

D00013001

It is also agreed that the offer is binding for the buyer under the following conditions:

1) the trademark verification does not uncover facts that may have a "material adverse effect" on the agreed price;

2) the acquisition contract is prepared at the same time with the Due Diligence on the Trademarks;

3) J.Abboud is entitled to the royalties earned for the S/S 2000 season.

February 3, 2000

[Handwritten notes in English]

CONFIDENTIAL PURSUANT TO COURT ORDER

Translated by:
TCA - Translation Co. of America
10 West 37th Street
New York, N.Y. 10018                                              (212) 563-7054

CONFIDENTIAL                                                                       KSC00004223

TCA Translation                                                                                         TCA Translation

D00013002

Joseph Abboud

|  | Our proposal min. max. $ min. $ min. | JA proposal (1) $ min. |
|---|---|---|
| Price |  |  |
| Earn Out valuation (2) |  |  |
| Compensation (3) |  |  |
| Travel |  |  |
| Total |  |  |

[see original for numbers]

(1) Joseph Abboud's proposal of December 21, 1999
(2) in the event that earn out is replaced by an "up front" payment
(3) annual compensation (for 5 years) 0.75

[handwritten]
MR up to 70

CONFIDENTIAL PURSUANT TO COURT ORDER

Translated by:
TCA - Translation Co. of America
10 West 37th Street
New York, N.Y. 10018                                                                              (212) 563-7054

CONFIDENTIAL                                                                                    KSC00004224

CA Translation                                                                                   TCA Translation

### J. ABBOUD

Key points in the verbal agreement 2/2/2000 to be transferred to a binding offer letter countersigned for acceptance by J. Abboud.

Object of the operation: acquisition of the trademarks

Price:
$ 65 Million    cash on signing and closing, which should be itemized as follows:

$ 60 Million    price of the trademarks
$ 5 Million    advance payment for personal and exclusive consulting by Mr. J. Abboud for a period of 5 years

$ 65 Million for J. Abboud constitute completely a capital gain

Closing day: 3/15/2000 (?)

Compensation for the position of Honorary Chairman: $10-15,000/year

Medical Insurance Package:
check how it is possible to assure an insurance package, for the Honorary Chairman and what its annual cost would be.

Royalties season S/S 2000:
for Mr. J. Abboud

ATTENTION to the special contracts (GM Executive Olympic Collection Project / GM Special Edition Buick Regal Agreement) basically not related to the season: we must therefore, define a time limit for the benefit of J. Abboud.

Request, as an attachment to the binding letter, a list of all the license contracts in order to be able to clearly define the royalties to which J. Abboud is entitled from each contract.

Clause "Ordinary course of Business":
A clause is necessary to establish that J. Abboud is not authorized, except with the prior consent of GKT:
- to sign new license contracts (another contract with General Motors appears to be in advance negotiation stage);
- to revoke/cancel the existing contracts

Translated by:
TCA - Translation Co. of America
10 West 37th Street
New York, N.Y. 10018

(212) 563-7054

CONFIDENTIAL

DEFENDANT'S EXHIBIT 3
Blumberg No. 5114

KSC00004286

TCA Translation                                                                 TCA Translation

In order to pay $65 million in a single installment, it is necessary to check, also taking J. Abboud's requirements into consideration, whether it would be possible to show two reasons in the purchase agreement.

a) $60 Million for the acquisition of the trademarks
b) $5 Million for advance payment for consulting for 5 years

or whether we need to do two separate contracts:

1) Purchase agreement
2) Consulting contract

If it is possible to do two separate contracts, the consulting contract will include both the exclusivity clause and the non competition clause (what are the uses and customs in terms of time in the USA: 10 years?).

If it is not possible to do two contracts, because of problems with J. Abboud, it is necessary to plan for a side-letter agreement in which the appointment as Honorary Chairman is communicated and his tasks are defined, with the consequent non competition and exclusivity clauses. Obviously the side-letter must be countersigned by J. Abboud.

The Binding Offer Letter is subject to due diligence on the trademarks and depends on its positive outcome, in the sense that it must not emerge from it that it may constitute "material adverse effect" on the defined value of the transaction.

Perhaps it should also be good to include in the Offer Letter a clause expressly prohibiting both parties from giving declarations to the press not previously agreed upon between them.

February 3, 2000

Translated by:
TCA - Translation Co. of America
10 West 37th Street
New York, N.Y. 10018                                              (212) 563-7054

CONFIDENTIAL                                                     KSC00004287