Louis S. Ederer (LE 7574)
John Maltbie (JM 3658)
ARNOLD & PORTER LLP
399 Park Avenue
New York, New York 10022
(212) 715-1000
*Attorneys for Defendants and
Counterclaim Plaintiffs Joseph Abboud, Houndstooth Corp.
and Herringbone Creative Services, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

JA APPAREL CORP.,

          Plaintiff,

    v.

JOSEPH ABBOUD, HOUNDSTOOTH
CORP., and HERRINGBONE CREATIVE
SERVICES, INC.,

          Defendants.

JOSEPH ABBOUD, HOUNDSTOOTH
CORP., and HERRINGBONE CREATIVE
SERVICES, INC.,

          Counterclaim Plaintiffs,

    v.

JA APPAREL CORP. and MARTIN STAFF,

          Counterclaim Defendants.

------------------------------------------------------------ x

Civil Action No. 07 CV 07787 (DAB)

**DECLARATION OF LOUIS S. EDERER IN SUPPORT OF CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS ON COUNTS ONE THROUGH SEVEN AND COUNT NINE OF PLAINTIFF'S COMPLAINT AND IN OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* TO PRECLUDE ADMISSION OF PAROL EVIDENCE**

# EXHIBIT L

GRUPPO-GFT

March 17, 2000

Board of Directors
Houndstooth Corporation
90 Pine Brook Road
Bedford, New York 10506

and

Mr. Joseph Abboud
c/o Houndstooth Corporation
90 Pine Brook Road
Bedford, New York 10506

Gentlemen:

Representatives of GFT net S.p.A. ("GFT") have had a number of discussions with you regarding the purchase of certain assets from Houndstooth Corporation ("Houndstooth") and Mr. Joseph Abboud and related matters (collectively, the "Transactions"). The purpose of this letter is to set forth in writing the agreement reached among Houndstooth, Mr. Joseph Abboud and GFT regarding the Transactions.

1. **Assets to be Purchased.** The assets to be sold by Houndstooth and Mr. Joseph Abboud which GFT will cause to be purchased by JA Apparel Corp. ("Apparel"), an indirect wholly owned subsidiary of GFT, consist of: (i) all of Houndstooth's and Mr. Joseph Abboud's right, title and interest in and to all trade names, trademarks and service marks existing as of the Closing (as defined below) and registered or used in any country in the world (collectively, the "Trademarks"), together with all registrations and applications therefor, the goodwill related thereto and any and all claims for past infringement, (ii) all of Houndstooth's and Mr. Joseph Abboud's right, title and interest in and to all licenses to use the Trademarks granted by Houndstooth and/or Mr. Joseph Abboud and existing as of the Closing (collectively, the "License Agreements") and (iii) all of the right, title and interest of Houndstooth and/or Mr. Joseph Abboud to use and apply for the registration of new trade names, trademarks and service marks containing the words "Joseph Abboud," "designed by Joseph Abboud," "by Joseph Abboud," "JOE" or "JA," or anything similar thereto or derivative thereof, either alone or in conjunction with other words or symbols (collectively, the "New Trademarks"), for any and all products or services.

2. **Purchase Price.** The purchase price to be paid for the Trademarks, the License Agreements and the New Trademarks will be sixty-

CONFIDENTIAL PURSUANT TO COURT ORDER

D00007611

CONFIDENTIAL

D 03174


DEFENDANT'S EXHIBIT 11

five million dollars ($85,000,000) which GFT will cause to be paid by Apparel to Houndstooth and Mr. Joseph Abboud in full in cash at the closing of the purchase (the "Closing") by wire transfer of immediately available funds to accounts designated by Houndstooth and Mr. Joseph Abboud for such purpose.

