Louis S. Ederer(LE 7574)
John Maltbie (JM 3658)
ARNOLD & PORTER LLP
399 Park Avenue
New York, New York 10022
(212) 715-1000
*Attorneys for Defendants and*
*Counterclaim Plaintiffs Joseph Abboud, Houndstooth Corp.*
*and Herringbone Creative Services, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x

JA APPAREL CORP.,

        Plaintiff,

        v.

JOSEPH ABBOUD, HOUNDSTOOTH
CORP., and HERRINGBONE CREATIVE
SERVICES, INC.,

        Defendants.

JOSEPH ABBOUD, HOUNDSTOOTH
CORP., and HERRINGBONE CREATIVE
SERVICES, INC.,

        Counterclaim Plaintiffs,

        v.

JA APPAREL CORP. and MARTIN STAFF,

        Counterclaim Defendants.

-------------------------------------------------------- x

Civil Action No. 07 CV 07787 (DAB)

**DECLARATION OF LOUIS S.
EDERER IN SUPPORT OF CROSS-
MOTION FOR JUDGMENT ON THE
PLEADINGS ON COUNTS ONE
THROUGH SEVEN AND COUNT
NINE OF PLAINTIFF'S
COMPLAINT AND IN OPPOSITION
TO PLAINTIFFS' MOTION *IN
LIMINE* TO PRECLUDE
ADMISSION OF PAROL EVIDENCE**

# <u>EXHIBIT M</u>

# Patterson, Belknap, Webb & Tyler LLP

1133 Avenue of the Americas
New York, NY 10036-6710
212-336-2000

Christopher C. Angell
Douglas E. Brawley
Susan F. Bloom
Henry P. Dubel
William F. Cavanaugh, Jr.
Lisa E. Cleary
Edward F. Cox
John Dell Vanerd
John M. Ditelberg
Gregory L. Diskant
David F. Dobbins
David W. Dykhouse
Philip R. Forlenza
Eugene M. Coleman
Alan Cottrez
David M. Glaser
Antonia M. Grumbach
Dana W. Hiscock
Scott Horton
Karen C. Hunter
Rochelle Korman
Robin Krause
Jeffrey E. LaGueux
Kim J. Landsman

Robert W. Lehrburger
Jeffrey I.D. Lewis
Robert P. LoDue
Ellen M. Martin
Maureen W. McCarthy
Thomas C. Morrison
Bernard F. O'Hare
Clarke C. Pharez
Thomas W. Pippert
Peter J. Schaeffer
Andrew D. Schau
John E. Schmeltzer, III
John P. Schmitt
Stephen W. Schwarz
Anna D. Sisterhoom
Karl E. Seib, Jr.
Saad B. Shapiro
Richard R. Upton
Frederick B. Warder III
William W. Webster
John D. Winter
Stephen P. Younger
Steven A. Zalesin

Of Counsel

Harold R Tyler, Jr.

Robert J. Egan
Robert M. Ferguson
George S. Frazza
Robert M. Pennoyer
Robert B. Shaw
Evelyn M. Sommer
Ira T. Wender, P.C.

Fax
212-336-2222
Writer's direct line
212-336-2684

May 3, 2000

**BY FACSIMILE**

Theodore E. Dinsmoor, Esq.
Finnegan, Hickey, Dinsmoor & Johnson, P.C.
175 Federal Street
Boston, Massachusetts 02110

RE:    Proposed Houndstooth/Abboud/GFT/JA Apparel Transaction

Dear Ted:

Attached for your review are drafts of an Agreement of Purchase and Sale and related Side Letter Agreement. Please call me after you have had a chance to review these drafts with your clients.

Very truly yours,

Jeffrey E. LaGueux

cc:    Ms. Anna Maria Pellegrino (by fax, w/attach.)
       Mr. Giorgio Valerio (by fax, w/attach.)
       Ms. Elena Vasco (by fax, w/attach.)
       Mr. Paolo Vigitello (by fax, w/attach.)

DEFENDANT'S
EXHIBIT
32

CONFIDENTIAL PURSUANT TO COURT ORDER

D00010869

JA Apparel Corp.
V.
Joseph Abboud, et al.
07-CIV-7787

PX-318

CONFIDENTIAL                                             KSC00004919

PBW&T DRAFT
5/3/00

AGREEMENT OF PURCHASE AND SALE, dated as of May __, 2000 (the "Agreement", among Houndstooth Corporation, a New York corporation ("Houndstooth"), Mr. Joseph Abboud ("Abboud," and collectively with Houndstooth, the "Sellers"), and JA Apparel Corp., a Delaware corporation (the "Buyer").

WHEREAS, the Sellers desire to sell to the Buyer, and the Buyer desires to buy from the Sellers, the Assets (as hereinafter defined);

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties and agreements hereinafter set forth, and intending to be legally bound hereby, the parties hereto agree that, subject to the conditions herein contained:

ARTICLE 1

SALE OF ASSETS AND TERMS OF PAYMENT

1.1.  The Sale.

(a)  Upon the terms and subject to the conditions of this Agreement, on the Closing Date (as hereinafter defined), the Sellers shall sell, convey, transfer, assign and deliver to the Buyer, and the Buyer shall purchase and acquire from the Sellers, all of the Sellers' right, title and interest in and to:

(A)  The names, trademarks, trade names, service marks, logos, insignias and designations identified on Schedule 1.1(a)(i)(A), and all trademark registrations and applications therefor, and the goodwill related thereto (collectively the "Trademarks"), together with all causes of action (and the proceeds thereof) in favor of the Sellers heretofore accrued or hereafter accruing with respect to any of the Trademarks, and all other Intellectual Property (as hereinafter defined).

(B)  All licenses to use the Trademarks granted by Houndstooth and/or Abboud (collectively, the "License Agreements").

(C)  All rights to use and apply for the registration of new trade names, trademarks, service marks, logos, insignias and designations containing the words "Joseph Abboud," "designed by Joseph Abboud," "by Joseph Abboud," "JOE" or "JA," or anything similar thereto or derivative thereof, either alone or in conjunction with other words or symbols (collectively, the "New Trademarks"), for any and all products or services.

)

CONFIDENTIAL PURSUANT TO COURT ORDER

D00010870

CONFIDENTIAL

KSC00004920

(D)     All books, financial records, invoices, and other documents, records and data files relating primarily to the Trademarks or the License Agreements.

(E)     The goodwill of or pertaining to the Trademarks.  (The items referred to in clauses (A) through (E) of this Section 1.1(a) are collectively referred to as the "Assets").

(b)     The Sellers shall sell, transfer, convey and assign to the Buyer title to all of the Assets at the Closing, free and clear of any liens, pledges, charges, mortgages, security interests, restrictions, easements, liabilities, claims, encumbrances or rights of others of every kind and description (collectively, "Liens").

(c)     The Buyer and the Sellers acknowledge that certain of the License Agreements included in the Assets, and the Sellers' rights and benefits thereunder, may not, by their terms, be assignable without the consent of the other parties thereto being first obtained.  Anything in this Agreement to the contrary notwithstanding, this Agreement shall not constitute an agreement to assign any such License Agreement, and the Buyer shall not be deemed to have assumed the same or to be required to perform any obligations thereunder, if an attempted assignment thereof, without the consent of a third party thereto, would constitute a breach thereof or in any way affect the rights under any such License Agreement of the Buyer or the Sellers, unless such consent has been obtained on or prior to the Closing Date.  The Buyer and the Sellers shall use commercially reasonable efforts to obtain the consent of each such third party.  If any such consent shall not be obtained on or prior to the Closing Date, and if the Buyer elects to waive the condition to its obligation to consummate the transactions contemplated by this Agreement set forth in Section 6.3(d), the Sellers and the Buyer will cooperate with each other in any reasonable arrangement designed to provide the Buyer, according to the provisions of Section 1.1(e), all benefits to which the Sellers are entitled under such License Agreements, including, but not limited to, one hundred percent (100%) of all royalties and advertising payments received by the Sellers and/or due to the Sellers under such License Agreements and, if the Buyer so receives such benefits, to relieve the Sellers of the burdens intended to be assigned to and assumed by the Buyer in respect of such License Agreement.

