Louis S. Ederer(LE 7574)
John Maltbie (JM 3658)
ARNOLD & PORTER LLP
399 Park Avenue
New York, New York 10022
(212) 715-1000
*Attorneys for Defendants and*
*Counterclaim Plaintiffs Joseph Abboud, Houndstooth Corp.*
*and Herringbone Creative Services, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x

JA APPAREL CORP.,

        Plaintiff,

        v.

JOSEPH ABBOUD, HOUNDSTOOTH
CORP., and HERRINGBONE CREATIVE
SERVICES, INC.,

        Defendants.

------------------------------------------------------- 

JOSEPH ABBOUD, HOUNDSTOOTH
CORP., and HERRINGBONE CREATIVE
SERVICES, INC.,

        Counterclaim Plaintiffs,

        v.

JA APPAREL CORP. and MARTIN STAFF,

        Counterclaim Defendants.

------------------------------------------------------- x

Civil Action No. 07 CV 07787 (DAB)

**DECLARATION OF LOUIS S.
EDERER IN SUPPORT OF CROSS-
MOTION FOR JUDGMENT ON THE
PLEADINGS ON COUNTS ONE
THROUGH SEVEN AND COUNT
NINE OF PLAINTIFF'S
COMPLAINT AND IN OPPOSITION
TO PLAINTIFFS' MOTION *IN
LIMINE* TO PRECLUDE
ADMISSION OF PAROL EVIDENCE**

# <u>EXHIBIT N</u>

CJJ

# FINNEGAN, HICKEY, DINSMOOR & JOHNSON, P.C.

### COUNSELLORS AT LAW

175 FEDERAL STREET
BOSTON, MASSACHUSETTS 02110
(617) 523-2500
FAX (617) 422-6080

May 19, 2000

<u>VIA TELECOPIER</u>

Jeffrey E. LaGueux
Patterson, Belknap, Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036-6710

Re:  <u>Draft of Agreement of Purchase and Sale, as well as Side Letter Agreement, between
Houndstooth/Abboud and JA Apparel</u>

Dear Jeff:

I have received and reviewed your May 3 drafts of the Purchase and Sale Agreement and the
Side Letter Agreement between Houndstooth Corporation and Joseph Abboud, as Sellers, and
J.A. Apparel Corp., as Buyer.

As a result of my review and my discussions with Joe, I note that the drafts are somewhat
inconsistent with the parties' March 17, 2000, Letter Agreement and that they do not take into
account the changed circumstances arising out of the requisite Hart-Scott-Rodino ("HSR")
filing. I shall address certain substantive items that need to be considered in this letter and
incorporate appropriate changes and corrections to the Purchase and Sale Agreement and the
Side Letter Agreement, as per the enclosed relined drafts.

First, as to timing, the March 17 Letter Agreement contemplated a closing on April 14, 2000.
However, in view of the delay engendered by the required HSR filing and preparation of the
May 3 drafts, it appears we shall not have a closing much before late June. We should finalize
the definitive agreements in another week; and, assuming a timely HSR filing with the lapse of
the 30-day waiting period, we should close by June 30.   This means that all items
contemplating a Closing after the first calendar quarter should be adjusted for a Closing after
the second calendar quarter.   These items would include the allocation and payment of
royalties in the Purchase and Sale Agreement, as well as the reimbursements for rent and
personnel in the Side Letter Agreement. In short, pertinent dates should be rolled forward, as
appropriate, to accommodate the HSR time lag. Further, as to the HSR filing fee, legally this
is the responsibility of the "acquiring" party, i.e., the Buyer.

Second, as to the assignment of the third party license agreements, further refinement is
required, particularly in view of the fact that Buyer already possesses rights in the Sellers'
major license agreements. Certainly, Sellers are prepared to assign all third party license



DIN00482



CONFIDENTIAL

KSC00004948

FINNEGAN, HICKEY, DINSMOOR & JOHNSON, P.C.

Jeffrey E. LaGueux
May 19, 2000
Page 2

agreements that are immediately assignable; and, as to any third party license agreements that
require consent to assignment, Sellers are willing to cooperate with Buyer in obtaining all such
consents. Further, to the extent that any third parties are unwilling to consent, Sellers will
cooperate with Buyer in any reasonable arrangement designed to provide Buyer with the
benefits of such third party license agreements in the manner you suggest. However, if Sellers
and Buyer are unable to obtain any third party consents, such inability cannot be used to
prevent Closing. Moreover, as a practical matter, the parties should not empower third-party
licensees to nullify the transaction by withholding their consents, as such empowerment will
only inure to the benefit of the third party licensees.

