Louis S. Ederer (LE 7574)
John Maltbie (JM 3658)
ARNOLD & PORTER LLP
399 Park Avenue
New York, New York 10022
Phone (212) 715-1000
Fax (212) 715-1399

*Attorneys for Defendants and*
*Counterclaim Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- x

JA APPAREL CORP.,

                    Plaintiff,

        v.

JOSEPH ABBOUD, HOUNDSTOOTH CORP.,
and HERRINGBONE CREATIVE
SERVICES, INC.,

                Defendants.

------------------------------------------------------- x
------------------------------------------------------- x

JOSEPH ABBOUD, HOUNDSTOOTH CORP.,
and HERRINGBONE CREATIVE
SERVICES, INC.,

                Counterclaim Plaintiffs,

        v.

JA APPAREL CORP. and MARTIN STAFF,

                Counterclaim Defendants.

------------------------------------------------------- x

Civil Action No. 07 CV 07787 (THK)

**DEFENDANTS AND**
**COUNTERCLAIM PLAINTIFFS'**
**TRIAL BRIEF**

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF FACTS ....................................................................... 2

ARGUMENT ........................................................................................... 5

I.    THE COURT SHOULD DISMISS JA APPAREL'S CLAIMS FOR BREACH OF THE PURCHASE AND SALE AGREEMENT ................................ 5

II.   THE COURT SHOULD DISMISS JA APPAREL'S CLAIMS FOR TRADEMARK INFRINGEMENT, FALSE DESIGNATION OF ORIGIN, TRADEMARK DILUTION AND UNFAIR COMPETITION .................................. 12

III.  JA APPAREL IS BARRED FROM ANY EQUITABLE RELIEF ON ITS CLAIMS OF TRADEMARK INFRINGEMENT, FALSE DESIGNATION OF ORIGIN, TRADEMARK DILUTION AND UNFAIR COMPETITION BY ITS OWN UNCLEAN HANDS ......................................................... 18

IV.  THIS COURT SHOULD DISMISS JA APPAREL'S CLAIMS FOR BREACH OF THE PERSONAL SERVICES AGREEMENT ................................. 20

CONCLUSION ....................................................................................... 26

# TABLE OF AUTHORITIES

PAGE

## CASES

*Better Business Bureau of Metro. Houston, Inc. v. Med. Directors, Inc.*, 681 F.2d 397 (5th Cir. 1982)....................................................................................................17

*Biosafe-One, Inc. v. Hawks*, 524 F.Supp.2d 452 (S.D.N.Y. 2007).................................................

*Brooks Automation, Inc. v. Blue Shift Techs.*, No. 06-P-1063, 2007 WL 1713370 (Mass. App. Ct. June 14, 2007) ...............................................................................21

*Buffalo Oyster Co. v. Nenno*, 132 Misc. 213, 229 N.Y.S. 210 (N.Y.Sup. 1928)..........................8

*Car-Freshner Corp. v. S.C. Johnson & Son, Inc.*, 70 F.3d 267 (2d Cir. 1995)..........................15

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).............................................................16

*Cincinatti v Discovery Network Inc.*, 507 US 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993).........................................................................................................17

*Collas v. Brown*, 211 Ala. 443, 100 So. 769 (1924) ...................................................................12

*Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.*, 125 F.3d 28 (2d Cir. 1997) .........................................................................................................15

*Cowley v. Anderson*, 159 F.2d 1 (10th Cir. 1947) ......................................................................22

*De Long Corp. v. Lucas*, 278 F.2d 804 (2d Cir. 1960) ...............................................................21

*Dolby v. Robertson*, 654 F.Supp. 815 (N.D.Cal. 1986) .........................................................14,15

*Edenfield v. Fane*, 507 U.S. 761, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993)...............................17

*44 Liquimart v Rhode Island,* 517 US 484, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996)...............17

*First Keystone Fed. Sav. Bank v. First Keystone Mortgage, Inc.*, 923 F.Supp. 693 (E.D.Pa.1996)...........................................................................................

*Haagen-Dazs, Inc. v. Frusen Gladje Ltd., A.B.*, 493 F.Supp. 73, (S.D.N.Y. 1980) ...................20

*Herman Miller v. Palazzetti Imports & Exports*, 270 F.3d 298 (6th Cir. 2001)..........................15

*H.H. Skinner v. Annie Oakes*, 10 Mo. App. 45 (1881) .................................................................8

*In re R.M.J.*, 455 U.S. 191, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982)..............................................17

*Johanna Farms, Inc. v. Citrus Bowl, Inc.*, 468 F.Supp. 866 (D.C.N.Y. 1978)............................20

*Karsh v. Heiden*, 120 Call. App. 2d 75, 260 P.2d 633 (1st Dist. 1953) ........................12

*Keiser v. Walsh*, 118 F.2d 13 (D.C. App. 1941) ........................................................22

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 125 S.Ct.
542, 550-51, 160 L.Ed.2d 440 (2004)..........................................................................14,15

*Lang v. Retirement Living Pub. Co., Inc.*, 949 F.2d 576 (2d Cir. 2001)..........................

*Levitt Corp. v. Levitt*, 593 F.2d 463 (2d Cir. 1979) ....................................................10

*Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814 (2d Cir. 1986) ........................ *passim*

*Mattel, Inc. v. Azrak-Hamway Int'l, Inc.*, 724 F.2d 357 (2d Cir. 1983) ........................15

*Morningside Group Ltd. v. Morningside Capital Group*, No. 96 Civ. 466 (AHN), 1997
WL 631032 (D.Conn. Sept. 24, 1997)...........................................................................

*Morton Salt Co. v. G.S. Suppiger Co.*, 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942) ..........20

*Nike v. Kasky*, 539 U.S. 654, 123 S. Ct. 2554, 156 L. Ed. 2d 580 (2003) ....................16

*Nippon v. Leslie Fay Cos., Inc.*, 216 B.R. 117 (Bankr. S.D.N.Y. 1997) ........................23

*Peel v. Attorney Registration & Disciplinary Comm'n of Ill.*, 496 U.S. 91, 108, 110
S.Ct. 2281, 2292, 110 L.Ed.2d 83 (1990)....................................................................17

*Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989)........................................................17

*Robin Woods, Inc. v. Robin F. Woods*, 815 F.Supp. 856 (W.D.Pa. 1992).........................8

*Salzman v. Siegelman*, 102 A.D. 406, 92 N.Y.S. 844 (2d Dept. 1905) ........................23

*Timm Med. Techs., Inc. v. Soma Blue, Inc.*, No. 99 Civ. 2011, 2002 WL 64456
(D.Minn. Jan. 15, 2002).............................................................................................11

*United States v. Turkette*, 452 U.S. 576, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981) ..................22

*World Auto Parts, Inc. v. Labenski*, 217 A.D.2d 940, 629 N.Y.S.2d 896
(4th Dept. 1995)..........................................................................................................21,23

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626,
105 S.Ct. 2265, 85 L.Ed.2d 652 (1985).......................................................................17

## STATUTES AND OTHER RESOURCES

Article III of the United States Constitution .................................................................................12

First Amendment to the United States Constitution .............................................................. *passim*

15 U.S.C. § 1115................................................................................................................ *passim*

15 U.S.C. § 1127................................................................................................................................7

12 *Moore's Federal Practice*, § 57.02[3] (Matthew Bender 3d Ed. 1997) .................................13

## PRELIMINARY STATEMENT

Defendants and Counterclaim Plaintiffs Joseph Abboud, Houndstooth Corp. and Herringbone Creative Services, Inc. (collectively "Abboud"), by their attorneys Arnold & Porter LLP, submit this Pretrial Memorandum of Law to acquaint the Court with the critical issues to be addressed at trial; and, to counter the diversionary assertions that have been made by Plaintiff and Counterclaim Defendant JA Apparel Corp. ("JA Apparel").

