# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JA APPAREL CORP., | |
| Plaintiff, | Civil Action No. 07 CV 07787 (THK) |
| v. | |
| JOSEPH ABBOUD, HOUNDSTOOTH CORP., and HERRINGBONE CREATIVE SERVICES, INC., | |
| Defendants. | |
| JOSEPH ABBOUD, HOUNDSTOOTH CORP., and HERRINGBONE CREATIVE SERVICES, INC., | |
| Counterclaim-Plaintiffs, | |
| v. | |
| JA APPAREL CORP. and MARTIN STAFF, | |
| Counterclaim-Defendants. | |

## PLAINTIFF AND COUNTERCLAIM-DEFENDANTS' POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

**KAYE SCHOLER LLP**
425 Park Avenue
New York, New York  10022
(212) 836-8000

*Attorneys for Plaintiff and Counterclaim-Defendant JA Apparel Corp. and Counterclaim-Defendant Martin Staff*

31619160_V59.WPD

Plaintiff and counterclaim-defendant JA Apparel Corp. ("JA Apparel") and counter-claim-defendant Martin Staff submit the following proposed post-trial findings of fact and conclusions of law (i) in support of JA Apparel's claims for relief (and its motion for a preliminary injunction which, pursuant to the Scheduling Order entered on September 10, 2007 (Dkt. Entry 3), has been consolidated with the final trial on the merits), and (ii) in opposition to the counterclaims of counterclaim-defendants Joseph Abboud, Houndstooth Corp. and Herringbone Creative Services, Inc.

Dated: April 4, 2008
       New York, New York

**KAYE SCHOLER LLP**

By: _____/s_____

       Thomas A. Smart
       Phillip A. Geraci
       425 Park Avenue
       New York, New York  10022
       (212) 836-8000

*Attorneys for Plaintiff and Counterclaim-*
       *Defendants*

*Of counsel:*

   John D. Geelan
   Richard A. De Sevo
   Victoria Haje
   Patricia Ryder

# TABLE OF CONTENTS

**Page**

I.  FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    A.  The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    B.  JA Apparel and Its Expansion of, and Success with, the ABBOUD Marks . . . . 11

    C.  JA Apparel's Trademark Registrations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    D.  JA Apparel's Relationship and Agreements with Mr. Abboud . . . . . . . . . . . . . 18

    E.  Mr. Abboud's Reputation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    F.  Defendants' Announcement of Their "jaz" Menswear Collection and
        Their Unauthorized Use of JA Apparel's ABBOUD Marks . . . . . . . . . . . . . . . 27

    G.  The Instances of Actual Confusion to Date . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    H.  Defendants' Proposed "Informational" Use of the Name
        "Joseph Abboud" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    I.  Mr. Abboud's Breach of the Non-Compete Obligations in the Side Letter
       Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

        1.  Mr. Abboud's Association with Herringbone Creative Services . . . . . . 40

        2.  Abboud's Acquisition of the Assets of the Fall River Shirt
            Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

            (a)  Kidder Was a Sham "Owner" of Alden . . . . . . . . . . . . . . . . . . . 46

            (b)  Abboud and Herringbone – Not Kidder – Acquired the Shirt
                Factory During the Restricted Period . . . . . . . . . . . . . . . . . . . . . 50

        3.  Defendants' Licensing Arrangement with Jack Victor . . . . . . . . . . . . . 64

        4.  Cardinal of Canada . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

        5.  J.S. Blank & Co. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

        6.  Merrill-Sharpe, Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

        7.  Lord & Taylor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

**Page**

        8.     Profits to Be Awarded JA Apparel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

J.     The Harm to JA Apparel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

K.     The Scope of Injunctive Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

II.    CONCLUSIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

A.     JA Apparel Has Established Its Lanham Act and State Law Claims . . . . . . . . 89

        1.     JA Apparel Has Established Its Claim for Breach of the Purchase
              and Sale Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

              (a)    The Agreement Is Unambiguous and, Therefore,
                        Parol Evidence Is Inadmissible . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

              (b)    The Parol Evidence Confirms that Defendants
                        Sold All of the Assets Specified in the Purchase and Sale
                        Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

              (c)    Defendants Have Breached the Agreement . . . . . . . . . . . . . . . . 114

        2.     JA Apparel Has Established Its Lanham Act Trademark
              Infringement and False Designation of Origin Claims . . . . . . . . . . . . 119

              (a)    The Use of a Previously Sold Personal Name,
                        Trademark or Trade Name Constitutes Trademark
                        Infringement Where There Is a Likelihood of
                        Confusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

              (b)    There Is a Strong Likelihood of Confusion Between
                        JA Apparel's ABBOUD Marks and Defendants'
                        Marks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

                     (1)    The JA Apparel Marks Are Very Strong . . . . . . . . . . . . . 133

                     (2)    Defendants' ABBOUD Mark Is
                            Identical to JA Apparel's ABBOUD Marks . . . . . . . . . . 134

                     (3)    The Parties' Goods and Services Are in Close
                            Proximity and There Is No Gap to Bridge . . . . . . . . . . . 135

                     (4)    Actual Confusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

**Page**

      (5)    Defendants Have Acted in Bad Faith . . . . . . . . . . . . . . . 138

      (6)    The Quality of Defendants' Products . . . . . . . . . . . . . . . 139

      (7)    Sophistication of the Relevant Audience . . . . . . . . . . . . 139

    (c)    Defendants Have Failed to Establish
Their Affirmative Defense of Fair Use . . . . . . . . . . . . . . . . . . . 140

3.    JA Apparel Has Established Its Claim for Dilution Under the
Lanham Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

4.    JA Apparel Has Established Its State Unfair Competition, Dilution,
and General Business Law Claims . . . . . . . . . . . . . . . . . . . . . . . . . . 151

5.    The First Amendment Does Not Immunize Defendants'
Breach of Contract, Trademark Infringement, Dilution,
Unfair Competition and Violation of the New York
General Business Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

6.    JA Apparel Has Established Its Claim for Breach of the Non-
Compete Provision  in the Side Letter Agreement . . . . . . . . . . . . . . . 153

B.    JA Apparel Is Threatened with Irreparable Injury If a Permanent
Injunction Is Not Issued . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

C.    The Balance of Hardships Tips Decidedly in JA Apparel's Favor . . . . . . . . . 161

D.    JA Apparel Has Established that a Permanent Injunction Should Be
Entered and that Corrective Measures Should Be Ordered . . . . . . . . . . . . . . 162

E.    Defendants Have Failed to Establish Any of Their Counterclaims . . . . . . . . . 165

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

## TABLE OF AUTHORITIES

**Cases**

**Page(s)**

*815 Tonawanda St. Corp. v. Fay's Drug Co.*,
842 F.2d 643 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

*A.V. by Versace, Inc. v. Gianni Versace S.p.A.*,
2005 U.S. Dist. LEXIS 925 (S.D.N.Y. Jan. 24, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*A.V. by Versace v. Gianni Versace, S.p.A.*,
2002 U.S. Dist. LEXIS 16323 (S.D.N.Y. Sept. 3, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . 160

*Adarand Constructors, Inc. v. Slater*,
528 U.S. 216, 224 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

*Adjusters Int'l, Inc. v. Public Adjusters Int'l, Inc.*,
1996 U.S. Dist. LEXIS 12604 (N.D.N.Y. Aug. 27, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Allied Maint. Corp. v. Allied Mech. Trades, Inc.*,
42 N.Y.2d 538, 399 N.Y.S.2d 628 (N.Y. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

*Am. Cyanamid Co. v. Campagna Per Le Farmacie In Italia S.p.A.*,
847 F.2d 53 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

*Am. Home Prods. Corp. v. Johnson Chem. Co.*,
589 F.2d 103 (2d Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

*Am. Para Prof. Sys., Inc. v. Hooper Holmes, Inc.*,
13 A.D.3d 167, 787 N.Y.S.2d 227 (1st Dep't 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

*Apple Computer, Inc. v. Franklin Computer Corp.*,
714 F.2d 1240 (3d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

*Asgrow Seed Co. v. Winterboer*,
513 U.S. 179 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

*Atlantic Mut. Ins. Co. v. Terk Tech. Corp.*,
309 A.D.2d 22, 763 N.Y.S.2d 56 (1st Dep't 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

*Banff, Ltd. v. Federated Dep't Stores, Inc.*,
841 F.2d 486 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132, 139

*Barr v. Sasser*,
1992 U.S. Dist. LEXIS 21751 (N.D. Okla. July 1, 1992) . . . . . . . . . . . . . . . . . . . . . . . . . 126

**Page(s)**

*Bates v. State Bar of Ariz.*,
433 U.S. 350 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

*Better Bus. Bureau of Metro. Houston, Inc. v. Med. Dirs., Inc.*,
681 F.2d 397 (5th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

*Brainard v. N.Y. Cent. R.R. Co.*,
242 N.Y. 125 (N.Y. 1926) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

*Breed v. Ins. Co.*,
46 N.Y.2d 351, 413 N.Y.S.2d 352 (N.Y. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

*Brooks Automation, Inc. v. Blue Shift Techs.*,
69 Mass. App. Ct. 1107, 2007 WL 1713370 (Mass. App. Ct. 2007) . . . . . . . . . . . . . . . 155

*Capital Cities Cable, Inc. v. Crisp*,
467 U.S. 691 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168

*Car-Freshener Corp. v. S.C. Johnson & Son, Inc.*,
70 F.3d 267 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

*Cartier v. Aaron Faber Inc.*,
512 F. Supp.2d 165 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

*Castrol, Inc. v. Pennzoil Co.*,
987 F.2d 939 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

*Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*,
830 F.2d 1217 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Century 21 Real Estate LLC v. Raritan Bay Realty*,
2007 U.S. Dist. LEXIS 34108 (E.D.N.Y. May 9, 2007) . . . . . . . . . . . . . . . . . . . . . . . 159

*Champion Spark Plug Co. v. Champion*,
23 F. Supp. 638 (E.D. Mich. 1938) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

*Charcoal Steak House of Charlotte, Inc. v. Staley*,
139 S.E.2d 185 (N.C. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

*Charles of Ritz Group, Ltd. v. Quality King Distribs., Inc.*,
832 F.2d 1317 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133, 163

**Page(s)**

*Chernoff Diamond & Co. v. Fitzmaurice, Inc.,*
   234 A.D.2d 200, 651 N.Y.S.2d 504 (1st Dep't 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

*Chevron U.S.A., Inc. v. Roxen Serv., Inc.,*
   813 F.2d 26 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

*Cipollone v. Liggett Group, Inc.,*
   505 U.S. 504 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168, 169

*Citadel Equity Fund Ltd. v. Aquila, Inc.,*
   371 F. Supp.2d 510 (S.D.N.Y. 2005), *aff'd*, 168 Fed. Appx. 474 (2d Cir. 2006) . . . . . . . . 96

*Citibank N.A. v. Citytrust,*
   756 F.2d 273 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

*Cliffcorn Answering Serv., Inc. v. Deutschel,*
   23 Misc.2d 254, 198 N.Y.S.2d 952 (N.Y. Sup. Ct. Kings Co. 1960) . . . . . . . . . . . . . . . . . 126

*Clinique Labs., Inc. v. Dep Corp.,*
   945 F. Supp. 547 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

*Coach Leatherware Co. v. Ann Taylor, Inc.,*
   933 F.2d 162 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

*Cohen v. California,*
   403 U.S. 15 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

*Cole v. Macklowe,*
   40 A.D.3d 396, 836 N.Y.S.2d 568 (1st Dep't 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

*Comdisco, Inc. v. Home Ins. Co.,*
   1996 U.S. Dist. LEXIS 304 (S.D.N.Y. Jan. 16, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

*Communications Satellite Corp. v. Comcet, Inc.,*
   429 F.2d 1245, 1250 (4th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

*Computer Assocs. Int'l, Inc. v. Computer Automation, Inc.,*
   678 F. Supp. 424 (S.D.N.Y. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

*Conopco, Inc. v. Wathne Ltd.,*
   190 A.D.2d 587, 593 N.Y.S.2d 787 (1st Dep't 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

**Page(s)**

*Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.,*
   125 F.3d 28 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

*Cowley v. Anderson,*
   159 F.2d 1 (10th Cir. 1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155

*Crosby v. Nat'l Foreign Trade Council,*
   530 U.S. 363 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168

*Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,*
   604 F.2d 200 (2d Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121, 148

*Dan-Foam A/S and Tempur-Pedic, Inc. v. Brand Named Beds, LLC,*
   500 F. Supp.2d 286 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

*DeLong Corp. v. Lucas,*
   176 F. Supp. 104 (S.D.N.Y. 1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

*Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.,*
   841 F. Supp. 1339 (E.D.N.Y. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

*Diversified Mortg. Investors v. U.S. Life Title Ins. Co. of New York,*
   544 F.2d 571 (2d Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

*Dolby v. Robertson,*
   654 F. Supp. 815 (N.D. Cal. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

*Donahue v. Artisan Entertainment, Inc.,*
   2002 U.S. Dist. LEXIS 5930 (S.D.N.Y. Apr. 5, 2002) . . . . . . . . . . . . . . . . . . . . . . . . 34

*Eagle Comtronics, Inc. v. Pico Prods., Inc.,*
   256 A.D.2d 1202, 682 N.Y.S.2d 505 (4th Dep't 1998) . . . . . . . . . . . . . . . . . . . . . . . 167

*eBay Inc. v. MercExchange, L.L.C.,*
   457 U.S. 389 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

*Eli Lilly & Co. v. Revlon, Inc.,*
   577 F. Supp. 477 (S.D.N.Y. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

*Emilio Pucci Societa A Responsibilita Limitata v. Pucci Corp.,*
   1988 U.S. Dist. LEXIS 14097 (N.D. Ill. Dec. 13, 1988) . . . . . . . . . . . . . . . . . . . . . . 140

**Page(s)**

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
    545 U.S. 546 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

*FDIC v. Meyer*,
    510 U.S. 471 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

*First Montauk Securities Corp. v. Menter*,
    26 F. Supp.2d 688 (S.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

*Francis S. Denney, Inc. v. I.S. Labs., Inc.*,
    758 F. Supp. 140 (S.D.N.Y. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

*Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*,
    111 F.3d 993 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*GTFM, Inc. v. Solid Clothing Inc.*,
    215 F. Supp.2d 273 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

*Geisel v. Poynter Prods., Inc.*,
    283 F Supp. 261 (S.D.N.Y. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

*Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*,
    523 F.2d 1331 (2d Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121, 140, 151

*Gruner + Jahr USA Publ'g. v. Meredith Corp.*,
    991 F.2d 1072 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

*Gucci Am., Inc. v. Action Activewear, Inc.*,
    759 F. Supp. 1060 (S.D.N.Y. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

*Gucci v. Gucci Shops, Inc.*,
    688 F. Supp. 916 (S.D.N.Y. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128, 145

*Guth v. Guth Chocolate Co.*,
    224 F. 932 (4th Cir. 1915) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122, 125, 129

*Hard Rock Cafe Int'l v. Morton*,
    1999 U.S. Dist. LEXIS 8340 (S.D.N.Y. June 2, 1999) . . . . . . . . . . . . . . . . . . . 131

*Harlequin Enters., Ltd. v. Gulf & Western Corp.*,
    644 F.2d 946 (2d Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

**Page(s)**

*Harold F. Ritchie Inc. v. Chesebrough-Pond's, Inc.*,
    281 F.2d 755 (2d Cir. 1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

*Harsco Corp. v. Segui*,
    91 F.3d 337 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*Hasbro Inc. v. Lanard Toys, Ltd.*,
    858 F.2d 70 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Hazel Bishop, Inc. v. Perfemme, Inc.*,
    314 F.2d 399 (2d Cir. 1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*Helene Curtis Indus. v. Church and Dwight*,
    560 F.2d 1325 (7th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

*Home Box Office, Inc. v. Showtime/The Movie Channel Inc.*,
    832 F.2d 1311 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149, 163

*Hudson-Port Ewen Assoc. v. Chien Kuo*,
    165 A.D.2d 301 (3d Dep't 1991), *aff'd*, 78 N.Y.2d 944,
    573 N.Y.S.2d 637 (N.Y. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

*In re Antenna Specialists Co.*,
    408 F.2d 1052 (C.C.P.A. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

*In re Colonial Stores Inc.*,
    394 F.2d 549 (C.C.P.A. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142, 144

*In re Walker Process Equipment, Inc.*,
    233 F.2d 329, 331 (C.C.P.A. 1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

*In re Kenston Mgmt. Co.*,
    137 B.R. 100 (Bankr. E.D.N.Y. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

*In re R.M.J.*,
    455 U.S. 191 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

*In re Robbins Inter., Inc.*,
    275 B.R. 456 (Bankr. S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

*Information Superhighway, Inc. v. Talk Am., Inc.*,
    395 F. Supp.2d 44 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

**Page(s)**

*Int'l Multifoods Corp. v. Comm. Union Ins. Co.*,
    98 F. Supp.2d 498 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*J.H. Goldberg Co., Inc. v. Stern*,
    53 A.D.2d 246, 385 N.Y.S.2d 427 (4th Dep't 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

*Joseph Scott Co. v. Scott Swimming Pools, Inc.*,
    764 F.2d 62 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*,
    543 U.S. 111 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142, 146, 148

*Karsh v. Haiden*,
    120 Cal.App.2d 75 (Cal. Ct. App. 1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

*Keiser v. Walsh*,
    118 F.2d 13 (D.C. Cir. 1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155

*Kiki Undies Corp. v. Alexander's Dep't Stores, Inc.*,
    390 F.2d 604 (2d Cir. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

*Kookai, S.A. v. Shabo*,
    950 F. Supp. 605 (S.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135, 136

*Laurence of London, Ltd. v. Count Roimi Ltd.*,
    30 A.D.2d 518, 290 N.Y.S.2d 125 (1st Dep't 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

*Lazzaroni USA Corp. v. Steiner Foods*,
    2006 U.S. Dist. LEXIS 20962 (D.N.J. Apr. 10, 2006) . . . . . . . . . . . . . . . . . . . 126, 130, 147

*LeSportsac, Inc. v. K Mart Corp.*,
    754 F.2d 71 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

*Levitt Corp. v. Levitt*,
    593 F.2d 463 (2d Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Levitt Corp v. Levitt*,
    1978 U.S. Dist. LEXIS 15820 (E.D.N.Y. Aug. 29, 1978),
    *aff'd*, 593 F.2d 463 (2d Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122, 123

*Lexington Mgmt. Corp. v. Lexington Capital Partners*,
    10 F. Supp.2d 271, 15 U.S.C. § 1057 (b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

**Page(s)**

*Lois Sportswear v. Levi Strauss & Co.*,
    799 F.2d 867 (2d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*,
    378 F. Supp.2d 448 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.*,
    426 F.3d 532 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134, 135

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
    454 F.3d 108 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

*MSP Corp. v. Westech Instruments, Inc.*,
    500 F. Supp.2d 1198 (D. Minn. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

*Madrigal Audio Labs., Inc. v. Cello, Ltd.*,
    799 F.2d 814 (2d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126-28, 130, 147-48

*Major League Baseball Properties, Inc. v. Sed Olet Denarius, Ltd.*,
    1990 U.S. Dist. LEXIS 13108 (S.D.N.Y. Oct. 5, 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . 131

*Manhattan Real Estate Equities Group, LLC v. Pine Equity, NY, Inc.*,
    16 A.D.3d 292, 791 N.Y.S.2d 418 (1st Dep't 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

*Marshak v. Green*,
    746 F.2d 927 (2d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

*Maryland v. La.*,
    451 U.S. 725 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168

*Mattel, Inc. v. MCA Records, Inc.*,
    296 F.3d 894 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

*Max Factor & Co. v. Max Factor*,
    226 F. Supp. 120 (S.D. Cal. 1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

*McNeil Labs., Inc. v. Am. Home Prods. Corp.*,
    416 F. Supp. 804 (D.N.J. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

**Page(s)**

*Merrill Lynch Commodities Inc. v. Richal Shipping Corp.*,
    581 F. Supp. 933 (S.D.N.Y. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

*Metlife, Inc. v. Metro. Nat'l Bank*,
    388 F. Supp.2d 223 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

*Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*,
    906 F.2d 884 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93, 101

*Miller v. Hekimian Labs., Inc.*,
    257 F. Supp.2d 506 (N.D.N.Y. 2003),
    *aff'd*, 85 Fed. Appx. 266 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

*Minnesota Mining & Mfg. Co. v. Johnson & Johnson*,
    454 F.2d 1179 (C.C.P.A. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

*Mobil Oil Corp. v. Pegasus Petroleum Corp.*,
    818 F.2d 254 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121, 135, 138

*Moore v. Kopel*,
    237 A.D.2d 124, 653 N.Y.S.2d 927 (1st Dep't 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

*Mushroom Makers, Inc. v. R.G. Barry Corp.*,
    580 F.2d 44 (2d Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

*Mutual Life Ins. Co. v. Menin*,
    115 F.2d 975 (2d Cir. 1940) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

*Muzak Corp. v. Hotel Taft Corp.*,
    1 N.Y.2d 42, 150 N.Y.S.2d 171 (N.Y. 1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

*Muzikowski v. Paramount Pictures Corp.*,
    2005 U.S. Dist. LEXIS 13127 (N.D. Ill. June 10, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . 153

*Namad v. Salomon Inc.*,
    74 N.Y.2d 751, 545 N.Y.S.2d 79 (N.Y. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

*Natural Organics, Inc. v. Nutraceutical Corp.*,
    426 F.3d 576 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

*New Kayak Pool Corp. v. R & P Pools, Inc.*,
    246 F.3d 183 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132, 158

**Page(s)**

*New York Mercantile Exch., Inc. v. Intercontinental Exch., Inc.,*
    289 F. Supp.2d 527 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

*New York Real Estate Inst., Inc. v. Edelman,*
    42 A.D. 3d 321, 839 N.Y.S.2d 488 (1st Dep't 2007) . . . . . . . . . . . . . . . . 154, 160, 164, 165

*Newark Morning Ledger Co. v. United States,*
    507 U.S. 546 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

*Nikon Inc. v. Ikon Corp.,*
    987 F.2d 91 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135, 139

*Nipon v. Leslie Fay Cos. (In re Leslie Fay Cos.),*
    216 B.R. 117 (Bankr. S.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Omega Importing Corp. v. Petri-Kine Camera Co.,*
    451 F.2d 1190 (2d Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

*Osgood Heating & Air Conditioning, Inc. v. Osgood,*
    2004 U.S. Dist. LEXIS 28817 (W.D. Tex. Dec. 21, 2004) . . . . . . . . . . . . . . . . . . . . . . . . 126

*P.F. Cosmetique, S.A. v. Minnetonka, Inc.,*
    605 F. Supp. 662 (S.D.N.Y. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

*Paddington Corp. v. Attiki Imps. & Distrib., Inc.,*
    966 F.2d 577 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

*Padovano v. Vivian,*
    217 A.D.2d 868, 629 N.Y.S.2d 844 (3d Dep't 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

*Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,*
    469 U.S. 189 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120, 162

*Paul Frank Indus., Inc. v. Sunich,*
    502 F. Supp.2d 1094 (C.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

*Peaceable Planet, Inc. v. Ty, Inc.,*
    362 F.3d 986 (7th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

*Playtex Prods., Inc. v. First Quality Hygienic, Inc.,*
    965 F. Supp. 339, *McCarthy,* § 11:83 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

**Page(s)**

Polaroid Corp. v. Polarad Elecs. Corp.,
  287 F.2d 492 (2d Cir. 1961): . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

Poorman v. Julian,
  22 Ill. App.2d 208 (Ill. App. Ct. 1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

Power Test Petroleum Distribs. v. Calcu Gas, Inc.,
  754 F.2d 91 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158, 159

Princeton Graphics Operating, L.P. v. NEC Home Elec. (U.S.A)., Inc.,
  732 F. Supp. 1258 (S.D.N.Y. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

Pro Hardware, Inc. v. Home Centers of Am., Inc.,
  607 F. Supp. 146 (S.D. Tex. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

Procter & Gamble Co. v. Quality King Distribs., Inc.,
  974 F. Supp. 190 (E.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

Purchasing Assocs. Inc. v. Weitz,
  13 N.Y.2d 267, 246 N.Y.S.2d 600 (N.Y. 1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

RJR Foods, Inc. v. White Rock Corp.,
  1978 U.S. Dist. LEXIS 15080 (S.D.N.Y. Oct. 6, 1978),
  aff'd, 603 F.2d 1058 (2d Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

Robin Woods Inc. v. Woods,
  815 F. Supp. 856 (W.D. Pa. 1992), aff'd, 28 F.3d 396 (3d Cir. 1994) . . . . . . . . . . . 128, 129

Rogers v. Grimaldi,
  875 F.2d 994 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

Rosmer v. Pfizer Inc.,
  263 F.3d 110 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

Rostropovich v. Koch Int'l Corp.,
  34 U.S.P.Q.2d 1609, 1995 U.S. Dist. LEXIS 2785
  (S.D.N.Y. March 7, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.,
  483 U.S. 522 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

Sardi's Restaurant Corp v. Lyle Sardie West. Pubs, Inc.,
  755 F.2d 719 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

**Page(s)**

*Savin Corp. v. Savin Group*,
    391 F.3d 439 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119, 133, 137

*Scandia Down Corp. v. Euroquilt, Inc.*,
    1982 U.S. Dist. LEXIS 17664 (N.D. Ill. Nov. 8, 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

*Securitron Magnalock Corp. v. Schnabolk*,
    65 F.3d 256 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

*Shirai v. Blum*,
    239 N.Y. 172, 146 N.E. 194 (N.Y. 1924) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

*Shred-It USA, Inc. v. Mobile Data Shred, Inc.*,
    228 F. Supp.2d 455 (S.D.N.Y. 2002), *aff'd*, 92 Fed. Appx. 812 (2d Cir. 2004) . . . . . . . . . . 89

*Slatt v. Slatt*,
    64 N.Y.2d 966, 488 N.Y.S.2d 645 (N.Y. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

*Snepp v. United States*,
    444 U.S. 507 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

*South Rd. Assocs., LLC v. Intern. Bus. Mach. Corp.*,
    4 N.Y.3d 272, 793 N.Y.S.2d 835 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91, 92

*Soweco, Inc. v. Shell Oil Co.*,
    617 F.2d 1178 (5th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

*Sports Auth. v. Prime Hospitality Corp.*,
    89 F.3d 955 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

*Spring Mills, Inc. v. Ultracashmere House, Ltd.*,
    689 F.2d 1127 (2d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134, 138

*Stephano v. News Group Publications, Inc.*,
    64 N.Y.2d 174, 485 N.Y.S.2d 220 (N.Y. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

*Stern's Miracle-Gro Prods., Inc. v. Shark Prods., Inc.*,
    823 F. Supp. 1077 (S.D.N.Y. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

*Stix Prods. v. United Merchants & Mfgrs., Inc. v. Firestone Tire & Rubber Co.*,
    295 F. Supp. 479 (S.D.N.Y. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

**Page(s)**

*Stoike v. First Nat'l Bank*,
290 N.Y. 195, 48 N.E.2d 482 (N.Y. 1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

*Suffolk County Water Auth. v. Village of Greenport*,
21 A.D.3d 947, 800 N.Y.S.2d 767 (2d Dep't 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

*Taylor Wine Co. v. Bully Hill Vineyards, Inc.*,
569 F.2d 731 (2d Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123, 147

*Terwilliger v. Terwilliger*,
206 F.3d 240 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

*Time, Inc. v. Petersen Publ'g Co.*,
173 F.3d 113 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

*Timm Med. Techs., Inc. v. SOMA Blue, Inc.*,
2002 U.S. Dist. LEXIS 926 (D. Minn. Jan. 15, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

*Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs.*,
63 N.Y.2d 396, 482 N.Y.S.2d 465 (N.Y. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
505 U.S. 763 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

*U.S. Shoe Corp. v. Brown Group, Inc.*,
740 F. Supp. 196 (S.D.N.Y. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

*United States Naval Inst. v. Charter Communs., Inc.*,
936 F.2d 692 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

*United States v. N.Y.C. Transit Auth.*,
885 F. Supp. 442 (E.D.N.Y. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

*United States v. Oregon State Med. Soc'y*,
343 U.S. 326 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

*Upjohn Co. v. Am. Home Prods. Corp.*,
598 F. Supp. 550 (S.D.N.Y. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

*Vanderbilt v. Rolls-Royce Motor Cars, Inc.*,
1990 WL 37825 (S.D.N.Y. March 28, 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

**Page(s)**

*Venetianaire Corp. v. A&P Import Co.*,
    429 F.2d 1079 (2d Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

*Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co.*,
    1 N.Y.3d 470, 775 N.Y.S.2d 765 (N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*Vidal Sassoon, Inc. v. Bristol-Meyers Co.*,
    661 F.2d 272 (2d Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

*Virgin Enters. Ltd. v. Nawab*,
    335 F.3d 141 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

*W.W.W. Assocs., Inc. v. Giancontieri*,
    77 N.Y.2d 157, 565 N.Y.S.2d 440 (N.Y. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . 91, 154

*Warner Publ'n, Inc. v. Popular Publ'ns*,
    87 F.2d 913 (2d Cir. 1937) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

*West, Weir & Bartel, Inc. v. Mary Carter Paint Co.*,
    25 N.Y.2d 535, 307 N.Y.S.2d 449 (N.Y. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*Whiteside v. North Am. Accident Ins. Co.*,
    200 N.Y. 320, 93 N.E.2d 948 (N.Y. 1911) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

*William R. Warner & Co. v. Eli Lilly & Co.*,
    265 U.S. 526 (1924) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

*World Auto Parts v. Labenski*,
    217 A.D.2d 940, 629 N.Y.S.2d 896 (4th Dep't 1995) . . . . . . . . . . . . . . . . . . . . . . . . . 154

*Yashiro Co. v. Falchi*,
    1999 U.S. App. LEXIS 18161 (2d Cir. July 30, 1999) . . . . . . . . . . . . . . . . . . . . . . . . 129

*Zeneca, Inc. v. Eli Lilly & Co.*,
    1999 U.S. Dist. LEXIS 10852 (S.D.N.Y. July 19, 1999) . . . . . . . . . . . . . . . . . . . . . . . 159

*Zoll v. Ruder Finn, Inc.*,
    2004 U.S. Dist. LEXIS 144 (S.D.N.Y. Jan. 7, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 167

**Page(s)**

**Statutes and Rules**

15 U.S.C. § 1057(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

15 U.S.C. § 1060(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

15 U.S.C. § 1065 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 123

15 U.S.C. § 1114 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 120

15 U.S.C. § 1115(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118, 133, 168

15 U.S.C. § 1115(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

15 U.S.C. § 1117 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

15 U.S.C. § 1125(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 120, 148

15 U.S.C. § 1125(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149, 150

15 U.S.C. § 1127 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131, 148, 168

28 U.S.C. § 636(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Fed. R. Civ. P. 73 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10

Fed. R. Evid. 801(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Fed. R. Evid. 803(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

N.Y. Civ. Rights Law § 50 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 7, 167

N.Y. Civ. Rights Law § 51 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

N.Y. Gen. Bus. Law § 349 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 151, 166

N.Y. Gen. Bus. Law § 350 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 151

N.Y. Gen. Bus. Law § 360-l . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151, 166

Pub. L. 100-667 § 132 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

**Page(s)**

## **Other Authorities**

*McCarthy on Trademarks* (2007)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

WEBSTER'S THIRD NEW INT'L DICTIONARY (2002)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JA APPAREL CORP., | |
| Plaintiff, | Civil Action No. 07 CV 07787 (THK) |
| v. | |
| JOSEPH ABBOUD, HOUNDSTOOTH CORP., and HERRINGBONE CREATIVE SERVICES, INC., | |
| Defendants. | |
| JOSEPH ABBOUD, HOUNDSTOOTH CORP., and HERRINGBONE CREATIVE SERVICES, INC., | |
| Counterclaim-Plaintiffs, | |
| v. | |
| JA APPAREL CORP. and MARTIN STAFF, | |
| Counterclaim-Defendants. | |

## PLAINTIFF AND COUNTERCLAIM-DEFENDANTS' POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff JA Apparel Corp. ("JA Apparel") commenced this action on September 4, 2007 against defendants Joseph Abboud ("Mr. Abboud"), Houndstooth Corp. ("Houndstooth"), and Herringbone Creative Services, Inc. ("Herringbone"), alleging (a) that defendants' announced intention to use the name, mark or designation "a new composition by designer Joseph Abboud," as well as the name "Joseph Abboud," in advertisements for Mr. Abboud's new "jaz" line of menswear (1) breached a Purchase and Sale Agreement pursuant to which *inter alia*, Mr. Abboud had sold to

JA Apparel all "right, title and interest" to the "names, trademarks, trade names, service marks, logos, insignias and designations" that include "Joseph Abboud," and all "trade names, trademarks, service marks, logos, insignias, and designations containing the words 'Joseph Abboud,' 'designed by Joseph Abboud,' 'by Joseph Abboud,' or anything similar thereto or derivative thereof" (collectively, "the ABBOUD Marks"); and (2) constitutes trademark infringement, false designation of origin, unfair competition, and dilution in violation of Sections 32, 43(a) and 43(c) of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), 1125(c), N.Y. GEN. BUS. LAW § 360-1, and the common law, as well as false and deceptive trade practices under N.Y. GEN. BUS. LAW §§ 349-350, and, in addition, (b) that defendants breached the non-competition provision of a contract entered into between JA Apparel, Mr. Abboud and Houndstooth. JA Apparel sought a preliminary and permanent injunction barring defendants' wrongful conduct, monetary relief, and declarations that Mr. Abboud's conduct breached the contracts.

By agreement of the parties, JA Apparel's motion was consolidated with the final trial on the merits. (Stipulated Scheduling Order, entered Sept. 10, 2007, Dkt. Entry 3). Thereafter, Mr. Abboud, Houndstooth and Herringbone filed counterclaims alleging that JA Apparel's "fashion designs sold under the JOSEPH ABBOUD trademark" "cause consumers and the trade to mistakenly believe" that the designs "are endorsed by Abboud," or "consist of designs created by Abboud" in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and N.Y. GEN. BUS. LAW § 349, violate Mr. Abboud's right of publicity under N.Y. CIV. RIGHTS LAW §§ 50-51, and constitute common law unfair competition. Mr. Abboud, Houndstooth and Herringbone seek preliminary and permanent injunctive relief, as well as monetary relief.

As explained in detail below, this action by JA Apparel seeks to stop Mr. Abboud and his affiliates from unlawfully misappropriating valuable names, trademarks, trade names, service

marks, logos, insignias and designations, all right, title, and interest to which Mr. Abboud uncondi-
tionally sold to JA Apparel for $65.5 million. Having pocketed that payment, Mr. Abboud forfeited
all rights to use the ABBOUD Marks, as well as "a new composition by designer Joseph Abboud"
and "by the award-winning designer Joseph Abboud," which defendants proposed during the trial.
Simply put, Mr. Abboud chose to trademark his name, he chose to sell his names, trademarks, trade
names, service marks, logos, insignias, designations, and related goodwill to plaintiff for $65.5
million, and, thus, he chose to forfeit any right to use those names, trademarks, trade names, service
marks, logos, insignias and designations.

      In particular, defendants' conduct is in direct breach of an agreement (the "Purchase
and Sale Agreement") in which Mr. Abboud and his company sold (a) *"all of the Sellers' right, title
and interest* in . . . [t]he names, trademarks, trade names, service marks, logos, insignias and desig-
nations" that include the words "Joseph Abboud," and the related goodwill, and (b) "*[a]ll rights to
use* and apply for the registration of new trade names, trademarks, service marks, logos, insignias
and designations containing the words *'Joseph Abboud,' 'designed by Joseph Abboud,' 'by Joseph
Abboud,' 'JOE' or 'JA,' or anything similar thereto or derivative thereof*, either alone or in conjunc-
tion with other words or symbols . . . , for *any and all* products or services." (Plaintiff's Trial
Exhibit ("PX") 1 ¶ 1.1(a)(A), (C) (emphasis added). Mr. Abboud has breached, and intends to
continue to breach, that agreement by planning to use in advertisements for his new "jaz" line the
names, marks or designations "Joseph Abboud," "a new composition by designer Joseph Abboud"
and "by the award-winning designer Joseph Abboud," the latter two of which are barely discernable
variations of the names, marks, or designations "Joseph Abboud," "designed by Joseph Abboud,"
and "by Joseph Abboud," and are plainly similar to or derived from these names, marks and

designations. Accordingly, defendants' proposed use of those terms constitutes a breach of the Purchase and Sale Agreement.

Nor is defendants' conduct rendered lawful by the fact that "Joseph Abboud" is Mr. Abboud's personal name. Time and again courts have enjoined the use of personal names where, as here (for $65.5 million), an individual has contracted away and granted to another the exclusive right to use the individual's name. *See, e.g., Levitt Corp. v. Levitt*, 593 F.2d 463, 468 (2d Cir. 1979) (where William Levitt had previously sold to plaintiff his business, including use of his personal name as a trade name or trademark, and the related goodwill, the Second Circuit affirmed a wide-ranging injunction prohibiting, *inter alia*, Mr. Levitt from using his name as a part of a trademark); *Nipon v. Leslie Fay Cos. (In re Leslie Fay Cos.)*, 216 B.R. 117, 125 (Bankr. S.D.N.Y. 1997) (enjoining clothing designer Albert Nipon from using the tagline or designation "Created by Albert Nipon" in conjunction with the trademark AMERICAN POP, holding that Mr. Nipon previously had sold to plaintiff the trademarks in his name and the related goodwill).

Furthermore, applying this Circuit's *Polaroid* analysis for determining trademark infringement, it is evident that defendants' use of the trademarks or designations "a new composition by designer Joseph Abboud," "by the award-winning designer Joseph Abboud," or other locutions incorporating the words "Joseph Abboud" infringes JA Apparel's ABBOUD Marks. Indeed, Mr. Abboud's lawyer advised a prospective licensee that the phrase "designed by Joseph Abboud" would constitute a trademark infringing on JA Apparel's trademark rights if it appeared on a "jaz" hangtag. (PX-152). Applying the *Polaroid* factors, JA Apparel's marks are strong and enforceable, the similarity of defendants' marks is obvious, the marks are used in connection with almost identical goods, there is evidence of actual confusion, and defendants have acted in bad faith. Defendants' unauthorized use of the names, marks or designations "a new composition by Joseph

4

Abboud," "by the award-winning designer Joseph Abboud," and "Joseph Abboud," for their "jaz" clothing line plainly creates a likelihood of consumer confusion as to the source, origin, sponsorship, license or approval with the line of products branded with JA Apparel's ABBOUD Marks. In addition, defendants' unauthorized use of the trademarks or designations "a new composition by designer Joseph Abboud," "by the award-winning designer Joseph Abboud," and other uses of "Joseph Abboud" dilute and create a likelihood of dilution of the distinctive quality of the ABBOUD Marks, and constitutes false and deceptive trade practices, which threatens to cause irreparable injury to JA Apparel and warrants permanent injunctive relief.

JA Apparel also has established that Mr. Abboud's conduct breached the non-compete provisions of a side letter agreement to the Purchase and Sale Agreement (the "Side Letter Agreement") that he entered into with JA Apparel in which he agreed, *inter alia*, to provide consulting services relating to fashion design and brand promotion of the products sold by JA Apparel under the ABBOUD Marks. (PX-2 ¶ 1(a)). Pursuant to that agreement, Mr. Abboud agreed that, until July 13, 2007 (the "Restricted Period"), he (i) would not, directly or indirectly, be associated with any person or entity that competed or proposed to compete with JA Apparel, and (ii) would obtain JA Apparel's written consent before becoming associated with any person or entity that competed or proposed to compete with the company.

Mr. Abboud violated the Side Letter Agreement by virtue of his position as an owner, director and officer of Herringbone, which during the Restricted Period "engaged in" and/or "propose[d] to engage in" business that would be competitive with JA Apparel. (PX-2 ¶ 2(a)). As of February 2007, Mr. Abboud, as President of Herringbone, prepared a detailed business plan, presented it to potential partners, conducted market research with his "team," and contacted retailers at the highest levels concerning his new brand. Moreover, two months before the end of the non-

competition period, Herringbone purchased a plant in Fall River, Massachusetts, to manufacture shirts in competition with JA Apparel, attempting to disguise the purchase through a shell company and a straw "owner." And, on or about March 29, 2007, approximately four months before the end of the non-competition period, Mr. Abboud agreed on the essential terms of a business relationship with Jack Victor Ltd. ("Jack Victor"), whereby Jack Victor would serve as the licensee for "jaz"-tailored clothing. In the ensuing 3½ months, before the expiration of the Restricted Period, defendants and Jack Victor collaborated on the design of "jaz" suits, formulated a public relations campaign, secured advertising space, prepared draft ads for "jaz", and purchased 1,600 meters of fabric for lining for "jaz" suits.

In addition, by May 4, 2007, Mr. Abboud had agreed on specific deal points for the purchase of Merrill-Sharpe Ltd. ("Merrill-Sharpe"), a company that produces and imports sportswear and knitwear. These deal points specified the total purchase price of $4 million, a payout schedule for the $4 million that Mr. Abboud would personally guarantee, and the post-acquisition salaries of the President and Vice-President of Merrill-Sharpe. Moreover, well before the end of the non-compete period, Mr. Abboud began negotiating a licensing arrangement with Cardinal of Canada ("Cardinal") for coats and outerwear, such that, by June 7, 2007, defendants welcomed Cardinal to the "JAZ family." Furthermore, prior to the expiration of the non-competition period, Mr. Abboud reached out to J.S. Blank & Co. ("J.S. Blank"), a neckwear manufacturer, about a licensing relationship for "jaz." And, by June 9, 2007, Mr. Abboud had engaged in "substantial negotiations" with Creative Design Studios about an agreement where Mr. Abboud would provide consulting and advisory services with respect to the design, development, production and sale of all of Lord & Taylor men's and boy's proprietary brand products and that Mr. Abboud would serve as the Creative Director for Lord & Taylor's men's and boy's business. Mr. Abboud also plainly

associated and collaborated with six different companies during the Restricted Period to develop sample "jaz" garments that were displayed at a July 30, 2007 press conference. Mr. Abboud conducted all of the foregoing activities in "association" with Herringbone, a company that competed with JA Apparel, as an "owner, director, officer, employee" and "participant," in plain breach of the Side Letter Agreement. (PX-2 ¶ 2(a)).

Finally, Mr. Abboud, Houndstooth and Herringbone have failed to establish their counterclaims. JA Apparel has the right to use the ABBOUD Marks and, thus, there is no basis under federal or state law to stop JA Apparel from doing so or, to seek any relief based on JA Apparel's doing so. Nor is there any basis for the claim that JA Apparel's "Do You Know Joe" and "Hey Joseph" advertising campaigns violate Section 43(a) of the Lanham Act or state law. There is no evidence that anyone associated the "Joe" character on the "douknowjoe.com" website or the "Joseph" in "Hey Joseph" with a real individual, much less with Joseph Abboud.[1] Mr. Abboud also has failed to establish his claim under N.Y. CIV. RIGHTS LAW § 50 for the alleged unauthorized use of his endorsement and/or publicity rights. Mr. Abboud provided "written consent" in the Purchase and Sale Agreement, as required by N.Y. CIV. RIGHTS LAW § 50, for JA Apparel's use of his name and, in all events, there is no basis to the assertion that Mr. Abboud has any right of publicity separate and apart from the rights that he transferred to JA Apparel in the Purchase and Sale Agreement. As for Houndstooth and Herringbone, there is no allegation anywhere in the counter-claims – and no evidence – that those entities had any rights under the statutes relied on or that they suffered any injury.

---

[1] Likewise, there is no evidentiary basis for the factual allegation in the counterclaim that JA Apparel and Martin Staff wrongfully attempted to impede the launch of defendants' new venture. And, in all events, there is no claim for relief in the counterclaims based on this spurious allegation, which makes the factual allegations in this regard irrelevant to the issues framed by the counterclaims.

On December 5, 2007, pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73, the parties consented "that a United States Magistrate Judge conduct all further proceedings in this matter, including any trial and entry of final judgment," and Judge Batts then referred this action to this United States Magistrate Judge. (Consent Order, Dec. 5, 2007, Dkt. Entry 19; Order of Reference, Dec. 5, 2007, Dkt. Entry 18). This Court conducted a trial of all of the parties' claims on February 20-22 and March 10-12, 2008. At the trial, JA Apparel called as witnesses Martin Staff, JA Apparel's President and Chief Executive Officer; Trudy Larson, JA Apparel's Vice President of Marketing; Tony Sapienza, President of JA Apparel's factory in Massachusetts; and Laura Decker, JA Apparel's Marketing Coordinator. Defendants called as witnesses Joseph Abboud, President of Herringbone and Houndstooth; Theodore Dinsmoor, defendants' counsel; Lewis Frankfort, Chairman and CEO of Coach, Inc.; and Steven Kolb, Executive Director of the Council of Fashion Designers of America. JA Apparel also called Jeffrey LaGueux, counsel to the buyer during the negotiation of the agreements at issue in this litigation, as a rebuttal witness. In addition to designations and cross-designations of some of the above witnesses, the parties submitted designations and cross-designations of eight other witnesses: Eric Spiel, JA Apparel's Senior Vice President of Finance and Chief Financial Officer; Robert Kidder, President of Herringbone Shirt Manufacturing Company, LLC ("Herringbone Shirt"); John Colucciello, Controller of Herringbone Shirt; Alan Victor, President of Jack Victor; William Sopp, counsel to defendants; William Mitchell, Mr. Abboud's friend and Vice Chairman of Ed Mitchell, Inc.; Richard Baker, President and CEO of NRDC Equity Partners, the owner of Lord & Taylor; and Andrew Schwartz, President of Herringbone Sportswear Company, LLC.[2]

---

[2]    Trial testimony is referred to as "TT" followed by the relevant transcript page numbers; deposition
(continued...)

The following findings of fact ("FF") and conclusions of law ("CL") – based upon a careful review of the entire record, an appraisal of the witnesses' testimony and demeanor, and the reasonable inferences to be drawn therefrom – constitute the Court's reasons, as required by Rule 65(d) of the Federal Rules of Civil Procedure, for ruling in favor of JA Apparel on both its and defendants' claims, for granting JA Apparel an accounting of profits earned during the Restricted Period of $578,104.10, and for granting JA Apparel a permanent injunction.

## I.

### FINDINGS OF FACT

#### A. THE PARTIES

1.    JA Apparel ("JA Apparel"), founded in 1988, is the owner of the "Joseph Abboud" name and numerous marks that incorporate, or are variations of, that name.  Although once strictly a menswear line, the JOSEPH ABBOUD brand now appears on a wide variety of products, including men's and boys' clothing, accessories, and home furnishings.  (TT 26).  In addition, JA Apparel is the owner of all rights to use and apply for the registration of new trade names, trademarks, service marks, logos, insignias and designations containing the words "Joseph Abboud," "designed by Joseph Abboud," "by Joseph Abboud," "JOE" or "JA," or anything "similar thereto

---

[2]    (...continued)
testimony is referred to as "[witness last name] Tr."; JA Apparel's trial exhibits are designated as    "PX-"; defendants' trial exhibits are designated as "DX-"); defendants' memorandum of law in opposition to JA Apparel's motion for a preliminary injunction (Dkt. Entry 11) is referred to as "Defs. PI Mem."; Defendants and Counterclaim-Plaintiffs' [Pre-Trial] Proposed Findings of Fact and Conclusions of Law, Feb. 14, 2008, as "Defs. Pre-Trial FF/CL"; Defendants and Counterclaim-Plaintiffs' Memorandum of Law in Support of Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiffs' Motion *in Limine* to Preclude the Admission of Parol Evidence, Feb. 14, 2008 (Dkt. Entry 33), as "Defs. Cross-Motion Mem."; Defendants and Counterclaim Plaintiffs' Trial Brief, Feb. 19, 2008 (Dkt. Entry 37), as "Defs. Trial Br."; Defendants and Counterclaim-Plaintiffs' Bench Memo on Use of Descriptive Terms in Their Descriptive Sense, March 5, 2008, as "Defs. Bench Mem."; and Defendants and Counterclaim-Plaintiffs' Reply Memorandum on Use of Descriptive Terms in Their Descriptive Sense, March 31, 2008, as "Defs. Reply Bench Mem."

or derivative thereof."  (PX-1 ¶ 1.1(a)(C)).  JA Apparel is also the owner of all goodwill associated

with that intellectual property.  (*Id.* ¶ 1.1(a)(E)).

2.    JA Apparel was formed when Mr. Abboud, through his wholly-owned corpor-

ation, Houndstooth Corp. ("Houndstooth"), entered into a joint venture arrangement with GFT USA,

Inc. ("GFT") to manufacture, market and sell various products under the Joseph Abboud brand

name.  (TT 332-33; Answer ¶ 19).  When the joint venture was terminated in 1996, JA Apparel

became a wholly-owned subsidiary of GFT.  (TT 366-67; Answer ¶ 19).  As explained below (*see*

FF 13-14, *infra*), in 2000, JA Apparel purchased all of the ABBOUD Marks from defendants Joseph

Abboud and Houndstooth.  In March 2004, JA Apparel was sold to affiliates of J.W. Childs Associ-

ates, L.P. ("J.W. Childs").  (TT 18-19; *see* FF 17, *infra*).  It is undisputed that when Mr. Abboud first

began designing clothes for his own account, he made a deliberate decision to use his name as a

trademark and designation for his clothes instead of using an arbitrary or fanciful term such as "jaz."

(*See* TT 327).

3.    Mr. Abboud is the sole owner and president of defendants Houndstooth,

formed in 1987, and Herringbone Creative Services, Inc. ("Herringbone").  (TT 312-14).  Herring-

bone owns JAZ Licensing LLC, which is the licensor of Mr. Abboud's "jaz" line of products.  (TT

313).  Herringbone also owns, *inter alia*, Herringbone Sportswear Companies ("Herringbone Sports-

wear") and Herringbone Shirt Manufacturing Company, LLC ("Herringbone Shirt"), which owns

a shirt manufacturing plant in Massachusetts.  (*Id.*).  Herringbone also owns Herringbone Consulting

Company, a company through which Mr. Abboud provides design services to other entities,

including Lord & Taylor.  (*Id.*).

## B.    JA APPAREL AND ITS EXPANSION OF, AND SUCCESS WITH, THE ABBOUD MARKS

4.     From 1988 onward, JA Apparel used the ABBOUD Marks in the manufacture, marketing, and sale of its products and continues such use today.  (TT 26, 33-34).  JA Apparel markets products under, *inter alia*, the "Joseph Abboud" and "JOE Joseph Abboud" brand names and is in the process of launching a fragrance line that will include "by Joseph Abboud" in the product name.  (TT 26-30).  JA Apparel's promotional efforts have been highly successful, and the resulting increase in consumer demand for JA Apparel's clothing line has resulted in a substantial boom to sales.  (TT 30, 32).  As Mr. Abboud testified, by 2000, the ABBOUD Marks were "valuable" and part of a "successful brand."  (TT 540-41).  In the United States alone, JA Apparel achieved $95 million in wholesale sales in 2006, growing by over 30% since the prior year.  (TT 30, 257; PX-192).  Since its 2004 acquisition by its current owner, the value of JA Apparel's retail worldwide sales has grown substantially, from less than $200 million in 2004 to over approximately $300 million in 2007, which is projected to be the biggest year in net terms that JA Apparel has ever had.  (TT 30-31, 41, 246).  Based on the strength, recognition and value of the "Joseph Abboud" brand name, since the 2004 acquisition, JA Apparel's licensing revenue has increased over 300% and it has added over 25 new license partners, and JOSEPH ABBOUD products are available in more than 50 countries internationally.  (TT 26, 30, 32).[3]

---

[3]     Defendants attempt to make much of the fact that JA Apparel's projections for tailored clothing and license fees were not met in 2007.  This was due to general trends in the industry, to Nordstrom's decision to emphasize European labels and to de-emphasize American labels, and to fewer licensees signing licenses than anticipated.  (TT 31; Spiel Tr. 251, 265-68).  Despite the retail recession, 2007 "was the biggest volume year that the brand Joseph Abboud ever had by far, and was the second most profitable year the company ever had."  (TT 41). In addition, JA Apparel's performance exceeded that of the six publicly traded companies to which it benchmarks its success.  (TT 31).  JA Apparel remains "the strongest American designer at the very best stores in America."  (Staff Tr. 355).  In any event, as explained below (CL 61, *infra*), the failure to meet a marketing projection for one year for a brand that otherwise has enjoyed enormous sales and success does not undermine the strength of the brand's trademark or the brand owner's right to protection from likely confusion.  (*See* Baker Tr. 19).

5.     Consumer demand has led JA Apparel to expand its Joseph Abboud product line to eyewear, hosiery, jeans, scarves, jewelry, luggage, small leather goods, outerwear, sleepwear, and rainwear, as well as a home collection, including bath accessories, dinnerware, flatware, and a large range of other goods.  (TT 26; PX-192).  JA Apparel's ABBOUD Marks also have received substantial third-party recognition in the media as identifying JA Apparel's products.  (TT 38-39; PX-6).  Consumer aided awareness of the JOSEPH ABBOUD brand is "twice as high as some of [JA Apparel's competitors]."  (TT 36-37).

6.     JA Apparel's tailored clothing, accessories, and furnishings bearing the ABBOUD Marks are available for sale at specialty retailers and department stores throughout the United States, including Nordstrom, Bloomingdale's, Saks Fifth Avenue, Lord & Taylor, Blooming-dale's, Macy's, Parisian/Belk, and other better department and specialty stores.[4]  (TT 32).  JA Apparel primarily targets 35 to 54 year-old men and its high-end, high quality products are priced accordingly.  (TT 33, 37).  For example, the price range of its JOSEPH ABBOUD suits is $695 to $1,085 and sport coats has been $475 to $895 (now $495-$895).  (TT 33, 37).  Under its JOE Joseph Abboud mark, JA Apparel has sold clothing geared to a slightly younger target audience.  (TT 27; Spiel Tr. 237).

7.     JA Apparel has spent about $7 million per year to advertise, market, and promote its products under the ABBOUD Marks at a wide variety of special events, as well as in a wide range of media, including nationally and internationally circulated newspapers and magazines, and the Internet.  (TT 33-35).  JA Apparel promotes its line of products in magazines, such as *GQ, Esquire* and *Best Life*.  (TT 34-35).  JA Apparel participates in major fashion trade

---

[4]     JA Apparel has on occasion sold excess stock to off-price retailers (*i.e.*, Marmaxx, TJ Maxx, Syms, Century 21, Filene's Basement) and discontinued items to Men's Warehouse.  It does not sell to Kohl's, JC Penney or Target.  (TT 42; Spiel Tr. 272-77, 317).

shows in North America, including the New York Designer's Collective, Chicago Collective, MAGIC, House and Home Chicago, and the Karvet Showroom event in Los Angeles, as well as works closely with its retailing customers, including department stores, to advertise, market, and promote the brand. (TT 34-36). In addition, since 1998 JA Apparel has owned the website "josephabboud.com" on which it advertises and promotes products under the names, trademarks, trade names, service marks, logos, insignias and designations that include "Joseph Abboud." (TT 34).

8. Indicative of the additional strength that JA Apparel has added to the already strong ABBOUD Marks is that in 2006, four companies engaged in discussions for a possible purchase of JA Apparel for a price in the range of $150 million to $192 million, as compared with the $65.5 million that JA Apparel paid for the ABBOUD Marks in 2000 and the $73 million that its current owners paid for JA Apparel in March 2004. (TT 62-64). JA Apparel rejected the offers as inadequate. Both it and its financial advisor, as well as its principal shareholders, believed the company to be worth more than these offers. Even with the downturn in the economy since then, the company is still worth multiples of what defendants sold it for. (TT 64, 242, 243).

9. In late 2004, JA Apparel began running an advertising campaign entitled "Hey Joseph, What Should I Wear," which ended in Spring 2006. (Staff Tr. 308). In this campaign, JA Apparel elicited questions from people who had questions about fashion and provided them with fashion advice. (TT 50, 429-30, 618-19). It operated a website at "askjosephabboud.com" on which it posted answers to questions raised by fashion consumers. (TT 159-60, 430). While Mr. Abboud still worked at JA Apparel, he was an active participant in the campaign and personally answered

the "questions on behalf of the company." (TT 50, 160-61, 619; PX-193; PX-194).[5]  The personal services contract paid Mr. Abboud an honorarium of $12,000 per year to serve as Chairman Emertis; Mr. Abboud did not ask for, nor receive, any compensation for his involvement in the "Hey Joseph" campaign. (TT 51, 619).  After Mr. Abboud left JA Apparel, the company's design team assumed responsibility for answering the fashion questions and, as such, the responses posted on the website were drafted to show group authorship, *i.e.*, "We recommend," and "We think." (TT 51-52, 200; PX-173).  The site made clear that "The Joseph Abboud Design Staff" was answering questions and not an individual named Joseph Abboud.  (TT 51-52, 200).

      10.    JA Apparel also promotes its products sold under its "JOE Joseph Abboud" trademark in the "Do You Know Joe" advertising campaign.  (TT 60).  This campaign began in or about September 2006, when JA Apparel launched the "JOE Joseph Abboud" brand in stores, which is geared toward a younger male consumer than JA Apparel's JOSEPH ABBOUD brand clothes.  (TT 27, 59-60).  The inception of the ad campaign was "Not Your Average Joe."  (TT 208, 211).  The campaign is promoted on the website "douknowjoe.com," which refers to a fictitious character named "Joe," and on billboards, posters and digital on-line banners.  (TT 60-61, 206-08).  As defendants' counsel acknowledged at trial, "JA Apparel has the right to use the mark JOE."  (TT 209).  There is no evidence – testimonial, survey or otherwise – that anyone associates the fictitious "Joe" character on the website or the "Joseph" in the "Hey Joseph" campaign with Joseph Abboud, the individual.  (TT 621, 623).  Nor does anything on the websites or in the advertising campaigns using

---

[5]    Mr. Abboud also participated in the renaming of JA Apparel's union factory in New Bedford, Massachusetts. The factory, previously called "Riverside Manufacturing Corporation," was renamed "Joseph Abboud Manufacturing Corporation" in May 2004.  (TT 48-49).  As he conceded, Mr. Abboud "never" said JA Apparel did not have rights to put the name "Joseph Abboud" on the factory, and he enthusiastically participated in the ribbon-cutting ceremony when the factory's new sign was revealed.  (TT 47-50; PX-161, PX-401).  Although Mr. Abboud testified at trial that his attorney, Mr. Dinsmoor, objected to the renaming of the plant, Mr. Dinsmoor testified that he was not even aware of the factory's sign until this litigation.  (TT 435, 626-27, 1005-06).

the phrases "Do You Know Joe" or "Hey Joseph" suggest an association with a real individual, much less with Joseph Abboud.[6]

## C.    JA APPAREL'S TRADEMARK REGISTRATIONS

11.    JA Apparel is the owner of the following U.S. Trademark Registrations for the following ABBOUD Marks, each of which has become incontestable under 15 U.S.C. §§ 1065, 1115(b):

| Mark | Goods | Registration No. |
|------|-------|------------------|
| JOSEPH ABBOUD | eyeglasses | 1756084 |
| JOSEPH ABBOUD | men's and women's apparel; namely, suits, jackets, shirts, ties, sweaters, trousers, overcoats and raincoats | 1675915 |
| JOSEPH ABBOUD | perfumed water, perfumed oil, eau de cologne, perfume, eau de perfume, eau de toilette, splash cologne, and after shave balm; | 2345776 |
| JOSEPH ABBOUD | computer carrying cases of leather; cellular telephone holders of leather; small leather goods namely, trifold, slimfold, wallets, fanny packs; change purses; business card cases; leather key fobs; key cases; briefcase-type portfolios; backpack briefcases; briefcases | 2471279 |
| JOSEPH ABBOUD | retail clothing store featur- | 2357617 |

---

[6]    Mr. Dinsmoor testified to putting JA Apparel "on notice" that some of its conduct, including the "Hey Joseph, What Should I Wear?" and "Do You Know Joe" campaigns, was allegedly violative of Mr. Abboud's so-called "publicity rights." (TT 849-51, 857-59). Regardless of what Mr. Dinsmoor did or did not complain about, JA Apparel was within its rights to use "Joseph Abboud" in all cited instances.

| Mark | Goods | Registration No. |
|---|---|---|
| | ing clothing, watches and wallets | |
| JOSEPH ABBOUD | textiles, namely towels, tablecloths, handkerchiefs, cloths for pillows, chairs, hanging scrolls and flags | 2408887 |
| JOSEPH ABBOUD | watches | 2408889 |
| JOSEPH ABBOUD | perfumed water, perfumed oil, eau de cologne, perfume, eau de perfume, eau de toilette, splash cologne, aftershave balm | 2408660 |
| JOSEPH ◇ ABBOUD | watches; small leather goods, namely wallets; sport shirts, knit shirts, sweaters, trousers, outer-wear, namely, overcoats and rain coats, leather coats and jackets, swimwear, loungewear, pajamas, robes, suits, sport coats, dress trousers, tuxedos, dress shirts, neckwear, scarves | 2690336 |
| JOSEPH ◇ ABBOUD | retail clothing store featur-ing clothing, watches and wallets | 2355271 |

(PX-15, PX-16, PX-17, PX-18, PX-19, PX-21, PX-20, PX-22, PX-23, PX-27; TT 24).

      12.     JA Apparel also owns the following U.S. Trademark Registrations for the following ABBOUD Marks:

| Mark | Goods | Registration No. |
|---|---|---|

| | | |
|---|---|---|
| JOSEPH ABBOUD JEANS INC. | jeans, clothing, namely, sport coats, pants, trousers, blazers, vests, shirts, knit shirts, T-shirts, sweaters, cardigans, belts for clothing, shorts, sweatshirts, outerwear, namely, leather coats and jackets | 3199722 |
| JOSEPH ◇ ABBOUD ENVIRONMENTS | candles; ribbons and braids | 2976156 |
| JOSEPH ◇ ABBOUD ENVIRONMENTS | flatware; mattresses and decorative pillows, down pillows and non-metal shower hooks; dinnerware and napkin rings made of non-precious metal; bath accessories, namely soap dishes, soap dispensers, toothbrush holders, and waste paper baskets; home furnishings, namely, down comforters, bed sheets, comforters, bed skirts, pillow shams, duvet covers, draperies, towels, shower curtains, tablecloths not of paper, textile, plastic and vinyl placemats, textile napkins, fabric table runners, and decorative fabric, namely, cotton, silk, polyester, nylon and wool | 2796710 |
| JOSEPH ABBOUD PROFILE | clothing, namely, suits, trousers and sport coats | 3303801 |

| | clothing – namely, suits, sportcoats, trousers, overcoats, raincoats, dress shirts, ties, bow ties and pocket squares | 1648203 |
|---|---|---|
| | clothing; namely, slacks, jeans, shorts, bermuda shorts, boxer shorts, bathing suits, shirts, socks, belts, suspenders, hats, scarves, gloves, ties, sweat pants, sweat shirts, sweat suits, knit shirts, sport shirts, tee shirts, tank top shirts, blouses, halter tops, turtle necks, underwear, hosiery, tights, body suits, sport coats, suits, coats, jackets, dresses, tennis wear and ski wear | 1802766 |

(PX-24, PX-25, PX-26, PX-28, PX-29, PX-30; TT 24).

## D.    JA APPAREL'S RELATIONSHIP AND AGREEMENTS WITH MR. ABBOUD

13.    On June 16, 2000, JA Apparel entered into the Purchase and Sale Agreement with Mr. Abboud and Houndstooth.  (PX-1).  Mr. Abboud, who was represented by counsel, read the Agreement before signing it and initialed each page on behalf of himself and Houndstooth.  (TT 767-68; Abboud Tr. 89-90).   In the Agreement, Mr. Abboud and Houndstooth sold all of the ABBOUD names, trademarks, trade names, service marks, logos, insignias and designations, and their related goodwill, as well as any license agreements pertaining to those marks, to JA Apparel for $65.5 million.  (PX-1 ¶¶ 1.1, 1.2).  The Agreement provided that every dollar of the $65.5 million payment would "be allocated 100% to Mr. Abboud."  (PX-1 ¶¶ 1.2).  As Mr. Abboud's

attorney put it, the Agreement was an opportunity for Mr. Abboud "to cash out." (PX-197, Dinsmoor 4/4/03 Tr. 26).

14.    The terms of sale in the Purchase and Sale Agreement were clear and explicit – in exchange for $65.5 million, Mr. Abboud and Houndstooth sold *all* of their interest in the ABBOUD Marks, including the related goodwill. The relevant provisions provide as follows:

1.1(a)    Upon the terms and subject to the conditions of this Agreement, on the Closing Date (as hereinafter defined), the Sellers shall sell, convey, transfer, assign and deliver to the Buyer, and the Buyer shall purchase and acquire from the Sellers, *all of the Sellers' right, title and interest* in and to:

(A)    The *names, trademarks, trade names, service marks, logos, insignias and designations* identified on Schedule 1.1(a)(A) [which includes 11 marks registered in the United States that include the words "Joseph Abboud" or "JA"],[7] and all trademark registrations and applications therefor, *and the goodwill related thereto* (collectively, the "Trademarks"), . . .

(B)    *All* licenses to use the Trademarks granted by Houndstooth or Abboud . . . (collectively, the "License Agreements").

(C)    *All rights to use* and apply for the registration of *new trade names, trademarks, service marks, logos, insignias and designations containing the words "Joseph Abboud," "designed by Joseph Abboud," "by Joseph Abboud," "JOE" or "JA," or anything similar thereto or derivative thereof, either alone or in conjunction with other words or symbols (collectively, the "New Trademarks"), for any and all products or services.*

---

[7]    Schedule 1.1(a)(A) to the Purchase and Sale Agreement (PX-1) includes a complete worldwide list of marks that were transferred to JA Apparel in the Agreement. The U.S. trademark registrations listed in the Schedule for the JOSEPH ABBOUD mark were: Reg. Nos. 1,756,084 and 1,675,915. Also listed in the Schedule were the following trademark applications for the JOSEPH ABBOUD mark that have since become registered marks: Ser. No. 75,769,266 (Reg. No. 2,345,776), Ser. No. 75,902,628 (Reg. No. 2,471,279), Ser. No. 75,772,376 (Reg. No. 2,357,617), Ser. No. 75,906,922 (Reg. No. 2,408,889) and Ser. No. 75,906,918 (Reg. No 2,408,887). Schedule 1.1(a)(A) further lists Reg. No. 1,773,480 (design mark), Reg. No. 1,802,766 (J.O.E. JUST ONE EARTH AN ENVIRONMENT OF STYLE), Reg. No. 1,648,203 (JA II & design mark), Reg. No. 1,893,638 (JUST ONE EARTH), and Ser. No. 75,906,917 (design mark), along with the following trademark applications that have since become registered marks: Ser. No. 75,772,402 (now Reg. No 2,355,271) (JOSEPH ABBOUD & design), Ser. No. 75,906,921 (now Reg. No. 2,408,888) (design mark), Ser. No. 75,902,629 (now Reg. No. 2,419,195) (design mark), and Ser. No. 75,878,009 (now Reg. No. 2,400,258) (design mark). In the Purchase and Sale Agreement, Mr. Abboud and Houndstooth "jointly and severally represent[ed] and warrant[ed]" that "Schedule 1.1(a)(A) sets forth a list of all of the trademark registrations, service mark registrations and applications . . . currently used by [them]." (PX-1 ¶ 3.6).

\*    \*    \*

(E)  The goodwill of or pertaining to the Trademarks.

(PX-1 ¶ 1.1(a)(A)-(E)) (emphasis added).

15.    On July 13, 2000, JA Apparel and Mr. Abboud also entered into the Side Letter Agreement.  As with the Purchase and Sale Agreement, Mr. Abboud was represented by counsel and read each page.  (TT 767-68; Abboud Tr. 92).  In the Side Letter Agreement, Mr. Abboud agreed, for five years, to provide, *inter alia*, consulting services relating to fashion design and brand promotion of the products sold by JA Apparel under the ABBOUD Marks.  (PX-2 ¶ 1(a)).  Mr. Abboud also agreed, for the two years thereafter (*i.e.*, until July 13, 2007), that he "will not, *directly or indirectly* through any partnership, corporation, limited liability company, trust or other entity, *be associated as an owner, director, officer, employee, consultant or other participant* with, *any* person, group, business enterprise or other entity which *is engaged in or proposes to engage in* the business of designing, licensing, manufacturing, marketing or distributing any products or services which are *or would be* competitive with the business of" JA Apparel.  (*Id.* ¶ 2(a)-(b)).  The Side Letter Agreement further required Mr. Abboud to obtain written permission from JA Apparel before becoming associated in any capacity with any person or entity that competed or proposed to compete with JA Apparel.  (*Id.* ¶ 2(b)).

16.    The non-compete obligations in the Side Letter Agreement were a condition of the sale, and Mr. Abboud expressly acknowledged that the purchase price of $65.5 million he was receiving in connection with the sale provided him with full and fair consideration for his non-competition obligations.  (PX-2 ¶ 2(c)).  Moreover, Mr. Abboud acknowledged in the Side Letter Agreement that his non-competition obligations were specifically bargained for in connection with the

consummation of the sale transaction and that in the event he breached such obligations, JA Apparel "will be entitled to obtain equitable relief in the form of a preliminary or permanent injunction from any court of competent jurisdiction in order to enforce such agreements." (*Id.* ¶ 2(d)). The Side Letter Agreement also reiterated that, in the Purchase and Sale Agreement, Mr. Abboud and Houndstooth had sold to JA Apparel *all* of the ABBOUD Marks and the goodwill related thereto. (*Id.* p. 1).[8]

        17.      Shortly after selling the ABBOUD Marks, including the related goodwill, in 2000 to JA Apparel, Mr. Abboud became involved in an acrimonious dispute with the then owners of JA Apparel (GFT/R.C.S) and JA Apparel's then President and CEO over Mr. Abboud's role in the company's creative process, and instituted litigation against them and JA Apparel. (TT 20, 43, 929-32). In that previous litigation, just as here, Mr. Abboud asserted, based on "oral conversations," that the definition of a term did not mean what it said – there, that his "role of and responsibility of [the] Creative Director" were greater than those defined in the agreement. (TT 930). In 2004, JA Apparel was sold to affiliates of J.W. Childs, which paid $73 million (and assumed certain debt) for the company, in a transaction that closed in March 2004. (TT 18-20). As Mr. Staff, JA Apparel's President and CEO, testified, the right to the Joseph Abboud name was the "cornerstone"

---

[8]     Although Mr. Abboud continues to own Joseph Abboud Worldwide, a company that is listed as active with the Secretary of State, the company has not conducted any business, or "used the name Joseph Abboud in any capacity since the Purchase and Sale Agreement." (TT 1003-05; *see also* TT 25, 314, 369, 657). This inactivity is strong evidence that defendants understood that, as the Purchase and Sale Agreement expressly provides, they sold all trademarks, trade names, etc. containing "Joseph Abboud" to JA Apparel. In addition, the Side Letter Agreement notably provided that all of the employees of Joseph Abboud Worldwide would be paid only through September 30, 2000. (TT 1004; PX-2 ¶ 3(b)). Moreover, because Paragraph 1.1(a)(A) of the Purchase and Sale Agreement transferred "all" "trade names" that include the words "Joseph Abboud," Mr. Abboud was, and is, prohibited from using the Joseph Abboud Worldwide trade name. (TT 1204; PX-1 ¶ 1.1(a)(A)).

of the deal.  (TT 20-21) ("We never would have bought the company if we didn't have exclusive rights to use the name.").

18.    Mr. Abboud subsequently terminated his litigation against JA Apparel, its former owners and then President and CEO, without receiving any monetary or other relief, and was given new responsibilities at JA Apparel by its current owners, pursuant to a June 29, 2004 Letter Agreement ("Letter Agreement").  (TT 45, 932; PX-206; PX-215).  In that letter agreement, Mr. Abboud and JA Apparel "reaffirm[ed] their commitment to the terms of the July 13, 2000 [Side Letter] Agreement" – an agreement that, as noted above, incorporated the terms of the Purchase and Sale Agreement and specifically reiterated that JA Apparel had acquired the ABBOUD Marks.  (TT 45, 163; PX-215 ¶ 1).  Under the Letter Agreement, Mr. Abboud had the right to make a $1 million investment in JA Holding, Inc., a company J.W. Childs formed to facilitate its acquisition of JA Apparel, which right Mr. Abboud exercised.  (PX-215 ¶ 3; TT 46, 426).  In addition, Mr. Abboud was given responsibility for an aspect of JA Apparel's tailored clothing line and was assigned designers to aid him with his work, and JA Apparel agreed to provide Mr. Abboud with access to its merchandising, marketing, publicity and advertising services.  (TT 46-47; PX-215 ¶¶ 8-9).[9]

19.    In Spring 2005, prior to the end of the five-year period set forth in the Side Letter Agreement, Mr. Abboud informed JA Apparel that he was not going to continue his role in JA Apparel.  (TT 53).  Pursuant to the Letter Agreement, Mr. Abboud's investment money was returned.  (*Id*.).  In April 2005, JA Apparel and Mr. Abboud jointly issued a press release notifying

---

[9]    Mr. Staff testified that the Letter Agreement was not meant to replace the previous Side Letter Agreement, but was "intended to additionally safeguard [JA Apparel]" and "to spell out the rules of engagement very clearly."  (TT 46; *see also* TT 1016).

the public of Mr. Abboud's departure.  (TT 54; PX-362).[10]  Contrary to defendants' argument, JA Apparel did not try to conceal from the public Mr. Abboud's departure.  In addition to the press release and stories carried in the regular press (*see* DX-29 at 29-31, DX-173), Mr. Staff "personally called all of [JA Apparel's] key retail partners to inform them that Mr. Abboud was leaving the company" (TT 56).

20.     The conclusion of the five-year personal services period on July 13, 2005 commenced the running of Mr. Abboud's agreement not to compete for two years, a period that ended on July 13, 2007.  (PX-2 ¶ 2(a)-(b)).  During this Restricted Period, Mr. Abboud never sought – and JA Apparel never granted him – any permission to compete with it or to become associated with anyone who competed with or proposed to compete with the company.  (TT 68, 80, 731-32).

## E.     MR. ABBOUD'S REPUTATION

21.     When Mr. Abboud worked with JA Apparel between 1988 and 1996, the company's design team reported to him and he "instructed the designers as to the overall direction of the collections."  (Abboud Tr. 49-50).  All of the products that were produced and sold by JA Apparel had the name "Joseph Abboud" on their labels, and all of the products for which he won design awards had the JOSEPH ABBOUD label.  (TT 338-59, 537-39, 615).[11]  By contrast, all of the goods

---

[10]     Mr. Abboud and his counsel, Mr. Dinsmoor, approved a press release with the following usage of the name "Joseph Abboud": "Joseph Abboud epitomizes American style and sophistication.  Over the company's 17 year history, a plethora of apparel, underwear, accessories, home and lifestyle products have contributed to the development of the $125 million annual business.  Joseph Abboud products are available in the Joseph Abboud flagship store as well as superior speciality retailers throughout the United States." (PX-362; TT 54-55, 441).  Not only did Mr. Abboud and Mr. Dinsmoor agree to the use of Mr. Abboud's name in this manner, but they failed to object to the prominent use of his name on the "Flagship Store."  (TT 1011).

[11]     At trial, Mr. Abboud testified to a litany of awards, all but one of which predated 2000, and the last one of which he received in 2006.  (TT 338-62).  It is undisputed that Mr. Abboud was working for JA Apparel selling clothes under the JOSEPH ABBOUD from 1987 to 2005 and that the awards Mr. Abboud
(continued...)

that he designed for other companies (*i.e.*, Coach, Chanel) did not have the JOSEPH ABBOUD mark, and Mr. Abboud has no evidence than any consumer associated any of those products with him. (TT 508-09, 527, 609). Indeed, Lewis Frankfort, the Chairman and CEO of Coach, testified that when Mr. Abboud consulted for Coach, there were no advertisements notifying the public that the goods were designed by Mr. Abboud, and Mr. Frankfort admitted that he had "no evidence" that would demonstrate that during that time consumers were aware that Mr. Abboud was designing Coach neckwear. (TT 1103).

    22.    Mr. Abboud testified that he began to develop his own designer "DNA" in 1985, when he joined Barry Bricken. (TT 323-25). The clothes Mr. Abboud worked on at Barry Bricken were sold under the "Barry Bricken" label and never used the words "Joseph Abboud" on a label, hang tag or advertising. (TT 323, 327, 518-19). Mr. Abboud also worked on men's accessories collections for both Chanel and Coach, and testified that both collections were "received very well" despite never using the words "Joseph Abboud" in any advertising or marketing materials. (TT 330, 373). Mr. Abboud testified that he wants "jaz" to be his "pure DNA." (TT 450). If, in Mr. Abboud's own words, designer DNA is "indicative of what a designer does" and is "an identification you recognize" (TT 323, 510-11), Mr. Abboud should be able to convey his designer DNA through the "jaz" brand without riding on the reputation of JA Apparel's JOSEPH ABBOUD brand. By contrast, he testified that he intended to create a new DNA for his "jaz" brand, but that he wanted to use the reputation in the name "Joseph Abboud" to build the "jaz" brand. (TT 510-14).

---

[11]    (...continued)

received were for his work on the JOSEPH ABBOUD brand. (TT 538-39, 615). All of the awards given to Mr. Abboud for his design capabilities during the period he worked on the JOSEPH ABBOUD brand were part of the goodwill purchased by JA Apparel as part of the Purchase and Sale Agreement. (PX-1¶ 1.1 (a)(A).

23.    Although Mr. Abboud has appeared on a handful of television shows, it always has been in the context of being a clothing designer.  (TT 513, 537).  Indeed, in the Side Letter Agreement, Mr. Abboud agreed to make personal appearances "on behalf of" JA Apparel whenever JA Apparel "deem[ed] it reasonably necessary *for the benefit of the brand awareness*" of the ABBOUD Marks.  (PX-2 ¶ 1(b)) (emphasis added).  Thus, Mr. Abboud admitted that "one of the reasons [of being on these television shows] was to help promote the [JOSEPH ABBOUD] brand" and "give visibility to the brand" and that he "wanted to be associated with [the JOSEPH ABBOUD] product."  (TT 354, 513, 537, 541).  As for his book, *Threads*, he sold very few copies, and his planned fiction book and hoped-for television show never got off the ground.  (TT 548; Abboud Tr. 374-87).[12]  Mr. Abboud also conceded that defendants have not conducted "any market research to determine whether and to what extent members of the public are aware of you, Joseph Abboud, the man."  (TT 624; *see* Staff Tr. 238-39).

24.    In an attempt to support his contention that he is recognized apart from apparel that bears the name "Joseph Abboud," Mr. Abboud called two reputation witnesses at trial – Lewis Frankfort, Chairman and CEO of Coach, and Steven Kolb, executive director at the Council of Fashion Designers of America ("CFDA"), both of whom have a close personal or business relationship with Mr. Abboud.  (TT 976, 1099).  Both testified that they had no knowledge whether consumers can distinguish  Joseph Abboud, the individual, from JOSEPH ABBOUD, the brand.  (TT 975, 1102-03).  Consistent with Mr. Abboud's concession that he was not aware of any evidence to show that he has any level of recognition or celebrity (TT 624), both also readily admitted that they had no knowledge as to any reputation that Mr. Abboud had among consumers

---

[12]    Mr. Abboud grudgingly admitted at his deposition that his promotional video for his proposed television show falsely stated that his book was on the *New York Times* best seller list.  (Abboud Tr. 378-80).

as opposed to within the fashion industry.  Thus, Mr. Frankfort testified that he was not aware of any surveys of professionals in the fashion industry regarding Mr. Abboud's reputation, that he could not testify for the ordinary consumer, and that the reason *he* would not be confused by Mr. Abboud's use of the name Joseph Abboud to promote his "jaz" line is because *he* personally knows Mr. Abboud is no longer with JA Apparel and that Mr. Abboud is behind the "jaz" line, because Mr. Abboud is his friend.  (TT 1099, 1103-04).  Similarly, Mr. Kolb testified that the reason *he* knew of Mr. Abboud's new "jaz" line was "because I follow the industry" and read the trade press on a "daily basis," that he could only testify to Mr. Abboud's reputation as a designer within the industry, that he "can't speak for the consumer," and that he is not aware of any consumer survey or consumer research showing what percentage, if any, of the American public has heard of Joseph Abboud the individual.  (TT 974-77).  To the same effect was the deposition testimony of Mr. Mitchell another friend of Mr. Abboud.  (Mitchell Tr. 14-15).  He testified:  "I know the industry . . . but I don't know the consumer."  (Mitchell Tr. 91).  Like defendants' other witnesses, Mr. Mitchell is not aware of any consumer survey demonstrating that Mr. Abboud has an identifiable reputation apart from the JOSEPH ABBOUD brand or what percentage, if any, of the American people are aware of Mr. Abboud the individual.  (Mitchell Tr. 54-56).  Indeed, Mr. Mitchell testified that Mr. Abboud's reputation as a designer is based in part on the products that carry the JOSEPH ABBOUD brand name.  (Mitchell Tr. 81-83).  In addition, Richard Baker, the President and CEO of the owner of Lord & Taylor, testified circularly in his deposition that Mr. Abboud's reputation as a fashion designer was based on Mr. Abboud's reputation as a fashion designer.  (Baker Tr. 140).  That none of these witnesses had any probative evidence to provide with respect to Mr. Abboud's reputation, if any, among consumers is particularly compelling because they are personal friends of Mr. Abboud

or, in the case of Mr. Kolb, are employed by the CFDA, of which Mr. Abboud is an active member and financial supporter.[13]

25.     In short, unlike other successful business persons who have reputations or are celebrities wholly apart from their reputation and celebrity in their field of work (*e.g.*, Bill Gates as a philanthropist, Michael Bloomberg as mayor, and Donald Trump as, well, Donald Trump), there is no evidence that Mr. Abboud possesses any reputation other than as a designer of goods bearing the ABBOUD Marks – the very marks all right, title and interest in which he sold to JA Apparel.[14]

## F.  DEFENDANTS' ANNOUNCEMENT OF THEIR "JAZ" MENSWEAR COLLECTION AND THEIR UNAUTHORIZED USE OF JA APPAREL'S ABBOUD MARKS

26.     At about the end of the Restricted Period applicable to the non-competition provisions in Mr. Abboud's Side Letter Agreement, JA Apparel received reports from sources in the fashion industry that Mr. Abboud already had entered or was entering into some type of business relationship with one or more companies to launch a new line of apparel.  Thereafter, on August 6, 2007, JA Apparel learned from an article published in *DNR*, the leading magazine of the men's fashion industry, that defendants had entered into licensing and manufacturing agreements with various companies and individuals to design, manufacture, and market a Fall 2008 menswear collection called "jaz."  (TT 71; PX-8).

---

[13]     *See* TT 454, 611, 972, 976, 1099-1101 (before knowing what the case was about, Mr. Frankfort, whom Mr. Abboud testified was his "mentor," told Mr. Abboud, "Whatever you need Joe, I'm available."), 976; Mitchell Tr. 9 (I "made it clear to Joseph that if I could ever help him in any way" I would); Mitchell Tr. 10 ("whatever I can do to help Joseph Abboud, I will do"; "I've always said to Joe, 'Whatever I can do'"); Baker Tr. 133 ("I have a nice personal relationship with [Mr. Abboud]").

[14]     While Mr. Staff testified that Mr. Abboud is a " legend" and "star," as defendants' counsel brought out on cross-examination, this is so only "[i]n retail circles;" Mr. Abboud was "never a celebrity outside the industry."  (TT 16, 47, 154-55, 171, 178).

27.     The article reported that Mr. Abboud had already "lined up" licensing partner-ships for his new menswear line with (i) Jack Victor Ltd. ("Jack Victor") for tailored clothing; (ii) Cardinal of Canada ("Cardinal") for outerwear; and (iii) J.S. Blank & Co. ("J.S. Blank") for ties. (PX-8).  All three of Mr. Abboud's licensees are direct competitors of JA Apparel, and Cardinal previously had been JA Apparel's licensee.  (TT 76).  Mr. Abboud was also reported to have "negotiated agreements" with (i) Alden Street Shirt, Co. LLC ("Alden") to acquire Alden for the production of his new, competitive shirt line; (ii) Merrill-Sharpe, Ltd. ("Merrill-Sharpe") to acquire Merrill-Sharpe for the production of his new competitive sportswear line; and (iii) veteran menswear executive Robert Kidder to serve as president of Mr. Abboud's dress shirt subsidiary.  (PX-8).  In addition, not only did the article show models wearing numerous items of menswear, but it identified the clothing as "from the Fall '08 JAZ Collection."  (*Id.*).

28.     It initially appeared from the *DNR* article that Mr. Abboud was going to honor JA Apparel's rights in the ABBOUD Marks and was using the name "jaz" to avoid any confusion. In fact, the *DNR* article, authored by David Lipke, noted:  "Abboud, the person, is prohibited from using the Joseph Abboud name on any product or marketing materials."  (PX-8; TT 74).

29.     Two days after the *DNR* article was published, however, Mr. Lipke forwarded to JA Apparel an email in which defendants asked Mr. Lipke to issue a "correction" because, they asserted, they "are free to use [Mr. Abboud's] name in marketing materials, not on clothing." Mr. Abboud's representatives told Mr. Lipke that they viewed the "Joseph Abboud" name as "a very big asset to us" and to their "partners, future partners and accounts."  (TT 81; PX-9).

30.     Mr. Abboud told Mr. Lipke, the author of the *DNR* article, that "I wanted to use my name and reputation for all the years I built it up to help promote my new JAZ collection." (TT 491-92).  Mr. Abboud also told his assistant to "just tell Mr. Lipke that we believe we have the

rights to use our name in advertising and marketing." (TT 564-65). She then asked *DNR* to print a Clarification. (TT 563-65). *DNR* obliged Mr. Abboud, running what it called a "Clarification" in its August 13, 2007 issue. (PX-10). The Clarification stated that, "according to [Mr.] Abboud and his attorney, Theodore Dinsmoor, the designer . . . is, in fact, *allowed to use his own name on marketing and advertising materials for Jaz.*" (PX-10) (emphasis added). (TT 921-22).[15]

31.    Similarly, Mr. Abboud told Mr. Lipke, the author of the *DNR* article that "[I] owned my publicity rights, [and] that I believe I had a right to use my name in advertising and marketing as long as it was used in an informational way to inform the public that I was the designer of JAZ." (Abboud Tr. 140; *see also* TT 493 ("I just want to describe to people that I created a new concept"), 569, 578-80 ("I have the right to inform the public of who is designing a new collection"), 609, 617).

32.    Defendants also expressed their intent to infringe JA Apparel's rights in an article in *The Wall Street Journal*. On August 6, 2007, the paper reported that "Mr. Abboud and his attorney" stated that Mr. Abboud "plans to promote his new label with the tagline 'a new composition by designer Joseph Abboud.'" (PX-11 p.2; TT 83-84, 561-62). Mr. Abboud admitted to providing *The Wall Street Journal* author with a "press release" using the tagline "a new composition by designer Joseph Abboud" and confirmed that, unlike with *DNR*, he never asked the author to print a clarification after the article was published announcing that "a new composition by designer

---

[15]    At trial, Mr. Dinsmoor testified that the quotation in the article was not entirely accurate. (TT 922). This is of no moment given that Mr. Dinsmoor's recollection of what he told the author of the article is not materially different from the Clarification as it appeared in *DNR*. (TT 922) ("My recollection is that I said: But the public has the right to know that . . . Joseph Abboud is the designer of the products that he markets and sells under his JAZ label."). Furthermore, Mr. Dinsmoor believed the author "conflate[d]" his and Mr. Abboud's statements and, significantly, he did not testify that the author had written anything that was not true. (*Id.*). Defendants did not call the author as a witness.

Joseph Abboud" was not going to be the tagline for "jaz." (TT 562-66). Recognizing that the use of the tagline "a new composition by designer Joseph Abboud" would constitute trademark infringement, Mr. Abboud attempted to walk away from what he and Mr. Dinsmoor told *The Wall Street Journal*. (TT 568, 572-74). It was only under examination by the Court that Mr. Abboud acknowledged that the article accurately reported that he and Mr. Dinsmoor said that Mr. Abboud "plans" to use "a new composition by designer Joseph Abboud." (TT 569-73; PX-11). Indeed, Mr. Abboud reserved the right to use the tagline, but only because of the lawsuit did he hold off doing so. (TT 574).

33.    Neither Mr. Abboud, nor any of the other defendants, has any – nor was given any – authorization to use the ABBOUD Marks in connection with a clothing line or "for any [or] all products or services," as set forth in the Purchase and Sale Agreement. (TT 68, 80, 731-32; PX-1 ¶ 1.1.(a)(C)). In connection with their "jaz" clothing line, defendants intend to use the trademarks or designations "a new composition by designer Joseph Abboud," "Joseph Abboud" and "by the award-winning designer Joseph Abboud." The last is a designation they proposed in the middle of trial in the hope that, unlike "a new composition by designer Joseph Abboud," it would pass muster (*see* FF 44, *infra*) and would not constitute a breach of the Purchase and Sale Agreement. But it is no different. Each of the phrases "a new composition by designer Joseph Abboud" and "by the award-winning designer Joseph Abboud" are barely discernable variations of the names, trademarks or designations "Joseph Abboud," "designed by Joseph Abboud," and "by Joseph Abboud," and are plainly "similar thereto" or "derivative thereof." Because Mr. Abboud sold to JA Apparel all right, title and interest to all names, trademarks, trade names, service marks, logos, insignias and designations that include "Joseph Abboud," and all trade names, trademarks, service marks, logos, insignias and designations containing the words "Joseph Abboud," "designed by Joseph Abboud,"

"by Joseph Abboud," "or anything similar thereto or derivative thereof," Mr. Abboud cannot use them.  (PX-1 ¶ 1.1(a)(A), (C)).  Indeed, before this litigation commenced, when, in connection with drafting a license agreement, Jack Victor proposed that the "jaz" hangtag include the phrase "designed by Joseph Abboud," Mr. Dinsmoor, defendants' attorney, correctly advised Jack Victor that "Joe's name cannot be used on a hangtag, as such use would constitute a trademark infringing on JA Apparel's trademark rights."  (PX-152; TT 934-37).

34.    Defendants' "jaz" line of clothing, which will be sold in connection with the trademarks or designations "a new composition by designer Joseph Abboud" and "by the award-winning designer Joseph Abboud," or will otherwise use "Joseph Abboud," will be sold in many of the same department and retail stores that sell JA Apparel's JOSEPH ABBOUD brand products and at similar price points.  (TT 72-73, 76, 87-88, 95-96, 610-14; PX-8; PX-11).[16]  In addition, defendants will target a similar audience to that of JA Apparel.  (TT 73, 88; PX-8).  As for advertising, although Mr. Abboud has testified that he has not decided on actual ads for his new line (*see* FF 37-44, *infra*), he prepared draft ads with Jack Victor that use the designations and trademarks "a new composition by designer Joseph Abboud" or "a new composition by Joseph Abboud," and a press release for prospective licensees that uses the phrase "a new concept from designer Joseph Abboud." (TT 568, 578, 596-600; PX-38, PX-42, PX-44, PX-101, PX-390).  In addition, although Mr. Abboud testified that he has no specific advertising plans at the moment, there is no reason to believe that the advertising channels he will use for defendants' "jaz" line will not be the same as, or at least

---

[16]    Defendants' reliance on their assertion that "jaz" products  may be sold at slightly higher price points than JA Apparel's JOSEPH ABBOUD products is misplaced.  JA Apparel's JOSEPH ABBOUD brand suits compete against suits that are priced in the same range and also suits that are priced higher.  Included among JA Apparel's principal competitors are "labels like Giorgio Armani, Zegna, Canali, who are more expensive than Joseph Abboud," but who "compete directly with hoping-to-buys."  (TT 87).  Indeed, the Court took judicial notice of the common sense fact that more expensive items are in competition with some things that are less expensive.  (TT 705-06).

overlap with, those in which JA Apparel advertises its JOSEPH ABBOUD products, particularly because he had the opportunity to go on the record and say that the channels would not overlap. (TT 593, 680-85, 692, 694-95). Indeed, Mr. Abboud testified that the mockup ads prepared with Jack Victor were for ads they "might do; whether they be for *GQ* or *Esquire*," both magazines in which JA Apparel advertises. (TT 33-34, 598; *see also* TT 695). Moreover, Mr. Abboud has, and will continue, to show his line at many of the same trade shows that JA Apparel attends, and, thus, use of his name on placards or signs for "jaz" at such shows would also likely cause confusion. (TT 99-100, 106-08, 117, 616-18).

## G.    THE INSTANCES OF ACTUAL CONFUSION TO DATE

35.    The mere publicity generated so far about the launch of Mr. Abboud's new "jaz" clothing line already has resulted in numerous instances of confusion as to the source of the line:

(a)    On August 6, 2007, an investment banker emailed JA Apparel's President and CEO after having received a business news alert about defendants' new "jaz" clothing line, in which he offered his "congratulations" because he mistakenly believed that JA Apparel – not Mr. Abboud and his affiliates – had acquired Merrill-Sharpe and Alden. (TT 128-29; PX-187).

(b)    On August 8, 2007, Vanessa Mahlab, the Associate Publisher of *Women's Wear Daily*, congratulated Trudy Larson, JA Apparel's Vice President of Marketing, on Mr. Abboud's return and asked how she liked working with Mr. Abboud. (PX-196; TT 300-02). In other words, notwithstanding that she is a very knowledgeable member of the fashion industry, Ms. Mahlab was "very confused." (TT 300-01).

(c)     On August 9, 2007, Annie Massicotte, the Office Manager of the Greater New Bedford Workforce Investment Board and who had been with the Board for over five years, sent an email to Tony Sapienza, President of JA Apparel's factory in Massachusetts, congratulating him on the acquisition of Fall River Shirt Co., which Mr. Abboud had acquired to make "jaz" shirts.  (PX-189; TT 276-71).

(d)     On August 14, 2007, a "fashion representative for a regional fashion publication" sent an email to Laura Decker, a marketing coordinator at JA Apparel, stating:  "I hear that Joseph Abboud is launching a new men's line called JAZ."  (PX-13; TT 293-94).

(e)     In the Fall of 2007, long-time Congressman Barney Frank, who is obviously knowledgeable about what transpires in his congressional district, congratulated the president of JA Apparel's Massachusetts factory, on the acquisition of Fall River Shirt Co.  (TT 279-80).

(f)     After an article had run in *DNR* in the Fall of 2007 about the new business relationship between Mr. Abboud and Lord & Taylor, Ms. Larson received a text message from Ken Sitomer, who has worked in the menswear industry for approximately thirty years. Mr. Sitomer congratulated Ms. Larson on the *DNR* article placement and commented that JA Apparel's new business relationship with Lord & Taylor must be "very exciting."  Ms. Larson explained that it was Mr. Abboud, not JA Apparel, who had done a deal with Lord & Taylor. Mr. Sitomer responded that he had been confused.  Ms. Larson was very concerned because JA Apparel sells the JOSEPH ABBOUD brand to Lord & Taylor and she was worried that confusion could harm JA Apparel.  (TT 302-03).

(g)     That none of these confused individuals is an ordinary consumer highlights how likely it is that defendants' use of any name, trademark, trade name, service mark, logo,

insignia or designation that includes the words "Joseph Abboud" would be confusing. For

if such sophisticated, knowledgeable people are confused, *a fortiori*, consumers are likely to

be confused.[17]

36.    Finally, the very news articles that announced the launch of defendants' new

"jaz" line indicate that confusion is likely. The August 6, 2007 *DNR* article reported that: "The pro-

spect of designer Joseph Abboud's marketing a new men's wear brand that competes in the same

zone as the Joseph Abboud brand could be a bit confusing to retailers and consumers." (PX-8).

Similarly, *The Wall Street Journal* observed that "JA Apparel could argue that the appearance of the

Abboud name in promotional material could create confusion between the brands." (PX-11).

## H.    DEFENDANTS' PROPOSED "INFORMATIONAL" USE OF THE NAME "JOSEPH ABBOUD"

37.    Throughout this litigation, defendants have taken the position that Mr. Abboud

has "a right to use [his] name in advertising and marketing as long as it was used in an informational

way to inform the public that [he] was the designer of JAZ." (Abboud Tr. 140; *accord,* TT 493 ("I

just want to describe to people that I created a new concept"), TT 580 (Q. "And you believe that you

have a right to use your name to tell the public that you are the source of the design?" A. "In an

informational way or a descriptive way, I have the right to inform the public."); *see* Abboud Tr.

98-109, 129-30, 153, 185-86).

---

[17]    These statements by third parties are admissible because they are not offered for the truth but, rather, for the third party's confused state of mind. FED. R. EVID. 801(c), 803(3). *See, e.g., Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.,* 111 F.3d 993, 1003-04 (2d Cir. 1997) (holding admissible sales manager's testimony because it was "probative of the declarant's confusion" and was "received to show the declarant's then exist-ing state of mind"); *Donahue v. Artisan Entertainment, Inc.,* 2002 U.S. Dist. LEXIS 5930, *25 (S.D.N.Y. Apr. 5, 2002) (testimony as to "statements that indicate actual confusion . . . are admissible to show the declarant's state of mind"); *Adjusters Int'l, Inc. v. Public Adjusters Int'l, Inc.,* 1996 U.S. Dist. LEXIS 12604, *36 n.24 (N.D.N.Y. Aug. 27, 1996) ("anecdotal evidence of actual confusion is admissible. . .under Fed. R. Evid 803 (3) as indicative of the declarant's then existing state of mind").

38.    When asked at his deposition, however, Mr. Abboud was unable to explain *how* he could use his name in an "informational way" in advertising or marketing without using it as a trademark, and stated that he would have to rely on advice of counsel. (Abboud Tr. 125, 141, 221-22). It was not until six days before trial, when defendants submitted their proposed pre-trial findings of fact and conclusions of law, that defendants first attempted to explain their position. Instead of specifying *how* they would use the name "Joseph Abboud" in an "informational way," however, defendants "proposed restrictions" that, for the most part, described how the name could *not* be used:

a.    No use of "Joseph Abboud" as a trademark or service mark;

b.    No use of "Joseph Abboud" in any form on products or product packaging, as well as product labels and hang tags attached thereto;

c.    No use of "Joseph Abboud" in reference to any prior association with JA Apparel, its business activities or its products;

d.    Use of "Joseph Abboud" only as a "descriptive term" to identify Joseph Abboud, individually, as a person, and/or to describe Joseph Abboud as (i) the designer or endorser of products and/or services that he personally designs (or supervises the designing of), selects, approves, markets and/or sells; or (ii) the owner, operator or manager of businesses that he personally owns or operates; or (iii) the celebrity, expert, artist, author, commentator and/or personality appearing in connection with his personal appearances, speaking engagements, or public announcements;

e.    In print, use "Joseph Abboud" only in connection with the trademark "jaz," or other trademarks, service marks and/or trade names, which are more prominently displayed in such materials or media than the name "Joseph Abboud", when any reference is made to any products and/or services; and

f.    In print, use "Joseph Abboud" only in same type size, font and color as the wording adjoining the name "Joseph Abboud." (Defs. Pre-Trial CL 78).

39.    At trial, Mr. Abboud testified that he did not recall seeing these proposed restrictions before, although he "believed" that he discussed them with counsel. (TT 603-04). Signif-

icantly, he did *not* testify, in the words of defendants' proposed restriction "b", that there would be "[*n*]*o* use of 'Joseph Abboud' in *any* form on products or product packaging, as well as product labels and hang tags attached thereto." (Emphasis added). Rather, he testified that "at the present time I'm not planning on using my name on the [product]" or any "derivation" of the name; that "currently" his name would not appear on the "jaz" label; that he was "not planning" on using his name on a hang tag; that "at this time" he was not going to use the phrase "designed by Joseph Abboud" on a product or hang tag; and that he was not intending to use "Joseph Abboud" or the phrases "designed by Joseph Abboud" or "by Joseph Abboud" on any packaging for the "jaz" product or on the product itself. (TT 549-52, 554). Then, when asked if he would "agree that you won't use the words 'by Joseph Abboud' or 'designed by Joseph Abboud' on a label, package or hang tag," Mr. Abboud agreed only that "I would not use them as trademarks." (TT 554). In short, Mr. Abboud would not answer whether he was going to use the phase "a new composition by designer Joseph Abboud" or any other phrase containing the words "Joseph Abboud," and refused to rule it out, stating that he would wait for the Court to rule before making a decision. (TT 501-02, 551-52, 578, 493 ("I'd like to see how we can do it"); 574 ("at the moment we are going to hold ['a new composition by designer Joseph Abboud'] in abeyance until we decide exactly how it is we can do this"); *see also* TT 501-02, 551-52, 578).

40. With respect to advertising or marketing, Mr. Abboud testified that it was "important" to him to be able to use the name "Joseph Abboud," but that he would do so "in a descriptive form in text." (TT 493, 606). Indeed, he purported to license the name "Joseph Abboud" to Lord & Taylor for the "purposes of advertising and/or promoting the Lord & Taylor's Men's and Boy's business." (PX-327A; *see* FF 155, *infra*). When asked at trial, Mr. Abboud was unable to explain *how* he could use his name in an ad for Lord & Taylor without using it as a trademark, and

stated that he would have to rely on advice of counsel. (TT 588-90). Similarly, he repeatedly was unable to explain *how* he could use his name in an "informational way" in advertising or marketing without using it as a trademark, and stated that he would have to rely on advice of counsel. (TT 552-54, 578-80, 589-90, 592, 600-01, 609).

41.    Mr. Abboud also testified, however, that "[w]e believe we had the right to use it [*i.e.*, "a new composition by designer Joseph Abboud"] should we want to use it." (TT 572-73). He further testified that the reason he wants to inform the public that he is the designer of his "jaz" line of clothing is to indicate that he is the "source" of the clothes (TT 580), which is precisely the function of a trademark (*see* CL 42, *infra*) – the very right and asset that Mr. Abboud sold for $65.5 million. (*See also* TT 579 (Mr. Abboud's reason for using "the slogan or tagline 'a new composition by designer Joseph Abboud' is to inform the public that [I am] the creator of the product"), TT 580 ("I want [consumers] to know that I'm behind the JAZ concept, yes"), TT 617 ("I would certainly like to be able to use my name in an informational way that I'm associated with JAZ, whether it's in [a handout or advertising] . . . not just to the trade, but of course to consumers")).

42.    When asked about defendants' proposed restriction "f" – that defendants would "use 'Joseph Abboud' only in same type size, font and color as the wording adjoining the name 'Joseph Abboud'" (*see* FF 38, *supra*) – Mr. Abboud testified that he would want the words "Joseph Abboud" to "[c]ertainly [be] large enough" to see and read. (TT 569). He was unable, however, to testify to a single example of how the name could be used consistent with the proposed restrictions. (TT 569, 606-08, 736).

43.    At the close of Mr. Abboud's trial testimony, the Court had the following colloquy with defendants' trial counsel:

THE COURT:  . . . I think I asked you this at the beginning of the trial Mr. Ederer, but I assume you're not going to leave it to the Court to figure out what the proper language would be.

Have you made any proposal about what you think would not infringe?

MR. EDERER:  No.  We don't have any proposal, your Honor.  (TT 503).[18]

44.    After this colloquy, and well after plaintiff had rested its case, defendants submitted mock-up advertisements using the phrase "by the award-winning designer Joseph Abboud" that they contended would be "informational" uses that would not breach the Purchase and Sale Agreement and that would not infringe plaintiff's trademark and statutory rights.  (DX-187, DX-188). Notwithstanding that the burden of proof is on defendants to establish their "fair use" defense (*see* CL 76, *infra*), they submitted no evidence that these mock-ups, or the phrase "by the award-winning designer Joseph Abboud," would not be likely to cause confusion among consumers as to the source of defendants' "jaz" products.  Indeed, defendants have submitted no market research regarding any potential use of the name "Joseph Abboud," even though Mr. Abboud conceded that he could not testify whether consumers who see the words "Joseph Abboud" can distinguish between the brand and the individual.  (TT 609; *see* TT 514 ("I can't speak for what the public knows."); Abboud Tr. 165-66).  Finally, with respect to a possible disclaimer, Mr. Abboud stated that, while he has discussed potential disclaimers with his counsel, "we didn't formulate any firm direction for what we would do" and that no market research has been conducted with respect to any disclaimer or to whether any disclaimer would prevent consumer confusion.  (TT 602-03; Abboud Tr. 179-80; *compare* TT (Staff) 100-01 ("a disclaimer will only further confuse the consumer").

---

[18]    At the beginning of the trial, the Court, addressing defendants' trial counsel, stated: "I'd like you to make clear to me what it is you're saying you believe Mr. Abboud should still be free to do in regard to this JAZ line."  (TT 2).

# I.    MR. ABBOUD'S BREACH OF THE NON-COMPETE OBLIGATIONS IN THE SIDE LETTER AGREEMENT

45.    As explained in detail below, Mr. Abboud, in a pattern of continuous, deliberate and frequently clandestine conduct, repeatedly breached the non-compete provision of the Side Letter Agreement.  First (and not even disputed by defendants), he "associated" himself "as an owner [or] officer" of defendant Herringbone, a company "engaged in or [that] propose[d] to engage in" a business that "would be competitive" with JA Apparel.  (PX-2 ¶ 2(a)).  Specifically, during the Restricted Period, Mr. Abboud, through Herringbone, purchased a shirt-manufacturing plant in Fall River, Massachusetts.  Also working through Herringbone, Mr. Abboud negotiated and agreed to specific, detailed deal points for the purchase of Merrill-Sharpe, a sports knitwear company.  In addition to acquiring the shirt factory and reaching an agreement in principal to purchase Merrill-Sharpe, Mr. Abboud, through Herringbone, violated the non-compete by negotiating four different licenses during the Restricted Period.  Four months before the end of this non-compete period, Mr. Abboud agreed on the essential terms of a business relationship with the executives and owners of Jack Victor, now the licensee for "jaz"-tailored clothing, even collaborating on the design of "jaz" suits months before the end of the non-compete.  Mr. Abboud also negotiated the principal terms of a licensing arrangement with Cardinal, another current "jaz" licensee, for coats and outerwear before the end of the non-compete period.  In addition, Mr. Abboud had negotiations with J.S. Blank, a neckwear manufacturer, about a licensing relationship for "jaz" before the end of the non-compete.  Finally, Mr. Abboud made a deal to design and market clothing for Lord & Taylor, engaging in substantial and serious negotiations leading to an agreement that was held for signing until after July 13, 2007, the last day of the Restricted Period.  Mr. Abboud negotiated each of these four license

agreements as Herringbone's President, operating out of its offices and utilizing Herringbone's lawyers and resources in breach of the non-compete provisions to the Side Letter Agreement.

46.    A result of his wrongful and clandestine conduct during the Restricted Period was that just over two weeks after the expiration of his non-compete, Mr. Abboud was able to announce to the public a full line of menswear – tailored suits, dress shirts and sport shirts, ties and outerwear. (PX-8; PX-11; PX-338A). Defendants' competitive misconduct, which occurred for at least 90 days prior to the expiration of the Restricted Period, permitted Mr. Abboud to come to market with his "jaz" menswear line a full season earlier than he otherwise would have been able to do and, thereby, deprived JA Apparel of the benefit of the bargain it had struck for $65.5 million.

### 1.    Mr. Abboud's Association with Herringbone Creative Services

47.    Mr. Abboud is and always has been throughout Herringbone's existence the 100% owner and President of the company, which was founded in *2000*. (TT 312-13, 658, 1072-73; PX-376). Notwithstanding that the non-compete prohibits Mr. Abboud from being associated as, *inter alia*, an officer, director, shareholder, or other participant of an entity that competed with or proposed to compete with JA Apparel (PX-2 ¶ 2(a)), Mr. Abboud served as an officer, director and sole shareholder of Herringbone, which, at all times, during the Restricted Period competed or proposed to compete with JA Apparel. All of the steps Mr. Abboud took to realize his competitive activities were made under the umbrella of Herringbone, including negotiating the licensing agreements with Jack Victor, Cardinal and J.S. Blank and the consulting agreement with Lord & Taylor, as well as financing and arranging the acquisition of the Fall River shirt factory and Merrill-Sharpe.

48.    The non-compete obligations of the Side Letter Agreement apply to Herringbone, and those provisions contain no exception for companies that are wholly owned by Mr. Abboud.

49.    Herringbone was and is in every sense a "real" business.  Mr. Abboud incorporated Herringbone as a New York corporation on August 8, 2000, after he entered into the Purchase and Sale Agreement with JA Apparel. (PX-376).  Herringbone was authorized to issue 200 shares of common stock, all of which were issued to Mr. Abboud.  (PX-332; PX-376; TT 658).  In addition to employing Mr. Abboud, Herringbone engaged Rachael Lahren as its Executive Director, who, during the Restricted Period, assisted Mr. Abboud in conducting business on behalf of Herringbone.  (TT 658).

50.    During the Restricted Period and continuing until the present day, Herringbone maintained offices at 640 Old Post Road, Bedford, New York, which consist of two floors containing computers, telephones, and fax machines.   (TT 559, 722; Abboud Tr. 11; Kidder Tr. 160).  Herringbone maintained a Post Office box and telephone and fax numbers in Bedford, New York (*see* PX-137), as well as e-mail accounts for Mr. Abboud (*see*, *e.g.*, PX-39) and Ms. Lahren (*see, e.g.*, PX-87).  Herringbone maintained a corporate credit card that Mr. Abboud used, as Herringbone's President, to travel on company business to numerous places, including Boston and Montreal, to conduct business on Herringbone's behalf.  (PX-136; TT 677).

51.    During the Restricted Period, Mr. Abboud also held meetings at Herringbone with potential and actual business partners.  These meetings are evidenced in Mr. Abboud's datebook, which, although omitting several key meetings and months in the Restricted Period,[19] lists many

---

[19]    The version of Mr. Abboud's datebook produced in this litigation begins in earnest only at the beginning of 2007.  Although plaintiff requested a better, more complete copy of the calendar several times, (continued...)

"jaz"-related meetings at Herringbone's offices during the Restricted Period.  (PX-122; Kidder Tr. 149, Abboud Tr. 586-87).  Defendants also used Herringbone's offices as the site of the "jaz" photo shoot and press conference held on July 30, 2007.  (TT 657-58).  Notably, as defendants conceded at trial, this press conference had been scheduled at least six weeks earlier in June, well before the expiration of the Restricted Period.  (TT 665-66; PX-369).

52.    Moreover, Herringbone had a line of credit with Merrill Lynch where it maintained a bank account.  (TT 910, 1071-1072; PX-70; PX-334).  Herringbone used this line of credit to finance the acquisition of the assets of the Fall River Shirt Company during the Restricted Period.

53.    Herringbone also had outside lawyers, *i.e.*, Mr. Dinsmoor and Burns & Levinson, LLP ("Burns & Levinson"), who represented Mr. Abboud and Herringbone in numerous transactions discussed below.  (TT 1066, 1075; Abboud Tr. 442-43; Sopp Tr. 52-53, 57, 92-93).  Herringbone engaged Manela & Pressman to provide accounting services for it and to serve as its registered agent with the Secretary of State.  (PX-376; Sopp Tr. 188-91).

54.    Throughout the Restricted Period, Mr. Abboud repeatedly identified himself as Herringbone's President in dealing with potential business partners such as Hartmarx and actual business partners such as Jack Victor.  (PX-38; PX-40; PX-137; TT 671-72; Victor Tr. 58-59).

55.    As early as Fall 2006, Mr. Abboud, as Herringbone's President, began actively pursuing new ventures in the menswear business, with the active assistance of Rachel Lahren, Executive Director of Herringbone, and utilizing the offices and resources of Herringbone.  For

---

[19]    (...continued)
defendants claimed that there was no better or more complete copy.  (*See* letter, Thomas A. Smart to Louis S. Ederer, Dec. 5, 2007, p. 4, attached to letter, Louis S. Ederer to Judge Theodore Katz, Dec. 14, 2007).

example, in Fall 2006, through Herringbone, Mr. Abboud commissioned a series of sketches from commercial artist Dominick Leuci, which he characterized as the "DNA of JAZ." (TT 453-54).[20] As he put it, "I sort of carried this always as kind of the image of the brand." (Abboud Tr. 533). Mr. Abboud proceeded to show these sketches along with a highly-developed business plan to prospective partners, customers and investors in the fashion industry – such as Steve Sadove of Saks Fifth Avenue, Lew Frankfort of Coach, and Homi Patel of Hartmarx – as early as December 2006.[21] (TT 454, 569, 668-69; PX-38). Included in the presentation was an exemplar of the "jaz" logo containing the phrase "a new concept from designer Joseph Abboud." (PX-38, PX-48). It is undisputed that Mr. Abboud worked on this presentation and business plan in the Fall of 2006, more than half a year before the end of the Restricted Period. (TT 453-54).

56.    Later, in early 2007, Mr. Abboud presented these sketches and a similar business plan to Jack Victor during initial talks about a licensing agreement. (TT 668). Eventually, these same sketches of the "DNA of JAZ," prepared under the auspices of Herringbone in Fall 2006, were prominently featured in the August 6, 2007 *DNR* article that announced the launch of "jaz." (TT 668-69; PX-8).

57.    During the Restricted Period, Herringbone, in collaboration with the SML Group ("SML"), designed the labels for defendants' new "jaz" menswear line. (PX-242; PX-338A). Mr. Abboud met with SML, in its Manhattan office, in mid-April 2007. (PX-122). According to Herringbone's July 30, 2007 press release, "[t]he [SML] team worked closely with Mr. Abboud

---

[20]    Herringbone paid Mr. Leuci $3,500 for his services. (PX-388).

[21]    In March 2007, Mr. Abboud met with Mr. Frankfort and "shared with [him] some design prototypes, fabrics, concept drawings, and [they] talked about the launch of this ["jaz"] collection and [Mr. Abboud's] business strategies." (TT 1097, 1101).

[during the Restricted Period] to customize the look, feel and quality of each specific size and shape of the new jaz label to ensure brand consistency across all product categories." (PX-242; PX-338A). The "jaz" labels were shared with Mr. Abboud's current license partners as early as June 7, 2007, and shown to other prospective partners as early as December 2006. (PX-38; PX-245).

58.    Mr. Abboud's competitive activities as the president and owner of Herringbone, discussed in detail below, consisted of extensive association with companies during the Restricted Period, which, in the language of the Side Letter Agreement (PX-2 ¶ 2(a)), "engage[d] in "and propose[d] to engage in the business of designing, licensing, manufacturing, marketing or distributing" "products or services which are or would be competitive with the business of the Buyer," not only insofar as Herringbone and/or Mr. Abboud associated with these companies, but also insofar as Mr. Abboud associated with Herringbone itself.

### 2.    Abboud's Acquisition of the Assets of the Fall River Shirt Company

59.    Mr. Abboud and Mr. Dinsmoor readily admitted at trial that Mr. Dinsmoor was "the architect" of a series of transactions whereby the assets of the Fall River Shirt Company, Inc. ("Fall River") were purchased during the Restricted Period by an entity created by defendants' lawyers. (TT 469, 899, 1041). Under this scheme, Mr. Dinsmoor and his colleagues at Burns & Levinson created an entity called Alden Street Shirt Company LLC ("Alden"), installed Robert Kidder as Alden's manager, and then obtained money from Herringbone to purchase the shirt factory in violation of the Side Letter Agreement.

60. In structuring this sham, Mr. Dinsmoor was at all times acting on Mr. Abboud's behalf.[22] As Mr. Abboud testified, Mr. Dinsmoor "was authorized" "at all times" "with any transactions relating to Alden and Herringbone" to act on Mr. Abboud's behalf. (TT 661). Similarly, Mr. Abboud confirmed at trial that his deposition testimony that "Mr. Dinsmoor was acting on my behalf for the entire process and I didn't get involved in any of the documents" was "accurate testimony." (TT 722; Abboud Tr. 447).

61. Fall River operated a plant at 135 Alden Street in Fall River, Massachusetts, which manufactured men's dress shirts and sport shirts for sale at better specialty stores and better department stores. (TT 703; Kidder Tr. 13; Colucciello Tr. 32). One of Fall River's principal customers was Nordstrom, which is also JA Apparel's largest customer. (TT 9, 33, 78-80; Kidder Tr. 52, 53; PX-387A). Fall River sold men's dress shirts and sports shirts to its customers at prices ranging from $65 to $125 (Colucciello Tr. 33; Kidder Tr. 53), which were similar to the prices of JA Apparel's shirts. (TT 78-80).

62. On May 14, 2007, Alden, which defendants' lawyers created only two weeks earlier, acquired Fall River's assets with 100% funding from Herringbone. (PX-129; PX-385; TT 909-10, 912, 1059, 1070; Kidder Tr. 130). Mr. Dinsmoor testified that Fall River's assets could not have been purchased "without Mr. Abboud's willingness to advance the funds." (TT 1061).

---

[22]    *Compare* Declaration of Joseph Abboud in Opposition to Plaintiff's Motion for Preliminary Injunction, Oct. 10, 2007 (Dkt. Entry 12) ¶ 28) ("Weeks after the Restricted Period expired, as part of my plans for my future business, I did proceed to acquire Alden Street Shirt Company, LLC and Merrill-Sharpe, Ltd., both of which I was in contact with prior to the expiration of the Restricted Period. However, I took no position with these companies prior to the end of the Restricted Period.").

(a)    **Kidder Was a Sham "Owner" of Alden**

63.    Mr. Abboud directly hired Robert Kidder, Fall River's former Vice President of Sales, to serve as Alden's manager, and Mr. Kidder had a written agreement *with Herringbone* that made him Alden's manager.  (Kidder Tr. 16-17, 21, 120).  Mr. Kidder served as Alden's top executive, and he freely testified that Alden was owned by Herringbone during the Restricted Period. (Kidder Tr. 101-02, 133, 138-39, 146-47, 150-51).  He identified Herringbone as Alden's owner as of May 2007 numerous times at his deposition, including when he testified:  "Again, it was my understanding that Mr. Abboud's company did purchase the assets of Fall River Company, that is correct," and that the purchase by Mr. Abboud's company was completed in "mid-May 2007."  (*Id.* at 138).  Mr. Kidder based his testimony on his "general information" of the matter and discussions with "Ted Dinsmoor, Mr. Abboud's lawyer," who told Mr. Kidder that "they had, in fact, purchased the assets" of Fall River in mid-May 2007.  (*Id.* at 138-39).

64.    Likewise, Mr. Kidder was adamant that he was not Alden's owner.  When asked directly at his deposition if he was ever the owner of Alden, Mr. Kidder flatly replied, "No, I was the manager."  (Kidder Tr. 148).

65.    Having been continuously employed as an executive by such of the three entities that occupied 135 Alden Street over the past year – Fall River, Alden and Herringbone Shirt Manufacturing Company – Mr. Kidder's testimony that defendant Herringbone actually owned Alden is particularly credible. (Kidder Tr. 133, 138-39, 146-48, 150-51).  Certainly, Mr. Kidder's testimony that he never owned Alden is unassailable.  (*Id.* at 148).  Mr. Kidder is a graduate of Harvard University and a sophisticated businessman with over 30 years of experience in the fashion industry. (*Id.* at 24-49).  Prior to his involvement with Fall River and Alden, Mr. Kidder owned a chain of

men's specialty shops and a well-known manufacturer of bridal wear.  (*Id.* at 26-27, 30-32).  At his deposition, Mr. Kidder testified at length as to where he worked over the last 30 years (over four organizations in the fashion industry) and as to who was the owner of each company.  (*Id.* at 26-49).  He did so with the authority of one who knows his own life and business.  Surely, he would have been aware that he owned the factory had he actually owned it.

66.     Prior to his testifying that Herringbone owned Alden during the Restricted Period, defendants' lawyers, including Mr. Dinsmoor, prepared Mr. Kidder for his deposition for more than five hours over the course of two days, during which time he reviewed numerous documents.  (Kidder Tr. 10-11).  Interestingly, although defendants' counsel cross-examined Mr. Kidder on several subjects at the end of his deposition, he did not question him about whether his recollection that Herringbone was Alden's owner was accurate.  Nor did counsel ask him whether he had made a mistake in stating that he was never Alden's owner.  Nevertheless, *seven weeks* after Mr. Kidder's deposition, defendants provided an affidavit from Mr. Kidder, attached to the errata sheet from his deposition transcript, which stated that during the Restricted Period, he, rather than Herringbone, was the owner of Alden, and thus the Fall River plant.  Mr. Kidder's affidavit – even if it were not inadmissible hearsay – cannot be credited.[23]

67.     Mr. Kidder's testimony reflects that rather than owning the plant, he was at most a straw man to oversee Alden, which was a sham corporation.  Mr. Kidder did not believe he was the owner of Alden and did not act like he owned the company.  Mr. Kidder did not invest any

---

[23]     The affidavit is not admissible under Rule 30(e), FED. R. CIV. P., because it does not "change" Mr. Kidder's answers to particular questions, by page and line number.  Instead, he simply signed an affidavit with a narrative that materially differed from his testimony.  Such a hearsay statement is no more admissible than if defendants had attempted to submit an affidavit at trial in lieu of calling the affiant as a witness, a procedure that would be a plain violation of JA Apparel's due process right to cross-examine a witness against it.

of his own money in Alden and had no personal risk in connection with its business. (TT 718-19, 1071, 1074-75; Kidder Tr. 128-29). All of Alden's money came from Herringbone and Herringbone bore all of the risk of Alden's business. (TT 909-10, 912, 1070; Kidder Tr. 130). Although Mr. Kidder signed a letter of intent between Alden and Fall River in connection with the acquisition ("Letter of Intent"), he characterized that as an agreement between Fall River's majority owner, George Nova, and Mr. Abboud. (Kidder Tr. 101-02). Mr. Kidder signed the Letter of Intent, but he did not "have any clue who negotiated it," and he "was not responsible for anything that is in" the purchase agreement of Fall River's assets. (*Id.* at 107, 115). Mr. Kidder did not know how Alden acquired the assets of Fall River, and had "no idea" how Alden came to hire Burns & Levinson, counsel to Mr. Abboud and Herringbone, to prepare the transaction documents. (*Id.* at 107, 112-13). Moreover, although a demand note reflects that Alden loaned money to Fall River on April 26, 2007 – *prior* to Alden's formation the next day – Mr. Kidder had "no responsibility" for making the loan and did not know who did. (*Id.* at 117-18).

68. Further, although William Sopp, an attorney at Burns & Levinson, prepared all of the loan agreements between Alden and Herringbone, Mr. Kidder did not know whether Mr. Sopp was counsel to Alden. (Kidder Tr. 123-25). Nor could he say whether Mr. Dinsmoor was counsel to Alden. (*Id.* at 125-26). In fact, when Alden's putative owner, Mr. Kidder, was asked whether the same lawyers who represented Herringbone represented Alden, he stated: "Again, I don't know who represented who, but I do know that all of those people [*i.e.*, Mr. Dinsmoor, Mr. Sopp and Burns & Levinson] were involved in the transaction." (*Id.* at 127). Similarly, Mr. Kidder was not involved in the creation of Alden, and it was Mr. Dinsmoor, Mr. Abboud's

attorney, and not Mr. Kidder, who structured the transaction whereby Alden acquired the Fall River assets.  (TT 1041; Kidder Tr. 130, 132).

69.    Mr. Kidder's deposition testimony disavowing any personal ownership of Alden is supported by Alden's corporate documents, which provide that Herringbone owned Alden and the Fall River plant during the Restricted Period.  On April 27, 2007, an Operating Agreement was entered into between Herringbone Shirt Manufacturing Company ("HSM") "f/k/a Alden Street Shirts Manufacturing Company, LLC" and Herringbone, which provided that, as of that date, Herringbone, and, thus, Mr. Abboud, owned 100% of Alden.  (PX-131).  Mr. Abboud signed the April 27, 2007 Operating Agreement on behalf of both HSM/Alden and Herringbone.  (*Id.*).  Defendants assert that Alden did not have an Operating Agreement and that the April 27, 2007 Operating Agreement was actually entered into after the expiration of the Restricted Period, and it was purportedly mistakenly dated April 27, 2007.  (Sopp Tr. 215-17).  Thus, Mr. Sopp claims that the April 27, 2007 Operating Agreement was created in mid to late July, at the instruction of Mr. Dinsmoor, as part of a series of corporate documents whereby Alden's name was to be changed to Herringbone Shirt.[24]  However, the First Amended Operating Agreement for the plant, dated September 6, 2007 ("Amended Agreement"), provides that it was amending an operating agreement "dated April 27, 2007" and defines that earlier agreement as the "April 2007 Operating Agreement." (PX-132).

70.    Further, although defendants allege that Alden did not have an operating agreement, the May 2007 Collateral Assignment and Pledge indicates that Alden had an Operating Agreement as of at least May 2, 2007.  (PX-75).  Indeed, it repeatedly refers to the defined term

---

[24]    This assertion, even if true, shows that Mr. Abboud and his proxy, Mr. Dinsmoor, controlled Alden and had the power to direct Mr. Sopp to change its corporate name.  (Sopp Tr. 215-17).

"LLC Agreement." (*Id.*). It is fair to conclude that the Operating Agreement that the Collateral Assignment and Pledge referred to was the April 27, 2007 Operating Agreement, which reflected Herringbone's ownership of Alden.

71.    Notably, defendants have never corrected these "mistakes" in the operating documents. Thus, the only two operating agreements in existence with respect to the shirt factory reflect that it was owned by Herringbone during the Restricted Period. Neither agreement makes any reference to Robert Kidder ever having owned Alden. (PX-131; PX-132; Sopp Tr. 239; Kidder Tr. 142-45).[25] At the very least, even accepting defendants' version of the events, the numerous "mistakes" in Alden's corporate documents reflect that it was a sham entity that was never intended to be more than a place-holder for Mr. Abboud.

### (b)    Abboud and Herringbone – Not Kidder – Acquired the Shirt Factory During the Restricted Period

72.    The testimony and documents demonstrate that defendants and their attorneys conceived, financed, and executed Alden's acquisition of the Fall River plant in March-May, 2007, and that the acquisition was consummated by them two months before to the expiration of the Restricted Period. (PX-65). Accordingly, even if Mr. Kidder's testimony that Herringbone owned Alden during the Restricted Period is cast aside, it is clear that Mr. Kidder was an owner in name only and that Herringbone and Mr. Abboud were the de facto owners of Alden and the shirt factory.

73.    As described in detail below, defendants – not Mr. Kidder – conducted the due diligence on the transaction. Defendants – not Mr. Kidder – negotiated the deal with Fall River's owner, Mr. Nova. Defendants – not Mr. Kidder – negotiated the purchase price to buy out the bank's

---

[25]    Similarly, the Releases of (i) Limited Guaranty and (ii) Collateral Assignment of Membership Interests and Surrender of Membership Interest also repeatedly refer to Alden's Operating Agreement, which defendants claim did not exist. (PX-220).

security interest with the bank. Defendants' lawyers structured the deal and negotiated the terms of the transaction documents with the lawyers for the seller, Fall River, and with TD Banknorth, which held a security interest on the assets. (TT 905-06, 910-11). Defendants – not Mr. Kidder – provided *all* of the money to acquire the plant and to operate it during the Restricted Period, and did so in a way that allowed them to foreclose on Alden's business at any time. Mr. Kidder did not invest any of his own money in Alden and had no personal financial risk in connection with Alden's acquisition of the Fall River assets. (TT 718-19, 1071, 1074-75; Kidder Tr. 128-29). Instead, all of that risk fell on Herringbone Creative, which provided 100% of Alden's finances. (TT 909-10, 912, 1070; Kidder Tr. 130).

74.     In late March and early April 2007 – before Alden's formation on April 27 – defendants and their professionals conducted due diligence on whether to purchase Fall River's assets. (PX-57). On or about March 5, 2007, Mr. Abboud personally visited the Fall River plant and met with its owner, Mr. Nova. (TT 706-07; Kidder Tr. 65-66; Abboud Tr. 407-08; PX-122). After touring the factory, Mr. Abboud decided he was interested in acquiring it. (TT 468). A couple of weeks later, Mr. Abboud met again with Mr. Kidder to discuss the factory. (TT 707). In late March and April 2007, Mr. Abboud and Mr. Dinsmoor (admittedly on Mr. Abboud's behalf) obtained financial information, including profit and loss and cash flow statements, concerning the plant from Fall River's controller, John Colucciello. (TT 707, 1042-43; Colucciello Tr. 52-57; Kidder Tr. 95-97, 99-100; PX-54; PX-55; PX-123).

75.     Clearly, Mr. Abboud wanted to buy the factory. Thus, on April 8, 2007, Mr. Kidder advised Mr. Colucciello that:

> [F]rom all of my discussions with Joe [Abboud] there is *no circumstance* under which I can forsee [*sic*] JA [Joseph Abboud] *losing his desire to purchase the factory*. (PX-72 (emphasis added); Kidder Tr. 85-86).

Moreover, it was clear that Mr. Abboud's purpose in acquiring the shirt factory was to secure a manufacturing facility for "jaz." Accordingly, in April, Mr. Kidder advised Mr. Abboud that he was "very excited to have the opportunity to work with you and I know that Fall River will be something that you will be proud of and something that will contribute to the future *success of your new brand*." (PX-130) (emphasis added).

76.    Mr. Dinsmoor testified that he toured the Fall River factory to "familiarize [himself] with its operations" and "to try to ascertain for Mr. Abboud's benefit the financial condition of the company." (TT 899-900; *see also* TT 708-09 ("Yes," Mr. Abboud "solicited the help of Mr. Dinsmoor . . . to try to get a sense of the financial situation of Fall River" because Mr. Abboud was "not an expert on the financial side of things")). Despite admitting that he was doing these things on behalf of Mr. Abboud, Mr. Dinsmoor testified that he "recommended the formation of a new company and pursuant to that Mr. Kidder running the company and Mr. Abboud advancing money to the company" out of a charitable motive. (TT 1038-40, 1060-61). Even giving Mr. Dinsmoor the benefit of the doubt, at a minimum, he had mixed motives, one of which was, plainly, acting on behalf of his client Joseph Abboud, to secure the factory for Mr. Abboud. (TT 661, 772, 1037-40).

77.    On April 9, 2007, Mr. Abboud – not Mr. Kidder – met again with Fall River's owner, Mr. Nova, regarding a purchase of the Fall River plant. (TT 706-07; Kidder Tr. 97-98). On April 11, 2007, Mr. Abboud received the plant's cash flow and projected profit and loss statements from Mr. Colucciello, which he forwarded to Mr. Dinsmoor. (PX-54; PX-55; TT 707-09; Colucciello Tr. 52-59). On April 13, 2007, Mr. Dinsmoor advised Mr. Colucciello that he had reviewed the

plant's financial information with Mr. Abboud, but wanted Mr. Colucciello to prepare additional cash flow projections as soon as possible, so that Mr. Dinsmoor, Mr. Abboud, and Mr. Colucciello could have an "intelligent discussion . . . about the company's finances." (TT 1044-45; PX-56; Colucciello Tr. 64-67, 74-75). On April 17, 2007, in an email entitled "Due Diligence," Mr. Dinsmoor asked Mr. Colucciello to provide him with a UCC-11 list of Fall River's outstanding security interests. (PX-57). Mr. Dinsmoor advised Mr. Colucciello that he needed that information "in order for Joe [Abboud] to proceed" with the acquisition. (*Id.*). Three days later, Mr. Dinsmoor obtained the requested information from Fall River's attorney, Richard Mittleman, and advised him by email that he needed to "speak further with Joe" and "expect[ed] to have an outline of the transaction on Monday." (PX-125). Mr. Dinsmoor's colleague, William Sopp of Burns & Levinson, who also was working on Mr. Abboud's behalf at this time, was copied on this April 20, 2007 email. (TT 1048-49). Mr. Sopp took "direction from Ted Dinsmoor" and was admittedly working on Mr. Abboud's and Herringbone's behalf throughout these negotiations and transactions. (TT 1049-51 ("Mr. Sopp was working with respect to the issue of the shirt company at [Mr. Dinsmoor's] direction"); Sopp Tr. 33, 45, 52-53, 92-93 (Mr. Sopp "was acting on behalf of Mr. Abboud's companies for the purpose of the financing that he was interested in doing or considering"), Sopp Tr. 279 ("[Mr. Dinsmoor] directed us to prepare the financing documents")).

78.    In addition to conducting due diligence regarding a possible acquisition, Mr. Abboud and Mr. Dinsmoor discussed the terms of the acquisition with Fall River's owner, Mr. Nova. (TT 1043; Kidder Tr. 71-72, 80, 92-93, 96-98; Abboud Tr. 415). Moreover, Mr. Dinsmoor and Mr. Abboud negotiated the form of the acquisition with Fall River's lawyer, Mr. Mittleman. (TT 710-11, 900, 1042, 1052-53; PX-58; PX-74). In contrast to Mr. Abboud,

Mr. Kidder did not negotiate with Mr. Nova or Mr. Mittleman concerning Alden's acquisition of Fall River's assets. (Kidder Tr. 102; Sopp Tr. 195).

79.    After conducting due diligence and negotiating with Mr. Nova, Mr. Abboud was ready to proceed with the acquisition of the plant's assets. In late April 2007, Mr. Abboud and Mr. Dinsmoor negotiated the Letter of Intent between Fall River and Alden that set forth the agreement whereby Alden would obtain the security interest that Fall River's lender, TD Banknorth, held in Fall River's assets, and Fall River would consent to Alden's foreclosure on those assets. (PX-73, PX-128; Kidder Tr. 103-05). On April 23, 2007, Mr. Dinsmoor, Mr. Sopp and Mr. Abboud met in Burns & Levinson's offices to discuss the Letter of Intent. (TT 1052). Mr. Kidder – the straw man – was absent from that meeting. (TT 1052). Later that day, Mr. Dinsmoor advised Fall River's counsel that he "met with Joe [Abboud] today to review a draft of intent" and that "Joe [Abboud] wants to negotiate the Bank's position before committing to a letter of intent." (PX-58).

80.    Mr. Kidder had no role in the negotiation of the Letter of Intent between Alden and Fall River. (Kidder Tr. 102-05, 107; *see* FF 79, *supra*). Significantly, Burns & Levinson, which allegedly represented Alden, did not provide Mr. Kidder with a copy of the draft Letter of Intent. (PX-128; Kidder Tr. 102-04; PX-128). Later, after the document was fully negotiated, Mr. Dinsmoor asked Mr. Kidder to sign the Letter of Intent, and, as Alden's manager, he complied. (Kidder Tr. 105-106).

81.    In addition to negotiating the Letter of Intent with Fall River's owner, Mr. Dinsmoor and Mr. Abboud also directly negotiated the plant's purchase price with TD Banknorth, which held a security interest on Fall River's assets. Specifically, on April 24, 2007, Mr. Dinsmoor met with representatives of the bank at a meting held at the factory. (PX-74). The

next day, April 25, Mr. Abboud and Mr. Dinsmoor met with representatives of TD Banknorth at the offices of the bank's counsel to negotiate the purchase price of the Fall River assets. (TT 714, 1053-54; Abboud Tr. 445; PX-58).[26] Although at trial Mr. Dinsmoor quibbled with TD Banknorth's characterization of Mr. Abboud as the "buyer," he admitted on cross-examination that Mr. Abboud was an "interested buyer" in these transactions. (TT 1056).

82.    Again, in contrast to Mr. Abboud, Mr. Kidder, the supposed "owner" of Alden, never met or communicated with TD Banknorth regarding the acquisition of the assets and played no role in any of these negotiations. (TT 1053-54; Kidder Tr. 108-10, 157).

83.    On April 27, 2007, Christina Murray of Burns & Levinson sent a revised red-lined draft of the Letter of Intent between Fall River and Alden to Fall River's counsel, Mr. Mittleman. (PX-128). Copied on this email were Messrs. Dinsmoor, Sopp and Abboud, as well as Ms. Lahren. Notably absent from the list of addressees was the straw owner, Mr. Kidder. In fact, Mr. Kidder testified at his deposition that he had never seen any drafts of the Letter of Intent. (Kidder Tr. 112, 159). The fax line on the executed Letter of Intent provided by defendants is dated April 28, 2008, one day after its red-line was sent to everyone but Mr. Kidder. (PX-73).

84.    Also on April 27, 2007, two days after Mr. Abboud and Mr. Dinsmoor's meeting with the bank, Mr. Sopp, at Mr. Dinsmoor's direction, created Alden, listing Burns & Levinson's offices as Alden's corporate headquarters. (PX-129; TT 1059). Mr. Abboud acknowledged "[m]y lawyers certainly did all of the work, the organizational work" for Alden. (Abboud Tr. 414). Mr. Kidder had no involvement in the creation of Alden. (Kidder Tr. 130). As

---

26    Mr. Sopp participated in Mr. Abboud's meeting with the bank via telephone and later billed this time to Alden. (Sopp Tr. 194).

Mr. Dinsmoor testified, "Mr. Kidder did not instruct me to form Alden Street, no." (TT 1062). In fact, it was Mr. Dinsmoor who phoned Mr. Kidder to inform him about the creation of Alden. (*Id.*).

85.    None of the actors in these transactions treated Mr. Kidder as if he were the owner of Alden. On April 27, 2007, Mr. Colucciello, who would stay on as Alden's controller, sent Mr. Abboud and Mr. Dinsmoor an email stating, "I want both Joe and yourself to know that I will be on a mission to save as much money as I possibly can on each and every category of supplier as possible." (PX-53). Mr. Kidder was not copied on this email.

86.    On May 9, 2007, as instructed, Mr. Colucciello provided a spreadsheet to Mr. Kidder and Mr. Abboud detailing the plant's current work for Nordstrom. (PX-387A). Three days later, Mr. Dinsmoor, counsel to defendants, instructed Mr. Colucciello to follow a "script" that Mr. Dinsmoor had prepared for dealing with Fall River's creditors. (PX-66; Colucciello Tr. 118-19). Notably, Mr. Colucciello was an important part of the Fall River management team who stayed on after Mr. Abboud acquired the plant.[27]

87.    On May 14, 2007, defendants consummated their acquisition of Fall River's assets. (PX-65). Mr. Kidder was never provided with a draft of the Secured Party Bill of Sale, which transferred the assets of the Fall River factory from TD Banknorth to Alden, before he signed it. (Kidder Tr. 157-58; Sopp Tr. 195).[28] On May 11, 2007, the bank's counsel sent a note to Mr. Sopp,

---

[27]    As early as April 7, 2007, Mr. Kidder suggested to Mr. Abboud that Fall River's controller, Mr. Colucciello, be encouraged to stay on after Mr. Abboud acquired the plant by telling "Joe": "It would mean a great deal to [Mr. Colucciello] if sometime on Mon[day] when you have a moment you could . . . tell him how much *you* want him to stay on . . . ." (PX-124) (emphasis added). Obviously, if Mr. Kidder was the "owner," he would not have had to persuade Mr. Abboud to keep Mr. Colucciello on as an employee; he would have done so himself.

[28]    Mr. Kidder signed the Secured Party Bill of Sale as "manager" of Alden. At trial, defendants argued that Mr. Kidder was confused between the designation "manager" and "member," and that members of a LLC are actually the owners. (TT 907-09). This argument is wrong, as even the Secured Party Bill of Sale

(continued...)

asking him to send his regards to, among others, "Ted [Dinsmoor]," and "Joe [Abboud]." (PX-64). Noticeably absent was any mention of the straw buyer, Mr. Kidder.

88.     Herringbone provided funds to Alden in a manner that ensured that Herringbone controlled Alden during the Restricted Period. Rather than loaning money to Alden for a fixed time period of one or more years, Herringbone funded Alden through a series of Demand Notes, which Herringbone had the right to foreclose on at any time, upon seven days notice. (PX-134, PX-375; TT 726-28, 1071-74). These loans from Herringbone to Alden were funded by Herringbone's credit facility Merrill Lynch, which, in turn, was secured by Mr. Abboud's assets. (TT 906-11, 1070-72; *cf.* Kidder Tr. 142 ("whether it's constructed as a loan or whether it's constructed as a payment, I don't honestly know")).

89.     Defendants directed their lawyers, Burns & Levinson and Mr. Dinsmoor, to represent Alden in various business matters, including loans that Alden was taking from Herringbone. (Kidder Tr. 112-14).[29] Mr. Kidder, on the other hand, "didn't get involved in any of the legal documents or anything." (Kidder Tr. 123). Although a true buyer of a factory with a purchase price

---

[28]     (...continued)
characterized Mr. Kidder as the "manager," not a "member" or "owner" of Alden. (PX-65).

[29]     Nor did Burns & Levinson treat Mr. Kidder as a client. For example, Burns & Levinson did not have an engagement letter with Alden at the time the firm began representing the shirt factory. (Sopp Tr. 33). In fact, there was *never* an engagement letter. (*Id.* at 65). Nor did Alden provide Burns & Levinson with a retainer before the firm commenced representation. (*Id.* at 33). Moreover, no diligence was conducted to see if Mr. Kidder actually had the ability to pay Burns & Levinson's fees. (*Id.* at 33-36). Rather, Mr. Sopp trusted that Mr. Dinsmoor, Mr. Abboud's attorney, would "tak[e] care of those things." (*Id.* at 34-36). In sum, Burns & Levinson hired Kidder to be Alden's manager, rather than Mr. Kidder engaging Burns & Levinson to represent Alden.

exceeding one million dollars would obviously have legal counsel advising him on the transaction, Mr. Kidder had no legal representation in this transaction.  (Sopp Tr. 238; Kidder Tr. 142-45).[30]

90.    On May 14, 2007, Herringbone lent Alden $996,000, which Alden used to purchase Fall River's assets.  (TT 726-28, 1074; Sopp Tr. 186-7).  All totaled, during the Restricted Period, Herringbone provided Alden with over $1.4 million, part of which was used to operate the business.  (TT 724-25; Abboud Tr. 442, 460-61; PX-70).  As noted, Mr. Kidder did not have any personal investment in Alden, and had no financial risk in the company's business.  (TT 718-19, 1071, 1074-75; Kidder Tr. 128-29).  Alden had no ability to repay the monies advanced by Herringbone.  (TT 728, 1073 (Alden was "insolvent"); Sopp Tr. 148-51).  Because the collateral for Herringbone loans was Alden's assets, Herringbone could foreclose and take Alden's business at anytime.

91.    Mr. Dinsmoor and Burns & Levinson's simultaneous representation of Alden and Herringbone in connection with the financing documents also demonstrates that Alden and Herringbone were related entities, jointly controlled by Mr. Abboud, rather than distinct parties operating at arm's length.  Although under normal circumstances, Herringbone and Alden would have had different interests in connection with these loans, Mr. Sopp represented Herringbone and Alden simultaneously and did not see any need to obtain a written conflict waiver from either company in connection with his joint representation of them on the loans.  (TT 1075-76; Kidder Tr.

---

[30]    The documents prepared by Burns & Levinson, however, suggest that if this were not a sham transaction, Mr. Kidder would have benefitted from a lawyer to protect his interests, rather than Mr. Abboud's.  For example, the Collateral Assignment and Pledge contains a "Consent to Jurisdiction" provision that listed "any State or Federal Court sitting in Massachusetts or Florida" to be a proper venue.  (PX-75).  This provision would have allowed Herringbone to bring suit against Mr. Kidder in Florida, while Mr. Kidder is a lifelong resident of Massachusetts.  (Kidder Tr. 52, 75-76).  Such an oversight in a corporate document reflects that this was not a real transaction, but, rather, a formality for a company that was structured to be a paper place holder for two months.

124-26; Sopp Tr. 166-68). Nor did Mr. Dinsmoor, who claims to have represented Mr. Abboud, Herringbone and Alden "simultaneous[ly]," think it necessary to obtain a written conflict waiver in connection with his joint representation. (TT 1066; Kidder Tr. 124-26). The fair conclusion is that no written waiver was needed because both Herringbone and Alden were jointly controlled by Mr. Abboud. Indeed, when asked why he never obtained a written conflict waiver from these two parties, Mr. Sopp proclaimed there was "more of a conflict in name than a true conflict of interest." (Sopp Tr. 166-68).[31]

92.    Mr. Kidder signed the loan agreements on behalf of Alden, but never asked Herringbone for a single modification of their terms. (Kidder Tr. 158-59). Burns & Levinson did not provide Mr. Kidder with any drafts of the loan documents; he simply recalls "going to Burns & Levinson in sometime I believe in mid May, sometime in May, and signing all of the papers that were relevant to Alden Street." (Kidder Tr. 159)

93.    Tellingly, throughout these transactions, there were never any negotiations between representatives of Alden on the one hand and Herringbone on the other. (Kidder Tr. 18, 106, 113, 124-27; Sopp Tr. 207-208). It is not difficult to infer that this is because there was no real difference, except on paper, in ownership and interest between Alden and Herringbone – Mr. Abboud owned both completely.

94.    Similarly, defendants' counsel, Mr. Dinsmoor, made statements that demonstrated that Alden and Mr. Abboud were one and the same. Specifically, when it appeared that Burns & Levinson would have to represent Alden and certain of the former executives of Fall River

---

[31]    When plaintiff's counsel attempted to inquire whether Burns & Levinson gave Alden any advice as to the one-sided nature of the transaction – whereby Herringbone could at any moment seize Alden's business – they were confronted with assertions of the attorney-client privilege. (Sopp Tr. 158-59, 169, 172-73).

in connection with a tax dispute with the IRS, Mr. Dinsmoor advised Mr. Nova that Burns & Levinson represented "Joe/Alden" and that "Joe/Alden" would be prepared to make certain tax payments on behalf of these individuals. (PX-60). Indeed, Mr. Dinsmoor referred to Mr. Abboud and Alden as alter egos four different times in the same May 2, 2007 email. (*Id.*). The point of Mr. Dinsmoor's email was to advise Fall River's former executives that they would have to provide Burns & Levinson with a written waiver of any conflicts of interest, because they were different parties with different interests than Alden. However, because Alden and Herringbone were related entities, Burns & Levinson did not deem it necessary to obtain a written conflict waiver from either of them. (TT 1075-76; Kidder Tr. 124-26; Sopp Tr. 166-68).

95.     The status of Alden and Herringbone as Mr. Abboud's alter egos is further underscored by the fact that, although Burns & Levinson ostensibly represented Herringbone, all of the legal fees incurred in connection with the Herringbone-Alden loan agreements were paid by Alden. (PX-404). Mr. Sopp decided on his own that Alden should pay Herringbone's legal fees in preparing the various financing documents and never even discussed the matter with Alden's putative owner, Mr. Kidder. (Sopp Tr. 241-42, 245). Similarly, to the extent that Mr. Dinsmoor claims that he was at times acting on behalf of Alden and/or Herringbone, and not Mr. Abboud, it is telling that he did not charge any of his time to those companies and, instead, was compensated for his services solely by Mr. Abboud. (TT 1037-38). As Mr. Kidder admitted, "the difference between Mr. Dinsmoor and Mr. Sopp and Burns & Levinson is very confusing to me. I don't know whom represented whom." (Kidder Tr. 125). Similarly, Alden's controller did not know whether Mr. Dinsmoor represented Alden, and understood Mr. Dinsmoor to be Mr. Abboud's lawyer.

(Colucciello Tr. 49-50, 84). Indeed, Mr. Colucciello had to be told by defendants' counsel at his deposition that Mr. Sopp was Alden's lawyer. (*Id.* at 79).

96.     Defendants also dominated Alden's operations during the Restricted Period. Mr. Abboud hand-picked Alden's manager, Mr. Kidder. (TT 718). Also during the Restricted Period, Mr. Kidder consulted with Mr. Abboud from time to time, and on at least one occasion met with Mr. Abboud at Herringbone's offices to discuss financial matters and Alden's new union contract. (Kidder Tr. 151-52). Furthermore, at trial, Mr. Abboud's proxy, Mr. Dinsmoor, admitted to working with the factory's staff prior to the foreclosure. (TT 917 ("I've been [to the shirt factory on] many occasions. I work directly with Mr. Kidder and Mr. Colucciello, in connection with the factory operations. So I'm quite familiar with them")).

97.     Throughout its short corporate life span, Alden continued to manufacture men's dress and sport shirts for sale at, among other stores, Nordstrom, and was a competitor of JA Apparel. (Kidder Tr. 151-52; PX-336).

98.     Although Mr. Dinsmoor testified at trial that Mr. Kidder could have sold the shirt factory if he wanted to (TT 917-18), not a single document suggests that it was not at all times understood that Mr. Abboud would take formal – as opposed to defacto – ownership of Alden after the Restricted Period.

99.     On the contrary, lest there be any possible doubt as to Mr. Kidder's role as straw man, one need only consider the July 9, 2007 email exchange between Ms. Lahren and Mr. Kidder. (PX-297). Rather than treating Mr. Kidder as the owner of an independent business, Herringbone's Executive Director blithely directed Mr. Kidder, as a JAZ "partner," to supply a quote in connection with the upcoming July 30, 2007 press conference, where Mr. Abboud's formal

acquisition of Alden would be announced. (*Id.*).[32] Mr. Kidder dutifully complied, by providing

Ms. Lahren with a paragraph describing Alden's collaboration with Mr. Abboud as a "tremendous

opportunity to become a significant factor in the woven shirt market." (*Id.*) Mr. Kidder's compliance

with Ms. Lahren's directive was completely understandable from Mr. Kidder's perspective because

he understood that Herringbone already owned Alden. (Kidder Tr. 101-02, 133, 138-39, 146-47,

150-51). In all events, this exchange demonstrates that during the Restricted Period, Herringbone's

control of Alden was complete and its formal ownership of Alden was a foregone conclusion.[33]

     100.    On September 6, 2007, Herringbone foreclosed on the Demand Notes to Alden.

(PX-220).[34] There is no record of Herringbone making any written demand on Alden for repayment

of the loan or Alden resisting that demand. (Sopp Tr. 234-25). Instead, Alden, again represented by

Herringbone's lawyer, Mr. Sopp, consented to Herringbone foreclosing on the loans. Underscoring

that the entire process was a sham, Mr. Abboud did not wait until the September 6 "foreclosure" to

change Alden's name to Herringbone Shirt; instead, he changed Alden's name to Herringbone Shirt

a week before Herringbone's foreclosure on the Demand Notes. (PX-337).

     101.    Prior to Herringbone's "foreclosure" on Alden's assets, Mr. Coluecciello contin-

ued to send Mr. Abboud, at his Herringbone email address, financial information concerning the

---

[32]    Notably, the July 30 press release does not identify Robert Kidder as Alden's owner. (PX-338A). Indeed, as part of their effort to conceal their breach of the non-compete, the press release does not identify the purported seller of Alden.

[33]    Similarly, weeks prior to the July 30 press conference, Mr. Kidder traveled to Herringbone's offices to meet with Mr. Abboud and show him various fabrics for shirts that would be manufactured at the Fall River plant and displayed at the press conference. (Kidder Tr. 193-95).

[34]    Significantly, Mr. Kidder did not receive any money in exchange for his membership interest in Alden, and Herringbone did not pay him any additional money for his interest. (PX-220). Herringbone, on the contrary, invested all of the money required to acquire and operate Fall River during the Restricted Period.

plant, including a record of payments that Mr. Colucciello conspicuously titled "JA Investment," which, under the heading "J.A. Cash Investment," lists payments beginning in early April 2007 to the Fall River plant.  (PX-69; Abboud Tr. 473).  At his deposition, Mr. Colucciello acknowledged that his reference to JA Investment referred to Mr. Abboud's investment, but claimed that this was "worded wrong," and that, in reality, the investment was made by Mr. Abboud's company, Herringbone.  (Colucciello Tr. 143-46, 157).

102.    The Fall River plant provided many potential benefits to Mr. Abboud's new business.  One of Fall River's principal customers was Nordstrom.  Mr. Abboud had good contacts with Nordstrom from his days at JA Apparel, and planned to try to market "jaz" garments to Nordstrom.  (Colucciello Tr. 32-33; Abboud Tr. 407; Victor Tr. 241; PX-38; PX-159).  Mr. Abboud was also interested in buying the plant because it had a highly skilled workforce and its domestic location would allow him to process customer orders more quickly.  (PX-181A, Kidder Tr. 76-78).

103.    At no time did Mr. Abboud seek JA Apparel's written consent, pursuant to paragraph 2(b) of the Side Letter Agreement, for any of his activities in connection with the shirt factory.  (PX-2 ¶ 2(b); TT 68, 80, 731-32).

104.    At a bare minimum, even giving credence to Mr. Abboud's "defense" to JA Apparel's non-compete claim, Mr. Abboud and Herringbone were clearly "participant[s]" in the shirt factory as its secured lenders and, by virtue of the Demand Notes, had the immediate right at all times during the Restricted Period to foreclose on the secured assets.  (TT 1071-73; Abboud Tr. 411-12).  Indeed, Mr. Abboud readily admitted his involvement in the acquisition of the Fall River plant.  *See* TT 470 ("Yes, I did" "in fact loan money to the shirt company;" "there were a series of loans that were made through my bank . . . at the end of April, beginning of May"); TT 471 ("I was the

lender"); TT 723-25 ("yes, we did, through Herringbone Creative Services, make loans to Alden Street"). Furthermore, Mr. Abboud admitted that his intent in lending money to keep Alden afloat was to purchase the factory after the non-compete expired. "All I did at that particular time was to make loans to Alden Street with the intention at the end of my noncompete . . . that I would attempt to acquire that business. (TT 731; *see also* TT 470 ("I had a discussion with Mr. Dinsmoor if there was any way that we could loan money to the shirt company so that it could survive until after the expiration of the noncompete")). As Mr. Dinsmoor testified, "if the shirt factory could be saved, it would enure to [Mr. Abboud's] benefit." (TT 1041-42; *see also* TT 1040 ("anything that was done to preserve the shirt factory until after the expiration of the noncompete in one way or another served Mr. Abboud's interests")). Accordingly, even accepting defendants' version of the facts, Mr. Abboud violated his non-compete obligations to JA Apparel.

105. In sum, because he violated his non-compete, Mr. Abboud, to his great competitive advantage, was able to obtain a turn-key shirt manufacturing operation that likely would not have existed on July 14, 2007. He admittedly engaged in the charade of the Alden/Robert Kidder fictitious ownership because he knew that a direct purchase of the shirt factory during the Restricted Period would breach his non-compete. (TT 470, 474, 721).

### 3.    Defendants' Licensing Arrangement with Jack Victor

106. Operating out of his offices at Herringbone, and with the assistance of Herringbone's lawyer, Mr. Dinsmoor, Mr. Abboud breached the non-compete by negotiating the terms of a licensing deal with Jack Victor and working with Jack Victor on his new menswear business before the expiration of the Restricted Period.

107.    Mr. Abboud began the long process of securing Jack Victor as the licensee for "jaz"- tailored clothing on January 31, 2007, when he traveled to Montreal to meet with Jack Victor's management team at the company's headquarters.  (TT 456-57, 666-67; Victor Tr. 29-39; Abboud Tr. 479-80).   At the meeting, Mr. Abboud made a presentation to members of Jack Victor's management team, including its President, Alan Victor; its Vice President of Marketing, Maurizio Iuliani; its Vice President of Merchandising, Tony Iuliani; and its Vice President of Operations, Vince D'Agostino.  (TT 667; Victor Tr. 29, 33).  At the meeting, Mr. Abboud presented the "jaz" logo to the Jack Victor team, took a tour of the factory, and discussed "[i]n general what a collection would look like."  (TT 458; Victor Tr. 135-36).  Herringbone previously paid Dominick Leuci, a professional illustrator, $3,500 to prepare sketches of design concepts that Mr. Abboud had created for "jaz," and at the meeting Mr. Abboud showed this 30-page presentation to Jack Victor's management team.  (PX-116; TT 667-70; PX-388; Victor Tr. 35-36; Abboud Tr. 315, 394-97, 399, 476, 483-84).

108.    After the meeting, Maurizio Iuliani advised Mr. Abboud that "[i]t was my great pleasure meeting you today in our offices.  Your enthusiasm and drive are contagious."  (PX-51). As Mr. M. Iuliani was responsible for trimmings, linings and buttons, as well as marketing, Mr. Abboud worked closely with him during the Restricted Period, *inter alia*, to develop public relations and marketing materials for "jaz", design "jaz" garments, and select linings, buttons and fabrics for "jaz" suits.  (TT 696; Abboud Tr. 482-83).

109.    After the January 31, 2007 meeting with Jack Victor in Montreal, Mr. Abboud had some follow-up phone discussions with Alan Victor concerning Jack Victor's becoming a

licensee for Mr. Abboud's "jaz" line of men's clothing and the "structure for a possible agreement." (Victor Tr. 60-61).

110.    On February 20, 2007, following up on their recent meeting and subsequent phone calls, Mr. Abboud wrote to Mr. Victor about a potential licensee agreement for "jaz." (PX-137; TT 670-71; Victor Tr. 58, 59).    Mr. Abboud, as "President" of Herringbone, wrote a letter to Mr. Victor stating that "[i]t was great speaking with you the last few days and I look forward to seeing you on the 29th of March in Montreal." (PX-137).  He went on to say "I am enclosing a list of items which I believe will be helpful in formulating a structure for a mutually beneficial agreement." (*Id*.).  At trial, Mr. Abboud described the letter as "an outline of what a license agreement [with Jack Victor] might look like." (TT 671).  Mr. Abboud identified 14 subjects for a proposed license agreement with Jack Victor, including the trademark, the definition of the products, price points, terms of agreement, territory, distribution channels, volume estimates forecast, a royalty rate, payment schedule, marketing and advertising contribution, timing and launch date, sourcing of products, showroom and selling environments, merchandising schedules, and product approval. (PX-137).

111.    Although his non-compete obligations would not expire for almost another four months, Mr. Abboud advised Mr. Victor that he already had a team in place and had been actively working to develop his new menswear line.  Specifically, in his February 20, 2007 letter, Mr. Abboud advised Mr. Victor: "[A]fter a considerable amount of research *over the last 18 months, my team* and I are absolutely convinced that the market is ready and more than eager for a new tailored collection. As I have mentioned before, *I have spoken confidentially to many retailers at the highest levels who are very supportive of this new concept in menswear*.  I am sure that together, a great manufacturer

with great design talent, we would achieve significant market share for clothing in North America. I'm excited about the prospects of working with you, Herschel, Paul and the entire Jack Victor team to build the next great tailored designer brand."  (PX-137 (emphasis added); *see also* TT 671-72). Mr. Abboud testified that his letter was accurate.  (Abboud Tr. 492).

112.    Mr. Abboud's references in his letter to "Herschel and Paul" referred, respectively, to Jack Victor's CEO, Herschel Victor, and its Head of U.S. Sales, Paul Diamond (Victor Tr. 68).  A week later, on February 27, 2007, Mr. Abboud met with Mr. Diamond in Jack Victor's offices in New York City to discuss the "JAZ brand" and "the possibility of doing a licensing deed with [Jack Victor]."  (TT 673-74; Victor Tr. 51-53, 55-56; Abboud Tr. 487-88; PX-122).

113.    As promised in his prior letter, on March 29, 2007, Mr. Abboud again traveled to Jack Victor's headquarters in Montreal and met with Alan Victor and other members of the Jack Victor management team, including Herschel Victor, to discuss Jack Victor's becoming a licensee for "jaz."  (TT 674; Victor Tr. 76-80).  At the meeting, the parties had detailed discussions and reached agreement on the goods that would be licensed by Jack Victor, the territory of the license, the currency for payment of the royalties, the licensor's rights with respect to the design of the licensed good, the licensee's obligations for payment of advertising and promotional costs, the term of the license, the distribution channels of the licensed goods, the trademark, the target retail price points for the licensed goods, a royalty payment schedule, the payment of expenses, the license commencement date, showroom obligations and the execution date of license agreement.  (PX-39; TT 674-76; Victor Tr. 81-83).

114.     With the negotiations completed, Jack Victor engaged its outside counsel, Robert Vineberg, to prepare the Heads of Agreement memorandum, dated March 30, 2007 ("Heads of Agreement"), which reflected the basic terms of the agreement that Mr. Abboud and Jack Victor had reached concerning "jaz." (PX-39; TT 674-76; Victor Tr. 83-84). Specifically, the Heads of Agreement reflects the parties' agreement that (1) Jack Victor would be the "jaz" licensee for "[s]hirts, sport jackets, soft jackets, trousers, formal wear, and custom/special order;" (2) the trademark would be "jaz," but "the name 'Joseph Abboud' can be used in publicity, public relations and in all media other than on the label of the garment;" (3) the territory of the license was the United States and Canada; (4) the royalty rate for the license was 7% of sales; (5) royalties would be paid in U.S. dollars; (6) Mr. Abboud would "provide creative input with the Jack Victor team and will have approval rights on the design and fabric of each garment;" (7) Jack Victor would be obligated to expend 2% of sales on advertising and promotional expenses for "jaz"-tailored clothing, and "there would be four *DNR* ads over the launch period to be credited against the 2% of sales;" (8) the license term would be five years, with an 18-month opt-out if Jack Victor failed to satisfy the agreed upon sales threshold of $8 million in the first twelve months of the license; (9) the licensed goods would be distributed in better specialty and specialty chain stores; (10) the licensed goods would have specific target retail prices (*e.g.*, suits $795 - $1,600, soft jackets $495 - $1,500); (11) the royalties would be payable quarterly, within 30 days of the end of the calendar quarter; (12) Mr. Abboud would pay his own expenses; (13) the agreement would commence "with the fall 2008 season;" (14) Jack Victor would provide "jaz" with a "showroom commensurate with the prestige of the brand;" (15) the license agreement could not actually be executed prior to July 13, 2007; and (16) Mr. Dinsmoor would serve as counsel to Mr. Abboud. (PX-39).

115.     On March 30, 2007, Mr. Vineberg sent the Heads of Agreement to Mr. Abboud at his Herringbone email address.  (PX-39; TT 674).  Mr. Abboud, in turn, forwarded the Heads of Agreement to Mr. Dinsmoor, who testified that he construed the Heads of Agreement to be a "term sheet."  (TT 676, 1023, 1026).

116.     On April 3, 2007, Mr. Dinsmoor advised Mr. Vineberg that "I have reviewed your Heads of Agreement with Joe, who confirms that they are correct."  (PX-138; TT 676-77, 1024-25; Victor Tr. 87-88).  A comparison of the Heads of Agreement with the final Jack Victor licensing agreement demonstrates that the parties had agreed to the main terms of their agreement in March 2007, more than three months *before* the expiration of the Restricted Period.  For example, both the Heads of Agreement and license agreement produced by defendants: (i) provided a 7% royalty rate, (ii) identified the licensed garments to include suits, jackets, sport jackets, trousers and formal attire, (iii) obligated Jack Victor to pay for four *DNR* advertisements upon the launch of "jaz," which would be set off against Jack Victor's general obligation to spend 2% of sales in advertising "jaz"-tailored clothing, (iv) provided almost identical target retail prices for the licensed goods, and (v) a five-year term, with a provision that either party may cancel the license after eighteen months if first year sales do not reach certain agreed-upon minimum sales.  (PX-39; DX-192).

117.     Shortly thereafter, Mr. Dinsmoor sent Jack Victor's counsel a highly detailed 30-page form "License Agreement between Houndstooth Corporation and [_____]" ("Form License Agreement").  (PX-140; TT 1028-29).  The final executed license agreement closely follows this Form License Agreement, which Mr. Dinsmoor provided to Jack Victor's counsel months before the non-compete expired.  (PX-140; DX-192).

118.    Although the Restricted Period would not expire for another three and a half months, Mr. Abboud and Jack Victor – having concluded the Heads of Agreement – started working together in earnest on developing "jaz"-tailored suits and marketing materials. Thus, on the same day that Mr. Dinsmoor signed off on the Heads of Agreement, Mr. Abboud advised them that he wanted to return to their Montreal headquarters on April 24 and April 25 to work with them on the following matters relating to "jaz":  (1) "Models/Styling/Make" for "jaz" suits, blazers, and trousers; (2) "Trimmings/Details/labels-hangtags; (3) Fabrics-for Fall of 2008; (4) public relations/advertising for the "jaz" line; and (5) "Image of JA" for advertising/hangtag."  (PX-141; TT 678-80; Victor Tr. 98-111).  Mr. M. Iuliani forwarded Mr. Abboud's request for an April meeting to Alan Victor and four other members of Jack Victor's management team, including the company's chief designer, Mario Rota.  (PX-141; Victor Tr. 146).

119.    On April 24 and April 25, Mr. Abboud met with the Jack Victor management team.  This was the third of four trips Mr. Abboud made during the Restricted Period to meet with the Jack Victor team to work on "jaz."  (TT 677; PX-122).  At the meeting, as reflected in the April 3 email (PX-139), Mr. Abboud and the Jack Victor management team worked on developing the design of "jaz" suits to be licensed by Jack Victor, as well as the models, trimmings, fabric, advertising and public relations matters for "jaz"-tailored suits.  (PX-141; Victor Tr. 111-13). Mr. Abboud admitted to speaking with representatives of Jack Victor at these meetings about "models," "styling," "trimming," "details," "labels," "hangtags," "fabrics for Fall '08," "PR" and "advertising."  (TT 679-80).  Mr. Abboud also reviewed Jack Victor suit silhouettes and some fabrics Jack Victor provided.  (TT 687-88, 700-01 ("I worked off a silhouette.  And yes, I created styles for

that")).  The parties also discussed whether to use Mr. Abboud's name and image in "jaz" advertising and hangtags and "how we would use it."  (TT 680-81; Abboud Tr. 507).

120.    Each of Mr. Abboud's trips to Montreal to meet with Jack Victor was paid for with Mr. Abboud's American Express Platinum Business Card, which was issued to Herringbone and which Herringbone pays.  (TT 677, 685; PX-136).

121.    On April 27, 2007, following the meeting in Montreal (and the same day Mr. Abboud was incorporating Alden in Massachusetts), Mr. Abboud had Ms. Lahren, Herringbone's Executive Director, send a presentation displaying the "jaz" logo in various forms prepared by SJI Associates, Inc., a New York based advertising agency and graphic design firm that defendants previously had hired to help develop the "jaz" logo.  (TT 685-86; PX-142).  Included in the presentation was an exemplar of the jaz" logo containing the phrase "a new concept from designer Joseph Abboud."  (PX-142).

122.    In addition to working on advertising and public relations matters concerning "jaz" during the Restricted Period, Mr. Abboud was also working with Jack Victor on developing the actual models that would be later brought to market.  Thus, on May 1, 2007, Mr. Abboud sent Alan Victor a detailed set of design notes for "jaz"-tailored suits based on existing Jack Victor models.  (PX-172; TT 686).  Mr. Abboud took these models and made design decisions with respect to the various aspects of the suits such as the lapel, pleats, number of buttons, vents, knee-bottom rise and pocket type.  (PX-172; Abboud Tr. 516-18).  In all, Mr. Abboud worked on the design of more than 20 suits across four Jack Victor model types.  (PX-172).  Mr. Abboud asked Mr. Victor to forward his proposed designs to other members of the Jack Victor management team, including Mr. M. Iuliani and Mr. Rota.  (PX-172; Abboud Tr. 520-21).

123.    The "jaz" suits that were produced for the July 30, 2007 *DNR* press conference came from some of the design models Mr. Abboud sent to Jack Victor on May 1, 2007.  (TT 689; TT 663-64).

124.    Under their agreement, although the basic silhouettes of "jaz" suits would be designed by Jack Victor's team, Mr. Abboud would be responsible for designing the "details" and "trimmings" of the suits, including, most importantly, the suit lining.  (PX-159; Victor Tr. 220 ("the details of the garment are the result of Mr. Abboud's creative efforts")).  Accordingly, during this time – before the conclusion of the Restricted Period – Mr. Abboud and Jack Victor were busy at work researching and selecting appropriate fabric for the linings of "jaz"-tailored suits.  On May 2, 2007, Jack Victor purchased 700 meters (over seven football fields) of fabric for "jaz" suits from Cervotessile S.p.A., an Italian fabric mill, which specializes in manufacturing linings for men's suits.  (PX-146; TT 695-98; Victor Tr. 156-59).  The order was for fabric for body lining, sleeve lining and trimming.  (Victor Tr. 154).  The Jack Victor purchase order, which has "JAZ" hand written on its face, was signed by Mr. M. Iuliani, who ordered the fabric lining to be delivered by June 10, 2007.  (PX-146).  The fabric was used in samples of "jaz"-tailored suits manufactured by Jack Victor.  (Abboud Tr. 539).  Indeed, Mr. Abboud admitted that the purchase order, at least in part, relates to conversations he had with Mr. M. Iuliani about purchasing linings for "jaz," and, when pressed by the Court, testified that he "did not question" that the lining had been ordered for "jaz."  (TT 696, TT 698).

125.    While Mr. Abboud and Jack Victor's business people were working to develop the new "jaz" line of tailored suits, their respective lawyers continued negotiating the license agreement.  On May 10, 2007, although Mr. Vineberg presented several options regarding the

"Agreement between Jack Victor Limited and Joseph Abboud" to Mr. Dinsmoor, including that "the parties postpone working together until an agreement is signed," Mr. Dinsmoor, in his response, pointedly did not choose the "postponement" option. (PX-147). By this time, he already had signed off on the Heads of Agreement, reminding Mr. Vineberg:

> I sent you a copy of Joe's standard license agreement by regular mail several weeks ago. Generally, all we need do is plug in the numbers for Jack Victor. This should only take about an hour. If it is necessary to modify the standard terms due to unique circumstances pertaining to Jack Victor, we can talk, but Joe really cannot have special license agreements for every licensee or the licensing process will become unmanageable. (PX-147).

The deal between Jack Victor and Mr. Abboud was essentially done, but for about "an hour" of work, and so the parties continued to forge ahead on developing "jaz"-tailored suits. (*Id.*).

126.    Mr. Abboud then set up his fourth visit to Jack Victor's Montreal headquarters for May 25 and May 26. (PX-148; TT 690-91). On May 25 and May 26, Mr. Abboud again met with Jack Victor's executive team in connection with, among other things, the public relations and image materials for "jaz" that Mr. Abboud brought to show the Jack Victor team. (TT 691).

127.    Also on May 25, Mr. Abboud ordered a suit from Jack Victor, which was subsequently paid for by, and shipped to, Herringbone. (PX-182). This suit was affixed with a "jaz" label and then worn by Mr. Abboud at the July 30, 2007 press conference. (Abboud Tr. 260-61, Victor Tr. 201-02). In the August 6, 2007 *DNR* article, Mr. Abboud can be seen modeling this suit, which he testified he designed. (PX-8; TT 663, 700).

128.    Mr. M. Iuliani sent a May 30, 2007 email to Mr. Abboud, making it clear that they were already working together on "jaz." Specifically, Mr. M. Iuliani stated: "I hope all is great with you. . . . Again, it was wonderful to see you in our offices last week and a privilege to be *working with you*." (PX-144) (emphasis added). Mr. M. Iuliani went on to advise Mr. Abboud: "I

need you to look at the JAZ Body lining quality that you have selected. I would like to place an order with Cervotessile with the colors you want to use, so that any future models we make will have the IRIDESCENT QUALITY. Please advise what colors you would like me to order." (*Id.*). At trial, Mr. Abboud confirmed that Mr. Iuliani ordered these linings on Mr. Abboud's behalf. (TT 693-94). On June 6, 2007, Mr. M. Iuliani followed up on this email by ordering 900 meters (almost 10 football fields) of fabric for linings for "jaz" men's suits from Cervotessile. (PX-145; TT 698-99; Victor Tr. 208-09). The purchase order identifies nine different fabrics, with various weights and sizes, that had been selected for "jaz" suits. The same day, Mr. M. Iuliani made an extensive order of buttons for "jaz"-tailored suits from an Italian-based button manufacturer. (Victor Tr. 209-10; PX-145).

129.    Consistent with Jack Victor's obligations under the March 30, 2007 Heads of Agreement, on June 2, 2007, Mr. M. Iuliani secured the center spread of the *DNR* Power 100 issue for "jaz," which would run in October 2007. (PX-243; Victor Tr. 170-72; Abboud Tr. 535-37). The Heads of Agreement specifically required Jack Victor to obtain ads in *DNR* in connection with the launch of "jaz." (PX-39). The "center spread" ad space of the *DNR* Power 100 issue is a highly coveted placement for advertising in the men's apparel industry, the cost of which is more than $20,000. (TT 89). Subsequently, Mr. Abboud ran an ad for "jaz" in the center spread of the *DNR* Power 100 issue, dated October 29, 2007. (TT 497; PX-45A).

130.    In June, moving forward with arranging the manufacture of "jaz" clothing, Michael Kearins of SML, which had been chosen to design the "jaz" labels, sent Mr. M. Iuliani an electronic file of "jaz" art. (PX-247). The material SML provided included the "jaz" script and logo. (PX-245). Mr. M. Iuliani, in turn, sent the "jaz" logo art to Anne McIsaac, a graphic designer at

Videotron, a Canadian firm that had been retained by Jack Victor to help prepare artwork for "jaz"-tailored clothing.  (TT 498; Victor Tr. 178-79; PX-245).

131.    On June 22, 2007, Mr. Abboud, following up on his suit order, sent an email to Mr. M. Iuliani concerning the *DNR* press conference, which already had been scheduled for July 30, 2007.  Mr. Abboud stated in relevant part, "Maurizio – I am exited [*sic*] that you are coming on the 30th.  It is a very important day for JAZ and means a lot that you will be there.  On that note, I was curious to know the status of my personal suit order as well as the samples for the press conference."  (PX-248).  Mr. M. Iuliani wrote back stating:  "It will be an honor for me to be there with you.  I had a conversation with Vince [D'Agostino] and he told me that everything should be ready by Thur. June 28." (*Id.*).  Similarly, on June 26, 2007, Mr. M. Iuliani contacted Mr. Abboud concerning the photo shoot that he had arranged for Mr. Abboud in connection with "jaz."  (PX-313; Abboud Tr. 541-42).

132.    Meanwhile, the lawyers continued their negotiations.  On June 28, 2007, Mr. Vineberg sent an email to Mr. Dinsmoor regarding "Agreement between Jack Victor Limited and Houndstooth Corporation."  (PX-151).  Mr. Vineberg opened his email by stating "I would like to move forward to finalize this agreement with you and would offer the following comments with respect to the draft which you forwarded to me some time ago." (*Id.*).  Mr. Vineberg went on to provide comments to certain provisions of the draft agreement that Mr. Dinsmoor previously had forwarded to him.  (*Id.*).  On July 5, 2007, Mr. Dinsmoor provided a detailed response to Mr. Vineberg's comments regarding the draft agreement in which he approved most of the proposed revisions thereto.  (PX-152).  On July 6, 2007, Jack Victor's outside counsel provided Mr. Dinsmoor with a memorandum advising him how to secure trademark registration for "jaz" in Canada.  (PX-

356).  On July 9, Mr. Vineberg provided Mr. Dinsmoor with tax withholding language that Mr. Vineberg had used in a prior agreement, which he thought Mr. Dinsmoor "may find to be helpful for ours." (PX-311).

133.    Confirming the close relationship between Jack Victor and defendants, on June 29, 2007, Ms. Lahren sent an email from Herringbone dated June 29, 2007 to Jack Victor and the other "jaz" partners in which she stated:

> Joseph asked that I send a note to our *partners* as a friendly reminder of the press conference on Monday, July 30th. . . . .  While we are busy on our end preparing for this very important day, we are hoping to learn that all product samples will be ready about the 15th of July.  This should give us plenty of time to dry run the meeting and be sure everything runs smoothly.  *We are thrilled to have you as a part of the new brand and very much looking forward to sharing the day with you.*  (PX-312) (emphasis added) (*see also* PX-310).

134.    Also in preparation for the press conference, on July 6, 2007, defendants contacted Jack Victor requesting material that would "present details of the new brand and its relationships. . . .  We are including a bit of a profile of each *partner*.  Please let me know of any interesting details that we may not already know about Jack Victor and I will work to include it." (PX-153 (emphasis added); Abboud Tr. 547).  Accordingly, Mr. M. Iuliani arranged to have Jack Victor prepare a specific quote for defendants in connection with the "jaz" press release. (PX-309).

135.    On July 11, 2007, Mr. Tony Iuliani, Jack Victor's Vice President of Merchandising, wrote Mr. Abboud, stating:  "Dear Joseph, hope everything is okay with you.  I have just returned from a 2 week holiday and am ready for Fall 2008.  I have listed below the mills that we'll be visiting and with whom I have made appointments all in our office with the exception of Loro Piana." (PX-158).  Thus, before his non-compete obligations expired, Mr. Abboud made detailed arrangements with Italian clothing mills where he could source his products.

136.    During the Restricted Period, Jack Victor prepared numerous garments for "jaz" that Mr. Abboud showed the press at the July 30, 2007 press conference.  At least three jackets and/or suits that Jack Victor manufactured for "jaz" during the Restricted Period were shown in the August 6, 2007 *DNR* Article regarding "jaz."  (TT 663-64; Victor Tr. 205).  Further, during the Restricted Period, Mr. M. Iuliani provided a "press kit" to defendants that could be distributed to the press at the July 30 conference.  (PX-309).

137.    All but admitting his intent, on July 17, 2007, Mr. Abboud instructed all of his "jaz partners" that the "Non-compete Clause" was one of four "SUBJECTS TO AVOID COMPLETELY" at the July 30, 2007 Press Conference and that he alone would "answer any questions regarding the non-compete." (PX-160; TT 730).  In another admission, Mr. Abboud urged the "jaz" partners to completely avoid any discussion of "**[a]ny interaction during my non-compete period**." (PX-160) (emphasis in original).  Another "Subject To Avoid Completely" was any discussion of Les Hale, who during the Restricted Period was JA Apparel's leading salesman of men's suits in the Midwest.  (PX-160; TT 730).  Acknowledging that he already had recruited this valuable JA Apparel salesperson to join "jaz" in violation of the non-compete, Mr. Abboud advised his partners that Mr. Hale and John Moxon (a former JA Apparel salesperson), "are currently employed and I do not want to jeopardize their positions before they finally finish Spring 2008 and give their notice." (PX-160).[35]  Accordingly, by this time Mr. Abboud already had secured Mr. Hale's services, and soon thereafter Mr. Hale quit his engagement with JA Apparel and started selling "jaz" suits for Mr. Abboud.  (TT 613, 617; Victor Tr. 211-12; Abboud Tr. 555-60).

---

[35]    While Mr. Hale was still working for JA Apparel, Mr. Abboud enlisted Mr. Hale and Mr. Moxon to jointly prepare sales and financial projections and identify potential retailers for Mr. Abboud's "jaz" line. (TT 613; Abboud Tr. 231-37).  This work was done in Herringbone's offices and then the information was distributed to potential licensees, including Jack Victor.  (PX-49; TT 613; Abboud Tr. 231-36).

138.    Further, lest there be any doubt that he had finalized the licensing agreements to be announced at the press conference, Mr. Abboud directed his partners to avoid discussion of "**any financial details of . . . the licensing agreements**."   (PX-160) (emphasis in original). Specifically, Mr. Abboud directed that although "the length of the agreements" could be discussed, the partners should not discuss the "dollar figures or royalty percentages" of those agreements. (*Id.*).

139.    The process of selecting a major licensee, negotiating a term sheet, and finalizing a formal license agreement is a long one, especially for a new line of clothing such as "jaz." Similarly, the process of formulating design concepts, working on designs, developing public relations and advertising materials, and selecting fabrics for suit linings and selecting buttons for mens suits, is a long creative process. (*See* Abboud Tr. 523).   "[D]esigning, getting fabric for and making a suit is not dissimilar in time from having a baby.  It takes months.  So to do it in a couple of weeks is impossible, just impossible." (TT 74).  The foregoing demonstrates that Mr. Abboud, in violation of his obligations, got more than a 90-day head start on that process, when he agreed to the Heads of Agreement with Jack Victor and almost immediately began working with that company on the development of "jaz"-tailored clothing.

### 4.    Cardinal of Canada

140.    In addition to disclosing their relationship with Alden and Jack Victor at the July 30 press conference, defendants also announced that Cardinal would be the "jaz" licensee for outerwear. (PX-110; PX-338A).  Defendants' relationship with Cardinal dates back to at least January 22, 2007, when Mr. Abboud held a meeting at Herringbone's offices with Cardinal's owner and CEO, Michael Ray.  (PX-122; Abboud Tr. 583-84).

141. Mr. Abboud and Mr. M. Ray had follow-up discussions concerning "jaz" during the Restricted Period during one of Mr. Abboud's longer trips to Montreal, when he was working on "jaz" with Jack Victor. (Abboud Tr. 586-87). Mr. Abboud visited Montreal in January, March, April and May 2007. (TT 677; Abboud Tr. 489-90). During one of the April or May meetings, Mr. Abboud and Mr. M. Ray reviewed "some of Cardinal's prototypes garments and some of their shapes, which is similar to what Jack Victor would have." (Abboud Tr. 586, 588-89). At the same time, during April and May, Mr. Dinsmoor, Mr. Abboud's attorney, was negotiating a license agreement with Cardinal. (TT 888).

142. Cardinal's dealings with defendants during the Restricted Period are reflected in part by a June 7, 2007 email that Cardinal's President, Adam Ray, wrote to Mr. Abboud. The email reflects that Cardinal and Abboud had already struck a deal and begun working together during the Restricted Period:

> It was a pleasure talking to you yesterday and hearing all of the exciting things that are happening with you and the launch of JAZZ. I feel extremely honored to have the opportunity *to work with you as your partner* in the coat, outerwear, and rain categories. . . . *I really feel you put an amazing team together as well as Licenses* to help build the JAZZ label and can't wait to get started. I also want you to know that I spoke to the factory in Italy about developing are [*sic*] business and a label with them and they where [*sic*] very happy and willing to do the sample making and production. *(I did not tell them the label, who was involved or anything we discussed).* (PX-171) (emphasis added).

143. Adam Ray had spent some time speaking with his father, Michael Ray, Cardinal's owner and CEO, and advised Mr. Abboud:

> based on the projections of suits and knowing they have two seasons we feel that for 2008 we would be comfortable with a minimum of $300,000. For 2009 $400,000 and for 2010 $500,000. These are just base minimums that we hope to exceed each year but need to have a starting point and coats is usually the last category to get placed as a brand is launched. (PX-171).

The formal license agreement between Cardinal and JAZ Licensing provides for precisely those minimums sales numbers. (PX-300).[36] In addition, Mr. A. Ray advised Mr. Abboud that Cardinal was agreeable to a 10% royalty on sales which, like the agreed-upon sales minimums, was a term that was reflected in the parties' executed license agreement. (PX-171; PX-300).

144.    Finally, Mr. A. Ray advised Mr. Abboud that he looked "forward to hearing from [him] and hope to get this done in time to be part of your launch to *DNR* on July 30th." (PX-171). The June 7, 2007 email reflects that as of that date, Mr. Abboud already had scheduled the July 30, 2007 press conference at Herringbone's offices, during which Mr. Abboud would disclose to the public the "jaz" line and his existing relationships with Alden, Jack Victor, Merrill-Sharpe, J.S. Blank and Cardinal.

145.    On the same day, June 7, in response to Mr. A. Ray's letter, defendants advised Mr. A. Ray that they were "so glad to learn that Cardinal will be part of the Jaz family. Jaz has been a long time coming and we are proud to be in good company." (PX-171).

146.    Though a licensing agreement had yet to be signed, the deal was complete. At the end of June, defendants sent Cardinal a box of "jaz" labels to affix to samples. (PX-365; PX-366; PX-368). Further, on July 6, 2007, Ms. Lahren identified Cardinal as a "jaz" "partner" and solicited quotes from Cardinal for the July 30 press release. (PX-260). Defendants officially announced Cardinal as one of the "jaz" partners in the press kit for the July 30 launch. (PX-338A).

147.    Defendants featured a Cardinal coat at the July 30, 2007 press conference. (Abboud Tr. 319, 589).

---

[36]    Defendants testified that a license agreement with Cardinal was executed in February 2008; however, a signed agreement was never produced in this litigation and PX-300 is the latest draft version JA Apparel received. (TT 888-89).

### 5.    J.S. Blank & Co.

148.    Barbara Blank, the president and co-owner of J.S. Blank, also attended the July 30, 2007 press conference and was introduced as a soon-to-be licensee for "jaz" neckwear.  (TT 488-89, 662; PX-110; PX-338A; *see also* PX-8).  Indeed, Mr. Abboud asked Ms. Blank to manufacture some neckwear specifically for the conference and one of J.S. Blank's ties was featured in the August 6, 2007 *DNR* article.  (Abboud Tr. 300-02; PX-8).  Mr. Abboud's datebook indicates a meeting with Ms. Blank on April 18, 2007, months before the end of the Restricted Period. (PX-122).  Mr. Dinsmoor testified to becoming involved in discussions about a licensing agreement with JS Blank "[a]bout the same time as [Jack] Victor, thereabouts, April, May [2007]."  (TT 886). Defendants exchanged drafts of a license agreement with JS Blank that purports to grant to licensee the right to exploit the name "Joseph Abboud."  (PX-210; PX-211).

### 6.    Merrill-Sharpe, Ltd.

149.    Before the expiration of his non-compete obligations, by March-April 2007, Mr. Abboud had had "discussions" with Merrill-Sharpe about a "potential purchase" of the company, the  sportswear company that would import and manufacture sportswear for his "jaz" line.  (Abboud Tr. 568-69, Schwartz Tr. 134, 136; PX-96; PX-98).  Merrill-Sharpe sells fashion sports shirts and knitwear produced in Italy and China.  (PX-78; PX-93).  Mr. Abboud met Andrew Schwartz, the then president of Merrill-Sharpe, sometime in 2006, and through the end of the year they communicated several times.  (Schwartz Tr. 138, 142-43, 146-49; Abboud Tr. 562-63; PX-79, PX-80, PX-81, PX-82, PX-83).  Mr. Abboud requested that Mr. Schwartz connect with him several times in 2006, and, accordingly, Mr. Schwartz reached out frequently to Rachel Lahren, the Executive Director of Herringbone, to schedule appointments with Mr. Abboud.  (Schwartz Tr. 137-39).

150.    Mr. Schwartz met with Mr. Abboud at the Herringbone office in Bedford as early as May 11, 2006 and Mr. Abboud, in March 2007, visited Merrill-Sharpe's offices. (PX-79; PX-88). No later than February 2007, Mr. Abboud and Mr. Schwartz started to discuss working together and, indeed, had been discussing business well before then. (PX-85; PX-86; Abboud Tr. 563-65; Schwartz Tr. 150-53). Mr. Abboud initially suggested contracting Merrill-Sharpe as his sportswear licensee, but then the parties agreed that an outright acquisition of Merrill-Sharpe by Mr. Abboud would better serve their interests. (Schwartz Tr. 101, 132-33).

151.    Mr. Abboud and Mr. Schwartz corresponded and met with each other frequently. By mid-April 2007, they were ready to discuss "specific details" of an acquisition whereby Mr. Abboud, through his newly created company Herringbone Sportswear Company, LLC ("Herringbone Sportswear"), would purchase the assets of Merrill-Sharpe, which would operate as the facility that would sell sportswear under Mr. Abboud's "jaz" label. (PX-92). By April 16, 2007, three months before the expiration of Mr. Abboud's non-compete obligation, the two business partners were ready to "finalize" the details of the $4 million acquisition. (PX-94). On May 4, 2007, Mr. Schwartz sent Mr. Abboud a term sheet with "agreed points," which included a total purchase price of $4 million for an asset sale that the parties "wish[ed]" would commence on August 1, 2007. (Schwartz Tr. 137, 169-70; Abboud Tr. 569-71; PX-95). That term sheet set forth a detailed payout schedule, which payments Mr. Abboud would personally guarantee. (Schwartz Tr. 169-71; PX-95). By May 4, 2007, Mr. Abboud and Mr. Schwartz also "agreed" to pay Mr. Schwartz $275,000 as President of the newly acquired company, and his colleague, Dominick Paci, $200,000 as Vice President. (Schwartz Tr. 174-75; PX-95). Mr. Schwartz also prepared detailed financial projections

for the sale of clothing under the "jaz" label, which he reviewed with Mr. Abboud before July 13, 2007.  (Schwartz Tr. 177-79; Abboud Tr. 574; PX-96).

152.    In or about May or June 2007, Mr. Abboud had a discussion with Mr. Paci and Mr. Schwartz about "design guidelines" for the "jaz" clothing line.  (Schwartz Tr. 59-63, 70).  These guidelines instructed the two Merrill-Sharpe employees as to which types of clothing Mr. Abboud envisioned for the "jaz" label, and told them which types of clothing they should buy to show at the July 30 press conference.  (Schwartz Tr. 59-63).[37]

153.    In June, at Mr. Abboud's request and "based on [Mr. Abboud's] guidelines," Mr. Paci flew to Italy to visit fabric mills and select articles of clothing to present at the "jaz" press conference.  (Schwartz Tr. 65-66, 71, 219; Abboud Tr. 575-76; PX-103).  Mr. Paci placed several orders for prototypes from fabric mills and purchased jackets, pants and knitwear that he brought back with him to New York and subsequently showed to Mr. Abboud, all prior to July 13, 2007.  (Schwartz Tr. 63, 65-66, 71, 200-02; Abboud Tr. 575-77, 580; PX-98 to PX-102).  In fact, several articles of clothing featured in the August 6, 2007 *DNR* article were selected by Mr. Paci during his visit to Italy in June, and one of the samples, shown at the press release presentation that had been selected by Mr. Paci and ordered in June 2007, was selected for use at an October 22, 2007 presentation that Mr. Abboud made to Nordstrom to sell his "jaz" clothing line.  (Schwartz Tr. 70, 201-02, 227-28, 281; Abboud Tr. 278-79, 576; PX-118).  Clearly, Mr. Paci's selection of sportswear in June 2007 provided Mr. Abboud with a significant head start in launching his new menswear line.

---

[37]    More specifically, Mr. Abboud "wanted cashmere knitwear pieces.  He wanted fashionable outerwear.  He wanted elegant shirtings.  He wanted some turtlenecks.  He wanted trousers.  He wanted to make sure they were luxurious and better.  He asked for a scarf to compliment the knitwear" and instructed on the "[c]olor pallet" and "contrast trims on shirts."  (Schwartz Tr. 60-61).

154.    While Mr. Paci was selecting samples on Mr. Abboud's behalf to be shown at the July 30 "jaz" press conference, Mr. Dinsmoor was conducting due diligence of Merrill-Sharpe's business and financial documents.  (PX-360; TT 896; Schwartz Tr. 220, 229-30).  Before the end of June, Mr. Dinsmoor, on behalf of Mr. Abboud and his company Herringbone Sportswear, gave Mr. Schwartz a document entitled "Herringbone Sportswear, LLC Due Diligence Request List."  (PX-360).  By July 5, 2007, in response to Mr. Dinsmoor's due diligence request, Mr. Schwartz had forwarded to Mr. Dinsmoor the requested documents, which Mr. Dinsmoor reviewed at that time.  (PX-104; TT 896; Schwartz Tr. 220).  On the very day that Mr. Abboud's noncompete period expired, Herringbone Sportswear Company was formed, such that no time was wasted to get Herringbone Sportswear up and running.  (PX-170).

###    7.    __Lord & Taylor__

155.    In April 2007, Mr. Abboud first met with Richard Baker, President and CEO of NRDC Equity Partners ("NRDC"), the owner of Lord & Taylor, when Lord & Taylor was looking for a men's designer.  (PX-122; TT 483; Baker Tr. 16, 107-08).  In or about early June 2007, Mr. Abboud and NRDC's Creative Design Studios ("CDS") exchanged a term sheet identifying the key terms of a consulting agreement between them, including the use of Mr. Abboud's name to promote Lord & Taylor clothing.  (PX-282).  By June 9, 2007, Mr. Abboud, operating out of his offices at Herringbone, and CDS had completed "substantial negotiations" for this consulting agreement, which provided that Mr. Abboud would provide personal consulting and advisory services with respect to the design, development, production and sale of all of Lord & Taylor men's and boy's proprietary brand products and that Mr. Abboud would serve as the Creative Director for Lord & Taylor's men's and boy's business.  (Baker Tr. 64-65, 85; TT 889-91).  On June 10, 2007, NRDC

thought that the agreement was so close to being final that the parties "could finish the whole thing

in less than an hour." (PX-275). The final consulting agreement between Herringbone Consulting

Company, a Herringbone company wholly owned by Mr. Abboud, and CDS was dated as of August

1, 2007. (PX-327A; TT 483-86; Baker Tr. 37). Finally, like Herringbone Sportswear, Herringbone

Consulting Company was created on July 13, 2007, the very day Mr. Abboud's non-compete

expired.[38]

### 8.    Profits to Be Awarded JA Apparel

156.    Alden's revenues during the Restricted Period were as follows: May 2007 –

$186,261.40; June 2007 – $343,705.01; July 1-13, 2007 (*i.e.*, 42% of the July revenues) –

---

[38]    Defendants contend that Mr. Staff contacted Mr. Baker in an attempt to dissuade him from maintaining a business relationship with Mr. Abboud, and in doing so made false statements that were intended to impugn Mr. Abboud's professional reputation and character. (Answer and Counterclaims ¶¶ 152-53). Wholly apart from the truth of the allegations – which Mr. Staff denies – the bottom line is that Mr. Baker testified that he "can't point to anything that [he] didn't do with Mr. Abboud as a result of any communications with Mr. Staff." (Baker Tr. 56-57). *See also* Baker Tr. 36-37 (Lord & Taylor "did what we would have otherwise done"); Baker Tr. 57 ("we've done all the things that we would have otherwise done"); Baker Tr. 150 ("That's correct . . . notwithstanding those conversations with Mr. Staff" we "went ahead" with our "relationship with Mr. Abboud"); Baker Tr. 64 ("none of the financial aspects of [Mr. Abboud's consulting] arrangement have been modified as a result of any conversation or e-mails [Mr. Baker] had with Mr. Staff"). In all events, Mr. Staff denied that he ever attempted to dissuade Lord & Taylor from maintaining a business relationship with Mr. Abboud. (TT 237-38; Staff Tr. 69-70). Rather, Mr. Staff reached out to Mr. Baker, as one of JA Apparel's largest customers, and expressed his disappointment in not being informed about the consulting arrangement with Mr. Abboud and that he was concerned about JA Apparel's trademark rights in the name "Joseph Abboud." In an email to Mr. Baker, Mr. Staff wrote that "I will always be nervous about anything that in any way could hurt my business, or that could dilute the value of my trademarks. I hope and believe that you understand that. . . . Let's also please try to communicate so that we minimize surprises." (PX-121). Indeed, Mr. Baker confirmed that he understood Mr. Staff was speaking to him because he was concerned about JA Apparel's business and trademark rights. (Baker Tr. 60-61). Moreover, Mr. Staff never threatened to pull JA Apparel's JOSEPH ABBOUD line out of Lord & Taylor. (TT 237). Finally, Mr. Baker testified that in his July 25, 2007 conversation with Mr. Staff, Mr. Staff did not "say anything disparaging about Mr. Abboud." (Baker Tr. 41). As for the September 19, 2007 conversation to which defendants point (*compare* TT (Staff) 237-38), not only did it take place well after Mr. Abboud and CDS had signed their agreement (PX-327A), so that it could not possibly have adversely affected a business relationship between Mr. Abboud and CDS that was entered into more than one month earlier and that remains in effect, but Mr. Baker testified that, regardless of anything that Mr. Staff said, he "formed [his] own view as to Mr. Abboud's talent, ability and capabilities as a designer." (Baker Tr. 150-51).

$48,137.69, for a total of $578,104.10.  (PX-336).  Although defendants have the burden of proof to

establish the amount of Alden's direct expenses, if any, that increases as its output increases (*i.e.*,

variable expenses) (*see* CL 100, *infra*), they have made no effort to do so.  Indeed, the only evidence

they submitted was the conclusory testimony of Mr. Abboud that the factory ran at a loss; he made

no effort to address any of the factory's expenses, let alone testify as to which were variable.  (TT

474-76).  Indeed, he testified that he was "not an expert" on "financial matters" "when it comes to

running a factory."  (TT 70-09).  Accordingly, JA Apparel is entitled to an award of $578,104.10.

## J.   THE HARM TO JA APPAREL

157.   If defendants are not enjoined, their use of the names, trademarks, trade names,

service marks, logos, insignias and designations that include "Joseph Abboud," including "a new

composition by designer Joseph Abboud," "by the award-winning designer Joseph Abboud" and

"Joseph Abboud," will cause substantial and irreparable injury to JA Apparel and its valuable

ABBOUD Marks.  Many actual and potential purchasers and consumers, upon encountering

defendants' infringing use and their associated promotions, are likely mistakenly to believe that JA

Apparel has in some way licensed, approved, or sponsored defendants' products, or that defendants'

products are in some way affiliated with or related to JA Apparel or its products sold under the

JOSEPH ABBOUD brand.  Indeed, in the brief time since defendants' announcement of their "jaz"

line and their use of the ABBOUD Marks in connection with that line, there already have been

several instances of actual confusion among sophisticated, experienced non-consumers.  JA Apparel

has no control over the nature or quality of the products manufactured and marketed by defendants,

and, as such, there is a real danger that JA Apparel's reputation will be damaged in a way that cannot

be measured or quantified.  Irreparable injury is even more likely where, as here, the goods at issue

are designer goods because purchasers of such goods have a particularly strong awareness of the brand name.  (TT 36-38).

158.     JA Apparel will be irreparably injured, and its legal remedies are inadequate, if defendants are not permanently enjoined because it would be extremely difficult to calculate lost sales resulting from defendants' infringing use of JA Apparel's ABBOUD Marks.  (TT 132-33).  It would be extremely difficult to identify or quantify which purchases of defendants' products are the result of confusion as opposed to because the purchaser, knowing that the product did not emanate from JA Apparel, wanted to purchase the product.  (TT 100).  Nor, given the nearly identical names, trademarks, trade names, service marks, logos, insignias and designations of the parties, is there any basis to believe that any disclaimer would be effective.  (*See* FF 44, *supra*).

159.     JA Apparel will also be irreparably harmed if an injunction is not entered barring defendants from competing with JA Apparel for 90 days from entry of the judgment, which is the minimum amount of time by which Mr. Abboud obtained a head start in violation of his non-compete obligations in the Side Letter Agreement.  (*See* FF 46, 139, *supra*; *see generally* FF 45-155).  By definition, the full impact of all of the tangible and intangible effects of competition cannot be quantified or measured.  It is, thus, not surprising that Mr. Abboud agreed in the Side Letter Agreement that if, as he has here, he breached such obligations, JA Apparel "will be entitled to obtain equitable relief in the form of a preliminary or permanent injunction from any court of competent jurisdiction in order to enforce such agreements."  (PX-2 ¶ 2(d)).  That agreement may now be enforced against him.

**K.    THE SCOPE OF INJUNCTIVE RELIEF**

160.    Based on the above Findings of Fact, the Court finds that, given the irreparable injury JA Apparel has and will continue to suffer as a result of defendants' violations of the Lanham Act, and the New York General Business Law, unfair competition and breach of the Purchase and Sale Agreement, and given the inadequacy of legal remedies, a permanent injunction should be entered enjoining defendants from breaching the Purchase and Sale Agreement and enjoining defendants' infringing and other wrongful conduct.

161.    In addition, given the irreparable injury JA Apparel has and will continue to suffer as a result of Mr. Abboud's breach of the Side Letter Agreement and the inadequacy of JA Apparel's legal remedies for such breach, the Court finds that JA Apparel is entitled to an injunction barring defendants from competing with JA Apparel for no less than the amount of time that Mr. Abboud breached his non-compete obligations in the Side Letter Agreement prior to July 13, 2007, *i.e.*, until 90 days from the date of entry of the Court's injunction.

## II.

### CONCLUSIONS OF LAW

1.    Under the "well-established principles of equity," a plaintiff is entitled to a permanent injunction if it shows actual success on the merits and (1) irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction.  *eBay Inc. v. MercExchange, L.L.C.*, 457 U.S. 389, 391 (2006); *A.V. by Versace, Inc. v. Gianni Versace S.p.A.*, 2005 U.S. Dist. LEXIS 925, *16-17 (S.D.N.Y. Jan. 24, 2005) (granting permanent injunction against

trademark infringement); *Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*, 378 F. Supp.2d 448, 459 (S.D.N.Y. 2005) (same). JA Apparel has satisfied each of these standards and, accordingly, the Court will enter a permanent injunction enjoining defendants from breaching the Purchase and Sale Agreement, from infringing and diluting the ABBOUD Marks, from competing unfairly with JA Apparel, and from breaching the non-competition obligations in the Side Letter Agreement.

**A.     JA APPAREL HAS ESTABLISHED ITS LANHAM ACT AND STATE LAW CLAIMS**

**1.     JA APPAREL HAS ESTABLISHED ITS CLAIM
FOR BREACH OF THE PURCHASE AND SALE AGREEMENT**

2.     To prevail on a claim of breach of contract under the governing New York law (*see* PX-1 ¶ 9.6), a plaintiff must demonstrate (1) the existence of a contract, (2) plaintiff's perform-ance, (3) defendant's breach, and (4) damages to the plaintiff. *See, e.g., Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996); *Shred-It USA, Inc. v. Mobile Data Shred, Inc.*, 228 F. Supp.2d 455, 462 (S.D.N.Y. 2002), *aff'd*, 92 Fed. Appx. 812 (2d Cir. 2004). *See also Hazel Bishop, Inc. v. Perfemme, Inc.*, 314 F.2d 399, 404 (2d Cir. 1963) (New York "upholds agreements whereby one party agrees to refrain from the commercial exploitation of his name and vests the exclusive right to the goodwill attached to his name in another") (affirming preliminary injunction).  Here, there is no dispute that the Purchase and Sale Agreement is a valid contract and that JA Apparel performed its obligations under the Agreement – paying Mr. Abboud $65.5 million.  Nor is there any question that JA Apparel has established that Mr. Abboud breached the Agreement.

3.     In the Purchase and Sale Agreement, Mr. Abboud agreed to and did sell to JA Apparel – for $65.5 million – *"all of the Sellers' right, title and interest* in . . . [t]he names, trade-marks, trade names, service marks, logos, insignias and designations" that include the words "Joseph Abboud," "all trademark registrations and applications therefor, and *the goodwill related thereto.*"

(PX-1 ¶ 1.1(a)(A)) (emphasis added).  There is no ambiguity that defendants expressly sold the Joseph Abboud "name" and it is black letter contract law that each word in a contract– "names, trademarks, trade names, service marks, logos, insignias and designations" must be given meaning.  (*See* CL 11, *infra*).  In addition, in the Agreement Mr. Abboud also sold to JA Apparel "*[a]ll rights to use* and apply for the registration of new trade names, trademarks, service marks, logos, insignias and designations containing the words 'Joseph Abboud,' 'designed by Joseph Abboud,' 'by Joseph Abboud,' or anything similar thereto or derivative thereof. . . . for *any and all* products or services." (PX-1 ¶ 1.1(a)(C)) (emphasis added).  Once again, each word – "trade names, trademarks, service marks, logos, insignias and designations"– must be given meaning.

    4. Plainly, Mr. Abboud's use of the name, mark or designation "a new composition by designer Joseph Abboud" or "by the award-winning designer Joseph Abboud" (or any other use of the words "Joseph Abboud" in marketing, advertising or publicity) is a barely discernable variation – and clearly, as Mr. Abboud admitted (TT 556-57), "similar" to both "designed by Joseph Abboud" and "by Joseph Abboud."  Indeed, one definition of "compose" is "to create by mental or artistic labor:  *design* and execute or put together," and the dictionary definition of "designation" is "the act of indicating or identifying."  WEBSTER'S THIRD NEW INT'L DICTIONARY p. 466 (2002) (emphasis added); http://www.merriam-webster.com/dictionary/designation.  Accordingly, JA Apparel has proven that Mr. Abboud's use of the name, mark or designations "a new composition by designer Joseph Abboud," "by the award-winning designer Joseph Abboud" and "Joseph Abboud" is a clear breach of Paragraphs 1.1(a)(A) and 1.1(a)(C) of the Agreement and is precisely the type of use of the ABBOUD Marks that Mr. Abboud agreed – in exchange for $65.5 million – never to do.

Thus, regardless of whether defendants' conduct rises to the level of trademark use, it breaches the Agreement.

(a)     **The Agreement Is Unambiguous and,
Therefore, Parol Evidence Is Inadmissible**

5.     The Court must "enforce[] [the Purchase and Sale Agreement] according to its terms," and must "concern ourselves with what the parties intended, *but only to the extent that they evidenced what they intended by what they wrote*" in the contract.  *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 443 (N.Y. 1990); *West, Weir & Bartel, Inc. v. Mary Carter Paint Co.*, 25 N.Y.2d 535, 542, 307 N.Y.S.2d 449, 453 (N.Y. 1969) (emphasis added). *Accord, South Rd. Assocs., LLC v. Intern. Bus. Mach. Corp.*, 4 N.Y.3d 272, 277, 793 N.Y.S.2d 835, 838 (N.Y. 2005) ("In cases of contract interpretation, it is well settled that 'when parties set down their agreement in a clear, complete document, their writing should . . . be enforced according to its terms.'") (quoting *Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475, 775 N.Y.S.2d 765, 767 (N.Y. 2004)).  "This principle is based on the sound policy that favors predictability in the interpretation of commercial writings.  If parties are properly to structure and plan their commercial activities, they must be able to rely upon the plain language of the agreements they sign." *Int'l Multifoods Corp. v. Comm. Union Ins. Co.*, 98 F. Supp.2d 498, 503 (S.D.N.Y. 2000) (applying New York law).  *See W.W.W. Assocs.*, 77 N.Y.2d at 162, 565 N.Y.S.2d at 443 (The purpose of the parol evidence rule is to "impart[] 'stability to commercial transactions by safeguarding against fraudulent claims . . . [and] infirmity of memory.'").

6.     "Whether or not a writing is ambiguous is a question of law to be resolved by the courts."  *W.W.W. Assocs.*, 77 N.Y.2d at 162, 565 N.Y.S.2d at 443.  Also "well settled [is] that extrinsic and parol evidence is not 'admissible to create an ambiguity in a written agreement which

is complete and clear and unambiguous upon its face.'" *Id.*, 77 N.Y.2d at 163, 565 N.Y.S.2d at 443;

*accord*, *South Rd. Assocs.*, 4 N.Y.3d at 278, 793 N.Y.S.2d at 838.   Nor does it matter whether the

extrinsic or parol evidence was created before or after the execution of the agreement, *see, e.g., Slatt*

*v. Slatt*, 64 N.Y.2d 966, 967, 488 N.Y.S.2d 645, 646 (N.Y. 1985); *Brainard v. N.Y. Cent. R.R. C*o.,

242 N.Y. 125, 133 (N.Y. 1926), or whether it is in the form of drafts of the agreement or of a party's

"understanding" of the agreement, *see, e.g.*, *Am. Para Prof. Sys., Inc. v. Hooper Holmes, Inc.*, 13

A.D.3d 167, 169, 787 N.Y.S.2d 227, 229 (1st Dep't 2004).   If the agreement is unambiguous, all such

evidence is excluded and its interpretation is for the Court alone.    As the Second Circuit has

summarized the law:

> Under New York law, a written contract is to be interpreted so as to give effect to the
> intention of the parties *as expressed in the unequivocal language they have employed*.
> Construing an unambiguous contract provision is a function of the court, rather than
> a jury, and *matters extrinsic to the agreement may not be considered when the intent
> of the parties can fairly be gleaned from the face of the instrument*.   A court may
> neither rewrite, under the guise of interpretation, a term of the contract when the term
> is clear and unambiguous, nor redraft a contract to accord with its instinct for the
> dispensation of equity upon the facts of a given case.

*Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000) (citations omitted) (emphasis added).

7.    Defendants identify no ambiguity in the Purchase and Sale Agreement, and

the Court finds none.    As defendants put it in their Answer, the Agreement "speaks for itself"

(Answer ¶¶ 20, 21, 23), and, as they conceded in a January 4, 2008 conference with the Court and

again in their brief seeking judgment on the pleadings on the contract claim and opposing plaintiff's

*in limine* motion to exclude the admission of parol evidence (Cross-Motion Mem. 1), the Agreement

is *not* ambiguous.    They stated in the conference, however, that if the Court disagrees with their

interpretation of the Agreement, the Court should admit parol evidence.    But, as they later admitted

(Cross-Motion Mem. 5), that is not the law.  If the Agreement – as all parties agree – is unambiguous,

then, as explained above, it is for the Court to interpret it based on the Agreement's text alone.  Thus, "a contract is not rendered ambiguous just because one of the parties attaches a different, subjective meaning to one of its terms."  *Moore v. Kopel*, 237 A.D.2d 124, 125, 653 N.Y.S.2d 927, 929 (1st Dep't 1997).  *Accord*, *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.,* 906 F.2d 884, 889 (2d Cir. 1990) ("Language whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation."); *Atlantic Mut. Ins. Co. v. Terk Tech. Corp.*, 309 A.D.2d 22, 28, 763 N.Y.S.2d 56, 61 (1st Dep't 2003).

8.     Put another way, ambiguity cannot be determined by referring to the parties' interpretation of a contract.  Their interpretations necessarily differ.  That is why they are in litigation. Indeed, even where judges disagree as to the meaning of a contract, that does not render the contract ambiguous; the plain meaning of the contract controls.  *See, e.g., Breed v. Ins. Co*., 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 355-56 (N.Y. 1978).  As the Fourth Circuit explained in applying the same fundamental rule to statutory interpretation, "[t]o hold otherwise would mean that . . . we would be abandoning our own duty to interpret the law." *Rosmer v. Pfizer Inc*., 263 F.3d 110, 118 (4th Cir. 2001) (finding statute unambiguous on 2-1 vote); *accord, Exxon Mobil Corp. v. Allapattah Servs., Inc*., 545 U.S. 546, 559-67 (2005) (finding same statute unambiguous on 5-4 vote).[39]

9.     There is nothing ambiguous about the Purchase and Sale Agreement.  In each instance, the Agreement expressly specifies that "all" of the designated assets are transferred to JA

---

[39]     Defendants initially argued that "by law the Purchase and Sale Agreement must be construed against" JA Apparel because, they asserted, JA Apparel's lawyers were the drafters of the Agreement.  (Defs. PI Mem. 12; Defs. Pre-Trial FF/CL Conclusion 57).  Defendants completely switched gears at trial, arguing that the Agreement was "jointly" drafted (TT 865-66), in apparent recognition of the fact that the Agreement expressly provides that "[t]he parties have participated jointly in the negotiation and drafting of this Agreement.  If any ambiguity or question of intent or interpretation arises, this Agreement *shall be construed as if drafted jointly by the parties* and *no* presumptions or burden of proof shall arise favoring or disfavoring any party by virtue of authorship of any of the provisions of the Agreement."  (PX-1 ¶ 9.8) (emphasis added).

Apparel. (PX-1 ¶ 1.1(a)). There is nothing ambiguous about the word "all." Nor is there anything ambiguous about any of the terms used to describe what was transferred:

- "right, title and interest"

- "names, trademarks, trade names, service marks, logos, insignias and designations identified on Schedule 1.1(a)(A), and all trademark registrations and applications therefor, and the goodwill related thereto," which were referred to "collectively" under the shorthand "the 'Trademarks'"

- "licenses to use the Trademarks granted by Houndstooth or Abboud"

- "rights to use and apply for the registration of new trade names, trademarks, service marks, logos, insignias and designations containing the words 'Joseph Abboud,' 'designed by Joseph Abboud,' 'by Joseph Abboud,' 'JOE' or 'JA,' or anything similar thereto or derivative thereof, either alone or in conjunction with other words or symbols (which were referred to "collectively" under the shorthand "the 'New Trademarks'"), for any and all products or services."

10.    As noted above, defendants not only fail to identify any ambiguity in any of these provisions, they assert affirmatively – and correctly – that the provisions are *not* ambiguous. Nevertheless, defendants contend that *all* that they sold in Paragraph 1.1(a)(A) was the trademark and service mark "Joseph Abboud" because Schedule 1.1(a)(A) is a list of trademark and service mark registrations or applications for registrations. In particular, they assert that they did not sell Mr. Abboud's "name" and that they are free to use his name in connection with the sale of products. Defendants' argument fails for three reasons.

11.     First, if all that Paragraph 1.1(a)(A) means is that the Agreement transferred "trademarks" and "service marks," then that could have and would have been stated much more simply and directly by merely stating that defendants were selling the "trademarks identified on Schedule 1.1(a)(A)."[40] But that is not what the provision says. It also specifically refers to "names," "trade names," "logos," "insignias" and "designations." These terms cannot be ignored. As New York's highest court has explained, the "rules of construction of contracts require us to adopt an interpretation which gives meaning to *every* provision of a contract or, in the negative, no provision of a contract should be left without force and effect." *Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y.2d 42, 46, 150 N.Y.S.2d 171, 174 (N.Y. 1956) (emphasis added).[41] Under defendants' interpretation, only two of the seven items – "trademarks" and service marks – would be given meaning, while the other six items – "names, . . .  trade names, logos, insignias and designations" – would be rendered "a nullity." *Namad v. Salomon Inc.*, 74 N.Y.2d 751, 753, 545 N.Y.S.2d 79, 80 (N.Y. 1989). Such a "construction is untenable" under New York contract law. *Id.*

12.     Second, the seven different items specified in Paragraph 1.1(a)(A) are referred to "collectively" as Trademarks. Use of the term "collectively" necessarily means that the defined term "Trademarks" means each of the seven items specified in the "collection." Otherwise, there would have been no need to use the term "collectively."

---

[40]     Defendants initially argued that the Agreement transferred only trademarks (Cross-Motion Mem. 7-8, Defs. Pre-Trial CL 43), but later, in the middle of their attorney's trial testimony (*see* CL108, *infra),* they changed their position and conceded that service marks were also sold.

[41]     *See also, e.g., Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs.*, 63 N.Y.2d 396, 403, 482 N.Y.S.2d 465, 468 (N.Y. 1984) ("In construing a contract, one of a court's goals is to avoid an interpretation that would leave contractual clauses meaningless."); *Suffolk County Water Auth. v. Village of Greenport*, 21 A.D.3d 947, 948, 800 N.Y.S.2d 767, 768 (2d Dep't 2005) ("an interpretation which renders language in the contract superfluous is unsupportable").

13.     Third, terms – here, "Trademarks" – that are defined in a contract have the meaning set forth in the contract, not the dictionary meaning or some other definition.  That is why the definition was put in the contract in the first place.  Thus, courts look to dictionary definitions, treatises or parol evidence to ascertain the meaning of a term *only* where, unlike here, the contract itself fails to provide a definition.  *Citadel Equity Fund Ltd. v. Aquila, Inc.*, 371 F. Supp.2d 510, 517 (S.D.N.Y. 2005), *aff'd*, 168 Fed. Appx. 474 (2d Cir. 2006); *Miller v. Hekimian Labs., Inc.*, 257 F. Supp.2d 506, 516-17 (N.D.N.Y. 2003), *aff'd*, 85 Fed. Appx. 266 (2d Cir. 2004).[42]  Put another way, if the Agreement had used the terms "old assets" and "new assets" – or, for that matter, "new stuff" and "old stuff" – no one would seriously contend that what was actually transferred would be dependent on the meaning of the word "stuff" unhinged from the language of the Agreement.  What controls – *all* that controls – is the plain language of the contract; in this case, all "names, trademarks, trade names, service marks, logos, insignias and designations" identified in the Agreement.

14.     Ignoring this textual analysis, defendants have proffered five reasons why Paragraph 1.1(a) of the Agreement should not be interpreted as written.  None any merit.

(a)     Defendants argue that the Agreement does not use the term "exclusive" with respect to the transfer of the right to use Mr. Abboud's "name."  (Defs. Cross-Motion Mem. 5; Defs. Pre-Trial CL 41).  The Agreement, however, expressly transfers "all" "right, title and interest" in the "name," "Joseph Abboud," which is Mr. Abboud's name.  There is nothing ambiguous about the word "all."  Nor does plaintiff contend that Mr. Abboud transferred the "exclusive" right to use his name.  Obviously, he did not transfer his right to use his name for a driver's license, marriage

---

[42]     This is consistent with the rule that only where a statute does not define a term does the court look to other aids to interpret the term.  *See, e.g.*, *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995); *FDIC v. Meyer*, 510 U.S. 471, 476 (1994); *Stoike v. First Nat'l Bank*, 290 N.Y. 195, 201, 48 N.E.2d 482, 485 (N.Y. 1943).

license, Social Security number, credit card, doctor's appointment or other personal affairs, but he did transfer "all" rights to use it in any commercial way, including for all products and services.[43]

   (b)  Defendants argue that Mr. Abboud did not sell his name to JA Apparel because he failed to execute a separate assignment transferring the Joseph Abboud name, and that, therefore, JA Apparel did not buy the name.  (TT 1139; Defs. Cross-Motion Mem. 6; Defs. Pre-Trial FF 54-56; Defs. Pre-Trial CL 47; DX-180, DX-182).  Assignments, however, are used to transfer trademarks and trademark registrations because the Lanham Act provides for assignments and their filing with the Patent and Trademark Office, which constitutes "prima facie evidence of [the assignment's] . . . execution."  15 U.S.C. § 1060(a)(3).  There is no such statutory provision for assignment of a name for use in commerce, and there is no legal reason requiring a separate assignment document.  In all events, there was no need for any additional assignment because Paragraph 1.1(a)(A) itself explicitly transferred the rights to the Joseph Abboud "name."  Defendants further argue that "there is a big difference between the word 'name' [Joseph Abboud] and the 'words' [Joseph Abboud]."  (Defs. Cross-Motion Mem. 8).  They never state what the difference is, nor cite a case that would explain the mystery.

---

[43] Defendants rely on two half-century-old state court cases from California and Illinois, neither of which applied New York law, which governs here, and both of which otherwise fail to apply to the facts here. In *Karsh v. Haiden*, 120 Cal.App.2d 75, 82 (Cal. Ct. App. 1953), the court stated that "[t]he right to use one's own name in business may be given up by contract," that "the seller of a business and goodwill may not use the firm name he has assigned or another similar firm name likely to cause confusion," that the seller "is not in the same position as a person who newly enters a line of business in which a firm which accidentally makes use of the same name has gained a reputation," and that "[t]he seller's contractual relation to the purchaser implies an obligation of 'good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement."  In *Poorman v. Julian*, 22 Ill.App.2d 208, 217 (Ill. App. Ct. 1959), the court held that the sale agreement could not be interpreted to prohibit the defendant from using his name for funeral directing where a statute required that a party engaged in funeral directing "must use his name in connection therewith" and where the "Bill of Sale . . . transfers nothing whatever in that respect." Not only is there no New York (or other) state statute regulating the use of names of people designing suits and sport coats, but, here, Mr. Abboud *did* transfer his name.

(c)    Defendants argue that there are no "names" listed on Schedule 1.1(a)(A).  (Defs. Cross-Motion Mem. 7).  To the contrary, the name "Joseph Abboud" appears repeatedly on the Schedule, as does the name "J.O.E."  The fact that "Joseph Abboud" is also a registered trademark, or is a trademark that is the subject of pending trademark applications, does not change the fact that it is also a "name."

(d)    Defendants argue that Paragraph 1.1(a)(A) of the Agreement should be read together with the provision in the Side Letter Agreement in which Mr. Abboud was permitted during the period of his non-compete obligations to make media appearances.  (Defs. Cross-Motion Mem. 9, quoting PX-2 ¶ 1(b)).  Defendants, however, ignore that this provision terminated on July 13, 2007, that in the Purchase and Sale Agreement that media appearance right was strictly limited to appearances that would *not* result in Mr. "Abboud actually competing with any of the business activities of" JA Apparel, and that Mr. Abboud reserved *no* right to make appearances or to use his personal name in competition with plaintiff.  (PX-2 ¶ 1(b)).

(e)    Defendants have also made the following argument:

While JA contends that the terms used in Article 1.1(a)(A) of the Purchase and Sale Agreement are independent of the trademarks on Schedule 1.1(a)(A), *i.e.*, "names" means "names" and not "trademarks", as a matter of law, this argument is belied by the clear and unambiguous language of Article 1.1(a)(A) of the Purchase and Sale Agreement, namely the placement of the phrase "identified on Schedule 1.1(a)(A)" following the term "designations", rather than the term "trademarks."  In other words, because the words "identified on Schedule 1.1(a)(A)" are *placed at the end of the terms*; and, because the Schedule is a *Trademark Report* that *only* identifies *trademarks and not any names or trade names*, the Court must, as a matter of law, interpret the terms as being descriptive of the trademarks on Schedule 1.1(a)(A), rather than as being independent of the Schedule. . . .  (Defs. Pre-Trial CL 43) (emphasis in original).

(1)    If what defendants are arguing is that Schedule 1.1(a) is just a list of trademark and service mark registrations and applications and, therefore, none of the other

intellectual property specified in Paragraph 1.1(a)(A) – "names," "trade names," "logos," "insignias" and "designations" – was transferred, the argument is belied by the Schedule itself, which contains not just trademark and service mark registrations, but names (*i.e.*, "Joseph Abboud"), trade names, logos, insignias and designations.  The document is entitled "Schedule 1.1(a)(A)" – not "Schedule of Trademarks and Service Marks" – and it is defined in Paragraph 1.1(a)(A) as "identif[ying]" "names, trademarks, trade names, service marks, logos, insignias and designations."  In addition, defendants' argument that the Schedule limits Paragraph 1.1(a)(A) to the listed registered trademarks and service marks on the Schedule is inconsistent with the fact that trade names cannot be registered with the Patent and Trademark Office.[44]  Moreover, if all that the Schedule was intended to include were trademark and service mark registrations and applications, then the phrase that follows "Schedule 1.1(a)(A)" in Paragraph 1.1(a)(A) – "and all trademark registrations and applications therefor" adds nothing and is superfluous, contrary to the black letter contract rule of interpretation that all words in a contract must be given meaning.

(2)    Defendants' argument is also belied by Paragraph 1.1(a)(C). In that provision, Mr. Abboud sold to JA Apparel "*[a]ll rights to use* and apply for the registration of new trade names, trademarks, service marks, logos, insignias and designations containing the words 'Joseph Abboud,' 'designed by Joseph Abboud,' 'by Joseph Abboud,' or anything similar thereto or derivative thereof, either alone or in conjunction with other words or symbols (collectively, the 'New Trademarks'), for *any and all* products or services."  (PX-1 ¶ 1.1(a)(C)) (emphasis added).

---

[44]      *Commun's Satellite Corp. v. Comcet, Inc.*, 429 F.2d 1245, 1250 (4th Cir. 1970) ("Trade names, as such, are not registrable under the Lanham Act"); *In re Antenna Specialists Co.*, 408 F.2d 1052 (C.C.P.A. 1969) (affirming examiner's refusal to register a trade name); *In re Walker Process Equip., Inc.*, 233 F.2d 329, 331 (C.C.P.A. 1956) (affirming examiner's refusal to register a trade name and noting that the Lanham Act "contains no provision permitting registration of trade names").

There is no reference to *any* schedule.  Thus, even accepting defendants' strained theory as to Paragraph 1.1(a)(A), Paragraph 1.1(a)(C) on its face provides that Mr. Abboud sold "*all* rights to *use* . . . new trade names, trademarks, service marks, logos, insignias and designations containing the words 'Joseph Abboud,' 'designed by Joseph Abboud,' 'by Joseph Abboud,' or anything similar thereto or derivative thereof," *regardless* of whether it is a trademark or service mark or rises to a trademark or service mark use.  (Emphasis added).  Put another way, if all that was being sold was the right to use and register new trademarks and service marks, that is what Paragraph 1.1(a)(C) would have said.

> (3)    Finally, if what defendants mean is that JA Apparel's interpretation of the Agreement – giving meaning to each of the terms in Paragraph 1.1(a)(A) – would make sense only if  "Schedule 1.1(a)(A)" followed the word "trademarks," then defendants' argument makes no sense, as setting forth Paragraph 1.1(a)(A) in this way, with the moved "Schedule 1.1(a)(A)" shown in bold below, shows:

> > 1.1(a)   Upon the terms and subject to the conditions of this Agreement, on the Closing Date (as hereinafter defined), the Sellers shall sell, convey, transfer, assign and deliver to the Buyer, and the Buyer shall purchase and acquire from the Sellers, *all of the Sellers' right, title and interest* in and to:

> > > (A)    The names, trademarks **identified on Schedule 1.1(a)(A)**, trade names, service marks, logos, insignias and designations, and all trademark registrations and applications therefor, and *the goodwill related thereto* (collectively, the "Trademarks"), . . .

As is readily apparent, by moving the phrase "identified on Schedule 1.1(a)(A)" after the word "trademarks," there is no modifier for the terms "names," "trade names," "service marks," "logos," "insignias" and "designations."  That is, the revised paragraph would not state *which* "names," "trade names," "service marks," "logos," "insignias" and "designations" were being transferred.  Nothing would limit them to "Joseph Abboud" or any other term.  It would just transfer "names," "trade

names," "service marks," "logos," "insignias" and "designations" in the abstract, unhinged from Joseph Abboud and reality.  The argument is absurd.

15.    When read together, Paragraphs 1.1(a) and 1.1(A)(C) transferred *all* present and future interests in the JOSEPH ABBOUD intellectual property.  Significantly, not in any of their six briefs nor at trial have defendants even once explained why the Court should (i) assume that the words "trade names," "logos", "insignias" and "designations" can be read out of Paragraph l.1(a)(C) and (ii) ignore the normal rules of contract construction under which each word is presumed to have separate meaning.  Nor do defendants point to any language in the Agreement that says that JA Apparel is buying names, trade names, logos, insignias and designations that rise to technical trademark use, but not names, trade names, logos, insignias and designations that do not rise to technical trademark use.  Simply put, the Agreement contains no exception for so-called "fair use" of "Joseph Abboud."

16.    In short, the parties made a deal set forth unambiguously in the Agreement and it is *that* deal that governs.  As the Second Circuit has explained, the "parties' rights under an unambiguous contract should be fathomed from the terms expressed in the instrument itself rather than from extrinsic evidence as to terms that were not expressed or judicial views as to what terms might be preferable . . . .  'The parties having agreed upon their own terms and conditions, 'the courts cannot change them and must not permit them to be violated or disregarded.'" *Metropolitan Life Ins. Co.,* 906 F.2d at 889 (quoting *Diversified Mortg. Investors v. U.S. Life Title Ins. Co. of New York*, 544 F.2d 571, 575 (2d Cir. 1976) (quoting *Whiteside v. North Am. Accident Ins. Co*., 200 N.Y. 320, 326, 93 N.E.2d 948, 950-51 (N.Y. 1911)).  The bottom line is that if the Agreement were limited to the transfer of the trademarks and service marks on the Schedule, it could have stated that very simply:

"The trademarks and service marks listed on Schedule 1.1(a)(A), and the goodwill related thereto."

It didn't.[45]

> **(b)    The Parol Evidence Confirms that Defendants Sold All**
> **of the Assets Specified in the Purchase and Sale Agreement**

17.    Even if parol evidence were admissible – which it is not – that evidence would

not alter the Court's interpretation of the Agreement.[46]  As explained in detail below, there is not a

single communication by anyone on behalf of defendants during the negotiation of the Purchase and

Sale Agreement that is inconsistent with the Agreement's express sale of "all of the Sellers' right,

title and interest in and to (A) [t]he names, trademarks, trade names, service marks, logos, insignias

and designations" [that include the words 'Joseph Abboud' or 'JA']" and "(C) [a]ll rights to use and

apply for the registration of new trade names, trademarks, service marks, logos, insignias and

designations containing the words "Joseph Abboud," "designed by Joseph Abboud," "by Joseph

Abboud," "JOE" or "JA," or anything similar thereto or derivative thereof, either alone or in

---

[45]    For essentially the same reasons, no parol evidence is admissible with respect to the Side Letter Agreement (PX-2), which is equally unambiguous on its face, also contains a merger clause, and which defendants have not asserted is ambiguous in any pleading.  Mr. Abboud is also precluded by *res judicata* from claiming that an oral agreement modifies the terms of the Side Letter Agreement because he made that claim in a previous litigation against JA Apparel that he dismissed with prejudice.  (*See* FF 17-18, *supra*).

[46]    That defendants did not even refer to their parol evidence until the eve of trial confirms the Court's conclusion that the evidence is not probative.  Thus, neither in their Answer nor in their brief opposing entry of a preliminary injunction did defendants assert that the Agreement was ambiguous or that they would seek to rely on parol evidence.  To the contrary, defendants alleged in their Answer that the Agreement "speaks for itself."  (Answer ¶¶ 20, 21, 23).  Similarly, in his declaration opposing entry of a preliminary injunction, Mr. Abboud did not assert that the Agreement was ambiguous nor refer to any parol evidence.  It was only in late December, when the parties exchanged witness and exhibit lists, that defendants for the first time indicated that they intended to introduce parol evidence by offering the testimony of Theodore Dinsmore, defendants' counsel, and a group of exhibits. Plaintiff then moved *in limine* to preclude the admission of parol evidence.  The Court reserved decision on the motion and allowed the admission of such testimony.  (TT 14).  As explained in Conclusions of Law 5-16, *supra*, the Court now concludes that the contract is unambiguous and parol evidence is inadmissible.  Nevertheless, given that the evidence was introduced at trial, and to make as complete a record as possible, the Court addresses that evidence herein.

conjunction with other words or symbols . . ., for any and all products or services."  (PX-1 ¶ 1.1(a)(A),(C)).  Nor, during the negotiations, did anyone on behalf of defendants ever tell anyone on behalf of JA Apparel that defendants thought that all that they sold were trademarks, that they did not sell Mr. Abboud's name (or the other assets specified in Paragraph 1.1(a) of the Purchase and Sale Agreement), or that Mr. Abboud believed that he had somehow reserved the right to use his name in advertising.

18.    As for the "understandings" of the Agreement that Mr. Abboud and his attorney, Theodore Dinsmoor, claim they personally had of the meaning (*e.g.*, TT 375, 380-84, 399-401, 407, 409-10, 423, 773-74, 783-84, 791-92, 987-88, 1132), not only are those understandings inconsistent with the express terms of the Agreement and are they not supported by the drafting history, but they are legally  irrelevant (assuming, which is not the case here, that parol evidence is admissible).  That is because only what is *communicated* to the opposing side is probative of the meaning of a contract.  *See, e.g.*, *Hudson-Port Ewen Assoc. v. Chien Kuo,* 165 A.D.2d 301, 305 (3d Dep't 1991), *aff'd* 78 N.Y.2d 944, 573 N.Y.S.2d 637 (N.Y. 1991) ("Defendants do not claim, however, that their understanding of the meaning of the contract was communicated to the buyer prior to or contemporaneous with the execution of the contract, and it is a well-established principle of law in New York that uncommunicated subjective intent alone cannot create an issue of fact where otherwise there is none.  In the absence of any evidence that the . . . views now advanced were either discussed or considered by the parties during the process leading up to the execution of the agreement, the words in the contract must be given the meaning which those to whom they are addressed would reasonably be expected to perceive.").[47]

---

[47]    *See also, e.g.*, *Cole v. Macklowe,* 40 A.D.3d 396, 398, 836 N.Y.S.2d 568, 570 (1st Dep't 2007)
(continued...)

19.     Mr. Abboud and his company Houndstooth were represented by Theodore Dinsmoor during the transaction. (TT 767-68, 1118-19). Mr. Dinsmoor, then a partner in Finnegan, Hickey, Dinsmoor and Johnson, P.C., has been personal counsel to Mr. Abboud for over 20 years, for years has received a monthly retainer of $4,000 from Mr. Abboud, and, as January of 2008, had billed Mr. Abboud $90,000 in connection with work his has done for defendants in this litigation. (TT 923-26). Jeffrey LaGueux, of Patterson Bellknap Webb & Tyler LLP, acted as the lead attorney for JA Apparel, the buyer, and its owner, GFT SpA ("GFT"), and has not represented JA Apparel since March 2004, when the company was sold to J.W. Childs.   (TT 1768, 109, 1115-19). Mr. LaGueux, unlike Mr. Dinsmoor, is an experienced corporate attorney who has functioned as the senior attorney in the negotiation of hundreds of corporate transactions. (TT 742-44, 1109-12, 1122-23). Neither Mr. Abboud nor anyone other than Mr. Dinsmoor and Mr. LaGueux participated in the negotiation of the Purchase and Sale Agreement, the Side Letter Agreement, and the previous letter of intent. (TT 409, 939, 1118-19).

20.     On or about November 11, 1999, Mr. Abboud met with Mr. Roberto Jorio Fili, the CEO of GFT, to discuss a proposed transaction. (TT 376).  Following that meeting, Mr. Abboud sent a letter to Mr. Maurizio Romiti, the CEO of the Italian conglomerate that owned GFT,  "to

---

[47]     (...continued)
("While defendant may have subjectively desired further terms, he admitted that he never told plaintiff that the interests that appear to have unequivocally been granted to plaintiff by these documents would not exist until plaintiff agreed to further conditions. Defendant's subjective desire for further terms is irrelevant given that the documents are unambiguous."); *Padovano v. Vivian,* 217 A.D.2d 868, 869, 629 N.Y.S.2d 844, 846 (3d Dep't 1995) ("Extrinsic evidence of the parties uncommunicated subjective intent wis irrelevant."); *In re Robbins Inter., Inc.,* 275 B.R. 456, 465 (Bankr. S.D.N.Y. 2000) ("In determining the parties' intent in an ambiguous contract, the factfinder examines the objective manifestations of the parties' intentions. This exclusive reliance upon evidence of objective manifestations of intent renders evidence of uncommunicated subjective intent irrelevant. Thus, the only germane testimonial evidence is that of the objective manifestations of the parties' intent."); *First Montauk Securities Corp. v. Menter,* 26 F. Supp.2d 688, 689 (S.D.N.Y. 1998) ("[I]t is hornbook law that the uncommunicated subjective intent of a party is irrelevant in interpreting a contract.").

clarify which issues are still in negotiation and which issues need further discussion and clarification. (DX-161; TT 761). Among the "points of agreement was "$50 - $55 Million at signing for all Joseph Abboud trademarks." (DX-161; TT 764).

21.     There were then some additional meetings and correspondence among the parties in which the issue of whether GFT would purchase specified assets or Mr. Abboud's ongoing business was referred to by shorthand as the sale of a "business" as opposed to the sale of "trademarks." When it was determined that Mr. Abboud's business would not be sold, it was decided that a letter of intent should be executed, and Mr. Abboud turned the matter over to Mr. Dinsmoor. (TT 385, 388-89, 395, 760-63, 767-68, 772, 1199; DX-162, DX-190). Mr. LaGueux drafted the initial version of the letter of intent. (DX-5; TT 772, 1115-16, 1120). As he testified, "[i]t's typical that in corporate transactions [that] the buyer's lawyer drafts the agreement" so that the buyer obtains the non-monetary terms as it "understood them to be." (TT 1116, 1121).

22.     The purpose of the letter of intent was to memorialize the underlying terms of the transaction, which would serve as the framework for the definitive agreement. (TT 1120). As Mr. LaGueux testified, and as indicated by its title, the letter of intent was not "intended to be a complete reflection of the entire agreement of the parties" but, rather, it was understood "that there would be a further definitive agreement that would be entered into." (TT 1120).

23.     The letter of intent included a section titled "Assets to be Purchased." That section provided for the sale of "all of Houndstooth's and Mr. Joseph Abboud's right, title and inter-est in and to *all trade names, trademarks and service marks* existing as of the Closing" and "all of the right title and interest of Houndstooth and/or Mr. Joseph Abboud to use and apply for the registra-tion of *new trade names, trademarks and service marks* containing the words "Joseph Abboud,"

"designed by Joseph Abboud," "by Joseph Abboud," "JOE" or "JA," or anything similar thereto or derivative thereof, either alone or in conjunction with other words or symbols . . . for any and all products or services." (DX-5) (emphasis added). Each subsequent draft, and the final, executed letter of intent included that identical language.    (DX-10, DX-11, DX-164; TT 944).    Although Mr. Dinsmoor suggested changes to other portions of the draft, at no point did he comment on the "Assets to be Purchased" paragraph in general, nor on the words "trade names, trademarks and service marks," specifically. (TT 772-73, 949, 954-55; DX-6, DX-7). Nor did he tell Mr. LaGueux that his client only intended to sell "trademarks" and not "trade names" and "service marks." (TT 941-42).

24.    After the letter of intent was executed on March 17, 2000, in accordance with custom, Mr. LaGueux, as the buyers' attorney, prepared the first draft of the Agreement. (TT 802, 1116, 1121; PX-317; PX-318; DX-11; DX-164). As Mr. LaGueux explained, "the goal [in drafting a contact] is to reduce to writing the intention of the parties in a clear an unambiguous contract that expresses the nature of the assets being acquired, purchase price, and the manner in which it's going to be paid and the respective representations and obligations that the parties are making in connection with the transaction. . . . Because the purpose of drafting the agreement is to express the intent of the parties, [and that t]he agreement is the full expression of that, . . . oral changes to the agreement are simply not permitted." (TT 1112, 1113). For these reasons, in the first draft, Mr. LeGueux included a merger clause expressly providing that it "embod[ies] the entire agreement and understanding of the parties" and "supersedes all prior agreements and understandings between the parties" – a provision that appeared unchanged in the final executed Agreement. (PX-318 ¶ 9.9; PX-1 ¶ 9.9; TT 1113).

25.    The text of Paragraph 1.1(a)(A) as it appeared in the first draft of the Agreement was nearly identical to Paragraph 1.1(a)(A) in the final executed version:

1.1(a)    Upon the terms and subject to the conditions of this Agreement, on the Closing Date (as hereinafter defined), the Sellers shall sell, convey, transfer, assign and deliver to the Buyer, and the Buyer shall purchase and acquire from the Sellers, *all of the Sellers' right, title and interest* in and to:

(A) The *names, trademarks, trade names, service marks, logos, insignias and designations* identified on Schedule 1.1(a)(i)(A) and all trademark registrations and applications therefor, *and the goodwill related thereto* (collectively, the "Trademarks"), together with all causes of action (and the proceeds thereof) in favor of the Sellers heretofore accrued or hereafter accruing with respect to any of the Trademarks, and all other Intellectual Property (as hereinafter defined). (PX-318) (emphasis added).

26.    As Mr. LaGueux, the initial draftsman of the Agreement, testified, the words "names, trademarks, trade names, service marks, logos, insignias and designations" were purposely included to describe the assets that were conveyed in Paragraph 1.1(a)(A). (TT 1124). Each word describes the "various categories of intellectual property" that the seller sold to the buyer, and each word was intended to have meaning. Mr. LeGueux wanted to draft this broadly because – presciently as it turns out – he was aware of other situations where designers, such as Halston, who had sold their names, reportedly later came to regret that "products were being made that he had no control over." (TT 1124-26, 1174, 1180). In addition, as for his use of the term "Trademarks" to define each of the intellectual property assets being sold, Mr. LaGueux testified that he used a definition as a "shorthand reference" instead of repeating the litany of seven words each time because, as common sense dictates, "you could make a mistake" if you tried to repeat the litany exactly the same way each time. (TT 1133-34, 1159-60). It is, as he explained, typical in corporate agreements to use defined terms to "capture" the "laundry list . . . embedded in the definition." (TT 1133-34).

27.     As with the corresponding section in the letter of intent, Mr. Dinsmoor and Mr. LaGueux did not discuss the words in Paragraph 1.1(a)(A) of the Agreement used to describe the assets to be conveyed and Mr. Dinsmoor did not suggest any edits to Paragraph 1.1(a)(A) of the Agreement. (TT 964-65, 992, 1127).  The *only* change made to the paragraph was to the title of the Schedule, which at first incorrectly was "Schedule 1.1(a)(i)(A)" instead of "Schedule 1.1(a)(A)." (TT 810, 1122, 1124; PX-318, DX-166, PX-1).

28.     Mr. Dinsmoor never stated to Mr. LaGueux that Mr. Abboud intended only to sell "trademarks," that he interpreted the terms "trade names," "service marks," "logos," "insignias," and "designations" to have no meaning, or that Paragraph 1.1(a)(A) did not sell the name "Joseph Abboud." (TT 985, 1128-30, 1146).  The only conversation that Mr. Dinsmoor had with Mr. LaGueux regarding the paragraph was about drafting the schedule referenced in that paragraph that was to be attached to the Agreement. (TT 808, 1001).[48]

29.     Notwithstanding that Paragraph 1.1(a)(A) expressly provides that Mr. Abboud was transferring, *inter alia*, all "trade names" that include "Joseph Abboud," Mr. Dinsmoor testified that "[t]here are no tradenames in that agreement" and that "[n]o tradenames were conveyed whatsoever." (TT 854; PX-1 ¶ 1.1(a)(A)).  Mr. Dinsmoor attempted to explain the inclusion of the words "names, trademarks, trade names, service marks, logos, insignias and designations" by arguing they are "descriptive of the trademarks" in Schedule 1.1(a)(A). (TT 854-55).[49]  This explanation – which

---

[48]     It was the sellers' responsibility to draft Schedule 1.1(a)(A), which Mr. Dinsmoor did with the assistance of Cohen, Pontani, Lieberman & Pavane LLP, another law firm that worked for Mr. Abboud and his company. (TT 809-10, 813, 1155, 1202-03).  Mr. LaGueux, who did not independently verify the information in the Schedule, testified that he relied on the seller's representations and warranties in the Agreement. (TT 1137-38, 1146, 1154-55, 1158-59, 1203; PX-1 ¶¶ 3.6, 5.2).  Mr. LaGueux was entirely correct in doing so.

[49]     Mr. Dinsmoor's trial testimony was inconsistent regarding Mr. Abboud's intention to sell "service
(continued...)

he never communicated to Mr. LaGueux – is not credible given that, as Mr. Dinsmoor testified, a

trademark, service mark and trade name all have "separate meanings" and that he was aware of these

separate meanings during the time the Agreement was negotiated and entered into – *i.e.*, a trademark

designates the origin of a product, a service mark designates the origin of a service, and a trade name

is the name of a company or corporation.  (*See* TT 927-28, 940, 981-82, 996, 1146).[50]

30.    Turning to the drafting of Paragraph 1.1(a)(C), Mr. LaGueux's initial draft of

the paragraph was included word for word in the final executed Agreement – "(C)  All rights to use

and apply for the registration of new trade names, trademarks, service marks, logos, insignias and

designations containing the words "Joseph Abboud," "designed by Joseph Abboud," "by Joseph

Abboud," "JOE" or "JA," or anything similar thereto or derivative thereof, either alone or in conjunc-

tion with other words or symbols (collectively, the "New Trademarks"), for any and all products or

services."  (PX-318 ¶ 1.1(a)(C); PX-1 ¶ 1.1(a)(C)).  Mr. Dinsmoor suggested *no* changes to the

paragraph and had no discussions with Mr. LaGueux regarding it, much less did he tell Mr. LaGueux

that he believed Mr. Abboud could use the phrase "designed by Joseph Abboud" or "by Joseph

---

[49]        (...continued)
marks" under the terms of the Agreement.  In his direct examination, Mr. Dinsmoor testified that the Agree-
ment only transferred "trademarks" and that "names, tradenames, *service marks*" meant only "trademarks"
and that, as a result, as he acknowledged in questioning by the Court, Paragraph 1.1(a)(A) "could have just
said trademarks."  (TT 855, 867-78).  Then, after improperly reviewing with defendants' attorney during a
break in his testimony a service mark application that he was going to be questioned about, he testified on
cross-examination that the paragraph also transferred "service marks."  (TT 988-89, 999).  Mr. Dinsmoor's
inconsistent, and inherently incredible testimony, just highlights why contracts – including the Agreement
– should be interpreted as written.

[50]        The lack of credibility of Mr. Dinsmoor's assertion, and defendants' position (TT 1132), that it was
his understanding that, notwithstanding the express language of the Agreement, Mr. Abboud only conveyed
trademarks and service marks because, allegedly, what was listed in Schedule 1.1(a)(A) lists only "trade-
marks" and "service marks," is underscored by the letter of intent, which includes the words "trademarks,
trade names and service marks," but does not make reference to any schedule.  (TT 944-45; DX-11).  Nor
does Paragraph 1.1(a)(C) of the Agreement refer to any schedule, let alone a schedule limiting the scope of
the paragraph to trademarks.  (TT 987-88, 1132-33).

Abboud" in a descriptive sense (or any other way) after the expiration of the non-compete period. (TT 818, 946, 948-49, 983-84, 1124, 1131-32).

31.    Neither Mr. Dinsmoor nor anyone else representing the sellers, or the sellers themselves, told Mr. LaGueux that under their interpretation of the Agreement, Mr. Abboud would be free to use his name at the end of the non-compete period in advertising and promoting menswear. (TT 985, 1140).   Nor did anyone state that Mr. Abboud intended to use the phrase "by designer Joseph Abboud" in the future.  (TT 647, 654-55).  Not surprisingly, given the amount of money being paid, Mr. LaGueux testified that he would not have advised the buyers to sign the Agreement if he believed that the words "names, tradenames, service marks, logos, insignias and designations," as they appeared in Paragraph 1.1(a)(A), had no meaning at all or simply meant "trademarks" and nothing else.  (TT 1130).  Mr. LaGueux understood that Mr. Abboud did not retain the right to use his name under the terms of the Agreement, an understanding that, given Mr. Dinsmoor's silence, Mr. LaGueux had every reason to believe at the time the Agreement was negotiated was shared by Mr. Dinsmoor.  (TT 1141).[51]

32.    Defendants also appear to assert that because defendants have been unable to unearth an executed version of the Assignment of Rights Agreement (DX-181), Mr. Abboud remains the owner of "all rights to use and apply for the registration of new trade names, trademarks, service marks, logos, insignias, and designations containing the words 'Joseph Abboud,' 'designed by Joseph Abboud,' 'by Joseph Abboud,' 'JOE' or 'J.A.' or anything similar thereto or derivative thereof, alone or in conjunction with other words or symbols (collectively, the 'New Trademarks'), for any and all

---

[51]    Consistent with this understanding, on or about February 23, 2000, Mr. LaGueux received a letter from Mr. Dinsmoor stating that  "Mr. Abboud understands that any effort on his part to pursue his trade as a designer of apparel *could not include the use of the name Joseph Abboud* or any of the other trademarks conveyed to JA Apparel."  (PX-347 (emphasis added); TT 1141-43)

products or services. . . ."  (DX-181; TT 837-38).  As Mr. LaGueux explained, however, no assignment was necessary because the "purchase and sale agreement clearly and unambiguously show[ed the seller's] intention to transfer rights in names that go beyond the trademarks listed on schedule [1.1(a)(A]."  (TT 1180; see TT 1204-06).  He further testified that he believed that the assignment had been executed and existed, and Mr. Abboud testified that all documents required by the sellers at closing were delivered.  (TT 413, 1138, 1179; DX-181).[52]  In all events, defendants were contractually obligated to execute the assignment if the buyer made such a demand under the terms of the Agreement.  (PX-1 ¶ 5.8; see TT 1178, 1205).  As Mr. LaGueux testified, the Agreement itself transferred the assets to the buyer.  (TT 1138; PX-1 ¶ 1.1(a)).

33.    Finally, defendants rely on several letters, a press release and the like that use the word "trademarks" to refer generally to the subject of the transaction.  (DX-1 to DX-4, DX 7 to DX-9; DX-14 to DX-18, DX-23, DX-24, DX-161, DX-178, DX-189; see, e.g., TT 380-84, 387-88, 393-95, 398-400, 412-13, 421-23, 785-86, 793-94, 951-52).[53]  Wholly apart from their inadmissibility as parol evidence, these documents do not support defendants' "interpretation" of the Agreement because (i) their use of the term "trademarks" is clearly just a shorthand for the assets that were actually sold (as opposed to the business and tangible assets of Joseph Abboud) and (ii) none states that the other six items expressly sold in the agreement – names, trade names, service marks, logos,

---

[52]    Under the cost constraints imposed by defendants, Mr. LaGueux's law firm, as a third-party to this litigation, conducted only a limited search for the executed assignment but did not find it; nor did it find the "closing documents."  (TT 1177, 1179).  The most logical explanations for the inability to locate the executed assignment are that the assignment is in storage or that, in light of the fact that the parties had been in an extensive litigation relating to the same transactions before, the assignment was misplaced during the litigation.

[53]    Most of the documents postdate the Agreement.  As noted earlier (CL 6, supra), parol evidence created after execution of a contract is just as inadmissible as parol evidence created before the contract's execution.

insignias and designations – were *not* sold.  There is no evidence, either testimonial or documentary, that indicates that the authors of those documents were using the word "trademarks" as anything but shorthand.  (TT 952, 1199-1200).  Moreover, in one of these documents, Mr. Abboud wrote to the CEO of GFT that the decision to go forward with the sale was "**emotional**, because I am *relinquishing my name* (albeit for a large sum), which I have worked towards building since I entered the industry full time in 1972, 28 years ago" – a statement directly at odds with the defendants' position in this litigation.  (DX-9 p.3) (bold by Mr. Abboud, italics added).  At trial, Mr. Abboud testified that by "name" he meant "my trademark" (but, inconsistently, that the word "trademark" does not mean "name").  (TT 404-06, 653-54).  This testimony is belied by the fact that "Joseph Abboud" was not used as a trademark until 1987, so Mr. Abboud could not have meant "relinquishing my trademark" when he wrote "relinquishing my name" that had been building up since 1972.  (TT 653).  Lastly, the title of the very press release on which defendants rely – to which Mr. Abboud never objected – is "GFT Net (HdP) acquires Joseph Abboud" – not GFT acquires "Joseph Abboud Trademarks."  (DX 178; *see* TT 1202).  In fact, when questioned at trial about one exhibit in which Mr. Fili used "trademarks" as a shorthand for the assets to be sold (DX-8), Mr. Dinsmoor remarked that he had "[n]o degree in mind-reading" and that he did not "know what was in Mr. Fili's mind."  (TT 952).[54]

---

[54]    The other documents on which defendants rely also do not support their position.  Thus, defendants try to make much of an August 2002 letter by Robert Wichser, the former president of JA Apparel, to a reporter for the *Westchester County Times*.  (Defs. Pre-Trial FF 89, CL 51).  The purpose of Mr. Wichser's letter was to "notify [the reporter] of many inaccurate and misleading statements in [his] article on Joseph Abboud."  (DX-15).  In his letter, Mr. Wichser clarifies that rather than buying a company in 2000, JA Apparel acquired a variety of intellectual property assets conveyed through the Purchase and Sale Agreement.  This distinction is consistent with those drawn by Mr. Fili and other members of GFT.  Nowhere did Mr. Wichser say that JA Apparel did not purchase the rights to the "Joseph Abboud" name.

Defendants also rely on the February 14, 2004 Stock Purchase Agreement in which JA Holding, Inc., a
(continued...)

34.    When all is said and done, defendants' reliance on Mr. Abboud's and Mr. Dinsmoor's subjective understanding of the Agreement is directly at odds with the express language of the Agreement – an understanding that they never communicated to JA Apparel or Mr. LaGueux – is a perfect illustration of why the parol evidence rule exists. As the First Department explained in affirming application of the parol evidence rule to support the entry of summary judgment, a "party has no right to induce another to contract with him on the supposition that his words mean one thing while he hopes that a court will adopt a construction by which the same words will mean another, more to his advantage." *Conopco, Inc. v. Wathne Ltd.* 190 A.D.2d 587, 588, 593 N.Y.S.2d 787, 787-78 (1st Dep't 1993) (citation omitted).

---

[54]    (...continued)
company owned by JW Childs Equity Partners, purchased JA Apparel from GFT (USA) Corp. (DX-23). In arguing that "[n]owhere is there any indication that JA Apparel was the owner of the personal name 'Joseph Abboud'" (Defs. Pre-Trial CL 51), defendants ignore Section 2.19 of the Agreement, entitled "Intellectual Property" and included in Article II "Representations and Warranties of Seller," which specifically represents that the Purchase and Sale Agreement "is legally valid and binding and...enforceable in accordance with its terms against Joseph Abboud. . . ." (DX-23). When defendants' counsel failed to show him the entire agreement during cross-examination, Mr. LaGueux stated that "I think there's also a separate representation in the agreement specifically about the effect of the purchase agreement from Mr. Abboud." (TT 1195). On redirect, Mr. LaGueux, upon being shown Section 2.19, testified: "That's the section I was referring to earlier. It identifies the purchase documents that were entered into in the June 2000 transaction at issue." (TT 1201). Similarly, the Disclosure Schedules accompanying the Stock Purchase Agreement specifically reference the Purchase and Sale Agreement. (DX-24; TT 1202 ("This is a representation and warranty that's typically in a purchase agreement where, as I said earlier, the – it's prompting a description of contracts that are in the name of the entity whose stock is being acquired. That's what this is . . . [and] it identif[ies] the contract of purchase and sale that's Plaintiff's Exhibit 1 in this case.")). Nowhere did the 2004 Stock Purchase Agreement modify whatever rights JA Apparel received through the Purchase and Sale Agreement.

Also misplaced is defendants' reliance on JA Apparel's use of the term "trademarks" in its Answer to Mr. Abboud's Complaint in his previous litigation with the company. (*See* Defs. Pre-Trial FF 91, CL 51). Far from indicating that only trademarks were sold, the Answer states that in Purchase and Sale Agreement "Joseph Abboud agreed *inter alia* to sell all of the Joseph Abboud Trademarks and their derivatives to JA Apparel and JA Apparel agreed to pay Joseph Abboud the sum of $65,500,000." (DX-17 ¶ 97). By using the phrase "*inter alia*," it is clear that JA Apparel was not purporting in its Answer to being encyclopedic about which assets it purchased from Mr. Abboud.

### (c)     Defendants Have Breached the Agreement

35.     Defendants do not contest that they sold, and cannot use, any trademark containing the terms "Abboud," "Joseph Abboud," "JOE" or "JA."   Rather, they argue, and Mr. Abboud repeatedly testified, that Mr. Abboud can "use his name" "to inform the trade *and consumers* in marketing materials that he is the designer of the JAZ line," that he "is responsible for the designs that will make up the JAZ collection," and that he "has the right to use his name as a symbol of his unique talents, skills and artistic abilities."  (Defs. PI Mem. 2, 5, 12, 15) (emphasis added); *see* FF 37, *supra*).  But by the express, unambiguous terms of Paragraphs 1.1(a)(A) and 1.1(a)(C), Mr. Abboud transferred the right to use "Joseph Abboud" as a trademark or as a name.   In Paragraph 1.1(a)(C), Mr. Abboud also transferred the right to use "by Joseph Abboud" or "designed by Joseph Abboud" as a trademark or as designation.   Thus, Mr. Abboud's proposal to use "a new composition by designer Joseph Abboud" or "by the award-winning designer Joseph Abboud," whether it amounts to trademark use or not, breaches both Paragraphs 1.1(a)(A) and 1.1(a)(C) because the Agreement is not limited to trademark use of the "Joseph Abboud" name and designations at issue.

36.     Defendants also attempt to draw a distinction between advertisements and hangtags, but in doing so they run right into the plain meaning of the Agreement.  The Agreement does not differentiate between "labels and packaging" and "marketing materials," the cases draw no such distinction, and defendants' counsel admitted that "[t]here is no practical difference."  (TT 3-4). Thus, the Agreement expressly provides that Mr. Abboud sold "all" of his "right, title and interest" to the names, trademarks, trade names, service marks, logos, insignias and designations that include "Joseph Abboud," and the related goodwill.  Defendants, moreover, conceded in their brief opposing

JA Apparel's motion for a preliminary injunction that they will "never" use "any of the various designations" Mr. Abboud sold to JA Apparel "on products, labels or packaging for his new JAZ collection" and that they cannot "use his name as an indicator of source," and Mr. Abboud's attorney, Mr. Dinsmoor, in responding to Jack Victor's proposal that the "jaz" hangtag say "designed by Joseph Abboud," correctly advised Jack Victor that "Joe's name cannot be used on a hangtag, as such use would constitute a trademark infringing on JA Apparel's trademark rights" (although at trial Mr. Abboud repeatedly refused to say that he would not use his name on a hang tag or label, but only that he did not plan to do so). (Defs. PI Mem. 5; PX-152; TT 550-54, 935-37; *see* FF 39, *supra*). Despite defendants' concession that they cannot use the Joseph Abboud "name as an indicator of source," Mr. Abboud testified that he wanted to use his name in "jaz" advertising to indicate that he is the "source" of the clothes. (TT 580).

      37.    Mr. Abboud also argues that he "specifically reserved for himself the right to continue [to] make media and personal appearances, and to develop his reputation as an authority in the apparel business – *in other words*, to develop and exploit his personal and publicity rights." (Defs. PI Mem. 7-8) (emphasis added).

      (a)    Mr. Abboud reserved *no* such rights in the Purchase and Sale Agreement. This is to be contrasted with the situation in *Levitt Corp. v. Levitt*, 593 F.2d 463 (2d Cir. 1979), where the defendant William Levitt sold to the plaintiff his business, including use of his personal name as a trade name or trademark, but in the sale agreement reserved for himself "the right to use his own name, privately or publicly (including, without limitation, in station-ery, publicity releases and advertising), as a corporate officer or director in any corporation or other business enterprise engaged in [residential development and construction], . . . provi-

ded that his use of such name shall not be in such manner as would be likely to create confu-sion" with "Levitt & Sons, Inc." or with the "trade names or trademarks" he sold to the plain-tiff.  *Id*. at 466 n.4.  Here, in stark contrast, as noted above, Mr. Abboud failed to reserve *any* right to use his personal name in competition with plaintiff.  By contrast, in the license agreements his attorney, Mr. Dinsmoor, negotiated with Jack Victor, Cardinal, J.S. Blank and Lord & Taylor, Mr. Abboud specifically licensed such rights:  "Licensee shall advertise and promote the Licensed Products and in doing so Licensee may exploit the publicity rights of Joseph Abboud, including his name, likeness and persona, during the Term of the License only in such form and manner as duly approved by Joseph Abboud in writing in advance of its release to the press and/or the public. . . .  Licensee shall not under any circumstances use Joseph Abboud's publicity rights as a trademark or service mark on the Licensed Products or otherwise. . . ."  (PX-159; PX-211; PX-296; PX-299; PX-303; PX-327A; DX-102; TT 585-87, 591-93, 876-78, 882-93, 1021, 1030, 1032; Baker Tr. 94, 151).  As noted by the Court in referring to these license agreements, "there were other contexts in which you [Mr. Abboud] sold licenses and you did discuss publicity rights without selling your name; isn't that true?," to which Mr. Abboud said "Yes."  (TT 646).

(b)     As for the Side Letter Agreement, it does *not* reserve Mr. Abboud's "personal and publicity rights."  Rather, it merely provides that Mr. Abboud may "(i) mak[e] media (including television) or celebrity appearances and otherwise act[] as a general authority in the fashion business, (ii) serv[e] for compensation on boards of directors, advisory boards and special committees, and (iii) acquir[e], own[] and hold[] stock in public corporations, in each case *as long as such activities do not result in Abboud actually competing with any of the*

*business activities of the Buyer . . . .*" (PX-2 ¶ 1(b)) (emphasis added). It also provides that Mr. Abboud was to make personal appearances "on behalf of" JA Apparel whenever JA Apparel "deem[ed] it reasonably necessary *for the benefit of the brand awareness*" of the ABBOUD Marks, thus expressly acknowledging that Mr. Abboud's personal appearances redound to the reputation and goodwill of the ABBOUD Marks. (*Id.* ¶ 1(a)) (emphasis added). Moreover, this provision is no longer even in effect, the Personal Services Period having expired on July 13, 2005. What governs is the Purchase and Sale Agreement, which, as noted above, contains no reservation of rights. That is, contract disputes are not decided, as defendants assert (Defs. PI Mem. 7-8), based on "in other words;" they are decided based on the actual words the contracts employ. As defendants stated in their Answer, each agreement "speaks for itself." (Answer ¶¶ 20, 21, 23-26).

38.    In short, as Mr. Abboud admitted at trial (TT 609), it is not possible to separate Mr. Abboud's personal reputation in his name from the goodwill in his name as a trademark because a designer's reputation is inseparable from the reputation of the goods he designs and sells.[55] To permit Mr. Abboud to use "Joseph Abboud" in marketing materials for his "jaz" line is to permit him to ride on the very "goodwill" that he sold for $65.5 million and which JA Apparel since has enhanced. (PX-1 ¶ 1.1(a)(E)). As Professor McCarthy explains, "a trademark is merely a symbol of good will." *McCarthy on Trademarks* § 2:17 at 2-37 (2007) ("*McCarthy*"). "Good will is a business value that reflects the basic human propensity to continue doing business with a seller who

---

[55]    *See Nipon v. Leslie Fay Cos. (In re Leslie Fay Cos.)*, 216 B.R. 117, 124 (Bankr. S.D.N.Y. 1997) ("The sale of a trademark includes the sale of the mark along with the goodwill and tangible business assets that go along with the trademark."); *Marshak v. Green*, 746 F.2d 927, 929 (2d Cir. 1984) ("A trade name or mark is merely a symbol of goodwill; it has no independent significance apart from the goodwill it symbolizes . . . a trademark cannot be sold or assigned apart from to [*sic*] goodwill it symbolizes.").

has offered goods and services that the customer likes and has found adequate to fulfill his needs." *Id.* As Learned Hand put it, goodwill "includes not only the likelihood that customers will return to the old place of business, but also that they will continue to do business with the old name." *Mutual Life Ins. Co. v. Menin*, 115 F.2d 975, 977 (2d Cir. 1940). *See Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 555-56 (1993) (the "expectancy of continued patronage provides a useful label with which to identify the total of all the imponderable qualities that attract customers to [a] business"). It is precisely this propensity of consumers to do business with the same company that previously put out products under the ABBOUD Marks that consumers find desirable – *i.e.*, JA Apparel's "goodwill" in the ABBOUD Marks – that defendants are attempting to misappropriate for themselves by using the same marks. Put another way, if Mr. Abboud retained the right to use the ABBOUD Marks in marketing materials and advertising or for "informational" purposes, then his sale of the goodwill of the marks (and the trademark registrations) was illusory and JA Apparel did not receive, as the Lanham Act guarantees to every owner of federally registered trademarks, the "*exclusive* right to use the registered mark[s] in commerce." 15 U.S.C. § 1115(a)-(b) (emphasis added).

        39.    In all events, it is well settled that "the language of a business contract must be construed in light of what a businessman would reasonably expect to give or receive, or to perform or suffer, under its terms." *Shirai v. Blum*, 239 N.Y. 172, 179, 146 N.E. 194, 196 (N.Y. 1924). *Accord, Comdisco, Inc. v. Home Ins. Co.*, 1996 U.S. Dist. LEXIS 304, *9-10 (S.D.N.Y. Jan. 16, 1996); *Merrill Lynch Commodities Inc. v. Richal Shipping Corp.*, 581 F. Supp. 933, 939 n.14 (S.D.N.Y. 1984). No one could reasonably assume that at the very time JA Apparel was buying *"all rights to use"* "Joseph Abboud," "by Joseph Abboud" and "designed by Joseph Abboud," "or

anything similar thereto or derivative thereof," it was not purchasing the right to use the very same phrases in an advertisement.

40.    In sum, having accepted $65.5 million for his voluntary sale of his marks, Mr. Abboud cannot "keep for himself the essential thing he sold." *Levitt*, 593 F.2d at 468.  He cannot eat his $65.5 million cake and have it too.

### 2.    JA APPAREL HAS ESTABLISHED ITS LANHAM ACT TRADEMARK INFRINGEMENT AND FALSE DESIGNATION OF ORIGIN CLAIMS

41.    To prevail on a claim for infringement of a registered trademark under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), a plaintiff must demonstrate that its mark is valid and entitled to protection and that defendant's use of its mark is likely to cause confusion.  *See, e.g., Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003); *Time, Inc. v. Petersen Publ'g Co*., 173 F.3d 113, 117 (2d Cir. 1999).  Here, it is undisputed that JA Apparel is the owner of valid and subsisting federal trademark registrations for the ABBOUD Marks for a wide variety of goods.  (*See* FF 11-12, *supra*).  Registration is *prima facie* evidence of the marks' validity and registered trademarks are presumed to be distinctive and should be "afforded the utmost degree of protection." *Savin Corp. v. Savin Group*, 391 F.3d 439, 457 (2d Cir. 2004) (citing *Lois Sportswear v. Levi Strauss & Co*., 799 F.2d 867, 871 (2d Cir. 1986)).  *Accord*, *Lexington Mgmt. Corp. v. Lexington Capital Partners*, 10 F. Supp.2d 271, 277 (S.D.N.Y. 1998); 15 U.S.C. § 1057(b).  Moreover, those registrations of "Joseph Abboud" that are incontestable (*see* FF 11, *supra*) are "*conclusive* evidence" of the marks' "validity . . . and . . . of the registrant's ownership of the mark[s] . . . and . . . *exclusive* right to use the registered  mark[s]."  15 U.S.C. § 1115(b) (emphasis added).[56]  *See Park 'N Fly, Inc. v.*

---

[56]    A registered mark becomes "incontestable" if it has been in continuous use for five years subsequent to its registration and meets the other requirements of 15 U.S.C. § 1065.

*Dollar Park and Fly, Inc.*, 469 U.S. 189, 196 (1985); *Gruner + Jahr USA Publ'g. v. Meredith Corp.*, 991 F.2d 1072, 1076 (2d Cir. 1993).

        42.      A *prima facie* case for a claim for infringement of a registered trademark under Section 32(1) of the Lanham Act,[57] as well as a claim for false designation of origin under Section 43(a) of the Lanham Act,[58] "is made out by showing the use of one's trademark by another in a way that is likely to confuse consumers as to the source of the product." *Lois Sportswear*, 799 F.2d at 871; *see also Virgin Enters. Ltd.*, 335 F.3d at 146. It is also well established that evidence of confusion as to sponsorship, approval or affiliation satisfies the confusion test. As the Second Circuit held in *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 205 (2d

---

[57]    Section 32(1) provides, in relevant part:

Any person who shall, without the consent of the registrant

    (a)    use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use *is likely to cause confusion, or to cause mistake, or to deceive* . . .

shall be liable in a civil action by the registrant . . . ." (15 U.S.C. § 1114(1)) (emphasis added).

[58]    Section 43(a)(1) provides, in relevant part:

    Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin . . . which

    (A) *is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person,* . . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. (15 U.S.C. § 1125(a)(1)) (emphasis added).

Cir. 1979), "[t]he public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." This approach was codified in the 1989 revision of Section 43(a) of the Lanham Act by expressly proscribing confusion as to "affiliation," "connection" or "sponsorship." PUB. L. 100-667 § 132.

43.     The confusion actionable under the Lanham Act is not limited to confusion at the instant of sale. Rather, it includes the "initial interest" confusion that occurs when a prospective purchaser mistakenly believes an infringer to be affiliated with, related to or sponsored by the plaintiff, even if that confusion is dispelled prior to purchase. *See Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 260 (2d Cir. 1987). Where initial interest confusion exists, "[t]he harm to [the trademark owner] . . . is the likelihood that a consumer, hearing the [similar] name and thinking it had some connection with [the trademark owner] would consider [the product or service] on that basis. The [similar] name therefore would attract potential customers based on the reputation built up by [the trademark owner] in this country for many years." *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1342 (2d Cir. 1975). *Accord, Sports Auth. v. Prime Hospitality Corp.*, 89 F.3d 955, 964 (2d Cir. 1996).

44.     The Lanham Act also prohibits post-sale confusion, which occurs when a non-purchaser encounters a defendant's infringing mark after a sale to someone else and mistakenly believes that defendant's goods or services emanate from or are in some way affiliated with or sponsored by plaintiff. *See, e.g., Lois Sportswear*, 799 F.2d at 872 (holding that "post-sale confusion" is "clear[ly]" "actionable").

45.     As explained below, JA Apparel has established the likelihood of each of these types of confusion – confusion at the time of sale, initial interest confusion and post-sale confusion.

**(a)    The Use of a Previously Sold Personal Name, Trademark or Trade Name Constitutes Trademark Infringement Where There Is a Likelihood of Confusion**

46.    It is a firmly established proposition of trademark law that the sale of a personal name trademark or trade name bars the seller from creating confusion by again using his name in competition with the purchasers of his former business.  As the Second Circuit has explained, "[t]o protect the property interest of the purchaser, . . . the courts will be especially alert to foreclose attempts by the seller to 'keep for himself the essential thing he sold, and also keep the price he got for it.'"  *Levitt*, 593 F.2d at 468 (quoting *Guth v. Guth Chocolate Co.*, 224 F. 932, 934 (4th Cir. 1915) (party that sold his company, together with the goodwill and right to use the name GUTH, lost the right to use his name as a trademark).[59]  In *Levitt*, the defendant, William Levitt, had sold his interest in his company, Levitt and Sons, including the LEVITT marks, and agreed not to "use the name 'Levitt' as a corporate title, trademark or trade name in the construction business."  *Id.* at 465-66.  Mr. Levitt also agreed not to compete with the purchaser for two years.

47.    Notwithstanding the sale of his business and his agreement not to use the LEVITT marks, Mr. Levitt began a construction venture in Florida, which advertised his intent to build a new "Levittown" in Florida, and which identified him as the founder of the company that had built "Levittowns" in other states.  *Levitt*, 593 F.2d at 466.  In affirming a wide-ranging injunction against such infringement, Chief Judge Kaufman explained that "[w]hen a name is used as a

---

[59]    The lower court's opinion in *Levitt Corp.*, which the Second Circuit affirmed, included a similar statement of the law:  Under circumstances where "[a personal name] has been voluntarily parted with, particularly, when the name has been extended to a corporation identified with the business and the corporation has then been sold, together with the name and its goodwill," the "doctrines of both trademark and contract, grounded in principles of honesty and good faith, limit the seller's right to his own family name."  *Levitt Corp v. Levitt*, 1978 U.S. Dist. LEXIS 15820, *15 (E.D.N.Y. Aug. 29, 1978), *aff'd*, 593 F.2d 463 (2d Cir. 1979).

trademark, it risks becoming a symbol of the corporation and . . . losing its individual identity." *Id*. at 468. "When a business purchases trademarks and goodwill, the essence of what it pays for is the right to inform the public that it is in possession of the special experience and skill symbolized by the name of the original concern, and of the sole authority to market its products. The value of goodwill obviously becomes diluted and sales lost if confusion arises in the mind of the public over the source of the reputable goods or services." *Id*. at 448.

48.    The Second Circuit went on to explain that because "the infringing party has previously sold his business, including use of his name and its goodwill, to the plaintiff, sweeping injunctive relief" was appropriate. *Levitt*, 593 F.2d at 468. In particular, the Court affirmed the district court's permanent injunction: (1) directing that defendants "cease all use of the term 'Levittown' in connection with the development, advertising and marketing" of the Florida project; (2) compelling defendants to remove the name "Levittown" from any existing advertising or other documentation; (3) directing defendants "for a period of two years to refrain from issuing any press release or advertising, or generating any publicity" concerning Levitt's connection with the Florida project; (4) "[d]irecting defendants to refrain permanently in connection with any future residential developments from issuing press releases, brochures, advertising, or publicity concerning [Levitt's] prior connection with or relationship to past projects which were, in fact, developed by Levitt & Sons, Inc. (New York) or its related corporation"; and (5) requiring corrective advertising in the form of a press release. 1978 U.S. Dist. LEXIS 15820, *18-20, *aff'd*, 593 F.2d 463, 467 (2d Cir. 1979). In support of this relief, the Court of Appeals quoted its earlier decision in *Taylor Wine Co. v. Bully Hill Vineyards, Inc.*, 569 F.2d 731, 735 (2d Cir. 1978), where the Court stated that "the fact that an alleged infringer has previously sold his business with its goodwill to the plaintiff makes a sweeping

injunction more tolerable." *Levitt*, 593 F.2d at 469.  Indeed, the Court in *Levitt Corp*. emphasized, "it is beyond cavil that a district court sitting in equity may devise a remedy that extends or exceeds the terms of a prior agreement between the parties if it is necessary to make the injured parties whole."  *Id*.[60]

      49.    Applying this clear law in a case where, as here, a clothing designer sold all of his rights in the name and its affiliated goodwill and then turned around and tried to use his name in connection with similar goods, the court enjoined the designer from using his name on any merchandise, labels or packaging.  *Nipon*, 216 B.R. 117.  There, the well-known clothing designer Albert Nipon and his company, Albert Nipon, Inc., had sold to Leslie Fay certain of its assets, including substantially all of the existing trademarks in his name and the related goodwill.  *Id*. at 123.  Years later, Mr. Nipon entered into a license agreement with American Pop for men's and boys' neckties. *Id*. at 125.  Beneath the American Pop trademark, in smaller type, the label read "CREATED BY ALBERT NIPON."  *Id*.  Albert Nipon also planned to sell watches under the "American Pop" trademark with the same "CREATED BY ALBERT NIPON" label on the watch box.  *Id*.  In an argument that Mr. Abboud echoes here, Mr. Nipon suggested that use of "his own name, and related advertising, [was] a permissible means to inform the public and industry of his association with American Pop."  *Id*. at 130.  The court rejected that argument:

> The use of the Albert Nipon name on at least one of the registered trademarks, "Executive Dress by Albert Nipon," is remarkably similar to the mark and legend of American Pop created by Albert Nipon.

---

[60]    As noted earlier (CL 37(a)), in *Levitt*, unlike here, in the sale agreement the defendant expressly reserved to himself "the right to use his own name, privately or publicly (including, without limitation, in stationery, publicity releases and advertising), as a corporate officer or director in any corporation or other business enterprise engaged in [residential development and construction,] . . . provided that his use of such name shall not be in such manner as would be likely to create confusion" with "Levitt & Sons, Inc." or with the "trade names or trademarks" he sold to the plaintiff.  *Levitt,* 593 F.2d at 466 n.4.

> This phrasing is commonly used by established trademarks in the apparel and accessory industry.  Thus, potential purchasers *could easily confuse such similar and usual phrasing* encompassing *Nipon's full name* on a label, hangtag, *advertising or promotional material*." (*Id*. at 127-28) (emphasis added).

Here, the trademarks and designations "designed by Joseph Abboud," "by Joseph Abboud," "a new composition by designer Joseph Abboud," and "by the award-winning designer Joseph Abboud," are not meaningfully different from the trademark "Executive Dress by Albert Nipon," which the court in *Nipon* held to be clearly infringed by Mr. Nipon's proposed "created by Albert Nipon" language, just as JA Apparel's trademarks are clearly infringed by "a new composition by designer Joseph Abboud" and "by the award-winning designer Joseph Abboud."  "A new composition by designer Joseph Abboud" and "by the award-winning designer Joseph Abboud" are similar to the phrasing that the *Nipon* court held was commonly used by established trademarks in the apparel industry.  (*Id*.).

       50.     In holding that defendants' conduct constituted trademark infringement and dilution under the Lanham Act, the court emphasized that "to protect the property interest of the purchaser . . . the courts will be especially alert to foreclose attempts by the seller to 'keep for himself' the essential thing he sold, and also keep the price he got for it."  *Id*. at 124 (quoting *Guth*, 224 F. at 934).  Accordingly, noting that Nipon "knew that by using his name he was using the goodwill of the mark belonging to Leslie Fay" (*id*. at 130), the court found that Nipon and American Pop had infringed and diluted plaintiff's trademark and had violated New York state law.  The court, therefore, enjoined Nipon from using his name on any merchandise labels for American Pop and "from further marketing of the Nipon Trademarks," holding that Nipon violated the Lanham Act by marketing and selling goods "incorporating the Nipon Trademarks on their labels, packaging and

associated promotional material, including display of goods at apparel trade shows." *Id.* at 125-26.[61]

Numerous other decisions also have enjoined a defendant from using his name as a trade name, trademark, or designation where he had sold it to the plaintiff. *See, e.g,, Francis S. Denney, Inc. v. I.S. Labs., Inc*., 758 F. Supp. 140 (S.D.N.Y. 1990); *Lazzaroni USA Corp. v. Steiner Foods*, 2006 U.S. Dist. LEXIS 20962, *23 (D.N.J. Apr. 10, 2006); *Osgood Heating & Air Conditioning, Inc. v. Osgood*, 2004 U.S. Dist. LEXIS 28817 (W.D. Tex. Dec. 21, 2004); *Barr v. Sasser*, 1992 U.S. Dist. LEXIS 21751 (N.D. Okla. July 1, 1992); *Cliffcorn Answering Serv., Inc. v. Deutschel*, 23 Misc.2d 254, 198 N.Y.S.2d 952 (N.Y. Sup. Ct. Kings Co. 1960).

51.     In short, as Professor McCarthy writes, "[i]f a person has sold a business which is identified by his personal name, the name is an asset which he has sold, and *he cannot keep commercial control of the name and keep the purchase price too*." *McCarthy* § 18:32  (emphasis added).  Similarly, as the Second Circuit reiterated in *Madrigal Audio Labs., Inc. v. Cello, Ltd*., 799 F.2d 814, 823 (2d Cir. 1986), "an individual who sells a trade name may not thereafter falsely designate the origin of newly-produced products by using his name in such a way as to mislead the public into believing that those products are produced by the company which purchased the trade name."  Indeed, in *Madrigal*, the district court enjoined defendant Levinson from using on product

---

[61]     Significantly, the defendants in *Nipon* placed disclaimers on the tie and watch packaging stating "THIS GARMENT IS NOT LICENSED OR UNDER THE AUTHORIZATION OF THE OWNER OF THE ALBERT NIPON REGISTERED TRADEMARKS." The disclaimer was printed on a hangtag pinned to the ties and was on a sticker affixed to the front of the watch boxes in a similar size font as the "created by Albert Nipon" label.  The same disclaimer, in smaller font than the "created by Albert Nipon" label, also appeared on the back of the box.  Nonetheless, the court held that defendants had "not met the heavy burden of providing sufficient evidence that their disclaimer significantly reduces the likelihood of consumer confusion." 216 B.R. at 125, 128.  In particular, because the "Albert Nipon name carrie[d] a strong reputation" in the fashion industry, the use of a disclaimer along with any mention of his name on garments, ties or watches did not mitigate a finding of confusion.  *Id*. at 128.  Here, any disclaimer would not prevent the confusion that defendants' use of JA Apparel ABBOUD Marks is likely to create; indeed, it might create further confusion.  (*See* FF 44, 158, *supra*).

labels or brochures the designation or phrase "Cello by Mark Levinson," which is highly similar to the phrases or designations that Mr. Abboud has announced he intends to use here. Significantly, the defendant Levinson did not even bother to appeal this aspect of the district court's ruling. *Id.* at 818-19.

52.    Although the Second Circuit in *Madrigal* narrowed the remaining injunctive provisions to permit the defendant, Levinson, to tell a limited number of highly sophisticated customers that he was associated with his new business, it did so because (i) defendant's goods – "high end audio equipment" costing as much as $10,000 – were "distinct" from the plaintiff's goods and (ii) there was no evidence that such limited use of the defendant's name had caused, or was likely to, cause confusion. 799 F.2d at 821-25. Here, in contrast, the goods are directly competitive and cost far less than $10,000, and there is ample evidence that confusion is likely. Moreover, Mr. Levinson, unlike Mr. Abboud, received no more than a "token amount" for the transfer of his name as a trademark, which was involuntary and occurred in a bankruptcy proceeding. *Id.* at 825. This indicates (unlike Messrs. Levitt, Nipon and Abboud) that he had not intentionally and willfully sold "all right, title and interest" in the exclusive right to use his name, a conclusion consistent with the fact that there was "little business goodwill associated with its use." *Id.* By contrast, here, there was abundant business conducted under the JOSEPH ABBOUD brand and trademark at the time of Mr. Abboud's sale and substantial goodwill associated with its use. Moreover, as the Second Circuit stated in *Madrigal*, "[w]hether a person who sells the trade name to his personal name is barred from using the personal name depends on the terms of the sale." *Id.* at 823. Here, under the express terms of the sale, Mr. Abboud contracted away the right to use the name "Joseph Abboud," as well as "by Joseph Abboud," and "designed by Joseph Abboud," or "anything similar thereto or derivative

thereof," "for any and all products and services." Thus, the Second Circuit's limited narrowing of the injunction in *Madrigal* provides no support for Mr. Abboud's attempt to use the name "Joseph Abboud" or the marks or designations "a new composition by designer Joseph Abboud" or "by the award-winning designer Joseph Abboud" in advertisements for his "jaz" clothing line.

53.    The cases on which defendants rely confirm that, as *Madrigal* holds, an individual who sells a trade name cannot use it later "in such a way as to mislead the public into believing that those products are produced by the company which purchased the trade name." *Madrigal*, 799 F.2d at 823. For example, *Gucci v. Gucci Shops, Inc.*, 688 F. Supp. 916 (S.D.N.Y. 1988), which defendants assert is the "best case standing for the proposition that an individual has the right to exploit a reputation he has built up for himself over many years" (Defs. PI Mem. 9), did not involve the sale of a name or trademark, and, thus, is irrelevant. As the Second Circuit held in *Madrigal*, "[w]hether a person who sells the trade name rights to his personal name is barred from using the personal name depends on the terms of the sale." *Madrigal*, 799 F.2d at 823. Here, under the express "terms of the sale" in the Purchase and Sale Agreement, Mr. Abboud sold the right to use the very names, trademarks, and designations that he has announced he will use. By contrast, in *Gucci*, the court held that plaintiff could design products for "American Tourister" bearing a label stating that it was "*designed by* Paolo Gucci" because he had *not*, as Mr. Abboud has done here, sold his right to use that designation. *Compare Gucci*, 688 F. Supp. at 927, *with* PX-1 ¶ 1.1(a)(A), (C).

54.    Defendants' reliance on other decisions is also misplaced. For example, in *Robin Woods Inc. v. Woods*, 815 F. Supp. 856 (W.D. Pa. 1992), *aff'd*, 28 F.3d 396 (3d Cir. 1994), the court enjoined the defendant from, *inter alia*, "manufacturing, promoting or selling any dolls . . . by reference to . . . the name 'Robin Woods'" and acknowledged that "[i]t is 'well-settled that a

person who has adopted and used his surname as a trade-mark, or trade-name may transfer the same with the good will of a business and thereby divest himself of the right to use his name in connection with such a business.'" *Id*. at 859, 873 (quoting *Guth*, 224 F. at 933). In *Timm Med. Techs., Inc. v. SOMA Blue, Inc*., 2002 U.S. Dist. LEXIS 926, *13 (D. Minn. Jan. 15, 2002), the court held that the defendants were "*not* entitled to market their products using the Osbon name." *Id*. (emphasis added). As for its statement that defendants could "use Julian Osbon's personal name to advertise the fact that he is now affiliated with defendants" (*id.* at *14), there is no indication that the defendant's grant of rights in that case was as broad as Mr. Abboud's grant of rights, which includes not just "trade names and trademarks" (*id*. at *2), but also "names" and "designations containing the words 'Joseph Abboud,' 'designed by Joseph Abboud,' 'by Joseph Abboud,' 'JOE' or 'JA,' or anything similar thereto or derivative thereof." (PX-1 ¶ 1.1(a)(A), (C)). Finally, unlike here, in *Yashiro Co. v. Falchi*, 1999 U.S. App. LEXIS 18161 (2d Cir. July 30, 1999) (unpublished), "the licensing agreement conveyed to Yashiro only the *non-exclusive* right to use the mark 'Carlos Falchi' by itself." *Id*. at *2 (emphasis by the Court).

      55.    But even if – contrary to the express language of the Agreement – Mr. Abboud had only sold the rights to his name as a trademark, it would be impossible for him to inform the public in advertisements that he is the designer of the "jaz" collection without making trademark use of the name he sold to JA Apparel. Thus, he repeatedly was unable to explain how he could use his name in an informational way in advertising or marketing without using it as a trademark, and stated that he would have to consult with his lawyers. (*See* FF 40-44, *supra*). Mr. Abboud himself conceded that he could not testify whether consumers who see the words "Joseph Abboud" can distinguish between the brand and the individual. (TT 609; *see* Abboud Tr. 165-66). Indeed, two

of Mr. Abboud's "reputation" witnesses, Mr. Kolb and Mr. Mitchell, testified that they could not testify to whether consumers can distinguish between the brand JOSEPH ABBOUD and the individual Joseph Abboud. (TT 973-74; Mitchell Tr. 64-56). To the contrary, Mr. Kolb admitted that before he worked in the fashion industry, when he was only a consumer, "I would have known and thought that Joseph Abboud, the man, was the designer for Joseph Abboud, the brand." (TT 974; *see* FF 24). In all events, even if Mr. Abboud had sold only the rights to his name as a trademark (which he did not), and even if he could inform the public in advertisements that he is the designer of the "jaz" collection without making trademark use of the name (which he cannot), he could not do so in a manner that would create confusion – a feat he could never accomplish because, under *Madrigal*, a trademark seller cannot use his name in a manner that will likely cause confusion, which is precisely the case here. (*See* CL 53, *supra*).

56.    In circumstances similar to those here, courts have recognized that, after a defendant has sold trademark rights in his name, his use of his name as an "attention-getting symbol" in packaging, "sales materials," and a "price list" to indicate that the product was the "product of" the defendant is an infringing trademark use. *Lazzaroni*, 2006 U.S. Dist. LEXIS 20962, *13-14 & n.1. Similarly, in *Nipon*, 216 B.R. at 127-28, the court, in finding infringement by the designer Albert Nipon after he sold his company's assets, including the trademark ALBERT NIPON and the related goodwill, held that the phrase "'Created by Albert Nipon' is remarkably similar to the mark and legend . . . used by established trademarks in the apparel and accessory industry" and, "[t]hus, potential purchasers could easily be confused by such similar and usual phrasing encompassing Nipon's full name on a label, hangtag, advertising or promotional material." The proof of the pudding is that if Mr. Abboud asked the Patent and Trademark Office to register the phrases "a new composition by

designer Joseph Abboud" and "by the award-wining designer Joseph Abboud," it would surely do so as they are designations of source, just as the Office has already registered twelve marks using the phrase "designed by."[62]  As if all of this were not enough, Mr. Abboud testified that he wants to inform the public that he is the designer of his "jaz" clothing line in order to indicate that he is the "source" of the clothes (TT 580), which is precisely the function of a trademark and is the very right and asset that Mr. Abboud sold for $65.5 million.  *See* 15 U.S.C. § 1127 ("The term 'trademark' includes any word, name, . . . used . . . to indicate the *source* of [his] goods. . . .") (emphasis added).

57.     Nor is there any basis to defendants' contention that the use of Mr. Abboud's name in advertising or marketing materials does not constitute trademark use but, rather, is an exercise of his "right" to inform consumers and the trade that he is the designer of the "jaz" collection. (Defs. PI Mem. 2, 5).  As Professor McCarthy explains, "merely advertising an infringing mark itself is an act of infringement, apart from any manufacturing or sale." *McCarthy,* § 25:26. *See also, e.g., Hard Rock Cafe Int'l v. Morton*, 1999 U.S. Dist. LEXIS 8340, *78 (S.D.N.Y. June 2, 1999) ("[a]dvertisements alone can constitute actionable use of a trademark"); *Major League Baseball Properties, Inc. v. Sed Olet Denarius, Ltd.*, 1990 U.S. Dist. LEXIS 13108, *10 (S.D.N.Y. Oct. 5, 1990) ("the use of [plaintiff's] marks in advertising, even without any attempts to sell, may dilute the distinctive quality of plaintiffs' marks").  Here, Mr. Abboud prepared draft ads for Jack Victor that use the designation and trademark "a new composition by Joseph Abboud" (PX-41, PX-42), prepared draft ads that use the designation and trademark "a new composition by designer Joseph Abboud" (PX-44A, PX-386, PX-390), and proposed ads with the slogan "by the award-winning designer

---

[62]     *E.g.*, "Designed by Harvey R. Ball USA 1963," "Logic Bricks Designed by XYLON," "Simonton Says Designed by George Simonton," "Select Designed by EMG," "MPRAPM Another Line Designed by Mikli," "Designed by Joyce C. Mitchell Nappy Jumpers," "Designed by Cecile Platovsky."  (PX-223).

Joseph Abboud" (DX-187, DX-188), which make clear trademark use of the "JOSEPH ABBOUD" and, if published, would be clear breaches of the Agreement and constitute trademark infringement.

> **(b)    There Is a Strong Likelihood of Confusion Between JA Apparel's ABBOUD Marks and Defendants' Marks**

58.    In evaluating the issue of likelihood of confusion, the Second Circuit has consistently applied the factors first set forth by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961):  (1) the strength of plaintiff's mark; (2) the degree of similarity between the two marks; (3) the proximity of the parties' products or services; (4) the likelihood that the prior owner will bridge the gap between the parties' services or products; (5) actual confusion; (6) defendant's bad faith in adopting its mark; (7) the quality of defendant's products or services; and (8) the sophistication of the relevant consumers.  *See also Natural Organics, Inc. v. Nutraceutical Corp.*, 426 F.3d 576, 578 (2d Cir. 2005); *New Kayak Pool Corp. v. R & P Pools, Inc.*, 246 F.3d 183, 185 (2d Cir. 2001); *Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 491 (2d Cir. 1988); *Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1225-29 (2d Cir. 1987).[63]

59.    No single *Polaroid* factor is decisive; each factor must be evaluated in the context of how it bears on the ultimate issue of likelihood of confusion, and the test should not be applied as if it were a "rigid formula."  *Lois Sportswear*, 799 F.2d at 872.  *See also Polaroid*, 287 F.2d at 495.  Instead, because each case presents its own circumstances, the *Polaroid* factors should serve "as a useful guide" in determining the ultimate issue of likelihood of confusion.  *Lois Sportswear*, 799 F.2d at 872.  Applying the pertinent *Polaroid* factors here, it is clear that defendants' use of the ABBOUD Marks is likely to cause confusion.  Indeed, in their pre-trial proposed findings

---

[63]    Although originally confined to products that were not competing, the *Polaroid* test has since been extended to the evaluation of likelihood of confusion between competing products and services as well.  *See Banff*, 841 F.2d at 490.

of fact and conclusions of law, defendants do not even attempt to explain why *any Polaroid* factor should be analyzed in their favor.  (*See* Defs. Pre-Trial CL 79-104).

### (1)    The JA Apparel Marks Are Very Strong

60.    JA Apparel's federally registered trademarks for the ABBOUD Marks are presumed to be distinctive and should be "afforded the utmost degree of protection."  *Savin*, 391 F.3d at 457; 15 U.S.C. § 1115(a).  (*See* FF 11-12, *supra*).  Moreover, its registrations for the JOSEPH ABBOUD mark that are incontestable are "conclusive evidence" of JA Apparel's "exclusive right" to use the mark.  15 U.S.C. § 1115(b).  (*See* CL 41, *supra*).

61.    The commercial success of the ABBOUD Marks is also evidence of their strength.  JA Apparel and its predecessor have spent substantial sums promoting the brand and have achieved remarkable sales and sales growth, and widespread recognition by third parties.  (*See* FF 4-8, *supra*).  As the Second Circuit held in *Charles of Ritz Group, Ltd. v. Quality King Distribs., Inc.*, 832 F.2d 1317, 1321 (2d Cir. 1987), the "commercial success" of a product "reinforces the strength of [its] mark."  *See also Playtex Prods., Inc. v. First Quality Hygienic, Inc.*, 965 F. Supp. 339, 341-42 (E.D.N.Y. 1996); *McCarthy,* § 11:83 at 11-185 to 188.   That sales did not meet projections does not change the fact that the ABBOUD Marks are strong, any more than does the fact that Ford recently had billions of dollars in losses means that the Ford trademark is no longer a strong mark.  Strength is a measure of recognition of the products' source, not whether any particular quarter's sales meets projections.  For the same reason, that some of JA Apparel ABBOUD products were sold to discounters does not take away from the strength of the ABBOUD Marks.

62.    Moreover, that defendants are intentionally attempting to capitalize on the ABBOUD Marks' goodwill by using them, in breach of Mr. Abboud's express agreement not to do

so, is significant evidence of the ABBOUD Marks' strength.  *See, e.g., Virgin Enters.*, 335 F.3d at 148 ("A mark's fame also gives unscrupulous traders an incentive to seek to create consumer confusion by associating themselves in consumers' minds with a famous mark"); *Harlequin Enters., Ltd. v. Gulf & Western Corp.*, 644 F.2d 946, 950 (2d Cir. 1981) (same).  Indeed, defendants admit that using the "Joseph Abboud" name in "marketing materials" is "a very big asset" to them, their "partners, future partners and accounts."  (PX-9; *see* FF 4).

63.    Finally, defendants are hardly in a position to challenge the strength of the ABBOUD Marks when Mr. Abboud sold them for $65.5 million, JA Apparel's value has greatly increased within just six years of the sale of the marks, and the entire premise of Mr. Abboud's position is that the name JOSEPH ABBOUD is famous in connection with menswear and related products. *See Nipon*, 216 B.R. at 127 (that Leslie Fay had purchased Nipon trademarks for $1 million was a "strong" indication and "quantifiable evidence" of the mark's strength).

### (2)    Defendants' ABBOUD Mark Is Identical to JA Apparel's ABBOUD Marks

64.    Whether two marks are confusingly similar is judged not by "whether the consumer will know the difference if [s]he sees the competing products on the same shelf," but "whether [s]he will know the difference if [defendant's product] is singly presented and [s]he has heard of [plaintiff's product]." *Spring Mills, Inc. v. Ultracashmere House, Ltd.*, 689 F.2d 1127, 1133 (2d Cir. 1982) (*quoting Am. Home Prods. Corp. v. Johnson Chem. Co.*, 589 F.2d 103, 107 (2d Cir. 1978)). *See also Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 538 (2d Cir. 2005).  Moreover, where, as here, the parties compete in the same marketplace – selling the same types of goods to the same purchasers and, in many cases, selling identical goods – "the degree of similarity of marks needed to cause likely confusion is less than in the case of dissimilar goods.

. . ." *McCarthy*, § 24:22 at 24-57; *see*, *e.g.*, *Louis Vuitton Malletier*, 426 F.3d at 538 n.3 (emphasizing that "'similarity of the marks' test – especially when the comparison is between marks on identical product types (here, handbags) – does not require an identity of marks"); *Nikon Inc. v. Ikon Corp.*, 987 F.2d 91, 95 (2d Cir. 1993); *RJR Foods, Inc. v. White Rock Corp.*, 1978 U.S. Dist. LEXIS 15080, *7 (S.D.N.Y. Oct. 6, 1978), *aff'd*, 603 F.2d 1058 (2d Cir. 1979).

65.     It cannot be disputed that the trademark, trade name and service mark "Joseph Abboud" is identical to plaintiff's ABBOUD Marks and that "composition by designer Joseph Abboud" and "by the award-winning designer Joseph Abboud" are barely discernable variations on the names, trademarks, trade names, service marks, logos, insignias and designations "Joseph Abboud," "designed by Joseph Abboud" and "by Joseph Abboud." This factor strongly weighs in favor of a finding of likelihood of confusion.

### (3)    The Parties' Goods and Services Are in Close Proximity and There Is No Gap to Bridge

66.     As the Second Circuit has explained, "competitive proximity must be measured with reference to the first two *Polaroid* factors" – the stronger the plaintiff's mark and the greater degree of similarity with the defendant's mark, then the greater the disparity in products and competitive environments that the law will protect against. *Mobil Oil Corp.*, 818 F.2d at 258. *Accord, Hasbro Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 77 (2d Cir. 1988); *Centaur Commun's*, 830 F.2d at 1226. When weighing this factor, courts also consider whether the prior user may wish to enter the defendant's market in the future – that is, whether there is a "likelihood of bridging the gap." *Hasbro*, 858 F.2d at 77; *see also Virgin Enters.*, 335 F.3d at 149-151; *Kookai, S.A. v. Shabo*, 950 F. Supp. 605, 608 (S.D.N.Y. 1997). However, where, as here, the parties compete in the same market, there is no "gap to bridge," and this factor weighs in favor of a likelihood of confusion. *See Kookai*,

950 F. Supp. at 608 (because "the fashion wear of both [parties] compete[s] directly against one another" and "targeted the same audience," "there is no 'gap' to bridge" and this factor "tips in favor of plaintiff").

67.    Here, JA Apparel's marks are very strong and defendants are using, or planning to use, virtually identical marks on similar if not virtually identical products.  In addition, both parties are selling, or planning to sell, their products with designer labels at similar or overlapping price points and through the same advertising and distribution channels and, indeed, in many of the same retail outlets.  In fact, Mr. Abboud testified that he intends to call on Nordstrom, which represents 40% of JA Apparel's business, and his "jaz" press kit proclaims that "Nordstrom will be targeted capitalizing on the principal's relationship and track record."  (TT 32-33, 73, 95, 610; PX-38).[64]  Where products "retail within a few dollars of each other, and are promoted at the same trade shows . . . they are in close proximity with each other."  *Nipon*, 216 B.R. at 129.  In short, because both parties sell, or plan to sell, at the same stores and consumers and advertise, or plan to advertise, goods at the same trade shows to the same buyers, there is no doubt their products are in close proximity.

### (4)    Actual Confusion

68.    "It is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source."  *Savin Corp.*, 391 F.3d at 459 (citing *Lois Sportswear*, 799 F.2d at

---

[64]    The Fall River shirt factory, which Mr. Abboud purchased through the Alden transaction and which is currently functioning under the Herringbone Shirt Manufacturing name, conducted 60% of its business with Nordstrom, JA Apparel's largest retailer.  The shirts manufactured in the Fall River factory are competitive with those sold under JA Apparel's JOSEPH ABBOUD brand.  (TT 78-80).

875) (affirming preliminary injunction despite absence of actual confusion); *Coach Leatherware Co. v. Ann Taylor, Inc.*, 933 F.2d 162, 170-71 (2d Cir. 1991) (same).

69.    Significantly, in the very short time since the public announcement of defendants' "jaz" line of clothing – even before defendants have engaged in any widespread marketing or advertising – there have been several instances of actual confusion as to the source of the new menswear collection.  (*See* FF 35, *supra*).  This evidence of actual confusion weighs in favor of a finding of a likelihood of confusion given that defendants' "jaz" menswear line has not yet been sold in the marketplace.  *Compare Nipon*, 216 B.R. at 130 (evidence of actual confusion not required particularly "when, as here, the second comer is still introducing the mark into the marketplace and thus opportunities for confusion are limited"); *MSP Corp. v. Westech Instruments, Inc.*, 500 F. Supp.2d 1198, 1211 (D. Minn. 2007) (lack of evidence of actual confusion "is not dispositive . . . when the defendant has not yet sold any of its product"); *Hasbro*, 858 F.2d at 72, 78 (lack of evidence of actual confusion affirmed as inconclusive where defendant's product was marketed for "short time," *i.e.*, ten months).  *Accord, Centaur Commun's*, 830 F.2d at 1227.[65]  Indeed, as noted earlier (FF 35, *supra*), the fact that these individuals were confused even though they are sophisticated and knowledgeable, consumers, *a fortiori*, are likely to be confused.

### (5)    Defendants Have Acted in Bad Faith

70.    It is not necessary to show intent in order to establish a likelihood of confusion.  *See Virgin Enters.*, 335 F.3d at 151 (bad faith factor is not of high relevance to the issue of likelihood

---

[65]    Defendants' complaint that plaintiff has not submitted a consumer survey is not well taken because (i) defendants concede that JA Apparel owns the ABBOUD Marks (TT 552) and do not seriously, if at all, contest that their use of the ABBOUD Marks as "trademarks" would constitute trademark infringement (*see, e.g.,* PX-152); (ii) defendants consistently refused during discovery and until the middle of trial to state how they intended to use the ABBOUD Marks (*see* FF 38-44, *supra*); and (iii) it is defendants' burden – not plaintiff's – to prove the  affirmative defense of  fair use (*see* CL 87, *infra*).

of confusion); *Lois Sportswear*, 799 F.2d at 875. *Accord, McCarthy* § 23:107, at 23-270. It is, however, well-settled that a knowing or deliberate violation of another's trademark rights constitutes compelling evidence of likelihood of confusion. *Centaur Commun's*, 830 F.2d at 1228; *Spring Mills*, 689 F.2d at 1135-36. As the Second Circuit has stated, "[w]here a second-comer acts in bad faith and intentionally copies a trademark or trade dress . . ., a presumption arises that the copier has succeeded in causing confusion." *GTFM, Inc. v. Solid Clothing Inc*., 215 F. Supp.2d 273, 297 (S.D.N.Y. 2002) (citing *Paddington Corp. v. Attiki Imps. & Distrib., Inc*., 966 F.2d 577, 586-87 (2d Cir. 1993)). Accordingly, "the second comer has a duty to so name and dress his product as to avoid all likelihood of consumers confusing it with the product of the first comer." *Mobil Oil Corp*., 818 F.2d at 259 (quoting *Harold F. Ritchie Inc. v. Chesebrough-Pond's, Inc*., 281 F.2d 755, 758 (2d Cir. 1960)).

      71. Here, defendants' bad faith and intent could not be clearer. Not only did they know of the ABBOUD Marks and JA Apparel's rights in those marks, it was Mr. Abboud himself who first obtained trademark rights in his name and then sold those rights to JA Apparel and pocketed $65.5 million for doing so. Even clearer evidence of their intent to infringe is that Mr. Abboud and his attorney requested *DNR* to publish a "Clarification" in its August 13, 2007 issue explicitly stating that they believe that they "are free to use [Joseph Abboud's] name on marketing and advertising materials." (PX-10). In addition, Mr. Abboud has announced to the media his "plans to promote his new label with the tagline 'a new composition by designer Joseph Abboud'" (PX-10; PX-11), Mr. Abboud's contract with Lord & Taylor's design entity expressly provides that Mr. Abboud has licensed to that entity his "publicity rights," "includ[ing] but not limited to [his] name" (PX-327A), and Mr. Abboud's attorney, Mr. Dinsmoor, has conceded that use of the phrase "designed by Joseph Abboud" in a hangtag "would constitute" trademark infringement (PX-152; TT 934-35, 937). Thus,

unlike in cases where the defendants were found to have acted in bad faith based on mere actual or constructive knowledge of the plaintiff's rights, here, defendants proceeded full speed ahead in a clear and deliberate attempt to use the goodwill in the very trademarks, trade names and designations they sold to the plaintiff. If that is not bad faith, nothing is.

### (6)    The Quality of Defendants' Products

72.    JA Apparel has no control over the production, advertising, or marketing of defendants' goods, and cannot attest to the quality of the goods, their advertising and marketing materials, or the promotions connected to them. But assuming that defendants' products are of comparable quality to JA Apparel's, that would not negate a likelihood of confusion because "a junior user's product of equal quality to a senior user's product injures the senior user by the increased tendency of similar quality products to promote consumer confusion." *Hasbro*, 858 F.2d at 78. *See also Nikon Inc*., 987 F.2d at 95; *Banff*, 841 F.2d at 492; *Centaur Commun's*, 830 F.2d at 1228; *Lois Sportswear*, 799 F.2d at 875.

### (7)    Sophistication of the Relevant Audience

73.    It is "unnecessary to examine whether or not the consumers of apparel and men's neckwear are sophisticated" where, as here, the marks "are so similar, even a sophisticated consumer group would be confused." *Nipon*, 216 B.R. at 132. However, "[a]ssuming, *arguendo*, the purchasers are sophisticated, many courts have found that purchasers of designer goods are often more vulnerable to confusion by similar marks because of their strong awareness of the status of the brand name. A consumer who is aware of the designer . . . could easily be misled by the neckwear label or watch packaging that boldly use the full distinct name . . . . 'It is the "subliminal confusion" apparent in the . . . relationship . . . between the . . . entities and the products that can transcend the

competence of even the most sophisticated consumer.'" *Id.* (citing *Grotrian*, 523 F.2d at 1341). Thrus, in this case, "even though the goods are 'designer,' the consumer purchaser is not necessarily an especially sophisticated one and, thus, the likelihood of confusion is not mitigated by this factor." *Id.* at 128, 132 (prohibiting fashion designer from using his name and noting that "[i]n this industry, the [designer's] name carries a strong reputation." (*Id.* at 128)). Any confusion likely to be created by similar marks "is heightened by the defendant's reference to its reputation as a creator and designer of fashion . . . . Any reference to a fashion reputation is, if anything, going to increase the confusion resulting from the use of very similar marks." *Emilio Pucci Societa A Responsibilita Limitata v. Pucci Corp.*, 1988 U.S. Dist. LEXIS 14097, *11-12 (N.D. Ill. Dec. 13, 1988).

————— ••➤➤✪➤➤•• —————

74.    In sum, weighing all of the *Polaroid* factors, JA Apparel has established that the use of the trademarks, names and designations "a new composition by designer Joseph Abboud," "by the award-winning designer Joseph Abboud" and "Joseph Abboud" in connection with defendants' "jaz" Fall 2008 menswear collection and advertising will likely confuse consumers into believing that defendants' goods originate with, or are licensed, approved, or sponsored by, or otherwise associated with or related to, JA Apparel and its ABBOUD Marks.

### (c)    Defendants Have Failed to Establish Their Affirmative Defense of Fair Use

75.    Mr. Abboud transferred far more than simply use of his name "as a mark." 15 U.S.C. § 1115(b)(4). Thus, as explained above, Paragraph 1.1(a) of the Agreement unambiguously provides that "all" of the designated assets are transferred to JA Apparel – *i.e.*, "all" "right, title and interest" to the "names, trademarks, trade names, service marks, logos, insignias and designations" identified on Schedule 1.1(a)(A), and all trademark registrations and applications therefor, and the

goodwill related thereto"; "all" "licenses to use the Trademarks granted by Houndstooth or Abboud"; and "all" "rights *to use* and apply for the registration of new trade names, trademarks, service marks, logos, insignias and designations containing the words 'Joseph Abboud,' 'designed by Joseph Abboud,' 'by Joseph Abboud,' 'JOE' or 'JA,' or anything similar thereto or derivative thereof, either alone or in conjunction with other words or symbols . . . for any and all products or services." (PX-1 ¶ 1.1(a)(A), (B), (C)) (emphasis added). When read together, these provisions transferred *all* present and future interests in the JOSEPH ABBOUD intellectual property. In fact, through paragraph 1.1(a)(C), in specifically enumerating "by Joseph Abboud" and "designed by Joseph Abboud," Mr. Abboud sold the very "informational" right defendants are claiming was withheld.

76. Because the plain and unambiguous language of the Purchase and Sale Agreement prohibits Mr. Abboud from using his name in an advertisement and from using the designations "a new composition by designer Joseph Abboud" and "by the award-winning designer Joseph Abboud," there is no need to consider Mr. Abboud's affirmative defense of "fair use." The Agreement contains no exception for so-called "fair use" of "Joseph Abboud" – let alone for such use in advertisements for products that are directly competitive with JA Apparel's JOSEPH ABBOUD products. Nor can there be any doubt that JA Apparel never would have paid $65.5 million to Mr. Abboud if Mr. Abboud or Mr. Dinsmoor had stated that they believed that, at the end of the non-compete period, Mr. Abboud could resume using his name in advertising in competition with JA Apparel's JOSEPH ABBOUD goods. In all events, defendants have failed to meet their burden of establishing their affirmative defense of "fair use" in 15 U.S.C. § 1115(b)(4).[66]

---

[66]    *See KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 123 (2004) (holding that defendant has burden of proof of fair use; reversing summary judgment for defendant). Although defendants have suggested that 15 U.S.C. § 1115(b)(4) is a defense to the breach of contract claim, by its

(continued...)

77.    Defendants assert that their proposed use of the name "Joseph Abboud" in their mock-ups of ads is "use of a descriptive term" in that it "communicate[s] truthful and valuable commercial information concerning the quality, value, characteristics, and/or attributes of goods." (Defs. Bench Mem. 1).  But the very cases defendants cite demonstrate that defendants' proposed use is not a descriptive one.

78.    As the predecessor to the Federal Circuit explained in a decision on which defendants rely, a mark is descriptive if it "*merely* denotes the ingredients, quality or composition of an article" and held that "SUGAR & SPICE" was *not* descriptive because it did not merely describe the "ingredients, quality or composition" of baking products.  *In re Colonial Stores Inc.*, 394 F.2d 549, 551 (C.C.P.A. 1968) (emphasis added).  Surely, if "SUGAR & SPICE" was *not* descriptive of the "ingredients, quality or composition" of baking products, then "Joseph Abboud" is not "descriptive" of the "ingredients, quality or composition" of products sold by Mr. Abboud.[67]

79.    Nor does *Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.*, 125 F.3d 28 (2d Cir. 1997), support defendants' argument.  In that case, the plaintiff used a "well known descriptive phrase," "Sealed with a Kiss," as its trademark.  *Id.* at 30.  By contrast, the defendants there made "a clear[ly] . . . non-trademark use of words in their descriptive sense" by using the

---

[66]    (...continued)
terms, it is only a defense to a claim under the Lanham Act.

[67]    Similarly, other cases defendants cite (Defs. Bench Mem. 1, 4) make clear that the legal test for descriptive use is whether the use refers to the ingredients, quality or composition of the product, and not to the product's source, origin or designer.  *See Minnesota Mining & Mfg. Co. v. Johnson & Johnson*, 454 F.2d 1179, 1181 (C.C.P.A. 1972) ("SKIN VISIBLE" held "not merely descriptive" for adhesive tape for medical and surgical uses); *Warner Publ'n, Inc. v. Popular Publ'ns*, 87 F.2d 913, 914 (2d Cir. 1937) ("Ranch Romances" held merely descriptive of romantic stories of the West); *Charcoal Steak House of Charlotte, Inc. v. Staley*, 139 S.E.2d 185, 188 (N.C. 1964) ("charcoal steak house" held to be "literally descriptive of the product which both plaintiff and defendant" sell). *See also* Defs. Reply Bench Mem. 6, citing *Peaceable Planet, Inc. v. Ty, Inc.*, 362 F.3d 986, 992 (7th Cir. 2004) (holding that plaintiff "has a valid trademark in the name 'Niles' as applied to its camel").

phrase "Seal it with a Kiss" as an "instruction to seal by kissing the complimentary postcard" referred to in a promotional display in which "the source of the defendants' product [wa]s clearly identified by the prominent display of the defendants' own trademarks" (*i.e.*, the defendants' product name was "in red block letters, at least twice the size of the lettering for 'Seal it with a Kiss!!'" and the brand name, CUTEX, was "in block letters three times the size of the 'Seal it' instruction"). *Id*. at 29-30. Also unavailing are the other cases on which defendants rely, which involved use of such clearly descriptive terms as "kicky" for ladies intimate apparel,[68] "lip repair cream" for lip treatment cream,[69] "larvicide" for a product for killing larvae,[70] "feels like a sneaker" as an advertising slogan for shoes,[71] "Coco-Quinine" for quinine containing chocolate,[72] or a "pine-tree shape" for a pine-scented plug-in air freshener.[73]  In short, in each of these cases the fair use was the use of ordinary English words to describe the "ingredients, quality or composition" of a product, *In re Colonial Stores*, 394 F.2d at 551, and not the source of the product.  Here, unlike the defendants in these cases,

---

[68]    *Kiki Undies Corp. v. Alexander's Dep't Stores, Inc.,* 390 F.2d 604, 605 (2d Cir. 1968).

[69]    *Eli Lilly & Co. v. Revlon, Inc.*, 577 F. Supp. 477, 485-86 (S.D.N.Y. 1983).

[70]    *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1186-87 (5th Cir. 1980).

[71]    *U.S. Shoe Corp. v. Brown Group, Inc*., 740 F. Supp. 196, 199 (S.D.N.Y. 1990).

[72]    *William R. Warner & Co. v. Eli Lilly & Co.*, 265 U.S. 526, 528-29 (1924). Defendants misleadingly cite a quotation from *William Warner* that used the word "name."  (Defs. Mem. at 5-6, quoting *William Warner*, 265 U.S. at 528).  The Court, however, used "name" to refer to the name of a *product – i.e.*, quinine and chocolate – not to the name of a *person*.  The case does not support the use of a person's name, as defendants are attempting to do here, to designate the source of a competitive product.

[73]    *Car-Freshener Corp. v. S.C. Johnson & Son, Inc.*, 70 F.3d 267, 270 (2d Cir. 1995).  *See also Venetianaire Corp. v. A&P Import Co.*, 429 F.2d 1079 (2d Cir. 1970) (defendant's use of the descriptive word "hygienic" held infringing because of similarity of packaging); *New York Mercantile Exch., Inc. v. Intercontinental Exch., Inc.*, 289 F. Supp.2d 527, 545 (S.D.N.Y. 2005) (defendant's use of "NYMEX" and "New York Mercantile Exchange" "merely to describe the economic aspects of its OTC contracts" held fair use); *Stix Prods. v. United Merchants & Mfgrs., Inc. v. Firestone Tire & Rubber Co.*, 295 F. Supp. 479 (S.D.N.Y. 1968) (defendant's use of "contact" in connection with self-adhesive plastic held infringing).

Mr. Abboud wants to make a clear trademark use of the JOSEPH ABBOUD name to identify himself, as Mr. Abboud testified at trial, as the "source" of his products.   (TT 580).

80.     What is more, as the few cases defendants cite that involved the name of a person demonstrate by comparison, the use of his name that Mr. Abboud proposes is anything but fair or descriptive.  Thus, in one case, the court enjoined one Max Factor because "it is the opinion of the court that he can*not* use his own name in the sale of ladies' hosiery without inevitably representing the hosiery he sells as that of the plaintiff."  *Max Factor & Co. v. Max Factor*, 226 F. Supp. 120, 127 (S.D. Cal. 1963) (emphasis added).  Similarly, in *Champion Spark Plug Co. v. Champion*, 23 F. Supp. 638, 641 (E.D. Mich. 1938), the court *enjoined* the defendant from using his name "Champion" "in connection with the business of manufacturing or spark plugs."  As for *815 Tonawanda St. Corp. v. Fay's Drug Co.*, 842 F.2d 643, 648-49 (2d Cir. 1988), the only issue there was whether the name "Fay" had developed secondary meaning and was protectible as a trademark. There was no holding that an individual who had developed secondary meaning in a personal name, registered it as a trademark, and subsequently sold the name, could thereafter make a "fair use" of the name to describe the source of a new, competing product or business.

81.     Here, the issue is not whether the ABBOUD Marks have obtained secondary meaning;  they plainly have.  The issue is whether Mr. Abboud, after selling his name as a trademark, can turn around and make a "fair use" of that very name to identify Mr. Abboud as the designer of "jaz" clothes;  *i.e.*, that, as Mr. Abboud testified at trial – "yes," he wants the public to know that he is the "*source* of the work."  (TT 580) (emphasis added).  If that is not a trademark use, nothing is. *See Lois Sportswear v. Levi Strauss & Co*., 799 F.2d 867, 871 (2d Cir. 1986) (a claim for trademark infringement and false designation of origin under the Lanham Act "is made out by showing the use

of one's trademark by another in a way that is likely to confuse consumers as to the source of the product"); *Virgin Enters.*, 335 F.3d at 146 (same).

82.    None of the cases on which defendants rely involved a situation where, as here, a fashion designer or other person sold his name and then turned around and tried to use the name in competition with the buyer.  Thus, in *Gucci v. Gucci Shops, Inc.*, 688 F. Supp. 916 (S.D.N.Y. 1988) – which did *not* involve the sale of a mark – it was only *after* an extensive analysis of the parties' agreements and the court's conclusion that the defendant's prior agreement not to use his name in competition was *not* binding, that the court addressed whether defendant's use of his name was fair.  *Id.* at 920-25.  And even then, the court required the defendant to use his full name – "Paolo Gucci" – in comparison to the plaintiff's trademark and name "Gucci," and only after finding that there was "little if any chance that the consumer will believe he is purchasing a 'Gucci' product manufactured by defendant."  *Id.* at 927.[74]  Such a finding could not possibly be made on the record here where both plaintiff and defendants will be using the identical "Joseph Abboud" name for almost identical goods and where defendants bear the burden of proof on their affirmative defense of fair use.

---

[74]    *See also, e.g., Dolby v. Robertson*, 654 F. Supp. 815, 820-21 (N.D. Cal. 1986) (which did not involve the sale of a mark, and where the court, in denying a preliminary injunction to the owners of Dolby Stereo that would have barred defendant, whose stage name was "Thomas Dolby," from using his full name, held that he "may not use the surname 'Dolby' alone"); *Joseph Scott Co. v. Scott Swimming Pools, Inc.*, 764 F.2d 62, 63,69 (2d Cir. 1985) (defendant, who did not sell name to plaintiff who owned "Scott House and Garden Service," permitted to make limited use of name his own name "Joseph M. Scott, Jr."); *Sardi's Restaurant Corp v. Lyle Sardie West. Pubs, Inc.*, 755 F.2d 719, 725-26 (9th Cir. 1985) (defendant, who did not sell his name to plaintiff who owned "Sardi's" restaurant in New York permitted to use own surname "Sardie's" for restaurant in California); *Paul Frank Indus., Inc. v. Sunich*, 502 F. Supp.2d 1094, 1098, 1102-03 (C.D. Cal. 2007) (recognizing that "[a]s with other marks, a court can restrict use of a full name if it is likely to cause consumer confusion with an established famous mark" and enjoining defendant from "commercial use" of his name "in any form as a trademark," including on T-shirts, but permitting defendant "to use his full name [which was not plaintiff's famous trademark]. . . in signatures, business meetings," "introducing or describing himself," and "in letters, business cards, and the like").

83.     Nor is there even a hint in *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004), that, as defendants suggest (Defs. Bench Mem. 6), a designer who sold his name can thereafter use it regardless of the degree of confusion such use may cause.  Rather, the "question" in *KP Permanent Make-Up* – which did not involve the use of a person's name – was whether the defendant "has a burden to negate *any* likelihood that the practice complained of will confuse consumers about the origin of the goods or services affected."  *Id*. at 114 (emphasis added). In answering that question in the negative, the Court stated that "we do *not* rule out the pertinence of the degree of consumer confusion under the fair use defense," and remanded the case for additional proceedings.  *Id*. at 123 (emphasis added).  The Court was concerned that the Lanham Act not be used "to deprive commercial speakers of the ordinary utility of descriptive words" (*id*. at 122), not with whether someone who, as Mr. Abboud has done here, sold his name and then turns around and attempts to use the name in advertising in a way that is likely to confuse consumers and claims that this is somehow a "fair" use.

84.     Defendants' assertion, that "Second Circuit decisions . . . clearly rule out any confusion analysis," is equally wide of the mark.  (Defs. Bench Mem. 7).  *Madrigal* held that "an individual who sells a trade name may *not* thereafter falsely designate the origin of newly-produced products by using his name in such a way as to mislead the public into believing that those products are produced by the company which purchased the trade name."  *Madrigal*, 799 F.2d at 823 (emphasis added).  As explained in detail in Conclusions of Law 51-52, the Court in *Madrigal* held that "[w]hether a person who sells the trade name rights to his personal name is barred from using the personal name depends on the terms of the sale," and the defendant Levinson was enjoined from using on product labels or brochures (which are ads) the designation or phrase "Cello by Mark

Levinson." *Id.* Here, the terms of the sale are clear that Mr. Abboud sold his name and agreed not to make any commercial use of it.

85.    Moreover, as also noted above, in *Levitt*, the Second Circuit affirmed a wide-ranging injunction prohibiting William Levitt from using his name commercially and emphasized that where, as here, "the infringing party has previously sold his business, including use of the name and its goodwill, to the plaintiff, *sweeping injunctive relief* is more tolerable" than where the defendant simply has the same or similar name to the plaintiff's. *Levitt,* 593 F.2d at 468-69, citing *Taylor*, 569 F.2d at 735 ("the fact that an alleged infringer has previously sold his business with its goodwill to the plaintiff makes a sweeping injunction more tolerable"). Similarly, and as also noted above, in *Nipon*, where, on facts that fit this case like a designer glove, the court enjoined clothing designer Albert Nipon from using the tagline or designation "Created by Albert Nipon" in conjunction with the trademark AMERICAN POP, holding that Mr. Nipon previously had sold to plaintiff the trademarks in his name and the related goodwill. *Nipon*, 216 B.R. at 123-25, 136.

86.    Turning to the ad mock-ups that were presented in the middle of trial (*see* FF 44, *supra*), they clearly use the name "Joseph Abboud" as an "attention-getting symbol," which constitutes a trademark use. *Lazzaroni*, 2006 U.S. Dist. LEXIS 20962, at *13-14 & n.1. Put another way, there is nothing fair or descriptive about the mock-ups' use of "Joseph Abboud." They do not use "Joseph Abboud" to describe a characteristic of a product as would be the case where, as in many of the cases defendants cite, someone has taken an every day English language word and turned it into a trademark. Consistent with Mr. Abboud's testimony at trial that he wants consumers to know that he is the source of the "jaz" products (TT 580), the use in the mock-ups of the name "Joseph Abboud" does not describe the characteristics of the "jaz" line, but, rather, designates its origin,

which is the very function of a trademark. *See* 15 U.S.C. § 1127. Thus, as noted above, courts have enjoined designers who have sold their names from coming back to the market and advertising their new brands with the designation "Created by Albert Nipon" and "Cello by Mark Levinson." *Nipon*, 216 B.R. at 125, 136; *Madrigal*, 799 F.2d at 818. Likewise, the United States Patent and Trademark Office, recognizing that the designation "designed by__" designates the source of a product, repeatedly has granted applications to register trademarks consisting of the phrase "designed by__." (*See* CL 56 n.61, *supra*).

87.    Finally, defendants have the burden of proof to demonstrate their fair use affirmative defense. *See KP Permanent Make-Up*, 543 U.S. at 123. Yet, they have offered not a shred of evidence (1) that Mr. Abboud has an identifiable reputation among consumers apart from the JOSEPH ABBOUD brand or what percentage, if any, of consumers are aware of Mr. Abboud the individual, or (2) that consumers would not be confused by the mock-ups into believing (i) that the "award-winning designer Joseph Abboud" is also the source or origin of JA Apparel's JOSEPH ABBOUD products, or that he is a sponsor of, affiliated or connected with, or approves of JA Apparel's JOSEPH ABBOUD products,[75] or (ii) that the company that sells the JOSEPH ABBOUD brand is the source or origin of the "jaz" line by the "award-winning designer Joseph Abboud" or that that company is a sponsor of, affiliated or connected with, or approves of Mr. Abboud's products. (*See* FF 21-25, 44, *supra*).[76]

---

[75]    15 U.S.C. § 1125(a)(1); *Dallas Cowboys Cheerleaders*, 604 F.2d at 205.

[76]    *Cf. Home Box Office, Inc. v. Showtime/The Movie Channel Inc.*, 832 F.2d 1311, 1316 (2d Cir. 1987) (defendant has "heavy burden" of "com[ing] forward with evidence sufficient to demonstrate" that a disclaimer "would significantly reduce the likelihood of consumer confusion").

88.     In all events, to the extent that any consumers recognize the name "Joseph Abboud" because of Mr. Abboud's reputation as a designer, that is part of the goodwill he sold to JA Apparel when he sold "Joseph Abboud."  Simply put, because the name "Joseph Abboud" has been trademarked and become famous, it is ludicrous to believe that using the same name in an advertisement for "jaz" will not convey the same meaning as "Joseph Abboud" in JA Apparel's ads.  In other words, it is neither in good faith nor *fair* to sell one's name for $65.5 million and then attempt to use that name in advertising in direct competition with the purchaser.

### 3.     JA APPAREL HAS ESTABLISHED ITS CLAIM FOR DILUTION UNDER THE LANHAM ACT

89.     Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c)(1), forbids "dilution" of "famous" marks and provides for injunctive relief against a defendant "who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury."  To succeed on a claim for dilution, the plaintiff must show that (1) its mark is famous and distinctive; (2) defendant adopted the mark after plaintiff's mark became famous; and (3) defendant's use caused likelihood of dilution of plaintiff's mark.

90.     A mark is "famous" if it is "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner."  15 U.S.C. § 1125(c)(2)(A).  Here, there is no dispute that the ABBOUD Marks are famous and that defendants adopted the marks after they became famous.[77]  JA Apparel's ABBOUD Marks satisfy

---

[77]     The Trademark Dilution Revision Act of 2006 ("TDRA") sets out four factors that courts may use in "determining whether a mark possesses the requisite degree of recognition" to be considered "famous":

(continued...)

the fame requirement because the JOSEPH ABBOUD mark is incontestable and has been registered on the Principal Register for several years and JA Apparel has spent millions of dollars in connection with its advertising and promotion of products bearing the JOSEPH ABBOUD trademark in a wide range of media and has achieved extensive sales.[78]  Moreover, the fact that JA Apparel paid $65.5 million for the ABBOUD Marks and related intellectual property rights and goodwill is itself strong evidence of the fame of the JOSEPH ABBOUD mark.  Nor can there be any dispute as to the likelihood of dilution by blurring.  As explained above in connection with defendants' trademark infringement, the factors typically used to assess dilution by blurring under § 43(c) – the similarity of the marks and products, the sophistication of the purchasers, and the renown of the senior and junior marks (*see* 15 U.S.C. § 1125(c)(1)) – all weigh heavily in favor of finding dilution.  *See Nipon*, 216 B.R. at 133; *Clinique Labs., Inc. v. Dep Corp.*, 945 F. Supp. 547, 563 (S.D.N.Y. 1996).

### 4.    JA APPAREL HAS ESTABLISHED ITS STATE UNFAIR COMPETITION, DILUTION, AND GENERAL BUSINESS LAW CLAIMS

91.    Because under New York law JA Apparel's unfair competition claim "is governed by essentially the same considerations as its infringement claim," for the same reasons that it has established its federal claims, it has established its common law unfair competition claim.  *Grotrian*, 523 F.2d at 1342 n.21.  *See also Stern's Miracle-Gro Prods., Inc. v. Shark Prods., Inc.*, 823 F. Supp. 1077, 1093 (S.D.N.Y. 1993); *Nipon*, 216 B.R. at 134; *Gucci Am., Inc. v. Action Activewear,*

---

[77]    (...continued)

"(1) [t]he duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties; (2) [t]he amount, volume, and geographic extent of sales of goods or services offered under the mark; (3) [t]he extent of actual recognition of the mark;" and (4) whether the mark is federally registered. 15 U.S.C. § 1125(c)(2)(A).  *See Dan-Foam A/S and Tempur-Pedic, Inc. v. Brand Named Beds, LLC*, 500 F. Supp.2d 286, 324 n.216 (S.D.N.Y. 2007) ("The TDRA simply requires that a mark 'possess the requisite degree of recognition,' and provides that 'the court may consider all relevant factors,' including those factors listed therein.").

[78]    *See* FF 4-11, *supra*; *see also* PX-5, PX-192, PX-363, PX-364.

*Inc.*, 759 F. Supp. 1060, 1063 (S.D.N.Y. 1991). Similarly, for these reasons, JA Apparel has estab-

lished its state law statutory claims for deceptive trade practices,[79] false advertising,[80] and dilution.[81]

### 5.  THE FIRST AMENDMENT DOES NOT IMMUNIZE DEFENDANTS' BREACH OF CONTRACT, TRADEMARK INFRINGEMENT, DILUTION, UNFAIR COMPETITION AND VIOLATION OF THE NEW YORK AND GENERAL BUSINESS LAW

92.    Defendants fail to cite any case that would support the application of the First

Amendment has any application to a situation where, as here, a private party voluntarily contracted

away his right to another private party to use certain names, trademarks, trade names, service marks,

logos, insignias, and designations. *Cf. Snepp v. United States*, 444 U.S. 507, 509 n.3 (1980) (uphold-

ing voluntary agreement to limit speech).

93.    In all events, the law is well settled that the First Amendment provides no pro-

tection for false or deceptive speech. *See, e.g., In re R.M.J.*, 455 U.S.191, 203 (1982) ("Misleading

---

[79]    N.Y. GEN. BUS. LAW § 349(a) ("[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful"). *See Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995); *Procter & Gamble Co. v. Quality King Distribs., Inc.*, 974 F. Supp. 190, 201 (E.D.N.Y. 1997).

[80]    N.Y. GEN. BUS. LAW §§ 350, 350-a ("[f]alse advertising" (*i.e.*, "advertising [that] is misleading in a material respect") in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful"). *See Princeton Graphics Operating, L.P. v. NEC Home Elec. (U.S.A)., Inc.*, 732 F. Supp. 1258, 1267 (S.D.N.Y. 1990) ("the standards for a violation under section 350-d [which grants a private right of action under section 350] are substantially the same as under section 43(a)" of the Lanham Act).

[81]    N.Y. GEN. BUS. LAW § 360-l ("[l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark"). *See Allied Maint. Corp. v. Allied Mech. Trades, Inc*., 42 N.Y.2d 538, 545, 399 N.Y.S.2d 628, 632 (N.Y. 1977) (statute "does not require a showing of confusion or competition to obtain an injunction"). Because JA Apparel has proven that defendants violated the federal dilution statute, it also has shown that they violated the New York Anti-Dilution Statute. *See Nipon*, 216 B.R. at 134 ("The federal and New York state dilution statues differ only by New York's predatory intent factor . . . .  Because I found that [defen-dants] violated the federal dilution statue, so too have they violated the New York statute."). *See also Metlife, Inc. v. Metro. Nat'l Bank*, 388 F. Supp.2d 223, 236-37 (S.D.N.Y. 2005).

advertising may be prohibited entirely."); *Bates v. State Bar of Ariz.*, 433 U.S. 350, 383 (1977)

("Advertising that is false, deceptive or misleading of course is subject to restraint."); *Castrol, Inc.*

*v. Pennzoil Co.*, 987 F.2d 939, 949 (3d Cir. 1993) ("[I]t is well settled that false commercial speech

is not protected by the First Amendment and may be banned entirely"). As one of the very cases on

which defendants rely (Defs. Bench Mem. 2, 14) states, "[o]bviously, much commercial speech is

not provably false, or even wholly false, but only deceptive or misleading. We foresee no obstacle

to a State's dealing effectively with this problem. The First Amendment, as we construe it today,

does not prohibit the State from insuring that the stream of commercial information flow cleanly as

well as freely." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425

U.S. 748, 771 (1976). Here, because use of the "Joseph Abboud" name is likely to cause confusion,

there is no First Amendment impediment to enjoining such confusing use. Simply put, there is no

constitutional right to confuse the public.[82]

---

[82]    The other cases on which defendants rely (Defs. Reply Bench Mem. 5, 11-12) have no application here. One involved core political speech, *Cohen v. California*, 403 U.S. 15, 16 (1971); three involved *non*commercial "artistic" uses, *Rogers v. Grimaldi*, 875 F.2d 994, 997 (2d Cir. 1989); *Muzikowski v. Paramount Pictures Corp.*, 2005 U.S. Dist. LEXIS 13127, *37, *40 (N.D. Ill. June 10, 2005); *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 901 (9th Cir. 2002); and another held in a case alleging false advertising under the Lanham Act that the injunction should be limited to statements "made in furtherance of the Center's commercial objectives," *Better Bus. Bureau of Metro. Houston, Inc. v. Med. Dirs., Inc.* 681 F.2d 397, 404-05 (5th Cir. 1982). Here, there is no dispute that defendants' use of the name "Joseph Abboud" is for commercial purposes. Lastly, contrary to defendants' assertion (Defs. Reply Bench Mem. 11), nowhere does *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44 (2d Cir. 1978), state that "courts tolerate a 'greater likelihood of confusion' when First Amendment interests are at stake." Nor, of course, do any of these cases state that a private party's agreement – as Mr. Abboud's here – not to use his name for commercial purposes violates the First Amendment. Indeed, the Supreme Court has held that it is constitutional for the *government* – to whom the Amendment *does* apply – to ban the use of an English word ("Olympic") even if such use is not "likely to confuse the public" or "may go beyond the 'strictly business' context." *San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.*, 483 U.S. 522, 535 (1987).

**6.    JA APPAREL HAS ESTABLISHED ITS CLAIM FOR BREACH**
**OF THE NON-COMPETE PROVISION IN THE SIDE LETTER AGREEMENT**

94.    JA Apparel also has succeeded in proving that Mr. Abboud breached the non-competition provision of the Side Letter Agreement he entered into with JA Apparel. Mr. Abboud agreed in the Side Letter Agreement that he "will not, *directly or indirectly* through any partnership, corporation, limited liability company, trust or other entity, *be associated as an owner, director, officer, employee, consultant or other participant* with, *any* person, group, business enterprise or other entity which *is engaged in or proposes to engage in* the business of designing, licensing, manufacturing, marketing or distributing any products or services which are *or would be* competitive with the business of the Buyer as then conducted or as such business may be reasonably expected to be conducted in the future anywhere in the world." (PX-2 ¶ 2(a)) (emphasis added). Defendants, however, contend that the Agreement only barred Mr. Abboud, prior to July 13, 2007, from "taking any position with, or otherwise *actively participat[ing]* in any business that might be considered competitive with JA Apparel." (Defs. PI Mem. 18). The Agreement, however, does not say that. The Court, of course, must "enforce[] [the agreement] according to its terms." *W.W.W. Assocs.*, 77 N.Y.2d at 162, 565 N.Y.S.2d at 443.

95.    Non-competition agreements that are entered into in connection with the sale of a business are routinely enforced so that the purchaser of assets is not deprived of the full value of the goodwill it has acquired in connection with the purchase. *See Purchasing Assocs. Inc. v. Weitz*, 13 N.Y.2d 267, 271-72, 246 N.Y.S.2d 600, 603-04 (N.Y. 1963); *New York Real Estate Inst., Inc. v. Edelman*, 42 A.D. 3d 321, 321, 839 N.Y.S.2d 488, 489 (1st Dep't 2007). As the Second Circuit has noted, it is an "unassailable statement of New York law that 'where the sale of a business includes the transfer of its good will, a reasonable covenant restricting the seller's right to compete with the

purchaser will be enforced.'" *Chevron U.S.A., Inc. v. Roxen Serv., Inc.*, 813 F.2d 26, 28 (2d Cir. 1987).  Moreover, New York courts have held that while mere planning may not in itself constitute competition, affirmative steps that go beyond the planning stage do constitute competition and, as such, are violative of a non-competition agreement.  *See World Auto Parts v. Labenski*, 217 A.D.2d 940, 629 N.Y.S.2d 896 (4th Dep't 1995) (holding that defendant breached non-compete provision by "attending trade shows, distributing his business card and discussing with competitors his plans to re-enter . . . business when the non-compete provision expired"); *DeLong Corp. v. Lucas*, 176 F. Supp. 104, 122-23 (S.D.N.Y. 1959) (finding that defendant's development and engineering of devices during the period in which he was restricted from working constituted affirmative steps that went beyond the planning stage and, as such, were in violation of his non-competition agreement).[83]

96.     Inasmuch as Mr. Abboud specifically acknowledged in the Side Letter Agreement that the $65.5 million he was receiving in connection with the overall transaction provided him with "full and fair consideration" for his non-competition agreement (PX-2 ¶ 2(c)), there can be no question that the restrictions Mr. Abboud agreed to here are enforceable.  Nor is there any question, as detailed in Findings of Fact 45-155, that Mr. Abboud Mr. Abboud, in a pattern of continuous, extensive, highly deliberate and frequently clandestine conduct, breached the non-compete provision of the Side Letter Agreement:

---

[83]     The cases on which Mr. Abboud relies (Defs. Trial Br. 21-22) were decided by non-New York courts applying non-New York law and fail to support his position.  In *Brooks Automation, Inc. v. Blue Shift Techs.*, 69 Mass. App. Ct. 1107, 2007 WL 1713370 (Mass. App. Ct. 2007) (unpublished), the court found that a former employee's actions could not reasonably be construed as directly or indirectly competing with his former employer because, unlike here, the former employee had no product, no investors, no funding, no marketing, and no employees, and was not working for another company.  As for the other cases on which defendants rely, *Cowley v. Anderson*, 159 F.2d 1 (10th Cir. 1947), and *Keiser v. Walsh*, 118 F.2d 13 (D.C. Cir. 1941), neither even involved non-competition agreements.

(a)    Mr. Abboud "associated" himself "as an owner [or] officer" of defendant Her-ringbone, a company "engaged in or [that] propose[d] to engage in" a business that "would be competitive" with JA Apparel.  (PX-2 ¶ 2(a)).  In particular, Mr. Abboud breached this provision by, operating through Herringbone, purchasing the Fall River shirt factory to manufacture shirts in competition with JA Apparel and repeatedly associating himself with licensees and the companies he acquired prior to July 13, 2007 to have them assist him in preparing clothes to be displayed at the July 30, 2007 press conference announcing the launch of his "jaz" line.[84]

(b)    During the Restricted Period, Mr. Abboud agreed on specific deal points for the purchase of Merrill-Sharpe to produce and import sportswear and knitwear.

(c)    Four months before the end of the Restricted Period, Mr. Abboud agreed on the essential terms of a business relationship with Jack Victor, whereby Jack Victor would serve as the licensee for "jaz"-tailored clothing, and proceeded to, among other things, collaborate on the design of "jaz" suits.

(d)    Also during the Restricted Period, Mr. Abboud and his representatives began negotiating a licensing arrangement with Cardinal for coats and outerwear for the "jaz" line.

(e)    Before the expiration of the Restricted Period, Mr. Abboud reached out to J.S. Blank, a neckwear manufacturer, about a licensing relationship for "jaz."

(f)    Mr. Abboud exchanged a term sheet with Lord & Taylor's owner, and he had "substantial negotiations," for a consulting  agreement that was held for signing until after

---

[84]    Mr. Abboud's contention (Defs. Pre-Trial CL 171-72) that his non-compete obligations do not apply to Herringbone because it is "his own company" is directly contrary to the contract's text, which expressly applies to conduct "*directly or indirectly* through *any* . . .  corporation. . . ." and has no exception for a company that Mr. Abboud owns.  (PX-2 ¶ 2(a) (emphasis added).

July 13, 2007, which provided that he would provide personal consulting and advisory

services with respect to the design, development, production and sale of all of Lord & Taylor

men's and boy's proprietary brand products and that he would serve as the Creative Director

for Lord & Taylor's men's and boy's business.

In short, where competition in the fashion industry clearly encompasses designing and getting a line

ready for an upcoming season, Mr. Abboud's activities, acting through Herringbone, a company he

owns and is an officer of, plainly breached his obligation not to "*directly or indirectly* through any

. . . corporation . . . *be associated as an owner, director, officer, employee, consultant or other*

*participant* with, *any* person, group, business enterprise or other entity which is *engaged in or*

*proposes to engage in* the business of designing, licensing, manufacturing, marketing or distributing

any products or services which are or would be competitive with the business of" JA Apparel.  (PX-2

¶ 2(a)-(b)).

      97.    The fact that Mr. Abboud employed secrecy, stealth and deception in his

structuring of the Fall River/Alden shirt factory purchase and in his dealings with the Merrill-Sharpe

acquisition is strong evidence that he knew he was breaching his non-compete obligations and

intended to do so.

      98.    Finally, it is undisputed that Mr. Abboud failed to obtain JA Apparel's permis-

sion before he entered into numerous associations with his current and potential business partners

during the Restricted Period.  By failing to obtain express written permission from JA Apparel before

associating himself with a party that competed, or which proposed to compete, with JA Apparel,

Mr. Abboud breached the provision of the non-competition clause in the Side Letter Agreement that

required him to obtain JA Apparel's written consent during the Restricted Period before becoming associated in any capacity with such persons.

99.    As a result of his wrongful and clandestine conduct during the Restricted Period, upon the expiration of his non-compete, Mr. Abboud was able to announce to the public a full line of menswear – tailored suits, dress shirts and sport shirts, ties and outerwear.  Defendants' competitive misconduct permitted Mr. Abboud to come to market with his "jaz" menswear line a full season earlier than he otherwise would have been able to do so, and thereby deprived JA Apparel of the benefit of the bargain it had struck for $65.5 million.

100.    With respect to monetary relief, JA Apparel is entitled to an accounting of Alden's profits earned during the Restricted Period.  *See, e.g., United States Naval Inst. v. Charter Communs., Inc.*, 936 F.2d 692, 696-97 (2d Cir. 1991).  Alden's revenues during the Restricted Period were $578,104.10.  (FF 156, *supra*).  Because it is defendants' burden to prove the amount of Alden's direct expenses, if any, that increase as output increases (*i.e.*, variable expenses), *see, e.g., United States Naval Inst.*, 936 F.2d at 696-97; *Laurence of London, Ltd. v. Count Roimi Ltd.*, 30 A.D.2d 518, 290 N.Y.S.2d 125, 127 (1st Dep't 1968), and because they have failed to do so (*see* FF 156, *supra*), JA Apparel is entitled to an award of the full amount – $578,104.10. .

**B.    JA APPAREL IS THREATENED WITH IRREPARABLE
INJURY IF A PERMANENT  INJUNCTION IS NOT ISSUED**

101.    It is black letter law that proof of a likelihood of confusion establishes the threat of irreparable injury if a permanent  injunction is not granted.  *See, e.g., New Kayak Pool Corp.*, 246 F.3d at 185; *Am. Cyanamid Co. v. Campagna Per Le Farmacie In Italia S.p.A.*, 847 F.2d 53, 55 (2d Cir. 1988); *Hasbro*, 858 F.2d at 73; *Cartier v. Aaron Faber Inc.*, 512 F. Supp.2d 165, 171 (S.D.N.Y. 2007).  That is because, unless the infringer is enjoined, the trademark owner "will lose

control over the reputation of its trademark pending trial." *Power Test Petroleum Distribs. v. Calcu Gas, Inc.*, 754 F.2d 91, 95 (2d Cir. 1985).

       102.    In addition to loss of control over its trademarks, JA Apparel will be irreparably injured if defendants are not permanently enjoined because it will be extremely difficult to calculate lost sales resulting from defendants' infringing use of JA Apparel's ABBOUD Marks. (*See* FF 158, *supra*). *See also, e.g., Power Test Petroleum Distribs.*, 754 F.2d at 95; *Zeneca, Inc. v. Eli Lilly & Co.*, 1999 U.S. Dist. LEXIS 10852, *113 (S.D.N.Y. July 19, 1999) ("the likelihood of customer confusion, impairment of plaintiff's reputation and good will and probable diversion of customers, combined with the difficulty of proving actual monetary damages arising from Lanham Act injuries, justifies a presumption of irreparable injury once the violation has been established") (citing *Upjohn Co. v. Am. Home Prods. Corp.*, 598 F. Supp. 550, 555 (S.D.N.Y. 1984)); *P.F. Cosmetique, S.A. v. Minnetonka, Inc.*, 605 F. Supp. 662, 667 (S.D.N.Y. 1985) ("The loss to the plaintiffs of sales" would also constitute irreparable harm because it would be "difficult if not impossible to calculate"). By definition, the consumer will have been confused and thus will not know that the product he purchased was not the product he thought he was purchasing. This further exacerbates the normally difficult problem of proving lost sales due to infringement or false advertising and furnishes an independent ground for a finding of irreparable harm. *See McNeil Labs., Inc. v. Am. Home Prods. Corp.*, 416 F. Supp. 804, 809 (D.N.J. 1976) ("Nor would it be a simple matter to calculate in damages the value of the customers who would be forever lost to [the plaintiff's product] were we to permit [the defendant] to continue to market [its infringing product]."). Indeed, by its very nature, the risk of confusion is an injury that is irreparable. *Omega Importing Corp. v. Petri-Kine Camera*

*Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971); *Century 21 Real Estate LLC v. Raritan Bay Realty*, 2007 U.S. Dist. LEXIS 34108, *7 (E.D.N.Y. May 9, 2007).

103.    If defendants are permitted to trade on the goodwill and value of the very ABBOUD Marks they sold to JA Apparel, many of defendants' sales will be based on the erroneous assumption that defendants are affiliated with JA Apparel, or people dissatisfied with defendants' products may incorrectly attribute that dissatisfaction to plaintiff.  Because consumers are sensitive to designer names as brand names, seeing "Joseph Abboud" in connection with defendants' "jaz" line will likely cause consumers to believe mistakenly that the same company that puts out the JOSEPH ABBOUD brand is the source, sponsor or licensor of the "jaz" brand. *See Nipon*, 216 B.R. at 128; *A.V. by Versace v. Gianni Versace, S.p.A.*, 2002 U.S. Dist. LEXIS 16323, *43 (S.D.N.Y. Sept. 3, 2002).

104.    Courts also have held that breach of a non-competition provision protecting a buyer's goodwill presumptively results in irreparable harm, thereby entitling plaintiff to an injunction. *See New York Real Estate Inst.*, 42 A.D.3d at 321, 839 N.Y.S.2d at 489; *Manhattan Real Estate Equities Group, LLC v. Pine Equity, NY, Inc.*, 16 A.D.3d 292, 292, 791 N.Y.S.2d 418, 419 (1st Dep't 2005).  Indeed, here, as noted earlier (FF 159, *supra*), Mr. Abboud agreed in the Side Letter Agreement that in the event he breached his non-compete obligations, JA Apparel "will be entitled" to entry of a permanent injunction.  (PX-2 ¶ 2(d)).

105.    Finally, the Court rejects defendants' argument that JA Apparel's alleged delay in seeking immediate injunctive relief when it commenced this action supports a finding that JA Apparel would not be irreparably injured in the absence of such relief.   Suffice it to say that JA Apparel sued within four weeks of defendants' announcement that they intended to use the designa-

tion "a new composition by designer Joseph Abboud," that JA Apparel *did* seek such relief and that

the truncated discovery period that JA Apparel sought was extended to 2½ months at *defendants*'

request to permit the preliminary injunction motion to be consolidated with the trial on the merits.

By contrast, in *Citibank N.A. v. Citytrust*, 756 F.2d 273, 274 (2d Cir. 1985), on which defendants rely,

plaintiff did not seek an injunction until more than ten weeks after learning of defendant's activity,

whereas here, JA Apparel took almost immediate action after learning of defendants' plans in August

2007.

## C.    THE BALANCE OF HARDSHIPS TIPS DECIDEDLY IN JA APPAREL'S FAVOR

106.    The reputation and goodwill enjoyed by JA Apparel as a result of its invest-

ment of time, money, and effort over the years to establish its well-known ABBOUD Marks are at

stake and threatened by defendants' unauthorized use of the names, trademarks and designations "a

new composition by designer Joseph Abboud," "by the award-winning designer Joseph Abboud,"

and "Joseph Abboud" on their "jaz" clothing line and in marketing and advertising materials for that

line.  By comparison, the harm that defendants could suffer if an injunction were granted is the loss

of revenue from their unauthorized use of JA Apparel's ABBOUD Marks and the other intellectual

property assets defendants sold to JA Apparel.  Defendants have no right to reap profits from the

investment sown by JA Apparel through its efforts to market and promote the ABBOUD Marks for

twenty years.  *See, e.g., LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 79 (2d Cir. 1985)  (finding

that "the true hardships tip markedly in favor of [plaintiff]" and affirming order enjoining defendant

from selling infringing products during pendency of suit, in light of potential harm to goodwill and

reputation of plaintiff's trademark rights).

107.    Mr. Abboud can hardly be heard to complain that it would be inequitable to enjoin him from exercising the very trademark and related rights that he voluntarily relinquished and sold for $65.5 million, or that an injunction would "delay[] or cripple[]" his effort "to launch a new business." (Defs. PI Mem. 23).  *See Chernoff Diamond & Co. v. Fitzmaurice, Inc.*, 234 A.D.2d 200, 203, 651 N.Y.S.2d 504, 506 (1st Dep't 1996) (granting injunction where, "considering that the restriction was freely bargained for as part of a negotiated contract, it cannot be said that the equities favor defendant"); *In re Kenston Mgmt. Co.*, 137 B.R. 100, 111 (Bankr. E.D.N.Y. 1992).  There simply is nothing inequitable about stopping someone from "keep[ing] for himself the essential thing he sold, and also keep[ing] the price he got for it."  *Levitt Corp.*, 593 F.2d at 468.  Thus, because a defendant cannot avoid an injunction by "construct[ing] its business around its infringement," *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3d Cir. 1983), courts have held that harm to a trademark infringer's business merits little or no equitable consideration.[85]  Mr. Abboud is, of course, free to compete actively and directly with JA Apparel under his "jaz" mark.

108.    Finally, in addressing the balance of hardships, the Court should consider where the public interest lies.  Courts consistently have recognized the paramount right of the public to be free from confusion in the marketplace, noting that it can only advance the public interest to halt the confusing adoption of infringing trademarks.  *Park 'N Fly*, 469 U.S. at 198; *see also Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 784 n.19 (1992) (Stevens, J., concurring).

---

[85]    *See, e.g.*, *Helene Curtis Indus. v. Church and Dwight*, 560 F.2d 1325, 1333 (7th Cir. 1977); *Dial-A-Mattress Operating Corp. v. Mattress Madness,* Inc., 841 F. Supp. 1339, 1357 (E.D.N.Y. 1994); *Pro Hardware, Inc. v. Home Centers of Am., Inc.*, 607 F. Supp. 146, 154-55 (S.D. Tex. 1984); *Scandia Down Corp. v. Euroquilt, Inc.*, 1982 U.S. Dist. LEXIS 17664, *9 (N.D. Ill. Nov. 8, 1982).

**D.    JA APPAREL HAS ESTABLISHED THAT A
PERMANENT INJUNCTION SHOULD BE ENTERED
AND THAT CORRECTIVE MEASURES SHOULD BE ORDERED**

109.    As explained above, JA Apparel has established its entitlement to a permanent injunction enjoining defendants from breaching the Purchase and Sale Agreement and barring defendants' trademark infringement, dilution, unfair competition, and breaches of contract.  Although defendants have suggested the possibility of a disclaimer, they have submitted no evidence in support of their argument, let alone met their "heavy burden" of "com[ing] forward with evidence sufficient to demonstrate" that a disclaimer (the terms of which they do not even provide) "would significantly reduce the likelihood of consumer confusion."  *Home Box Office, Inc. v. Showtime/The Movie Channel Inc.*, 832 F.2d 1311, 1316 (2d Cir. 1987); *Charles of the Ritz Group Ltd. v. Quality King Distribs., Inc*., 832 F.2d 1317, 1324 (2d Cir. 1987) (same); *see Nipon*, 216 B.R. at 128 (rejecting use of disclaimer).  As the Second Circuit has acknowledged, "disclaimers are frequently not effective." *Home Box Office*, 832 F.2d at 1316.  *Accord*, *Charles of the Ritz*, 832 F.2d at 1324.  The Court explained that placing the burden of proof on the defendant "recognizes" that the defendant has been found to have infringed the plaintiff's mark, that "it alleviates the unnecessary hardship that could be imposed on [the plaintiff] if it repeatedly had to catch up with [the defendant's] use of its trademark by adequately demonstrating that each new permutation [of the mark] and its context was likely to mislead consumers," and that "it is the allocation of the burden of proof which best accords with our interpretation of the Lanham Act as a means of protecting trademark holders and the public from confusion as to the source and promotion of products."  *Home Box Office*, 832 F.2d at 1316.  Moreover, wholly apart from the burden of proof, the Court concludes that given the broad scope of the rights that Mr. Abboud transferred to JA Apparel, including such phrases as "designed by Joseph

Abboud," and given that defendants propose to use the identical name and mark that JA Apparel owns – "Joseph Abboud" – it is highly likely that no disclaimer could be used that would obviate the likelihood of confusion that defendants' use of "Joseph Abboud" would generate. (*See* FF 44, 158, *supra*).[86]

110.    In addition, the Court holds that because defendants' infringement of the ABBOUD Marks and their acts of false designation of origin, sponsorship and approval were willful and deliberate, JA Apparel is entitled to an award of its reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

111.    Finally, Mr. Abboud acknowledged in the Side Letter Agreement that his non-competition obligations were specifically bargained for in connection with the consummation of the sale transaction and that in the event he breached such obligations, JA Apparel "will be entitled to obtain equitable relief in the form of a preliminary or permanent injunction from any court of competent jurisdiction in order to enforce such agreements." (PX-2 ¶ 2(d)). In accordance with well-settled New York law, the Court will enforce the Side Letter Agreement and grant an injunction

---

[86]    At times in this case defendants have suggested that this dispute is a "hypothetical" one and that there is no Article III "case or controversy" before the Court. (Defs. Trial Br. 12-13). Suffice it to say, that the record is directly to the contrary. Defendants have made clear their intent to use the phrase "by designer" even though Mr. Abboud admitted that such uses would be "similar" to the uses prohibited by the Purchase and Sale Agreement (TT 556-57), they have made clear that they reserve the right to make any use of "Joseph Abboud" or "by designer" not prohibited by the Court, and they have refused to agree not to use "Joseph Abboud" on products, packaging, or hangtags. (*See* FF 39-44, *supra*). Given this record, it is clear that defendants' threatened use of "Joseph Abboud" presents "actual or imminent" "injury in fact" to plaintiff," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); and that, far from making it "'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur,'" *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 224 (2000), defendants have made clear their intent to use "Joseph Abboud" in their business, advertising and promotion, in breach of plaintiff's contract, statutory and common law rights. *Compare United States v. Oregon State Med. Soc'y*, 343 U.S. 326, 333 (1952) ("It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption."); *United States v. N.Y.C. Transit Auth.,* 885 F. Supp. 442, 444-45, 447 (E.D.N.Y. 1995) (permanent injunction granted)

here. *See New York Real Estate Inst.*, 42 A.D.3d at 321, 839 N.Y.S.2d at 489 (stating that in addition to the legal presumption of irreparable injury from the breach of a non-competition agreement designed to protect a buyer's goodwill, the court was also bound to enforce the parties' agreement that the buyer would be entitled to an injunction in the event of such a breach).  In particular, the Court will bar defendants from competing with JA Apparel for 90 days from the date of entry of the Court's order, which is the period of time that Mr. Abboud breached the non-competition provisions of his Side Letter Agreement prior to July 13, 2007.  *See* FF 159, 161; *New York Real Estate Inst.*, 42 A.D.3d at 321, 839 N.Y.S.2d at 489-90 (finding that where a party breaches an agreement not to compete and the time period during which competition was precluded has since expired, such time period may be extended for the length of time that the offending party was in violation of the agreement); *J.H. Goldberg Co., Inc. v. Stern*, 53 A.D.2d 246, 252, 385 N.Y.S.2d 427, 432 (4th Dep't 1976) (same).

## E.     DEFENDANTS HAVE FAILED TO ESTABLISH ANY OF THEIR COUNTERCLAIMS

112.    Alleging a violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), Mr. Abboud, Houndstooth and Herringbone assert that JA Apparel's "fashion designs sold under the JOSEPH ABBOUD trademark" "cause consumers and the trade to mistakenly believe" that the designs "are endorsed by Abboud," or "consist of designs created by Abboud."  (Counterclaim ¶¶ 150, 151, 155, 161).  Defendants, however, sold to JA Apparel *"all"* of their *"right, title and interest* in . . . [t]he names, trademarks, trade names, service marks, logos, insignias and designations" that include the words "Joseph Abboud," *"all* trademark registrations and applications therefor, and *the goodwill related thereto,"* and "*[a]ll rights to use* . . . new trade names, trademarks, service marks, logos, insignias and designations containing the words 'Joseph Abboud,' 'designed by Joseph

Abboud,' 'by Joseph Abboud,' or *anything similar thereto or derivative thereof. . . .* for *any and all* products or services," and the "goodwill" pertaining thereto. (PX-1 ¶ 1.1(a)(A)-(E) (emphasis added). Accordingly, and as exhaustively explained above, JA Apparel has the right to use the ABBOUD Marks and designations; there is no basis for defendants to stop JA Apparel from doing so or to seek any relief, monetary, injunctive or otherwise based on JA Apparel doing so. Nor is there any basis for Mr. Abboud, Houndstooth or Herringbone to assert that JA Apparel's "douknowjoe.com" and "Hey Joseph" advertising campaigns violate Section 43(a) for the Lanham Act. First, there is no evidence that JA Apparel used the terms "Do You Know Joe" and "Hey Joseph" as anything other than trademarks designed to designate the source of JOSEPH ABBOUD brand clothing, which JA Apparel had every right to do under the Agreement and as the owner of the ABBOUD Marks. Second, there is no credible evidence that anyone associated the "Joe" character on the "douknowjoe.com" website or the "Joseph" in "Hey Joseph" with Joseph Abboud, the individual. Nor does anything on the website or in the phrase "Hey Joseph," or the advertising campaigns using the phrases "Do You Know Joe" or "Hey Joseph," suggest an association with a real individual, much less with Joseph Abboud. For the same reasons, Mr. Abboud, Houndstooth and Herringbone have failed to establish their claim under N.Y. GEN. BUS. LAW § 349, for alleged deceptive acts or practices, and their claim for state law unfair competition.[87]

113.     Nor is there any factual basis for the allegation that JA Apparel or Mr. Staff wrongfully contacted persons in the fashion industry in an effort to impair or prevent counterclaim-

---

[87]     Defendants seek monetary damages in excess of $31 million – a stunning amount based simply on Mr. Abboud's "estimate" of a "10 percent royalty or endorsement fee" based on of JA Apparel's annual retail sales of products bearing the JOSEPH ABBOUD trademark. (Abboud Tr. 618-19). In other words, defendants seek damages based on the theory that they, not JA Apparel own the JOSEPH ABBOUD trademark. Needless to say, they cannot get damages for the very assets that they sold to JA Apparel.

defendants from entering into or maintaining new business relationships.  (*See* FF 155 n.38).

Moreover, even if the allegation were true – which it is not – it would not support a claim of unfair

competition. As Mr. Abboud, Houndstooth and Herringbone state, "[a] claim of unfair competition

under New York [l]aw is analyzed in the same manner as a trademark infringement claim under the

Lanham Act."  (Defs. Pre-Trial CL 243).[88]  Not surprisingly, they fail to cite a single case in which

a court held that interference with an existing or potential business relationship constitutes unfair

competition as opposed to tortious interference with contract or prospective business relations (*see*

Defs. Pre-Trial CL 246) – claims that have *not* been asserted in this case.

      114.    Mr. Abboud, Houndstooth and Herringbone also have failed to establish their

claim under N.Y. CIV. RIGHTS LAW § 50 for the alleged "unauthorized use of [Mr.] Abboud's

endorsement and/or publicity rights."[89]  The statute bars the "use[] for advertising purposes, or for

---

[88]    *See* Defs. Pre-Trial CL 243-45, *citing Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 119 (2d Cir. 2006) ("We analyze claims under New York's unfair competition statute [*i.e.*, N.Y. GEN. BUS. LAW § 360-1] in a similar fashion to how we analyze claims under the Lanham Act." reversing preliminary injunction for failure to "prove likelihood of confusion under New York state law"); *Information Superhighway, Inc. v. Talk Am., Inc.*, 395 F. Supp.2d 44, 56 (S.D.N.Y. 2005) ("The elements necessary to prevail on common law causes of action for trademark infringement and unfair competition mirror Lanham Act claims."); *Rostropovich v. Koch Int'l Corp.*, 34 U.S.P.Q.2d 1609, 1995 U.S. Dist. LEXIS 2785, *16 (S.D.N.Y. March 7, 1995) ("New York courts apply the doctrine of unfair competition to protect against the misappropriation of the product of another's work."); *Vanderbilt v. Rolls-Royce Motor Cars, Inc.*, 1990 WL 37825, *4 (S.D.N.Y. March 28, 1990) ("misappropriation" of "name and persona . . . constitutes a claim for unfair competition under New York law"); *Computer Assocs. Int'l, Inc. v. Computer Automation, Inc.*, 678 F. Supp. 424, 429 (S.D.N.Y. 1987) ("The essence of such a claim [*i.e.*, a "claim for relief under New York common law unfair competition"] is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of goods."); *Eagle Comtronics, Inc. v. Pico Prods., Inc.*, 256 A.D.2d 1202, 682 N.Y.S.2d 505, 506 (4th Dep't 1998) ("Under Federal or State law, the gravamen of a claim of unfair competition is the bad faith misappropriation of a commercial advantage belonging to another by infringement or dilution of a trademark or trade name or by exploitation of proprietary information or trade secrets."). Two of the cases on which defendants rely (Defs. Pre-Trial CL 245) did not even involve state law unfair competition claims and provide no support for their position. *See Vidal Sassoon, Inc. v. Bristol-Meyers Co.*, 661 F.2d 272, 275, 277-78 (2d Cir. 1981); *Geisel v. Poynter Prods., Inc.*, 283 F Supp. 261 263, 267 (S.D.N.Y. 1968).

[89]    Although Mr. Abboud, Houndstooth and Herringbone purport to base their state law unfair competi-
(continued...)

the purposes of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person."  N.Y. Civ. Rights Law § 50.  There is no proof (or even allegation) that defendants used any portrait or picture of Mr. Abboud.  As for use of Mr. Abboud's name, Mr. Abboud provided "written consent" in the Purchase and Sale Agreement and, accordingly, he cannot maintain a claim under the statute.  Nor, for the reasons explained above (*see* FF 21-25, CL 37-38, *supra*), is there any basis to the assertion that Mr. Abboud has a right of publicity separate and apart from the rights that he transferred to JA Apparel in the Purchase and Sale Agreement.

115.    Wholly apart from the above, there is no evidence that Mr. Staff personally took any action that supports any of the counterclaims and, for that reason alone (in addition to the other reasons explained herein), judgment will be entered in his favor.

116.    Finally, even if Mr. Abboud had a right under state law to use the words "Joseph Abboud" in connection with the marketing, advertising or sale of menswear or other products, that right would be preempted by federal law.  "Article VI of the Constitution provides that the laws of the United States 'shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding."  *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992).  Accordingly, "since . . . *McCulloch v. Maryland*, . . . it has been settled that state law that conflicts with federal law is 'without effect'" and "must yield to a congressional Act."  *Id.* at 516 (quoting *Maryland v. La.*, 451 U.S. 725, 746 (1981)); *Crosby v. Nat'l Foreign Trade*

---

[89]        (...continued)

tion claim, in part, on JA Apparel's alleged unauthorized use of Mr. Abboud's endorsement and publicity rights (Counterclaim ¶ 176), it is black letter law that the "right of publicity . . . is exclusively statutory in this State" and that there is no "independent common-law right of publicity."  *Stephano v. News Group Publications, Inc.*, 64 N.Y.2d 174, 183, 485 N.Y.S.2d 220, 224 (N.Y. 1984).  *See Zoll v. Ruder Finn, Inc.*, 2004 U.S. Dist. LEXIS 144, *12 (S.D.N.Y. Jan. 7, 2004) ("The New York Civil Rights law preempts all common law claims based on unauthorized use of name, image, or personality, including unjust enrichment claims.").

*Council*, 530 U.S. 363, 372 (2000).  Federal law, thus, preempts state laws that conflict with federal law, including state laws that "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 698-99 (1984).  Here, JA Apparel owns several federally registered trademarks for "JOSEPH ABBOUD" or that include those words.  (*See* FF 11-12, *supra*).  As a matter of federal law, JA Apparel therefore has the "*exclusive* right to use the[se] registered mark[s] in commerce."  15 U.S.C. § 1115(a)-(b) (emphasis added).  *See* 15 U.S.C. § 1127 ("The intent of this chapter is to . . . protect registered marks used in such commerce from interference by State, or territorial legislation.").  Any state law that would provide relief to Mr. Abboud, Houndstooth and Herringbone would be in direct conflict with, and stand as an obstacle to, JA Apparel's right under federal law to the exclusive use of these marks.  Accordingly, the state law is preempted and "without effect."  *Cipollone*, 505 U.S. at 516.

## CONCLUSION

117.    In sum, the Court finds and holds that JA Apparel has established each of its claims for relief, that it is entitled to an award of $578,104.10, and that it is entitled to entry of a permanent injunction in the form attached hereto.  The Court further finds and holds that defendants have failed to establish any of their counterclaims.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JA APPAREL CORP., <br><br>                 Plaintiff, <br><br> v. <br><br> JOSEPH ABBOUD, HOUNDSTOOTH CORP., and HERRINGBONE CREATIVE SERVICES, INC., <br><br>                 Defendants. | Civil Action No. 07 CV 07787 (THK) |
| JOSEPH ABBOUD, HOUNDSTOOTH CORP., and HERRINGBONE CREATIVE SERVICES, INC., <br><br>                 Counterclaim-Plaintiffs, <br><br> v. <br><br> JA APPAREL CORP. and MARTIN STAFF, <br><br>                 Counterclaim-Defendants. | |

## JUDGMENT AND PERMANENT INJUNCTION

        This action came on for trial before the Court, the Honorable Theodore Katz, United States Magistrate Judge, presiding, beginning on February 22, 2008.  Evidence was taken, argument was heard and considered, and a decision was duly rendered as reflected in the Findings of Fact and Conclusions of Law filed on _____, 2008.  In accordance with those Findings and Conclusions,

IT IS ORDERED, ADJUDGED, AND DECREED that:

1.      Defendants have violated Sections 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a), committed acts of trademark infringement and unfair competition in violation of state common law, caused trademark dilution in violation of New York Gen. Bus. Law § 360-l, committed unfair competition and deceptive acts in violation of New York Gen. Bus. Law §§ 349 and 350, *et seq.*, and committed breaches of contract in violation of state common law.

2.      Plaintiff JA Apparel, not defendants, Joseph Abboud, Houndstooth Corp., and Herringbone Creative Services, Inc., owns all rights that exist in, and all rights to use and apply for the registration of, the names, trademarks, trade names, service marks, logos, insignias and designations that contain the words "Joseph Abboud," "designed by Joseph Abboud," "by Joseph Abboud," or anything similar thereto or derivative thereof, either alone or in conjunction with other words or symbols, for any and all products and services.

3.      The plaintiff, JA Apparel, recover from defendant Joseph Abboud, $578,104.10, together with interest on such sum at the judgment rate from the date of entry of this Judgment until fully satisfied pursuant to 28 U.S.C. § 1961.

4.      Defendants, Joseph Abboud, Houndstooth Corp., and Herringbone Creative Services, Inc., their officers, directors, agents, employees, servants, representatives, attorneys, successors, assigns, licensees and others controlling, controlled by or affiliated with them and all those in privity or active concert or participation with any of the foregoing, and all those who receive actual notice by personal service or otherwise:

(A)     are permanently restrained and enjoined from:

(i)     using in business or commercially any name, trademark, trade name, service mark, logo, insignia or designation that includes the words or phrases "Joseph Abboud," "JA," "designed by Joseph Abboud," "by Joseph Abboud," "by designer Joseph Abboud," "a new composition by designer Joseph Abboud," "by the award-winning designer Joseph Abboud," "a new concept from designer Joseph Abboud," or anything similar thereto or derivative thereof, either alone or in conjunction with other words or symbols, in connection with any goods or services, including, but not limited to, using any such name, trademark, trade name, service mark, logo, insignia or designation in a manner that is likely to confuse any person as to the source, origin, affiliation, connection, association, sponsorship, approval or endorsement of any products or services; and

(ii)     manufacturing, advertising, marketing, promoting, offering to sell, selling or otherwise distributing any goods or services in connection with any name, trademark, trade name, service mark, logo, insignia or designation that includes the words or phrases "Joseph Abboud," "JA," "designed by Joseph Abboud," "by Joseph Abboud," "by designer Joseph Abboud," "a new composition by designer Joseph Abboud," "by the award-winning designer Joseph Abboud," "a new concept from designer Joseph Abboud," or anything similar thereto or derivative thereof, either alone or in conjunction with other words or symbols; and

(B)     restrained and enjoined from competing with plaintiff on or before ninety (90) days from entry of this Judgment.

5.      Defendants, Joseph Abboud, Houndstooth Corp., and Herringbone Creative Services, Inc., shall serve upon plaintiff, JA Apparel, within thirty (30) days after entry of this Judgment, a report in writing under oath setting forth in detail the manner and form in which defendants have complied with this Judgment.

6.      The plaintiff, JA Apparel, pursuant to 15 U.S.C. § 1117, recover from defendants, Joseph Abboud, Houndstooth Corp., and Herringbone Creative Services, Inc., individually and collectively, plaintiff's reasonable attorneys' fees in an amount to be determined.

7.      The counterclaims asserted by Joseph Abboud, Houndstooth Corp., and Herringbone Creative Services, Inc., are each dismissed with prejudice and counterclaim-plaintiffs take nothing by way of these counterclaims.

Dated: _____, 2008
          New York, NY

_____
United States Magistrate Judge