3. <u>Mr. Abboud's Services</u>. In connection with the purchase of the Trademarks, the License Agreements and the New Trademarks, at the Closing Mr. Joseph Abboud and Apparel will enter into a side letter agreement pursuant to which Mr. Joseph Abboud will agree to provide certain personal services to Apparel as described below on an exclusive basis for a period of five years from and after the Closing, it being understood that the consideration for such services is in the purchase price paid for the Trademarks, the License Agreements and the New Trademarks. The services to be provided by Mr. Joseph Abboud will consist of the following: (i) providing stylistic guidelines in connection with the Black Label collection, (ii) providing stylistic ideas and proposals for the design and development of all other collections marketed under the Trademarks and/or the New Trademarks, (iii) providing concepts and ideas in connection with public relations activities and advertising campaigns, (iv) providing suggestions and ideas for the development of new business opportunities and new licensing relationships for Apparel, (v) making personal appearances at exhibitions, fashion shows and other events on behalf of Apparel whenever Apparel deems it necessary for the benefit of the brand awareness of the Trademarks and/or the New Trademarks, subject to reasonable prior notice to Mr. Joseph Abboud. Mr. Joseph Abboud will be entitled to car service transportation and first class travel and overnight accommodation arrangements at the expense of Apparel whenever he is required to travel in the course of performing these services. The side letter agreement will also contain non-competition covenants by Mr. Joseph Abboud for an additional two-year period beyond the five-year period of Mr. Abboud's personal services pursuant to which he will be prohibited from being associated in any capacity with any enterprise which is engaged in or proposes to engage in the business of designing, licensing, manufacturing, marketing, distributing or otherwise dealing with any products or services which are competitive with the business of Apparel as then conducted or as may be conducted in the future. In order to enforce the non-competition covenants described above, Mr. Joseph Abboud will be obligated to obtain the prior written consent of Apparel in order to become associated with any enterprise, other than Apparel or any of its affiliates, which is engaged in or proposes to engage in the business of designing, licensing, manufacturing, marketing, distributing or otherwise dealing with any products or services which could reasonably be expected to be competitive with the business of Apparel as then conducted or as then proposed to be conducted. The side letter agreement will also contain the engagement of Apparel to reimburse Joseph Abboud Worldwide Inc. ("Worldwide") on a periodic monthly basis for



CONFIDENTIAL PURSUANT TO COURT ORDER

D00007812

CONFIDENTIAL

D 03175

the one hundred percent (100%) of the cost of (i) the rent paid by Worldwide for the third floor offices in 49 West 57th Street in New York City currently occupied by Worldwide for the period from the Closing to September 30, 2000 and (ii) the base compensation paid by Worldwide for the following employees of Worldwide for the period from the Closing to September 30, 2000 (Mark Scarborough, Bob Franceschini, Dominick Leuci, Deborah Koncan, Alison Grogins and Amy Vernazza) and (iii) fifty percent (50%) of the rent paid by Worldwide for the third floor offices in 49 West 57th Street in New York City currently occupied by Worldwide for the period from October 1, 2000 to the earlier to occur of (y) December 31, 2000 and (z) the date that Worldwide subleases, assigns or surrenders its lease with respect to such space. The side letter agreement will specify the exact dollar amounts which will be payable by Apparel pursuant to this engagement and Apparel will not be required to assume or become the subtenant with respect to the lease for Worldwide's space located in the third floor in 49 West 57th Street or to become the employer of or offer employment to any of the individual employees of Worldwide referred to in the side letter.

4. **Service as Chairman Emeritus.** Immediately following the Closing, Mr. Joseph Abboud will be appointed as the Chairman Emeritus of Apparel and he agrees to serve in such capacity for a period of five years from and after the Closing. For his service in such capacity, Mr. Abboud will receive an annual retainer of twelve thousand dollars ($12,000), payable in arrears in semi-annual installments of six thousand dollars ($6,000) each, beginning six (6) months from the Closing, during such five-year period. Mr. Joseph Abboud will be entitled to a corporate expense account from Apparel (including a corporate credit card) which will be used exclusively for business-related expenses incurred by him in connection with his duties as Chairman Emeritus of Apparel. Mr. Abboud would also be entitled to membership club dues of up to $6,000 per annum for up to two luncheon clubs located in New York City for purposes of business entertainment in connection with the performance of his duties on behalf of Apparel. All such business-related expenses will be submitted on a monthly basis to Apparel for its approval. Mr. Joseph Abboud will also be entitled to a clothing allowance of up to $10,000 per year pursuant to which he will be entitled to purchase articles of apparel manufactured by or for Apparel at a twenty percent discount to Apparel's standard wholesale prices on an item by item basis. In addition, during the period of his service as Chairman Emeritus of Apparel Mr. Abboud will also be entitled to receive medical insurance coverage on the same terms and conditions as Apparel currently provides to its senior executive officers, as more particularly described in Exhibit A attached hereto and made a part hereof.