(d)     On the Closing Date, the Buyer shall not assume any debts, commitments, obligations or liabilities of the Sellers except for the obligations of the Sellers arising with respect to the period of time from and after the Closing Date under the License Agreements which are assigned to the Buyer on the Closing Date in accordance with the provisions of this Agreement (the "Post-Closing License Obligations").

(e)     In connection with the assignment of the License Agreements, Houndstooth and/or Abboud will be entitled to receive and retain all royalty and other payments thereunder which relate to the period ending with (but including) the Spring/Summer 2000 season and the Buyer will be entitled to receive and retain all royalty and other payments which relate to the period commencing with (and including) the Fall/Winter 2000 season.  In the case of License Agreements which do not by their terms expressly refer to the Spring/Summer 2000 or

2

473326.4

CONFIDENTIAL PURSUANT TO COURT ORDER

D00010871

CONFIDENTIAL

KSC00004921

Fall/Winter 2000 seasons (including the GM Executive Olympic Collection Project and the GM Special Edition Buick Regal Agreement), all royalty and other payments pursuant thereto which are due on or before March 31, 2000 will be retained by Houndstooth and/or Abboud and all royalty and other payments pursuant thereto which are due on or after April 1, 2000 will be for the account of the Buyer.

(f)   Immediately following the Closing, Abboud will be appointed as the Chairman Emeritus of the Buyer, and will serve in such capacity from and after the Closing. For his service in such capacity, Abboud will receive an annual retainer of Twelve Thousand Dollars ($12,000), payable in arrears in semi-annual installments of Six Thousand Dollars ($6,000) each, beginning six (6) months from the Closing (as hereinafter defined), during such five-year period. Abboud will be entitled to a corporate expense account from the Buyer (including a corporate credit card) which will be used exclusively for business-related expenses incurred by him in connection with his duties as Chairman Emeritus of the Buyer. Such business-related expenses will be submitted on a monthly basis to the Buyer for its approval. Abboud will also be entitled to a clothing allowance of up to Ten Thousand Dollars ($10,000) per year pursuant to which he will be entitled to purchase articles of apparel manufactured by or for the Buyer at a twenty percent (20%) discount to the Buyer's standard wholesale price on an item by item basis. In addition, during the period of his service as Chairman Emeritus of the Buyer, Abboud will also be entitled to receive medical insurance coverage on the same terms and conditions as the Buyer provides from time to time to its senior executive officers, as more particularly described as of the date hereof in Schedule 1.1(e).

(g)   Except for the Post-Closing License Obligations which are to be assumed by the Buyer at the Closing, it is understood and agreed that the Buyer is not assuming any debts, commitments, obligations or liabilities of the Sellers, including, but not limited to, the debts, commitments, obligations or liabilities of the Sellers pursuant to: (i) the Agreement, dated June 1, 1998, by and between Houndstooth and Jean Claude Weil, (ii) the Agreement, dated June 4, 1998, by and between Joseph Abboud Worldwide, Inc. and Lawrence Appel Associates, (iii) the License Agreement, dated as of January 1, 1999, by and between Houndstooth and Mettlers Abboud, Inc., (iv) the Consulting Agreement, dated as of August 1, 1998, among Houndstooth, Robert J. Wichser and Abboud, and (v) the Equipment Leases listed in Schedule 1.1(f).

All of the debts, commitments, obligations or liabilities of the Sellers which are not Post-Closing License Obligations shall be retained by the Sellers (collectively, the "Retained Liabilities") and the Buyer shall have no liability or other obligation with respect to the Retained Liabilities.

1.2.   Purchase Price.   Upon the terms and subject to the conditions contained in this Agreement, in reliance upon the representations, warranties and agreements of the Sellers contained herein, and in consideration of the aforesaid sale, assignment, transfer, and delivery of the Assets, on the Closing Date the Buyer will pay to the Sellers the aggregate sum of Sixty Five

472226.6

CONFIDENTIAL PURSUANT TO COURT ORDER                    D00010872

CONFIDENTIAL                                                KSC00004922

Million Dollars ($65,000,000) (the "Purchase Price"). The Purchase Price shall be allocated between the Sellers as set forth on Schedule 1.2.

1.3. Manner of Payment. At the Closing, the Buyer shall deliver to the Sellers the Purchase Price in full by wire transfer of immediately available funds to accounts designated by the Sellers in writing not more than two (2) business days prior to the Closing Date.

## ARTICLE II

## THE CLOSING

2.1. Time and Place of Closing. Upon the terms and subject to the conditions contained in this Agreement, the closing of the transactions contemplated by this Agreement (the "Closing") will take place at the offices of Patterson, Belknap, Webb & Tyler LLP, 1133 Avenue of the Americas, New York, New York 10036-6710 at 10:00 a.m. (local time) on the seventh business day after the satisfaction or waiver (if permissible) of the last of the conditions to be satisfied set forth in Article VI hereof. The date on which the Closing actually occurs and the transactions contemplated hereby become effective is hereinafter referred to as the "Closing Date."

2.2. Deliveries by the Sellers. At the Closing, the Sellers will deliver or cause to be delivered to the Buyer duly executed instruments of transfer and assignment of the Assets in form reasonably satisfactory to the Buyer, sufficient to vest in the Buyer good title to the Assets to be conveyed at the Closing in accordance with the terms of this Agreement. In addition, at the Closing, the Sellers shall deliver to Buyer:

(i) the originals (or if not in existence copies) of all License Agreements and the originals of all books, records and files included in the Assets;

(ii) copies of corporate and stockholder resolutions of Houndstooth authorizing the execution and delivery of this Agreement and each Exhibit hereto to which Houndstooth is a party and the consummation of the transactions contemplated hereby and thereby, certified by an executive officer of Houndstooth;

(iii) a certificate of good standing of Houndstooth issued as of a recent date by the Secretary of State of the State of New York;

4

477720.4

CONFIDENTIAL PURSUANT TO COURT ORDER

D00010873

CONFIDENTIAL

KSC00004923

(iv) executed counterparts reasonably satisfactory in form and substance to the Buyer of all consents necessary to the assignment to the Buyer of the License Agreements (the "Consents");

(v) an opinion of counsel to Houndstooth and Abboud, dated the Closing Date, addressed to the Buyer, favorably opining as to the matters set forth in Exhibit 2.2(v) hereto and in form reasonably satisfactory to the Buyer;

(vi) the Side Letter Agreement pursuant to which Abboud will agree to provide certain personal services to the Buyer, in the form attached hereto as Exhibit 2.2(vi) duly executed by Abboud (the "Side Letter Agreement");

(vii) instruments of assignments in favor of the Buyer with respect to each of the Trademarks, in form and content acceptable to the Buyer, duly executed by Houndstooth or Abboud, as the case may be; and

(viii) all other documents required by the terms of this Agreement to be delivered to the Buyer at the Closing.

2.3. <u>Deliveries by the Buyer</u>. At the Closing, the Buyer shall deliver to the Sellers:

(i) a certificate of good standing of the Buyer issued as of a recent date by the Secretary of State of the State of Delaware;

(ii) copies of corporate and stockholder resolutions of the Buyer authorizing the execution and delivery of this Agreement and each Exhibit hereto to which the Buyer is a party and the consummation of the transactions contemplated hereby and thereby, certified by an officer of the Buyer;

(iii) the Side Letter Agreement duly executed by the Buyer; and

(iv) all other documents required by the terms of this Agreement to be delivered to the Sellers at the Closing.