Third, in connection with the assignment of the third-party license agreements, it is also
appropriate that Sellers should assign to Buyer the June 1, 1998, contract with Jean Claude
Weil. As I am sure you know, Weil has the exclusive right to procure licenses for home
furnishing products; and, as a result of his past efforts, Weil has secured certain home
furnishing licenses on which he is entitled to a 15% commission based on future license fees.
At this time it appears that the home furnishing licenses generate a very small portion of the
overall licensing revenue; so payments to Weil are minimal. However, I understand the Buyer
has plans to develop the home furnishing licenses and to the extent Buyer chooses to do so,
payments to Weil may be greatly increased. Since Sellers will have no future control
whatsoever over either the home furnishings licenses or the promotion and sale of home
furnishing products, it is inappropriate that they should be responsible for future payments to
Weil arising out of such future licensing activity.

Fourth, the prohibition on Joe's engagement "in other business activities during the personal
services period" requires further refinement. Certainly, Joe is prepared to provide all requisite
personal services to the Buyer, but this should not preclude him from engaging in other
business activities that do not conflict with his obligations to Buyer and are not competitive
with the Buyer's sale and/or licensing of Abboud products. In short, Joe ought to be able to
own stock in other corporations, serve on various boards of directors, engage in apparel
industry activities and functions and appear and perform as a celebrity in his own right, even
though such activities are not tied into the Buyer's operations. In general, I believe all such
activities on Joe's part would probably inure to Buyer's benefit in that Joe would continue to
promote Abboud products. Further, any prohibition on Joe's activities during the two year
period immediately following the expiration of the personal services period requires refinement
along the same lines.

Fifth, as to Buyer's reimbursement of certain expenses during the transition period, I am not
sure whether the wording in the Side Letter Agreement is as significant as the specific amounts
to be reimbursed, but I note that the new wording differs somewhat from the March 19 Letter
Agreement.

DIN00483

CONFIDENTIAL

KSC00004949

FINNEGAN, HICKEY, DINSMOOR & JOHNSON, P.C.

Jeffrey E. LaGueux
May 19, 2000
Page 3

For example under the March 19 Letter Agreement, Buyer is required to reimburse Sellers for "the rent paid by Worldwide for the third floor offices in 49 West 57th Street in New York City," while the draft of the Side Letter Agreement refers to "base rent (excluding utilities)." Quite frankly, I am not sure what utilities may or may not be included in the rent, but Joe's understanding of the March 19 Letter Agreement is that "rent" includes all payments by Sellers, as lessee, to their landlord, as lessor. At this time, the monthly payment to the landlord is $10,927. Similarly, under the March 19 Letter Agreement, Buyer is required to reimburse Sellers the "base compensation" paid to specified employees. Joe's understanding of the March 19 Letter Agreement is that "base compensation" means all compensation, i.e. salary and benefits. Obviously, the word "base" excludes bonuses, perquisites or other special payments. In any event, the salary component of base compensation should be reimbursed on an individual bi-weekly basis, while benefits should be reimbursed as a lump sum on a monthly basis.

Further, I note you have added language that "reimbursement will be paid, in arrears, within ten business days of the submission of an appropriate invoice therefor from Worldwide." I am not sure why we need this invoicing scheme when the amount of the rent, as well as the compensation for the specified employees, is fixed. If Buyer desires an invoice, Sellers are prepared to render an invoice, in advance. However, schedules would seem more appropriate. Further, regardless of invoicing, Sellers expect to receive reimbursements from Buyer at or before the time payments are due either the landlord or the employees. In short, to the extent rent is due the first of each month, Sellers expect to receive reimbursement for rent on or before the first of each month. Similarly, to the extent employees are paid on a bi-weekly basis, the first and fifteenth of each month, Sellers should receive reimbursement for salary on or before the first and fifteenth of each month and reimbursement for benefits on or before the first of each month.