This lawsuit involves the First Amendment rights of the renowned fashion designer, Joseph Abboud, to use his personal name, other than as a trademark, to identify himself; to symbolize his personal talent, skill and artistic ability; and, to signify his professional accomplishment and reputation, in truthful and valuable commercial communications that inform the trade and consumers that Abboud is the designer of the apparel products he plans to market and sell under his "jaz" trademark.

Contrary to the assertions of JA Apparel, while Abboud agreed to assign his license agreements and trademarks, including his JOSEPH ABBOUD mark, to JA Apparel in the parties' June 16, 2000 Purchase and Sale Agreement (the "Purchase and Sale Agreement"), and subsequently assigned his license agreements and trademarks by means of delivering express written assignments to JA Apparel on July 13, 2000 (the "Assignments"), the closing date of the transaction, he did *not* agree to sell, transfer or assign, nor did he sell, transfer or assign, the *exclusive* right to use his personal name, persona, accomplishments and reputation.

Further, contrary to JA Apparel's assertions, trademark law, as embodied in the "fair use" provision of the Lanham Act, 15 U.S.C. § 1115(b)(4), expressly provides for and permits Abboud to exercise his First Amendment right of commercial communication to convey to the trade and the consuming public truthful and valuable commercial information, namely that he is

1

the designer of the apparel products that he intends to market and sell to them under his "jaz"

trademark.

Finally, contrary to JA Apparel's assertions, Abboud did *not* waive, forfeit or forego his

First Amendment rights to commercial communication by transferring to JA Apparel an

*exclusive* right to use his personal name; or, by contracting never to use his personal name; or, by

committing to a lifetime restrictive covenant on his ability to compete with JA Apparel in the

marketplace.

## STATEMENT OF FACTS

Abboud has devoted his entire professional career in the fashion industry to developing

his individual talents, skills and artistic abilities as a designer of apparel products. Among

Abboud's numerous professional awards, include: the Cutty Sark award for Most Promising

Menswear Designer; the Council of Fashion Designers award for Menswear Designer of The

Years in 1989 and 1990; the Neckwear Association award for Special Achievement; and, a

Commerce Department award in 1995 from then Commerce Secretary Ron Brown. Abboud has

served as a fashion expert in the national media; he has authored numerous articles on fashion

design and the fashion industry; and, he has appeared as a celebrity designer at many public

events and charitable programs. Thus, Abboud has achieved widespread public recognition as an

accomplished fashion designer. *See* Def. Proposed Findings of Fact at ¶¶1-26.

After launching his first menswear line under the JOSEPH ABBOUD trademark in 1987,

Abboud and GFT International B.V., a Netherlands corporation ("GFT"), which owned and

operated a tailored clothing manufacturing facility in New Bedford, Massachusetts, formed JA

Apparel, a joint venture to manufacture, market and sell apparel that Abboud designed under the

JOSEPH ABBOUD trademark, then licensed to JA Apparel. In 1996 GFT wanted sole control

over the joint venture, so JA Apparel bought-out Abboud's interest in exchange for new licenses to use the JOSEPH ABBOUD trademark on certain menswear products that it continued to manufacture, market and sell. Thereupon, Abboud formed Joseph Abboud Worldwide Inc., to serve as his design company; to manage his licensees; and to develop other licensing opportunities. *See* Def. Proposed Findings of Fact at ¶¶27-35.

However, several years later, the Italian owners of GFT made a strategic decision to sell JA Apparel along with its tailored clothing manufacturing facility in New Bedford, Massachusetts. To enhance their sale, they had JA Apparel purchase Abboud's license agreements as well as the trademarks owned by Abboud, including the JOSEPH ABBOUD mark. These "assets" were transferred by means of express written Assignments duly delivered by Abboud to JA Apparel on July, 13, 2000. Having acquired Abboud's license agreements and trademarks by means of the Assignments; and, having secured a five year Personal Services Agreement and a two year restricted covenant from Abboud, in 2003 GFT's Italian owners sold JA Apparel to J.W. Childs Equity Investors for $73 million.

In spring 2005 Abboud notified JA Apparel that he would depart the company at the end of his Personal Services obligation on July 13, 2005. Abboud's notice created a public relations crisis at JA Apparel that triggered its unlawful, deceitful and fraudulent publicity campaign to usurp, convert and misappropriate Abboud's personal name, persona, accomplishments and reputation as a world renowned fashion designer for its own commercial use and benefit by creating the false and misleading impression among consumers that Abboud was still affiliated with JA Apparel; and/or, that Abboud was still involved in the design of its apparel products. Moreover, not only did JA Apparel's unlawful publicity campaign misappropriate Abboud's publicity rights, as protected by, *inter alia*, the New York Civil Rights law, but it constituted a

3

fraud on the public that has created the very potential for confusion that JA Apparel now tries to attribute to Abboud's legitimate and lawful use of his personal name to identify himself as the designer of the apparel products he plans to market and sell under his "jaz" trademark.

Once Abboud departed JA Apparel he was then subject to a two year restrictive covenant that prevented him from competing with JA until July 13, 2007. Thereafter, on July 31, 2007, Abboud held a press conference to announce that he would launch a new menswear line in fall 2008 under his "jaz" trademark; and, that he would acquire new companies and work with new licensees to assist him in the development of his "jaz" menswear business. In making his announcement, Abboud made it clear to the press that while he may use his name in promotional and advertising materials to inform consumers that he was the creative force behind the "jaz" products, he would *not* use his name as a trademark on products, packaging or labels. Nevertheless, as Abboud struggled to steer clear of conflict with JA Apparel, JA Apparel used the press conference as a pretext for filing this lawsuit in order to disrupt, deter and/or destroy Abboud's new business venture.