5. **Allocation of Royalties and Other Payments.** In connection with the assignment of the License Agreements described above, Houndstooth and/or Mr. Joseph Abboud will be entitled to receive and retain all royalty and

CONFIDENTIAL PURSUANT TO COURT ORDER

D00007813

CONFIDENTIAL

D 03176

other payments thereunder which relate to the period ending with (but including) the Spring/Summer 2000 season and Apparel will be entitled to receive royalty and other payments which relate to the period commencing with (and including) the Fall/Winter 2000 season. In the case of License Agreements which do not by their terms expressly refer to the Spring/Summer 2000 or Fall/Winter 2000 seasons (including the GM Executive Olympic Collection Project and the GM Special Edition Buick Regal Agreement), all royalties and other payments pursuant thereto which are due on or before March 31, 2000 will be retained by Houndstooth and/or Mr. Joseph Abboud and all royalties and other payments pursuant thereto which are due on or after April 1, 2000 will be for the account of Apparel. Houndstooth will prepare a complete list of the License Agreements, identifying the last payments pursuant to the License Agreements made to it and/or Mr. Joseph Abboud, and such list will be attached to a definitive Agreement of Purchase and Sale.

6. **Conditions to Closing.** The obligation of GFT to consummate the Transactions is subject to the following conditions precedent:

1. GFT shall have completed its due diligence investigation of the Trademarks and the License Agreements and nothing shall have come to its attention in the course of such investigation which could reasonably be expected to have a material adverse effect on the value of the Trademarks or the License Agreements.

2. Houndstooth, Mr. Joseph Abboud and GFT shall have duly made all required filings with all governmental agencies required in connection with the consummation of the Transactions, including, but not limited to, the Federal Trade Commission and the Department of Justice pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), and the applicable waiting period pursuant to the HSR Act shall have expired or been terminated prior to the Closing.

3. All third party consents required in connection with the consummation of the Transactions, including, but not limited to, the consents of all licensees and other parties to the License Agreements (other than Houndstooth and/or Mr. Joseph Abboud) to the assignment of the License Agreements to Apparel shall have been obtained on terms and conditions acceptable to GFT.

4. GFT, Houndstooth and Mr. Joseph Abboud shall have entered into a definitive Agreement of Purchase and Sale, and GFT and Mr. Joseph Abboud shall have entered into a side letter agreement, each of which contains the terms and conditions set forth herein and such other terms and conditions, including, but not limited to, representations, warranties and indemnities by Houndstooth and Mr. Joseph Abboud, as are reasonable and customary for transactions of this nature.

CONFIDENTIAL PURSUANT TO COURT ORDER

D000007614

CONFIDENTIAL

D 03177

5. Houndstooth and Mr. Joseph Abboud shall have complied with their obligations set forth in paragraphs 7, 8, 9, 10 and 11 of this letter agreement.

6. The Board of Directors of GFT S.p.A. and HdP S.p.A. shall have approved the Transactions.

7. **Access to Information.** Before, from and after the date of this letter agreement, Houndstooth and Mr. Joseph Abboud agree to make available to GFT, its counsel, accountants and employees such documents, books, records and information relating to the Trademarks and the License Agreements as shall be requested by GFT.

8. **Ordinary Course Operation Pending Closing.** From and after the date of this letter agreement, Mr. Joseph Abboud and Houndstooth agree to operate the business of Houndstooth solely in the ordinary course consistent with past practice and not to amend, assign or terminate any of the License Agreements, waive any term or provision thereof or enter into any new licensing relationship or other contractual obligation relating to the Trademarks, in each case without the prior written consent of GFT, which may be granted or withheld by GFT in its discretion. Requests by Mr. Joseph Abboud and/or Houndstooth for any such consent shall be addressed to the attention of Mr. Roberto Jorio Fili, Chief Executive Officer, GFT S.p.A., Corso Emilia 6-10152, Torino (Italy).

9. **Exclusivity.** Mr. Joseph Abboud and Houndstooth agree not to, and agree not to authorize or permit any officer, director or employee of Houndstooth or any of its affiliates or any investment banker, attorney, accountant or other representative retained by them to, solicit or encourage (including by way of furnishing information), or maintain discussions or negotiations or take any other action to facilitate any inquiries or the making of any proposal relating to the sale, transfer or other disposal of any of the capital stock or assets of Houndstooth other than in connection with the Transactions. 

10. **No Public Announcements.** Each of GFT, Houndstooth and Mr. Joseph Abboud agrees not to make any public statement or other announcement or communication (whether in writing or orally) pertaining or relating in any way to the existence of this letter agreement or the Transactions contemplated hereby prior to the Closing. The parties will agree upon and issue a joint press release relating to the Transactions when they deem it advisable.

11. **Best Efforts to Effect the Transactions.** From and after the date of this letter agreement, each of Houndstooth and Mr. Joseph Abboud

CONFIDENTIAL PURSUANT TO COURT ORDER

D000007815

CONFIDENTIAL

D 03178

agrees to use its or his best efforts to take such actions as shall be reasonably necessary to effect the consummation of Transactions.