ARTICLE III

<u>REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE SELLERS</u>

Except as set forth in the schedules to this Agreement being delivered by the Sellers to the Buyer simultaneously with the execution and delivery hereof (the "Schedules," and each, a "Schedule"), the Sellers hereby jointly and severally represent and warrant to the Buyer as follows:

5

472326.4

CONFIDENTIAL PURSUANT TO COURT ORDER

D00010874

CONFIDENTIAL

KSC00004924

3.1. <u>Organization</u>. Houndstooth is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now being conducted.

3.2. <u>Authority Relative to this Agreement</u>. Houndstooth has full corporate power and authority to execute and deliver this Agreement and each other agreement, document and instrument to be executed or delivered by it contemplated by this Agreement (the "Houndstooth Documents") and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement or the Houndstooth Documents by Houndstooth and the consummation of the transactions contemplated hereby and thereby by Houndstooth have been duly and validly authorized by all necessary action on the part of Houndstooth and no other corporate proceedings on the part of Houndstooth are necessary to authorize this Agreement and the Houndstooth Documents or to consummate the transactions contemplated hereby and thereby. This Agreement has been, and when executed at Closing the Houndstooth Documents will be, duly and validly executed and delivered by Houndstooth and, assuming the due authorization, execution and delivery by the Buyer, this Agreement constitutes, and the Houndstooth Documents will constitute, a legal, valid and binding obligation of Houndstooth, enforceable against Houndstooth in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws affecting creditors' rights generally and by general equitable principles (regardless of whether enforceability is considered in a proceeding in equity or at law).

3.3. <u>Consents and Approvals; No Violation</u>. Except for the applicable requirements of the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended, and the rules and regulations thereunder (the "HSR Act"), there is no requirement applicable to the Sellers to make any filing with, or to obtain any permit, authorization, consent or approval of, any governmental or regulatory authority as a condition to the lawful consummation by the Sellers of the transactions contemplated by this Agreement. Except as set forth in <u>Schedule 3.3</u>, neither the execution and delivery of this Agreement by the Sellers nor the consummation by the Sellers of the transactions contemplated hereby nor compliance by the Sellers with any of the provisions hereof will (i) conflict with or result in any breach of any provision of the Certificate of Incorporation or By-laws of Houndstooth, (ii) result in a breach of or default, or give rise to any right of termination, cancellation or acceleration under, any of the terms, conditions or provisions of any of the License Agreements or any material note, bond, mortgage, indenture, license, agreement, lease or other similar material instrument or obligation to which either of the Sellers is a party or by which any of the Sellers' properties or assets may be bound, except for such breaches or defaults (or, rights of termination cancellation or acceleration) as to which requisite waivers or consents have been obtained, or (iii) assuming compliance with the HSR Act, violate any material order, judgment, writ, injunction, decree, or any material statute, rule or regulation applicable to either of the Sellers or any of the Sellers' properties or assets.

6

472726.4

CONFIDENTIAL PURSUANT TO COURT ORDER

D00010875

CONFIDENTIAL

KSC00004925

3.4. <u>Title to Assets</u>. The Sellers have good title to all of the Assets and rights which each owns or purports to own, free and clear of all Liens.

3.5. <u>Legal Proceedings, etc.</u> There are no actions, suits, proceedings or any legal, administrative, arbitration or other proceedings or governmental investigations pending or threatened against the Sellers which relate to or affect any of the Assets or which seek to question, delay or prevent the consummation of or would potentially impair the ability of the Sellers to consummate the transaction contemplated hereby. There is not outstanding any order, writ, injunction, award or decree of any court or arbitrator or any federal, state, municipal or other governmental department, commission, board, agency or instrumentality with respect to or affecting the Assets.

3.6. <u>Intellectual Property</u>. (a) Schedule 3.6 sets forth a list of all of the trademark registrations, service mark registrations and applications and copyright registrations and applications currently used by the Sellers in connection with the Trademarks (the "Intellectual Property").

(b) The Sellers own the Intellectual Property, free and clear of all Liens, and the Sellers have the power and authority to transfer to the Buyer all of such rights to be transferred to the Buyer under this Agreement with respect to the Intellectual Property. No Intellectual Property nor Sellers' use thereof infringes on the rights owned or held by any other person and there is no claim or litigation pending or threatened in writing against the Sellers contesting the right of the Sellers to sell or the right of the Sellers to use any of the Intellectual Property.

3.7. <u>Royalties and Other Payments</u>. Schedule 3.7 contains a true and complete list of the following information with respect to each License Agreement as of the date hereof: (i) the date and amount of the most recent payment received by either of the Sellers thereunder, (ii) a description of the nature of the payment (i.e., a minimum guaranteed royalty payment, percentage royalty payment, advertising contribution payment, etc.), (iii) the time period to which such payment relates (i.e., percentage royalty payment for the first quarter of 2000, minimum guaranteed royalty payment for the Fall/Winter 2000 season), and (iv) the date that the Sellers expect to receive the last payments thereunder which relate to the period ending with (but including) the Spring/Summer 2000 season.

3.8. <u>License Agreements</u>. Except as set forth in Schedule 3.8, there are no License Agreements of Houndstooth or Abboud affecting any of the Assets. There is not, under any of the License Agreements, any existing default or event of default which, with or without due notice or lapse of time or both, would constitute a default or event of default on the part of the Sellers or the other parties thereto. Except as set forth in Schedule 3.8, no consents are required for the assignment of any License Agreement to the Buyer other than consents which have already been obtained. Each License Agreement is a valid and binding obligation of the Sellers and the other party thereto, enforceable in accordance with its terms, except as such

7

472726.4

CONFIDENTIAL PURSUANT TO COURT ORDER

D00010876

CONFIDENTIAL

KSC00004926

enforceability may be limited by the effect of bankruptcy, insolvency or similar laws affecting creditors' rights generally or by general principles of equity, and is in full force and effect.

3.9. _Employees._ Schedule 3.9 contains a true and complete list of the names of each individual who is employed or retained or compensated as an independent contractor or consultant (either directly or indirectly) by Houndstooth or Joseph Abboud Worldwide, Inc. ("Worldwide") as of the date hereof, along with his or her current job title, annual base compensation (and date of most recent increase therein) employee benefits and perquisites received.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE BUYER

Except as set forth in the schedules to this Agreement delivered by the Buyer to the Sellers simultaneously with the execution and delivery hereof, the Buyer represents and warrants to the Sellers as follows:

4.1. _Organization._ The Buyer is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now being conducted.

4.2. _Authority Relative to this Agreement._ The Buyer has full corporate power and authority to execute and deliver this Agreement and the Side Letter Agreement and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the Side Letter Agreement by the Buyer and the consummation of the transactions contemplated hereby and thereby by the Buyer have been duly and validly authorized by all necessary action on the part of the Buyer and no other proceedings on the part of the Buyer are necessary to authorize this Agreement and the Side Letter Agreement or to consummate the transactions contemplated hereby and thereby. This Agreement has been, and when executed at the Closing the Side Letter Agreement will be, duly and validly executed and delivered by the Buyer and, assuming the due authorization, execution and delivery by the Sellers, this Agreement constitutes, and when executed at the Closing the Side Letter Agreement will constitute, a legal, valid and binding obligation of the Buyer, enforceable against the Buyer in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws affecting creditors' rights generally and by general equitable principles (regardless of whether enforceability is considered in a proceeding in equity or at law).