And further, as to reimbursement of expenses, although not mentioned in the March 19 Letter Agreement, Sellers reasonably contemplate that since Buyer is going to be directing the activities of all employees at 49 West 57th Street during the transition period, Buyer should be responsible for any and all costs incurred as a result of such employees' activities for and on behalf of Buyer, as duly directed and/or approved by Buyer. Thus, while Sellers recognize that Buyer is not assuming responsibility for any of the equipment leases at 49 West 57th Street, to the extent Buyer directs employees to utilize any equipment, Buyer should pay for such usage. This reimbursement of expenses would apply to equipment, utilities, supplies or other items of expense arising out of employees' work at 49 West 57th Street during the transition period and should be reimbursed within ten (10) days of receipt of an invoice for such expenses.

Finally, although, not previously mentioned, there is another transition item that needs to be taken care of and that is Sellers' advertising obligation to WFAN-66AM New York. Sellers

DIN00484

CONFIDENTIAL

KSC00004950

FINNEGAN, HICKEY, DINSMOOR & JOHNSON, P.C.

Jeffrey E. LaGueux
May 19, 2000
Page 4

previously committed to 50 live 60-second commercials on the "Imus in the Morning" radio show on WFAN as follows:  10 x January = $25,000; 10 x March = $25,000; 10 x Fathers Day = $25,000; 5x July = $12,500 and 15 x December = $37,500.  Since the commercials running after the closing would obviously benefit Buyer in promoting the sale of Abboud products, Buyer should assume responsibility for such commercials after the Closing.  The amounts due for these post Closing commercials are $12,500 due October 15, 2000; and $37,500 due February 15, 2001.

Sixth, I note that with regard to choice of forum in both the Purchase and Sale Agreement and the Side Letter Agreement you have selected the New York judicial system.  As a practical matter, while Sellers have no objection to adjudication in New York, they prefer tripartite arbitration of any disputes before the American Arbitration Association in accord with its Commercial Arbitration Rules.

Specific language reflecting these changes and other corrections to the May 3 drafts of the Purchase and Sale Agreement and the Side Letter Agreement is red-lined on the enclosed redrafts.

If you have any questions, please contact me at my office.  As time is of the essence in concluding this transaction, if Buyer cannot execute the Purchase and Sale Agreement and Side Letter Agreement substantially as redrafted, I suggest we immediately arrange for a meeting in New York with all parties present to conclude and execute the Agreements.

Cordially,

Theodore E. Dinsmoor

TED/jmw
Enc.

cc:     Joseph Abboud
        Joseph Anton

DIN00485

CONFIDENTIAL

KSC00004951

~~FBW&T DRAFT~~
~~5/3/00~~FHDJ DRAFT
5/19/00

June __, 2000

Mr. Joseph Abboud
c/o Houndstooth Corporation
90 Pine Brook Road
Bedford, New York 10506

Joseph Abboud Worldwide Inc.
49 West 57th Street
New York, New York 10019

Gentlemen:

Reference is made to the Agreement of Purchase and Sale, dated as of May __, 2000 (the "Agreement"), among Houndstooth Corporation ("Houndstooth"), Mr. Joseph Abboud ("Abboud") and JA Apparel Corp. (the "Buyer"). Pursuant to the Agreement, on the date hereof the Buyer is acquiring from Houndstooth and Abboud (i) certain names, trade names, service marks, logos, insignias, designations, trademark registrations and applications and the goodwill related thereto (collectively, the "Trademarks"), (ii) all licenses to use the Trademarks granted by Houndstooth or Abboud (collectively, the "License Agreements") and (iii) all rights to use and apply for the registration of new trade names, trademarks, service marks, logos, insignias and designations containing the words "Joseph Abboud," "designed by Joseph Abboud," "by Joseph Abboud," "JOE" or "JA" or anything similar thereto or derivative thereof, either alone or in conjunction with other words or symbols (collectively, the "New Trademarks" and, collectively with the Trademarks and the License Agreements, the "Assets"). In consideration of the consummation of the purchase and sale of the Assets pursuant to the Agreement, and in order to induce Houndstooth, Abboud and the Buyer to consummate such purchase, the parties hereto have agreed as follows:

1. Personal Services to be Performed by Abboud.

(a) For a period of five (5) years from and after the date hereof (the "Personal Services Period"), Abboud agrees to serve as Chairman Emeritus of the Buyer and provide the following personal services to the Buyer on an exclusive basis: ~~(a)~~(i) providing stylistic guidelines in connection with the Black Label collection of apparel marketed under the Trademarks, (ii) providing stylistic ideas and proposals for the design and development of all other collections marketed under the Trademarks and/or the New Trademarks, (iii) providing concepts and ideas in connection with public relations activities and advertising campaigns, (iv) providing suggestions and ideas for the development of new business opportunities and new licensing relationships for the Buyer and (v) upon notice of not less than thirty (30) business days, making personal appearances at exhibitions, fashion shows and other events on behalf of

DEFENDANT'S EXHIBIT 36

DIN00476

the Buyer whenever ~~the Buyer deems it~~ reasonably necessary for the benefit of the brand awareness of the Trademarks and/or the New Trademarks.

(b)  It is understood and agreed that Abboud's performance of such personal services will be rendered as requested from time to time by the Buyer during the Personal Services Period and that Abboud will not be entitled to engage in other business activities during the Personal Services ~~Period, other than~~ Period that would ~~serving as Chairman Emeritus of the Buyer as provided in the Agreement~~ conflict with his obligations hereunder. Subject to reasonable prior notice, Abboud agrees to use his reasonable ~~best~~ efforts to make himself available to perform such personal services at the request of the Buyer in New York, New York and at such other places as the Buyer may from time to time reasonably request, in each case during the Personal Services Period.

(c)  Abboud agrees that the purchase price paid by the Buyer for the Assets on the date hereof pursuant to the Agreement provides him with full and fair consideration from the Buyer for the performance of such personal services during the Personal Services Period and that he will not be entitled to any additional compensation from the Buyer or any of its affiliates with respect to the performance of such personal services except as expressly provided in this Letter Agreement. Buyer agrees that no default by Abboud under this Letter Agreement shall give rise to a right of indemnification under the Agreement.

(d)  During the Personal Services Period, Abboud shall receive all of the benefits and compensation described in this paragraph. For his services hereunder, Abboud shall receive an annual retainer of Twelve Thousand Dollars ($12,000), payable in arrears in semi-annual installments of Six Thousand Dollars ($6,000) each, beginning six (6) months from the Closing (as hereinafter defined). Abboud shall be entitled to a corporate expense account from the Buyer (including a corporate credit card) which will be used exclusively for business-related expenses incurred by him in connection with his services hereunder. ~~services. Abboud will~~ Such business-related expenses will be submitted on a monthly basis to the Buyer for its reasonable approval. Abboud shall be entitled to car service transportation and first class travel and overnight accommodation arrangements at the expense of the Buyer whenever he is required to travel at the request of the Buyer in the course of performing such personal ~~services.~~ services. Abboud shall be entitled to membership club dues of up to $6,000 per annum payable the first of each year. Also, Abboud shall be entitled to a clothing allowance of up to Ten Thousand Dollars ($10,000) per year pursuant to which he will be entitled to purchase articles of apparel manufactured by or for the Buyer at a twenty percent (20%) discount to the Buyer's standard wholesale price on an item by item basis. Abboud will also be entitled to receive medical and dental insurance coverage on terms and conditions no less favorable to Abboud than those described as of the date hereof in Schedule 1(d).

2.  Prohibition of Competing Activities by Abboud.

(a)  For the two-year period immediately following the expiration of the Personal Services Period (the "Restricted Period"), Abboud agrees that he will not, directly or

485001.2

DIN00477

CONFIDENTIAL

KSC00004953

indirectly through any partnership, corporation, limited liability company, trust or other entity, be associated as an owner, director, officer, employee, consultant or other participant with, any person, group, business enterprise or other entity which is engaged in or proposes to engage in the business of designing, licensing, manufacturing, marketing, ~~or distributing or~~ ~~otherwise dealing with~~ any products or services which are or would be competitive with the business of the Buyer as then conducted or as such business may <u>reasonably</u> be conducted in the future anywhere in the world.

(b) In order to enforce the agreement of Abboud set forth in paragraph (a) <u>of this Section 2</u>, Abboud agrees that at all times during the Restricted Period he will ~~be obligated to obtain the prior written consent of the Buyer, which may be granted, withheld or conditioned in the sole discretion of the Buyer,~~<u>notify Buyer</u> before becoming associated in any capacity with any person, group, business enterprise or other entity, other than the Buyer or any of its affiliates, which is engaged in or proposes to engage in the business of designing, licensing, manufacturing, ~~marketing,~~<u>marketing or</u> distributing ~~or otherwise dealing with~~ any products or services which could reasonably be expected to be competitive with the business of the Buyer as then conducted or as then proposed to be conducted.