On September 4, 2007, upon the recommendation of JA Apparel's investment advisors at J.W. Childs Associates, JA Apparel filed its Complaint against Abboud claiming that Abboud breached the terms of the Purchase and Sale Agreement and the Personal Services Agreement; and, otherwise infringed upon its JOSEPH ABBOUD marks by proposing to make use of his personal name in connection with his "jaz" line. However, these claims have no merit, because, notwithstanding JA Apparel's erroneous interpretation of the terms of the Purchase and Sale Agreement, as a matter of law, Abboud's transfer of his marks and licenses to JA Apparel is governed by the terms and conditions of the express written Assignments he delivered to JA Apparel on July 13, 2000, and not by the terms of the Purchase and Sale Agreement. Further, as

4

the Court can readily determine from the clear and unambiguous language in the express written Assignments that Abboud delivered to JA Apparel on July 13, 2000, Abboud only assigned his license agreements and trademarks: he did *not* assign or transfer any *exclusive* right to use his personal name. Thus, Abboud has the legal right under the terms of the Purchase and Sale Agreement and the Assignments, as well as the "fair use" provision of the Lanham Act, 15 U.S.C. § 1115(b)(4), and the First Amendment protection afforded commercial speech, to take advantage of and trade upon his personal name, accomplishments and reputation in order to identify himself as the designer of his new "jaz" product line.

## ARGUMENT

## I.    THE COURT SHOULD DISMISS JA APPAREL'S CLAIMS FOR BREACH OF THE PURCHASE AND SALE AGREEMENT

The thrust of JA Apparel's breach of contract argument is that, by virtue of the Purchase and Sale Agreement, Abboud explicitly sold to JA Apparel the exclusive right to use Abboud's name, not only as a trademark, but in any conceivable way, shape or form it might desire to use his name, including as a trade name for its business and/or an identification of Abboud as the designer of its products. As a result, JA Apparel argues that the Purchase and Sale Agreement precludes Abboud from using his name in connection with his new "jaz" menswear business.[1] However, JA Apparel's argument wholly ignores the fact that the Purchase and Sale Agreement was merely an agreement on Abboud's part to deliver and/or convey certain assets at the Closing of the transaction. Therefore, while the Court might look to the language of the Purchase and

---

[1] Defendants refer the Court to their Proposed Findings of Fact and Conclusions of Law, as well as in their Memorandum of Law in Support of the Cross-Motion for Judgment on the Pleadings, have set forth their arguments as to why the clear language of the Purchase and Sale Agreement does not support JA Apparel's reading of that Agreement. *See* Def. Proposed Findings at ¶¶57-78; Def. Proposed Conclusions at ¶¶41-48; Memorandum of Law in Support of Judgment on the Pleadings at pp. 3-10.

Sale Agreement, it must be guided by the Assignments that Abboud actually conveyed to JA Apparel at the Closing Date for the transaction to determine what assets Abboud transferred to JA Apparel.

Accordingly, the Court must determine whether, on July 13, 2000, when Abboud delivered to JA Apparel the Assignment of specific "trademarks and service marks", identified by their registration numbers on the Schedule A attached thereto, such Assignment included Abboud's explicit transfer of the exclusive right to use his personal name, even as against himself; and, the right to use Abboud's personal name in JA Apparel's business, including the right to use his personal name to identify its business, *i.e.*, as a trade name, and the right to use Abboud's name to trade upon his personal talent, skill, artistic ability, professional accomplishments and reputation for JA Apparel's own commercial advantage and benefit. *See,* Def. Ex. 180. If Abboud did not, (and he clearly did not, as there was no explicit mention of any exclusive right to use Abboud's personal name in the Assignment or on Schedule A attached thereto), then Abboud has the right to use his name to identify himself in business and to communicate to the public the truthful and valuable commercial information that he is the creative force behind his new "jaz" menswear line, so long as he uses his name as a descriptive term in an informative message, and not as a trademark. Indeed, Abboud's right to so communicate with the public at large is protected both by the "fair use" provision of the Lanham Act, 15 U.S.C. § 1115(b)(4); and, by his First Amendment right to communicate commercial speech.

As regards the issue of whether or not Abboud explicitly assigned the exclusive right, even as against himself, to use his name to identify himself and his widespread reputation as a fashion designer, when he assigned his rights to the JOSEPH ABBOUD *trademark* on July 13,

6

2000, the law in this Circuit is crystal clear.  The leading case, *Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814 (2d Cir. 1986), recognizes that an individual's right to use his personal name in business is inviolate, unless an *exclusive* right is *clearly* assigned by contract.  In short, *Madrigal Audio Labs.*, stands for the clear and unequivocal proposition that "[w]hen an individual sells no more than the right to use his name as a trade name or trademark he is precluded only from using his personal name as part of that of another company or on other products." *Madrigal Audio Labs.*, 799 F.2d at 823.  Further, recognizing that even when a personal name has become a trademark, that is, a "name. . . . used by a person. . . . to identify or distinguish his goods. . . from those manufactured or sold by others and to indicate the source of the goods. . . ." (15 U.S.C. 1127), the Second Circuit in *Madrigal Audio Labs.* found that a personal name can also "serve the important function to its bearer of acting as a symbol of that individual's personality, reputation and accomplishments", as distinguished from the products bearing his trademarked name. *Madrigal Audio Labs.*, 799 F.2d at 825.  Thus, according to the Court in *Madrigal Audio Labs.*, although "an individual may sell the right to use his personal name, a court will not bar him from using that name to identify himself in business, unless his 'intention to convey an exclusive right to the use of [his] own name' is clearly shown." *Id.*, at 822.

Thus, the only way JA Apparel can preclude Abboud from using his personal name, otherwise than as a mark, in connection with his new "jaz" business, is if it can show that on July 13, 2000, Abboud not only assigned the right to use his personal name as a trademark, but also, that he clearly assigned the exclusive right to use his name to identify himself in business, "exclusive" meaning even as against himself.  If JA Apparel cannot clearly show such assignment, (and it cannot), Abboud then has the right, under the "fair use" provisions of the

7

Lanham Act and the First Amendment, despite any potential "confusion" that may result from his informing the trade and the consuming public that he is the creative force behind his new "jaz" line; and/or from trading upon his name as the symbol of the formidable reputation, celebrity and persona he has worked so hard to develop over the last 30 years. Here, the Assignments, which speak for themselves, clearly do not manifest, or even mention, any exclusive right to the use of Abboud's personal name.

Furthermore, aside from the conspicuous absence of any exclusive right to use Abboud's personal name in the Assignments, it is important to note that any such assignment with respect to a name that embodies personal good will would be void as a fraud on the public. *Madrigal Audio Labs.,* 799 F.2d 814 at 825, fn.5; *Robin Woods, Inc. v. Robin F. Woods*, 815 F.Supp. 856, 874 (W.D.Pa. 1992) (finding that "the Company has no right to cloak with secrecy the fact that Mrs. Woods is no longer associated with it, nor does it possess the right to represent that it retains her services, and it would be at least misleading were the Company to make such representations to the public"); *Buffalo Oyster Co. v. Nenno*, 132 Misc. 213, 229 N.Y.S. 210 (N.Y.Sup. 1928) (noting that the plaintiff could not do anything to lead the public to believe that the defendant was in any way connected with the business of the plaintiff); *H.H. Skinner v. Annie Oakes*, 10 Mo. App. 45, 56-57 (1881).