12. **Expenses.** Each party hereto shall each bear its or his own costs and expenses incurred in connection with the Transactions.

13. **Brokerage.** Houndstooth and Mr. Joseph Abboud hereby represent and warrant to GFT that they have not dealt with any broker in connection with the Transactions contemplated hereby other than Joseph Anton and they agree jointly and severally to indemnify and hold GFT harmless from any claims or damages suffered by GFT as a result of the claims of Mr. Anton or any other broker claiming a commission through their actions. GFT hereby represents and warrants to Houndstooth and Mr. Joseph Abboud that it has not dealt with any broker in connection with the Transactions contemplated hereby and agrees to indemnify and hold each of Houndstooth and Mr. Joseph Abboud harmless from any claims or damages suffered by them as a result of the claims of any broker claiming a commission through GFT's actions. The parties agree that any and all amounts that may be payable to Robert J. Wichser pursuant to the consulting agreement between Mr. Wichser and Houndstooth, dated as of August 1, 1995, as a result of the Transactions contemplated hereby are the sole responsibility of Houndstooth and/or Mr. Abboud, and Houndstooth and Mr. Abboud shall jointly and severally indemnify and hold GFT harmless from any and all liability to Mr. Wichser for such amounts.

14. **Governing Law.** This letter agreement and the terms hereof will be governed by and construed in accordance with the laws of the State of New York without regard to its conflicts of law provisions. Any litigation, action, or proceeding arising out of any dispute concerning or otherwise attempting to enforce, interpret, or remedy any breach of this letter agreement shall be brought only in a federal court of competent jurisdiction sitting within the County and State of New York. Both parties irrevocably and unconditionally (a) submit to personal jurisdiction in the State of New York and consent to venue in the County and State of New York with respect to any such action, (b) waive any objection to the jurisdiction and venue in the County and State of New York, and (c) agree not to plead or claim in any such court that any such suit, action or proceeding has been brought in an inconvenient forum. 

15. **Prior Agreements.** This letter agreement supersedes all prior agreements, whether written or oral, with respect to its subject matter.

16. **Closing Date.** The parties agree to use commercially reasonable efforts to effect the Closing on April 14, 2000. This letter agreement, including, but not limited to, the agreements of Houndstooth and

CONFIDENTIAL PURSUANT TO COURT ORDER

D00007616

CONFIDENTIAL

D 03179

Mr. Joseph Abboud contained in paragraph 9 of this letter agreement, shall terminate and be of no further force or effect if the Closing has not occurred by May 10, 2000; provided, however, that each party hereto will be liable to the other parties hereto for the breach of its or his obligations pursuant to this letter agreement which occur prior to the date of termination notwithstanding such termination.

17. **Counterparts.** This letter agreement may be executed in one or more counterparts, each of which shall be an original but all of which shall collectively constitute a single instrument.

If the foregoing accurately reflects our agreement, please so indicate by signing the enclosed counterpart of this letter agreement in the space provided below and returning it to the undersigned, whereupon this letter agreement shall become a binding agreement among the parties hereto. Our attorneys will then proceed to review your legal and financial records relating to the Trademarks and the License Agreements and to draft the definitive Agreement of Purchase and Sale and side letter agreement to effectuate the Transactions.

Very truly yours,

GFT net S.P.A.

By: _[signature]_
Name: Roberto Jorio Fili
Title: Chief Executive Officer

AGREED AND ACCEPTED:

HOUNDSTOOTH CORPORATION

By: _____
    Name:
    Title:

_____
Mr. Joseph Abboud

CONFIDENTIAL PURSUANT TO COURT ORDER

CONFIDENTIAL

D 03180

D00007817

EXHIBIT A

## MEDICAL AND DENTAL PLAN COMPARISON

| | In Network | Out of Network | |
|---|---|---|---|
| Medical Deductible | None | $250 ($750 for family) | None |
| Out-of-Pocket Maximum (cross-accumulate; includes co-pay) | $600 single / $900 single + one / $1,300 family | $1,000 single / $1,800 single + one / $2,600 family | None |
| Lifetime Max (cross-accumulate) | $2 million | | None |
| **PHYSICIAN SERVICES** | | | |
| Office Visit | $10 Co-Pay | 80% after deductible | $10 Co-Pay |
| Hospital Visit | $10 Co-Pay | 80% after deductible | No Co-Pay |
| Surgeon In-Patient/Out-Patient | $100/$50 | 80% after deductible | No Co-Pay |
| Specialist Visit | $10 Co-Pay | 80% after deductible | $15 Co-Pay |
| Emergency Care | $10 Co-Pay | 80% after deductible | $15 Co-Pay |
| Chiropractic | $10 Co-Pay (after 30 visits subject to review) | 80% after deductible (after 30 visits subject to review) | $15 Co-Pay in NY; not covered in other locations |
| **HOSPITAL SERVICE** | | | |
| In-Patient | $200 Co-Pay | 80% after deductible | No Co-Pay |
| Emergency Care/Out-Patient | $50 Co-Pay (waived if admitted) | 80% after deductible | $35 Co-Pay |
| Pre-Certification | Patient must get approval | Patient must get approval | Referral required |
| **LAB/X-RAY** | | | |
| Routine Lab | $10 Co-Pay | 80% after deductible | $15 Co-Pay |
| X-Rays and MRI's | $25 Co-Pay | 80% after deductible | $15 Co-Pay |
| **PREVENTIVE CARE** | | | |
| Adult Well Care (Physical, GYN exam, etc) | $10 Co-Pay | 80% not subject to ded. Max benefits $100/calendar year | $10 Co-Pay / $5 Co-Pay for GYN visit |
| Well Child Care (0 – 19 years) | $10 Co-Pay | 80% not subject to deductible | $10 Co-Pay |
| Vision & Hearing Screening | $10 Co-Pay | Not Covered | $15 Co-Pay |
| Prescription Glasses/Contacts | Not Covered | Not Covered | $125 every 2 years |
| Fitness Discounts | Not Covered | Not Covered | Gym & Equipment |
| **PRESCRIPTION DRUGS** | | | |
| Card | $5 Co-Pay generic or $10 Co-Pay brand | $5 Co-Pay generic or $10 Co-Pay brand | $10 Co-Pay |
| Maintenance Drug | $5 Co-Pay generic or $10 Co-Pay name brand for a 90 day supply by mail | $5 Co-Pay generic or $10 Co-Pay name brand for a 90 day supply by mail | $10 Co-Pay for a 90 day supply at the pharmacy |

Page 1 of 2

CONFIDENTIAL

D 03181

EXHIBIT A

## MEDICAL AND DENTAL PLAN COMPARISON (Continued)

| | PLAN ONE | | |
|---|---|---|---|
| | In Network | Out of Network | |
| **MENTAL NERVOUS / ALCOHOL / DRUG ABUSE** | | | |
| In-Patient | $200 Co-Pay (limited to 40 days lifetime max/individual) | 80% after deductible (limited to 20 days lifetime maximum/ individual) | No Co-Pay (limited to 35 days/calendar year) |
| Out-Patient | $10 Co-Pay (limited to 40 visits/calendar year per individual) | 80% after deductible (limited to 40 visits/ calendar year per individual) | $26 Co-Pay (limited to 20 visits/calendar year) |
| **ALCOHOL / DRUG ABUSE** | | | |
| In-Patient | $200 Co-Pay (Lifetime max of $15K per individual) | 80% after deductible (Lifetime max of $15K per individual) | No Co-Pay |
| Out-Patient | $10 Co-Pay (limited to 30 visits/calendar year. Lifetime max of $15K/individual) | 80% after deductible (limited to $75/visit to 20 visits/calendar yr. Lifetime max of $15K/ individual) | $15 Co-Pay (limited to 60 visits/calendar year) |
| **COSMETIC SURGERY** | | | |
| **DENTAL BENEFITS** | | | |
| Deductible | $100 per person ($300 for family) | | None |
| Maximum Calendar Year Benefit | $2000 | | None |
| **DENTAL SERVICES** | | | |
| Preventive Services (I) | 100% not subject to deductible | | $2 Co-Pay |
| Basic Services (II) | 80% after deductible | | $2 Co-Pay |
| Major Services (III) | 50% after deductible | | Available at reduced fees |
| Orthodontics | Not Covered | | Available at reduced fees |
| **EMPLOYEE CONTRIBUTIONS** | | | |
| Single (medical & dental) | $85 | | $40 |
| Single + one (medical & dental) | $135 | | $85 |
| Family (medical family/single dental) | $175 | | Not Available |
| Family (medical & dental) | $210 | | $142 |

1. This outline contains highlights only and is subject to change. Full coverage details are contained in the Summary Plan Document.

2. Coverage is effective the first day of the month following a one-month waiting period from your hire date.

Page 2 of 2

CONFIDENTIAL

D 03182