4.3. _Consents and Approvals; No Violation._ Except for the applicable requirements of the HSR Act, there is no requirement applicable to the Buyer to make any filing

8

672274.4

CONFIDENTIAL PURSUANT TO COURT ORDER                    D00010877

CONFIDENTIAL                                            KSC00004927

with, or to obtain any permit, authorization, consent or approval of, any governmental or regulatory authority as a condition to the lawful consummation by the Buyer of the transactions contemplated by this Agreement. Neither the execution and delivery of this Agreement by the Buyer nor the consummation by the Buyer of the transactions contemplated hereby nor compliance by the Buyer with any of the provisions of this Agreement will (i) conflict with or result in a breach of any provision of the Certificate of Incorporation or By-laws of the Buyer, (ii) result in a breach of or default, or give rise to any right of termination, cancellation or acceleration under, any of the terms, conditions or provisions of any material note, bond, mortgage, indenture, license, agreement, lease or other similar material instrument or obligation to which the Buyer is a party or by which any of the Buyer's properties or assets may be bound, except for such breaches or defaults (or rights of termination, cancellation or acceleration) as to which requisite waivers or consents have been obtained, or (iii) assuming compliance with the HSR Act, violate any material order, judgment, writ, injunction, decree, statute, rule or regulation applicable to the Buyer or any of the Buyer's properties or assets.

4.4. Litigation. There are no actions, suits, proceedings or government investigations pending or, threatened against Buyer which seek to question, delay or prevent the consummation of or would materially impair the ability of the Buyer to consummate the transactions contemplated hereby.

ARTICLE V

COVENANTS OF THE PARTIES

5.1. Conduct of Business. Except as contemplated by this Agreement, during the period from the date of this Agreement to the Closing Date, the Sellers will maintain and use the Assets according to, and will conduct the business of Houndstooth solely in, the ordinary and usual course of business consistent with past practices. Without limiting the generality of the foregoing, and, except as otherwise contemplated by this Agreement or disclosed on Schedule 5.1 hereto, prior to the Closing Date, without the prior written consent of the Buyer, the Sellers will not:

(a) sell, transfer, mortgage, or otherwise dispose of, or agree to sell, transfer, or otherwise dispose of, any Assets;

(b) amend, assign or terminate any of the License Agreements, waive any term or provision thereof or enter into any new licensing relationship or other contractual obligation relating to the Trademarks;

(c) enter into any agreement, commitment or contract with respect to the Assets; or

9

47222 6.*

CONFIDENTIAL PURSUANT TO COURT ORDER

D00010878

CONFIDENTIAL

KSC00004928

(d) (i) increase or agree to increase in any manner the base compensation of any of the employees of Houndstooth or Worldwide or (ii) pay or agree to pay any pension, retirement allowance or other employee benefit to any of the employees of Houndstooth or Worldwide not in existence as of the date hereof.

5.2  Changes In Information.  During the period from the date of this Agreement to the Closing Date, the Sellers shall give the Buyer prompt written notice of any change in, or any of the information contained in, the representations and warranties of the Sellers made in this Agreement or of any event or circumstance which, if it had occurred on or prior to the date hereof, would cause any of the representations and warranties of the Sellers made in this Agreement not to be true and correct in all material respects.

5.3.  Access to Information.  Between the date of this Agreement and the Closing Date, the Sellers will (i) give the Buyer and its authorized representatives reasonable access to all books, records, documents and information of Houndstooth and Abboud relating to the Assets, (ii) permit the Buyer to make such inspections thereof, during regular business hours, as the Buyer may reasonably request and (iii) cause Houndstooth's officers to furnish the Buyer with such financial and operating data and other information with respect to the Assets as the Buyer may from time to time reasonably request; provided, however, that any such investigation shall be conducted in such a manner as not to interfere unreasonably with the operation of Houndstooth or Abboud.

5.4.  Expenses.  Except as otherwise specifically provided in Section 5.6 of this Agreement with respect to the sharing by the Sellers and the Buyer of the required filing fee with respect to the HSR Act (as hereinafter defined), whether or not the transactions contemplated hereby are consummated, all costs and expenses incurred by the Buyer in connection with this Agreement and the transactions contemplated hereby will be paid by the Buyer and all costs and expenses incurred by the Sellers in connection with this Agreement and the transactions contemplated hereby will be paid by the Sellers.

5.5.  Best Efforts.  Subject to the terms and conditions of this Agreement, each of the parties hereto will use his or its reasonable efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by this Agreement. The parties hereto acknowledge that time shall be of the essence in this Agreement and agree not to take any action that will have the effect of unreasonably delaying, impairing or impeding the receipt of any required authorizations, consents, orders or approvals.

5.6.  HSR and Filings.  Within three (3) business days after the date hereof, the Sellers and the Buyer shall cause their respective ultimate parent entities to prepare and file the written notification and report form and related submissions required to be made with the Federal Trade Commission and the Antitrust Division of the Department of Justice in connection with the consummation of the transactions contemplated hereby and, promptly after a request therefor,

10

477726.4

CONFIDENTIAL PURSUANT TO COURT ORDER

D00010879

CONFIDENTIAL    KSC00004929

shall prepare and file any additional information requested by the Federal Trade Commission or the Antitrust Division of the Department of Justice to be filed and submitted under the HSR Act in connection with such original notifications and submissions, and shall diligently request and pursue early termination of the required waiting period under the HSR Act (the "HSR Waiting Period"). Anything to the contrary in this Agreement notwithstanding, in no event shall the Sellers, the Buyer or any of their respective affiliates be required to take any adverse action regarding the disposition of any businesses, assets or properties, or to incur any unusual or significant liability or expense (other than the payment by the Sellers, on the one hand, and the Buyer, on the other hand, of one half of the required filing fee pursuant to the HSR Act), in order to obtain any approval under the HSR Act or any termination of the HSR Waiting Period. The Sellers and the Buyer will use their best efforts to make or cause to be made all such filings and submissions as may be required under applicable laws and regulations, if any, for the consummation of the transactions contemplated by this Agreement. The Buyer and the Sellers will coordinate and cooperate with one another in exchanging such information and providing such reasonable assistance as another may request in connection with all of the foregoing.

5.7. Public Announcements. None of the Sellers or the Buyer shall make any public statement or other announcement or communication (whether in writing or orally) or issue any press release pertaining or relating in any way to the terms of this Agreement and the transactions contemplated hereby prior to or after the Closing other than the joint press release which is being issued by the Sellers and the Buyer on the date hereof, except as may be required by applicable law.

5.8. Further Assurances. From time to time, without further consideration, the Sellers, will, at the expense of the Buyer, execute and deliver such documents to the Buyer as the Buyer may reasonably request in order more effectively to consummate the transactions contemplated hereby. From time to time, without further consideration, the Buyer will, at the expense of Sellers, execute and deliver such documents as the Sellers may reasonably request in order more effectively to consummate the transactions contemplated hereby. In case at any time after the Closing Date any further action is necessary or desirable to carry out the purposes of this Agreement, each party to this Agreement will take or cause its proper officers and directors to take all such necessary action.

5.9. Brokers. The Sellers represent and warrant to the Buyer that, except for Joseph Anton whose fees shall be the sole responsibility of the Sellers, no broker, finder or other person is entitled to any brokerage fees, commissions or finder's fees from the Sellers in connection with the transactions contemplated hereby. The Sellers will pay or discharge, and will jointly and severally indemnify and hold the Buyer harmless from and against, any and all claims or liabilities for all brokerage fees, commissions and finder's fees incurred in connection with the transactions contemplated hereby by reason of any action taken by the Sellers. The Buyer represents and warrants to the Sellers that no broker, finder or other person is entitled to any brokerage fees, commissions or finder's fees from the Buyer in connection with the transactions contemplated hereby. The Buyer will pay or discharge, and will indemnify and hold the Sellers

11

＊77226.＊

CONFIDENTIAL PURSUANT TO COURT ORDER

D00010880

CONFIDENTIAL

KSC00004930

harmless from and against, any and all claims or liabilities for all brokerage fees, commissions and finder's fees incurred in connection with the transactions contemplated hereby by reason of any action taken by the Buyer. The Sellers will pay or discharge and indemnify and hold the Buyer Robert J. Wichser pursuant to the Consulting Agreement between Mr. Wichser and Houndstooth, dated as of August 1, 1998.