(c) Abboud agrees that the purchase price paid by the Buyer for the Assets on the date hereof pursuant to the Agreement provides him with full and fair consideration from the Buyer for the agreement of Abboud set forth in this Section 2 during the Restricted Period and that he will not be entitled to any additional compensation from the Buyer or any of its affiliates with respect to such agreement.

(d) Abboud acknowledges that his agreements set forth in this Section 2 were specifically bargained for by the Buyer in connection with the consummation of the trans?ctions contemplated by the Agreement, that the services to be performed by him pursuant to ?ection 1 above are special and unique and that in the event of any breach by Abboud of his agreements set forth in such Sections the Buyer will not have an adequate remedy at law and therefore will be entitled to obtain equitable relief in the form of a preliminary or permanent injunction from any court of competent jurisdiction in order to enforce such agreements.

(e) In the event that a court of competent jurisdiction would refuse to enforce the agreement of Abboud set forth in this Section 2 because it covers too wide a geographic area, extends for a period of time which is deemed excessive or otherwise, it is the intention of the Buyer and Abboud that such agreement shall be reformed by such court so as to comport with the maximum allowable provisions permitted by applicable law.

3. <u>Reimbursement of Certain Expenses by The Buyer.</u>

(a) In consideration of the sale of the Assets by Abboud and Houndstooth to the Buyer pursuant to the Agreement on the date hereof, the Buyer agrees to reimburse Joseph Abboud Worldwide Inc. ("Worldwide") on a periodic monthly basis for 100% of the base rent(excluding utilities) as of the date hereof (~~($9,321.10)~~)($10,927) paid by Worldwide for the third floor offices in 49 West 57th Street in New York City currently occupied by Worldwide

485001.2

DIN00478

CONFIDENTIAL

for the period from and including the Closing Date (as defined in the Agreement) through and ~~including September 30, 2000 (such period, the~~ending on the last day of the sixth full calendar month following the Closing Date (the "Reimbursement Period"). ~~Such reimbursement will be paid, in arrears, within ten business days of the submission of an appropriate invoice therefor from Worldwide. Abboud agrees to cause Worldwide to submit such invoices to the Buyer not later than ten business days after the end of each month within the Reimbursement Period.~~ paid in accordance with Schedule 3(a).

(b) In consideration of the sale of the Assets by Abboud and Houndstooth to the Buyer pursuant to the Agreement on the date hereof, the Buyer agrees to reimburse Worldwide on a periodic monthly basis for 100% of the base compensation as of the Closing Date, paid by Worldwide during the Reimbursement Period to each of Mark Scarborough, Bob Franceschini, Dominick Leuci, Deborah Koncan, Alison Grogina and Amy Vernazza (~~$_____, $_____, $_____, $_____, $_____, and $_____, respectively)~~. Such reimbursement ~~will be paid in arrears, within ten business days of the submission of an appropriate invoice therefor from Worldwide with respect to~~accordance with Schedule 3(a) for each such individual until the earlier to occur of (i) the date that such individual ceases to be employed by Worldwide for any reason (including, but not limited to, as a result of the discretionary hiring of such individual by the Buyer or one of its affiliates) and (ii) the expiration of the Reimbursement Period. ~~Abboud agrees to cause Worldwide to submit such invoices to the Buyer not later than ten business days after the end of each month within the Reimbursement Period.~~