Finally, it is important to note that in the Personal Service Agreement, which accompanied the Assignment of trademarks and was also signed and delivered to JA Apparel on July 13, 2000, Abboud expressly reserved unto himself the right to use, develop and exploit his own name and reputation as an expert in the fashion industry. Thus, any assignment of the exclusive right to use Abboud's name would have been wholly inconsistent with Abboud's rights under the Personal Services Agreement.

With no legitimate, linguistic, logical or legal way to interpret the Assignments delivered on July, 13, 2000, JA Apparel would have this court imply Abboud's assignment of an exclusive right to his name from the fact that he was paid $65.5 million for his license agreements and trademarks. However, the amount of money Abboud was paid has nothing to do with what he assigned in an arms-length transaction duly negotiated between sophisticated parties represented by legal counsel, particularly in light the Second Circuit's decision in *Madrigal Audio Labs.*, which determines that an exclusive right to the use of an individual's personal name must be "clearly shown" and *not implied* from the contract of sale. Notwithstanding the irrelevance of JA Apparel's implication argument, it is appropriate to point out that the numerous license agreements that Abboud assigned to JA Apparel at the Closing were generating approximately $7 million per year. Thus, the majority of the $65.5 million represented the future value of the license agreements that Abboud assigned and not the trademarks.

Further, the conduct of JA Apparel following the execution of the Purchase and Sale Agreement and the Closing is compelling evidence that JA Apparel understood that what it had acquired in the transaction where the license agreements and trademarks that Abboud owned. For example, in a July 16, 2000, press release, approved by the parties on the day the Purchase and Sale Agreement was signed, the following statement was made:

> GFT Net (HdP) and Joseph Abboud have announced that they have signed a contract for *the acquisition of GFT Net of all the trademarks and licensing contracts with the name of Joseph Abboud.*
>
> Joseph Abboud is an award-winning American designer, whose talent and distinctive point of view have earned him accolades on an international basis.
>
> GFT Net, is currently licensed to produce and distribute the Men's formal, sportswear and golf lines with the trademark Joseph Abboud through JA Apparel, a company controlled by GFT USA. With this agreement, GFT Net sets the objective of further reinforcing its existing activity and developing new product

9

lines in new markets, within a global strategy.

On the basis of a signed contract, *GFT Net will acquire the trademarks and licensing agreements registered in the name of Joseph Abboud and his company Houndstooth Corp. for a compensation of $65 million.* The acquisition will be carried out during the month of July, once the necessary approvals have been attained by anti-trust authorities.

For GFT Net, *the acquisition of one of the most successful U.S. trademarks* of the last few years, with total sales estimated over $250 million, represents a significant step in their own strategy, to be realized both by external growth as well as by maximizing the value of the trademarks in their portfolio.

Def. Ex. 179 (emphasis added). Further, in another press release dated July 6, 2000 JA Apparel announced that "*[u]nder the terms of the acquisition, Hdp purchased all existing trademarks and licensing agreements and all future trademarks bearing the Joseph Abboud name.*" Def. Ex. 14 (emphasis added); *see also* Def. Proposed Findings at ¶¶86 -95; Def. Proposed Conclusions at ¶¶49-51.

Finally, while JA Apparel likes to cite *Levitt Corp. v. Levitt*, 593 F.2d 463 (2d Cir. 1979), a case decided by the Second Circuit seven years before *Madrigal Audio Labs.*, in support of its position that it somehow acquired the exclusive right to use Abboud's name in any way, shape or form, the decision in *Levitt Corp.*, is inapposite. A close reading of *Levitt Corp.* makes clear that the case actually supports Abboud's position. In *Levitt Corp.*, unlike in *Madrigal Audio Labs.*, or the instant case, William Levitt, the developer of "Levittown", in addition to selling the marks and trade names incorporating his own last name "Levitt", "explicitly acknowledged that he does not have any right to use the name "Levitt" as a corporate title, trademark or trade name in the construction business." *Levitt Corp.*, 593 F.2d at 466. The agreement also specifically provided that although Levitt retained the right to use his own personal name publicly as a corporate officer or director of a business enterprise, he did so "only to the extent that such use would not

be likely to create confusion with a corporate title, trademarks, or trade names of Levitt & Sons, Inc". *Id.*, at 466.

However, Levitt soon violated his agreement, and, when challenged, entered into a settlement which provided that "any future breaches of contract would subject him to both injunctive relief and liquidated damages." *Id.* When Levitt again breached his agreement by, among other things, using the trademark "Levittown" to describe a new real estate project as "Levittown, Florida," and the trade name "Levitt" to describe his new business, "Levitt & Sons", the court entered a preliminary injunction that prevented Levitt from publicizing his participation in his new Florida real estate venture for two years; and, from "publicizing [his] prior connection with Levitt & Sons and its related corporations." *Id.*, at 467. Significantly, the Court did *not* enjoin Levitt from all future use of his name in connection with his other, *i.e.*, non-Florida, real estate projects; or, from promoting and or advertising his affiliation and involvement with such other real estate projects. Therefore, because Abboud has not used his name as a trademark and does not intend to use his name as a trademark, as Levitt did, the decision in *Levitt Corp.* cannot serve as any precedent for the instant case.

In sum, because there is nothing in the Purchase and Sale Agreement or in any of the Assignments Abboud delivered to JA Apparel at the Closing to *show*, let alone *clearly show,* that Abboud had any intention to assign to JA Apparel the *exclusive* right to use his name other than as a trademark, Abboud has the right to use his name to identify himself and to "tak[e] advantage of his individual reputation" in his new business venture in which he plans to market and sell products that he has designed and/or approved under his "jaz" trademark. *See, e.g., Madrigal Audio Labs.,* 799 F.2d 814, 825; *Timm Med. Techs., Inc. v. Soma Blue, Inc.,* No. 99 Civ. 2011,

11

2002 WL 64456, at *6 (D.Minn. Jan. 15, 2002); *Karsh v. Heiden*, 120 Cal. App. 2d 75, 82, 260

P.2d 633, 637 (1953); *Collas v. Brown*, 211 Ala. 443, 100 So. 769 (1924).

## II.   THE COURT SHOULD DISMISS JA APPAREL'S CLAIMS FOR TRADEMARK INFRINGEMENT, FALSE DESIGNATION OF ORIGIN, TRADEMARK DILUTION AND UNFAIR COMPETITION.