5.10. No Shop. Neither Abboud nor Houndstooth shall, nor shall either authorize or permit any of its affiliates or any of Houndstooth's or any such affiliate's respective officers, directors or employees or any investment banker, attorney, accountant or other representative retained by Houndstooth, Abboud or any such affiliate to, solicit, encourage (including by way of furnishing information), entertain, respond to or take any other action to facilitate, any inquiries or the making of any proposal relating to the sale, transfer or other disposal of any of the capital stock or assets of Houndstooth, other than in connection with the transactions contemplated by this Agreement.

5.11. Non-Assigned License Agreements. With respect to any License Agreements as to which any required consent is not obtained on or prior to the Closing Date (the "Non-Assigned License Agreements") the Sellers will pay to the Buyer one hundred percent (100%) of all royalties and advertising payments received by the Sellers and/or due to the Sellers under such Non-Assigned License Agreements. Subject to the receipt of such payments the Buyer shall relieve the Sellers of the burdens intended to be assumed by the Buyer with respect to such Non-Assigned License Agreements.

## ARTICLE VI

## CLOSING CONDITIONS

6.1. Conditions to Each Party's Obligations to Effect the Transactions Contemplated Hereby. The respective obligations of each party to effect the transactions contemplated hereby shall be subject to the fulfillment at or prior to the Closing Date of the following conditions:

(a)    There shall be no effective injunction, writ, preliminary restraining order of a court of competent jurisdiction directing that the transactions provided for herein may not be consummated.

(b)    No action, suit, proceeding or investigation by or before any court, administrative agency or other governmental authority shall have been instituted (i) to restrain,

12

CONFIDENTIAL PURSUANT TO COURT ORDER

D00010881

CONFIDENTIAL

KSC00004931

prohibit or invalidate the transactions contemplated by this Agreement or (ii) which seeks material or substantial damages by reason of completion of such transaction.

(c)    The HSR Waiting Period with respect to the transactions contemplated hereby shall have expired or been subject to earlier termination.

6.2.    Conditions to the Obligations of the Sellers to Effect the Transactions Contemplated Hereby.  The obligations of the Sellers to effect the transactions contemplated hereby shall be further subject to the fulfillment at or prior to the Closing Date of the following conditions, any of which may be waived by the Sellers:

(a)    The Buyer shall have performed and complied with the agreements contained in this Agreement required to be performed and complied with by it at or prior to the Closing Date, the representations and warranties of the Buyer set forth in this Agreement shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date (except as otherwise contemplated by this Agreement).

(b)    The Sellers shall have received a certificate to the effect of Section 6.2(a) signed by an authorized officer of the Buyer.

(c)    The Sellers shall have received the documents referred to in Section 2.3.

6.3.    Conditions to the Obligations of the Buyer to Effect the Transactions Contemplated Hereby.  The obligations of the Buyer to effect the transactions contemplated hereby shall be further subject to the fulfillment at or prior to the Closing Date of the following condition, any of which may be waived by the Buyer:

(a)    The Sellers shall have performed and complied with the agreements contained in this Agreement required to be performed and complied with by them at or prior to the Closing Date, the representations and warranties of the Sellers set forth in this Agreement shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date (except as otherwise contemplated by this Agreement).

(b)    The Buyer shall have received a certificate to the effect of clause 6.3(a) signed by Abboud and an authorized officer of Houndstooth.

(c)    The Buyer shall have received the documents referred to in Section 2.2.

13

477726.4

CONFIDENTIAL PURSUANT TO COURT ORDER                                    D00010882

CONFIDENTIAL                                                                                    KSC00004932

(d)  All third-party consents required in connection with the consummation of the transactions, including but not limited to, the consents of all licensees and other parties to the License Agreements to the assignment of the License Agreements to the Buyer shall have been obtained on terms and conditions acceptable to the Buyer.

### ARTICLE VII

### TERMINATION AND ABANDONMENT

7.1.  _Termination._  This Agreement may be terminated at any time prior to the Closing Date:

(a)  by mutual consent of the Sellers and the Buyer;

(b)  by the Sellers or the Buyer at any time after June ___, 2000; provided, however, that no party hereto shall have the right to terminate this Agreement under this Section 7.1(b) if such party's failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur prior to such date;

(c)  by the Buyer, if there has been a material violation or breach by the Sellers of any covenant, representation or warranty of the Sellers contained in this Agreement which has resulted in the failure to satisfy any condition to the obligations of the Buyer to consummate the transactions contemplated hereby and if such violation or breach is one that is capable of being cured by the Sellers within ten (10) business days following notice to cure, then such violation or breach shall not have been cured within ten (10) business days following notice thereof from the Buyer, or waived by the Buyer; or

(d)  by the Sellers, if there has been a material violation or breach by the Buyer of any covenant, representation or warranty of the Buyer contained in this Agreement which has resulted in the failure to satisfy any condition to the obligations of the Sellers to consummate the transactions contemplated hereby and if such violation or breach is one that is capable of being cured by the Buyer within ten (10) business days following notice to cure, then such violation or breach shall not have been cured within ten (10) business days following notice thereof from the Sellers, or waived by the Sellers.

7.2.  _Procedure and Effect of Termination._  In the event of termination of this Agreement as provided in Section 7.1, this Agreement shall terminate and the transactions contemplated hereby shall be abandoned, without further action by any of the parties hereto.  If this Agreement is terminated as provided herein:

(a)  upon request therefor, each party will redeliver all documents, work papers and other material of any other party relating to the transactions contemplated hereby, whether obtained before or after the execution hereof, to the party furnishing the same;

14

D00010883

**CONFIDENTIAL**

KSC00004933

(b)     all information received by the Buyer with respect to the Assets and the Sellers (other than information which is a matter of public knowledge or which has heretofore been or is hereafter published in any publication for public distribution or filed as public information with any governmental authority) shall not at any time be used for the advantage of the Buyer to the detriment of the person furnishing such information; and the Buyer will use its commercially reasonable efforts to prevent the disclosure thereof to third persons except as may be required by law, regulation or order;

(c)     no party hereto shall have any liability or further obligation to any other party to this Agreement pursuant to this Agreement except as stated in this Section 7.2 and in Sections 5.4, 5.7, 5.9 and 9.6; provided, however, that nothing in this Section 7.2 shall be deemed to release any party from any liability for breach by such party of any of its covenants set forth in this Agreement which occurs on or before the date of the termination of this Agreement; and

(d)     all filings, applications and other submissions made pursuant to Section 5.6 shall, to the extent practicable, be withdrawn from the agency or other person to which made.

## ARTICLE VIII

### INDEMNIFICATION

8.1     Indemnification by the Sellers.  The Sellers hereby agree to jointly and severally indemnify the Buyer and its respective officers, directors, employees and stockholders against, and agrees to defend and hold them harmless from, any loss, liability, claim, judgment, settlement, award, penalty, damage, cost or expense (including reasonable attorneys' fees and expenses) (a "Loss") for or on account of or arising from or in connection with or otherwise with respect to:

(a)     any breach by either of the Sellers of any of its or his representations or warranties contained in this Agreement (including the Schedules hereto) or any agreement, document or certificate delivered in connection herewith;

(b)     any breach by either of the Sellers of any of their covenants or agreements contained in this Agreement or any breach by Abboud of his covenants and agreements contained in the Side Letter Agreement; or

15

472226.4

CONFIDENTIAL PURSUANT TO COURT ORDER

D00010884

CONFIDENTIAL                                                                        KSC00004934

(c)     any Retained Liabilities of the Sellers;

provided, however, that the Sellers shall not have any liability pursuant to clause (a) of this Section 8.1 unless the aggregate of all Losses for which the Sellers would, but for this proviso, be liable, exceeds, on a cumulative basis, Fifty Thousand Dollars ($50,000), in which case the Sellers shall be liable for the amount of all Losses.