(c) In consideration of the sale of the Assets by Abboud and Houndstooth to the Buyer pursuant to the Agreement on the date hereof, the Buyer agrees to reimburse Worldwide on a periodic monthly basis for 50% of the base rent (excluding utilities),rent, paid by Worldwide as of the Closing Date hereof~~($9,321.10 x 50% = $1,660.55)~~ for the third floor offices in 49 West 57th Street in New York City currently occupied by Worldwide ~~for the period from and including October 1, 2000~~Worldwide. Such reimbursement will be paid in accordance with Schedule 3(c) from the end of the Reimbursement Period to and including the earlier to occur of (y) ~~December 31, 2000~~the last day of the third full month following the Reimbursement Period and (z) the date that Worldwide subleases, assigns or surrenders its lease with respect to such space such period the "Partial Reimbursement Period"). ~~Such reimbursement will be paid, in arrears, within ten business days of the submission of an appropriate invoice therefor from Worldwide. Abboud agrees to cause Worldwide to submit such invoices to the Buyer not later than ten business days after the end of each month within the Partial Reimbursement Period.~~ In addition, Abboud agrees to cause Worldwide to use its commercially reasonable efforts to sublease, assign or surrender its lease with respect to such space during the Partial Reimbursement Period and to promptly notify the Buyer if Worldwide is able to effect any such sublease, assignment or surrender.

485001 2

DIN00479

CONFIDENTIAL

KSC00004955

(d)    The Buyer agrees to reimburse Worldwide for the out-of-pocket costs, including utilities, equipment and supplies, incurred by Worldwide arising from Buyer's use of employees, premises and facilities of Worldwide at 49 West 57th Street in New York City (other than rent which is expressly addressed above). Abboud agrees to cause Worldwide to submit invoices for all such expenses to the Buyer not later than ten business days after the end of each month during the Reimbursement Period; and Buyer agrees to pay such invoices within ten (10) business days.

(e)    The Buyer agrees to pay Sellers' advertising obligation directly to WFAN-66AM New York under prior commitments for commercials on the "Imus in the Morning" radio show on WFAN as follows: $12,500 due October 15, 2000; and $37,500 due February 15, 2001.

4.   Miscellaneous.

(a)    Notwithstanding anything in this Letter Agreement to the contrary, so long as Abboud's activities are reasonably expected to enhance the goodwill of the Assets, Abboud shall not be prohibited or be required to obtain Buyer's consent to (i) make media or celebrity appearances, or (ii) to serve, for compensation, on boards of directors, advisory boards, or to otherwise act as a general authority on the fashion industry, or (iii) to acquire, own and hold stock in public corporations.

(a) This(b)    This Letter Agreement constitutes the entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes all prior or contemporaneous agreements, whether written or oral, among such parties relating to the subject matter hereof.

(b) This Letter Agreement and the rights and obligations of the parties will be governed by, construed and enforced in accordance with the laws of the State of New York without regard to the choice of law provisions thereof.

(c) All actions and proceedings arising out of or relating to this Letter Agreement will be exclusively heard and determined in a New York state or federal court sitting in the City of New York and by the execution and delivery hereof the parties hereby irrevocably submit to the jurisdiction of such courts in any such action or proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of such action or proceeding.  (c)    This Letter Agreement is personal as to the parties hereto and no party hereto may assign its rights or delegate its obligations hereunder, in whole or in part, to any third party without the prior written consent of the other party, and any such assignment or delegation, in the absence of such consent, shall be void and without effect.  Notwithstanding the foregoing, Buyer shall have the right to transfer this Agreement to any subsidiary corporation controlled by Buyer, or to any corporation of which Buyer is a subsidiary or which controls Buyer or to any corporation which is controlled by a corporation which controls Buyer.

485001.2

DIN00480

CONFIDENTIAL

KSC00004956

(d)  This Letter Agreement and the rights and obligations of the parties will be governed by, construed and enforced in accordance with the laws of the State of New York without regard to the choice of law provisions thereof.

_____  (e)  The parties agree that all controversies and disputes in connection with or arising out of this Agreement shall be determined by binding tripartite arbitration before the American Arbitration Association in New York in accordance with the Association's Rules for Commercial Arbitration.

_____  (f)  This Letter Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(e)(g)  All notices and other communications hereunder must be in writing and will be deemed given if sent to the respective parties hereto at their addresses as set forth in, and in the manner provided in, the Agreement.

To indicate your agreement to the foregoing, please execute the duplicate copy of this Letter Agreement in the space provided below for such purpose and return it to the undersigned, whereupon this Letter Agreement shall become a binding agreement among the parties.

Very truly yours,

JA APPAREL CORP.

By: _____
   Name:
   Title:

ACCEPTED AND AGREED TO:

_____
Joseph Abboud

HOUNDSTOOTH CORPORATION

By: _____
   Name:
   Title:

485001.2

DIN00481

CONFIDENTIAL

KSC00004957