Once it is determined that Abboud did not assign to JA Apparel the exclusive right to use

his name in business, even as against himself, the court must then address the issue of whether

there are any restraints on how Abboud can use his name in connection with his new "jaz"

menswear business.  That issue, also, is addressed in *Madrigal Audio Labs.*, which makes clear

that so long as Abboud only uses his name to identify himself personally; to refer to his own

talents, skills and artistic abilities; and to signify his reputation as a designer of apparel products,

his use is completely protected under the law.  As indicated in *Madrigal Audio Labs.*, "[w]hen an

individual sells no more than the right to use his name as a trade name or trademark. . . . [he is

not precluded] from taking advantage of his individual reputation (as opposed to the reputation

of the company which bore his personal name as a trade name) by establishing a company [or a

brand] which competes against the purchaser of the trade name [or trademark]." *Madrigal Audio

Labs.*, 799 F.2d 814, 825.  Moreover, when it comes to advertising, the seller may use his name

in advertising, and indicate that he is affiliated with the new company or brand, so long as he

does so "in a not overly intrusive manner."  *Id.*, at 823.

Significantly, to date Abboud has done nothing to publicly advertise his affiliation with

his new "jaz" brand; so any ruling on a hypothetical use or advertisement of Abboud's personal

name would constitute an advisory opinion and thereby an impermissible extension of this

Courts jurisdiction under Article III of the United States Constitution.  In this regard, it is

important to note that while JA Apparel attempts to trumpet a tag line using Abboud's personal

12

name in one or more mock-up advertisements that a then prospective licensee, Jack Victor, Ltd., had prepared and submitted to Abboud for legal review and approval last September, all such legal review and approval was held in abeyance pending the outcome of this lawsuit. Thus, while it might be interesting to obtain some judicial advisory opinions on proposed advertisements that Abboud has not reviewed; has not approved; and has not placed in any advertising media, such advisory opinions on an unripe, speculative and/or hypothetical set of facts are well beyond the scope of this Court's jurisdictional authority over "cases and controversies"; and, wholly inappropriate as the basis for awarding any kind of equitable relief. 12 *Moore's Federal Practice*, § 57.02[3] at 57-10 (Matthew Bender 3d Ed. 1997).

However, Abboud does intend to advertise, "in a not overly intrusive manner", that he is the designer of his "jaz" menswear line, in order to communicate to the trade and public this truthful and valuable commercial information. Abboud has already indicated that he has not and will not use his name as a trademark and that he has not and will not make any reference, in advertising or otherwise, to his former association with JA Apparel or its "Joseph Abboud" brand. Thus, by definition, under *Madrigal Audio Labs.*, Abboud's proposed use of his personal name would not be "overly intrusive."

Unfortunately, JA Apparel tries to obfuscate, obscure and/or obliterate Abboud's legal right to use his name by invoking a "likelihood of confusion" analysis, that plays no part with regard to Abboud's "fair use" of his personal name under the Lanham Act (15 U.S.C. § 1115(b)(4)) or his communication of truthful and valuable commercial information to the trade and consuming public under the First Amendment. In short, to achieve its own misguided and unlawful ends, JA Apparel resorts to means that are both statutorily and constitutionally corrupt.

13

Specifically, recognizing that the right to use one's name in business in a non-trademark, descriptive manner is sacrosanct, the Lanham Act provides an absolute defense to a claim for trademark infringement (*i.e.*, a likelihood of confusion as to source), when an individual uses his personal name in connection with his own business:

> Such conclusive evidence of the right to use the registered mark. . . shall be subject to the following defenses or defects:
>
>    *  *  *
>
> That the use of the name. . . charged to be an infringement is a use, *otherwise than as a mark, of the party's individual name in his own business. . . .*

15 U.S.C. § 1115(b)(4) (emphasis added); *see also Dolby v. Robertson*, 654 F.Supp. 815 (N.D.Cal. 1986).

In addition to absolutely protecting an individual's right to use his personal name in business, even when his personal name is also someone else's trademark, the use of a "term, or device", otherwise than as a mark, "which is descriptive of and used fairly and in good faith only to describe the goods or services of such party" is also protected under the "fair use" provision of the Lanham Act. 15 U.S.C. § 1115(b)(4). While, notably, the requirement that the use be "descriptive of" and be "fair and in good faith" *does not apply to the use of one's name* (the ability to make such use being inviolate), Abboud meets the fairness test as well, because, he only intends to use his name "descriptively" and in "good faith" to identify himself and his role as the designer of his new "jaz" product line. *See* Proposed Conclusions of Law at ¶¶94-104.

This principle is discussed by the Supreme Court in *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 125 S.Ct. 542, 550-51, 160 L.Ed.2d 440 (2004).  In *KP Permanent Make-Up, Inc.*, in a case involving the defendant's use of a registered trademark in a descriptive manner, the Supreme Court held that a "fair use" under the Lanham Act may be

14

made regardless of the likelihood of confusion as to source. In so holding, the Court noted that "[i]f any confusion results, that is a risk the plaintiff accepted when it decided to identify its product with a well-known descriptive phrase." *KP Permanent Make-Up, Inc*, 543 U.S. at 121-23. Similarly, in acquiring a trademark that is also a person's name, which that person has an inviolate right to use in business under the "fair use" provision of the Lanham Act, JA Apparel assumed the risk that Abboud would do so (and, in fact, as the evidence will show, it knew all along that he would do so), and also the risk that "confusion" might result from such use. *Dolby*, 654 F.Supp. 815 (finding that defendant could make a non-trademark "fair use" use of his stage name "Thomas Dolby" even though it may be likely to confuse consumers); *Herman Miller v. Palazzetti Imports & Exports*, 270 F.3d 298 (6th Cir. 2001) (finding, in a personal name case, that the "descriptive primary meaning is always available for use by others to describe their goods, in the interest of free competition"); *see also Car-Freshner Corp. v. S.C. Johnson & Son, Inc.*, 70 F.3d 267, 269-70 (2d Cir. 1995) (determining that "the public's right to use descriptive words or images in good faith in their ordinary descriptive sense must prevail over the exclusivity claims of the trademark owner"); *Mattel, Inc. v. Azrak-Hamway Int'l, Inc.*, 724 F.2d 357, 361 (2d Cir. 1983) (noting that the fair use defense "allows a competitor to use another's registered trademark to describe aspects of one's own goods"). Put another way, as the Supreme Court stated in *KP Permanent Make-Up, Inc.*, "the defendant has no independent burden to negate the likelihood of any confusion in raising the fair use defense." Indeed, "some possibility of consumer confusion must be compatible with fair use." *KP Permanent Make-Up, Inc*, 543 U.S. at 121-23; *see also Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.*, 125

15

F.3d 28, 30-31 (2d Cir. 1997) (noting that the fair use defense may succeed even if there is a likelihood of confusion).[2]

Moreover, Abboud's right to use his personal name in business, and to communicate to consumers and the trade the truthful and valuable commercial information that he is the designer and creative force behind his "jaz" product line, is also protected under the First Amendment as "commercial speech". *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N. Y.*, 447 U.S. 557, 563, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). Commercial speech is speech that "does no more than propose a commercial transaction". *Nike v. Kasky*, 539 U.S. 654, 123 S. Ct. 2554, 156 L. Ed. 2d 580 (2003). That is exactly what Abboud proposes to do, that is, communicate, in traditional promotional and advertising media, truthful and valuable commercial information to the trade and consumers, including the message that he is the designer of his "jaz" product line.