8.2     Indemnification by the Buyer.  The Buyers hereby agrees to indemnify the Sellers and their respective officers, directors, employees and stockholders against, and agrees to defend and hold them harmless from, any Loss for or on account of or arising from or in connection with or otherwise with respect to:

(a)     any breach by the Buyer of any of its representations or warranties contained in this Agreement (including the Schedules hereto) or any certificate delivered in connection herewith; or

(b)     any breach by the Buyer of any of its covenants or agreements contained in this Agreement or in the Side Letter Agreement;

provided, however, that the Buyer shall not have any liability pursuant to clause (a) of this Section 8.2 unless the aggregate of all Losses for which the Buyer would, but for this proviso, be liable, exceeds, on a cumulative basis, Fifty Thousand Dollars ($50,000), in which case the Buyer shall be liable for the amount of all Losses.

8.3.     Procedure for Non-Third Party Claims.  With respect to any claim for indemnification hereunder other than a Third Party Claim (as hereinafter defined), the party or parties receiving such claim shall have thirty (30) business days from receipt of written notice of such claim within which to respond.  If the party receiving such claim does not respond within such thirty (30) business day period, the party receiving such claim shall be deemed to have accepted responsibility to make payment and shall have no further right to contest the validity of such claim.  If the party receiving such claim notifies the party making the claim within such thirty (30) business day period that it rejects such claim in whole or in part, the party making the claim shall be free to pursue such remedies as may be available to it under applicable law.

8.4     Procedure For Third Party Claims.  (a) In order for a party (the "indemnified party"), to be entitled to any indemnification provided for under this Article VIII in respect of, arising out of or involving a claim made by any entity or person not a party hereto against the indemnified party (a "Third Party Claim"), such indemnified party must notify the indemnifying party promptly in writing of the Third Party Claim; provided, however, that failure to give such notification shall not affect the indemnification provided hereunder except to the extent the indemnifying party actually shall have been prejudiced as a result of such failure (except that the indemnifying party shall not be liable for any expenses incurred during the period in which the indemnified party failed to give such notice). Thereafter, the indemnified party shall deliver to

16

472226.4

CONFIDENTIAL PURSUANT TO COURT ORDER

D00010885

CONFIDENTIAL                                                                                    KSC00004935

the indemnifying party, within five (5) business days after the indemnified party's receipt thereof, copies of all notices and documents (including court papers) received by the indemnified party relating to the Third Party Claim.

(b)     If a Third Party Claim is made against an indemnified party, the indemnifying party will be entitled to participate in the defense thereof and, if it chooses, to assume the defense thereof at its own cost and expense with counsel selected by the indemnifying party and reasonably satisfactory to the indemnified party.  Should the indemnifying party elect to assume the defense of a Third Party Claim, the indemnifying party will not be liable to the indemnified party for any legal expenses subsequently incurred by the indemnified party in connection with the defense thereof unless the indemnified party shall have reasonably determined that there may be one or more defenses which are available to it which are different from or in addition to those available to the indemnifying party.  If the indemnifying party assumes such defense, the indemnified party shall have the right to participate in the defense thereof and to employ counsel, at its own expense, separate from the counsel employed by the indemnifying party, it being understood that the indemnifying party shall control such defense unless the circumstances described in the immediately preceding sentence are present.  The indemnifying party shall be liable for the reasonable fees and expenses of counsel employed by the indemnified party for any period during which the indemnifying party has not assumed the defense thereof (other than during any period in which the indemnified party shall have failed to give notice of the Third Party Claim as provided above unless it is finally determined pursuant to the provisions of Section 8.3 hereof that the indemnified party is not entitled to indemnification under this Article VIII).  If the indemnifying party chooses to defend a Third Party Claim, the parties hereto shall reasonably cooperate in the defense thereof.  Such cooperation shall include, at the sole cost and expense of the indemnifying party, the retention and (upon the indemnifying party's request) the provision to the indemnifying party of records and information which are reasonably relevant to such Third Party Claim, and making employees, consultants and independent contractors available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder and to provide testimony.  If the indemnifying party chooses to defend any Third Party Claim, the indemnifying party shall not agree to any settlement, compromise or discharge of such Third Party Claim without the prior written consent of the indemnified party, unless such settlement, compromise or discharge provides solely for monetary relief and the full and complete release of the indemnified party is the result thereof.  Whether or not the indemnifying party shall have assumed the defense of a Third Party Claim, the indemnified party shall not admit any liability with respect to, or settle, compromise or discharge, such Third Party Claim without the indemnifying party's prior written consent; provided, however, that if the indemnifying party does not elect to control or defend a Third Party Claim, or after so electing does not actively contest and defend the same in good faith, the indemnified party shall be entitled to contest, defend and/or settle such Third Party Claim on such terms and with such counsel as the indemnified party deems appropriate, and at the cost and expense of the indemnifying party unless it is finally determined pursuant to Section 8.3 hereof that the indemnified party is not entitled to indemnification.

17

472226.4

CONFIDENTIAL PURSUANT TO COURT ORDER

D00010886

CONFIDENTIAL                                                                        KSC00004936

8.5    Limitations on Claims.  Under no circumstances shall the indemnifying party be liable for claims by the party seeking indemnification that as a consequence of the breach in question the party seeking indemnification has incurred consequential, punitive, special or exemplary damages.

8.6    Exclusivity of Remedies.  The remedies of any party hereto for breaches by another party of any representation, warranty, covenant or agreement hereunder, or otherwise arising out of any matter pertaining hereto, shall, in the absence of fraud, be limited to the right of indemnification provided in this Article VIII, and such right of indemnification shall be exclusive of any and all other rights or remedies which might be available to a party upon the occurrence of any such breach or with respect to such other matter whether such other right or remedy would otherwise be available at law or in equity.

## ARTICLE IX

## MISCELLANEOUS PROVISIONS

9.1.    Amendment and Modification.  Subject to applicable law, this Agreement may be amended, modified or supplemented only by written agreement of the Sellers and the Buyer at any time prior to the Closing Date with respect to any of the terms contained herein.

9.2.    Waiver of Compliance; Consents.  Except as otherwise provided in this Agreement, any failure of any of the parties to comply with any obligation, covenant, agreement or condition herein may be waived by the party or parties entitled to the benefits thereof only by a written instrument signed by the party granting such waiver, but such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.  Whenever this Agreement requires or permits consent by or on behalf of any party hereto, such consent shall be given in writing in a manner consistent with the requirements for a waiver of compliance as set forth in this Section 9.2.

9.3    Survival of Representations, Warranties and Covenants.  The representations and warranties set forth in this Agreement shall survive the Closing and will expire (i) in the case of the representations and warranties set forth in Sections 3.1, 3.5, 3.7, 3.9, 4.1 and 4.4, on the first anniversary of the Closing Date, and (ii) in the case of the representations and warranties set forth in Sections 3.2, 3.3, 3.4, 3.6, 3.8, 4.2 and 4.3, on the sixth anniversary of the Closing Date.  No party shall be entitled to assert any claims against the other for misrepresentations or breaches of representations and warranties under or pursuant to this Agreement (or for indemnification under Article VIII hereof for such misrepresentations or breaches of representations and warranties), unless the party asserting such claim shall notify the

18

477224.4

CONFIDENTIAL PURSUANT TO COURT ORDER

D00010887

CONFIDENTIAL

KSC00004937

other of such claim with reasonable specificity and outlining the basis of alleged liability within the survival period of the applicable representation and warranty and in the event of such notice the party asserting such claim shall be entitled to pursue and seek recovery for all Losses relating thereto, subject to the limitations set forth in Article VIII. The covenants and agreements of the parties set forth in this Agreement shall survive the Closing and will expire on the sixth anniversary of the Closing Date except that the covenants of the Sellers and the Buyer set forth in Section 5.11 shall continue with respect to each of the Non-Assigned License Agreements until the termination of such Non-Assigned License Agreements. No party shall be entitled to assert any claims against the other for breaches of covenants under or pursuant to this Agreement (or for indemnification under Article VIII hereof for such breaches), unless the party asserting such claim shall notify the other of such claim with reasonable specificity and outlining the basis of alleged liability within the survival period of the covenants and in the event of such notice the party asserting such claim shall be entitled to pursue and seek recovery for all Losses relating thereto, subject to the limitations set forth in Article VIII.