---

[2] It should be noted that all of the instances of so-called "actual confusion" raised by JA Apparel took place in the late Summer and early Fall of 2007, in relation to articles appearing in the press announcing Abboud's launch of his new "jaz" menswear line in Fall 2008 and/or his acquisition of a shirt manufacturing facility located in Fall River, Massachusetts. At the time, Abboud was not marketing and/or offering for sale any "jaz" products and, as such, there could not have been any instances of actionable confusion, *i.e.*, instances were a consumer or retailer made a mistaken purchasing decision. Moreover, it should be noted that since Abboud began marketing and offering for sale his "jaz" line, in late 2007, there has not been one incident of trade or consumer confusion. Accordingly, JA Apparel's alleged evidence of actual confusion should be precluded by the Court as it is not competent evidence of actual confusion. *See, e.g., Lang v. Retirement Living Pub. Co., Inc.*, 949 F.2d 576, 582-83 (2d Cir. 2001) (noting that the relevant confusion in cases under the Lanham Act is that which affects "the purchasing and selling of the goods or services in question", *i.e.*, that "trademark infringement protects only against mistaken purchasing decisions and not against confusion generally"); *Morningside Group Ltd. v. Morningside Capital Group*, No. 96 Civ. 466 (AHN), 1997 WL 631032 at *5-6 (D.Conn. Sept. 24, 1997) (noting that evidence of "four individuals who mistakenly called [plaintiff to congratulate it] on a recent acquisition" was not the type of actual confusion actionable under the Lanham Act); *First Keystone Fed. Sav. Bank v. First Keystone Mortgage, Inc.*, 923 F.Supp. 693, 705 (E.D.Pa.1996) (citing *Lang* and holding that the plaintiff failed to make a showing of actual confusion where there was only evidence that some consumers called the plaintiff thinking it was the defendant and no evidence that any consumer mistook the defendant for the plaintiff in making a mortgage application); *see also Biosafe-One, Inc. v. Hawks*, 524 F.Supp.2d 452, 465 and fn.6 (S.D.N.Y. 2007) (finding that were plaintiff failed to introduce an affidavit from the person who was allegedly confused, "[p]laintiffs' conclusory statements that consumers are confused do not prove actual confusion").

16

When commercial speech is at issue, the First Amendment's purpose is to protect the consumer's interest in the free flow of valuable commercial information. *See, e.g., Edenfield v. Fane*, 507 U.S. 761, 766, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993) (noting that "First Amendment coverage of commercial speech is designed to safeguard" society's "interes[t] in broad access to complete and accurate commercial information"). Because "disclosure of truthful, relevant information is more likely to make a positive contribution to decision making than is concealment of such information," *Peel v. Attorney Registration & Disciplinary Comm'n of Ill.*, 496 U.S. 91, 108, 110 S.Ct. 2281, 2292, 110 L.Ed.2d 83 (1990), only false, deceptive, or misleading commercial speech may be banned. *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 638, 105 S.Ct. 2265, 2275, 85 L.Ed.2d 652 (1985). Thus, to the extent a Court is called upon to resolve a conflict between the right to free expression and any possible confusion that expression may engender, the First Amendment requires the Court to balance those rights, but, in doing so, it tolerates a certain amount of confusion. *See, e.g., Better Business Bureau of Metro. Houston, Inc. v. Med. Directors, Inc.*, 681 F.2d 397, 405 (5th Cir. 1982) (finding that the appropriate constitutional response to such potential confusion "is not less speech, but more speech"); *Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir. 1989). Accordingly, in striking the appropriate balance between the constitutional right to provide consumers truthful and valuable commercial information in advertising, and the possibility that uninformed consumers might be confused, the Court must *narrowly tailor* the balance to protect the commercial speech. *In re R.M.J.*, 455 U.S. 191, 203, 102 S.Ct. 929, 937, 71 L.Ed.2d 64 (1982); *see also Cincinatti v Discovery Network Inc.*, 507 US 410, 418, n.13, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993) (eschewing rational basis analysis in favor of "alternative, less drastic measures" for regulating commercial speech); 44 *Liquimart v Rhode Island,* 517 US 484, 522-

17

23, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996) (Thomas, J. concurring) (that there is "no

constitutional basis for permitting government to keep citizens ignorant as a means of

manipulating their choices in the *commercial* or *political* marketplace.") (emphasis added). This

constitutional approach to dealing with commercial communication is, of course, a far cry from

the unconstitutional *sweeping* injunctive relief that JA Apparel seeks from this Court.

     In sum, by having failed to acquire the exclusive right to use Abboud's name in business,

Abboud is legally entitled to make a "fair use" of his personal name, other than as a trademark,

and he is protected from claims of infringement under the Lanham Act, or on any other common

law claim for unfair competition, dilution or otherwise; and, he is protected against any judicial

action banning his commercial speech under the First Amendment.

**III.     JA APPAREL IS BARRED FROM ANY EQUITABLE RELIEF ON ITS CLAIMS
OF TRADEMARK INFRINGEMENT, FALSE DESIGNATION OF ORIGIN,
TRADEMARK DILUTION AND UNFAIR COMPETITION BY ITS OWN
UNCLEAN HANDS.**

     Aside from the foregoing legal arguments, there is yet another reason why JA Apparel's

aforesaid claims must be dismissed; and that is because the evidence at trial will show that over

the last two years, ever since Abboud departed JA Apparel, the company has systematically

engaged in a course of conduct, including a series of very public advertising and marketing

campaigns, designed to deceive, defraud and otherwise mislead consumers into believing that

Abboud is still associated with JA Apparel and still designing "Joseph Abboud" brand clothing.

*See*, Def. Proposed Findings at ¶¶139-150.  This illicit, illegal and inequitable campaign has

caused, created and perpetuated the very potential confusion that JA Apparel claims would exist

if Abboud was allowed to use his personal name in connection with his "jaz" menswear line.  In

short, JA Apparel has abused its trademark rights so as to create potential confusion between

itself and Abboud the designer and thus by means of its own "unclean hands" has foreclosed itself from seeking any equitable relief against Abboud. *See, e.g., Madrigal Audio Labs.*, 799 F.2d 814, 825 at fn.5 (noting that a purchaser of a trade name and/or trademark consisting of a personal name from an individual, commits a fraud on the public if the purchaser represents itself as possessing the personal goodwill (*i.e.*, his skill) of the individual); *see also* Def. Proposed Conclusions of Law at ¶¶120-126.