      9.4.  Notices.  All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally or mailed by registered or certified mail (return receipt requested), postage prepaid, to the parties at the following addresses (or at such other address for a party as shall be specified by like notice; provided, however, that notices of a change of address shall be effective only upon receipt thereof):

    (a)    if to the Sellers:

        [      ]

    with a copy to:

        Finnegan, Hickey, Dinsmoor & Johnson, P.C
        175 Federal Street
        Boston, Massachusetts  02110
        Attention: Theodore E. Dinsmoor, Esq.

    (b)    if to the Buyer,

        JA Apparel Corp.
        c/o GFT (USA) Corp.
        11 West 42nd Street
        19th Floor
        New York, New York  10036
        Attention: Chief Executive Officer

    with a copy to

19

477226.4

CONFIDENTIAL PURSUANT TO COURT ORDER

D00010888

CONFIDENTIAL

KSC00004938

Patterson, Belknap, Webb & Tyler LLP
1133 Avenue of the Americas
New York, New York 10036-6710
Attention: Jeffrey E. LaGueux, Esq.

9.5. Assignment. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, but prior to the Closing neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without the prior written consent of all of the other parties, nor is this Agreement intended to confer upon any other person except the parties hereto and their respective successors and assigns any rights or remedies hereunder.

9.6. Governing Law. This Agreement shall be governed by the laws of the State of New York (regardless of the laws that might otherwise govern under applicable New York principles of conflicts of law) as to all matters, including but not limited to matters of validity, construction, effect, performance and remedies. All actions and proceedings arising out of or relating to this Agreement shall be heard and determined in only in a federal court of competent jurisdiction sitting within the County and State of New York, and the parties hereto hereby irrevocably and unconditionally submit to personal jurisdiction in the State of New York and consent to venue in the County and State of New York with respect to any such action, waive any objection to the jurisdiction and venue in the County and State of New York, and agree not to plead or claim in any such court that any such suit, action or proceeding has been brought in an inconvenient forum.

9.7. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

9.8. Interpretation. The article and section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the parties and shall not in any way affect the meaning or interpretation of this Agreement. The parties have participated jointly in the negotiation and drafting of this Agreement. If any ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumptions or burden of proof shall arise favoring or disfavoring any party by virtue of authorship of any of the provisions of this Agreement. As used in this Agreement, the term "person" shall mean and include an individual, a partnership, a joint venture, a corporation, a trust, an unincorporated organization and a government or any department or agency thereof.

9.9. Entire Agreement. This Agreement, including the Exhibits and Schedules hereto and the documents, certificates and instruments referred to herein, embody the entire agreement and understanding of the parties hereto in respect of the transactions contemplated by this Agreement. There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth or referred to herein. This Agreement

20

472226.4

CONFIDENTIAL PURSUANT TO COURT ORDER                    D00010889

CONFIDENTIAL                                                    KSC00004939

supersedes all prior agreements and understandings between the parties with respect to such transactions.

9.10.  Severability.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

9.11.  Bulk Transfer Laws.  The Buyer acknowledges that the Sellers will not comply with the provisions of any bulk transfer laws of any jurisdiction in connection with the transactions contemplated by this Agreement and the Sellers shall jointly and severally indemnify the Buyer for all Losses in connection with or arising out of such noncompliance.

9.12.  No Third Party Beneficiary.  Nothing herein, expressed or implied, is intended or shall be construed to confer upon or give to any person, firm, corporation or legal entity, other than the parties hereto and their respective successors and permitted assigns, any right, remedy, or other benefit under or by reason of this Agreement or any documents executed in connection with this Agreement.

21

473236.4

CONFIDENTIAL PURSUANT TO COURT ORDER

D00010890

CONFIDENTIAL                                                      KSC00004940

05/03/00  12:03 FAX 212 338 2222        PATTERSON, BELKNAP                    Ø024

IN WITNESS WHEREOF, each of the Sellers and the Buyer has caused this
Agreement to be signed by its duly authorized officers as of the date first above written.

HOUNDSTOOTH CORPORATION

By:
       Name:
       Title:

_____
Joseph Abboud

JA APPAREL CORP.

By:
       Name:
       Title:

22                                        472226.4

CONFIDENTIAL PURSUANT TO COURT ORDER                         D00010891

CONFIDENTIAL                                                  KSC00004941

PBW&T DRAFT
5/3/00

June ___, 2000

Mr. Joseph Abboud
c/o Houndstooth Corporation
90 Pine Brook Road
Bedford, New York 10506

Joseph Abboud Worldwide Inc.
49 West 57th Street
New York, New York 10019

Gentlemen:

Reference is made to the Agreement of Purchase and Sale, dated as of May ___, 2000 (the "Agreement"), among Houndstooth Corporation ("Houndstooth"), Mr. Joseph Abboud ("Abboud") and JA Apparel Corp. (the "Buyer"). Pursuant to the Agreement, on the date hereof the Buyer is acquiring from Houndstooth and Abboud (i) certain names, trade names, service marks, logos, insignias, designations, trademark registrations and applications and the goodwill related thereto (collectively, the "Trademarks"), (ii) all licenses to use the Trademarks granted by Houndstooth or Abboud (collectively, the "License Agreements") and (iii) all rights to use and apply for the registration of new trade names, trademarks, service marks, logos, insignias and designations containing the words "Joseph Abboud," "designed by Joseph Abboud," "by Joseph Abboud," "JOE" or "JA" or anything similar thereto or derivative thereof, either alone or in conjunction with other words or symbols (collectively, the "New Trademarks" and, collectively with the Trademarks and the License Agreements, the "Assets"). In consideration of the consummation of the purchase and sale of the Assets pursuant to the Agreement, and in order to induce Houndstooth, Abboud and the Buyer to consummate such purchase, the parties hereto have agreed as follows:

1. Personal Services to be Performed by Abboud.

(a) For a period of five (5) years from and after the date hereof (the "Personal Services Period"), Abboud agrees to provide the following personal services to the Buyer on an exclusive basis: (a) providing stylistic guidelines in connection with the Black Label collection of apparel marketed under the Trademarks, (ii) providing stylistic ideas and proposals for the design and development of all other collections marketed under the Trademarks and/or the New Trademarks, (iii) providing concepts and ideas in connection with public relations activities and advertising campaigns, (iv) providing suggestions and ideas for the development of new business opportunities and new licensing relationships for the Buyer and (v) making personal appearances at exhibitions, fashion shows and other events on behalf of the Buyer whenever the Buyer

CONFIDENTIAL PURSUANT TO COURT ORDER

D00010892

D00010892

CONFIDENTIAL

KSC00004942

deems it necessary for the benefit of the brand awareness of the Trademarks and/or the New Trademarks.

(b)  It is understood and agreed that Abboud's performance of such personal services will be rendered as requested from time to time by the Buyer during the Personal Services Period and that Abboud will not be entitled to engage in other business activities during the Personal Services Period, other than serving as Chairman Emeritus of the Buyer as provided in the Agreement.  Subject to reasonable prior notice, Abboud agrees to use his reasonable best efforts to make himself available to perform such personal services at the request of the Buyer in New York, New York and at such other places as the Buyer may from time to time reasonably request, in each case during the Personal Services Period.