Specifically, JA Apparel has, since Abboud let the Company in July 2005, repeatedly referred to itself in the press, promotional materials and even on the telephone as the "Joseph Abboud Company", even though it never obtained any assignment of the right to use "Joseph Abboud" as a trade name. Moreover, over that same time period, JA Apparel has repeatedly referred to "JOE" or "JOSEPH" or "JOSEPH ABBOUD", as a person, and not as a trademark, in the press, promotional materials and its web sites. Obviously, there is only one person named "Joseph Abboud", the well-known designer Joseph Abboud; so JA Apparel's misconduct and unlawful use Abboud's personal name constitutes a free riding on Abboud's personal goodwill and reputation, which he deliberately reserved to himself in the Personal Services Agreement; and, a blatant effort to create the very confusion it now seeks to protect against.[3]

As Abboud's reputation is so widespread, it is not surprising that JA Apparel has engaged in these unlawful tactics , particularly as over the last two years, its business has been in precipitous decline. Indeed, as the evidence will show, in 2007 JA Apparel was so desperate to connect its brand of Joseph Abboud apparel products with the designer Joseph Abboud, that it

---

[3] The unlawful acts of JA Apparel and its CEO, Counterclaim Defendant Martin Staff, from the time Abboud left JA Apparel in July 2005 to present, as set forth more fully in Defendants' Proposed Findings of Fact at ¶¶139-151, form the basis of Abboud's counterclaims. *See* Proposed Conclusions of Law at ¶¶185-248.

felt the need to *approach Abboud and pay him for the opportunity to become either a licensee or a sponsor of JA Apparel's products,* despite its position in this case is that it already owns Abboud's name and persona.  Here, JA Apparel's own internal conduct constitutes a powerful admission that its present claims are meritless.

In addition to forming the basis for Abboud's counterclaims (*See* Proposed Conclusions of Law at ¶¶185-248), such conduct on the part of JA Apparel constitutes unclean hands.  As it is seeking equitable relief in this case, namely a complete injunction against any use by Abboud of his personal name in business, in any way, shape or form, JA Apparel must come to the courthouse with pristine hands.  Instead, it comes having engaged in a series of dirty tactics designed to strip Abboud of his own identity, before the expiration of his restrictive covenant. *See, e.g., Haagen-Dazs, Inc. v. Frusen Gladje Ltd., A.B.*, 493 F.Supp. 73, 75-76 (S.D.N.Y. 1980); *Johanna Farms, Inc. v. Citrus Bowl, Inc.*, 468 F.Supp. 866, 874 (D.C.N.Y. 1978); *Morton Salt Co. v. G.S. Suppiger Co.*, 314 U.S. 488, 494, 62 S.Ct. 402, 406, 86 L.Ed. 363 (1942).

## IV. THIS COURT SHOULD DISMISS JA APPAREL'S CLAIMS FOR BREACH OF THE PERSONAL SERVICES AGREEMENT

In yet another attempt to divert this Court's attention away from Abboud's constitutional right to communicate truthful and valuable commercial information to the trade and consuming public, JA Apparel has spent an inordinate amount of time, money and effort trying to argue that Abboud "jumped the gun" on his restrictive covenant.  Essentially JA Apparel alleges that by engaging in a series of preparatory acts in anticipation of his return to the apparel business, including planning for a press conference; negotiating with prospective licensees; and, lending money to a shirt factory, Abboud violated Paragraph 2(a) of his Personal Services Agreement, which states:

20

For the two-year period immediately following the expiration of the Personal Services Period (the "Restricted Period") [*i.e.*, from July 13,2005 - July 13, 2007], Abboud agrees that he will not, directly or indirectly through any partnership, corporation, limited liability company, trust or other entity, be associated as an owner, director, officer, employee, consultant or other participant with, any person, group, business enterprise or other entity which is engaged in or proposes to engage in the business of designing, licensing, manufacturing, marketing or distributing any products or services which are or would be competitive with the business of [JA Apparel] as then conducted or as such business may be reasonably expected to be conducted in the future anywhere in the world.

Def. Ex. 13 at ¶(2)(a).[4]

However, the evidence will show that whatever Abboud did to prepare for his return to the apparel industry prior to the end of the Restricted Period, he did not violate Paragraph 2(a). In this regard, Abboud wants to dispel JA Apparel's erroneous notion that non-compete law generally prohibits a party subject to a restrictive covenant from preparing to compete, but not actually competing, during the non-compete period. There simply is no such general rule, and the two cases previously cited by plaintiff on this point, *De Long Corp. v. Lucas*, 278 F.2d 804, 808-09 (2d Cir. 1960) and *World Auto Parts, Inc. v. Labenski*, 217 A.D.2d 940, 629 N.Y.S.2d 896 (4th Dept. 1995), do not stand for this proposition. Rather, the rule on this issue, if there is one, is that the court must look at the wording of the non-compete provision itself, to see whether or not specific preparatory acts are prohibited. *See, e.g., Brooks Automation, Inc. v. Blue Shift*

---

[4] JA Apparel will also, apparently, make the argument that Abboud violated these provisions of Paragraph 2(a) by owning his own companies, defendants Herringbone and Houndstooth, during the so-called Restricted Period, thereby "associating" himself as an "owner" with a "corporation" that "proposed to engage" in competition with JA Apparel. This, however, makes absolutely no sense, since the clear intention of Paragraph 2(a) was to prohibit Abboud from "associating" with third parties in their business activities. Otherwise, since defendant Houndstooth and other companies, such as Joseph Abboud Worldwide, were already owned by Abboud, and were known to be owned by Abboud, at the time he entered into the Personal Services Agreement, it could not have been the parties' intention to prevent Abboud from "associating" with his own companies. Further, a close reading of Paragraph 2(a) makes clear that Abboud's ownership of his own companies is permitted -- so long as he doesn't associate himself, personally or through any such companies, with a third party in the manner prohibited by Paragraph 2(a).

*Techs.*, No. 06-P-1063, 2007 WL 1713370 at *2 (Mass. App. Ct. June 14, 2007); *Cowley v.*

*Anderson*, 159 F.2d 1, 5 (10th Cir. 1947) *Keiser v. Walsh*, 118 F.2d 13, 14 (D.C. App. 1941).

Thus, in order to ascertain an alleged violation of Paragraph 2(a), *i.e.*, whether Abboud

"associated" with a business in competition with JA Apparel during the Restricted Period, the

court should look at the language qualifying and defining the word "associated", namely the

words *"as an owner, director, officer, employee, consultant or other participant"* in any business

competing with JA Apparel. Def. Ex. 13 at ¶(2)(a) (emphasis added). Here the inquiry is

obvious and succinct, given that "participant" is not an open-ended word embodying any

association that JA Apparel can concoct, but a general word that must be read in accord with the

preceding terms under the doctrine of *ejusdem generis* and thereby restricted in its meaning to

*active involvement* in a business enterprise. *See, e.g., United States v. Turkette*, 452 U.S. 576,

581, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981) (holding that *ejusdem generis* is "an aid to

statutory construction problems suggesting that where general words follow a specific

enumeration of persons or things, the general words should be limited to persons or things

similar to those specifically enumerated").