(c)  Abboud agrees that the purchase price paid by the Buyer for the Assets on the date hereof pursuant to the Agreement provides him with full and fair consideration from the Buyer for the performance of such personal services during the Personal Services Period and that he will not be entitled to any additional compensation from the Buyer or any of its affiliates with respect to the performance of such personal services.  Abboud will be entitled to car service transportation and first class travel and overnight accommodation arrangements at the expense of the Buyer whenever he is required to travel at the request of the Buyer in the course of performing such personal services.

2.  Prohibition of Competing Activities by Abboud.

(a)  For the two-year period immediately following the expiration of the Personal Services Period (the "Restricted Period"), Abboud agrees that he will not, directly or indirectly through any partnership, corporation, limited liability company, trust or other entity, be associated as an owner, director, officer, employee, consultant or other participant with, any person, group, business enterprise or other entity which is engaged in or proposes to engage in the business of designing, licensing, manufacturing, marketing, distributing or otherwise dealing with any products or services which are or would be competitive with the business of the Buyer as then conducted or as such business may be conducted in the future anywhere in the world.

(b)  In order to enforce the agreement of Abboud set forth in paragraph (a) this Section 2, Abboud agrees that at all times during the Restricted Period he will be obligated to obtain the prior written consent of the Buyer, which may be granted, withheld or conditioned in the sole discretion of the Buyer, before becoming associated in any capacity with any person, group, business enterprise or other entity, other than the Buyer or any of its affiliates, which is engaged in or proposes to engage in the business of designing, licensing, manufacturing, marketing, distributing or otherwise dealing with any products or services which could reasonably be expected to be

2

485001.2

CONFIDENTIAL PURSUANT TO COURT ORDER

D00010893

CONFIDENTIAL

KSC00004943

competitive with the business of the Buyer as then conducted or as then proposed to be conducted.

(c)  Abboud agrees that the purchase price paid by the Buyer for the Assets on the date hereof pursuant to the Agreement provides him with full and fair consideration from the Buyer for the agreement of Abboud set forth in this Section 2 during the Restricted Period and that he will not be entitled to any additional compensation from the Buyer or any of its affiliates with respect to such agreement.

(d)  Abboud acknowledges that his agreements set forth in this Section 2 were specifically bargained for by the Buyer in connection with the consummation of the transactions contemplated by the Agreement, that the services to be performed by him pursuant to Section 1 above are special and unique and that in the event of any breach by Abboud of his agreements set forth in such Sections the Buyer will not have an adequate remedy at law and therefore will be entitled to obtain equitable relief in the form of a preliminary or permanent injunction from any court of competent jurisdiction in order to enforce such agreements.

(e)  In the event that a court of competent jurisdiction would refuse to enforce the agreement of Abboud set forth in this Section 2 because it covers too wide a geographic area, extends for a period of time which is deemed excessive or otherwise, it is the intention of the Buyer and Abboud that such agreement shall be reformed by such court so as to comport with the maximum allowable provisions permitted by applicable law.

3.  Reimbursement of Certain Expenses by The Buyer.

(a)  In consideration of the sale of the Assets by Abboud and Houndstooth to the Buyer pursuant to the Agreement on the date hereof, the Buyer agrees to reimburse Joseph Abboud Worldwide Inc. ("Worldwide") on a periodic monthly basis for 100% of the base rent (excluding utilities) as of the date hereof ($9,321.10) paid by Worldwide for the third floor offices in 49 West 57th Street in New York City currently occupied by Worldwide for the period from and including the Closing Date (as defined in the Agreement) through and including September 30, 2000 (such period, the "Reimbursement Period"). Such reimbursement will be paid, in arrears, within ten business days of the submission of an appropriate invoice therefor from Worldwide. Abboud agrees to cause Worldwide to submit such invoices to the Buyer not later than ten business days after the end of each month within the Reimbursement Period.

3

485001.2

CONFIDENTIAL PURSUANT TO COURT ORDER

D00010894

D00010894

CONFIDENTIAL

KSC00004944

PATTERSON,BELKNAP                    ☑028

(b) In consideration of the sale of the Assets by Abboud and Houndstooth to the Buyer pursuant to the Agreement on the date hereof, the Buyer agrees to reimburse Worldwide on a periodic monthly basis for 100% of the base compensation as of the Closing Date, paid by Worldwide during the Reimbursement Period to each of Mark Scarborough, Bob Franceschini, Dominick Leuci, Deborah Koncan, Alison Grogina and Amy Vernazza ($_____, $_____, $_____, $_____, $_____, $_____ and $_____, respectively). Such reimbursement will be paid in arrears, within ten business days of the submission of an appropriate invoice therefor from Worldwide with respect to each such individual until the earlier to occur of (i) the date that such individual ceases to be employed by Worldwide for any reason (including, but not limited to, as a result of the discretionary hiring of such individual by the Buyer or one of its affiliates) and (ii) the expiration of the Reimbursement Period. Abboud agrees to cause Worldwide to submit such invoices to the Buyer not later than ten business days after the end of each month within the Reimbursement Period.

(c) In consideration of the sale of the Assets by Abboud and Houndstooth to the Buyer pursuant to the Agreement on the date hereof, the Buyer agrees to reimburse Worldwide on a periodic monthly basis for 50% of the base rent (excluding utilities), paid by Worldwide as of the Closing Date hereof ($9,321.10 x 50% = $4,660.55) for the third floor offices in 49 West 57th Street in New York City currently occupied by Worldwide for the period from and including October 1, 2000 to and including the earlier to occur of (y) December 31, 2000 and (z) the date that Worldwide subleases, assigns or surrenders its lease with respect to such space such period the "Partial Reimbursement Period"). Such reimbursement will be paid, in arrears, within ten business days of the submission of an appropriate invoice therefor from Worldwide. Abboud agrees to cause Worldwide to submit such invoices to the Buyer not later than ten business days after the end of each month within the Partial Reimbursement Period. In addition, Abboud agrees to cause Worldwide to use its commercially reasonable efforts to sublease, assign or surrender its lease with respect to such space during the Partial Reimbursement Period and to promptly notify the Buyer if Worldwide is able to effect any such sublease, assignment or surrender.

4 Miscellaneous.

(a) This Letter Agreement constitutes the entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes all prior or contemporaneous agreements, whether written or oral, among such parties relating to the subject matter hereof.

(b) This Letter Agreement and the rights and obligations of the parties will be governed by, construed and enforced in accordance with the laws of the State of New York without regard to the choice of law provisions thereof.

4                                    485001.2

CONFIDENTIAL PURSUANT TO COURT ORDER                    D00010895

D00010895

CONFIDENTIAL                                    KSC00004945

(c) All actions and proceedings arising out of or relating to this Letter Agreement will be exclusively heard and determined in a New York state or federal court sitting in the City of New York and by the execution and delivery hereof the parties hereby irrevocably submit to the jurisdiction of such courts in any such action or proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of such action or proceeding.

(d) This Letter Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(e) All notices and other communications hereunder must be in writing and will be deemed given if sent to the respective parties hereto at their addresses as set forth in, and in the manner provided in, the Agreement.

To indicate your agreement to the foregoing, please execute the duplicate copy of this Letter Agreement in the space provided below for such purpose and return it to the undersigned, whereupon this Letter Agreement shall become a binding agreement among the parties.

Very truly yours,

JA APPAREL CORP.

By: _____
    Name:
    Title:

ACCEPTED AND AGREED TO:

_____
Joseph Abboud

HOUNDSTOOTH CORPORATION

By: _____
    Name:
    Title:

5

485001.2

CONFIDENTIAL PURSUANT TO COURT ORDER

D00010896

CONFIDENTIAL

KSC00004946