Simply put, the evidence will show that at no time during the Restricted Period did

Abboud become an owner, director, officer or employee of, or a consultant to any business in

competition with JA Apparel. Nevertheless, JA Apparel asserts that Abboud's lending of

money, *i.e.*, passing money from his Merrill Lynch credit line through Herringbone Creative

Services, Inc., to Alden Street Shirt Manufacturing Company, LLC ("Alden Street"), constitutes

an act of ownership, and/or participation in violation of the Personal Services Agreement.

However, JA Apparel offers no factual or legal support for this proposition. Rather, while JA

Apparel may suggest that the lending of money to Alden Street was something of a sham

transaction, the evidence will show that the lending was well documented and the funds actually transferred in accord with the documentation, in order to insure the financial survival of its troubled business and not to direct, administer, alter or affect its management, operations, marketing or sales activities.  Indeed, and most importantly, there was no sharing of resources between Abboud and Alden Street; and, no indicia of ownership or control  *See*, Proposed Findings of Fact at ¶¶120-134.

Further, the mere lending of money does not constitute a forbidden association unless, as is clearly *not* the case here, the restrictive covenant expressly prohibits the lending of money. *Salzman v. Siegelman*, 102 A.D. 406, 92 N.Y.S. 844 (2d Dept. 1905) (noting that a restrictive covenant does not prohibit the lending of money) compare *Nippon v. Leslie Fay Cos., Inc.*, 216 B.R. 117 (Bankr. S.D.N.Y. 1997) (involving a restriction on all activities as a "lender" to a competitor)  and *World Auto Parts*, 217 A.D.2d 940, 629 N.Y.S.2d 896 (involving an unspecified restriction on lending).

Therefore, JA Apparel is left with the rather obscure argument that Abboud's lending was just a pretext for his actually participating, *i.e.*, involving himself, in Alden Street's business activities.  Yet, here, all the evidence is to the contrary, as every knowledgeable witness has testified that Abboud was not involved in Alden Street's business activities during the Restricted Period; and, that he did not order, instruct or advise Robert Kidder, who was the owner and manager of Alden Street during that time period, on how to manage or run Alden Street's business.  In sum, to prove that Abboud participated in the business of Alden Street, JA Apparel

must show that Abboud, as a lender, actually controlled the business decisions/activities of Alden Street; and, this it simply cannot show.[5]

Moreover, regardless of Abboud's legal relationship with Alden Street, it is important to note that Alden Street does not compete with JA Apparel. Specifically, Alden Street is in the business of *contract shirt manufacturing*, known in the trade as "cut, make and trim" or, "CMT". In this CMT business, large retailers, such as Nordstrom, purchase their own piece goods, such as fabrics, and send them to Alden Street to be made into shirts. Alden Street "cuts" the fabric; "makes" it into shirts by sewing the cut fabric pieces together; and then "trims" the excess fabric from the shirt. At all times relevant throughout the CMT process, the shirt is owned by Nordstrom not Alden Street; so there is no sale of the shirt by Alden Street to Nordstrom. Rather, Alden Street bills Nordstrom for the CMT *work* that it performs, in accordance with the terms of its CMT contract with Nordstrom.

In contrast to Alden Street, JA Apparel is in the business of *wholesaling* shirts that it buys from other manufacturers. Thus, while JA Apparel does own a tailored clothing manufacturing facility in New Bedford, Massachusetts, this facility does not manufacture shirts; and, it does not contract for CMT shirt work. Thus, there is no competition between Alden Street and JA Apparel, for not only do they conduct different types of business, but they operate at very different levels of the distribution chain.

---

[5] JA also asserts that Abboud was the owner of Alden Street, based on Kidder's confusing and erroneous testimony about a conversation he had with Attorney Theodore Dinsmoor. However, according to Attorney Dinsmoor, who structured Alden Street; Attorney William Sopp, who incorporated Alden Street; the Alden Street corporate records signed by Kidder, himself; and the Internal Revenue Service Employer Identification, pursuant to which Kidder agreed to report income or loss from Alden Street as the owner of Alden Street, at all times relevant during Abboud's Restricted Period, Kidder was the rightful, legal owner of Alden Street.

Otherwise, JA Apparel asserts that even if Abboud did not associate himself as an "owner, director, officer, employee [or] consultant" with any third party during the Restricted Period, he nevertheless associated himself as an "other participant" with several potential licensees by discussing their terms for future licensing arrangements. However, a potential participant is not a participant. Thus, even though terms were discussed, they were never incorporated into any licensing agreements until after the expiration of the Restricted Period; and, even after license agreements were drafted at least a month after the expiration of the Restricted Period, the agreements were not executed so as to establish a licensing relationship until almost six (6) months after the expiration of the Restricted Period. Also, it is important to note that there were no licensed products made, marketed or sold by any potential licensees during the Restricted Period and no deposits, royalties or other emoluments paid by any potential licensee to Abboud during the Restricted Period. In short, the prospective licensing arrangements did not result in any *commercial activity* during the Restricted Period. *See*, Proposed Findings of Fact at ¶¶107-119.

Finally, in a last desperate effort to find a breach of the Personal Services Agreement, JA Apparel points to Abboud's personal efforts to prepare for a press conference, which he held two weeks after the Restricted Period. According to JA Apparel, Abboud's personal efforts to prepare himself for a press conference, somehow make Abboud a "participant" in somebody else's business. While it is true that Abboud inspected fabric swatches from Alden Street; that he purchased suits from Jack Victor, Ltd; and, that he selected sportswear at Merrill-Sharpe, Ltd., all for the purpose of securing props that he would eventually display at the press conference, these activities do not make Abboud a participant in anyone else's businesses. Thus, while Abboud's activities were conducted in preparation for his press conference after the

25

expiration of the Restricted Period, they do not constitute an impermissible "association" during that period.

## CONCLUSION

For the foregoing reasons, this Court should dismiss all of Plaintiff's claims and enter judgment on them for the Defendant's.

Dated:  New York, New York
        February 19, 2008

Respectfully submitted,

ARNOLD & PORTER LLP

By:  _Louis S Ederer_
        Louis S. Ederer (LE 7574)
        John Maltbie (JM 3658)
        399 Park Avenue
        New York, New York 10022
        (212) 715-1000

        *Attorneys for Defendants and*
        *Counterclaim Plaintiffs Joseph Abboud,*
        *Houndstooth Corp. and Herringbone*
        *Creative Services, Inc.*

26