Louis S. Ederer (LE 7574)
John Maltbie (JM 3658)
ARNOLD & PORTER LLP
399 Park Avenue
New York, New York 10022
Phone (212) 715-1000
Fax (212) 715-1399

*Attorneys for Defendants and*
*Counterclaim Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------ x
                                                             :
   JA APPAREL CORP.,                                         :     Civil Action No. 07 CV 07787 (DAB)
                                                             :
                            Plaintiff,                       :
                                                             :
                 v.                                          :
                                                             :
   JOSEPH ABBOUD, HOUNDSTOOTH CORP.,                         :     **DEFENDANTS AND**
   and HERRINGBONE CREATIVE                                  :     **COUNTERCLAIM PLAINTIFFS'**
   SERVICES, INC.,                                           :     **SUPPLEMENTAL PROPOSED**
                                                             :     **FINDINGS OF FACT AND**
                            Defendants.                      :     **CONCLUSIONS OF LAW**
                                                             :
------------------------------------------------------------ x
------------------------------------------------------------ x
                                                             :
   JOSEPH ABBOUD, HOUNDSTOOTH CORP.,                         :
   and HERRINGBONE CREATIVE                                  :
   SERVICES, INC.,                                           :
                                                             :
                            Counterclaim Plaintiffs,         :
                                                             :
                 v.                                          :
                                                             :
   JA APPAREL CORP. and MARTIN STAFF,                        :
                                                             :
                            Counterclaim Defendants.         :
                                                             :
------------------------------------------------------------ x

## TABLE OF CONTENTS

I. **ABBOUD'S PROPOSED FINDINGS OF FACT** ................................................................. 1

    A.    Abboud's Reputation as a World Class Fashion Designer, Celebrity and Public Personality ................................................................................. 1

    B.    Abboud's Relationship With JA Apparel and the Negotiation of the Purchase and Sale Agreement and the Personal Services Agreement .................... 7

    C.    The Pertinent Provisions of the Purchase and Sale Agreement and Personal Services Agreement ................................................................. 20

    D.    JA Apparel's Conduct Following the Closing on July 13, 2000 ......................... 32

    E.    Abboud's "jaz" Business and his Proposed Use of His Personal Name in Advertising and Promotional Materials to Convey Truthful and Valuable Information to the Trade and Consumers, Namely That He is the Designer of the "jaz" Menswear Line ................................................................. 36

    F.    Abboud's Activities During the Restricted Period ................................................ 40

    G.    Abboud's Press Conference to Announce the Launch of his "jaz" Menswear Line ................................................................................................. 48

    H.    JA Apparel's Activities in Violation of Abboud's Publicity Rights .................... 49

II. **ABBOUD'S PROPOSED CONCLUSIONS OF LAW** ...................................................... 54

    A.    Jurisdictional Basis ............................................................................................. 54

    B.    JA Apparel's Claims — Generally ..................................................................... 54

    C.    JA Apparel's Claims for Breach of Contract, Declaratory Judgment and Trademark Infringement Must be Dismissed as Abboud Did Not Convey or Assign to JA Apparel the Exclusive Right to the Use of His Personal Name Commercially .................................................................................................. 54

        1.    The Provisions of the Purchase and Sale Agreement and the Personal Services Agreement Relevant to JA Apparel's Claim ............................... 60

        2.    Contract Interpretation — Generally ......................................................... 62

        3.    Contract Interpretation — Where Sophisticated Business People Negotiate at Arms Length With the Assistance of Counsel ..................... 63

        4.    Contract Interpretation — Ambiguity ....................................................... 64

i

5.    Contract Interpretation — Course of Conduct ........................................... 74

6.    Contract Interpretation — Extrinsic/Parol Evidence ................................ 76

7.    Contract Interpretation — *Noscitur a Sociis* Doctrine ............................. 77

8.    Contract Interpretation — Any Ambiguities Are to be Resolved Against the Party Who Drafted the Agreement ......................................... 78

9.    An Individual Who Only Conveys the Right to Use His Name as a Trademark is Precluded Only From Using His Name in the Future as a Trademark ............................................................................................... 79

10.   Abboud's Proposed Use of His Name Does Not Constitute an Arrogation or Free Riding on the Goodwill of JA Apparel's Trademarks ............................................................................................... 82

D.    JA Apparel's Claims of Trademark Infringement, False Designation of Origin and Trademark Dilution Must be Dismissed as Abboud's Proposed Use of His Personal Name to Convey Truthful and Valuable Information to the Trade and Consumers is Protected by 15 U.S.C. § 1114(b)(4)..................... 91

1.    15 U.S.C. § 1114(B)(4) is an Absolute Defense to Claims of Trademark Infringement, False Designation of Origin and Trademark Dilution ................................................................................................. 92

2.    A Finding of a Likelihood of Confusion is Irrelevant Where an Individual is Using his Personal Name Other Than as a Trademark in Connection With his Business or Where a Trademark is Being Used Descriptively and in Good Faith ................................................................ 93

3.    Abboud Proposes to Use His Personal Name Other Than as a Trademark and Not in its Secondary Meaning Trademark Sense ............. 99

4.    Abboud's Proposed Use of His Personal Name is a Descriptive Use Made in Good Faith and There is No Evidence That Abboud Has Acted or Proposes to Act in Bad Faith ...................................................... 104

E.    JA Apparel's Claims of Trademark Infringement, False Designation of Origin and Trademark Dilution Must be Dismissed as Abboud's Proposed Use of His Personal Name to Convey Truthful and Valuable Information to the Trade and Consumers is Protected Commercial Speech Under the First Amendment ...................................................................................................... 112

F.    JA Apparel is Not Entitled to Any Equitable Relief on its Claims of Trademark Infringement, False Designation of Origin and Trademark Dilution Because of its Unclean Hands ............................................................ 116

ii

G.  JA Apparel's Trademark Dilution Claim Under New York G.B.L. § 360-1 Must be Dismissed ............................................................ 119

H.  JA Apparel's Common Law Unfair Competition Claim Must be Dismissed ... 120

I.  JA Apparel's Common Law Trademark Infringement Claim Must be Dismissed ............................................................ 121

J.  JA Apparel's Deceptive Acts and Practices Claim Under New York G.B.L. § 349 Must be Dismissed ............................................................ 122

K.  JA Apparel's False Advertising Claim Under New York G.B.L. § 350 Must be Dismissed ............................................................ 123

L.  JA Apparel's Claim That Abboud Breached the Personal Services Agreement Must be Dismissed ............................................................ 124

   1.  Contract Interpretation — Generally ............................................ 125

   2.  Contract Interpretation — Where Sophisticated Business People Negotiate at Arms Length With the Assistance of Counsel ............... 126

   3.  Contract Interpretation — Ambiguity ........................................... 126

   4.  The Personal Services Agreement is Clear as to the Scope of Abboud's Restrictive Covenant ................................................... 128

   5.  Contract Interpretation — *Ejusdem Generis* Doctrine ................... 130

   6.  Contract Interpretation — Any Ambiguities Are to be Resolved Against the Party Who Drafted the Agreement ............................. 131

   7.  Although Ultimately it is the Language of the Parties' Personal Services Agreement That Controls, the Case Law also Supports Abboud on This Issue ............................................................ 131

   8.  The Equitable Relief Sought by JA Apparel in Connection With Abboud's Alleged Breach of the Personal Services Agreement Should be Denied as Oppressive ............................................... 135

M.  Abboud's Counterclaims — Generally ............................................ 137

N.  Abboud Will Prevail on His Right of Publicity Claim Under Section 43(a) of the Lanham Act ............................................................ 137

O.  Abboud Will Prevail on His Right of Publicity Claim Under New York Civil Rights Law §§ 50, 51 ............................................................ 142

P.    Abboud Will Prevail on His False Advertising Claim Under Section 43(a) of the Lanham Act ............................................................................................. 145

Q.    Abboud Will Prevail on His Claim Under New York G.B.L. § 349 ................. 149

R.    Abboud Will Prevail on His Common Law Unfair Competition Claim ........... 151

# <u>TABLE OF AUTHORITIES</u>
## <u>CASES</u>

*A. Charmichel & Co. v Latimer, Stillman & Co.*,
    11 R.I. 395, 404 (1876)......................................................................................103

*Abdul-Jabar v. Gen. Motors Corp.*,
    85 F.3d 407 (9th Cir. 1996) ......................................................................138, 141

*Abercrombie & Fitch Co. v. Hunting World, Inc.*,
    537 F.2d 4 (2d Cir. 1976)...................................................................103, 109

*Abraham Zion Corp. v. Lebow*,
    761 F.2d 93 (2d Cir. 1985)...........................................................................108

*AIM Int'l Trading, L.L.C. v. Valcucine S.P.A.*,
    No. 02 Civ. 1363 (PKL) 2003 WL 21203503 (S.D.N.Y. May 22, 2003).................58, 125

*Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyds, London*,
    136 F.2d 82 (2d Cir. 1998).........................................................64, 66, 126, 128

*Allied Maint. Corp. v. Allied Mech. Trades, Inc.*,
    42 N.Y.2d 538, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977).........................120

*American Inst. of Chem. Eng'rs v. Reber-Frid Co.*,
    682 F.2d 382 (2d Cir. 1982).......................................................................125

*Ames Publishing Co. v. Walker-Davis Publications, Inc.*,
    372 F. Supp. 1 (E.D. Pa.1974) ....................................................................117

*Application of Colonial Stores, Inc.*,
    394 F.2d 549 (C.C.P.A. 1972) ....................................................................105

*Arnold v. ABC, Inc.*, No. 06 Civ. 1747 (GBD)
    2007 WL 210330 (S.D.N.Y. Jan. 29, 2007) ....................................103, 105, 107, 110, 121

*Auto Hearse Mfg. Co. v. Bateman*,
    109 A. 735 (N.J. Ch. 1920).........................................................................80

*A.V. by Versace, Inc. v. Gianni Versace, S.p.A.*,
    No. 96 Civ. 9721, 2005 WL 147364 (S.D.N.Y. Jan. 24, 2005)......................112

*Bambu Sales, Inc., v. Sultana Crackers, Inc.*,
    683 F. Supp. 899 (E.D.N.Y. 1988) ................................141, 145, 149, 150, 152

*Basile S.P.A v Basile*,
    899 F.2d 35 (D.C. Cir. 1990)............................................................81, 91, 99

*Bates v. State Bar of Arizona*,
　433 U.S. 350 (1977).................................................................................................116

*Bates v. United States*,
　522 U.S. 23 (1997)...............................................................................................89, 93

*Bear U.S.A., Inc. v. Kim*,
　993 F. Supp. 894 (S.D.N.Y. 1998) ..........................................................................70

*Beer Nuts, Inc. v. Clover Club Foods Co.*,
　805 F.2d 920 (10th Cir. 1986) .................................................................................70

*Bell v. Harley Davidson Motor Co.*, No. 05 Civ. 2151 (JLS) (BLM),
　2008 WL 596212 (S.D.Cal. March 3, 2008).....................................................100, 107

*Berghoff Rest. Co. v. Lewis W. Berghoff, Inc.*,
　357 F. Supp. 127 (N.D. Ill. 1973), *aff'd*, 499 F.2d 1183 (7th Cir. 1974).........................98

*Bethlehem Steel Co. v. Turner Constr. Co.*,
　2 N.Y.2d 456, 161 N.Y.S.2d 90, 141 N.E.2d 590 (1957)...................................66, 74, 128

*Better Bus. Bureau of Metro. Houston, Inc. v. Med. Dirs., Inc.*,
　681 F.2d 397 (5th Cir. 1982) .............................................................................89, 116

*BGL Dev., Inc. v. Xpedite Sys., Inc*,
　184 F. Supp. 2d 360 (S.D.N.Y. 2002).......................................................................63

*Biosafe-One, Inc. v. Hawks*,
　524 F. Supp. 2d 452 (S.D.N.Y. 2007).......................................................................40

*Bi-Rite Enters. v. Button Master*,
　555 F. Supp. 1188 (S.D.N.Y. 1983).......................................................................142

*Blakely v. Sousa*,
　197 Pa. 305 (1900)..................................................................................................86

*Blue Jeans U.S.A., Inc. v. Basciano*,
　286 A.D.2d 274, 729 N.Y.S.2d 703, 705 (2001) ..........................................................76

*Bolger v. Youngs Drug Prods. Corp.*,
　463 U.S. 60 (1983).................................................................................................114

*Breed v. Ins. Co. of North Am.*,
　46 N.Y.2d 351, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978)...................................66, 128

*Brinkley v. Casablancas*,
　80 A.D.2d 428 (1st Dept. 1981)..............................................................................143

*Brooks Automation, Inc. v. Blue Shift Techs.*, No. 06-P-1063,
    2007 WL 1713370 (Mass. App. Ct. June 14, 2007) ................................................131, 133

*Buffalo Oyster Co. v. Nenno*,
    132 Misc. 213, 229 N.Y.S. 210 (N.Y.Sup. 1928) ...................................................... *passim*

*Burns v. Navorska*,
    42 Ohio App. 313, 182 N.E. 282 (1932) ...........................................................................55

*Buying For The Home, LLC v. Humble Abode, LLC*,
    459 F. Supp. 2d 310 (D.N.J. 2006) ...................................................................................70

*Cairns v. Franklin Mint Co.*,
    292 F.2d 1139 (9th Cir. 2002) ..........................................................................................94

*Car-Freshner Corp. v. S.C. Johnson & Son, Inc.*,
    70 F.3d 267 (2d Cir. 1995) .................................................95, 97, 101, 106, 107

*CBS Broad. Inc. v. Jones*,
    460 F. Supp. 2d 500 (S.D.N.Y. 2006) ..............................................................................76

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N. Y.*,
    447 U.S. 557 (1980) ...........................................................................................112, 113

*Central Mut. Ins. Co. v. StunFence, Inc.*,
    292 F. Supp. 2d 1072 (N.D. Ill. 2003) .............................................................................70

*Champion Spark Plug Co. v. Champion*,
    23 F. Supp. 638 (E.D. Mich. 1938) ................................................................................110

*Charcoal Steakhouse of Charlotte, Inc. v. Staley*,
    139 S.E.2d 185 (N.C. 1964) ...........................................................................................105

*Chatterjee Fund Mgmt., L.P. v. Dimensional Media Assoc.*,
    260 A.D.2d 159, 687 N.Y.S.2d 364 (1st Dep't 1999) ...............................................79, 131

*Chimart Assoc. v. Paul*,
    66 N.Y.2d 570, 489 N.E.2d 231, 498 N.Y.S.2d 344 (1986).....................................65, 127

*City of Harrisonville v. Dickey Clay Mfg. Co.*,
    289 U.S. 334 (1933)........................................................................................................135

*Civil Serv. Employees Assoc., Inc. v. Plainedge Union Free Sch. Dist.*,
    12 A.D.3d 395, 786 N.Y.S.3d 59 (2d Dep't 2004)....................................................64, 126

*Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Group, Inc.*,
    886 F.2d 490 (2d Cir. 1989)...........................................................................................115

*Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.*,
    228 F.3d 24 (1st Cir. 2000)............................................................147

*Coca-Cola Co. v. Tropicana Prods., Inc.*,
    690 F.2d 312 (2d Cir. 1982)...........................................................146

*Cohen v. Herbal Concepts, Inc.*,
    63 N.Y.2d 379, 482 N.Y.S.2d 457 (1984).............................142, 143

*Collas v. Brown*,
    211 Ala. 443, 100 So. 769 (1924)..............................................84, 86

*Commander Oil Corp. v. Advance Food Serv. Equip.*,
    991 F.2d 49 (2d Cir. 1993)...............................................................63

*Computer Assocs. Int'l, Inc. v. Computer Automation, Inc.*,
    678 F. Supp. 424 (S.D.N.Y. 1987) .......................................120, 151

*Conboy v. AT&T Corp.*,
    241 F.3d 242 (2d Cir. 2001)...................................................122, 149

*Consolidated Gas Supply Corp. v. Matula*,
    36 N.Y.2d 790, 330 N.E.2d 647, 369 N.Y.S.2d 698 (1975)....65, 127

*Consumers Union of U.S., Inc. v. Gen. Signal Corp.*,
    724 F.2d 1044 (2d Cir. 1983)............................................89, 98, 116

*Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.*,
    125 F.3d 28 (2d Cir. 1997)...................................................... *passim*

*Cowley v. Anderson*, 159 F.2d 1 (10th Cir. 1947) .............................131, 133

*Data Systems Computer Centre, Inc. v. Tempesta*,
    171 A.D.2d 274, 566 N.Y.S.2d 955 (2d Dept. 1991) .....................135

*De Long Corp. v. Lucas*,
    278 F.2d 804 (2d Cir. 1960)...................................................131, 132

*Dolby v. Robertson*,
    654 F. Supp. 815 (N.D.Cal. 1986) .......................92, 93, 98, 108, 109

*Dole v. United Steelworkers of Am.*,
    494 U.S. 26 (1990)............................................................................77

*Duryea v. Nat'l Starch-Mfg. Co.*,
    79 F. 651 (2d Cir. 1897)...................................................................57

*Eagle Comtronics, Inc. v. Pico Prods., Inc.*,
    256 A.D.2d 1202, 682 N.Y.S.2d 505 (4th Dep't 1998)...........121, 151

*Edenfield v. Fane,*
    507 U.S. 761 (1993)................................................................................113, 114

*Eli Lilly & Co. v. Elizabeth Arden,*
    577 F. Supp. 477 (S.D.N.Y. 1983) .................................................................99

*EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.,*
    228 F.3d 56 (2d Cir. 2000).....................................................................93, 110

*Empire Home Servs., L.L.C. v. Empire Iron Works, Inc.,* No. 05-Civ.-72584,
    2006 WL 2269507 (E.D. Mich. Aug. 8, 2006) ...............................................70

*Empire Props. Corp. v. Mfrs. Trust Co.,*
    288 N.Y. 242, 43 N.E.2d 25 (1942)........................................................62, 126

*Equibrand Corp. v. Reinsman Equestrian Prods., Inc.,*
    No. 3:07 Civ. 0536-P, 2007 WL 1461393 (N.D. Tex. May 17, 2007) ..............56

*ETW Corp. v. Jireh Pub., Inc.,*
    332 F.3d 915 (6th Cir. 2003) .........................................................................70

*Evans v. Famous Music Corp.,*
    1 N.Y.3d 452, 807 N.E.2d 869, 775 N.Y.S.2d 757 (2004)...................62, 65, 76, 125, 127

*Excellus Health Plan v. Tran,*
    287 F. Supp. 2d 167 (N.D.N.Y. 2003) .................................................122, 150

*Federal Ins. Co. v. Americas Ins. Co.,*
    258 A.D.2d 39, 691 N.Y.S.2d 508 (1st Dep't 1999) ......................................75

*First Keystone Fed. Sav. Bank v. First Keystone Mortgage, Inc.,*
    923 F. Supp. 693 (E.D. Pa.1996) ..................................................................40

*First Nat. Bank of Boston v. Bellotti,*
    435 U.S. 765 (1978).....................................................................................113

*Forstmann v. Joray Holding Co.,*
    244 N.Y. 22, 154 N.E. 652 (1926)................................................................135

*Friend v. H.A. Friend and Co.,*
    416 F.2d 526 (9th Cir. 1969) .........................................................................88

*Galerie Furstenberg v. Coffaro,*
    697 F. Supp. 1282 (S.D.N.Y. 1988).......................................................123, 124

*Geisel v. Poynter Prods., Inc.,*
    283 F. Supp. 261 (D.C.N.Y. 1968).........................................138, 139, 141, 151

*General Venture Capital Corp. v. Wilder Transp., Inc.*,
    26 A.D. 2d 173, 271 N.Y.S.2d 805 (1st Dep't 1966) ................................................78, 131

*G.M.L., Inc. v. Mayhew*,
    188 F. Supp. 2d 891 (M.D. Tenn. 2002).........................................................................70

*Greenfield v. Philles Records*,
    98 N.Y.2d 562, 780 N.E.2d 647, 750 N.Y.S.2d 565 (2002).....................................65, 126

*Gucci Am. v. Duty Free Apparel, Ltd.*,
    277 F. Supp. 2d 269 (S.D.N.Y. 2003)....................................................................122, 150

*Gucci v. Gucci Shops, Inc.*,
    688 F. Supp. 916 (S.D.N.Y. 1988) ..............................................................84, 99, 103

*Guth Chocolate Co. v. Guth*,
    215 F. 750 (D. Md. 1914) .................................................................................... *passim*

*Haagen-Dazs, Inc. v. Frusen Gladje Ltd., A.B.*,
    493 F. Supp. 73 (S.D.N.Y. 1980) .........................................................................117, 119

*Haelan Labs., Inc. v. Topps Chewing Gum, Inc.*,
    202 F.2d 866 (2d Cir. 1953)...........................................................................................142

*Haritatos v. Hasbro, Inc.*, No. 6:05-Civ-930, 2007 WL 3124626
    (N.D.N.Y. Oct. 23, 2007)........................................................................123, 124, 150

*Hartford Acc. & Indem. Co. v. Wesolowski*,
    33 N.Y.2d 169, 305 N.E.2d 907, 350 N.Y.S.2d 895 (1973)............................................76

*Hegeman & Co. v. Hegeman*,
    8 Daly 1 (NY) ...................................................................................................................87

*Herman Miller v. Palazzetti Imports & Exports*,
    270 F.3d 298 (6th Cir. 2001) ............................................................105, 106, 107, 108

*Hesmer Foods, Inc. v. Campbell Soup Co.*,
    346 F.2d 356 (7th Cir. 1965) ........................................................................................139

*H.H. Skinner v. Annie Oakes*,
    10 Mo. App. 45 (1881) ........................................................................................ *passim*

*Hilton v. Hilton*,
    89 N.J. Eq. 182, 104 A. 375 (1918) ................................................................................57

*Holiday Inns, Inc. v. Trump*,
    617 F. Supp. 1443 (D.N.J. 1985).............................................................................90, 116

*Howe Scale Co. v. Wyckoff, Seamans, & Benedict,*
198 U.S. 118 (1905).................................................................................95

*Hunt Ltd. v. Lifschultz Fast Freight, Inc.,*
889 F.2d 1274 (2d Cir.1989).................................................66, 74, 128

*IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp.,*
26 F.3d 370 (2d Cir. 1994)......................................................................74

*Information Superhighway, Inc. v. Talk Am., Inc.,*
395 F. Supp. 2d 44 (S.D.N.Y. 2005).............................................120, 121, 151

*In re Food Mgmt. Group,* LLC,
372 B.R. 171 (Bankr. S.D.N.Y. 2007)......................................................58, 125

*In re The Leslie Fay Cos., Inc.,*
216 B.R. 117 (S.D.N.Y. 1997)............................................81, 91, 99, 100, 134

*In re R.M.J.,*
455 U.S. 191 (1982)............................................................89, 114, 115

*International Association of Machinists & Aerospace Workers v.*
*Northeast Airlines, Inc.,* 473 F.2d 549 (1st Cir. 1972) ....................................135

*Jacobson v. Sassower,*
66 N.Y.2d 991, 489 N.E.2d 1283, 499 N.Y.S.2d 381 (1985)....................78, 131

*Jarecki v. G. D. Searle & Co.,*
367 U.S. 303 (1961)................................................................................77

*Jaret Intern., Inc. v. Promotion in Motion, Inc.,*
826 F. Supp. 69 (E.D.N.Y. 1993) ...........................................................40

*Jaro Transp. Servs., Inc. v. Grandy,*
No. 4:03-Civ.-01227, 2006 WL 2553424 (N.D. Ohio Sept. 5, 2006) .............................70

*J.H. Goldberg Co. v. Stern,*
53 A.D.2d 246 (4th Dept. 1976) ....................................................134, 136, 137

*Johanna Farms, Inc. v. Citrus Bowl, Inc.,*
468 F. Supp. 866 (D.C.N.Y. 1978) ...............................................117, 119

*John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.,*
22 F.3d 458 (2d Cir. 1994)...............................................................63, 126

*Johnson & Johnson * Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.,*
960 F.2d 294 (2d Cir. 1992)...............................................................147, 148

*Joseph Scott Co. v. Scott Swimming Pools, Inc.*,
764 F.2d 62 (2d Cir. 1985)......................................................................79, 88

*Karsh v. Heiden*,
120 Cal. App. 2d 75, 260 P.2d 633 (1st Dist. 1953)............................... *passim*

*Keiser v. Walsh*,
118 F.2d 13 (D.C. App. 1941) ...........................................................131, 133

*Keystone Driller Co. v. Gen. Excavator Co.*,
290 U.S. 240 (1933).................................................................................117

*Kiki Undies Corp. v. Alexander's Dep't Stores, Inc.*,
390 F.2d 604 (2d Cir. 1968).....................................................................101

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*,
543 U.S. 111 (2004)...........................................................................*passim*

*Lang v. Retirement Living Pub. Co., Inc.*,
949 F.2d 576 (2d Cir. 2001).......................................................................40

*Lazzaroni USA Corp. v. Steiner Foods*,
2006 WL 932345 (D.N.J. 2006) .....................................................81, 91, 100

*Levitt Corp. v. Levitt*,
593 F.2d 463, 468 (2d Cir. 1979)..............................................72, 79, 81, 85, 91

*Lindy Pen Co. v. Bic Pen Corp.*,
725 F.2d 1240 (9th Cir. 1984) ....................................................................94

*L.L. Bean, Inc. v. Drake Publishers, Inc.*,
811 F.2d 26 (1st Cir. 1987).......................................................................114

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
454 F.3d 108 (2d Cir. 2006)................................................................120, 151

*Lucente v. IBM Corp.*,
310 F.3d 243 (2d Cir. 2002)......................................................................128

*Madrigal Audio Labs., Inc. v. Cello, Ltd.*,
799 F.2d 814 (2d Cir. 1986).................................................................*passim*

*Manhattan Med. Co. v. Wood*,
108 U.S. 218 (1883)................................................................................119

*Marks v. Carrier*,
No. 90 Civ. 6714, 1992 WL 245684 (S.D.N.Y. Sept. 21, 1992).................65, 127

xii

*Maternally Yours, Inc. v. Your Maternity Shop, Inc.*,
   234 F.2d 538 (2d Cir. 1956).............................................................................138

*Mattel, Inc. v. Azrak-Hamway Int'l, Inc.*,
   724 F.2d 357 (2d Cir. 1983).............................................................................106

*Max Factor & Co. v. Factor*,
   226 F. Supp. 120 (S.D. Cal. 1903)...................................................................110

*McDonald v. North Shore Yacht Sales, Inc.*,
   134 Misc.2d 910, 513 N.Y.S.2d 590 (1987)....................................................123

*McGraw-Hill Cos. v. Int'l Sec. Exch.*,
   No. 05 Civ 1129, 2005 WL 2100518 (S.D.N.Y. Sept. 1, 2005).......................120

*McNeil-PPC, Inc. v. Pfizer Inc.*,
   351 F. Supp. 2d 226 (S.D.N.Y. 2005).............................................................146

*Messer v. The Frettas*,
   168 Mass. 140 (1897) .......................................................................................86

*Millgard Corp. v. E.E. Cruz/Nab/Frontier-Kemper*, No. 99 Civ. 2952 (LBS)
   2004 WL 1488534 (S.D.N.Y. July 2, 2004) ..............................................58, 125

*Minnesota Mining & Mfg. Co. v. Johnson & Johnson*,
   454 F.2d 1179 (C.C.P.A. 1972) .......................................................................105

*Moncure v. N.Y. State Dep't of Envtl. Conservation*,
   218 A.D.2d 262, 639 N.Y.S.2d 859 (3d Dep't 1996)................................62, 125

*Morningside Group Ltd. v. Morningside Capital Group*,
   No. 96 Civ. 466 (AHN), 1997 WL 631032 (D.Conn. Sept. 24, 1997)..............40

*Morton Salt Co. v. G.S. Suppiger Co.*,
   314 U.S. 488 (1942)................................................................................117, 119

*Mr. Travel, Inc. v. V. I. P. Travel Service, Inc.*,
   268 F. Supp. 958 (N.D. Ill. 1966) .....................................................................70

*National Basketball Assoc. v. Motorola, Inc.*,
   105 F.3d 841 (2d Cir. 1997).............................................................................146

*National Starch Mfg. Co. v. Duryea*,
   101 F. 117 (2d Cir. 1900)...................................................................................57

*National Survival Game v. Skirmish, U.S.A., Inc.*,
   603 F. Supp. 339 (S.D.N.Y. 1985) ..................................142, 145, 149, 150, 153

*New York Football Giants, Inc. v. L.A. Chargers Football Club, Inc.*,
    291 F.2d 471 (5th Cir. 1961) ........................................................................117

*New York Mercantile Exchange, Inc. v Intercontinental Exchange Inc.*,
    389 F. Supp. 2d 527 (S.D.N.Y. 2005).................................................92, 94, 97

*New York Real Estate Institute, Inc. v. Edelman*,
    42 A.D.3d 321, 839 N.Y.S.2d 488 (1st Dept. 2007)........................................136

*Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*,
    166 F.3d 65 (2d Cir. 1999)..................................................................93, 94, 97

*Nike v. Kasky*,
    539 U.S. 654 (2003)........................................................................................112

*Nowak v. Ironworkers Local 6 Pension Fund*,
    81 F.3d 1182 (2d Cir. 1996)......................................................................66, 128

*Ocean Transport Line, Inc. v. Am. Philippine Fiber Indus.*,
    743 F.2d 85 (2nd Cir. 1984)..............................................................................74

*Old Colony Trust Co. v. Omaha*,
    230 U.S. 100 (1913)..........................................................................................74

*Paco Sport Ltd. v. Paco Rabanne Parfums*,
    86 F. Supp. 2d 305 (S.D.N.Y. 2000).................................................................40

*Paramount Pictures Corp. v. Video Broad. Systems, Inc.*,
    724 F. Supp. 808 (D. Kan. 1989)......................................................................70

*Park 'N Fly, Inc., v. Dollar Park & Fly, Inc.*,
    469 U.S. 189 (1986)........................................................................................105

*Parkway Baking Co. v. Freihofer Baking Co.*,
    255 F.2d 641 (3d Cir. 1958)............................................................................139

*Paul Frank Indus., Inc. v. Sunich*,
    502 F. Supp. 2d 1094 (C.D.Cal. Aug 21, 2007) .............................................101

*Peaceable Planet, Inc. v Ty, Inc.*,
    362 F.3d 986 (7th Cir. 2004) ............................................................................99

*Peel v. Attorney Registration & Disciplinary Comm'n of Ill.*,
    496 U.S. 91 (1990)..........................................................................................113

*Permatex, Inc. v. Loctite Corp.*, No. 03 Civ. 943 (LAK) (GWG),
    2003 WL 22683341 (S.D.N.Y. Nov. 14, 2003)................................................77

*Poorman v. Julian*,
   22 Ill. App. 2d 208, 160 N.E. 2d 169 (1959) .................................................56, 57, 58, 59

*Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.*,
   324 U.S. 806 (1945).............................................................................................116, 117

*Promotora De Navegacion v. Sea Containers, Ltd.*,
   131 F. Supp. 2d 412 (S.D.N.Y. 2000)....................................................................63, 126

*Proyecfin de Venezuela, S.A. v. Banco Industrial de Venezuela, S.A.*,
   760 F.2d 390 (2d Cir. 1985)............................................................................................63

*Radio Channel Networks, Inc. v. Broadcast.Com, Inc.*, No. Civ. 98 Civ. 4799 (RPP),
   1999 WL 124455 (S.D.N.Y. March 8, 1999) ...............................................................107

*Reiss v. Fin. Performance Corp.*,
   97 N.Y.2d 195, 764 N.E.2d 958, 738 N.Y.S.2d 658 (2001)..............................64, 65, 127

*Rentways, Inc. v. O'Neill Milk & Cream Co.*,
   308 N.Y. 342, 126 N.E.2d 271 (1955)...................................................................78, 131

*Republic Corp. v. Procedyne Corp.*,
   401 F. Supp. 1061 (S.D.N.Y. 1975).......................................................................58, 125

*Republic Molding Corp. v. B. W. Photo Utils.*,
   319 F.2d 347 (9th Cir. 1963) ......................................................................................117

*Resource Developers, Inc. v. Statue of Liberty-Ellis Island Found., Inc.*,
   926 F.2d 134 (2d Cir. 1991).........................................................................147, 148, 149

*Riter v. Keokuk Electro-Metals Co.*,
   248 Iowa 710 (1957)...................................................................................................135

*RJE Corp. v. Northville Indus. Corp.*,
   198 F. Supp. 2d 249 (E.D.N.Y. 2002) ...........................................................................63

*Robin Woods, Inc. v. Robin F. Woods*,
   815 F. Supp. 856, 874 (W.D.Pa. 1992)................................................................ *passim*

*Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.*,
   134 F.3d 749 (6th Cir. 1998) ..............................................................................70, 139

*Rogers v Grimaldi*,
   875 F.2d 994 (2d Cir. 1989)........................................................................................115

*Rosemont Enters., Inc. v Urban Systems, Inc.*,
   72 Misc. 2d 788 (1973)...............................................................................................143

*Rostropovich v. Koch Int'l Corp.*,
    34 U.S.P.Q.2d 1609 (S.D.N.Y. 1995)............................................................138, 141, 152

*R.W. Rogers Co. v. Wm. Rogers Mfg. Co.*,
    70 F. 1017 (2d Cir. 1895)......................................................................................110

*Salzman v. Siegelman*,
    102 A.D. 406, 92 N.Y.S. 844 (2d Dept. 1905) ..............................................134

*Santucci Constr. Co. v. Carlo V. Santucci, Inc.*,
    200 U.S.P.Q. 783 (N.D. Ill. 1978) ......................................................................98

*Sardi's Rest. Corp. v. Sardie*,
    755 F.2d 719 (9th Cir. 1985) ...............................................................89, 90, 115, 116

*Sayers v. Rochester Tel. Corp. Supplemental Mgt. Pension Plan*,
    7 F.3d 1091 (2d Cir. 1993)................................................................................65, 128

*S.C. Johnson & Son, Inc. v. Clorox Co.*,
    241 F.3d 232 (2d Cir. 2001)...................................................................................146

*Sea Spray Holdings, Ltd. v. Pali Fin. Group, Inc.*,
    269 F. Supp. 2d 356 (S.D.N.Y. 2003)....................................................................63

*Securitron Magnalock Corp. v. Schnabolk*,
    65 F.3d 256 (2d Cir. 1995)..............................................................122, 123, 124, 150

*Seiden Assocs., Inc. v. ANC Holdings, Inc.*,
    959 F.2d 425 (2d Cir. 1992).......................................................................................76

*Schmid Labs. v. Youngs Drug Prods.*,
    482 F. Supp. 14 (D.N.J. 1979) .................................................................................109

*Schmidt v. Magnetic Head Corp.*,
    97 A.D.2d 151, 468 N.Y.S.2d 649 (2d Dep't 1983)....................................64, 127

*Shakespeare Co. v. Silstar Corp.*,
    110 F.3d 234 (4th Cir. 1997) ...........................................................................97, 98

*Shamsky v. Garan, Inc.*,
    167 Misc. 2d 149 (Sup. Ct. 1995)...........................................................................143

*SMJ Group, Inc. v. 417 Lafayette Rest. LLC*,
    2006 WL 2516519 (S.D.N.Y. Aug. 30, 2006)................................122, 124, 150

*Societe Des Hotels Meridien v. LaSalle Hotel Operating P'ship, L.P.*,
    380 F.3d 126 (2d Cir. 2004................................................................................146

xvi

*South Rd. Assoc., LLC v. Int'l Bus. Machs. Corp.*,
    4 N.Y.3d 272, 826 N.E.2d 806, 793 N.Y.S.2d 835 (2005)......................................62, 126

*Soweco, Inc. v. Shell Oil Co.*,
    617 F.2d 1178 (5th Cir. 1980) ...................................................................97, 107

*Space Imaging Europe, Ltd. v. Space Imaging L.P.*,
    38 F. Supp. 2d 326 (S.D.N.Y. 1999)............................................................66, 128

*Star Indus., Inc. v. Bacardi & Co. Ltd.*,
    412 F.3d 373 (2d Cir. 2005)...............................................................................40

*Stix Prods. Inc. v. United Merchants & Mfrs., Inc.*,
    295 F. Supp. 479 (S.D.N.Y. 1968) ...............................................................101

*Stutman v. Chem. Bank*,
    95 N.Y.2d 24, 731 N.E.2d 608, 709 N.Y.S.2d 892 (2000)......................................122, 149

*Sunenblick v. Harrell*,
    895 F. Supp. 616 (S.D.N.Y. 1995) ...................................................................40

*Sunmark, Inc. v. Ocean Spray Cranberries, Inc.*,
    64 F.3d 1055 (7th Cir. 1995) ...........................................................................98

*Taylor Wine Co. v Bully Hill Vineyards, Inc.*,
    569 F.2d 731 (2d Cir. 1978)................................................................ *passim*

*TCPIP Holding Co., Inc. v. Haar Commcn's., Inc.*,
    244 F.3d 88 (2d Cir. 2001).................................................................................93

*Thaddeus Davids Co. v. Davids*,
    233 U.S. 461 (1914)...........................................................................................95

*This is Me, Inc. v. Taylor*,
    157 F.3d 139 (2d Cir. 1998)...............................................................................63

*The Lepage Co. v. Russia Cement Co.*,
    51 F. 941 (1st Cir. 1892).................................................................... *passim*

*Time Warner Cable v. City of N.Y.*,
    943 F. Supp. 1357 (S.D.N.Y. 1996)..............................................................74, 75

*Timm Med. Techs., Inc. v. Soma Blue, Inc.*,
    No. 99 Civ. 2011, 2002 WL 64456 (D.Minn. Jan. 15, 2002) .........................80, 81, 83, 84

*Topps Chewing, Inc. v. Fleer Corp*,
    799 F.2d 851 (2d Cir. 1986)...........................................................................117

*U-Neek, Inc. v. Wal-Mart Stores, Inc.*,
    147 F. Supp. 2d 158 (S.D.N.Y. 2001)..........................................................................120

*Upjohn Co. v. Am. Home Prods. Corp.*,
    598 F. Supp. 550 (S.D.N.Y. 1984) ..................................................................89, 116

*United States v. Turkette*,
    452 U.S. 576 (1981)..........................................................................................130

*United States Shoe Corp. v Brown Groups, Inc.*,
    740 F. Supp. 196 (S.D.N.Y.), *aff'd*, 923 F.2d 844 (2d Cir. 1990) ...........................101, 106

*Waterman Co. v. Modern Pen Co.*,
    235 U.S. 88 (1914)............................................................................................88

*Warner v. Publ'n, Inc. v Popular Publ'n, Inc.,*
    87 F.2d 923 (2d Cir. 1937)................................................................................105

*Welch v. Mr. Christmas*,
    57 N.Y.2d 143 (1982) .......................................................................................143

*West Indian Sea Island Cotton Ass'n Inc. v. Threadtex, Inc.*,
    761 F. Supp.1941 (S.D.N.Y. 1991) .................................141, 145, 149, 150, 152

*Whirlpool Properties, Inc. v. LG Electronics U.S.A., Inc.*,
    No. 1:03-Civ.-414, 2006 WL 62846 (W.D. Mich. Jan. 10, 2006)....................................70

*White v. Samsung Elecs. Am. Inc.*,
    971 F.2d 1395 (9th Cir. 1992) ..........................................................................138

*Wildlife Internationale, Inc. v. Clements*,
    591 F. Supp. 1542 (S.D. Ohio 1984) ..................................................................139

*William Warner & Co. v. Eli Lilly & Co.*,
    265 U.S. 526 (1924)..........................................................................................95

*Wojchowski v. Daines*,
    498 F.3d 99 (2d Cir. 2007)................................................................................130

*Wonder Labs, Inc. v. Procter & Gamble Co.*,
    728 F. Supp. 1058 (S.D.N.Y. 1990)...................................................................121

*Worden & Co. v. Cal. Fig Syrup Co.*,
    187 U.S. 516 (1903)..........................................................................................119

*World Auto Parts, Inc. v. Labenski*,
    217 A.D.2d 940, 629 N.Y.S.2d 896 (4th Dept. 1995) ...............................132, 134

*Worsham Sprinkler Co., Inc. v. Wes Worsham Fire Protection, LLC*,
    419 F. Supp. 2d 861 (E.D. Va. 2006) ..............................................................70

*Vanderbilt v. Rolls-Royce Motor Cars, Inc.*,
    No. 88 CIV. 8263, 1990 WL 37825 (S.D.N.Y. March 28, 1990).............................. *passim*

*Van Wagner Adv. Corp. v. S & M Enters.*,
    67 N.Y.2d 186, 492 N.E2d 756, 501 N.Y.S.2d 628 (1986)......................................65, 127

*Vermont Teddy Bear Co. v. 538 Madison Realty Co.*,
    1 N.Y.3d 470, 775 N.Y.S.2d 765, 807 N.E.2d 876 (2004)......................................65, 127

*Vidal Sassoon, Inc. v. Bristol-Meyers Co.*,
    661 F.2d 272 (2d Cir. 1981)..........................................................................138, 141, 151

*Virginia Pharmacy v. Virginia Consumer Counsel*,
    425 U.S. 771 (1976)..........................................................................................112

*Yankee Pub. Inc. v. News Am. Pub. Inc.*,
    809 F. Supp. 267 (S.D.N.Y. 1992) .....................................................................114, 115

*Yashiro Co. v. Falchi*,
    No. 99-7541, 1999 U.S. App. LEXIS 18161 (2d Cir. July 30, 1999)............................56

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*,
    471 U.S. 626 (1985)........................................................................................113, 114

*425 Fifth Ave. Realty Assocs. v. Yeshiva Univ.*,
    228 A.D.2d 178, 643 N.Y.S.2d 542 (1st Dep't 1996) ............................................64, 126

*815 Tonawanda St. Corp. v. Fay's Drug Co., Inc.*,
    842 F.2d 643 (2d Cir. 1988)..............................................................................108

## STATUTES AND OTHER RESOURCES

First Amendment to the United States Constitution ............................................ *passim*

15.U.S.C. § 1051..............................................................................................93

15 U.S.C. § 1052..............................................................................................93

15.U.S.C. § 1066..............................................................................................93

15 U.S.C. § 1114..........................................................................................54, 91, 92, 93

15 U.S.C. § 1115.............................................................................................. *passim*

15 U.S.C. § 1125.............................................................................................. *passim*

15.U.S.C. § 1127 ..................................................................................................93

New York Civil Rights Law, § 50 .........................................................119, 142, 143

New York Civil Rights Law, § 51 .........................................................119, 142, 143

New York G.B.L. § 349 ........................................................122, 123, 149, 151

New York G.B.L. § 350 ..........................................................................123, 124

New York G.B.L. § 360-l ........................................................................119, 120

New York G.B.L. § 368-d .................................................................................120

Practice Commentary to Article 22-A, *Consumer Protection from Deceptive Acts &
      Practices* ..................................................................................................123

3 Callmann, *Unfair Competition, Trademarks & Monopolies*, § 17.06 (4th Ed. 1983,
      1986 Supp.) ..................................................................................................84


3 Callmann, *Unfair Competition, Trademarks & Monopolies*, § 19.60 (4th Ed. 1983,
      1986 Supp.) ..................................................................................55, 79, 80

3 Callmann, *Unfair Competition, Trademarks and Monopolies* § 21.36 (4th ed. 1983)...........108

3 Jerome Gilson, et al., *Trademark Protection and Practice*, § 11.08[3][d][i][D] (2003) ....94, 98

J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 3:1 (4th ed.
      2004) ..................................................................................................70

J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 3:3 (4th ed.
      2004) ..................................................................................102, 104

J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 27:35 (4th ed.
      2004) ..................................................................................................146

12 *Moore's Federal Practice*, § 57.02[3] at 57-10 (Matthew Bender 3d Ed. 1997) ..................54

*H.R. 102 Hearings* 72 (Wallace Martin)..................................................................105

*Nims on Unfair Competition and Trademarks*, 58, § 19 (3rd Ed.) ...............................55

*Restatement of the Law, Second, Contracts*, § 202 ....................................................63

*Restatement of the Law, Third, Unfair Competition*, § 28...........................................................94

*Restatement of the Law, Third, Unfair Competition*, § 34.................................................. *passim*

Defendants and Counterclaim Plaintiffs Joseph Abboud ("Abboud"), Houndstooth Corp. ("Houndstooth") and Herringbone Creative Services, Inc. ("Herringbone") (sometimes collectively referred to as "Abboud") submit the following Supplemental Proposed Findings of Fact ("Def. Proposed Findings") and Conclusions of Law ("Def. Proposed Conclusions"):

## I.    ABBOUD'S PROPOSED FINDINGS OF FACT

### A.    Abboud's Reputation as a World Class Fashion Designer, Celebrity and Public Personality

1.    Abboud is a fashion designer, who creates concepts, ideas and products to launch into the fashion industry.  Abboud Tr. Testimony at p. 312:12-16.

2.    Abboud has dedicated his entire professional life to working in the apparel industry and to developing his talents, skills and artistic abilities as a designer of menswear and other consumer products.  Over that period, Abboud has developed a widespread and impeccable reputation as a world class designer of apparel and accessories.  Abboud Tr. Testimony at 312:12 - 361:14; Baker Dep. Testimony at p. 138:4-15; Frankfort Tr. Testimony at pp. 1092:11 - 1097:12; Kolb Tr. Testimony at pp. 968:16 - 975:25; Mitchell Dep.. Testimony at pp. 58:17 - 59:15; 64:20 - 65:5; 82:9-15.

3.    Abboud has a reputation as a designer, personality and celebrity separate and apart from the JOSEPH ABBOUD brand.  Abboud Tr. Testimony at pp. 363:15 - 364:2; Frankfort Tr. Testimony at p. 1097:5-12.

4.    Abboud's career in the fashion industry began over 40 years ago when he joined the prestigious Boston, Massachusetts, menswear retailer, Louis Boston.  Over the course of the next twelve years, Abboud served as buyer, designer, merchandiser, and eventually coordinator of promotion and advertising at Louis Boston.  Abboud Tr. Testimony at pp 315:1 - 317:14.

5.    Abboud left Louis Boston in 1980, wanting to cross over from the retail side to

1

the wholesale side of the fashion business, where he would be able to create product.  Abboud Tr. Testimony at pp 317:15 - 318:1.

6.      After leaving Louis Boston in 1980, Abboud joined a company called Southwick, a men's manufacturing company that produced men's tailored clothing, including suits and jackets and dress trousers and tuxedos.  Abboud was responsible for creating new tailored clothing for Southwick in order to rejuvenate the company's tailored clothing line, and to establish a newer, younger customer.  Abboud Tr. Testimony at pp 318:2 - 319:3.

7.      Abboud left Southwick in 1981 and began working for Polo Ralph Lauren as a menswear designer, and became the Associate Director of Menswear Design for Polo Ralph Lauren.  During that time, Abboud worked with Ralph Lauren himself to develop Polo's menswear collections.  Abboud Tr. Testimony at 319:9-15; 319:23 - 322:24.

8.      In 1985 Abboud was approached by Barry Bricken ("Bricken"), who was in the menswear business making trousers.  Bricken asked that Abboud join him and create an entire menswear collection from scratch.  Abboud accepted Bricken's offer, thinking that it was a great opportunity to continue to evolve his design process and his design capabilities and experiences. Abboud Tr. Testimony at pp. 322:25 - 323:15.

9.      While with Bricken, Abboud developed his "DNA" as a designer, namely, a place between American traditional preppie clothes and fast European clothes.  For example, Abboud developed unusual color combinations and tried to be a little more interesting, unusual and unexpected in the color pallets he chose — for instance, as opposed to navy and red, he would do navy and brown; instead of black and white, he would do black and beige.  Abboud Tr. Testimony at pp. 323:16 - 325:20.

10.      In 1987 Abboud launched his own menswear label consisting of his own, unique

designs; and, he enjoyed success with menswear designs featuring rich colors and unusually crafted textures.  Abboud Tr. Testimony at pp. 327:3 - 329:22; 330:21 - 331:6.

11.    In 1988 Abboud won the Cutty Sark Award for Most Promising Menswear Designer, a very prestigious award that was awarded to other designers such as Ralph Lauren, Calvin Klein and Perry Ellis.  Abboud Tr. Testimony at p. 338:3-15.

12.    In 1989 and again in 1990 the Council of Fashion Designers of America ("CFDA") honored Abboud with the Menswear Designer of the Year award.  The CFDA is the most prestigious design organization in the United States, representing such designers as Ralph Lauren, Calvin Klein, Donna Karan, Michael Kors, Vera Wang, Oscar de la Renta and Marc Jacobs.  Abboud became the first designer to win the coveted award two years in a row.  For designers, CFDA awards are the Academy Awards of the fashion industry — and the Menswear Designer of the Year Award is the most important award presented in the fashion industry. Abboud Tr. Testimony at pp. 338:16 - 339:15; Kolb Tr. Testimony at pp. 968:16 - 975:25.

13.    Moreover, in the late 1990's Abboud received the Woolmark Award, created by the Wool Bureau and given to individuals who have contributed to the design of sweaters and knitwear.  Abboud Tr. Testimony at p. 349:14-22.

14.    In 1994 Abboud received a Special Achievement Award from the Neckwear Association of America — an honor that had been presented only twice before to Bill Blass and Ralph Lauren, when the association deemed that an individual's work had changed the face of the industry.  Abboud Tr. Testimony at p. 347:5-25.

15.    Additionally, in 1995 Abboud was honored by the United States Department of Commerce at the White House "for creative contributions promoting the American fashion and retail industry"; and, "for actively promoting American design to the world, and for bringing the

hallmark for excellence to American fashion." Abboud Tr. Testimony at pp. 348:19 - 349:13.

16.    Also in the mid-1990's Abboud and Pierre Cardin were invited to Osaka Japan by the Japanese government to show their collections as part of a cultural experience tour. Abboud Tr. Testimony at p. 348:4-18.

17.    Moreover, in 1997 Abboud was presented with the prestigious Michael Award, named in honor of actor Michael Landon, as Menswear Designer of the Year. Abboud Tr. Testimony at pp. 350:24 - 351:7.

18.    In 2000 Abboud was honored by the American Jewish Committee for his philanthropic work and his contribution to the menswear industry and fashion design, with a special proclamation from Senator John F. Kerry of Massachusetts. Abboud Tr. Testimony at p. 351:8-17.

19.    In 2006 Abboud was honored by the Otis College of Design in Los Angeles, one of the most prestigious designs schools in America, with the Creative Vision Award for his outstanding contribution to the fashion industry. Abboud Tr. Testimony at pp. 351:25 - 352:14.

20.    Further, over the years Abboud has personally served as the official designer for NBC's broadcasters at the Olympics, for the CBS broadcasters at the NCAA College Basketball Championship, popularly known as "March Madness," for sports and entertainment celebrities such as Bryant Gumbel, Tim McCarver, Bob Costas, Jim Nance, Pat O'Brien and the actor Kevin Kline. Abboud received personal recognition in the media for this work. Abboud Tr. Testimony at pp. 352:15 - 356:4.

21.    In addition, Abboud designed automobile interiors and trim for General Motors and Buick. Abboud Tr. Testimony at pp. 370:23 - 371:23.

22.    In the late 1980's, Abboud was approached by Chanel, the world famous luxury

goods company, to design Chanel's men's collection, which included neckwear, scarves and formal wear. Abboud designed for Chanel for four seasons and the designs he created were well received. Abboud Tr. Testimony at pp. 329:23 - 330:20.

23.    Abboud has also designed products and consulted for the widely popular luxury goods company, Coach. Abboud Tr. Testimony at pp. 371:24 - 372:19; Frankfort Tr. Testimony at pp. 1092:11 - 1097:12.

24.    Apart from his work as a fashion designer, Abboud has frequently lectured on fashion and design-related themes, including the business end of the apparel industry. Abboud Tr. Testimony at pp. pp. 356:5 - 363:1.

25.    Abboud has held a position with the University of Massachusetts - Boston as a Distinguished Visiting Professor of Marketing; has taught the Management of Creativity at Sacred Heart University at the graduate level; and, has taught the Marketing of Creativity at Fordham University. Abboud Tr. Testimony at p. 361:20 - 362:9; Mitchell Dep. Testimony at pp. 74:4 - 75:12.

26.    Abboud is currently on the Advisory Board for the Laboratory Institute of Merchandising College and serves as the Chairman of Educational Initiatives of the CFDA, which oversees all fashion schools and institutions across the United States including Parsons and Fashion Institute of Technology. Abboud Tr. Testimony at pp. 351:25 - 352:14; Kolb Tr. Testimony at pp. 968:16 - 975:25.

27.    Abboud's innovations in the design of neckwear were recognized in a book entitled the *Book of Ties*, which chronicled a history of neckwear design and the designers who made contributions to the neckwear industry. Abboud Tr. Testimony at pp. 349:23 - 350:23.

28.    In 2004 Abboud published his memoirs, entitled *Threads: My Life Behind the*

*Seams in the High-Stakes World of Fashion*, detailing his lifetime commitment to the world of fashion. Recently, *Threads: My Life Behind the Seams in the High-Stakes World of Fashion* has been published in Portuguese as well as Chinese. Abboud Tr. Testimony at pp. 364:11 - 366:3; Mitchell Dep. Testimony at pp. 43:8 - 47:17; Def Exs. 93-94.

29.    In addition to developing his reputation as a world class designer, Abboud has also worked hard over many years to build up his personal image as a celebrity and public personality, completely apart from his reputation as a designer or fashion industry expert. Abboud Tr. Testimony at pp. 356:5 - 361:14; Mitchell Dep. Testimony at pp. 43:8 - 47:17; Def. Ex. 93.

30.    In furtherance of these efforts, over the years, Abboud has appeared on The Today Show, Good Morning America, Fox News, CNN, CNBC, MSNBC, CBS, The Metro Channel, The Mike Barnicle Show, The Martha Stewart Show and The O'Reilly Factor, commenting not only on issues relating to fashion and design, but also on topics of the day. Abboud Tr. Testimony at p. 356:5-22.

31.    Abboud has also been a frequent guest on Don Imus's radio show. Abboud Tr. Testimony at pp. 356:23 - 357:16.

32.    Over the years, Abboud has hosted radio shows, including a style show that aired on Saturdays in Boston on 96.9FM. Abboud has also hosted charity events over the years. Abboud Tr. Testimony at p. 357:17-22; 358:10 - 361:14; Mitchell Dep. Testimony at pp. 43:8 - 47:17; 61:14 - 63:8.

33.    Abboud has become a well known celebrity at Boston's Fenway Park and in 2002 he threw out the opening pitch. Abboud Tr. Testimony at pp. 357:23 - 358:9; Def. Ex. 93.

34.    Abboud is also known for being involved in a number of charitable organizations.

Abboud Tr. Testimony at pp. 358:10 - 361:14; Mitchell Dep. Testimony at pp. 43:8 - 47:17.

35.    Abboud sits on the boards of the C.J. Foundation for SIDS (Sudden Infant Death Syndrome), the Sean McDonough Foundation (which raises money for children in need as well as those afflicted with serious illnesses in and around the Boston area), the Nomar 5 Foundation (which helps raise money for the under-privileged children of Boston), and CFDA's "Fashion Targets Breast Cancer."  Abboud Tr. Testimony at pp. 358:10 - 361:14.

36.    Abboud is also the Co-Chairman of Swim Across the Sound, an organization that raises money for cancer; and, has created the Mohegan Sun/Joseph Abboud Celebrity Tennis Tournament, which has raised nearly a million dollars to benefit the Imus Ranch for children with cancer, the C.J. Foundation for SIDS, and the Northern Westchester Hospital's neonatal unit.  Abboud Tr. Testimony at pp. 358:10 - 361:14.

**B.    Abboud's Relationship With JA Apparel and the Negotiation of the Purchase and Sale Agreement and the Personal Services Agreement**

37.    In 1987, while working for the Milton Freeberg Company, Abboud launched his first menswear line under the "Joseph Abboud" label and registered his name, "Joseph Abboud", as a trademark with the United States Patent and Trademark Office.  Abboud Tr. Testimony at 327:8 - 329:22.

38.    Thereafter, in March 1988 Abboud, through his new company, defendant Houndstooth, a New York corporation, formed a joint venture with GFT International B.V., a Netherlands corporation ("GFT"), which owned and operated a tailored clothing manufacturing facility in New Bedford, Massachusetts.  Abboud Tr. Testimony at pp. 331:7 - 333:3; Dinsmoor Tr. Testimony at pp. 745:17 - 746:6.

39.    The joint venture was named "JA Apparel Corp." ("JA Apparel"), not "the Joseph Abboud Company", as Abboud never authorized the joint venture to use his name as a trade

7

name.  Abboud Tr. Testimony at pp. 332:2 - 333:4; Dinsmoor Tr. Testimony at p. 747:5-17.

40.     Pursuant to a March 1, 1988, License Agreement, Abboud duly licensed JA Apparel to use his JOSEPH ABBOUD trademarks to manufacture, market and sell menswear and womenswear products that Abboud personally designed and approved.  Def. Ex. 165; Abboud Tr. Testimony at p. 333:5-12; Dinsmoor Tr. Testimony at pp. 746:7 - 747:4.

41.     Thus, throughout the joint venture, JA Apparel was only a licensee of the JOSEPH ABBOUD trademarks, duly authorized to *manufacture* the apparel products that Abboud personally *designed* and *approved* for the joint venture.  At no time during the joint venture did JA Apparel have any rights of ownership in the JOSEPH ABBOUD trademarks or in the good will associated with the trademarks.  Def. Ex. 165; Abboud Tr. Testimony at pp. 335:1 - 337:17; Dinsmoor Tr. Testimony at pp. 746:7 - 747:4.

42.     In January 1996 GFT, which had recently been acquired by new Italian owners, sought to obtain sole control over the joint venture; so GFT bought out Abboud's interest in JA Apparel and canceled the 1988 License Agreement in exchange for Abboud issuing two new licenses to use the JOSEPH ABBOUD trademark in the manufacture, marketing and sale of men's tailored clothing and men's sportswear that Abboud  approved.  Def. Exs. 183 - 184; Dinsmoor Tr. Testimony at pp. 751:11 - 753:14.

43.     Thus, throughout the new license period, JA Apparel remained only a licensee of the JOSPEH ABBOUD trademark, duly authorized to *manufacture* the apparel products that Abboud personally *approved*.  At no time during the license period did JA Apparel have any rights of ownership in the JOSEPH ABBOUD trademarks or in the good will associated with the JOSEPH ABBOUD trademarks.  Def. Exs. 183 - 184; Dinsmoor Tr. Testimony at pp. 751:11 - 753:14.

44.    Thereupon, Abboud formed Joseph Abboud Worldwide Inc., to operate his design studio and to manage the licensing of the JOSEPH ABBOUD trademarks to JA Apparel and other manufacturers for various apparel products, as well as accessories, toiletries, and household goods.  Abboud still owns Joseph Abboud Worldwide, Inc., a company which is still in good standing with the State of New York.  Def. Ex. 174; Abboud Tr. Testimony at 314:15-21; Dinsmoor Tr. Testimony at pp. 753:15 - 754:4.

45.    Thus, at all times relevant from 1988 to 2000, Abboud, through his license agreements and their approval processes, controlled the design of all licensed products bearing the JOSEPH ABBOUD trademarks and thereby earned and retained all the good will associated with his *design* of the licensed products.  Therefore, at no time prior to Abboud's sale of the JOSEPH ABBOUD trademarks did JA Apparel own, obtain or possess any goodwill associated with Abboud's design work or the JOSEPH ABBOUD trademarks.  Def. Exs. 165 & 183 - 184; Dinsmoor Tr. Testimony at pp. 751:11 - 753:14; 758:22 - 759:20.

46.    However, several years later in 1999 GFT made a strategic decision to exit the apparel industry by selling off GFT's fashion subsidiaries, including JA Apparel.  To facilitate the sale of JA Apparel's tailored clothing manufacturing facility in New Bedford, Massachusetts, the Italian owners sought to have JA Apparel purchase the JOSEPH ABBOUD trademarks and all other manufacturing licenses to which the trademarks had been attached.  The Italians were not interested in and did not buy Abboud's design business, Joseph Abboud Worldwide Inc, or even the trade name "Joseph Abboud Worldwide, Inc."  Abboud Tr. Testimony at pp. 375:19 - 376:6; 397:8 - 398:17; Dinsmoor Tr. Testimony at pp. 757:11 - 758:21; 759:21 - 763:5; 821:16 - 825:14; Def. Exs. 8 & 166 - 167.

47.    Thus, in the Fall of 1999, Roberto Jorio Fili, the Chairman and Chief Executive

Officer of JA Apparel ("Fili"), informed Abboud that he was interested in acquiring Abboud's trademarks and license agreements. Fili was the principal business negotiator in connection with the parties negotiations. Abboud Tr. Testimony at pp. 375:19 - 376:6; 397:8 - 398:17; Dinsmoor Tr. Testimony at p. 938:5-7.

48.     During the course of Abboud's negotiations with Fili, the only thing that Abboud and Fili ever discussed was the sale of the JOSEPH ABBOUD trademarks and Abboud's license agreements. There were never any discussion in which Fili or anyone else at JA Apparel ever said or even suggested that JA Apparel was interested in acquiring or intended to acquire the exclusive right to use and exploit the name "Joseph Abboud", other than as a trademark, for any and all commercial purposes, even to the exclusion of Abboud, forever. Abboud Tr. Testimony at pp. 384:25 - 385:7; 502:4-13; 645:3 - 647:3.

49.     On November 11, 1999, Abboud and Fili signed a letter clarifying "which issues [were] still in negotiation [concerning the purchase of the JOSEPH ABBOUD trademarks] and which issues need[ed] further discussion and clarification." Def. Ex 161 at ¶8; Abboud Tr. Testimony at pp. 382:18 - 383:11; Dinsmoor Tr. Testimony at pp. 763:25 - 764:22.

50.     This November 11, 1999, letter set forth "Points of Agreement" which state that JA Apparel would pay Abboud "$50 - $55 million at signing for all *Joseph Abboud trademarks*." (emphasis added); Def. Ex. 161 at ¶(I)(A); Abboud Tr. Testimony at pp. 382:18 - 383:11.

51.     Abboud also discussed with Fili, JA Apparel's interest in acquiring Abboud's license agreements. At the time the parties were negotiating the terms of the transaction, Abboud's license agreements were generating approximately $7 million a year of royalty income to Abboud. Abboud Tr. Testimony at p. 385:8-20.

52.     On December 3, 1999, JA Apparel's Italian lawyer sent Abboud a letter in which

he indicated that the target of the deal was "all *Joseph Abboud Trademarks* personally owned by Mr. Abboud." (emphasis added). The Italian lawyer also acknowledged Abboud's "well-known reputation and prestige" in the apparel industry independently of JA Apparel. Def. Ex. 2; Abboud Tr. Testimony at pp. 385:21 - 388:21.

53.    On February 2, 2000, Abboud had a meeting in Milan, Italy, with representatives of JA Apparel, during which the parties discussed JA Apparel's interest in acquiring the JOSEPH ABBOUD trademarks and Abboud's license agreements. In a memo memorializing the parties' discussions at the meeting, JA Apparel representatives reiterated that the object of the deal was the "*acquisition of [the Joseph Abboud] trademarks,*" stressing further that they were interested in buying "*only the trademarks and not the two companies currently owned*" by Abboud. There were no discussions at this meeting about JA Apparel's interest in acquiring or intended to acquire the exclusive right to use and exploit the name "Joseph Abboud", other than as a trademark, for any and all commercial purposes, even to the exclusion of Abboud, forever. Def. Exs. 162 and 3 (emphasis added); Abboud Tr. Testimony at pp. 388:22 - 390:23; 392:20 - 395:5.

54.    Following the February 2, 2000 meeting in Milan, Abboud instructed his attorney, Theodore E. Dinsmoor, Esq. ("Dinsmoor") to work with JA Apparel's lawyer, Jeffrey E. LaGueux, Esq., a partner at the law firm of Patterson, Belknap, Webb & Tyler LLP ("LaGueux") to document the trademark transaction that had been agreed upon by the parties in Milan.. Abboud Tr. Testimony at p. 395:6-15; Dinsmoor Tr. Testimony at pp. 767:19 - 768:7; 771:5 - 772:3.

55.    On February 10, 2000, LaGueux, sent a draft letter of intent that he had prepared regarding the proposed acquisition by JA Apparel of the JOSEPH ABBOUD trademarks to

11

Dinsmoor.  Def. Ex. 5; Dinsmoor Tr. Testimony at p. 770:3-18.

56.     In the February 10, 2000, draft letter of intent, LaGueux indicated that the assets that JA Apparel would purchase consisted of, *inter alia*, "all of Houndstooth's and [Abboud's] right, title and interest in and to all trade names, trademarks and service marks existing as of the Closing . . . (collectively, the "Trademarks"), together with all registrations and applications therefor, the goodwill related thereto and any and all claims for past infringement."  There was no mention in the February 10, 2000, draft letter of intent to any "names", nor was there any mention of any intent to acquire the exclusive right to use and exploit the name "Joseph Abboud", other than as a trademark, for any and all commercial purposes, even to the exclusion of Abboud, forever.  Def. Ex. 5.

57.     In addition, in the February 10 letter of intent, JA Apparel proposed that Abboud enter into an indefinite restrictive covenant not to compete against JA Apparel.  Specifically, JA Apparel proposed the following language:

> [t]he side letter will also contain a non-competition covenant by [Abboud] which will extend beyond the five-year period of [Abboud's] personal services, pursuant to which he will be prohibited from being associated in any capacity with any enterprise which is engaged in or proposes to engage in the business of designing, licensing, manufacturing, marketing, distributing or otherwise dealing with any products or services which are competitive with the business of [JA] Apparel as then conducted or as may be conducted in the future.

Def. Ex. 5; Dinsmoor Tr. Testimony at pp. 772:4 - 774:22.

58.     On February 15, 2000, Dinsmoor responded to LaGueux's February 10 draft letter of intent by indicating, *inter alia*, that Abboud would not agree to an indefinite restrictive covenant and that by virtue of the transaction, JA Apparel should assume responsibility for Abboud's business, Joseph Abboud Worldwide, Inc.  Def. Ex. 6 at ¶¶2,5; Dinsmoor Tr. Testimony at pp. 774:23 - 778:8.

59.     Around February 17, 2000, LaGueux sent Dinsmoor a revised letter of intent.

12

Dinsmoor Tr. Testimony at pp. 778:9 - 779:17.

60.     On February 23, 2000, Dinsmoor sent LaGueux a letter responding to his revised letter of intent.  Pl. Ex. 347; Dinsmoor Tr. Testimony at pp. 779:18 - 787:5.

61.     Thereafter, on February 25, 2000, Fili sent a letter to Abboud in which he made clear that JA Apparel was not interested in acquiring Abboud's design business — Joseph Abboud Worldwide, Inc. — rather, as JA Apparel was, in fact, only interested in purchasing the JOSEPH ABBOUD trademarks.  Specifically, Fili stated that:

> Right from the initial steps of our negotiation I have always declared that our objective was and still is the acquisition of the trademark.

> This concept, then, has been also repeatedly reaffirmed throughout our correspondence and it has been finally clarified during our last meeting in Milano on the 2nd of February.

> It is very discouraging to read that your attorney is re-discussing this point over again, and so therefore I would like, one more time, to amicably go through its main topics:

>> 2.1 Object of the acquisition are the trademarks;

>> 2.2 We are not interested in buying companies;

>> 2.3 We are not interested in the 57th Street premises.

Def. Ex 8 at ¶2; Abboud Tr. Testimony at 395:16 - 396:18; 398:18 - 400:1.

62.     Further, in his February 25 letter to Abboud, Fili, writing with respect to the scope of the proposed restrictive covenant, recognized a clear distinction between Joseph Abboud the "designer" and the JOSEPH ABBOUD trademarks his company was acquiring, when he indicated:

> [W]here, from the very beginning of our discussions it had been made clear that by acquiring for a huge amount the trademarks owned by yourself and Houndstooth[], GFT intends to protect itself for the future with a clause safeguarding its own investment (which incidentally will start being partially profitable on the 5th year) and not allowing the "designer" Joseph Abboud to engage in any activity which could in anyway damage the growth of the business,

the integrity of the investment and the consolidation and return of the same. Especially after only 5 years.

Def. Ex 8 at ¶1; Abboud Tr. Testimony at pp. 400:2 - 401:7.

63.     Fili did not say or even suggest that JA Apparel was interested in acquiring or intending to acquire any "names", nor did he mention any intent to acquire the exclusive right to use and exploit the name "Joseph Abboud", other than as a trademark, for any and all commercial purposes, even to the exclusion of Abboud.  Def. Ex 8.

64.     Responding to Fili's February 25 letter, Abboud, on March 1, 2000, sent Fili a letter indicating, *inter alia*, that:

> *[i]f, for whatever reasons, the corporation does not want to continue with my services after five years, I want the option to practice my skills should I choose to continue working in the future.  It goes without saying that at <u>no</u> <u>time</u> will I have any rights to any of the Joseph Abboud trademarks.  Here is where you must separate Joseph Abboud personally from the Joseph Abboud trademarks.*
>
> \* \* \* \*
>
> I will commit to the five years, but I do not believe that any restriction beyond that is reasonable.  That does not preclude us from revisiting this issue during the five year term and extending our relationship with mutually agreeable terms.  I believe this is the best formula to keep both parties focused on each other for a longer period of time and ensure our mutual commitment to this business.

Def. Ex 9 at ¶1 (emphasis added); Abboud Tr. Testimony at pp. 401:21 - 402:7; 403:21 - 404:18.[1]

65.     On March 9, 2000, LaGueux sent Dinsmoor a revision to the draft letter intent to reflect the points discussed in the parties recent correspondence.  Specifically, LaGueux modified the restrictive covenant from an indefinite period to a five year period beyond the five

---

[1] Also in this letter, Abboud indicated that the transaction was "emotional" because he was "relinquishing [his] name, albeit for a large sum"  In making this statement he was referring to relinquishing his name as a trademark. Def Ex. 9; Abboud Tr. Testimony at pp. 405:16 - 406:18.  In point of fact, at no point during Abboud's negotiations with Fili did the parties ever have a discussion about Abboud relinquishing his name other than as a trademark. Abboud Tr. Testimony at p. 406:19-21.

year personal services period.  In addition, language was added to make clear that while JA Apparel would not acquire Abboud's design business — Joseph Abboud Worldwide, Inc., — it would agree to reimburse Joseph Abboud Worldwide, Inc. for certain limited operating expenses.  There was no mention in the March 9, 2000, draft letter of intent to acquire any "names", nor was there any mention that JA Apparel was interested in acquiring or intended to acquire the exclusive right to use and exploit the name "Joseph Abboud", other than as a trademark, for any and all commercial purposes, even to the exclusion of Abboud, forever.  Def. Ex. 10 at ¶3; Dinsmoor Tr. Testimony at  pp. 795:10 - 801:18.

66.     Following receipt of the March 9, 2000, revisions to the draft letter of intent, Dinsmoor informed LaGueux that Abboud would not agree to a five year restricted period in addition to the five year personal services period.  However, Dinsmoor indicated that Abboud would agree to a two year restricted period beyond the five year personal services period. Dinsmoor Tr. Testimony at pp. 795:10 - 801:18.

67.     Thereafter, on March 17, 2000, Abboud, Houdstooth and JA Apparel entered into a letter of intent concerning, *inter alia*, the sale of the JOSEPH ABBOUD trademarks, the five year personal services period, the two year restricted period and JA Apparel's reimbursement to Joseph Abboud Worldwide, Inc. for certain operating entities.  There was no mention in the March 17, 2000, letter of intent to acquire any "names", nor was there any mention that JA Apparel was interested in acquiring or intended to acquire the exclusive right to use and exploit the name "Joseph Abboud", other than as a trademark, for any and all commercial purposes, even to th exclusion of Abboud, forever.  Def. Exs. 11 and 164 at ¶¶1,3; Abboud Tr. Testimony at p. 407:2-20; Dinsmoor Tr. Testimony at pp. 802:7 - 803:14.

68.     On May 3, 2000, LaGueux sent a draft of the Purchase and Sale Agreement and

the Personal Services Agreement to Dinsmoor.  The language in the Purchase and Sale

Agreement pertinent to JA Apparel's acquisition of the JOSEPH ABBOUD trademarks and the

language in the Personal Services Agreement pertinent to Abboud's restricted period, appeared

in summary form as follows:

Purchase and Sale Agreement

Article 1.1(a)(A) - Provides that on the closing date JA Apparel shall acquire from Abboud "[t]he names, trademarks, trade names, service marks, logos, insignias and designations appearing on Schedule 1.1(a)(A), and all trademark registrations and applications therefor, and the goodwill related thereto (collectively, the "Trademarks), together with all causes of action (and the proceeds thereof) in favor of [Abboud] heretofore accrued or hereafter accruing with respect to any of the Trademarks, and all other Intellectual Property (as hereinafter defined)."

Article 1.1(a)(B) - Provides that on the closing date JA Apparel shall acquire from Abboud "[a]ll licenses to the Trademarks granted by [Abboud] . . . (collectively, the "License Agreements")."

Article 1.1(a)(C) - Provides that on the closing date JA Apparel shall acquire from Abboud "[a]ll rights to use and apply for the registration of new trade names, trademarks, service marks, logos, insignias and designations containing the words 'Joseph Abboud', 'designed by Joseph Abboud,' 'by Joseph Abboud,' 'JOE,' or "JA," or anything similar thereto or derivative thereof, either alone or in conjunction with other words or symbols (collectively, the "New Trademarks"), for any and all products or services."

Article 1.1(a)(D) - Provides that on the closing date JA Apparel shall acquire from Abboud "[a]ll books, financial records, invoices, and other documents, records and data files relating primarily to the Trademarks or the License Agreements."

Article 1.1(a)(D) - Provides that on the closing date JA Apparel shall acquire from Abboud "[t]he goodwill of or pertaining to the Trademarks."

Personal Services Agreement

For the two-year period immediately following the expiration of the Personal Services Period (the "Restricted Period") [*i.e.*, from July 13,2005 - July 13, 2007], Abboud agrees that he will not, directly or indirectly through any partnership, corporation, limited liability company, trust or other entity, be associated as an owner, director, officer, employee, consultant or other participant with, any person, group, business enterprise or other entity which is engaged in or proposes to engage in the business of designing, licensing, manufacturing, marketing or distributing any products or services which are or would be competitive with the

16

business of [JA Apparel] as then conducted or as such business may be reasonably expected to be conducted in the future anywhere in the world.

Pl. Ex. 318; Dinsmoor Tr. Testimony at pp. 803:21 - 809:5.

69.     By letter dated May 19, 2000, Dinsmoor commented on LaGueux's draft of the Agreements and, with respect to the Personal Services Agreement, noted that the agreement should be modified to make clear that Abboud could, *inter alia*, "engage in apparel industry activities and functions and appear and perform as a celebrity in his own right, even though such activities are not tied into [JA Apparel's] operations." Def Ex. 163; Dinsmoor Tr. Testimony at pp. 818:21 - 821:1.

70.     On May 23, 2000, Dinsmoor sent a letter to LaGueux enclosing a copy of Schedule 1.1(a)(A), a Trademark Report which was to be Schedule 1.1(a)(A) to the Purchase and Sale Agreement. In this letter Dinsmoor writes that "Cohan Pontani registered most of these trademarks with JA Apparel before it bought out Joe's interests. Thus, I have little or no knowledge about most trademark registrations and I cannot make any representations whatsoever as to the completeness or accuracy of the schedule." Def. Ex. 185; Pl. 1 at Schedule 1.1(a)(A); Dinsmoor Tr. Testimony at pp. 809:6 - 816:9.

71.     After Dinsmoor sent Schedule 1.1(a)(A) to LaGueux on May 23, 2000, LaGueux never asked him to provide any additional information concerning Schedule 1.1(a)(A), to supplement Schedule 1.1(a)(A) in any way, to modify Schedule 1.1(a)(A), or to take any further action regarding Schedule 1.1(a)(A), which would have added the name "Joseph Abboud", other than as a trademark, to the Schedule, as well as the trade name "Joseph Abboud Worldwide". In addition, LaGueux simply ignored Dinsmoor's statement in the May 23, 2000 letter informing him to conduct whatever due diligence he deemed necessary for purposes of verifying the accuracy and completeness of Schedule 1.1(a)(A). LaGueux did contact Dinsmoor to inform

him that the Schedule would be incorporated into the Purchase and Sale Agreement. Def. Ex. 185; Pl. 1 at Schedule 1.1(a)(A); Dinsmoor Tr. Testimony at pp. 816:10 - 817:9; LaGueux Tr. Testimony at pp. 1154:16 - 1155:16; 159:2-10.

72.    On June 7, 2000, commenting on LaGueux's June 5, 2000 draft of the Purchase and Sale Agreement, and specifically Article 3.6(a) in which the term "Intellectual Property" is defined in the Purchase and Sale Agreement, Dinsmoor informed LaGueux that Schedule 1.1(a)(A), *i.e.*, the "Trademark Report By Mark", provided a list of the intellectual property, namely trademark and service mark registrations and applications,, that was to be conveyed at the Closing. Def. Exs. 166 - 167; Dinsmoor Tr. Testimony at pp. 825:15 - 828:25. There is no mention on the Schedule or in Article 3.6 of any obligation to convey any exclusive right to use and exploit the name "Joseph Abboud", other than as a trademark, for any and all commercial purposes, even to the exclusion of Abboud, forever.

73.    Prior to the execution of the Purchase and Sale Agreement and the Personal Services Agreement, the Personal Services Agreement was amended to make clear that Abboud was permitted to make media and celebrity appearances in his individual capacity, as an authority in the fashion design business. Pl. Ex. 2; Abboud Tr. Testimony at 413:24 - 417:15; Dinsmoor Tr. Testimony at pp. 818:21 - 821:1; 839:24 - 841:20.

74.    The Purchase and Sale Agreement contemplated that certain assignments setting forth the assets that Abboud was conveying to JA Apparel would be executed on the Closing Date, July 13, 2000. LaGueux prepared the assignment documents. Dinsmoor Tr. Testimony at pp. 830:17 - 839:23; LaGueux Tr. Testimony at p.1173:2-22.

75.    JA Apparel never prepared an assignment concerning the exclusive right to use and exploit the name "Joseph Abboud", other than as a trademark, for any and all commercial

purposes, even to the exclusion of Abboud, forever; and, it never requested that Abboud deliver

any such assignment at the Closing.  LaGueux Tr. Testimony ay pp. 1179:24 - 1180:6; Dinsmoor

Tr. Testimony at pp. 830:17 - 839:23; Def. Exs. 180 - 182.

76.    Pursuant to the terms of the Purchase and Sale Agreement, on the Closing Date,

July 13, 2000, Abboud only delivered to JA Apparel three (3) Assignments that assigned the

Trademarks, the New Trademarks and the License Agreements.  Abboud did not deliver and thus

JA Apparel did not acquire, any assignment of the exclusive right to use and exploit the name

"Joseph Abboud", other than as a trademark, for any and all commercial purposes, even to the

exclusion of Abboud, forever.  Abboud Tr. Testimony at pp. 417:16 -421:7 Dinsmoor Tr.

Testimony at pp. 830:17 - 839:23; Def. Exs. 180 - 182.

77.    Pursuant to the terms of the Purchase and Sale Agreement, on the Closing Date,

July 13, 2000, Abboud, only delivered to JA Apparel three (3) Assignments that assigned the

Trademarks, the New Trademarks and the License Agreements.  Abboud did not deliver, and

thus JA Apparel did not acquire, any assignment of Abboud's name, likeness, persona, or any of

his other personal or publicity rights.  Abboud Tr. Testimony at pp. 417:16 -421:7; Dinsmoor Tr.

Testimony at pp. 830:17 - 839:23; Def. Exs. 180 - 182.

78.    Pursuant to the terms of the Purchase and Sale Agreement, on the Closing Date,

July 13, 2000, Abboud only delivered three (3) Assignments that assigned the Trademarks, the

New Trademarks and the License Agreements.  Abboud did not deliver, and thus JA Apparel did

not acquire, any assignment of Abboud's design business or his business entity, Joseph Abboud

Worldwide, Inc., or the rights to use his name as a trade name in any business, whatsoever,

including, without limitation, JA Apparel's business or the business of its manufacturing facility

in New Bedford, Massachusetts.  Abboud Tr. Testimony at pp. 417:16 -421:7; Dinsmoor Tr.

Testimony at pp. 830:17 - 839:23; Def. Exs. 180 - 182.

79.     At no point in time during the course of the negotiations of the letter of intent or the Purchase and Sale Agreement, did anyone at JA Apparel or any representative of JA Apparel, including Fili or LaGueux, ever indicate to Abboud or Dinsmoor that JA Apparel was interested in acquiring the exclusive right to use and exploit the name "Joseph Abboud", other than as a trademark, for any and all commercial purposes, even to the exclusion of Abboud, forever. Abboud Tr. Testimony at pp. 384:25 - 385:7; 502:4-13; 645:3 - 647:3; Dinsmoor Tr. Testimony at pp. 794:20 - 795:9; 797:14-21; 799:7-12; 802:7 - 803:14; 817:13-17; LaGueux Tr. Testimony at p. 1154:1-4.

80.     Despite knowing that Abboud owned the trade name Joseph Abboud Worldwide, Inc., and in fact addressing the Personal Services Agreement to Joseph Abboud Worldwide, Inc., that trade name was not included on Schedule 1.1(a)(A) of the Purchase and Sale Agreement. Moreover, at no point in time before or following the Closing on July 13, 2000, did anyone from JA Apparel ask Abboud to change the company name of Joseph Abboud Worldwide, Inc. or stop using the trade name Joseph Abboud Worldwide, Inc.  Def. Ex. 174; Pl. Ex. 1 at Schedule 1.1(a)(A); Pl. Ex. 2; Abboud Tr. Testimony at p. 418:8-19; LaGueux Tr. Testimony at pp. 1156:4-19; 1157:10-23.

### C.     The Pertinent Provisions of the Purchase and Sale Agreement and Personal Services Agreement

81.     On June 16, 2000, Abboud, Houndstooth and JA Apparel entered into the Purchase and Sale Agreement and on July 13, 2000 the parties entered into the Personal Services Agreement.  Pl. Exs 1 - 2.

82.     Article 1.1(a)(A) of the Purchase and Sale Agreement provides that Abboud shall convey to JA Apparel

> The names, trademarks, trade names, service marks, logos, insignias and designations appearing on Schedule 1.1(a)(A), and all trademark registrations and applications therefor, and the goodwill related thereto (collectively, the "Trademarks), together with all causes of action (and the proceeds thereof) in favor of [Abboud] heretofore accrued or hereafter accruing with respect to any of the Trademarks, and all other Intellectual Property (as hereinafter defined).

Pl. Ex. 1; Dinsmoor Tr. Testimony at pp. 864:20 - 869:12; 988:23 - 991:23; 996:25 - 997:25.

83.     Article 3.6(a) of the Purchase and Sale Agreement defines "Intellectual Property" as follows:

> Schedule 1.1(a)(A) sets forth a list of all of the trademark registrations, service mark registrations and applications and copyright registrations and applications currently used by the [Abboud] in connection with the Trademarks (the "Intellectual Property").

Pl. Ex. 1.

84.     JA Apparel has taken the position in this case that by virtue of language in the Purchase and Sale Agreement, it acquired the exclusive right to use and exploit the name "Joseph Abboud", other than as a trademark, for any and all commercial purposes, even to the exclusion of Abboud, forever.  However, its own arguments have conceded certain points in this action which are wholly inconsistent with its interpretation of the Purchase and Sale Agreement.  For example, Staff testified that Abboud could identify himself (i) on a business card as the owner of "jaz"; (ii) verbally in his business activities connected to the "jaz" menswear line "as long as it doesn't confuse consumers"; and (iii) verbally to consumers as the designer of the "jaz" menswear line.  Moreover, JA Apparel's counsel has conceded that (i) Abboud can make a use of his name to the trade, which is clearly use and exploitation of the name "Joseph Abboud" for a commercial purpose; (ii) Abboud can personally appear at retail establishment, such as Bloomingdale's, and identify himself as the designer of his "jaz" menswear line, which is clearly use and exploitation of the name "Joseph Abboud" for a commercial purpose; and (iii) Abboud

can potentially use his name in advertising if it is done in "mice type", which is clearly use and exploitation of the name "Joseph Abboud" for a commercial purpose. *See*, Pl. Closing Argument; Staff Tr. Testimony at 260:25 - 262:18.

85.     Throughout the course of these proceedings, JA Apparel has put forward several different interpretations of Article 1.1(a)(A) and Article 1.1(a)(C) of the Purchase and Sale Agreement to support its idiosyncratic conclusion that Abboud **CLEARLY** transferred the exclusive right to use and exploit the name "Joseph Abboud", other than as a trademark, for any and all commercial purposes, even to the exclusion of Abboud, forever, albeit the sheer multitude of explanations indicates that its idiosyncratic interpretation is anything but **clearly shown**. JA Apparel's interpretation of Article 1.1(a)(A) and Article 1.1(a)(C) differs widely from LaGueux's (the drafter of Article 1.1(a)(A) and Article 1.1(a)(C) interpretation of these Articles. *Compare* Def. designations from Spiel Dep. Testimony; Staff Tr. Testimony at pp. 138:2 - 147:19; 196:20 - 197:12; 260:25 - 262:18.[2] and JA Apparel's Complaint, with LaGuex Tr. Testimony at pp. 1126:9-14; 1127:16-18; 1163:22 -1166:18.

86.     With respect to Article 1.1(a)(A) of the Purchase and Sale Agreement, JA Apparel has argued that the word "names" (without reference to any specific names) indicates that Abboud somehow must have intended to transfer the exclusive right to use and exploit the name "Joseph Abboud", other than as a trademark, for any and all commercial purposes, even to the exclusion of Abboud, forever. However, JA Apparel fails to note that Article 1.1(a)(A) also

---

[2] Staff testifies that by virtue of the Purchase and Sale Agreement, JA Apparel could use the phrase "A New Composition By Designer Joseph Abboud" and that in marketing and promotional materials JA Apparel was free to refer to Abboud the person. However, as a matter of law, by making such uses JA Apparel would be committing a fraud on the public by representing itself as possessing the personal goodwill (*i.e.*, the skill and abilities) of Abboud,. *See, e.g., Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814, 825 at fn.5 (2d Cir. 1986); *Buffalo Oyster Co. v. Nenno*, 132 Misc. 213, 229 N.Y.S. 210 (N.Y.Sup. 1928) (noting that the plaintiff could not do anything to lead the public to believe that the defendant was in any way connected with the business of the plaintiff)

includes the phrase "identified on <u>Schedule 1.1(a)(A)</u>" at the end of the listing of terms; and that, because the Schedule is a "*Trademark Report By Mark*" it *only* identifies *trademarks and service marks and <u>not</u> any names*, **OTHER THAN AS A TRADEMARK**. Thus, the terms *trade names, logos, insignias or designations* must be interpreted as being descriptive of the "names, trade names, logos, insignias or designations" that comprise the Marks that appear on <u>Schedule 1.1(a)(A)</u>. Otherwise, contrary to JA Apparel's assertion, all such terms, other than "trademarks" and "service marks", are without meaning, as there are no "names", "trade names", "logos", "insignias" or "designations" identified on <u>Schedule 1.1(a)(A)</u>. Pl. Ex. 1; Dinsmoor Tr. Testimony at pp. 864:20 - 869:12; 988:23 - 991:23; 996:25 - 997:25.

87.    Further, the Purchase and Sale Agreement includes the following phrase, "and all trademark registrations and applications therefore", which encompass the registrations and applications appearing on the "*Trademark Report By Mark*". Therefore, "names" means *the names used and registered as marks on the "Trademark Report By Mark"*; not names that are used other than as a trademark. Pl. Ex. 1; Dinsmoor Tr. Testimony at pp. 864:20 - 869:12; 988:23 - 991:23; 996:25 - 997:25.

88.    Significantly, Article 1.1(a)(A) of the Purchase and Sale Agreement does not state that Abboud shall convey "his name" or "[t]he name Joseph Abboud"; nor does it identify or list any names on Schedule 1.1(a)(A); nor does it say that Abboud shall convey the exclusive right to use and exploit the name "Joseph Abboud", other than as a mark, for any and all commercial purposes, even to the exclusion of Abboud, forever. Pl. Ex. 1; Dinsmoor Tr. Testimony at pp. 864:20 - 869:12; 988:23 - 991:23; 996:25 - 997:25.

89.    At trial, LaGueux, the drafter of the Purchase and Sale Agreement, testified that the language of Article 1.1(a)(A) was an attempt to capture various devices, such as "names",

that are "embedded in trademarks". He also testified that Paragraph 1.1(a)(A) was an attempt to acquire "elements" of trademarks, so that these elements could then be used in other trademarks. LaGueux, when pressed as to where in Article 1.1(a)(A) it says that JA Apparel was acquiring the exclusive right to use Abboud's personal name commercially, admitted that "it is in the nature of what is a trademark".[3]  LaGuex Tr. Testimony at pp. 1126:9-14; 1127:16-18; 1163:22 - 1164:6.

90.     Article 1.1(a)(A) of the Purchase and Sale Agreement does not clearly show that Abboud intended to convey the exclusive right to use and exploit the name "Joseph Abboud", other than as a trademark, for any and all commercial purposes, even to the exclusion of Abboud, forever.  Pl. Ex. 1.

91.     Article 1.1(a)(B) of the Purchase and Sale Agreement provides that Abboud shall convey to JA Apparel "[a]ll licenses to the Trademarks granted by [Abboud] . . . (collectively, the "License Agreements")."  Pl. Ex. 1.

92.     Article 1.1(a)(C) of the Purchase and Sale Agreement provides that Abboud shall convey to JA Apparel

> [a]ll rights to use and apply for the registration of new trade names, trademarks, service marks, logos, insignias and designations containing the words 'Joseph Abboud', 'designed by Joseph Abboud,' 'by Joseph Abboud,' 'JOE,' or "JA," or anything similar thereto or derivative thereof, either alone or in conjunction with other words or symbols (collectively, the "New Trademarks"), for any and all products or services.

Pl. Ex. 1; Dinsmoor Tr. Testimony at pp. 987:5 - 988:22.

---

[3] Notably, when pressed as to which Article of the Purchase and Sale Agreement gave JA Apparel the exclusive right to use Abboud's personal name in business, LaGueux pointed to Article 1.1(a)(C) as opposed to Article 1.1(a)(A). As indicated below, however, LaGueux's rationale as to how Article 1.1(a)(C) transfers this right is implausible. LaGueux Tr. Testimony at pp. 1140:21 - 1141:21; 1148:2-10; 1161:13 -18; 1164:7 - 1166:18.

93.      The "assets" to be sold under Article 1.1(a)(C) of the Purchase and Sale

Agreement are the "rights to use and apply for the registration of *new* trade names, trademarks,

[etc.] . . . *containing* the *words* 'Joseph Abboud' . . . for any and all *products and services*"

(emphasis added).  Thus, Article 1.1(a)(C) clearly contemplates the *conveyance* of Abboud's

*consent* to the "use and registration" of *new, i.e., future*, Marks. as required by the Lanham Act,

Section 2(c).  It does not apply to the *conveyance* of *existing* intellectual property, such as

Abboud's personal name or the trade name "Joseph Abboud Worldwide, Inc.", as *existing*

intellectual property is addressed by Article 1.1(a)(A).  Further, Article 1.1(a)(C)'s *consent* to

use and apply for the registration of *new* Marks is limited by the phrase "for any and all goods

and services", which implicitly *excludes* any use *for* the identification of a person, *i.e.*, a

publicity right, or *for* the identification of a business, *i.e.*, a trade name.  This limitation clearly

precludes JA Apparel from *using* the *words* "Joseph Abboud" to designate Abboud as a person,

or to designate its business.  Finally, as in Article 1.1(a)(A), the words "trade names, trademarks,

service marks, logos, insignias and designations" should be interpreted consistently with the

*same* terms in Article 1.1(a)(A) to be *descriptive* of the new Marks.[4]  .  Therefore, while Article

1.1(a)(C) may bar Abboud from using and registering the *words* "Joseph Abboud" and/or

"designed by 'Joseph Abboud'" as a Mark, he remains free to make use of his personal name in

its *primary descriptive sense* to identify himself and/or describe his own products.  Pl. Ex. 1;

Dinsmoor Tr. Testimony at pp. 987:5 - 988:22.

---

[4]  This is confirmed by the trial testimony of both Dinsmoor, who said the words "The names, etc." were descriptive of the marks appearing on Schedule 1.1(a)(A), and LaGueux, who said "The names, etc." were elements of the marks on Schedule 1.1(a)(A), *i.e.*, that such words do *not* reference distinct forms of intellectual property separate and apart from the Marks, themselves.  Dinsmoor Tr. Testimony at pp. 864:20 - 869:12; 988:23 - 991:23; 996:25 - 997:25; LaGueux Tr. Testimony at pp. 1163:22 - 1164:6; 1174:10-11.

94.    LaGeuex, the drafter of Article 1.1(a)(C) acknowledged that Article 1.1(a)(C) was included in the Purchase and Sale Agreement because JA Apparel did not want Abboud to use and register trademarks containing the words "Joseph Abboud" in the future; and because under Section 2 (c) of the Lanham Act, JA Apparel could not use and register trademarks containing Abboud's name without his consent.  Def. Ex. 193; LaGueux Tr. Testimony at pp. 1165:12 - 1166:18; 1167:1 - 1170:16.

95.    JA Apparel has contended during this case that the single word "designation" in Article 1.1(a)(C) **CLEARLY SHOWS** that Abboud intended to convey the exclusive right to use and exploit the name "Joseph Abboud", other than as a trademark, for any and all commercial purposes, even to the exclusion of Abboud, forever.  Never, in the field of contract interpretation, have so many words been incorporated into one word, not to mention that they are all supposed to be **CLEARLY SHOWN** in this one word.  Anyway, this interpretation of Article 1.1(a)(C) is completely different from the interpretation provided by LaGueux, the drafter of Article 1.1(a)(C), as to why Article 1.1(a)(C).  LaGueux testified that if you cut Article 1.1(a)(C) into four parts, and then take the first part, *i.e.*, the words "all rights to use and apply for registration of"; and you then cut out the second part, *i.e.*, the words "new trade names, trademarks, service marks, logos, insignias and designations"; so you can continue uninterrupted with the third part, *i.e.*, the words "Joseph Abboud"; and, then tack on the fourth part, *i.e.*, the words "for any and all products or services", the Article gives JA Apparel has the right to use the words "Joseph Abboud" for any and all products and services.  Further, by cutting out the word "designations", LaGueux completely undermines JA Apparel's reading of Article 1.1(a)(C), which is based entirely on its reading of  the word "designations".  LaGueux Tr. Testimony at pp. 1164:7 - 1165:11.

96.     Article 1.1(a)(C) of the Purchase and Sale Agreement simply does not **CLEARLY SHOW** that Abboud intended to convey the exclusive right to use and exploit the name "Joseph Abboud", other than as a trademark, for any and all commercial purposes, even to the exclusion of Abboud, forever.  Pl. Ex. 1.

97.     In addition to the foregoing, other provisions of the Purchase and Sale Agreement clearly show that the transaction was limited to a sale of trademarks and licenses.  Thus, Article 1.1(a)(D) of the Purchase and Sale Agreement provides that Abboud shall convey to JA Apparel "[a]ll books, financial records, invoices, and other documents, records and data files relating primarily to the Trademarks or the License Agreements."  Pl. Ex. 1.

98.     Article 1.1(a)(E) of the Purchase and Sale Agreement provides that Abboud shall convey to JA Apparel "[t]he goodwill of or pertaining to the Trademarks."  Pl. Ex. 1.

99.     Article 1.1(b) of the Purchase and Sale Agreement provides that Abboud shall convey and assign to JA Apparel the "Trademarks," "New Trademarks" and "License Agreements" at the "Closing."  Pl. Ex. 1; Dinsmoor Tr. Testimony at pp. 830:17 - 839:23; Def. Exs. 180 - 182.

100.    Further, Article 2.2 of the Purchase and Sale Agreement, sets forth the conveyances that Abboud was to make at the "Closing."  Specifically, with respect to intellectual property rights, Abboud agreed to convey to JA Apparel "(vii) instruments of assignments in favor of [JA Apparel] with respect to each of the Trademarks, in form and content acceptable to [JA Apparel], duly executed by Houndstooth or Abboud, as the case may be."  Pl. Ex. 1; Dinsmoor Tr. Testimony at pp. 830:17 - 839:23; Def. Exs. 180 - 182.

101.    Thus, there is no term, language or provision in the Purchase and Sale Agreement explicitly obligating Abboud to convey to JA Apparel the exclusive right to use and exploit the

name "Joseph Abboud, other than as a trademark, for any and all commercial purposes, even to the exclusion of Abboud, forever.  Certainly, if JA Apparel had ever intended to bargain for such an exclusive right, it could have insisted on language in the Purchase and Sale Agreement explicitly stating that Abboud would convey the exclusive right to use and exploit the name "Joseph Abboud", other than as trademark, for any and all commercial purposes, even to the exclusion of Abboud, forever, but it **CLEARLY** did not do so; it never even mentioned such an exclusive right in any of its negotiations with Abboud; or in any of its communications with Abboud and his attorney; or in the Purchase and Sale Agreement; or in any of the Assignments delivered at Closing.  Pl. Ex. 1.

102.    Further, there is no term, language or provision in the Purchase and Sale Agreement pursuant to which Abboud agreed never to use his name, Joseph Abboud, other than as a trademark; or, agreed to refrain from using his name in his business, or to identify himself in connection with commercial activities, or to describe an attribute of the products that he markets and sells; or, agreed to waive, relinquish, forego and forfeit all rights respecting any common law or statutory "fair use" defense with respect to the use of the name "Joseph Abboud", other than as a trademark, either in business or as a descriptive term for products and services or in connection with any commercial endeavor, or for commercial purposes in any and all media.  Pl. Ex. 1.

103.    Finally, there is no term, language or provision in the Purchase and Sale Agreement pursuant to which Abboud agreed to assign any of his personal or publicity rights, including the use of his personal name Joseph Abboud; or his portrait or picture; or his individual persona, likeness, or appearance; or his accomplishments reputation and celebrity, to JA Apparel. Pl. Ex. 1.

28

104.    In fact, at the "Closing", which was held on or about July 13, 2000, Abboud only delivered three (3) assignments to JA Apparel: one Assignment of the "Trademarks"; a second Assignment of the "New Trademarks"; and, a third Assignment of the "License Agreements." Def. Exs. 180 - 182; Abboud Tr. Testimony at pp. 417:16 -421:7; Dinsmoor Tr. Testimony at pp. 830:17 - 839:23; LaGueux Tr. Testimony at p.1173:2-22.

105.    Abboud did not deliver at the Closing any assignments of any exclusive right to use and exploit the name "Joseph Abboud", other than as a trademark, for any and all commercial purposes, even to the exclusion of Abboud, forever;, nor, did Abboud ever convey or assign to JA Apparel any of his publicity rights, his personal name; his likeness, persona, or celebrity.  Pl. Ex. 1; Def. Exs. 180 - 182; Abboud Tr. Testimony at pp. 417:16 -421:7; Dinsmoor Tr. Testimony at pp. 830:17 - 839:23; Def. Exs. 180 - 182; LaGueux Tr. Testimony ay pp. 1179:24 - 1180:6.

106.    Abboud did not deliver at the Closing any assignment referencing his trade name Joseph Abboud Worldwide Inc.; or any trade names or the right to use his personal name as a trade name in JA Apparel's business or the business of its manufacturing facility in New Bedford, Massachusetts.  Pl. Ex. 1; Def. Exs. 180 - 182; Abboud Tr. Testimony at pp. 417:16 - 421:7; Dinsmoor Tr. Testimony at pp. 830:17 - 839:23; Def. Exs. 180 - 182.

107.    At the Closing on July 13, 2000, Abboud, Houndstooth and JA Apparel entered into the Personal Services Agreement with JA Apparel.  Pl. Ex. 2.

108.    The Personal Services Agreement was addressed to Abboud care of Houndstooth Corporation and Joseph Abboud Worldwide, Inc.  Pl. Ex. 2; Abboud Tr. Testimony at p. 418:8-16; Dinsmoor Tr. Testimony at pp. 821:16 - 825:14; LaGueux Tr. Testimony at pp. 1156:4-19; 1157:10-23.

109.    Under the terms of the Personal Services Agreement, Abboud agreed to serve as Chairman Emeritus of JA Apparel for a period of five (5) years (the "Personal Services Period"). Pl. Ex. 2 at ¶1(a).

110.    The Personal Services Agreement specifically prohibited Abboud from engaging in any business activities during the Personal Services Period.  Pl. Ex. 2 at ¶1(b).

111.    So that there was no misunderstanding as to what Abboud had agreed to convey to JA Apparel in the Purchase and Sale Agreement, and what Abboud had reserved for himself, and because it was important for Abboud to continue to be able to build and exploit his own celebrity and persona, Abboud deliberately bargained for, and was permitted to make media and celebrity appearances in his individual capacity, as an authority in the fashion design business, during the Personal Service Period.  Pl. Ex. 2 at ¶1(b); Abboud Tr. Testimony at pp. 413:24 - 417:15.

112.    Abboud deliberately reserved these rights in order to protect, preserve and enhance the value of his publicity rights, particularly since he knew that one day he would no longer have any association with JA Apparel, and might want to exploit his own individual reputation and goodwill as a world class designer to re-enter the apparel industry.  Pl. Ex. 2 at ¶1(b); Abboud Tr. Testimony at pp. 413:24 - 417:15; 424:1 - 425:10.

113.    Under the terms of the Personal Services Agreement, the Personal Services Period expired on July 13, 2005.  However, the Personal Services Agreement provided that upon the expiration of the Personal Services Period, Abboud would be subject to certain restrictions on his association with JA Apparel competitors for a two year Restricted Period commencing July 13, 2005 (the "Restricted Period").  Pl. Ex. 2 at ¶2(a).

114.    The restrictive provision of the Personal Services Agreement provides that:

> For the two-year period immediately following the expiration of the Personal Services Period (the "Restricted Period") [*i.e.*, from July 13, 2005 - July 13, 2007], Abboud agrees that he will not, directly or indirectly through any partnership, corporation, limited liability company, trust or other entity, *be associated as an owner, director, officer, employee, consultant or other participant* with, any person, group, business enterprise or other entity which is engaged in or proposes to engage in the business of designing, licensing, manufacturing, marketing or distributing any products or services which are or would be competitive with the business of [JA Apparel] as then conducted or as such business may be reasonably expected to be conducted in the future anywhere in the world.

(emphasis added); Pl. Ex. 2 at ¶(2)(a).

115.    By virtue of the restrictive provision of the Personal Services Agreement, Abboud, either himself or "through any partnership, corporation, limited liability company, trust or entity" which he controls, agreed to refrain from being "associated" as an "owner, director, officer, employee, consultant or other participant" with "any person, group, business enterprise or other entity which is engaged in or proposes to engage in the business of designing, licensing, manufacturing, marketing or distributing any products or services which are or would be competitive" of JA Apparel.  Pl. Ex. 2 at ¶(2)(a).

116.    In the Personal Services Agreement, Abboud did not agree to any restrictions on his ability to exploit his own personal or publicity rights.  Pl. Ex. 2; Abboud Tr. Testimony at pp. 424:1 - 425:10.

117.    In fact, during the personal service period Abboud continued to make public appearances including a number of book signings and many appearances on television and radio. He made these appearances on behalf of himself personally and not on behalf of JA Apparel so as to continue to build his own personal reputation as a designer.  Abboud Tr. Testimony at pp. 424:1 - 425:10; 426:11 - 427:18.

118.    In the Personal Services Agreement, Abboud did not agree to refrain from planning or preparing to associate with business enterprises *after* the expiration of the Restricted

31

Period.  Pl. Ex. 2.

119.    Under the terms of the Personal Services Agreement, the Restricted Period

expired on July 13, 2007.  Pl. Ex. 2 at ¶2(a).

120.    The Purchase and Sale Agreement and Personal Services Agreement are each

governed by New York law.  Pl. Exs. 1 - 2.

**D.    JA Apparel's Conduct Following the Closing on July 13, 2000**

121.    The conduct of JA Apparel following the Closing on July 13, 2000, clearly

demonstrates that JA Apparel understood that *all* Abboud had assigned to it where the

Trademarks, New Trademarks and Licensing Agreements, previously owned by Abboud.  Def.

Exs. 14-15, 17-24, 178 and 189.

122.    On June 16, 2000, JA Apparel and Abboud agreed on the language of the

following press release:

> GFT Net (HdP) and Joseph Abboud have announced that they have signed a
> contract for *the acquisition of GFT Net of all the trademarks and licensing
> contracts with the name of Joseph Abboud.*
>
> Joseph Abboud is an award-winning American designer, whose talent and
> distinctive point of view have earned him accolades on an international basis.
>
> GFT Net, is currently licensed to produce and distribute the Men's formal,
> sportswear and golf lines with the trademark Joseph Abboud through JA Apparel,
> a company controlled by GFT USA.  With this agreement, GFT Net sets the
> objective of further reinforcing its existing activity and developing new product
> lines in new markets, within a global strategy.
>
> On the basis of a signed contract, *GFT Net will acquire the trademarks and
> licensing agreements registered in the name of Joseph Abboud and his company
> Houndstooth Corp. for a compensation of $65 million.*  The acquisition will be
> carried out during the month of July, once the necessary approvals have been
> attained by anti-trust authorities.
>
> For GFT Net, *the acquisition of one of the most successful U.S. trademarks* of the
> last few years, with total sales estimated over $250 million, represents a
> significant step in their own strategy, to be realized both by external growth as
> well as by maximizing the value of the trademarks in their portfolio.

32

The press release was approved by Abboud as well as the then Chairman and Chief Executive Officer of JA Apparel, Roberto Jorio Fili.  Def. Ex. 178 (emphasis added); Abboud Tr. Testimony at pp. 411:12 - 413:15; LaGueux Tr. Testimony at pp. 1181:11 - 1183:2; 1183:9-14.

123.    Subsequently, JA Apparel issued a press release in which it announced that it had recently acquired the "Joseph Abboud fashion label."  In the press release, the following statement was made:

> Prior to the acquisition, GFT.Net (Hdp) was the licensee for the Joseph Abboud core men's apparel business (which consists of tailored clothing, sportswear, furnishings and golf apparel) and produced and distributed these lines through its JA Apparel Corp. division.  All other Joseph Abboud licensees were controlled by licensor [Joseph Abboud] Worldwide, the New York-based designer company. *Under the terms of the acquisition, Hdp purchased all existing trademarks and licensing agreements and all future trademarks bearing the Joseph Abboud name.* The net result of the acquisition, according to Fili, will be to effectively bring all brand manufacturing, marketing and strategy together under one organization.

Def. Ex. 14 (emphasis added); Abboud Tr. Testimony at pp. 421:8 - 423:25; Dinsmoor Tr. Testimony at pp. 841:21 - 843:17.

124.    On August 8, 2002, in a letter to the *Westchester County Times* to notify them of certain "inaccurate and misleading statements" in their August 2002 article entitled "Joseph Abboud's Master Plan", Robert J. Wichser, then President and Chief Operating Officer of JA Apparel made, *inter alia*, the following statements:

> The Joseph Abboud brand is produced by JA Apparel - a wholly owned division of GFT NET since July 2000, *when the latter acquired all existing trademarks, license agreements and new trademarks bearing the Joseph Abboud name.*"

> \* \* \* \*

> *The company name is JA Apparel; Joseph Abboud Company does not exist.*

Def. Ex. 15 (emphasis added).

125.    On December 18, 2002, in its Verified Answer and Counterclaims in the case captioned *Joseph Abboud v. JA Apparel Corp., et al.*, Index No. 604033/02 (NY Sup, Cty of

NY), JA Apparel repeatedly refers to the July 2000 transaction as the transaction whereby Abboud sold "*the Joseph Abboud Trademarks*" to JA Apparel. For example, JA Apparel makes the following statements in Paragraphs 85 and 95, respectively:

> These Counterclaims arise from Joseph Abboud's course of conduct over the past two and a half years to deprive JA Apparel of the benefits of the *trademarks* and personal services that it purchased from Mr. Abboud for $65,500.000.
>
> * * * *
>
> *The sale to JA Apparel of the Joseph Abboud Trademarks* that was consummated in July 2000 was the culmination of negotiations that commenced as early as September 1999 . . .

Def. Ex. 17 at ¶95 (emphasis added); LaGueux Tr. Testimony at pp. 1184:7 - 1185:10.

126.    On September 18, 2003, then counsel for JA Apparel, in a Statement of Undisputed Facts filed in support of JA Apparel's Motion for Summary Judgment in the case captioned *Joseph Abboud and Houndstooth Corp. v. Robert J. Wichser and JA Apparel Corp., et al.*, Index Nos. 604033/02 and 602211/03 (NY Sup, Cty of NY), made the following statement:

> *JA Apparel paid Mr. Abboud $65.5 million for his trademarks.*

Def. Ex. 18 at ¶31 (emphasis added).

127.    On June 13, 2003 in an Affirmation of Jeffrey E. LaGueux, in the case captioned *Joseph Abboud v. JA Apparel Corp., et al.*, Index No. 604033/02 (NY Sup, Cty of NY), then counsel for JA Apparel, made the following statement:

> In 2000, I counseled the defendants with respect to *JA Apparel's purchase of the Joseph Abboud trademarks* from an entity controlled by plaintiff Joseph Abboud (the "transaction"), largely by drafting transactional agreements for the defendants' review and giving advice to the defendants on various legal issues that arose during the negotiations.

Def. Ex. 189 at ¶4 (emphasis added); LaGueux Tr. Testimony at pp. 1187:11 - 1188:14.

128.    On or about February 14, 2004, as memorialized in a Stock Purchase Agreement, JA Holding, Inc., a company owned by JW Childs Equity Partners, purchased JA Apparel from

GFT (USA) Corp. LaGueux was involved in the preparation of the documents for this transaction. Def. Exs. 23-24; LaGueux Tr. Testimony at pp. 1188:20 - 1189:4; *see also*, Def. designations from Spiel Dep. Testimony.

129.    In the February 14, 2004 Stock Purchase Agreement, it was disclosed that JA Apparel owned certain "intellectual property", including, *inter alia*, the following:

> *(ii) trademarks, service marks, trade names, trade dress, logos, business and product names, designs, slogans, goodwill and registrations and applications for registration thereof;*

Nowhere in the Stock Purchase Agreement is there any indication that JA Apparel was the owner of the personal name "Joseph Abboud." Def. Ex. 23 at ¶2.19 (emphasis added) ; LaGueux Tr. Testimony at pp. 1189:23 - 1194:6; 1195:17 - 1196:9; *see also*, Def. designations from Spiel Dep. Testimony.

130.    The February 14, 2004 Stock Purchase Agreement includes a schedule of disclosures, including Schedule 2.19(b), which contains the following list of the intellectual property owned by JA Apparel:

> Software License Agreement, dated as of June 3, 1994, between GFT (U.S.A.) Corp. and Application Consultants.
>
> See shrinkwrap software license agreements attached to Schedule 2.19(c).
>
> josephabboud.com - domain name.
>
> josephabboud.org - domain name.
>
> josephabboud.net - domain name.
>
> Corporate names of each of the companies.
>
> *List of existing trademark registrations annexed hereto.*
>
> RLM Apparel Software Systems, Inc. System/38 Integrated Apparel System IIAS) Package Contract #311, dated as of April 26, 1985, by and between RLM and GFT (U.S.A.) Corporation.

Notably, Schedule 2.19(b) does not indicate that JA Apparel held the exclusive right to use the

words "Joseph Abboud" commercially in any way, shape or form.  Def. Ex. 24 at ¶ Schedule 2.19(b) (emphasis added) ; LaGueux Tr. Testimony at pp. 1189:23 - 1194:6; 1195:17 - 1196:9; *see also*, designations from Spiel Dep. Testimony.

131.    Since the Purchase and Sale Agreement, JA Apparel has repeatedly recognized that Abboud has the right to exploit his personal publicity rights.  Def. Exs. 49 - 52.

132.    Moreover, since the Purchase and Sale Agreement, JA Apparel has repeatedly recognized that it does not possess the right to refer to "Joseph Abboud" the individual, as exemplified by JA Apparel's offer, in 2007, to make Abboud a licensee or pay him an endorsement fee in an effort to use Abboud personally and his individual good will and reputation in order to generate more business for the company and heat up the brand.  Def. Exs. 45 - 47; Def. Designations from Spiel Dep. Testimony; Staff Tr. Testimony at 138:2 - 147:19; Abboud Tr. Testimony at pp. 448:9 - 449:20.

**E.    Abboud's "jaz" Business and His Proposed Use of His Personal Name in Advertising and Promotional Materials to Convey Truthful and Valuable Information to the Trade and Consumers, Namely That he is the Designer of the "jaz" Menswear Line**

133.    Abboud's new clothing line, which he plans on introducing at retail in Fall 2008, will be marketed and sold under the trademark "jaz", with labels and hangtags featuring the following design, on which the name "Joseph Abboud" does not and will not appear:



Abboud Tr. Testimony at pp. 450:10 - 451:16; Def. Exs. 97, 100.

134.    The "jaz" brand will be quintessentially American — a clothing line that will be

classic with an edge.  Def. Ex. 101.

135.    In designing the "jaz" line, Abboud has focused on creating products that are unique and distinctive and speak to the sophisticated American consumer.  Def. Ex. 101.

136.    The "jaz" line will be an upscale menswear line available only at high-end department stores, and will be sold at higher price points than the products that are currently sold under JA Apparel's JOSEPH ABBOUD trademark.  Abboud Tr. Testimony at pp. 479:11 - 480:10; Def. Ex. 101.

137.    The products sold under the "jaz" trademark will be of a higher quality than the products that are currently sold under JA Apparel's JOSEPH ABBOUD trademark.  Abboud Tr. Testimony at p. 480:11-25.

138.    To date, Abboud has made no use of his name in connection with the advertising, marketing and/or promotion of the "jaz" menswear line.  Abboud Tr. Testimony at pp. 492:13 - 494:5; 501:15 - 502:3; 549:6 - 552:15; 554:1 - 555:11; 556:15 - 557:24; 568:10 - 570:25; 572:4 - 574:21; 579:4-21; 587:18 - 590:5; 603:10 - 609:8; 732:9 - 737:2.[5]

139.    Abboud does not intend to use his personal name as part of a trademark in connection with the sale and/or marketing of the "jaz" line.  Abboud Tr. Testimony at pp. 492:13 - 494:5; 501:15 - 502:3; 549:6 - 552:15; 554:1 - 555:11; 556:15 - 557:24; 568:10 - 570:25; 572:4 - 574:21; 579:4-21; 587:18 - 590:5; 603:10 - 609:8; 732:9 - 737:2.

140.    Abboud does not have a present intention to use his name on any product, label, hang tag or product packaging for the "jaz" menswear line.  Abboud Tr. Testimony at pp. 492:13 - 494:5; 501:15 - 502:3; 549:6 - 552:15; 554:1 - 555:11; 556:15 - 557:24; 568:10 - 570:25; 572:4

---

[5] All of the mock-up ads that have been created by Abboud during the course of this litigation that include his name in the ad, have been created in order to show to his lawyers and none of them were intended to be run as advertisements.  Abboud Tr. Testimony at pp. 500:6 - 501:14; 574:22 - 576:5; Def. Exs. 33 & 36 - 38; Pl. Ex. 44a.

- 574:21; 579:4-21; 587:18 - 590:5; 603:10 - 609:8; 732:9 - 737:2; Dinsmoor Tr. Testimony at pp. 880:18 - 882:10; 935:5-13.

141.    Abboud's only intended use of his personal name in connection with his "jaz" product line is for descriptive purposes, specifically to communicate to the trade and consuming public the truthful, commercially valuable information that he has exercised his individual talents, skills and artistic abilities to design and create the "jaz" products that he is marketing and selling.  Def. Exs. 187 - 188; Abboud Tr. Testimony at pp. 492:13 - 494:5; 501:15 - 502:3; 549:6 - 552:15; 554:1 - 555:11; 556:15 - 557:24; 568:10 - 570:25; 572:4 - 574:21; 579:4-21; 587:18 - 590:5; 603:10 - 609:8; 732:9 - 737:2.

142.    Therefore, in his advertising and promotional materials, Abboud only intends to refer to himself as the *designer* of the "jaz" product line in a not overly intrusive manner.  Def. Exs. 187 - 188; Abboud Tr. Testimony at pp. 492:13 - 494:5; 501:15 - 502:3; 549:6 - 552:15; 554:1 - 555:11; 556:15 - 557:24; 568:10 - 570:25; 572:4 - 574:21; 579:4-21; 587:18 - 590:5; 603:10 - 609:8; 732:9 - 737:2.

143.    In sum, Abboud will: (i) not use his name as a trademark or service mark; (ii) not use his name on products, product labels or product packaging; (iii) not use his name in reference to any prior association with JA Apparel, its business activities or its products; (iv) use his name only as a "descriptive term" to identify himself, and/or to describe himself as (a) the designer or endorser of products and/or services that he personally designs (or supervises the designing of), selects, approves, markets and/or sells; or (b) the owner, operator or manager of businesses that he personally owns or operates; or (c) the celebrity, expert, artist, author, commentator and/or personality appearing in connection with his personal appearances, speaking engagements, or public announcements; (v) use his name in print only in connection with the "jaz" mark, or other

trademarks, service marks and/or trade names, which are more prominently displayed in such materials or media than the name "Joseph Abboud", when any reference is made to any products and/or services; and (vi) use his name in print only in the same type size, font and color as the wording surrounding his name.  These restrictions are shown on mock-up ads that Abboud has prepared.  Def. Exs. 187 - 188; Abboud Tr. Testimony at pp. 492:13 - 494:5; 501:15 - 502:3; 549:6 - 552:15; 554:1 - 555:11; 556:15 - 557:24; 568:10 - 570:25; 572:4 - 574:21; 579:4-21; 587:18 - 590:5; 603:10 - 609:8; 732:9 - 737:2.[6]

144.    Abboud would be open to the use of a disclaimer in any consumer advertising in which he makes a use of his personal name.  Abboud has proposed the following disclaimer: Abboud Tr. Testimony at pp. 601:21 - 603:4; Def. Ex.35.

145.    No trade person will be confused by Abboud's proposed use of his personal name to refer to himself as the *designer* of the "jaz" product line.  Abboud Tr. Testimony at p. 481:1-13; Frankfort Tr. Testimony at pp. 1092:11 - 1097:12; Kolb Tr. Testimony at pp. 968:16 - 975:25; Mitchell Tr. Testimony at pp. 17:15-20; 61:14 - 63:8; 90:7 - 91:16.

146.    Moreover, there is no competent or credible evidence that any consumer will be confused by Abboud's proposed use of his personal name to refer to himself as the *designer* of the "jaz" product line.  Baker Dep. Testimony at pp. 126:15 - 127:7, 136:13 - 137:11; Staff Dep. Testimony at pp. 364:21 - 368:13.; Staff Tr. Testimony at pp. 238:13 - 241:18; Sapienza Tr. Testimony; 275:12 - 289:8; Decker Tr. Testimony at pp. 292:1 - 298:24; Larson Tr. Testimony at

---

[6] Contrary to JA Apparel's assertions, Abboud is clearly using his "jaz" trademark to identify the "source" of his apparel products in Def. Exs. 187 - 188, rather than his name, which is being used *descriptively* to identify himself as the creator of his "jaz" product line.  JA Apparel's attempt to transform Abboud's testimony that he is the "source" of his "work" into an intention to use his name to identify his products is simply unavailing, because the word "work" refers to Abboud's *design* work, not his "jaz" product line.

pp. 299:17 - 308:21.[7]

### F.    Abboud's Activities During the Restricted Period

147.    Under the Personal Services Agreement, Abboud undertook that when his personal services commitment to JA Apparel ended on July 13, 2005, he would be subject to a limited restriction on his ability to become "associated" with apparel companies in competition with JA Apparel, for a two-year period.  Pl. Ex. 2 at ¶2(a).

148.    Specifically, Abboud, either himself or "through any partnership, corporation, limited liability company, trust or entity" which he controls, agreed to refrain from being "associated" as an "owner, director, officer, employee, consultant or other participant" with "any

---

[7] All of the alleged instances of confusion that JA Apparel relies upon took place in August and September 2007 as a result of news reports respecting Abboud's launch of his new "jaz" menswear line in Fall 2008 and other business activities.  At the time, Abboud was not marketing and/or offering for sale any "jaz" products and, as such, there could not have been any instances of actionable confusion, *i.e.*, instances where a consumer or retailer made a mistaken purchasing decision.  Moreover, it should be noted that since Abboud began marketing and offering for sale his "jaz" line, there has not been one incident of trade or consumer confusion.  JA Apparel's President and CEO, Martin Staff, confirmed as much at his deposition in this case when he admitted that he is not aware of any instances of confusion among the trade and consumers.  *See*, Staff Dep. Testimony at pp. 364:21 - 368:13.  Moreover, as a matter of law, the evidence of actual confusion presented by JA Apparel in not credible as courts have routinely found that anecdotal evidence of confusion that does not relate to a mistaken purchasing decision is not competent confusion evidence.  *Lang v. Retirement Living Pub. Co., Inc.*, 949 F.2d 576, 582-83 (2d Cir. 2001); *Morningside Group Ltd. v. Morningside Capital Group*, No. 96 Civ. 466 (AHN), 1997 WL 631032 at *5-6 (D.Conn. Sept. 24, 1997) (noting that evidence of "four individuals who mistakenly called [plaintiff to congratulate it] on a recent acquisition" was not the type of actual confusion actionable under the Lanham Act); *First Keystone Fed. Sav. Bank v. First Keystone Mortgage, Inc.*, 923 F.Supp. 693, 705 (E.D.Pa.1996) (citing *Lang* and holding that the plaintiff failed to make a showing of actual confusion where there was only evidence that some consumers called the plaintiff thinking it was the defendant and no evidence that any consumer mistook the defendant for the plaintiff in making a mortgage application); *see also Sunenblick v. Harrell*, 895 F.Supp. 616, 631 (S.D.N.Y. 1995) (determining that the initial confusion of a retailer seeking to purchase goods does not support a finding of actual confusion where the retailer made its ultimate purchasing decision absent deception); *see also Biosafe-One, Inc. v. Hawks*, 524 F.Supp.2d 452, 465 and fn.6 (S.D.N.Y. 2007) (finding that were plaintiff failed to introduce an affidavit from the person who was allegedly confused, "[p]laintiffs' conclusory statements that consumers are confused do not prove actual confusion"); *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 387-88 (2d Cir. 2005) ("evidence of actual confusion consist[ing] entirely of testimony by several interested witnesses recounting a handful of anecdotes, including a number of hearsay statements" held not to weigh in favor of Plaintiff); *Paco Sport Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 319-20 (S.D.N.Y. 2000) (noting that "the witnesses' testimony that recounts certain third party confusion was textbook hearsay, and as such, is particularly unreliable since any probative value it has would be based upon an assumption that those statements truthfully reflect the beliefs of those workers, none of whom was available for cross-examination"); *Jaret Intern., Inc. v. Promotion in Motion, Inc.*, 826 F.Supp. 69, 72-73 (E.D.N.Y. 1993) (finding that affidavit of plaintiff's employee detailing a conversation he had with an individual who was allegedly confused was non-credible evidence).

person, group, business enterprise or other entity which is engaged in or proposes to engage in the business of designing, licensing, manufacturing, marketing or distributing any products or services which are or would be competitive" of JA Apparel.  Pl. Ex. 2 at ¶2(a).

149.    The Personal Services Agreement clearly and unambiguously prohibits Abboud, either himself or through an entity which he controls, from being associated with a third party business with which he was not previously associated then in competition with JA Apparel or proposing to compete with JA Apparel during the Restricted Period.  Pl. Ex. 2 at ¶2(a).

150.    Significantly, the Personal Services Agreement did not restrict Abboud from owning his own company during the Restricted Period, so long as he did not use *that company* to become "associated" as an "owner, director, officer, employee, consultant or other participant" with a third party business with which he was not previously associated, that competed with or proposed to compete with JA Apparel during the Restricted Period.  Pl. Ex. 2 at ¶(2)(a).

151.    Accordingly, Abboud's ownership of Herringbone, a company which Abboud controls, in and of itself, does not constitute a breach of the Personal Service Agreement, as were it otherwise, Abboud would have been in breach of the Personal Services Agreement by virtue of his mere association with Herringbone, which was clearly not the intention of Paragraph 2(a) of the Personal Services Agreement.  Pl. Ex. 2 at ¶(2)(a).

152.    Further, the Personal Services Agreement specifically defines "associated" as "an owner, director, officer, employee, consultant or other participant" in a third party competitive business.  Here, Abboud did not become "an owner, director, officer, employee, consultant or other participant" of a third party competitive business during the Restricted Period that was in competition with, or proposed to compete with JA Apparel during the Restricted Period.  Pl. Ex. 2 at ¶(2)(a).

153.    Abboud did not agree to any restrictions on his ability to *prepare* to associate once the Restricted Period expired, and nowhere does the Personal Services Agreement say that, during the Restricted Period, Abboud could not speak to third parties about future business once the Restricted Period expired.  Pl. Ex. 2 at ¶2(a).

154.    Abboud made contact during the Restricted Period with several third parties, including Jack Victor Ltd. ("Jack Victor"), Merrill Sharpe, Ltd. ("Merrill Sharpe"), Alden Street Shirt Manufacturing Co. LLC ("Alden Street"), Cardinal of Canada, Inc. ("Cardinal"), and J.S. Blank & Co. ("J.S. Blank"), about the possibility of entering into license or acquisition agreements with them after the Restricted Period expired.  Abboud Tr. Testimony at pp. 455:13 - 477:13; Dinsmoor Tr Testimony at pp. 869:13 - 874:5; 882:21 - 888:25; 893:19 - 898:10; 898:11 - 920:6; 1035:15 - 1041:2; 1060:1 - 1061:21; 1070:7 - 1072:24.

155.    Abboud worked on sketches and designs for his new "jaz" menswear line during the Restricted Period and, together with certain third parties, selected certain clothing products during that period for use at his July 31, 2007 press conference at which he announced the launch of his "jaz" line in the Fall of 2008.  Abboud Tr. Testimony at pp. 452:1 - 454:1; Def. Exs. 100 - 101.

156.    However, Abboud did not associate with any entity during the Restricted Period that was in active competition with JA Apparel.  Abboud Tr. Testimony at pp. 455:13 - 477:13; Dinsmoor Tr. Testimony at pp. 869:13 - 874:5; 882:21 - 888:25; 893:19 - 898:10; 898:11 - 920:6; 1035:15 - 1041:2; 1060:1 - 1061:21; 1070:7 - 1072:24; *see also*, Def. designations from Victor Dep. Testimony and Colucciello Dep. Testimony.

157.    Specifically, Abboud did not associate himself as an "owner, director, officer, employee, consultant or other participant" with Jack Victor, Merrill Sharpe, Alden Street,

Cardinal, and/or J.S. Blank during the Restricted Period nor did he take any active role in the business of these entities during the Restricted Period. Abboud Tr. Testimony at pp. 455:13 - 477:13; Dinsmoor Tr. Testimony at pp. 869:13 - 874:5; 882:21 - 888:25; 893:19 - 898:10; 898:11 - 920:6; 1035:15 - 1041:2; 1060:1 - 1061:21; 1070:7 - 1072:24; *see also*, Def. designations from Victor Dep. Testimony; Colucciello Dep. Testimony and Sopp Tr. Testimony.

158.    Abboud did not design any product with Jack Victor, Cardinal and/or J.S. Blank during the Restricted Period. Abboud Tr. Testimony at pp. 455:13 - 466:4.

159.    Jack Victor, Cardinal and J.S. Blank did not offer for sale or sell any "jaz" products during the Restricted Period. Abboud Tr. Testimony at pp. 455:13 - 466:4.

160.    Abboud did not receive any royalty payments from Jack Victor, Cardinal and/or J.S. Blank during the Restricted Period. Abboud Tr. Testimony at pp. 455:13 - 466:4.

161.    In fact, Abboud did not start to develop and put together his "jaz" collection until after the expiration of the Restricted Period. Abboud Tr. Testimony at pp. 477:14 - 479:10.

162.    While Abboud has taken orders from approximately 100 retail accounts, all of those orders were taken after the expiration of the Restricted Period. Abboud Tr. Testimony at pp. 481:1 - 481:7; 481:14-24.

163.    Neither Abboud nor any of his proprietary companies entered into any agreements with any third parties to engage in any commercial activity during the Restricted Period. Def. Ex. 192; Abboud Tr. Testimony at pp. 455:13 - 477:13; Dinsmoor Tr. Testimony at pp. 882:21 - 888:25; *see also,* Def. designations from Victor Dep. Testimony and Colucciello Dep. Testimony.

164.    Moreover, prior to the expiration of the Restricted Period, Abboud advised representatives of Jack Victor, Merrill Sharpe, Alden Street, Cardinal, J.S. Blank and NRDC that

he was under a restrictive covenant until July 13, 2005. Abboud Tr. Testimony at pp. 455:13 - 477:13; Baker Dep. Testimony at pp. 69:2 - 70:13, 71:2-15; Dinsmoor Tr. Testimony at p. 874:7-12.

165.    Although terms for prospective license agreements were discussed during the Restricted Period and prospective terms circulated, at all times relevant the parties contemplated the necessity of a definitive written document, duly executed, to consummate their agreement. Abboud Tr. Testimony at pp. 455:13 - 466:4; Dinsmoor Tr. Testimony at pp. 882:21 - 888:25.

166.    With regard to all potential license agreements for the "jaz" trademark, the drafts of the definitive written license agreements were not even prepared until after the expiration of the Restricted Period; the final license agreements were not executed until after the expiration of the Restricted Period; royalties were not paid until after the expiration of the Restricted Period; and licensed Products were not produced, manufactured or sold until after the expiration of the Restricted Period. Def. Exs. 102 - 104; Pl. Exs. 210 - 211; Abboud Tr. Testimony at pp. 455:13 - 466:4; Dinsmoor Tr. Testimony at pp. 882:21 - 888:25; *see also,* Def. designations from Victor Dep. Testimony.

167.    Further, with respect to the prospective acquisition by Abboud of Merrill Sharpe, the draft of the definitive written document was not even prepared until after the expiration of the Restricted Period; and, a transfer of assets did not occur until after the Restricted Period. Pl. Ex. 360; Def. Ex. 140; Abboud Tr. Testimony at pp. 466:5 - 467:9; Dinsmoor Tr. Testimony at pp. 893:19 - 898:10; *see also,* Def. designations from Schwartz Dep. Testimony.

168.    Moreover, Abboud did not commence the development of a sportswear line with Merrill Sharpe during the Restricted Period and, in fact, did not begin to develop his "jaz" sportswear line until September 2007. Abboud Tr. Testimony at pp. 466:5 - 467:9.

44

169.     Further, with regard to Abboud's consulting arrangement with NRDC, although a draft of the written agreement was prepared during the Restricted Period, it was not finalized and executed until after the expiration of the Restricted Period.  Pl. Exs. 276, 282, 327a; Abboud Tr. Testimony at pp. 483:10 - 486:23; 487:13-19; Dinsmoor Tr. Testimony at pp. 889:1 - 893:18; Baker Dep. Testimony at p. 37:7-13; 87:17 - 88:3.

170.     During the Restricted Period Abboud did not do any consulting work for NRDC. Abboud Tr. Testimony at pp. 483:10 - 485:20.

171.     Finally, with respect to Alden Street, Abboud did not become an owner of that company until Robert Kidder transferred his ownership interest in the company to Abboud on September 6, 2007, after the expiration of the Restricted Period.  Def. Exs. 113 - 140 & 159; Abboud Tr. Testimony at pp. 468:10 - 477:13; Dinsmoor Tr. Testimony at pp. 917:13 - 920:6; *see also*, Def. designations from Sopp Dep. Testimony.

172.     Over a period of approximately two years, during 2005 and 2006, the owners of Fall River Shirt Company, Inc. ("Fall River"), a company that manufactured private label shirts under contract, had attempted to sell their company to potential buyers, including JA Apparel. However, no offers had been obtained from anyone.  Staff Tr. Testimony at pp. 78:13 - 79:5; *see also*, Def. designations from Kidder Dep. Testimony and Colucciello Dep. Testimony.

173.     In late Winter 2007, in light of escalating financial difficulties at Fall River, Robert Kidder, of Fall River, contacted Abboud to inquire as to whether Abboud might be interested in acquiring Fall River.  While Abboud had an interest in acquiring Fall River sometime in Fall 2007, in light of his restrictive covenant with JA Apparel, Abboud had no interest in acquiring Fall River before then.  Abboud Tr. Testimony at pp. 468:10 - 477:13.

174.    In April 2007 Robert Kidder informed Abboud that Fall River was in severe financial distress and would not be able to continue operations until Fall 2007; so Abboud instructed his attorney, Theodore Dinsmoor, to investigate Fall River's financial condition. Abboud Tr. Testimony at pp. 468:10 - 477:13; Dinsmoor Tr. Testimony at pp. 898:11 - 907:5.

175.    After meeting with Fall River personnel and reviewing Fall River's financial statements and corporate documents, Attorney Dinsmoor believed that Fall River was indeed in severe financial distress and would not survive until Fall 2007 without a significant infusion of cash. Dinsmoor Tr. Testimony at pp. 898:11 - 907:5.

176.    As a result, Attorney Dinsmoor, wanting to save the shirt factory, recommended various options for infusing cash into Fall River, including, among others, extending Banknorth's line of credit to Fall River; guaranteeing Banknorth's extension of credit' subordinating Banknorth's security interest to a new creditor; and purchasing Banknorth's position, *i.e.*, the Fall River Note to Banknorth. Dinsmoor Tr. Testimony at pp. 898:11 - 907:5; 1060:1 - 1061:21; *see also*, Def. designations from Sopp Dep. Testimony.

177.    At meetings with Banknorth representatives on or about April 24 and 25, 2007, Banknorth rejected all of Attorney Dinsmoor's options for infusing cash and insisted on foreclosing its security interest in all of Fall River's assets. However, Banknorth did propose a secured party sale of such assets to a new buyer. Dinsmoor Tr. Testimony at pp. 898:11 - 907:5; see also, Def. designations from Sopp Dep. Testimony.

178.    In view of Banknorth's proposal, Attorney Dinsmoor instructed William Sopp, an attorney at Burns & Levinson LLP, to form a new corporation to be called Alden Street; Attorney Dinsmoor also secured Robert Kidder's commitment to become the owner and manager of Alden Street; and, Attorney Dinsmoor secured Abboud's commitment to advance his Merrill

Lynch line of credit to Alden Street by passing it through Herringbone. Def. Exs. 113 - 140 & 159; Abboud Tr. Testimony at pp. 468:10 - 477:13; Dinsmoor Tr. Testimony at pp. 898:11 - 914:17; 1060:1 - 1061:21; 1070:7 - 1072:24; *see also*, Def. designations from Sopp Dep. Testimony.

179.    Thus, Merrill Lynch wired $996,000 to Alden Street to purchase the assets of Fall River from Banknorth; and, subsequently, Alden Street has paid the interest on the principle to Merrill Lynch. Def. Ex. 125; Dinsmoor Tr. Testimony at pp. 909:18 - 914:17; 1070:7 - 1072:24.

180.    Other transfers of funds from Merrill Lynch to Alden Street were made under similar pass through credit arrangements throughout the Restricted Period and thereafter. Def. Exs. 116 - 199; 126 - 127 & 129; Abboud Tr. Testimony at pp. 468:10 - 477:13; Dinsmoor Tr. Testimony at pp. 909:18 - 914:17; 1070:7 - 1072:24.

181.    Thus, while Herringbone was nominally a lender to Alden Street, in point of fact, Herringbone was simply the vehicle through which Abboud's Merrill Lynch line of credit was passed through to Alden Street. Dinsmoor Tr. Testimony at pp. 909:18 - 914:17; 1070:7 - 1072:24.

182.    Therefore, Abboud is properly characterized as the pledgee of securities to Merrill Lynch to secure the line of credit passing through Herringbone to Alden Street. Neither Abboud's role of pledging securities to secure such a line of credit from Merrill Lynch or Herringbone's role in passing through the line of credit to Alden Street constitutes association as an "owner, director, officer, employee, consultant or other participant" of Alden Street. Dinsmoor Tr. Testimony at pp. 909:18 - 914:17; 1070:7 - 1072:24.

183.    The Alden Street transaction was structured in such a way so as not to violate the restrictive covenant in Abboud's Personal Services Agreement.  Def. Exs. 113 - 140 & 159; Dinsmoor Tr. Testimony at pp. 898:11 - 917:5; 1060:1 - 1061:21; 1070:7 - 1072:24.

184.    Neither Abboud or Dinsmoor involved themselves in the day to day operations of Alden Street during the Restricted Period.  Indeed, at all times during the Restricted Period, the day to day operations of Alden Street where conducted by its then owner and manager Robert Kidder.  Abboud Tr. Testimony at pp. 455:13 - 477:13; Dinsmoor Tr. Testimony at pp. 914:18 - 917:5; 917:13 - 920:6; 1035:15 - 1041:2; *see also*, Def. designations from Kidder Dep. Testimony.

185.    Neither Abboud's role as a pledgee securities to Merrill Lynch violates the restrictive covenant of the Personal Services Agreement.  Pl. Ex. 2 at ¶2(a).

186.    Alden Street, a company that manufactures private label shirts under contract, does not compete with JA Apparel, which wholesales shirts manufactured by others, as the two companies operate at different levels of the distribution chain.  Dinsmoor Tr. Testimony at pp. 914:18 - 917:5; *see also*, Def. designations from Colucciello Dep. Testimony and Def. designations from Kidder Dep. Testimony.

187.    During the Restricted Period Alden Street lost more than $500,000.  Since that time, Alden Street has continued to lose money and requires a continual infusion of capital to survive.  Pl. Ex. 336; Abboud Tr. Testimony at pp. 474:8 - 477:13.

188.    All of Abboud's activities during the Restricted Period were in preparation for future or prospective associations that did not occur until after the expiration of the Restricted Period.  Abboud Tr. Testimony at pp. 455:13 - 477:13; Dinsmoor Tr. Testimony at pp. 869:13 -

874:5; 882:21 - 888:25; 893:19 - 898:10; 898:11 - 920:6; 1035:15 - 1041:2; 1060:1 - 1061:21; 1070:7 - 1072:24.

### G. Abboud's Press Conference to Announce the Launch of His "jaz" Menswear Line

189.    JA Apparel argues that Abboud's efforts to prepare for his July 31, 2007 press conference at which he announced his plans for the launch of his "jaz" menswear line were in violation of the restrictive covenant of the Personal Services Agreement.  However, none of Abboud's activities in preparation for the press conference consisted of any commercial activity in competition with JA Apparel.  Abboud Tr. Testimony at pp. 455:13 - 477:13; 487:20 - 490:15.

190.    Rather, at all times relevant, Abboud was acting solely to secure apparel samples that he might use in connection with the July 31, 2007, press conference.  Abboud Tr. Testimony at pp. 455:13 - 477:13; 487:20 - 490:15.

191.    Moreover, the July 31, 2007 press conference was simply to announce Abboud's intention to launch his "jaz" menswear line in Fall 2008 and not to sell or offer products for sale. The samples appearing at the July 31, 2007 press conference were not for sale and were not sold. Abboud Tr. Testimony at pp. 455:13 - 477:13; 487:20 - 490:15; Dinsmoor Tr. Testiomony at pp. 869:13 - 874:5; 882:21 - 888:25; 893:19 - 898:10; 898:11 - 920:6; 1035:15 - 1041:2; 1060:1 - 1061:21; 1070:7 - 1072:24.

### H. JA Apparel's Activities in Violation of Abboud's Publicity Rights

192.    In the spring of 2005 Abboud notified JA Apparel that he would depart the company on or about July 13, 2005, at the end of the Personal Services Period.  Abboud Tr. Testimony at pp. 438:3 - 440:6; Dinsmoor Tr. Testimony at pp. 846:16 - 848:10.

193.    Shortly after Abboud informed JA Apparel that he was leaving the company, Abboud's attorney, in or about April 2005 Theodore Dinsmoor informed JA Apparel's counsel

that once Abboud left, JA Apparel would have to stop any marketing and/or promotional

campaigns referring to "Joseph Abboud" as a person, rather than the JOSEPH ABBOUD brand

of apparel, as Joseph Abboud would no longer be associated with the company, and any

indication that he was would violate Abboud's personal publicity rights and would be misleading

to consumers.  Pl. Ex. 362; Def. Ex. 170; Abboud Tr. Testimony at pp. 440:7 - 441:11; Dinsmoor

Tr. Testimony at pp. 848:25 - 859:19; 863:8 - 864:19.

194.    The notice that Abboud was leaving JA Apparel created a public relations crisis

with JA Apparel, as JA Apparel struggled to explain Abboud's departure to its investors and

customers.  As a result of Abboud's departure, JA Apparel devised a plan to counter Abboud's

departure from the company, both within the trade and to consumers.  Def. Exs. 26 - 30 & 177;

Staff Tr. Testimony at pp. 178:7 - 197:12.

195.    Shortly after Abboud's departure from JA Apparel in July 2005, JA Apparel, with

no intent to use the phrases on clothing, filed trademark applications with the United States

Patent and Trademark Office seeking to register the following phrases as trademarks:

## "BY JOSEPH ABBOUD";

## "JOE BY JOSEPH ABBOUD";

## "Ask Joseph Abboud";

## "Hey Joseph, What Should I Wear?"; and

## "Ask Joseph."

All of these slogans refer to Joseph Abboud the individual.  JA Apparel abandoned each of these

applications.[8]  Def. Ex. 30; Staff Tr. Testimony at pp. 188:16 - 197:12; Def. designations from
Spiel Dep. Testimony.

196.    Since Abboud left the company in July 2005, JA Apparel has used promotional
material, public advertising, publicity campaigns, websites, sponsorships, and even its own
answering service to refer to and mislead the public into believing that Joseph Abboud, the
individual, is still with JA Apparel, designing products for the company and endorsing the
company's products.  Def. Exs. 82, 84, 86, 146 - 152, & 156 - 158; Abboud Tr. Testimony at pp.
443:1 - 445:23; Staff Tr. Testimony at pp. 188:16 - 197:12

197.    These promotional and advertising campaigns repeatedly refer to "Joseph
Abboud" and/or "Joe" as a person and create an identification with "Joseph Abboud" the
designer, rather than the Joseph Abboud brand of apparel.  Def. Exs. 82, 84, 86, 146 - 152, &
156 - 158; Abboud Tr. Testimony at pp. 443:1 - 445:23.

198.    These promotional and advertising campaigns include the following:

## "Hey Joseph, What Should I Wear?";

## "Do You Know Joe?" and

## "Ask Joseph Abboud".

Def. Exs. 82, 84, 86, 146 - 152, & 156 - 158; Abboud Tr. Testimony at pp. 443:1 - 445:23.

---

[8] Of note, JA Apparel has never used the words "By Joseph Abboud" and/or "Joe By Joseph Abboud" as trademarks
or otherwise.  Rather, it has used the words "JOE Joseph Abboud" as the trademark on its off-price brand.  Def. Ex.
156.  As detailed below, as a matter of law, JA Apparel can not use "by Joseph Abboud", "designed by Joseph
Abboud,." "by the designer Joseph Abboud" and/or "by the award winning designer Joseph Abboud," whether as
trademarks or otherwise, since by making such uses JA Apparel would be, as a matter of law, committing a fraud on
the public by representing itself as possessing the personal goodwill (*i.e.*, the skill and abilities) of Abboud.
*Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814, 825 at fn.5 (2d Cir. 1986); *Buffalo Oyster Co. v. Nenno*, 132
Misc. 213, 229 N.Y.S. 210 (N.Y.Sup. 1928) (noting that the plaintiff could not do anything to lead the public to
believe that the defendant was in any way connected with the business of the plaintiff).

199.    JA Apparel has spent millions of dollars to widely promote and advertise these campaigns, including the "Do You Know Joe?" campaign, on the Internet as well as in traditional advertising media.  Def. Exs. 82, 84, 86, 146 - 152, & 156 - 158; Staff Tr. Testimony at pp. 206:14 - 208:5.

200.    In connection with its "Do You Know Joe?" campaign, JA Apparel has used the following phrases to refer to an individual name "Joe":  "Joe has been known to party with the royals"; Joe is irresistible to older women"; "Joe was a former child star.  And he turned out all right"; and "Joe has a drink named after him in Monte Carlo."  Def. Exs. 82, 84, 86, 146 - 152, & 156 - 158.

201.    Since Abboud left the company in July 2005, JA Apparel's use of the name "Joseph Abboud" and/or "Joe" has deceived consumers into believing that Abboud is still affiliated with the company and/or that he is still designing apparel products for the company.  Def. Exs. 82, 84, 86, 146 - 152, & 156 - 158.

202.    Since Abboud left the company in July 2005, JA Apparel has benefited to Abboud's detriment by trading on Abboud's personal reputation, fashion expertise and celebrity status.  Def. Exs. 82, 84, 86, 146 - 152, & 156 - 158; Abboud Tr. Testimony at pp. 443:1 - 445:23.

203.    Abboud has been damaged by the unlawful acts of JA Apparel in the amount of approximately $37.5 million.  This amount was arrived at by estimating the royalties that Abboud should have received from JA Apparel for the period July 2005 to the present for Abboud's publicity rights if such rights would have been licensed by JA Apparel rather than used by JA Apparel without Abboud's authorization.  JA Apparel has indicated that its retail sales have been approximately $300 million and, as an industry average, wholesale sales are

approximately 50% of the retail sales or, in this case, approximately $150 million.  A 10% royalty is common in the industry for a person with the reputation of Abboud, and is also consistent with the royalties his company will be receiving for licensing the "jaz" trademark. Abboud Tr. Testimony at pp. 443:1 - 445:23.

204.    Further, JA Apparel's Chief Executive Officer, in an effort to impede the launch of Abboud's new venture, and otherwise injure Abboud, contacted Richard Baker, the President and Chief Executive Officer of NRDC, the owner of Lord & Taylor, in an effort to impair or prevent Abboud from entering into or maintaining his new business relationship with NRDC.  In making such contact, Staff employed dishonest and unfair means to dissuade Mr. Baker from maintaining his business relationships with Abboud, all in a deliberate attempt to injure Abboud with respect to his lawful business activities, his professional reputation, his personal character, and his ability to engage in his chosen profession by exercising his unique design talents, skills and artistic abilities for his own financial benefit and well being.  As a result of the contacts made by Staff, Richard Baker proceeded more cautiously with respect to NRDC's relationship with Abboud, causing Abboud to suffer a loss of revenues.  Pl. Ex. 327a; Baker Dep. Testimony at pp. 31:14-24; 32:20 - 34:18; 35:7 - 36:4; 43:7-18 45:18 - 47:13; 52:20 - 54:10; 55:3 - 57:22; 147:19 - 149:21; 150:13-18; Abboud Tr. Testimony at pp. 483:10 - 486:23; 487:13-19.

## II.     ABBOUD'S PROPOSED CONCLUSIONS OF LAW

### A.     Jurisdictional Basis

1.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1338(a) and (b) as the parties claims arise under federal law, and pursuant to 28 U.S.C. § 1367 under the principles of pendant jurisdiction for the claims arising under the laws of the State of New York.  However, certain aspects of JA Apparel's claims are not justiciable under Article III of the U.S. Constitution, because the claims would require the Court to issue an advisory opinion on a hypothetical set of facts and/or a set of facts that is unlikely to occur.  12 *Moore's Federal Practice*, § 57.02[3] at 57-10 (Matthew Bender 3d Ed. 1997).

## JA APPAREL'S CLAIMS — PROPOSED CONCLUSION OF LAW

### B.     JA Apparel's Claims — Generally

2.     I rule as a matter of law that the evidence presented at trial, taken as a whole, is legally insufficient to support a general finding in favor of JA Apparel on Claims 1 - 10 of its Complaint; and, therefore, Claims 1 - 10 should be dismissed and judgment entered in favor of Abboud.

### C.     JA Apparel's Claims For Breach of Contract, Declaratory Judgment and Trademark Infringement Must be Dismissed as Abboud did Not Convey or Assign to JA Apparel the Exclusive Right to the Use of His Personal Name Commercially

3.     JA Apparel claims that Abboud, who proposes to use his personal name to communicate truthful and commercially valuable information to the trade and consumers, namely, that he is the designer of the menswear products he plans to market and sell under the "jaz" trademark, is in breach of the Purchase and Sale Agreement and would infringe the JOSEPH ABBOUD trademark in violation of Sections 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

4.      As a matter of law, whether a person who conveys the right to use personal name as a trademark has also conveyed the right to use his personal name in reference to himself and to his own individual reputation and goodwill, and therefore, by later using his name, has committed a breach of contract and/or trademark infringement in violation of the Lanham Act, depends (i) on the terms of the parties' agreement of sale, *i.e.*, whether the individual explicitly sold the exclusive right to use his name in any way, shape or form; and, (ii) on the manner with which the individual is using his or her name, *i.e.*, as a trademark or for descriptive purposes. *Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814, 823 (2d Cir. 1986) (determining that where an individual conveys *no more* than the right to use his name as a trade name or trademark, the individual is "precluded only from using his personal name as part of that of another company or on other products"); *see also Restatement of the Law, Third, Unfair Competition*, § 34 at comment g (noting that an individual who conveys the trademark and/or trade name rights to his personal name may not use the name "as a prominent feature of a trade name or trademark").

5.      In a case involving the sale of a trademark consisting of an individual's personal name, it is presumed that the individual did *not* intend to part with the exclusive right to the use of his name.  *Burns v. Navorska*, 42 Ohio App. 313, 315, 182 N.E. 282, 283 (1932), citing *Nims on Unfair Competition and Trademarks*, 58, § 19 (3rd Ed.).

6.      Thus, as a matter of law, a Court may not bar an individual from using his personal name unless "'his intention to convey an exclusive right to the use of [his] own name' is '*clearly shown*'" in the agreement of sale.  *Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814, 822-23 (2d Cir. 1986) (emphasis added), citing *Guth Chocolate Co. v. Guth*, 215 F. 750, 767 (D.Md. 1914); 3 Callmann, *Unfair Competition, Trademarks & Monopolies*, § 19.60 at 236

(4th Ed. 1983, 1986 Supp.); *see also Yashiro Co. v. Falchi*, No. 99-7541, 1999 U.S. App. LEXIS 18161, at * 2-3 (2d Cir. July 30, 1999); *Robin Woods, Inc. v. Robin F. Woods*, 815 F.Supp. 856, 874 (W.D.Pa. 1992); *Restatement of the Law, Third, Unfair Competition*, § 34 at comment g (noting that "[a]n assignment of a personal name mark will not ordinarily be interpreted to preclude the named individual from all subsequent use of the name in business unless the intention to do so is *clearly shown*" (emphasis added)); *Karsh v. Heiden*, 120 Call. App. 2d 75, 82, 260 P.2d 633, 637 (1st Dist. 1953) (finding that "the right to use one's own name in business may be given up by contract, but in the absence of *express language* to that effect the intention to part with that right will not be presumed" (emphasis added)); *Poorman v. Julian*, 22 Ill. App. 2d 208, 215, 160 N.E. 2d 169, 172 (1959) (determining that "a court in equity will enjoin the use by a natural person of his own name only when there is a grant to someone else of the exclusive right to use it. *This exclusive right must be found in the final agreement of the parties by the use of the word 'exclusive' or the intent of the parties to grant an exclusive right must be manifest*" (emphasis added)).

7.      In the Second Circuit, the exclusive right to use a personal name *cannot be implied* from the sale of the right to use a personal name as a trademark.  Compare *Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814, 822-23 (2d Cir. 1986) (determining that the sale of the "exclusive" right to a "trade name" does not include the exclusive right to a personal name) with *Equibrand Corp. v. Reinsman Equestrian Prods., Inc.*, No. 3:07 Civ. 0536-P, 2007 WL 1461393, at *14 (N.D. Tex. May 17, 2007) (determining that a sale of "all intellectual property", including "trademarks," impliedly includes the use of a personal name in business).

8.      Where, in the agreement of sale, an individual conveys his name as a trademark and reserves the right to return to business after a reasonable period of time, the individual has

not, as a matter of law, conveyed an exclusive right to use his name in any way, shape or form, since the agreement of sale must then be construed as implying that the individual may use his name when he returns to business. *National Starch Mfg. Co. v. Duryea*, 101 F. 117 (2d Cir. 1900); and *Duryea v. Nat'l Starch-Mfg. Co.*, 79 F. 651 (2d Cir. 1897); *Poorman v. Julian*, 22 Ill. App. 2d 208, 216, 160 N.E. 2d 169, 173 (1959); *Hilton v. Hilton*, 89 N.J. Eq. 182, 184-85, 104 A. 375, 376 (1918).

       9.     As a matter of law, JA Apparel, having brought a claim alleging that Abboud breached the Purchase and Sale Agreement by selling the exclusive right to us his name in business, has the burden of proving, by a preponderance of the credible evidence, that the Purchase and Sale Agreement *clearly* shows Abboud's intent to sell such exclusive right and not just his trademarks. This is a higher threshold than simply reading the paragraphs and attempting to determine what the language of the Purhcase and Sale Agreement means -- the Agreement must be clear on its face that Abboud intended to sell the exclusive right to use his name in business. Thus, the failure of the Agreement to clearly indicate that it was Abboud's intent to sell to JA Apparel the exclusive right to the use of his personal name in business, such as a statement to the affect that "For the avoidance of doubt, as part of the Assets to be conveyed by Seller, Seller shall assign, transfer and convey at the Closing the exclusive right to use the name "Joseph Abboud" for commercial benefit in any and all media in perpetuity", constitutes a failure to meet this higher threshold. *Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814, 822-23 (2d Cir. 1986) (determining that the sale of the "exclusive" right to a "trade name" does not include the exclusive right to a personal name); *Restatement of the Law, Third, Unfair Competition*, § 34 at comment g (noting that "[a]n assignment of a personal name mark will not ordinarily be interpreted to preclude the named individual from all subsequent use of the name in

business unless the intention to do so is *clearly shown*" (emphasis added)); *Karsh v. Heiden*, 120 Call. App. 2d 75, 82, 260 P.2d 633, 637 (1st Dist. 1953) (finding that "the right to use one's own name in business may be given up by contract, but in the absence of *express language* to that effect the intention to part with that right will not be presumed" (emphasis added)); *Poorman v. Julian*, 22 Ill. App. 2d 208, 215, 160 N.E. 2d 169, 172 (1959) (determining that "a court in equity will enjoin the use by a natural person of his own name only when there is a grant to someone else of the exclusive right to use it. *This exclusive right must be found in the final agreement of the parties by the use of the word 'exclusive' or the intent of the parties to grant an exclusive right must be manifest*" (emphasis added)); *see also In re Food Mgmt. Group*, LLC, 372 B.R. 171, 188 (Bankr. S.D.N.Y. 2007); *Millgard Corp. v. E.E. Cruz/Nab/Frontier-Kemper*, No. 99 Civ. 2952 (LBS) 2004 WL 1488534, at *4 (S.D.N.Y. July 2, 2004); *see also Republic Corp. v. Procedyne Corp.*, 401 F.Supp. 1061, 1068 (S.D.N.Y. 1975) (noting that under New York law, the elements of an action for breach of contract are "(1) formation of a contract between plaintiff and defendant; (2) performance by plaintiff of any dependent conditions or conditions precedent; (3) defendant's failure to perform; and (4) resulting damage to plaintiff"); *AIM Int'l Trading, L.L.C. v. Valcucine S.P.A.*, No. 02 Civ. 1363 (PKL) 2003 WL 21203503, at *8 (S.D.N.Y. May 22, 2003).

10.     Here, Articles 1.1(a)(A) and 1.1(a)(C) of the Purchase and Sale Agreement do not clearly state that Abboud intended to give up the exclusive right to use his name in any way, shape or form for all time in business.  Accordingly, as a matter of law, it cannot be found that JA Apparel acquired the exclusive right to use Abboud's name in any way, shape or form for all time in business.  *Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814, 822-23 (2d Cir. 1986) (a Court may not bar an individual from using his personal name unless "'his intention to convey

an exclusive right to the use of [his] own name' is '*clearly shown*'" in the agreement of sale) (emphasis added) (citations omitted); *Restatement of the Law, Third, Unfair Competition*, § 34 at comment g (noting that "[a]n assignment of a personal name mark will not ordinarily be interpreted to preclude the named individual from all subsequent use of the name in business unless the intention to do so is *clearly shown*" (emphasis added)); *Karsh v. Heiden*, 120 Call. App. 2d 75, 82, 260 P.2d 633, 637 (1st Dist. 1953) (finding that "the right to use one's own name in business may be given up by contract, but in the absence of *express language* to that effect the intention to part with that right will not be presumed" (emphasis added)); *Poorman v. Julian*, 22 Ill. App. 2d 208, 215, 160 N.E. 2d 169, 172 (1959) (determining that "a court in equity will enjoin the use by a natural person of his own name only when there is a grant to someone else of the exclusive right to use it. *This exclusive right must be found in the final agreement of the parties by the use of the word 'exclusive' or the intent of the parties to grant an exclusive right must be manifest*" (emphasis added)).

11.    Moreover, at the "Closing", which was held on or about July 13, 2000, Abboud conveyed and assigned to JA Apparel the "Trademarks" set forth on <u>Schedule 1.1(a)(A)</u> of the Purchase and Sale Agreement, the "New Trademarks" and the "License Agreements."  Abboud did not convey and/or assign to JA Apparel any exclusive right to the use of Abboud's personal name in any way, shape or form, nor did Abboud convey or assign any of his personal or publicity rights, or any right to use or exploit his individual reputation, persona, likeness or celebrity.  *Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814, 822-23 (2d Cir. 1986) (determining that the sale of a "trade name" does not include the exclusive right to a personal name); Def. Exs. 12 & 179-182.

1.     **The Provisions of the Purchase and Sale Agreement and the Personal Services Agreement Relevant to JA Apparel's Claim**

12.     The Purchase and Sale Agreement and Personal Services Agreement are each governed by New York law.  Pl. Ex. 1.

13.     Pursuant to Article 1.1(a)(A) of the Purchase and Sale Agreement, Abboud agreed that on the closing date he would then convey to JA Apparel "[T]he names, trademarks, trade names, service marks, logos, insignias and designations identified on Schedule 1.1(a)(A), and all trademark registrations and applications therefor, and the goodwill related thereto (collectively, the "Trademarks), together with all causes of action (and the proceeds thereof) in favor of [Abboud] heretofore accrued or hereafter accruing with respect to any of the Trademarks, and all other Intellectual Property (as hereinafter defined)."  Pl. Ex. 1.

14.     Article 3.6(a) of the Purchase and Sale Agreement defines "Intellectual Property" as follows:

> Schedule 1.1(a)(A) sets forth a list of all of the trademark registrations, service mark registrations and applications and copyright registrations and applications currently used by the [Abboud] in connection with the Trademarks (the "Intellectual Property").

Pl. Ex. 1.

15.     Pursuant to Article 1.1(a)(B) of the Purchase and Sale Agreement, Abboud agreed that on the closing date he would then convey to JA Apparel "All licenses to the Trademarks granted by [Abboud] . . . (collectively, the "License Agreements."  Pl. Ex. 1.

16.     Pursuant to Article 1.1(a)(C) of the Purchase and Sale Agreement, Abboud agreed that on the closing date he would then convey to JA Apparel "All rights to use and apply for the registration of new trade names, trademarks, service marks, logos, insignias and designations containing the words 'Joseph Abboud', 'designed by Joseph Abboud,' 'by Joseph Abboud,'

60

'JOE,' or "JA," or anything similar thereto or derivative thereof, either alone or in conjunction with other words or symbols (collectively, the "New Trademarks"), for any and all products or services." Pl. Ex. 1.

17.     Pursuant to Article 1.1(a)(D) of the Purchase and Sale Agreement, Abboud agreed that on the closing date he would then convey to JA Apparel "All books, financial records, invoices, and other documents, records and data files relating primarily to the Trademarks or the License Agreements." Pl. Ex. 1.

18.     Pursuant to Article 1.1(a)(E) of the Purchase and Sale Agreement, Abboud agreed that on the closing date he would then convey to JA Apparel "The goodwill of or pertaining to the Trademarks." Pl. Ex. 1.

19.     Pursuant to Article 1.1(b) of the Purchase and Sale Agreement, Abboud agreed that on the closing date he would convey and assign to JA Apparel the "Trademarks," "New Trademarks" and "License Agreements." Pl. Ex. 1.

20.     Article 2.2 of the Purchase and Sale Agreement sets forth the conveyances that Abboud was to make at the "Closing." Specifically, with respect to intellectual property rights, Abboud agreed to convey to JA Apparel "(vii) instruments of assignments in favor of [JA Apparel] with respect to each of the Trademarks, in form and content acceptable to [JA Apparel], duly executed by Houndstooth or Abboud, as the case may be." Pl. Ex. 1.

21.     Under the terms of the Personal Services Agreement, Abboud agreed to serve as Chairman Emeritus of JA Apparel for a period of five (5) years (the "Personal Services Period"). Pl. Ex. 2 at ¶1(a).

22.     The Personal Services Agreement specifically prohibited Abboud from engaging in any business activities during the Personal Services Period. Pl. Ex. 2 at ¶1(b).

23.    However, the Personal Services Agreement permitted Abboud to make media and celebrity appearances in his individual capacity, as an authority in the fashion design business, in order to protect, preserve and enhance the value of his personal goodwill and his publicity rights. Pl. Ex. 2 at ¶1(b).

24.    Under the terms of the Personal Services Agreement, the Personal Services Period expired on July 13, 2005.  However, the Personal Services Agreement provided that upon the expiration of the Personal Services Period, Abboud would be restricted from becoming "associated" with JA Apparel competitors for a two year Restricted Period commencing July 13, 2005.  Under the terms of the Personal Services Agreement, the Restricted Period expired on July 13, 2007.  Pl. Ex. 2 at ¶2(a).

### 2.    Contract Interpretation — Generally

25.    The role of the courts in interpreting the language of a contractual agreement "is to ascertain the intention of the parties at the time they entered into the contract." *Evans v. Famous Music Corp.*, 1 N.Y.3d 452, 458, 807 N.E.2d 869, 775 N.Y.S.2d 757 (2004); *see also Moncure v. N.Y. State Dep't of Envtl. Conservation*, 218 A.D.2d 262, 265-66, 639 N.Y.S.2d 859, 862 (3d Dep't 1996) (noting that an agreement should be interpreted with its primary purpose in mind and that the words should be construed in light of the objective of the parties).

26.    The parties intent must be gleaned from the agreement as a whole in order to avoid excessive emphasis being placed upon particular words or phrases.  *South Rd. Assoc., LLC v. Int'l Bus. Machs. Corp.*, 4 N.Y.3d 272, 277, 826 N.E.2d 806, 793 N.Y.S.2d 835 (2005); *Empire Props. Corp. v. Mfrs. Trust Co.*, 288 N.Y. 242, 248, 43 N.E.2d 25 (1942).

27.    As a matter of law, this rule "applies with equal force where two documents are contemporaneous and related or where one incorporates the terms of the other" — as is the case

here.  *Proyecfin de Venezuela, S.A. v. Banco Industrial de Venezuela, S.A.,* 760 F.2d 390, 396 (2d Cir. 1985).

28.     Therefore, the Court must interpret contractual agreements together whenever those writings form part of the same transaction.  *RJE Corp. v. Northville Indus. Corp.*, 198 F. Supp. 2d 249, 254 (E.D.N.Y. 2002) (noting that "[a] writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together", quoting *Restatement of the Law, Second, Contracts,* § 202(2) (1979)).

29.     Here, although technically separate writings, the Purchase and Sale Agreement and the Personal Services Agreements are part of an integrated transaction, and thus, as a matter of law, should be read as one and in a manner making their provisions consistent.  Pl. Exs. 1-2; *BGL Dev., Inc. v. Xpedite Sys., Inc*, 184 F. Supp. 2d 360, 361 (S.D.N.Y. 2002) (holding that the parties intended a letter to be read with the original Agreement where the "letter expressly refers to the Agreement ("Per our agreement") and refers to the same transaction as the Agreement"); *see also Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 52-53 (2d Cir. 1993); *This is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998); *Sea Spray Holdings, Ltd. v. Pali Fin. Group, Inc.,* 269 F. Supp. 2d 356, 360 (S.D.N.Y. 2003).

### 3.     Contract Interpretation — Where Sophisticated Business People Negotiate at Arms Length With the Assistance of Counsel

30.     As a matter of law, sophisticated business people who negotiate at arm's length and with the assistance of counsel will be held to the express terms of their agreements.  *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.*, 22 F.3d 458, 462 (2d Cir. 1994) (finding that sophisticated parties who entered into a contract willingly were held to the terms expressed in their contract); *Promotora De Navegacion v. Sea Containers, Ltd.*, 131 F. Supp. 2d 412, 417

(S.D.N.Y. 2000) (noting that "courts in this circuit are loathe to 'ignore . . . language of agreements freely entered into by two sophisticated parties'") (citation omitted).

31.    Here, both the Purchase and Sale Agreement and the Personal Services Agreement were negotiated by sophisticated business people who negotiated at arm's length and with the assistance of counsel.  Pl. Exs. 1 - 2.

32.    When an agreement is negotiated by sophisticated parties, as was the case here, the Court cannot, as a matter of law, interpret the agreement "as impliedly stating something which the parties have neglected to specifically include."  *425 Fifth Ave. Realty Assocs. v. Yeshiva Univ.*, 228 A.D.2d 178, 178, 643 N.Y.S.2d 542, 543 (1st Dep't 1996) (citation omitted); *Civil Serv. Employees Assoc., Inc. v. Plainedge Union Free Sch. Dist.*, 12 A.D.3d 395, 396, 786 N.Y.S.3d 59, 61 (2d Dep't 2004) (noting that "[t]he defendants had the opportunity to include in the collective bargaining agreement any provisions they thought were necessary to protect their rights.  The fact that they failed to do so does not warrant after-the-fact judicial modification to add the language they neglected to include").

### 4.    Contract Interpretation — Ambiguity

33.    As a matter of law, the initial interpretation of a contract includes the threshold question of whether the contract's terms are clear and ambiguous, *i.e.*, terms that suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement.  *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyds, London*, 136 F.2d 82, 86 (2d Cir. 1998).

34.    Whether or not a contract provision is ambiguous is a question of law to be resolved by a court and "must be ascertained from the face of an agreement without regard to extrinsic evidence."  *Reiss v. Fin. Performance Corp.*, 97 N.Y.2d 195, 199, 764 N.E.2d 958, 738 N.Y.S.2d 658 (2001), quoting *Schmidt v. Magnetic Head Corp.*, 97 A.D.2d 151, 157, 468

N.Y.S.2d 649 (2d Dep't 1983); *Van Wagner Adv. Corp. v. S & M Enters.*, 67 N.Y.2d 186, 191, 492 N.E2d 756, 501 N.Y.S.2d 628 (1986).

35.     Therefore, the Court's initial inquiry is to determine "whether the agreement on its face is reasonably susceptible of more than one interpretation." *Chimart Assoc. v. Paul*, 66 N.Y.2d 570, 573, 489 N.E.2d 231, 498 N.Y.S.2d 344 (1986).

36.     The Court may not, as a matter of law, "add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475, 775 N.Y.S.2d 765, 807 N.E.2d 876 (2004), quoting *Reiss v. Fin. Performance Corp.*, 97 N.Y.2d 195, 199, 738 N.Y.S.2d 658, 764 N.E.2d 958 (2001).

37.     As a matter of law, where intent is complete, clear and unambiguous as evidenced by the plain meaning of the language the parties chose to employ in the contract, the contract should be enforced as written. *Marks v. Carrier*, No. 90 Civ. 6714, 1992 WL 245684, at *3 (S.D.N.Y. Sept. 21, 1992).

38.     In such a situation, there is no need to look at extrinsic evidence. *Evans v. Famous Music Corp.*, 1 N.Y.3d 452, 458, 807 N.E.2d 869, 775 N.Y.S.2d 757 (2004); *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569, 780 N.E.2d 647, 750 N.Y.S.2d 565 (2002); *Consolidated Gas Supply Corp. v. Matula*, 36 N.Y.2d 790, 792, 330 N.E.2d 647, 369 N.Y.S.2d 698 (1975) (Jasen, J., dissenting).

39.     As a matter of law, contractual language is unambiguous if it has "a definite and precise meaning," "there is no reasonable basis for a difference of opinion" as to its interpretation and the court can interpret it without the aid of extrinsic evidence. *Sayers v. Rochester Tel. Corp. Supplemental Mgt. Pension Plan*, 7 F.3d 1091, 1094-95 (2d Cir. 1993),

quoting *Breed v. Ins. Co. of North Am.*, 46 N.Y.2d 351, 413 N.Y.S.2d 352, 355, 385 N.E.2d 1280

(1978)); *Lucente v. IBM Corp.*, 310 F.3d 243, 257 (2d Cir. 2002); *Alexander & Alexander Servs.,*

*Inc. v. These Certain Underwriters at Lloyds, London*, 136 F.2d 82, 86 (2d Cir. 1998).

    40.    Conversely, contractual language is ambiguous if a reasonably intelligent and

objective person who considers the language in the context of the entire agreement and who is

aware of the general customs, practices, usages, and terminology of the industry can reach more

than one interpretation. *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1192 (2d

Cir. 1996); *Space Imaging Europe, Ltd. v. Space Imaging L.P.*, 38 F. Supp. 2d 326, 334

(S.D.N.Y. 1999).

    41.    As a matter of law, the language of a contract is not made ambiguous simply

because the parties urge different interpretations. Nor does ambiguity exist where one party's

view "strain[s] the contract language beyond its reasonable and ordinary meaning." *Hunt Ltd. v.*

*Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir.1989); *Bethlehem Steel Co. v. Turner*

*Constr. Co.*, 2 N.Y.2d 456, 459, 161 N.Y.S.2d 90, 141 N.E.2d 590 (1957).

    42.    Here, the language of the Purchase and Sale Agreement, read in conjunction with

the language of the Personal Services Agreement, is, as a matter of law, clear and unambiguous

as to what Abboud was obligated to convey or assign to JA Apparel, namely trademarks and

servicemarks and the goodwill pertaining thereto, as well as license agreements. It is also clear

and unambiguous as to what Abboud was not explicitly obligated to convey or assign to JA

Apparel, specifically the "exclusive right" to use his name in any way, shape or form in business,

other than as a trademark. Pl. Ex. 1.

    43.    Further, the Purchase and Sale Agreement does not contain any provision that

would preclude Abboud from using his personal name to identify himself personally in business;

and, it does not contain a lifetime covenant for Abboud not to compete against JA Apparel. Rather, the Personal Services Agreement contains a limited Restricted Period, which strongly suggests that Abboud did not convey any right to the exclusive use of his name.  Pl. Exs. 1 - 2.

44.     While JA Apparel contends that the terms used in Article 1.1(a)(A) of the Purchase and Sale Agreement are independent of the trademarks on Schedule 1.1(a)(A), *i.e.*, "names" means "names" and not "trademarks", as a matter of law, this argument is belied by the clear and unambiguous language of Article 1.1(a)(A) of the Purchase and Sale Agreement, namely because the words "identified on Schedule 1.1(a)(A)" are *placed at the end of the terms*; and, because the Schedule is a *"Trademark Report By Mark"* that *only* identifies *trademarks and servicemarks and not any names or trade names*, the Court must, as a matter of law, interpret the terms as being descriptive of the marks appearing on Schedule 1.1(a)(A), rather than as being independent of Schedule 1.1(a)(A).[9]  This interpretation is also supported by the language "and all trademark registrations and applications therefore", which encompass the registrations and applications identified on the *"Trademark Report By Mark"*.  Therefore, "names" means *the names that are trademarked on the "Trademark Report By Mark"*.  Also, this interpretation is supported by the language stating that Abboud shall convey "[t]he names", rather than "his name" or "[t]he name Joseph Abboud."  And, this interpretation is confirmed by the fact that Abboud did not convey any exclusive right to the use of his personal name on the closing date. Pl. Ex. 1; Def. Exs. 180 - 182; Pl. Ex. 1; Dinsmoor Tr. Testimony at pp. 864:20 - 869:12; 988:23 - 991:23; 996:25 - 997:25.

---

[9] At trial, LaGueux, the drafter of the Purchase and Sale Agreement, testified that the language of Article 1.1(a)(A) was an attempt to capture various devices, such as "names", that are "embedded in trademarks".  He also testified that Paragraph 1.1(a)(A) was an attempt to acquire "elements" of trademarks, so that these elements could then be used in other trademarks.  LaGueux, when pressed as to where in Article 1.1(a)(A) it says that JA Apparel was acquiring the exclusive right to use Abboud's personal name commercially, admitted that "it is in the nature of what is a trademark".  LaGuex Tr. Testimony at pp. 1126:9-14; 1127:16-18; 1163:22 -1164:6.

45.      In sum, pursuant to the Purchase and Sale Agreement, the "assets" to be sold

under Article 1.1(a)(A), however described in the text, *i.e.*, "names, trademarks, trade names

[etc.]" are those "identified" on Schedule 1.1(a)(A), which is a "*Trademark Report By Mark*"

that only identifies "Trademark[s]", *i.e.*, trademarks and service marks.  Thus, whether the words

"names, trademarks, trade names [etc.]" should be interpreted as *descriptive* of the Marks on

Schedule 1.1(a)(A) or to mean *distinct* forms of intellectual property, is easily resolved by the

fact that the Schedule only *identifies* Trademarks — it does not *identify* any "names", "trade

names" or anything else.  Quite obviously, what was going on here was that the drafter was

trying to capture by description all indicia that would serve as marks and might end up appearing

on Schedule 1.1(a)(A), the list of trademarks, since this deal was never anything other than a

trademark deal.  Further, this interpretation is confirmed by Abboud's representation and

warranty in Article 3.6 that Schedule 1.1(a)(A) sets forth all his "trademark registrations [and]

service mark registrations and applications", without making any representation at all regarding

any "names", "trade names" or anything else.  Finally, this interpretation is confirmed by

Abboud's Assignment of United States Trademark/Service Mark Rights at the Closing, which

again only provides for the assignment of "the Marks and registrations and applications

associated with them".  Again, there was never any assignment and not any mention of any

"names" or "trade names", whatsoever.  Pl. Ex. 1; Def. Exs. 180 - 182; Dinsmoor Tr. Testimony

at pp. 864:20 - 869:12; 988:23 - 991:23; 996:25 - 997:25.

46.      The "assets" to be sold under Article 1.1(a)(C) of the Purchase and Sale

Agreement are the "rights to use and apply for the registration of *new* trade names, trademarks,

[etc.] . . . *containing* the *words* 'Joseph Abboud' . . . for any and all *products and services*"

(emphasis added).  Thus, Article 1.1(a)(C) clearly contemplates the *conveyance* of Abboud's

*consent* to the "use and registration" of *new, i.e., future*, Marks. as required by the Lanham Act,

Section 2(c).  It does not apply to the *conveyance* of *existing* intellectual property, such as

Abboud's personal name or the trade name "Joseph Abboud Worldwide, Inc.", as *existing*

intellectual property is addressed by Article 1.1(a)(A).  Further, Article 1.1(a)(C)'s *consent* to

use and apply for the registration of *new* Marks is limited by the phrase "for any and all goods

and services", which implicitly *excludes* any use *for* the identification of a person, *i.e.*, a

publicity right, or *for* the identification of a business, *i.e.*, a trade name.  This limitation clearly

precludes JA Apparel from *using* the *words* "Joseph Abboud" to designate Abboud as a person,

or to designate its business.[10]  Finally, as in Article 1.1(a)(A), the words "trade names,

trademarks, service marks, logos, insignias and designations" should be interpreted consistently

with the *same* terms in Article 1.1(a)(A) to be *descriptive* of the new Marks.[11]  .  Therefore,

while Article 1.1(a)(C) may bar Abboud from using and registering the *words* "Joseph Abboud"

and/or "designed by 'Joseph Abboud'" as a Mark, he remains free to make use of his personal

---

[10] Thus, as a matter of law, JA Apparel can not use "by Joseph Abboud", "designed by Joseph Abboud,." "by the designer Joseph Abboud" and/or "by the award winning designer Joseph Abboud," whether as trademarks or otherwise, since by making such uses JA Apparel would be, as a matter of law, committing a fraud on the public by representing itself as possessing the personal goodwill (*i.e.*, the skill and abilities) of Abboud.  *Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814, 825 at fn.5 (2d Cir. 1986); *Robin Woods, Inc. v. Robin F. Woods*, 815 F.Supp. 856, 874 (W.D.Pa. 1992) (finding that "the Company has no right to cloak with secrecy the fact that Mrs. Woods is no longer associated with it, nor does it possess the right to represent that it retains her services, and it would be at least misleading were the Company to make such representations to the public"); *Buffalo Oyster Co. v. Nenno*, 132 Misc. 213, 229 N.Y.S. 210 (N.Y.Sup. 1928) (noting that the plaintiff could not do anything to lead the public to believe that the defendant was in any way connected with the business of the plaintiff); *H.H. Skinner v. Annie Oakes*, 10 Mo. App. 45, 56-57 (1881).

[11]  This is confirmed by the trial testimony of both Dinsmoor, who said the words "The names, etc." were descriptive of the marks appearing on Schedule 1.1(a)(A), and LaGueux, who said "The names, etc." were elements of the marks on Schedule 1.1(a)(A), *i.e.*, that such words do *not* reference distinct forms of intellectual property separate and apart from the Marks, themselves.  Dinsmoor Tr. Testimony at pp. 864:20 - 869:12; 988:23 - 991:23; 996:25 - 997:25; LaGueux Tr. Testimony at pp. 1163:22 - 1164:6; 1174:10-11.

name in its *primary descriptive sense* to identify himself and/or describe his own products. Pl.

Ex. 1; Dinsmoor Tr. Testimony at pp. 987:5 - 988:22.[12]

47.     Moreover, JA Apparel's argument that the appearance of the word "designation"

in Article 1.1(a)(C) somehow means that Abboud agreed to convey to JA Apparel the exclusive

right to use his name other than as a trademark is simply wrong, since the word "designation" is

another way to describe a trademark. Indeed, it is well established that the word "designation" is

a term that is often used interchangeably with the word "trademark." *See, e.g.*, *ETW Corp. v.*

*Jireh Pub., Inc.*, 332 F.3d 915, 921-22 (6th Cir. 2003) (stating that "[t]he essence of a trademark

is a *designation* in the form of a distinguishing name, symbol or device which is used to identify

a person's goods and distinguish them from the goods of another") (emphasis added); *Worsham*

*Sprinkler Co., Inc. v. Wes Worsham Fire Protection, LLC*, 419 F. Supp. 2d 861, 867 (E.D. Va.

2006) (noting that "[a] trademark is 'a *designation* used to identify and distinguish the goods of a

person,' while a service mark is a *designation* to identify and distinguish the services of a

person") (emphasis added); McCarthy, *McCarthy on Trademarks*, § 3.1 (noting that under both

common law and federal law, "a trademark is a *designation* used to identify and distinguish the

goods of a person") (emphasis added); *see also Buying For The Home, LLC v. Humble Abode,*

*LLC*, 459 F. Supp. 2d 310, 327 (D.NJ 2006); *Bear U.S.A., Inc. v. Kim*, 993 F.Supp. 894, 895

(S.D.N.Y. 1998); *G.M.L., Inc. v. Mayhew*, 188 F. Supp. 2d 891, 895 (M.D. Tenn. 2002); *Rock &*

*Roll Hall of Fame & Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir. 1998); *Jaro*

*Transp. Servs., Inc. v. Grandy*, No. 4:03-Civ.-01227, 2006 WL 2553424 at *5 (N.D. Ohio Sept.

---

[12] LaGeuex, the drafter of Article 1.1(a)(C) acknowledged that Article 1.1(a)(C) was included in the Purchase and Sale Agreement because JA Apparel did not want Abboud to use and register trademarks containing the words "Joseph Abboud" in the future; and because under Section 2 (c) of the Lanham Act, JA Apparel could not use and register trademarks containing Abboud's name without his consent. Def. Ex. 193; LaGueux Tr. Testimony at pp. 1165:12 - 1166:18; 1167:1 - 1170:16.

5, 2006); *Empire Home Servs., L.L.C. v. Empire Iron Works, Inc.*, No. 05-Civ.-72584, 2006 WL 2269507 at *4 (E.D. Mich. Aug. 8, 2006); *Whirlpool Properties, Inc. v. LG Electronics U.S.A., Inc.*, No. 1:03-Civ.-414, 2006 WL 62846 at *8 (W.D. Mich. Jan. 10, 2006); *Central Mut. Ins. Co. v. StunFence, Inc.*, 292 F. Supp. 2d 1072, 1079 (N.D. Ill. 2003); *Mr. Travel, Inc. v. V. I. P. Travel Service, Inc.*, 268 F.Supp. 958, 961 (N.D. Ill. 1966); *Paramount Pictures Corp. v. Video Broad. Systems, Inc.*, 724 F.Supp. 808, 813 (D. Kan. 1989); *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 925 (10th Cir. 1986).[13]

48.    Moreover, in the Personal Services Agreement, Abboud reserved his personal publicity rights to himself, and was specifically permitted to make media and celebrity appearances in his individual capacity, and to develop his personal reputation, which would imply a right to identify himself.  Pl. Ex. 2 at ¶1(b).

49.    And, pursuant to the Personal Services Agreement, Abboud's design business and/or his trade name, Joseph Abboud Worldwide, Inc., clearly survived the purchase and sale transaction.  Indeed, the Personal Services Agreement provides for JA Apparel to pay money to Joseph Abboud Worldwide, Inc., to support its business offices and staff *after* the purchase and sale transaction.  Pl. Exs. 1 - 2.

50.    The Purchase and Sale Agreement makes no mention of Abboud's personal goodwill as a designer, or to the goodwill of Joseph Abboud Worldwide, Inc.  Although JA

---

[13] JA Apparel's interpretation of Article 1.1(a)(C) is also completely different from the interpretation provided by LaGueux, the drafter of Article 1.1(a)(C), as to why Article 1.1(a)(C) gives JA Apparel the exclusive right to use Abboud's personal name in business. LaGueux testified that if you cut Article 1.1(a)(C) into four parts, and then take the first part, *i.e.*, the words "all rights to use and apply for registration of"; and you then cut out the second part, *i.e.*, the words "new trade names, trademarks, service marks, logos, insignias and designations"; so you can continue uninterrupted with the third part, *i.e.*, the words "Joseph Abboud"; and, then tack on the fourth part, *i.e.*, the words "for any and all products or services", the Article gives JA Apparel has the right to use the words "Joseph Abboud" for any and all products and services.  Further, by cutting out the word "designations", LaGueux completely undermines JA Apparel's reading of Article 1.1(a)(C), which is based entirely on its reading of  the word "designations".  LaGueux Tr. Testimony at pp. 1164:7 - 1165:11.

Apparel contends that the goodwill sold also encompasses Abboud's personal goodwill, the goodwill that Abboud sold is expressly attached to the Trademarks; and, there is no mention of Abboud's personal goodwill or the business goodwill attached to the trade name, Joseph Abboud Worldwide, Inc., which Abboud continued to own after the sale.  Pl. Ex. 1.

51.     Moreover, at all times prior to the Purchase and Sale Agreement, JA Apparel was only a licensee of the JOSEPH ABBOUD trademarks, duly authorized to *manufacture* the apparel products that Abboud personally *designed* and *approved*.  At no time prior to the execution of the Purchase and Sale Agreement, did JA Apparel have any rights of ownership in the JOSEPH ABBOUD trademarks or in the good will associated with the trademarks.  Rather, that goodwill inured to Abboud personally.  As such, this case is readily distinguishable from *Levitt Corp. v. Levitt*, 593 F.2d 463, 468 (2d Cir. 1979), wherein Levitt assigned both his name and trademark to the acquiring corporation and thereafter continued to build up the brand.

52.     Furth, there is no term, language or provision in the Purchase and Sale Agreement explicitly obligating Abboud to convey to JA Apparel the exclusive right to use and exploit the name "Joseph Abboud, other than as a trademark, for any and all commercial purposes, even to the exclusion of Abboud, forever.  Certainly, if JA Apparel had ever intended to bargain for such an exclusive right, it could have insisted on language in the Purchase and Sale Agreement explicitly stating that Abboud would convey the exclusive right to use and exploit the name "Joseph Abboud", other than as trademark, for any and all commercial purposes, even to the exclusion of Abboud, forever, but it **CLEARLY** did not do so; it never even mentioned such an exclusive right in any of its negotiations with Abboud; or in any of its communications with Abboud and his attorney; or in the Purchase and Sale Agreement; or in any of the Assignments delivered at Closing.  Pl. Ex. 1.

53.     Moreover, there is no term, language or provision in the Purchase and Sale Agreement pursuant to which Abboud agreed never to use his name, Joseph Abboud, other than as a trademark; or, agreed to refrain from using his name in his business, or to identify himself in connection with commercial activities, or to describe an attribute of the products that he markets and sells; or, agreed to waive, relinquish, forego and forfeit all rights respecting any common law or statutory "fair use" defense with respect to the use of the name "Joseph Abboud", other than as a trademark, either in business or as a descriptive term for products and services or in connection with any commercial endeavor, or for commercial purposes in any and all media.  Pl. Ex. 1.

54.     Finally, there is no term, language or provision in the Purchase and Sale Agreement pursuant to which Abboud agreed to assign any of his personal or publicity rights, including the use of his personal name Joseph Abboud; or his portrait or picture; or his individual persona, likeness, or appearance; or his accomplishments reputation and celebrity, to JA Apparel. Pl. Ex. 1.

55.     In fact, at the "Closing", which was held on or about July 13, 2000, Abboud only delivered three (3) assignments to JA Apparel: one Assignment of the "Trademarks"; a second Assignment of the "New Trademarks"; and, a third Assignment of the "License Agreements." Def. Exs. 180 - 182; Abboud Tr. Testimony at pp. 417:16 -421:7; Dinsmoor Tr. Testimony at pp. 830:17 - 839:23; LaGueux Tr. Testimony at p.1173:2-22.

56.     Abboud did not deliver at the Closing any assignments of any exclusive right to use and exploit the name "Joseph Abboud", other than as a trademark, for any and all commercial purposes, even to the exclusion of Abboud, forever;, nor, did Abboud ever convey or assign to JA Apparel any of his publicity rights, his personal name; his likeness, persona, or

celebrity.  Pl. Ex. 1; Def. Exs. 180 - 182; Abboud Tr. Testimony at pp. 417:16 -421:7; Dinsmoor Tr. Testimony at pp. 830:17 - 839:23; Def. Exs. 180 - 182; LaGueux Tr. Testimony ay pp. 1179:24 - 1180:6.

57.    Abboud did not deliver at the Closing any assignment referencing his trade name Joseph Abboud Worldwide Inc.; or any trade names or the right to use his personal name as a trade name in JA Apparel's business or the business of its manufacturing facility in New Bedford, Massachusetts.  Pl. Ex. 1; Def. Exs. 180 - 182; Abboud Tr. Testimony at pp. 417:16 - 421:7; Dinsmoor Tr. Testimony at pp. 830:17 - 839:23; Def. Exs. 180 - 182.

58.    Accordingly, as the Purchase and Sale Agreement is not ambiguous as to what Abboud agreed to convey; and, in fact, what he conveyed on the closing date, namely trademarks and the goodwill pertaining thereto, as well as license agreements, the Court, as a matter of law, need not look at extrinsic evidence to determine the intent of the parties.  *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir.1989); *Bethlehem Steel Co. v. Turner Constr. Co.*, 2 N.Y.2d 456, 459, 161 N.Y.S.2d 90, 141 N.E.2d 590 (1957).

### 5.    Contract Interpretation — Course of Conduct

59.    Under New York law, evidence of the parties' course of conduct is admissible to interpret a contract, even if the contract is unambiguous.  *Time Warner Cable v. City of N.Y.*, 943 F.Supp. 1357, 1390 (S.D.N.Y. 1996).

60.    Indeed, as a matter of law, the parties' interpretation of the contract in practice, prior to litigation, "is deemed of great, if not controlling, influence"  *IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp.*, 26 F.3d 370, 374 (2d Cir. 1994), quoting *Old Colony Trust Co. v. Omaha*, 230 U.S. 100, 118, 33 S.Ct. 967, 57 L.Ed. 1410 (1913); *Ocean Transport Line, Inc. v. Am. Philippine Fiber Indus.*, 743 F.2d 85, 91 (2nd Cir. 1984) (noting that "the "parties' interpretation of the contract in practice, prior to litigation, is compelling evidence of the parties'

74

intent"); *Time Warner Cable v. City of N.Y.*, 943 F.Supp. 1357, 1390 (S.D.N.Y. 1996); *see also Federal Ins. Co. v. Americas Ins. Co.*, 258 A.D.2d 39, 44, 691 N.Y.S.2d 508, 512 (1st Dep't 1999) (stating that the course of performance under a contract is considered to be the "most persuasive evidence of the agreed intention of the parties"); *Restatement, Second, of Contracts* § 202 comment g (stating that "[t]he parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning").

61.     Here, as a matter of law, the conduct of JA Apparel following the sale of the JOSEPH ABBOUD trademarks is compelling evidence that JA Apparel understood that all it had acquired in the Purchase and Sale Agreement where trademarks. S*ee, e.g.,* Def. Ex. 14 (a July 6, 2000 press release in which JA Apparel, in connection with its announcement that it had recently acquired the "Joseph Abboud fashion label," indicated that "*[u]nder the terms of the acquisition, Hdp purchased all existing trademarks and licensing agreements and all future trademarks bearing the Joseph Abboud name*") (emphasis added); Def. Ex. 15 (in an August 8, 2002 letter, to the *Westchester County Times*, Robert J. Wichser, then President and Chief Operating Officer of JA Apparel, stated that "[t]he Joseph Abboud brand is produced by JA Apparel - a wholly owned division of GFT NET since July 2000, *when the latter acquired all existing trademarks, license agreements and new trademarks bearing the Joseph Abboud name*" (emphasis added); Def. Ex. 18 at ¶31 (in its September 18, 2003 Statement of Undisputed Facts filed in support of JA Apparel's Motion for Summary Judgment in the case captioned *Joseph Abboud and Houndstooth Corp. v. Robert J. Wichser and JA Apparel Corp., et al.*, Index Nos. 604033/02 and 602211/03 (NY Sup, Cty of NY), JA Apparel's then counsel indicated that "*JA Apparel paid Mr. Abboud $65.5 million for his trademarks*") (emphasis added); Def. Ex. 23 at ¶2.19 (Nowhere in the February 14, 2004 Stock Purchase Agreement in which JA Holding, Inc., a company owned

by JW Childs Equity Partners, purchased JA Apparel from GFT (USA) Corp., is there any indication that JA Apparel was the owner of the personal name "Joseph Abboud"); Def. Ex. 24 at ¶ Schedule 2.19(b) (Nowhere in the Disclosure Schedules to the February 14, 2004 Stock Purchase Agreement is there any indication that JA Apparel was the owner of the personal name "Joseph Abboud").

### 6.    Contract Interpretation — Extrinsic/Parol Evidence

62.    In the event the Court determines that the language of the Purchase and Sale Agreement is susceptible to more than one interpretation and is therefore ambiguous as to what assets Abboud conveyed to JA Apparel, the Court should look at extrinsic/parol evidence for guidance in determining the intent of the parties as to which interpretation should prevail. *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992); *CBS Broad. Inc. v. Jones*, 460 F. Supp. 2d 500 (S.D.N.Y. 2006); *Evans v. Famous Music Corp.*, 1 N.Y.3d 452, 459, 807 N.E.2d 869, 775 N.Y.S.2d 757 (2004); *Blue Jeans U.S.A., Inc. v. Basciano*, 286 A.D.2d 274, 276, 729 N.Y.S.2d 703, 705 (2001); *Hartford Acc. & Indem. Co. v. Wesolowski*, 33 N.Y.2d 169, 172, 305 N.E.2d 907, 350 N.Y.S.2d 895 (1973).

63.    Here, it is clear from the documents memorializing the negotiations leading up to the execution of the Purchase and Sale Agreement and the Personal Services Agreement that the parties intended that Abboud convey or assign to JA Apparel trademarks and license agreements and nothing more. Def. Ex. 161 (a Nov. 11, 1999 letter containing the "Point of Agreement" and specifying that JA Apparel was interested in purchasing "all Joseph Abboud trademarks"); Def. Ex. 8 (a Feb. 25, 2000 letter indicating that the objective of the transaction "was and still is the acquisition of the trademarks" and, in reference to Joseph Abboud Worldwide, Inc., stating that JA Apparel was "not interested in buying companies"); Def. Ex. 11 (a March 17, 2000 letter of intent indicating that the assets to be purchased by JA Apparel included the "Trademarks"; the

right to use and apply for registration of the "New Trademarks"; and all licenses to use the "Trademarks." The letter of intent formed the basis for drafting the Purchase and Sale Agreement).

### 7.    Contract Interpretation — *Noscitur A Sociis* Doctrine

64.    Moreover, the Court should apply the traditional canon of contract construction, *noscitur a sociis*, which dictates that words grouped in a list should be given related meaning. *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 36, 110 S.Ct. 929, 108 L.Ed.2d 23 (1990); see also *Jarecki v. G. D. Searle & Co.*, 367 U.S. 303, 81 S. Ct. 1579, 6 L. Ed. 2d 859 (1961) (stating that "[t]he maxim *noscitur a sociis*, that a word is known by the company it keeps, while not an inescapable rule, is often wisely applied where a word is capable of many meanings"); *Permatex, Inc. v. Loctite Corp.*, No. 03 Civ. 943 (LAK) (GWG), 2003 WL 22683341, at *7 (S.D.N.Y. Nov. 14, 2003) (noting that "[u]nder the doctrine of *noscitur a sociis*, where the meaning of a word is unclear, a court will look at the surrounding words to ascertain the doubtful word's meaning").

65.    Here, Article 1.1(a)(A) of the Agreement expressly provides for the sale of the "names, trademarks, trade names, service marks, logos, insignias and designations", which are all identified on Schedule 1.1(a)(A) by either their application numbers or their registration numbers and defined as the "Trademarks". Manifestly, Schedule 1.1(a)(A) is a "*Trademark Report By Mark*" containing the registered numbers and application numbers for trademarks. There are no names, no trade names, no logos, no insignias and no designations on the Schedule - only trademarks. Thus, "names, trademarks, trade names, service marks, logos, insignias and designations" must all be construed as terms describing the trademarks identified on Schedule 1.1(a)(A), as indicated by the encapsulating definition of all such terms as "Trademarks." Pl. Ex. 1.

66.    Further, Article 1.1(a)(C) of the Agreement provides for the sale of "all rights to use and apply for the registration of new trade names, trademarks, service marks, logos, insignias and designations containing the *words* "Joseph Abboud" (emphasis added), which are all defined as the "New Trademarks".  Although JA Apparel contends that the reference to "designations containing the words 'Joseph Abboud'" suggests the sale of something more than trademarks, these words should be construed the same as in Article 1.1(a)(A), *i.e.*, as terms that are descriptive of the "New Trademarks."  Moreover, Article 1.1(a)(C) defines all the "trade names, trademarks, service marks, logos, insignias and designations" referenced to therein as "New Trademarks", and grants the right to use the New Trademarks "for any and all products or services", which indicate a trademark usage only, not any non-trademark usage such as a reference to an individual.  Pl. Ex. 1.

### 8.    Contract Interpretation — Any Ambiguities Are to be Resolved Against the Party Who Drafted the Agreement

67.    Finally, as a matter of law, any ambiguities in the language of the Purchase and Sale Agreement must be construed against JA Apparel, the party who drafted the Agreement. *Jacobson v. Sassower*, 66 N.Y.2d 991, 993, 489 N.E.2d 1283, 1284, 499 N.Y.S.2d 381, 382 (1985) (determining that "[i]n cases of doubt or ambiguity, a contract must be construed most strongly against the party who prepared it"); *General Venture Capital Corp. v. Wilder Transp., Inc.*, 26 A.D. 2d 173, 271 N.Y.S.2d 805 (1st Dep't 1966) (noting that where the "remaining doubt as to the proper interpretation is merely as to which of two possible and reasonable meanings should be adopted, the court will adopt that one which is the less favorable in its legal effect to the party who chose the words"); *Rentways, Inc. v. O'Neill Milk & Cream Co.*, 308 N.Y. 342, 347, 126 N.E.2d 271 (1955) (finding that "where there is ambiguity in the terms of a contract prepared by one of the parties, it is consistent with both reason and justice that any fair

doubt as to the meaning of its own words should be resolved against such party"); *Chatterjee Fund Mgmt., L.P. v. Dimensional Media Assoc.*, 260 A.D.2d 159, 687 N.Y.S.2d 364 (1st Dep't 1999).

> **9.    An Individual Who Only Conveys the Right to Use His Name as a Trademark is Precluded Only From Using His Name in the Future as a Trademark**

68.    Where, as here, Abboud only conveyed to JA Apparel the right to use his name as a trademark, as a matter of law, he is only precluded from using his personal name on other products. *Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814, 823 (2d Cir. 1986) (noting that where an individual conveys only the right to use his name as a trade name or trademark he is "precluded only from using his personal name as part of that of another company or on other products"), citing *Levitt Corp. v. Levitt*, 593 F.2d 463, 468 (2d Cir. 1979); *Taylor Wine Co. v. Bully Hill Vineyards, Inc.*, 569 F.2d 731, 75 (2d Cir. 1978); *see also Restatement of the Law, Third, Unfair Competition*, § 34 at comment g (noting that an individual who conveys the trademark and/or trade name rights to his personal name may not use the name "as a prominent feature of a trade name or trademark").

69.    Moreover, as a matter of law, when an individual only conveys the right to use his name as a trademark he is not precluded from taking advantage of his individual reputation by establishing a company which competes against the purchaser of the trademark. *Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814, 823 (2d Cir. 1986), citing 3 Callmann, *Unfair Competition, Trademarks & Monopolies*, § 19.60 at 236 (4th Ed. 1983, 1986 Supp.); *Guth Chocolate Co. v. Guth*, 215 F. 750, 767 (D.Md. 1914); *The Lepage Co. v. Russia Cement Co.*, 51 F. 941, 944-46 (1st Cir. 1892); *see also Joseph Scott Co. v. Scott Swimming Pools, Inc.*, 764 F.2d 62, 67 (2d Cir. 1985); *Robin Woods, Inc. v. Robin F. Woods*, 815 F.Supp. 856, 874 (W.D.Pa. 1992); *Restatement of the Law, Third, Unfair Competition*, § 34 at comment g.

70.     Further, when an individual only conveys the right to use his name as a

trademark, as a matter of law, he is not precluded from "advertising, in a not overly intrusive

manner, that he is affiliated with a new company."  In fact, such advertising can include, and

Abboud has the right to, just as in *Madrigal*, where the Second Circuit found that Levinson had

the absolute right to "inform[] the public that he is designing audio equipment for Cell", inform

the public that he is the designer of the "jaz" menswear line.  *Madrigal Audio Labs., Inc. v.

Cello, Ltd.*, 799 F.2d 814, 823 (2d Cir. 1986)[14], citing 3 Callmann, *Unfair Competition,

Trademarks & Monopolies*, § 19.60 at 236 (4th Ed. 1983, 1986 Supp.); *Guth Chocolate Co. v.

Guth*, 215 F. 750, 767 (D.Md. 1914); *Auto Hearse Mfg. Co. v. Bateman*, 109 A. 735, 736 (N.J.

Ch. 1920); *see also Timm Med. Techs., Inc. v. Soma Blue, Inc.*, No. 99 Civ. 2011, 2002 WL

64456, at *5 (D.Minn. Jan. 15, 2002); *Restatement of the Law, Third, Unfair Competition*, § 34

at comment g (noting that an individual who conveys the trademark and/or trade name rights to

his personal name may use the name in "promotional material describing a new business").

71.     Accordingly, because Abboud only conveyed to JA Apparel the right to use his

name as a trademark; and because Abboud does not intend to use his name as a trademark in

connection with his "jaz" business, he is not precluded, as a matter of law, from taking advantage

---

[14] Contrary to JA Apparel's arguments, there is nothing in Madrigal which would prohibit Abboud from using his name otherwise as mark in brochures pursuant to 15 U.S.C. § 1115(b)(4).  Rather, an accurate reading of Madrigal reveals that it was Eginton, D.J. who, after admitting that he did not "understand anything about the merits of any . . . trademark case" and was "not about to educate [himself] in that jungle", issued a May 31, 1985, preliminary injunction prohibiting Cell from using the phrase "Cello By Mark Levinson" on product and further ordered "Cello from using . . . brochures linking Levinson to Cello", because "there is a likelihood of confusion . . . in the trade by the simultaneous use of Mark Levinson by the two companies."  There is no discussion in the Second Circuit decision regarding how the phrase "Cello By Mark Levinson" would be used, *i.e.*, the prominence, placement and presentation of the phrase.  Further, this preliminary injunction was not appealed and therefore not addressed by the Second Circuit, which only focused on a Feb. 24, 1986, modified injunction.  Nevertheless, the Court severely criticized Eginton for his ignorance about trademark law; and, by virtue of its opinion, proceeded to permit Levinson to "advertise" his involvement with Cello.  In any event, Abboud does not propose to use his name on product and has indicated that he would only use his name in a clear reference to himself, *i.e.*, as the "designer Joseph Abboud" and/or "award winning designer Joseph Abboud", as exemplified in Def. Exs. 187 - 188.

of his individual reputation as a world class designer by making use of his personal name in advertising and promotional materials to convey truthful and valuable commercial information to the trade and consumers, namely that he is the designer of the menswear products he plans to market and sell under his "jaz" trademark. *Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814, 823 (2d Cir. 1986); *Taylor Wine Co. v Bully Hill Vineyards, Inc.*, 569 F.2d 731 (2d Cir. 1978); *Timm Med. Techs., Inc. v. Soma Blue, Inc.*, No. 99 Civ. 2011, 2002 WL 64456, at *5 (D.Minn. Jan. 15, 2002); *Robin Woods, Inc. v. Robin F. Woods*, 815 F.Supp. 856, 874 (W.D.Pa. 1992); *Restatement of the Law, Third, Unfair Competition*, § 34 at comment g; *see also* Def. Exs. 12, 179 - 182; Abboud Tr. Testimony.

72.     Notably, all of the cases that JA Apparel relies upon in support of its contention that Abboud should not be able to make *any non-trademark commercial use* of his name are cases in which the defendant was using his name as a trademark, service mark or trade name. Accordingly, none of the defendants in these cases were using there personal name, other than as a trademark, in business. *See, e.g.*, *Levitt Corp. v. Levitt*, 593 F.2d 463, 468 (2d Cir. 1979); *In re The Leslie Fay Cos., Inc.*, 216 B.R. 117 (S.D.N.Y. 1997); *Lazzaroni USA Corp. v. Steiner Foods*, 2006 WL 932345 (D.N.J. 2006); *Basile S.P.A. v Basile*, 899 F.2d 35 (D.C. Cir. 1990); *Guth Chocolate Co. v. Guth*, 215 F. 750, 767 (D.Md. 1914); *The Lepage Co. v. Russia Cement Co.*, 51 F. 941, 944-46 (1st Cir. 1892). As a matter of law, these cases are not applicable here as Abboud has conceded that he will not use his name as a trademark or service mark, rather, he proposes to use his name, other than as a trademark in business, which he has the absolute right to do under 15 U.S.C. § 1115(b)(4).

10. **Abboud's Proposed Use of His Name Does not Constitute an Arrogation or Free Riding on the Goodwill of JA Apparel's Trademarks**

73.     Here, the record is clear that for over 40 years Abboud has been developing his talents, skills and artistic abilities as a designer of menswear and other consumer products. Over that period, he has developed a widespread and impeccable reputation as a designer of apparel and fashion items and, beyond his reputation as a designer, Abboud has built a widespread reputation as a celebrity and public personality. This Abboud has done, as the parties contemplated in the Personal Services Agreement, both before and after he assigned his trademarks to JA Apparel. Abboud's reputation as a designer, personality and celebrity is separate and apart from the JOSEPH ABBOUD brand. Abboud Tr. Testimony at 312:12 - 361:14; 363:15 - 364:2; Baker Dep. Testimony at p. 138:4-15; Frankfort Tr. Testimony at pp. 1092:11 - 1097:12; Kolb Tr. Testimony at pp. 968:16 - 975:25; Mitchell Dep.. Testimony at pp. 58:17 - 59:15; 64:20 - 65:5; 82:9-15.

74.     Moreover, the record is clear that throughout the period of Abboud's involvement in the joint venture known as JA Apparel, from March 1988 through July 1996, Abboud continued to own and exploit the JOSEPH ABBOUD trademarks for his own use and benefit to identify himself as the designer of the apparel products that JA Apparel and others manufactured, marketed and sold under his license. Def. Ex. 165; Abboud Tr. Testimony at pp. 335:1 - 337:17; Dinsmoor Tr. Testimony at pp. 746:7 - 747:4.

75.     Further, the record is clear that throughout the period following the termination of the joint venture, Abboud continued to own and exploit the JOSEPH ABBOUD trademarks for his own use and benefit to identify himself as the designer of the apparel products that JA Apparel and others manufactured, marketed and sold under license from Abboud. Def. Exs. 183 - 184; Dinsmoor Tr. Testimony at pp. 751:11 - 753:14.

76.    In fact, at all times prior to entering into the Purchase and Sale Agreement in June

2000, Abboud owned and exploited the JOSEPH ABBOUD trademarks for his own use and

benefit to identify himself as the designer of the apparel products that JA Apparel and others

manufactured, marketed and sold under license from Abboud.  Def. Exs. 165, 183 - 184; Abboud

Tr. Testimony at pp. 335:1 - 337:17; Dinsmoor Tr. Testimony at pp. 746:7 - 747:4; 751:11 -

753:14.

77.    Finally, the Purchase and Sale Agreement and the Assignments that Abboud

delivered to JA Apparel on the Closing Date make it clear that Abboud did not assign his name

to JA Apparel or any exclusive right to use his name in any way, shape or form; he did not

convey his design business to JA Apparel; and, he did not convey his trade name, Joseph

Abboud Worldwide, Inc., or any other trade name to JA Apparel.  Accordingly, as a matter of

law, Abboud retained all the *personal goodwill* attendant to his name, his design business and his

trade name, Joseph Abboud Worldwide, Inc., for his own future use and benefit.  *Madrigal*

*Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814, 825 (2d Cir. 1986) (distinguishing between

seller's use of trade name that he sold and use of his personal name to identify himself in a new

business venture in order to take advantage of his personal reputation as a designer of audio

equipment) ; *Timm Med. Techs., Inc. v. Soma Blue, Inc.*, No. 99 Civ. 2011, 2002 WL 64456, at

*6 (D.Minn. Jan. 15, 2002) (holding that seller of business, trade name and trademarks could

subsequently use his name to "advertise" his reputation as a designer of medical equipment in

connection with a new business venture); *Karsh v. Heiden*, 120 Cal. App. 2d 75, 82, 260 P.2d

633, 637 (1953) (stating that "it is not necessarily unfair" for a party that sold business and trade

name to subsequently "cash in" on his personal reputation in order to advance future business

interests) .

78.     As a matter of law, although a personal name has become a trademark "it continues to serve the important function of its bearer of acting as a symbol of that individual's personality, reputation and accomplishments *as distinguished* from that of the business, corporation or otherwise, from which he has been associated."  *Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814, 822 (2d Cir. 1986) (emphasis added), citing 3 Callmann, *Unfair Competition, Trademarks & Monopolies*, § 17.06 (4th Ed. 1983, 1986 Supp.); *Timm Med. Techs., Inc. v. Soma Blue, Inc.*, No. 99 Civ. 2011, 2002 WL 64456, at *6 (D.Minn. Jan. 15, 2002); *Robin Woods, Inc. v. Robin F. Woods*, 815 F.Supp. 856, 874 (W.D.Pa. 1992); *Karsh v. Heiden*, 120 Cal. App. 2d 75, 82, 260 P.2d 633, 637 (1953); *see also Gucci v Gucci Shops, Inc.*, 688 F. Supp. 916 (S.D.N.Y. 1988); *Taylor Wine Co. v Bully Hill Vineyards, Inc.*, 569 F.2d 731 (2d Cir. 1978).

79.     Moreover, where, as here, an individual only assigns the right to use his name as a trademark, the personal goodwill of the individual (*i.e.*, the individual's experience, skill and reputation) remains his, and does not pass to the purchaser of the trademark.  *Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814, 825 (2d Cir. 1986) (finding that "Madrigal at most acquired such goodwill as was associated with the use of the trade name 'Levinson' by MLAS and not the right to use Levinson's personal name as a symbol of his individual reputation"); *Timm Med. Techs., Inc. v. Soma Blue, Inc.*, No. 99 Civ. 2011, 2002 WL 64456, at *6 (D.Minn. Jan. 15, 2002) (the "court declines to prohibit Osbon from using his personal name as a symbol of his individual reputation and advertising his affiliation with defendants"); *Robin Woods, Inc. v. Robin F. Woods*, 815 F.Supp. 856, 874 (W.D.Pa. 1992); *Karsh v. Heiden*, 120 Cal. App. 2d 75, 82, 260 P.2d 633, 637 (1953); *Collas v. Brown*, 211 Ala. 443, 100 So. 769 (1924).

80.     Further, the record is clear that in the Personal Services Agreement that accompanied the Purchase and Sale Agreement, Abboud reserved unto himself the right to

84

exploit his name, image and persona as an expert in the fashion business and as a celebrity on television or in other media in order to exploit his name for his own use and benefit. Thus, the Personal Services Agreement makes it abundantly clear that Abboud, despite his sale of the JOSEPH ABBOUD trademark, intended to reserve and did reserve his name to identify himself as a designer of apparel, as an expert in the fashion business and as a celebrity. Pl. Ex. 2 at ¶1(b); Abboud Tr. Testimony at pp. 413:24 - 417:15.

81.    Significantly, where an individual has sold his name as a trademark and subsequently proceeds to use his name as a trademark, the courts are justified in granting "sweeping injunctive relief" as a means of *correcting* such *bad faith* infringement. *Levitt Corp. v. Levitt*, 593 F.2d 463, 468 (2d Cir. 1979) (Levitt used "Levittown Florida" on his Florida real estate project); *Guth Chocolate Co. v. Guth*, 215 F. 750, 767 (D.Md. 1914) (Guth used his name prominently on the packages for his candy); and *The Lepage Co. v. Russia Cement Co.*, 51 F. 941, 944-46 (1st Cir. 1892) (LePage used his name on the bottles containing his glue).

82.    Moreover, when an individual uses his name in association with a *prior business affiliation* to "purposefully identify himself with the accomplishments of the original corporation", the individual is then arrogating for himself "the trade reputation for which he received valuable consideration" in order to trade upon the goodwill associated with the prior company. *Levitt Corp. v. Levitt*, 593 F.2d 463, 468 (2d Cir. 1979); *Guth Chocolate Co. v. Guth*, 215 F. 750, 767 (D.Md. 1914); *The Lepage Co. v. Russia Cement Co.*, 51 F. 941, 944-46 (1st Cir. 1892).

83.    However, Abboud has not and has no intention of using his name as a trademark and/or promoting, advertising or otherwise communicating his prior association with JA Apparel. Def. Exs. 187 - 188; Abboud Tr. Testimony at pp. 492:13 - 494:5; 501:15 - 502:3;

549:6 - 552:15; 554:1 - 555:11; 556:15 - 557:24; 568:10 - 570:25; 572:4 - 574:21; 579:4-21; 587:18 - 590:5; 603:10 - 609:8; 732:9 - 737:2.  Thus, as a matter of law, this case is clearly distinguishable from *Levitt Corp. v. Levitt*, 593 F.2d 463, 468 (2d Cir. 1979), *Guth Chocolate Co. v. Guth*, 215 F. 750, 767 (D.Md. 1914) and *The Lepage Co. v. Russia Cement Co.*, 51 F. 941, 944-46 (1st Cir. 1892), wherein the sellers of businesses, were precluded from trading on the good will of the businesses that they sold.

84.    Moreover, JA Apparel did not acquire and, as a matter of law, could not acquire, Abboud's personal reputation for exercising his talents, skills and artistic abilities as a designer. *Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814, 825 at fn.5 (2d Cir. 1986); *H.H. Skinner v. Annie Oakes*, 10 Mo. App. 45, 56-57 (1881); *see also Collas v. Brown*, 211 Ala. 443, 100 So. 769 (1924) (distinguishing between business goodwill and personal goodwill and noting that "on a sale, in the nature of things, this personal element is withdrawn.  The purchaser takes the results of past endeavors in building a business, which he is entitled to take as it is, but unaided by the continuing services of the seller.  The personal experience, skill and reputation of the seller remain his, and cannot pass as a part of the good will of the business"); *Messer v. The Frettas*, 168 Mass 140 (1897) (determining that the seller of a musical organization should not be enjoined from subsequent use of her own name to describe her personal skill as a musician, because an individual's personal goodwill cannot accompany a sale of the business); *Blakely v. Sousa*, 197 Pa. 305 (1900) (finding that "the name of an artist, an author, a musician or a lawyer has never been regarded as a trade name and, as such salable; the value of the names of such persons being entirely dependent upon their personal reputation, skill and experience, and indissolubly connected or associated with the owner"); *Hegeman & Co. v. Hegeman*, 8 Daly 1 (NY) (stating that "when the whole pecuniary value of a name is derived solely from the

personal qualities of the one to whom the name belongs, such as his skill, special knowledge and experience, or from the fact that the article is produced under his personal supervision, which imparts to it a special value, then the right to the name is not transmissible").

85.    Thus, as a matter of law, a purchaser of a trade name and/or trademark consisting of a personal name from an individual, commits a fraud on the public if the purchaser represents itself as possessing the personal goodwill (*i.e.*, his skill) of the individual. *Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814, 825 at fn.5 (2d Cir. 1986); *Robin Woods, Inc. v. Robin F. Woods*, 815 F.Supp. 856, 874 (W.D.Pa. 1992) (finding that "the Company has no right to cloak with secrecy the fact that Mrs. Woods is no longer associated with it, nor does it possess the right to represent that it retains her services, and it would be at least misleading were the Company to make such representations to the public"); *Buffalo Oyster Co. v. Nenno*, 132 Misc. 213, 229 N.Y.S. 210 (N.Y.Sup. 1928) (noting that the plaintiff could not do anything to lead the public to believe that the defendant was in any way connected with the business of the plaintiff); *H.H. Skinner v. Annie Oakes*, 10 Mo. App. 45, 56-57 (1881).

86.    Thus, as a matter of law, JA Apparel can not use "by Joseph Abboud", "designed by Joseph Abboud,." "by the designer Joseph Abboud" and/or "by the award winning designer Joseph Abboud," whether as trademarks or otherwise, since by making such uses JA Apparel would be, as a matter of law, committing a fraud on the public by representing itself as possessing the personal goodwill (*i.e.*, the skill and abilities) of Abboud. *Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814, 825 at fn.5 (2d Cir. 1986); *Robin Woods, Inc. v. Robin F. Woods*, 815 F.Supp. 856, 874 (W.D.Pa. 1992) (finding that "the Company has no right to cloak with secrecy the fact that Mrs. Woods is no longer associated with it, nor does it possess the right to represent that it retains her services, and it would be at least misleading were the Company to

make such representations to the public"); *Buffalo Oyster Co. v. Nenno*, 132 Misc. 213, 229

N.Y.S. 210 (N.Y.Sup. 1928) (noting that the plaintiff could not do anything to lead the public to

believe that the defendant was in any way connected with the business of the plaintiff); *H.H.*

*Skinner v. Annie Oakes*, 10 Mo. App. 45, 56-57 (1881).

87.    Further, as a matter of law, the Court cannot preclude Abboud's use of his

personal name "where no attempt to confuse the public or to arrogate the goodwill of [JA

Apparel] has been made."  *Robin Woods, Inc. v. Robin F. Woods*, 815 F.Supp. 856, 874

(W.D.Pa. 1992), citing *Friend v. H.A. Friend and Co.*, 416 F.2d 526, 531 (9th Cir. 1969); *see*

*also Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814, 825 (2d Cir. 1986); *Joseph Scott*

*Co. v. Scott Swimming Pools, Inc.*, 764 F.2d 62, 67 (2d Cir. 1985), citing *Waterman Co. v.*

*Modern Pen Co.*, 235 U.S. 88, 35 S.Ct. 91, 59 L.Ed. 142 (1914).

88.    Finally, it is important to note that Abboud only intends to use his name in the

form of constitutionally protected commercial speech to communicate truthful and valuable

commercial information to the trade and consumers, namely, that he is the designer of the

menswear products he plans to market and sell under his "jaz" trademark.  Def. Exs. 187 - 188;

Abboud Tr. Testimony at pp. 492:13 - 494:5; 501:15 - 502:3; 549:6 - 552:15; 554:1 - 555:11;

556:15 - 557:24; 568:10 - 570:25; 572:4 - 574:21; 579:4-21; 587:18 - 590:5; 603:10 - 609:8;

732:9 - 737:2; *See, supra* at ¶¶ 138 - 154 for a more detail discussion of commercial speech.

89.    Such a constitutional use of protected commercial speech only trades on

Abboud's personal reputation as a designer and therefore does not arrogate any good will

associated with the trademarks that he assigned to JA Apparel.  *Madrigal Audio Labs., Inc. v.*

*Cello, Ltd.*, 799 F.2d 814, 823-24 (2d Cir. 1986); *Robin Woods, Inc. v. Robin F. Woods*, 815

F.Supp. 856, 874 (W.D.Pa. 1992) (finding that "[d]efendants have not attempted to arrogate the

goodwill of the Company by trading on the personal reputation of designer of audio equipment, nor have they falsely designated any of their products as associated with plaintiffs"); *Timm Med. Techs., Inc. v. Soma Blue, Inc.*, No. 99 Civ. 2011, 2002 WL 64456, at *6 (D.Minn. Jan. 15, 2002) (no arrogation occurs when a renowned designer of medical equipment uses his name and reputation in advertising his personal association with a new business venture); *Karsh v. Heiden*, 120 Cal. App. 2d 75, 82, 260 P.2d 633, 637 (1953) (there is nothing "unfair" about the seller of a business bearing his name subsequently "cash[ing] in" on his personal reputation in a new business venture).

90.    As a matter of law, there is a particular "judicial reluctance to preclude an individual's business use of his own surname when such is honest and straight forward, with no attempt to confuse the public." *Sardi's Rest. Corp. v. Sardie*, 755 F.2d 719, 725 (9th Cir. 1985); *see also In re R.M.J.*, 455 U.S. 191, 203, 102 S.Ct. 929, 937, 71 L.Ed.2d 64 (1982).

91.    Thus, it is constitutionally impermissible to enjoin commercial speech, when narrow tailoring by means of explanation will suffice to permit truthful communications. *In re R.M.J.*, 455 U.S. 191, 203, 102 S.Ct. 929, 937, 71 L.Ed.2d 64 (1982) (noting that "the Court in *Bates* suggested that the remedy in the first instance is not necessarily a prohibition but preferably a requirement of disclaimers or explanation"); *Bates v. State Bar of Arizona*, 433 U.S. 350, 368-72, 375-55, 97 S.Ct. 2691, 2704-05, 53 L.Ed.2d 810 (1977); *Consumers Union of U.S., Inc. v. Gen. Signal Corp.*, 724 F.2d 1044, 1053 (2d Cir. 1983) (injunction not available "where there is any possibility that an explanation or disclaimer will suffice"); *see also Upjohn Co. v. Am. Home Prods. Corp.*, 598 F.Supp. 550, 561-62 (S.D.N.Y. 1984); *Better Business Bureau of Metro. Houston, Inc. v. Med. Directors, Inc.*, 681 F.2d 397, 405 (5th Cir. 1982); *Sardi's Rest.*

89

*Corp. v. Sardie*, 755 F.2d 719, 725 (9th Cir. 1985); *Holiday Inns, Inc. v. Trump*, 617 F.Supp.

1443, 1474-75 (D.N.J. 1985).

92.     Here, Abboud proposes certain restrictions on the use of his personal name which,

as a matter of law, strike the appropriate balance between his First Amendment right to provide

the trade and consumers with truthful and relevant commercial information, namely, that he is

the designer of the menswear products he plans to market and sell under the "jaz" trademark, and

the commercial interest in avoiding excessive consumer confusion.  These proposed restrictions

are as follows:

     a.     No use of "Joseph Abboud" as a trademark or service mark;

     b.     No use of "Joseph Abboud" in any form on products or product packaging, as well as product labels and hang tags attached thereto;

     c.     No use of "Joseph Abboud" in reference to any prior association with JA Apparel, its business activities or its products;

     d.     Use of "Joseph Abboud" only as a "descriptive term" to identify Joseph Abboud, individually, as a person, and/or to describe Joseph Abboud as (i) the designer or endorser of  products and/or services that he personally designs (or supervises the designing of), selects, approves, markets and/or sells; or (ii) the owner, operator or manager of businesses that he personally owns or operates; or (iii) the celebrity, expert, artist, author, commentator and/or personality appearing in connection with his personal appearances, speaking engagements, or public announcements;

     e.     In print, use "Joseph Abboud" only in connection with the trademark "jaz", or other trademarks, service marks and/or trade names, which are more prominently displayed in such materials or media than the name "Joseph Abboud", when any reference is made to any products and/or services; and

     f.     In print, use "Joseph Abboud" only in same type size, font and color as the wording adjoining the name "Joseph Abboud."

Def. Exs. 187-188; *see also* Def. Exs. 187 - 188; Abboud Tr. Testimony at pp. 492:13 - 494:5; 501:15 - 502:3; 549:6 - 552:15; 554:1 - 555:11; 556:15 - 557:24; 568:10 - 570:25; 572:4 - 574:21; 579:4-21; 587:18 - 590:5; 603:10 - 609:8; 732:9 - 737:2.[15]

    **D.**    **JA Apparel's Claims of Trademark Infringement, False Designation of Origin and Trademark Dilution Must be Dismissed as Abboud's Proposed Use of His Personal Name to Convey Truthful and Valuable Information to Consumers is Protected by 15 U.S.C § 1115(b)(4)**

    93.    JA Apparel has made claims against Abboud under Sections 32(1) (trademark infringement — 15 U.S.C. § 1114(1)), 43(a) (false designation of origin — 15 U.S.C. § 1125(a)) and 43(c) (trademark dilution — 15 U.S.C. § 1125(c)) of the Lanham Act.

    94.    Notably, all of the cases that JA Apparel relies upon in support of its contention that Abboud should not be able to make *any non-trademark commercial use* of his name are cases in which the defendant was using his name as a trademark, service mark or trade name. Accordingly, none of the defendants in these cases were using there personal name, other than as a trademark, in business.  *See, e.g.*, *Levitt Corp. v. Levitt*, 593 F.2d 463, 468 (2d Cir. 1979); *In re The Leslie Fay Cos., Inc.*, 216 B.R. 117 (S.D.N.Y. 1997); *Lazzaroni USA Corp. v. Steiner Foods*, 2006 WL 932345 (D.N.J. 2006); *Basile S.P.A. v Basile*, 899 F.2d 35 (D.C. Cir. 1990); *Guth Chocolate Co. v. Guth*, 215 F. 750, 767 (D.Md. 1914); *The Lepage Co. v. Russia Cement Co.*, 51 F. 941, 944-46 (1st Cir. 1892).  As a matter of law, these cases are not applicable here as Abboud has conceded that he will not use his name as a trademark or service mark, rather, he proposes to

---

[15] Contrary to JA Apparel's assertions, Abboud is clearly using his "jaz" trademark to identify the "source" of his apparel products in the example ads, rather than his name, which is being used *descriptively* to identify himself as the creator of his "jaz" product line.  *Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.*, 125 F.3d 28, 30 (2d Cir. 1997 (noting that "[t]he non-trademark use of the challenged phrase and the defendants' good faith are both evidenced by the fact that the source of the defendants' product is clearly identified by the prominent display of the defendants' own trademarks").  JA Apparel's attempt to transform Abboud's testimony that he is the "source" of his "work" into an intention to use his name to identify his products is simply unavailing, because the word "work" refers to Abboud's *design* work, not his "jaz" product line.

use his name, other than as a trademark in business, which he has the absolute right to do under

15 U.S.C. § 1115(b)(4).

> **1.    15 U.S.C. § 1115(b)(4)  is an Absolute Defense to Claims of Trademark Infringement, False Designation of Origin and Trademark Dilution[16]**

95.    A party may defend against a claim of trademark infringement, false designation

of origin and trademark dilution by establishing one of nine statutory affirmative "defenses or

defects."  One such defense is the fair use defense.  Section 33(b)(4) of the Lanham Act, 15

U.S.C. § 1115(b)(4), defines fair use as follows:

> That the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark, [a] of the party's individual name in his own business, [b] or of the individual name of anyone in privity with such party, or [c] of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin.

15 U.S.C. § 1115(b)(4).

96.    The right of a person to refer to himself in business by his own name is so

sacrosanct that the Lanham Act expressly recognizes and preserves a person's right to use his

name in connection with his own business.  15 U.S.C. § 1115(b)(4).

97.    Thus, as a matter of law, the "fair use" defense of the Lanham Act provides an

*absolute* defense to infringement for a competitor using his own name other than as a trademark

in his business, because such *use* is *not* qualified by the word "good faith"; and, a *qualified*

defense for a competitor using a descriptive term other than as a trademark to describe his

products in "good faith."  15 U.S.C. § 1115(b)(4); *Dolby v. Robertson*, 654 F.Supp. 815

(N.D.Cal. 1986).

---

[16] Attached hereto as Appendix A is a copy of the Brief for the United States as Amicus Curiae Supporting Petitioner in *KP Permanent Make-Up v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004).

98.     Sections 32(1) (15 U.S.C. § 1114(1)), 43(a) (15 U.S.C. § 1125(a)) and 43(c) (15

U.S.C. § 1125(c)) of the Lanham Act are, as a matter of law, subject to the statutory defense of

"fair use."  *New York Mercantile Exch., Inc. v. Intercontinental Exch., Inc.*, 389 F. Supp. 2d 527,

545 (S.D.N.Y. 2005); *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*, 228

F.3d 56, 65 (2d Cir. 2000) (determining that fair use is a defense to a Section 43(a) claim); *Nihon*

*Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 73-74 (2d Cir. 1999) (noting that

fair use is a defense to a Section 32(1) claim); *TCPIP Holding Co., Inc. v. Haar Commcn's., Inc.*,

244 F.3d 88, 103-04 (2d Cir. 2001) (stating that fair use is a defense to a Section 43(c) claim).

### 2.    A Finding of a Likelihood of Confusion is Irrelevant Where an Individual is Using His Personal Name Other Than as a Trademark in Connection With His Business or Where a Trademark is being Used Descriptively and in Good Faith

99.     Since this is a case where Abboud is not intending to use his personal name as a

trademark, but is intending to use his name other than as a trademark in connection with his

business, as a matter of law, a finding of a likelihood of confusion *is irrelevant*.  *Dolby v.*

*Robertson*, 654 F.Supp. 815 (N.D.Cal. 1986); *see also* the text of 15 U.S.C. § 1115(b)(4) which,

unlike other provisions of the Lanham Act, does not include likelihood of confusion as one of the

elements a defendant must negate to establish the fair use defense (*see*, *Bates v. United States*,

522 U.S. 23, 29 (1997) (the Court notes that it "ordinarily resist[s] reading words or elements

into a statute that do not appear on its face"; *see also* 15.U.S.C. § 1051(a)(3)(D), 15.U.S.C. §

(b)(3)(D), 15 U.S.C. § 1052(d), 15.U.S.C. § 1066, 15.U.S.C. § 1114(1), 15.U.S.C. §

1125(a)(1)(A) and 15.U.S.C. § 1127 (all Lanham Act provisions that make consumer confusion

relevant to the trademark claim); *Cf. Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's*

*USA Co.*, 125 F.3d 28, 30-31 (2d Cir. 1997) (noting that the fair use defense may succeed even if

there is a likelihood of confusion).

100.    Moreover, where a trademark is being used descriptively and in good faith, as a matter of law, a finding of a likelihood of confusion *is irrelevant*. *Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.*, 125 F.3d 28, 30-31 (2d Cir. 1997) (noting that the fair use defense may succeed even if there is a likelihood of confusion); *New York Mercantile Exchange, Inc. v. Intercontinental Exchange Inc.,* 389 F. Supp. 2d 527, 545 (S.D.N.Y. 2005) (assertion that the "fair use defense is not available if [it] 'creates a likelihood of confusion' . . . is *wrong as a matter of law*"); *Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 73-74 (2d Cir. 1999) (holding that the defendant's use of the trademark was protected under 15 U.S.C. § 1115(b)(4), notwithstanding the district court's finding of a likelihood of confusion); *see also* 3 Jerome Gilson, et al., *Trademark Protection and Practice*, § 11.08[3][d][i][D], at 11-201-202 (2003) (the "modern trend" is "to hold that fair use of a term should be protected even if some confusion is likely"); *Restatement of the Law, Third, Unfair Competition*, § 28 at comment b (1993) (noting that the fair use defense "can be applicable even if the trademark owner presents evidence sufficient to prove a likelihood of confusion."  As long as "the manner of use by the defendant is reasonable in light of the commercial justification for the use, the possibility or even certainty that some prospective purchasers will perceive the term as an indication of source despite the reasonableness of the defendant's use is not sufficient to deprive the defendant of the right to employ the term in its descriptive sense").

101.    For many years, the Ninth Circuit and several of its followers, took the position that "fair use" and "likelihood of confusion" were incompatible.  *Cairns v. Franklin Mint Co.,* 292 F.2d 1139, 1151 (9th Cir. 2002).  Accordingly, when confronted with a "fair use" defense, the Ninth Circuit proceeded to analyze "fair use" under its "likelihood of confusion" test to determine whether, notwithstanding the use of a descriptive term in its descriptive sense, such

use might be likely to cause confusion with a registered mark. If so, courts in the Ninth Circuit would proceed to bar such descriptive use, because it was still likely to cause confusion. *Lindy Pen Co. v. Bic Pen Corp.*, 725 F.2d 1240 (9th Cir. 1984).

102. In contrast, the Second Circuit has generally taken the more practical view that "fair use" of a descriptive term is a defense to a claim of infringement, despite confusion with a registered mark, as long as the term is used in its *primary* descriptive sense. This approach was foreshadowed by the Supreme Court's pre-Lanham Act decision in *William Warner & Co. v. Eli Lilly & Co.*, 265 U.S. 526, 528 (1924), where the Court held that "[a] name which is merely descriptive of the ingredients, qualities, or characteristics of an article of trade cannot be appropriated as a trademark and the exclusive use of it afforded legal protection. The use of a similar name by another to truthfully describe his own products does not constitute a legal or moral wrong, even if its effect is to cause the public to mistake the origin or ownership of the product."[17]

103. Accordingly, the Second Circuit has typically focused on the three factors articulated in 15 U.S.C. § 1115(b)(4) for purposes of determining whether the use of descriptive term is "fair", rather than undertaking a likelihood of confusion analysis. These factors are whether the term in question is used (i) descriptively; (ii) other than as a mark; and (iii) in good faith. *Car-Freshener Corp. v. S.C. Johnson & Son, Inc.,* 70 F.3d 267, 269 (2d Cir. 1995).

---

[17] *See also, Thaddeus Davids Co. v. Davids*, 233 U.S. 461, 470 (1914) (determining that when "marks consist[ed] of names or terms having double significance," which were "susceptible of legitimate uses with respect to their primary sense," another's use of such names and terms will only be an infringement if the use was not undertaken in good faith); *Howe Scale Co. v. Wyckoff, Seamans, & Benedict*, 198 U.S. 118, 140 (1905) (noting that "courts will not interefere where the only confusion, if any, results from a similarity of names, and not from the manner of use. The essence of the wrong in unfair competition consists in the sale of the goods of one manufacturer or vendor for those of another; and if defendant conducts its business as not to palm off its goods as those of complainant, the action fails".

104.    Thus, according to the Second Circuit, the "fair use" defense "permits others to use protected marks in descriptive ways" notwithstanding any likelihood of confusion. *Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.,* 125 F.3d 28, 30-31 (2d Cir. 1997).

105.    This split in how the Circuits have analyzed "fair use", *i.e.*, whether or not a confusion analysis was appropriate, was resolved by the Supreme Court in *KP Permanent Make-Up v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004), which rejected the Ninth Circuit's view that the "fair use" of descriptive words should be subject to a likelihood of confusion test. Rather, as the Court aptly noted, "Congress said nothing about the likelihood of confusion in setting out the elements of the fair use defense." *Id.* at 118. Specifically, the Court noted the common law's "tolerance for a certain degree of confusion on the part of consumers", as well as the Lanham Act's "similar leniency, there being no indication that the statute was meant to deprive commercial speakers of the ordinary utility of descriptive words." *Id.* at 122.

106.    The Court in *KP Permanent Make-Up v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004) found that while a plaintiff in an infringement case must always prove likelihood of confusion as part of its *prima facie* case, a defendant relying on the *fair use* defense need only prove that his use of the mark was in the mark's descriptive sense, *i.e.*, other than as a trademark.

107.    Further, the Court in *KP Permanent Make-Up v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004) determined that "consumer confusion must be compatible with fair use," as this is the consequence of preventing "anyone [from] obtain[ing] a complete monopoly on use of a descriptive term." *Id.* at 121-23. As such, the Court determined that the "risk of confusion will not rule out fair use."

108.    To the extent that the Supreme Court in *KP Permanent Make-Up v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004) left further development of the "fair use" defense to the Circuit Courts, as a matter of law, only Second Circuit decisions control here and they clearly rule out any confusion analysis.  *Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.,* 125 F.3d 28, 30-31 (2d Cir. 1997) (noting that the fair use defense may succeed even if there is a likelihood of confusion); *New York Mercantile Exchange, Inc. v. Intercontinental Exchange Inc.,* 389 F. Supp. 2d 527, 545 (S.D.N.Y. 2005) (assertion that the "fair use defense is not available if [it] 'creates a likelihood of confusion' . . . is *wrong as a matter of law*") (emphasis added); *see also Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 73-74 (2d Cir. 1999); *Shakespeare Co. v. Silstar Corp.*, 110 F.3d 234, 243 (4th Cir. 1997) (noting that "it defies logic to argue that defense may not be asserted in the only situation where it even becomes relevant.  If a fair use defense is not to be considered when there is a likelihood of confusion, then it is never to be considered . . . A defense which can be considered only when the *prima facie* case has failed is no defense at all"); *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1189 n. 30 (5th Cir. 1980) (stating that "even if there were a likelihood of confusion, the defendant would still be entitled to its fair use defense, so long as it had met the requirements of § 1115(b)(4).  To hold otherwise would effectively eviscerate the fair use defense").

109.    Based on the Supreme Court's decision in *KP Permanent Make-Up v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004), as well as the decisions in *Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.*, 125 F.3d 28, 30-31 (2d Cir. 1997), *Car-Freshener Corp. v. S.C. Johnson & Son, Inc.,* 70 F.3d 267, 269 (2d Cir. 1995) and *New York Mercantile Exchange, Inc. v. Intercontinental Exchange Inc.,* 389 F. Supp. 2d 527, 545 (S.D.N.Y. 2005), as a matter of law, Abboud, who is proposing to use his name in connection with his business, need

only prove that his intended use of his name is descriptive, that is, other than as a mark, to succeed in establishing his fair use defense; he is not required to prove a lack of confusion.  JA Apparel's apparent reliance on non-Second Circuit case law and/or historic cases emphasizing a likelihood of confusion analysis is wholly misplaced.[18]  *See also Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.*, 125 F.3d 28, 30-31 (2d Cir. 1997) (noting that the fair use defense may succeed even if there is a likelihood of confusion); *Sunmark, Inc. v. Ocean Spray Cranberries, Inc.*, 64 F.3d 1055, 1059 (7th Cir. 1995) (determining that a finding of a likelihood of confusion did not preclude the fair use defense); *Shakespeare Co. v. Silstar Corp. of Am., Inc.*, 110 F.3d 234, 243 (4th Cir. 1997) (noting that "a determination of likely confusion [does not] preclud[e] considering the fairness of use"); *Dolby v. Robertson*, 654 F.Supp. 815 (N.D.Cal. 1986) (finding that defendant could make a non-trademark "fair use" use of his stage name "Thomas Dolby" even though it may be likely to confuse consumers); *see also* 3 Jerome Gilson, et al., *Trademark Protection and Practice*, § 11.08[3][d][i][D], at 11-201-202 (2003) (the "modern trend" is "to hold that fair use of a term should be protected even if some confusion is likely"); *Restatement of the Law, Third, Unfair Competition*, § 28 at comment b (1993) (noting that the fair use defense "can be applicable even if the trademark owner presents evidence

---

[18] Despite the Supreme Court's very clear statement that negation of confusion is not an element of the "fair use" defense, *KP Permanent Make-Up v. Lasting Impression I, Inc.*, 543 U.S. 111 at 121-23 (2004), JA Apparel erroneously asserts that Abboud would have to prove that consumers would not be confused by the example mock-up ads (Det Ex. 187 - 188).  In any event, while such proof is clearly irrelevant to the "fair use" defense, without waiving Abboud's rights respecting the "fair use" defense, it is noteworthy that any concern about confusion could be easily addressed by adding a disclaimer to the example mock-up ads stating that:  "Designer Joseph Abboud is no longer affiliated or associated with JA Apparel Corp., the owner of trademark "Joseph Abboud."  *Gucci v. Gucci Shops, Inc.*, 688 F.Supp. 916 (S.D.N.Y. 1988); *Consumers Union of U.S., Inc. v. Gen. Signal Corp.*, 724 F.2d 1044, 1053 (2d Cir. 1983) (under the First Amendment "absolute prohibitions of [commercial] speech . . . are improper where there is any possibility that an explanation or disclaimer will suffice"); *see also Santucci Constr. Co. v. Carlo V. Santucci, Inc.*, 200 U.S.P.Q. 783, 788 (N.D. Ill. 1978) (defendant allowed to use trade name Carlo V. Santucci, Inc. provided a disclaimer of affiliation with plaintiff is used); *Berghoff Rest. Co. v. Lewis W. Berghoff, Inc.*, 357 F. Supp. 127 (N.D. Ill. 1973), *aff'd*, 499 F.2d 1183 (7th Cir. 1974) (may use surname in connection with restaurant provided it is used with first name and a disclaimer).

sufficient to prove a likelihood of confusion." As long as "the manner of use by the defendant is reasonable in light of the commercial justification for the use, the possibility or even certainty that some prospective purchasers will perceive the term as an indication of source despite the reasonableness of the defendant's use is not sufficient to deprive the defendant of the right to employ the term in its descriptive sense").

### 3. Abboud Proposes to Use His Personal Name Other Than as a Trademark and Not in its Secondary Meaning Trademark Sense

110.    As a matter of law, the "fair use" defense with respect to personal names not only protects the right of a person to identify himself with his business, but it also performs the very important function of insuring the communication of useful information to the consuming public. *Peaceable Planet, Inc. v Ty, Inc.,* 362 F.3d 986, 989 (7th Cir. 2004). This function has been held to be particularly important in the high-end fashion industry, where an individual designer's personal reputation plays a key role in a consumer's decision to purchase high-end fashion apparel. *Basile S.P.A. v Basile*, 899 F.2d 35, 40 (D.C. Cir. 1990) (discussing consumer interest in the reputation of individual designers, such as Yves St. Laurent and Christian Dior, with regard to their purchase of high fashion apparel).

111.    While some courts have found a non-trademark use even when another's mark is placed on products, *Gucci v. Gucci Shops, Inc.*, 688 F.Supp. 916, 927 (S.D.N.Y. 1988) ("Designed By Paolo Gucci" may be placed on hangtags with a disclaimer), or packaging, *Eli Lilly & Co. v. Elizabeth Arden,* 577 F. Supp. 477, 486 (S.D.N.Y. 1983) ("descriptive term on packaging does not show that the term is being used as a trademark"), many attempts at placing a descriptive mark on products have resulted in a finding of trademark infringement. *See, e.g., In re The Leslie Fay Cos., Inc.*, 216 B.R. 117 (S.D.N.Y. 1997) (enjoining use of "Albert Nippon" on merchandise labels attached to products).

112.    Here, Abboud does not intend to place his name on products, their labels or their

packaging.  Def. Exs. 187 - 188; Abboud Tr. Testimony at pp. 492:13 - 494:5; 501:15 - 502:3;

549:6 - 552:15; 554:1 - 555:11; 556:15 - 557:24; 568:10 - 570:25; 572:4 - 574:21; 579:4-21;

587:18 - 590:5; 603:10 - 609:8; 732:9 - 737:2; Dinsmoor Tr. Testimony at pp. 880:18 - 882:10;

935:5-13.  *See*, *Bell v. Harley Davidson Motor Co.*, No. 05 Civ. 2151 (JLS) (BLM), 2008 WL

596212 at *6-7 (S.D.Cal. March 3, 2008) (finding that Harley-Davidson's use of the "Ride Hard"

mark was a fair use as it did not "locate the phrase on its merchandise (*e.g.*, hang tags or labels)

where one would expect to find the source-identifiers of a product").  Rather, Abboud intends to

use his name descriptively, to refer to himself individually, and as a form of commercial speech

to describe values, characteristics and attributes of his products in promotional and advertising

material that is placed in newspapers, magazines and other traditional communications media.

Thus, Abboud's intended placement of his name in media is not a trademark placement; rather, it

is commercial speech placement, protected by the First Amendment.  *Madrigal Audio Labs., Inc.

v. Cello, Ltd.*, 799 F.2d 814, 823 (2d Cir. 1986), (Levinson has right to "advertis[e]" and

"inform[] the public" that "he is now designing audio equipment for Cello"), as well as *In re The

Leslie Fay Cos., Inc.*, 216 B.R. 117 (S.D.N.Y. 1997) ("Nippon is not precluded from advising the

apparel industry of his association with American Pop").[19]

113.    The Lanham Act defines a trademark as follows:

> [a]ny word, name, symbol, or device, or any combination thereof — (1) used by a
> person, or (2) which a person has a bona fide intention to use in commerce . . . to
> identify and distinguish his or her goods, including a unique product, from those
> manufactured or sold by others and to indicate the source of the goods, even if
> that source is unknown.

---

[19] JA Apparel attempts to confuse the Court by reference to *Lazzaroni USA Corp. v. Steiner Foods*, 2006 WL 932345 (D.N.J. 2006), but that case involved not only the placement of a name on packaging, but a picture of the packaging in a catalogue.  Here, Abboud does not intend to use his name on any product or on any packaging.

15 U.S.C. § 1127.

114.    In assessing whether a use is "other than as a mark," courts must consider how the defendant is using the challenged term and whether the use operates to convey information. *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 121-23, 125 S.Ct. 542, 550-51, 160 L.Ed.2d 440 (2004); *Car-Freshner Corp. v. S.C. Johnson & Son, Inc.*, 70 F.3d 267, 269-70 (2d Cir. 1995).

115.    As a matter of law, the test for determining whether the use operates to convey information and is therefore a descriptive usage is whether the term conveys information about the quality, value, characteristics of goods, *Stix Prods. Inc. v. United Merchants & Mfrs., Inc.,* 295 F.Supp. 479, 487 (S.D.N.Y. 1968), particularly when it is used in text to describe some attribute of the goods. *Kiki Undies Corp. v. Alexander's Dep't Stores, Inc.,* 390 F.2d 604 (2d Cir. 1968) (use of "kicky" to describe clothing in newspaper ad was a descriptive use that did not infringe the "KIKI" mark); *U.S. Shoe Corp. v. Brown Group Inc.,* 740 F.Supp. 196 (S.D.N.Y. 1990) (use of portion of trademark in text was a descriptive use); *Restatement*, *Third, Unfair Competition*, § 28, at comment c ("use in textual descriptions is ordinarily a fair use").

116.    Further, as a matter of law, many courts have ruled that even when a person sells his name as a trademark, he is still free to use his name descriptively to identify himself in connection with his business. *Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814, 823 (2d Cir. 1986) (protecting Mark Levinson's right to *advertise* and *inform* the public that "he is now *designing* audio equipment for Cello"(emphasis added)); *Taylor Wine Co. v Bully Hill Vineyards, Inc.*, 569 F.2d 731 (2d Cir. 1978) (protecting vintner's use of his *signature* on wine bottles; so public can rely on his personal "knowledge" and "skill" as a "grower and distributor of regional wines"); *Paul Frank Indus., Inc. v. Sunich*, 502 F. Supp. 2d 1094, 1097 (C.D.Cal.

Aug 21, 2007) (permitting Paul Frank "to identify himself as the *designer* of [his] products in a *message or informative piece* posted on [his] website" (emphasis added)).[20]

117.    Here, as a matter of law, Abboud does not propose to use his personal name as a trademark, that is, to identify and distinguish his goods, or to indicate the source, but rather only to use his personal name in his business to convey information about the products being sold under his "jaz" mark, namely that he is the designer of such product.  Def. Exs. 187 - 188; Abboud Tr. Testimony at pp. 492:13 - 494:5; 501:15 - 502:3; 549:6 - 552:15; 554:1 - 555:11; 556:15 - 557:24; 568:10 - 570:25; 572:4 - 574:21; 579:4-21; 587:18 - 590:5; 603:10 - 609:8; 732:9 - 737:2; Dinsmoor Tr. Testimony at pp. 880:18 - 882:10; 935:5-13.  *See*,  J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 3:3 (4th ed. 2004) (noting that some of the common markers of whether a word is being used as a trademark are:  "larger-sized print, all capital letters or initial capitals, distinctive or different print style, color, and prominent position on label or advertising copy"); *Restatement of the Law, Third, Unfair Competition*, § 28 at comment a (1995) (noting that "[t]he physical nature of the use in terms of size, location, and other characteristics in comparison with the appearance of other descriptive matter or other trademarks is also relevant to the fairness of the use").

118.    Moreover, where the source of Abboud's products is clearly identified by the prominent display of his "jaz" trademark, as a matter of law, he is not using his personal name as a trademark.  Def. Exs. 187 - 188; Abboud Tr. Testimony at pp. 492:13 - 494:5; 501:15 - 502:3; 549:6 - 552:15; 554:1 - 555:11; 556:15 - 557:24; 568:10 - 570:25; 572:4 - 574:21; 579:4-21;

---

[20] Although all these decisions are infected with a confusion analysis that is not relevant to the "fair use" defense, on the critical issue of *descriptive* usage they all draw a sharp distinction between the seller's prohibited use of his personal name as a trademark on products; and, the *descriptive* use of his personal name to communicate to the consuming public the truthful and valuable commercial information that he has *designed* the products he markets and sells.

587:18 - 590:5; 603:10 - 609:8; 732:9 - 737:2; Dinsmoor Tr. Testimony at pp. 880:18 - 882:10;

935:5-13.  *See*, *Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.*, 125 F.3d 28,

30 (2d Cir. 1997) (noting that "[t]he non-trademark use of the challenged phrase and the

defendants' good faith are both evidenced by the fact that the source of the defendants' product

is clearly identified by the prominent display of the defendants' own trademarks"); *see also*

*Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 13 (2d Cir. 1976); *Arnold v. ABC,*

*Inc.*, No. 06 Civ. 1747 (GBD) 2007 WL 210330, at 2-3 (S.D.N.Y. Jan. 29, 2007).[21]

119.    Here, as shown in Def. Exs. 187 - 188, Abboud's proposed use of his name is in

informational text *tagged* onto Abboud's "jaz" mark, which is prominently displayed in large

script letters; and the use of the word "designer", immediately preceding the words "Joseph

Abboud", clearly connotes that Abboud's name is being used in its *primary* descriptive sense to

identify Joseph Abboud the person, and not in its *secondary* trademark sense.  As such,

Abboud's intended use of his name (*See*, Def. Exs. 187 - 188 and the restrictions set forth in ¶92

, *supra*) makes clear that such use is a non-prominent *descriptive* use, rather than a source-

indicating *trademark* use.  *See, e.g.*, *Gucci v. Gucci Shops, Inc.*, 688 F.Supp. 916, 927 (S.D.N.Y.

1988) (designer Paolo Gucci was permitted to use his name *descriptively* in order to "identify

himself as the designer of [his] products", upon the following conditions: (i) the products are

---

[21] Contrary to JA Apparel's assertions, Abboud is clearly using his "jaz" trademark to identify the "source" of his apparel products in the example ads, rather than his name, which is being used descriptively to identify himself as the designer of the products.  *Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.*, 125 F.3d 28, 30 (2d Cir. 1997) (noting that "[t]he non-trademark use of the challenged phrase and the defendants' good faith are both evidenced by the fact that the source of the defendants' product is clearly identified by the prominent display of the defendants' own trademarks").  Further, JA Apparel's attempt to transform Abboud's testimony that he is the "source" of his "work" into an intention to use his name to identify his products is simply unavailing, because the word "work" refers to Abboud's *design* work, not his "jaz" products; and, JA Apparel has no right to such *design* work or to hold itself out as the "source" of such *design* work.  *A. Charmichel & Co. v Latimer, Stillman & Co.*, 11 R.I. 395, 404 (1876) (stating that: "If an artist or an artisan has acquired by his personal skill and ability a reputation which gives to his works in the market a higher value than those of other artists or artisans, he cannot give to other persons the right to affix his name or mark to their goods, because he cannot give to them a right to practice a fraud upon the public").

designed by Paolo Gucci, designed under his supervision or selected by him; (ii) the use is

always in connection with Paolo Gucci's RIVIERA trademark, or other mark; (iii) the name

Paolo Gucci always appears after the mark; (iv) the phrase "[Trademark] designed by Paolo

Gucci" is split into no more than three lines; and (v) all of the letters of the phrase "designed by

Paolo Gucci" are in the identical typestyle, size and color); 1 J. Thomas McCarthy, *McCarthy on*

*Trademarks & Unfair Competition* § 3:3 (4th ed. 2004) (some of the common markers of

whether a word is being used as a trademark are "larger-sized print, all capital letters or initial

capitals, distinctive or different print style, color, and prominent position on label or advertising

copy"); *Restatement, Third, Unfair Competition*, § 28 at comment a (the "nature of the use in

terms of size, location, and other characteristics in comparison with the appearance of other

descriptive matter or other trademarks is also relevant"); *see also*, Abboud Tr. Testimony at pp.

492:13 - 494:5; 501:15 - 502:3; 549:6 - 552:15; 554:1 - 555:11; 556:15 - 557:24; 568:10 -

570:25; 572:4 - 574:21; 579:4-21; 587:18 - 590:5; 603:10 - 609:8; 732:9 - 737:2; Dinsmoor Tr.

Testimony at pp. 880:18 - 882:10; 935:5-13.

> **4.    Abboud's Proposed Use of His Personal Name is a Descriptive Use Made in Good Faith and There is no Evidence That Abboud has Acted or Proposes to Act in Bad Faith**

120.    Moreover, Abboud's proposed use of his name would also satisfy the additional

requirements for the second prong of the fair use defense, namely, that his proposed use is a

descriptive use made fairly and in good faith in that he intends to make fair use of his name in its

primary, descriptive sense, namely, to identify himself and to communicate truthful and valuable

commercial information to the trade and consumers that he is the designer of the menswear

products he plans to market and sell under the "jaz" trademark.  Def. Exs. 187 - 188; Abboud Tr.

Testimony at pp. 492:13 - 494:5; 501:15 - 502:3; 549:6 - 552:15; 554:1 - 555:11; 556:15 -

557:24; 568:10 - 570:25; 572:4 - 574:21; 579:4-21; 587:18 - 590:5; 603:10 - 609:8; 732:9 -

737:2; Dinsmoor Tr. Testimony at pp. 880:18 - 882:10; 935:5-13.  *See*, *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 121-23, 125 S.Ct. 542, 550-51, 160 L.Ed.2d 440 (2004); *Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814, 822 (2d Cir. 1986); *Arnold v. ABC, Inc.*, No. 06 Civ. 1747 (GBD) 2007 WL 210330, at 2-3 (S.D.N.Y. Jan. 29, 2007); *Herman Miller v. Palazzetti Imports & Exports*, 270 F.3d 298, 317-21 (6th Cir. 2001); *Restatement of the Law, Third, Unfair Competition*, § 28 at comment a (1995).  As a matter of law, the "fair use" defense with respect to personal names not only protects the right of a person to identify himself with

121.    It is a fundamental principle of trademark law that *descriptive* terms are "in the public domain" and "must be left free for public use," while inherently *distinctive* terms enjoy *exclusivity* as trademarks when registered and are thereby removed from the public domain. *Minnesota Mining & Mfg. Co. v. Johnson & Johnson,* 454 F.2d 1179, 1180 (C.C.P.A. 1972); *Application of Colonial Stores, Inc.,* 394 F.2d 549, 551 (C.C.P.A. 1972); *see also*, *Warner v. Publ'n, Inc. v Popular Publ'n, Inc.,* 87 F.2d 923, 915 (2d Cir. 1937) ("The defendant has as much right to a descriptive title as the plaintiff"); *Charcoal Steakhouse of Charlotte, Inc. v. Staley*, 139 S.E.2d 185, 187 (N.C. 1964) ("generally descriptive words . . . are the common property and heritage of all who speak the English language; they are *publici juris*.  If the words reasonably indicate and describe the business or the article to which they are applied, they may not be monopolized).[22]

---

[22] By allowing persons other than the trademark owner to make a fair and good faith use of such descriptive terms for the limited purpose of describing a fact concerning their own goods, Congress preserved in Section 1115(b)(4) "the trademark owner['s] absolute and complete control over [the words] as a trademark," while allowing others "to use the same [words] in a wholly incidental and descriptive manner in describing the[ir] product[s]."  *H.R. 102 Hearings* 72 (Wallace Martin) at 70; *see also Park 'N Fly, Inc., v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 201 (1986) (fair use defense was designed to preserve for "the public domain language that is merely descriptive").

122.    Thus, under the Lanham Act, the only *intellectual property right* that a trademark owner can acquire with respect to a *descriptive* term is the right to use the term in its *secondary* sense as a trademark, so any inquiry as to the distinction between Abboud's right to use his name descriptively and JA Apparel's right to use the JOSEPH ABBOUD trademarks must focus on whether the name is being used in its *primary* sense to identify the person, or in its *secondary* sense to identify the source of a product.  15 U.S.C. § 1115(b)(4).

123.    As such, a trademark owner, as a matter of law, cannot prevent others from using the word that forms the trademark in its primary or descriptive sense.  *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 121-23, 125 S.Ct. 542, 550-51, 160 L.Ed.2d 440 (2004); *Car-Freshner Corp. v. S.C. Johnson & Son, Inc.*, 70 F.3d 267, 269-70 (2d Cir. 1995) (determining that "the public's right to use descriptive words or images in good faith in their ordinary descriptive sense must prevail over the exclusivity claims of the trademark owner"); *Mattel, Inc. v. Azrak-Hamway Int'l, Inc.*, 724 F.2d 357, 361 (2d Cir. 1983) (noting that the fair use defense "allows a competitor to use another's registered trademark to describe aspects of one's own goods"); *U.S. Shoe Corp. v Brown Groups, Inc.*, 740 F. Supp. 196, 198 (S.D.N.Y.), *aff'd*, 923 F.2d 844 (2d Cir. 1990) (in finding that defendant's use of the phrase "feels like a sneaker" in advertising was a fair use of plaintiff's mark, the Court noted that the purpose of the fair use defense is to prevent the trademark rights of one party from being extended to preclude another party from communicating information about his product to the public.  Thus, where a plaintiff chooses a mark with descriptive qualities, the fair use doctrine recognizes that "he cannot altogether exclude some kinds of competing uses, particularly those which use words in their primary descriptive and non-trademark sense"); *Herman Miller v. Palazzetti Imports & Exports*, 270 F.3d 298, 317-21 (6th Cir. 2001) (finding, in a personal name case, that the

"descriptive primary meaning is always available for use by others to describe their goods, in the interest of free competition").

124.    Moreover, as a matter of law, where a party acquires or adopts a descriptive mark, as is the case here, it runs the risk that another party will make use of the descriptive mark.  *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 122, 125 S.Ct. 542, 550-51, 160 L.Ed.2d 440 (2004); *Car-Freshner Corp. v. S.C. Johnson & Son, Inc.*, 70 F.3d 267, 270 (2d Cir. 1995) (noting that "[i]f any confusion results to the detriment of the markholder, that was a risk entailed in the selection of a mark with descriptive attributes"); *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1189 (5th Cir. 1980) ("If a defendant's use of a term to fairly describe a characteristic of its goods creates a likelihood of confusion, then plaintiff should adopt some other method of distinguishing its goods from those of defendant"); *Arnold v. ABC, Inc.*, No. 06 Civ. 1747 (GBD) 2007 WL 210330, at 2-3 (S.D.N.Y. Jan. 29, 2007); *Herman Miller v. Palazzetti Imports & Exports*, 270 F.3d 298, 317-21 (6th Cir. 2001).

125.    Descriptive terms include all terms used in a descriptive sense, *Car-Freshner Corp. v. S.C. Johnson & Son, Inc.*, 70 F.3d 267, 269 (2d Cir. 1995); *Radio Channel Networks, Inc. v. Broadcast.Com, Inc.*, No. Civ. 98 Civ. 4799 (RPP), 1999 WL 124455, at *3, fn.3 (S.D.N.Y. March 8, 1999) (noting that the "Second Circuit has indicated that although 11 U.S.C. § 1115(b)(4) purports to protect uses of the claimed mark which 'describe the goods or services of [defendant], or their geographic origin,' the fair use defense has not been construed so narrowly as to apply only to descriptions of the detailed particulars of a defendant's goods or services.  Instead, the defense applies when the challenged words are used, broadly speaking, in their 'descriptive sense'"); *Bell v. Harley Davidson Motor Co.*, No. 05 Civ. 2151 (JLS) (BLM), 2008 WL 596212 at *6-7 (S.D.Cal. March 3, 2008) (noting that while Harley-Davidson's use of

the "Ride Hard" mark does not describe a specific characteristic of Harley's products or goods its use was a fair use as "courts do not interpret the Lanham Act's fair use language so narrowly").

126.    Further, as a matter of law, "for purposes of trademark analysis, personal names – both surnames and first names – are generally regarded as descriptive terms." *815 Tonawanda St. Corp. v. Fay's Drug Co., Inc.,* 842 F.2d 643, 648 (2d Cir. 1988); *see also Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814, 822 (2d Cir. 1986); *Abraham Zion Corp. v. Lebow*, 761 F.2d 93, 104 (2d Cir. 1985); 3 *Callmann, The Law of Unfair Competition, Trademarks and Monopolies* § 21.36, at 145 (4th ed. 1983) (noting that "[a]n individual name is rather similar to a descriptive word").

127.    Therefore, as a matter of law, a name like "Joseph Abboud", just like all other descriptive terms that are also used as trademarks, can have two meanings, its *primary* descriptive meaning and its *secondary* trademark meaning. *Restatement of the Law, Third, Unfair Competition*, § 28 at comment a (1995); *Dolby v. Robertson*, 654 F.Supp. 815 (N.D.Cal. 1986); *Cf. Herman Miller v. Palazzetti Imports & Exports*, 270 F.3d 298, 317-21 (6th Cir. 2001)

128.    As a matter of law, because a personal name is primarily a descriptive term, then even after a name acquires a secondary source-indicating meaning, the "fair use" defense protects a subsequent user's use of a personal name "if the name is used solely to indicate truthfully the named person's connection with the goods, services, or business." *Restatement of the Law, Third, Unfair Competition*, § 28 at comment a (1995); *see also Dolby v. Robertson*, 654 F.Supp. 815 (N.D.Cal. 1986) (finding that defendant could make a non-trademark "fair use" use of his stage name "Thomas Dolby" even though it may be likely to confuse consumers); *Cf. Herman Miller v. Palazzetti Imports & Exports*, 270 F.3d 298, 317-21 (6th Cir. 2001).  Thus, the

108

name "Joseph Abboud" is a descriptive term that, if used in its descriptive sense, performs the *primary* function of identifying Joseph Abboud as a person and fashion designer, including all his attendant personal goodwill. In addition, the name "Joseph Abboud", if used as a trademark, performs the *secondary* function of identifying JA Apparel as the source of JOSEPH ABBOUD brand products.

129.    As a matter of law, a good faith use of a personal name arises when a person has a *legitimate connection* with his business and/or products. *Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814, 822 (2d Cir. 1986); *Dolby v. Robertson*, 654 F.Supp. 815 (N.D.Cal. 1986).

130.    Thus, even when a personal name has been assigned as a mark, as a matter of law, "it continues to serve the important function to its bearer of acting as a symbol of that person's personality, reputation and accomplishments" as distinguished from its *secondary* function of identifying goods. *Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814, 822 (2d Cir. 1986). Thus, not withstanding such a sale, a person is not precluded "from taking advantage of his individual reputation" by using his name in connection with his new business. *Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814, 822 (2d Cir. 1986); *Taylor Wine Co. v. Bully Hill Vineyards, Inc.*, 569 F.2d 731, 737 (2d Cir. 1978).

131.    Moreover, as a matter of law, the Court can infer from the purely descriptive use Abboud intends to make of his personal name that he is acting in good faith and is not acting in bad faith. *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 13 (2d Cir. 1976) (holding that the "fair use" defense protected the descriptive use of "safari" in part because defendant did not use the word alone on the product "as it would doubtless have done if confusion had been intended"); *Schmid Labs. v. Youngs Drug Prods.*, 482 F.Supp. 14, 21 (D.N.J. 1979).

132.    As a matter of law, bad faith arises when a person "enters a particular line of trade for no apparent reason other than to use a conveniently confusing surname to his advantage." *Taylor Wine Co. v. Bully Hill Vineyards, Inc.*, 569 F.2d 731, 735 (2d Cir. 1978), *citing R.W. Rogers Co. v. Wm. Rogers Mfg. Co.*, 70 F. 1017, 1018 (2d Cir. 1895) (defendant was a "decoy" for silver plating firm); *Max Factor & Co. v. Factor*, 226 F.Supp. 120, 121 (S.D. Cal. 1903) (defendant had no involvement in hosiery business using his name); *Champion Spark Plug Co. v. Champion*, 23 F.Supp. 638, 641 (E.D. Mich. 1938) (defendant did not manufacture spark plugs); *see also*, *Arnold v. ABC, Inc.*, No. 06 Civ. 1747 (GBD) 2007 WL 210330, at 2-3 (S.D.N.Y. Jan. 29, 2007), citing *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos, Inc.*, 228 F.3d 56, 66 (2d Cir. 2000)

133.    Here, aside from JA Apparel's conclusory allegation that Abboud's acts are intended to confuse customers and the public as to the source of Abboud's services and to injure JA Apparel and reap the benefit of JA Apparel's goodwill, there are no facts in the record which would support a conclusion that Abboud's planned use of his personal surname to inform the trade and consumers that he is the designer of the apparel products he plans to market and sell under the "jaz" trademark is in bad faith.  *Arnold v. ABC, Inc.*, No. 06 Civ. 1747 (GBD) 2007 WL 210330, at 2-3 (S.D.N.Y. Jan. 29, 2007).

134.    Accordingly, as a matter of law, JA Apparel has failed to demonstrate that Abboud has used and/or is planning to use his personal name in bad faith.  *Arnold v. ABC, Inc.*, No. 06 Civ. 1747 (GBD) 2007 WL 210330, at 2-3 (S.D.N.Y. Jan. 29, 2007).

135.    In fact, as a matter of law, it is JA Apparel who, by using the name "Joseph Abboud" in a non-trademark manner, has acted in bad faith.  *Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814, 825 at fn.5 (2d Cir. 1986) (noting that a purchaser of a trade name

and/or trademark consisting of a personal name from an individual, commits a fraud on the public if the purchaser represents itself as possessing the personal goodwill of the individual); *Robin Woods, Inc. v. Robin F. Woods*, 815 F.Supp. 856, 874 (W.D.Pa. 1992) (finding that "the Company has no right to cloak with secrecy the fact that Mrs. Woods is no longer associated with it, nor does it possess the right to represent that it retains her services, and it would be at least misleading were the Company to make such representations to the public"); *Buffalo Oyster Co. v. Nenno*, 132 Misc. 213, 229 N.Y.S. 210 (N.Y.Sup. 1928) (noting that the plaintiff could not do anything to lead the public to believe that the defendant was in any way connected with the business of the plaintiff); *H.H. Skinner v. Annie Oakes*, 10 Mo. App. 45, 56-57 (1881).

136.    Here, Abboud is a designer who possesses substantial personal goodwill as the result of his individual talents, skills and artistic abilities, as well as his own accomplishments in the fashion industry and his widespread reputation and celebrity.  Therefore, as a matter of law, Abboud has a *legitimate* basis to use his name to identify himself in connection with his business and the "jaz" product line that he has designed, and any such use, therefore, is in good faith. *Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814, 822 (2d Cir. 1986); *Taylor Wine Co. v. Bully Hill Vineyards, Inc.*, 569 F.2d 731, 737 (2d Cir. 1978).

137.    By using his name its descriptive sense to communicate truthful and valuable commercial information to the trade and consumers that he is the designer of the menswear line being marketed and sold under the "jaz" trademark, by not using his name as a trademark, by limiting the use of his name to promotional and advertising materials that are not attached to the "jaz" products, packaging and/or labeling, and by agreeing to abide by the certain other restrictions (*see, supra* ¶89), Abboud's proposed use of his personal name fits safely within the well recognized parameters of fair use.  *Taylor Wine Co. v Bully Hill Vineyards, Inc.*, 569 F.2d

731 (2d Cir. 1978) (protecting vintner's right to put his signature on wine bottles); *Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814, 825 (2d Cir. 1986) (permitting designer to advertise his affiliation with new company); *Gucci v Gucci Shops, Inc.*, 688 F. Supp. 916 (S.D.N.Y. 1988) (permitting fashion designer "to identify himself as the designer of products sold under a separate trademark); and *A.V. by Versace, Inc. v. Gianni Versace, S.p.A.*, No. 96 Civ. 9721, 2005 WL 147364 (S.D.N.Y. Jan. 24, 2005) (permitting a fashion designer to use his name to identify goods that he designed by use of the phrase 'designed by Alfredo Versace', prior to a contempt proceeding).

**E.    JA Apparel's Claims of Trademark Infringement, False Designation of Origin and Trademark Dilution Must be Dismissed as Abboud's Proposed Use of His Personal Name to Convey Truthful and Valuable Information to the Trade and Consumers is Protected Commercial Speech Under the First Amendment**

138.    Moreover, Abboud intends to use his name as a descriptive term to communicate truthful, commercially valuable information to the trade and consumers, including the message that he is the designer of the apparel products he plans to market and sell under his "jaz" trademark is protected as commercial speech by the First Amendment.  *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N. Y.*, 447 U.S. 557, 563, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980); *Virginia Pharmacy v. Virginia Consumer Counsel*, 425 U.S. 771 (1976); Abboud Tr. Testimony.

139.    The First Amendment's protection for commercial speech extends to descriptive terms used in the promotion and advertising of products.  *Virginia State Bd. Of Pharmacy v. Citizens Consumer Council, Inc.,* 425 U.S. 748, 765 (1976).

140.    As a matter of law, commercial speech is speech that "does no more than propose a commercial transaction."  *Nike v. Kasky*, 539 U.S. 654, 123 S. Ct. 2554, 156 L. Ed. 2d 580 (2003).

141.    Abboud's intended use of his name constitutes commercial speech.  Abboud Tr.
Testimony.

142.    As a matter of law, courts must scrutinize commercial speech under the standard
set forth in *Central Hudson Gas & Elec. Corp. v. Public Serv. Com.,* 447 U.S. 557 (1980).  In
*Central Hudson*, the Supreme Court ruled that government regulation, which would include
injunctive relief, of truthful commercial speech is unconstitutional, unless narrowly tailored to
directly and materially advance a substantial government interest.

143.    When commercial speech is at issue, the First Amendment's basic objective is the
protection of the consumer's interest in the free flow of truthful commercial information.
*Edenfield v. Fane*, 507 U.S. 761, 766, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993) (noting that "First
Amendment coverage of commercial speech is designed to safeguard" society's "interes[t] in
broad access to complete and accurate commercial information"); *Zauderer v. Office of
Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651, 105 S.Ct. 2265, 85 L.Ed.2d
652 (1985) (stating that "the extension of First Amendment protection to commercial speech is
justified principally by the value to consumers of the information"); *Central Hudson Gas & Elec.
Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 563, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980)
(noting that "[t]he First Amendment's concern for commercial speech is based on the
informational function of advertising"); *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 783,
98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) (stating that "[a] commercial advertisement is
constitutionally protected not so much because it pertains to the seller's business as because it
furthers the societal interest in the free flow of commercial information").

144.    Because "disclosure of truthful, relevant information is more likely to make a
positive contribution to decision making than is concealment of such information," *Peel v.*

*Attorney Registration & Disciplinary Comm'n of Ill.*, 496 U.S. 91, 108, 110 S.Ct. 2281, 2292, 110 L.Ed.2d 83 (1990), only false, deceptive, or misleading commercial speech may be banned. *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 638, 105 S.Ct. 2265, 2275, 85 L.Ed.2d 652 (1985); *see also In re R.M.J.*, 455 U.S. 191, 203, 102 S.Ct. 929, 937, 71 L.Ed.2d 64 (1982) (noting that "[t]ruthful advertising related to lawful activities is entitled to the protections of the First Amendment. . . . Misleading advertising may be prohibited entirely").

145.    It is well established that the party seeking to restrict commercial speech carries the burden of justifying any proposed restriction. *Edenfield v. Fane*, 507 U.S. 761, 770, 113 S.Ct. 1792, 1800, 123 L.Ed.2d 543 (1993); *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 71, n. 20, 103 S.Ct. 2875, 2883, n. 20, 77 L.Ed.2d 469 (1983).

146.    As a matter of law, where a Court is confronted with a conflict between the constitutional right of free expression and public education, and the commercial interest in avoiding consumer confusion, the First Amendment requires the Court to balance these interests. *L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26, 29 (1st Cir. 1987) (noting that "[t]rademark rights do not entitle the owner to quash an unauthorized use of the mark by another who is communicating ideas or expressing points of view").

147.    The First Amendment confers a measure of protection for the use of a trademark when that use is a part of the expression of a communicative message. *Yankee Pub. Inc. v. News Am. Pub. Inc.*, 809 F.Supp. 267, 275-76 (S.D.N.Y. 1992).

148.    Indeed, as a matter of law, when the use of another's mark is part of a communicative message and not a source identifier, the First Amendment is implicated in opposition to the trademark right.  In recognition of this potential conflict, the Second Circuit has

construed the Lanham Act narrowly when the use of the trademark is for the purpose of a communicative message. *Yankee Pub. Inc. v. News Am. Pub. Inc.*, 809 F.Supp. 267, 275-76 (S.D.N.Y. 1992); *see also Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir. 1989); *Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Group, Inc.*, 886 F.2d 490, 493-95 (2d Cir. 1989).

149.    As a matter of law, the First Amendment tolerates a certain amount of confusion. *Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir. 1989).

150.    Moreover, as a matter of law, "truthful advertising related to lawful activities is entitled to protections of the First Amendment . . . [and the government] may not place an absolute prohibition on certain types of potentially misleading information . . . if the information may also be presented in a way that is not deceptive." *In re R.M.J.*, 455 U.S. 191, 203, 102 S.Ct. 929, 937, 71 L.Ed.2d 64 (1982).

151.    Therefore, in striking the appropriate balance between the constitutional right of providing consumers with truthful and relevant information, and the commercial interest in avoiding consumer confusion, the Court, as a matter of law, is constitutionally prohibited from barring the commercial speech. Rather, as a matter of law, the balance must be narrowly tailored to protect the commercial speech. *In re R.M.J.*, 455 U.S. 191, 203, 102 S.Ct. 929, 937, 71 L.Ed.2d 64 (1982).

152.    Moreover, as a matter of law, there is a particular "judicial reluctance to preclude an individual's business use of his own surname when such is honest and straight forward, with no attempt to confuse the public." *Sardi's Rest. Corp. v. Sardie*, 755 F.2d 719, 725 (9th Cir. 1985); *see also In re R.M.J.*, 455 U.S. 191, 203, 102 S.Ct. 929, 937, 71 L.Ed.2d 64 (1982).

153.    Thus, it is constitutionally impermissible to enjoin commercial speech, when narrow tailoring by means of explanation will suffice to permit truthful communications. *In re*

*R.M.J.*, 455 U.S. 191, 203, 102 S.Ct. 929, 937, 71 L.Ed.2d 64 (1982) (noting that "the Court in *Bates* suggested that the remedy in the first instance is not necessarily a prohibition but preferably a requirement of disclaimers or explanation"); *Bates v. State Bar of Arizona*, 433 U.S. 350, 368-72, 375-55, 97 S.Ct. 2691, 2704-05, 53 L.Ed.2d 810 (1977); *Consumers Union of U.S., Inc. v. Gen. Signal Corp.*, 724 F.2d 1044, 1053 (2d Cir. 1983) (injunction not available "where there is any possibility that an explanation or disclaimer will suffice"); *see also Upjohn Co. v. Am. Home Prods. Corp.*, 598 F.Supp. 550, 561-62 (S.D.N.Y. 1984); *Better Business Bureau of Metro. Houston, Inc. v. Med. Directors, Inc.*, 681 F.2d 397, 405 (5th Cir. 1982); *Sardi's Rest. Corp. v. Sardie*, 755 F.2d 719, 725 (9th Cir. 1985); *Holiday Inns, Inc. v. Trump*, 617 F.Supp. 1443, 1474-75 (D.N.J. 1985).

154.    Here, Abboud proposes certain restrictions on the use of his personal surname which, as a matter of law, strike the appropriate balance between his First Amendment right to communicate truthful and valuable commercial information to the trade and consumers, namely, that he is the designer of the menswear products he plans to market and sell under the "jaz" trademark, and the commercial interest in avoiding excessive consumer confusion.  These proposed restrictions are set forth in Para. 89, *supra*.

**F.    JA Apparel is not Entitled to any Equitable Relief on its Claims of Trademark Infringement, False Designation of Origin and Trademark Dilution Because of its Unclean Hands**

155.    The unclean hands defense is an "ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief."  *Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.*, 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (1945).

156.    Indeed, as a matter of law, before any form of equitable relief may issue, "it is axiomatic that one who seeks equity's assistance must stand before the court with clean hands in

the acquisition of the right he is seeking to protect." *Johanna Farms, Inc. v. Citrus Bowl, Inc.*, 468 F.Supp. 866, 874 (D.C.N.Y. 1978), citing *Precision Instrument Mfg. Co. v. Automotive Maint. Machinery Co.*, 324 U.S. 806, 814-815, 65 S.Ct. 993, 89 L.Ed. 1381 (1945); *Republic Molding Corp. v. B. W. Photo Utils.*, 319 F.2d 347, 349-50 (9th Cir. 1963); *New York Football Giants, Inc. v. L.A. Chargers Football Club, Inc.*, 291 F.2d 471, 473-74 (5th Cir. 1961).

157.    The unclean hands doctrine applies where the misconduct alleged as the basis for the defense "has immediate and necessary relation to the equity that [plaintiff] seeks in respect of the matter in litigation." *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245, 54 S.Ct. 146, 78 L.Ed. 293 (1933).

158.    Thus, if the party invoking the Lanham Act's protection has participated in bad faith commercial conduct, as a matter of law, he is not entitled to avail himself of its protections as "[t]o permit a suitor with unclean hands to obtain injunctive relief would run afoul of the legislative goals [of the Lanham Act]." *Ames Publishing Co. v. Walker-Davis Publications, Inc.*, 372 F.Supp. 1, 13 (E.D.Pa.1974); *see also Haagen-Dazs, Inc. v. Frusen Gladje Ltd., A.B.*, 493 F.Supp. 73, 75-76 (S.D.N.Y. 1980) (noting that in the context of an action under the Lanham Act, a court sitting in equity may properly withhold its aid where the plaintiff is making misrepresentations as to the nature or origin of the trademarked product); *Morton Salt Co. v. G.S. Suppiger Co.*, 314 U.S. 488, 494, 62 S.Ct. 402, 406, 86 L.Ed. 363 (1942).

159.    Apart from trademark law and the First Amendment, the distinction between use of a descriptive term in its primary descriptive sense, as opposed to its secondary, source-indicating sense, is important, because, as a matter of law, the name "Joseph Abboud", even in its *primary* descriptive sense, is itself an *intellectual property right* that is *owned* by Abboud as a publicity right. *Topps Chewing, Inc. v. Fleer Corp,* 799 F.2d 851, 852 (2d Cir. 1986).

160.    As a matter of law, a purchaser of a trade name and/or trademark consisting of a personal name from an individual, commits a fraud on the public if the purchaser represents itself as possessing the personal goodwill (*i.e.*, his skill) of the individual. *Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814, 825 at fn.5 (2d Cir. 1986); *Robin Woods, Inc. v. Robin F. Woods*, 815 F.Supp. 856, 874 (W.D.Pa. 1992) (finding that "the Company has no right to cloak with secrecy the fact that Mrs. Woods is no longer associated with it, nor does it possess the right to represent that it retains her services, and it would be at least misleading were the Company to make such representations to the public"); *Buffalo Oyster Co. v. Nenno*, 132 Misc. 213, 229 N.Y.S. 210 (N.Y.Sup. 1928) (noting that the plaintiff could not do anything to lead the public to believe that the defendant was in any way connected with the business of the plaintiff); *H.H. Skinner v. Annie Oakes*, 10 Mo. App. 45, 56-57 (1881).

161.    Here, as noted above, by way of the Purchase and Sale Agreement, Abboud conveyed to JA Apparel only the trademarks and the goodwill pertaining thereto, as well as license agreements.  Abboud did not convey or assign to JA Apparel the "exclusive right" to use his name in any way, shape or form in business; nor did Abboud convey or assign his right to use his name in connection with his future design efforts in the apparel industry following the expiration of his two year Restricted Period; and he did not convey or assign to JA Apparel any trade names, such as Joseph Abboud Worldwide, Inc.  Moreover, by virtue of the Personal Services Agreement, Abboud reserved his personal publicity rights to himself, and was specifically permitted to make media and celebrity appearances in his individual capacity, and to develop his personal reputation.  Pl. Exs. 1 - 2; Def. Exs. 180 - 182.

162.    Moreover, despite the fact that Abboud did not convey to JA Apparel the right to use the name "Joseph Abboud" to refer to his person or to his reputation as a designer, since

Abboud left the company in July 2005, JA Apparel has persistently used promotional material, public advertising, publicity campaigns, websites, sponsorships, and even its own answering service to refer to Abboud, the person, rather than its JOSEPH ABBOUD trademark, in an effort to deceive, mislead and defraud consumers into believing that Abboud is still affiliated with the company and/or that he is still designing apparel products for the company. As a matter of law, this flagrant misappropriation of Abboud's publicity rights under Section 43(a) of the Lanham Act Lanham Act and New York Civil Rights Act §§ 50 and 51 (*see*, *supra* Def. Proposed Findings at ¶¶192 - 204), constitutes a misuse of the JOSEPH ABBOUD trademarks and a fraud on the public that bars JA Apparel from obtaining any equitable relief to enforce its trademark in this lawsuit. *Haagen-Dazs, Inc. v. Frusen Gladje Ltd., A.B.*, 493 F.Supp. 73, 75-76 (S.D.N.Y. 1980); *Johanna Farms, Inc. v. Citrus Bowl, Inc.*, 468 F.Supp. 866, 874 (D.C.N.Y. 1978); *see also Manhattan Med. Co. v. Wood*, 108 U.S. 218, 2 S.Ct. 436, 27 L.Ed. 706 (1883); *Worden & Co. v. Cal. Fig Syrup Co.*, 187 U.S. 516, 23 S.Ct. 161, 47 L.Ed. 282 (1903); *Morton Salt Co. v. G.S. Suppiger Co.*, 314 U.S. 488, 494, 62 S.Ct. 402, 406, 86 L.Ed. 363 (1942); *see also* Def. Exs. 12, 13, 179 - 182.

### G.    JA Apparel's Trademark Dilution Claim Under New York G.B.L. § 360-1 Must be Dismissed

163.    New York G.B.L. § 360-1 states in relevant part that:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark . . . shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

N.Y. Gen. Bus. Law § 360-1

164.    To state a claim under New York G.B.L. § 360-1 a plaintiff must show: (1) that the plaintiff's mark is truly distinctive or has acquired secondary meaning, and (2) a likelihood of

dilution either as a result of blurring or tarnishment.  *U-Neek, Inc. v. Wal-Mart Stores, Inc.*, 147 F. Supp. 2d 158, 175 (S.D.N.Y. 2001).

165.    A claim for dilution rests on the allegation that a defendant is attempting to "feed[ ] upon the business reputation of an established distinctive trademark or name."  *Allied Maint. Corp. v. Allied Mech. Trades, Inc.*, 42 N.Y.2d 538, 544, 399 N.Y.S.2d 628, 632, 369 N.E.2d 1162, 1165 (1977) (referring to New York G.B.L. § 368-d, the prior version of New York G.B.L. § 360-1).

166.    Since Abboud's use of his personal name constitutes fair use (*see*, *supra* at ¶¶93 - 137), JA Apparel's trademark dilution claim under New York G.B.L. § 360-1 is barred as a matter of law.  *McGraw-Hill Cos. v. Int'l Sec. Exch.*, No. 05 Civ. 1129, 2005 WL 2100518, at *9 (S.D.N.Y. Sept. 1, 2005).

## H.    JA Apparel's Common Law Unfair Competition Claim Must be Dismissed

167.    JA Apparel also asserts a claim for common law unfair competition.

168.    A claim of unfair competition under New York Law is analyzed in the same manner as a trademark infringement claim under the Lanham Act.  *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 119 (2d Cir. 2006); *Information Superhighway, Inc. v. Talk Am., Inc.*, 395 F. Supp. 2d 44, 56 (S.D.N.Y. 2005) (noting that the "[t]he elements necessary to prevail on common law causes of action for trademark infringement and unfair competition mirror Lanham Act claims").

169.    In addition, to succeed on the merits of a "common law claim of unfair competition, [a plaintiff] must couple its evidence supporting liability under the Lanham Act with additional evidence demonstrating [the defendant's] bad faith."  *Computer Assocs. Int'l, Inc. v. Computer Automation, Inc.*, 678 F.Supp. 424, 429 (S.D.N.Y. 1987) ("stating that "[t]he essence of [an unfair competition claim] is the bad faith misappropriation of the labors and

expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of goods"); *see also Eagle Comtronics, Inc. v. Pico Prods., Inc.*, 256 A.D.2d 1202, 682 N.Y.S.2d 505, 506 (4th Dep't 1998).

170.    Since Abboud's use of his personal name constitutes fair use (*see*, *supra* at ¶¶93 - 137), JA Apparel's common law unfair competition claim is barred as a matter of law. *Wonder Labs, Inc. v. Procter & Gamble Co.*, 728 F.Supp. 1058, 1067 (S.D.N.Y. 1990) (stating that "the defense that the defendant's use of the mark is purely descriptive and not as a trademark equally precludes recovery for common law unfair competition"); *Arnold v. ABC, Inc.*, No. 06 Civ. 1747 (GBD) 2007 WL 210330, at 4 (S.D.N.Y. Jan. 29, 2007).

## I.    JA Apparel's Common Law Trademark Infringement Claim Must be Dismissed

171.    JA Apparel also asserts a claim for common law trademark infringement.

172.    A claim of common law trademark infringement under New York Law is analyzed in the same manner as a trademark infringement claim under the Lanham Act. *Information Superhighway, Inc. v. Talk Am., Inc.*, 395 F. Supp. 2d 44, 56 (S.D.N.Y. 2005) (noting that "[t]he elements necessary to prevail on common law causes of action for trademark infringement and unfair competition mirror Lanham Act claims").

173.    Since Abboud's use of his personal name constitutes fair use (*see*, *supra* at ¶¶93 - 137), JA Apparel's common law trademark infringement claim is barred as a matter of law. *Information Superhighway, Inc. v. Talk Am., Inc.*, 395 F. Supp. 2d 44, 56 (S.D.N.Y. 2005) (noting that since plaintiff's Lanham Act claim will be dismissed under the fair use doctrine, plaintiff's common law claims must also be dismissed).

J.     **JA Apparel's Deceptive Acts and Practices Claim Under New York G.B.L. §
349 Must be Dismissed**

174.    JA Apparel also asserts a claim for deceptive acts and practices under New York

G.B.L. § 349.

175.    New York G.B.L. § 349 protects against "[d]eceptive acts and practices in the

conduct of any business, trade or commerce or in the furnishing of any service" in New York.

N.Y. G.B.L. § 349.

176.    To assert a claim under New York G.B.L. § 349, a plaintiff must prove that (1)

the act or practice was consumer oriented; (2) the act or practice was misleading in a material

way; and (3) the plaintiff suffered an injury as a result of the deceptive practice.  *Stutman v.*

*Chem. Bank*, 95 N.Y.2d 24, 29, 731 N.E.2d 608, 709 N.Y.S.2d 892 (2000); *see also Conboy v.*

*AT&T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001) (citing *Stutman* for the proposition that "a

Section 349 violation requires a defendant to mislead the plaintiff in some material way").

177.    It has been held that commercial plaintiffs can only state a claim under New York

G.B.L. § 349 where injury to consumers at large is alleged.  *Securitron Magnalock Corp. v.*

*Schnabolk*, 65 F.3d 256, 264-65 (2d Cir. 1995).

178.    Injury or harm that satisfies this standard includes "potential danger to the public

health or safety."  *Gucci Am. v. Duty Free Apparel, Ltd.*, 277 F. Supp. 2d 269 (S.D.N.Y. 2003).

179.    Where the substance of the claim is harm to another business, the harm to the

public may be deemed too insubstantial to constitute a claim under New York G.B.L. § 349.

*Excellus Health Plan v. Tran*, 287 F. Supp. 2d 167, 180 (N.D.N.Y. 2003).

180.    In fact, as a matter of law, New York G.B.L. § 349 requires a showing of direct

harm to consumers more than the consumer confusion found in trademark infringement actions.

*Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995); *SMJ Group, Inc. v.*

*417 Lafayette Rest. LLC*, 2006 WL 2516519, *4 (S.D.N.Y. Aug. 30, 2006); *Haritatos v. Hasbro, Inc.*, No. 6:05-Civ-930, 2007 WL 3124626, *8 (N.D.N.Y. Oct. 23, 2007).

181.    Accordingly, as JA Apparel has failed to allege any harm to consumers more than its allegations of consumer confusion in its Lanham Act claims, its claim under New York G.B.L. § 349 must, as a matter of law, be dismissed. *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995).

**K.    JA Apparel's False Advertising Claim Under New York G.B.L. § 350 Must be Dismissed**

182.    JA Apparel also asserts a claim for false advertising under New York G.B.L. § 350.

183.    New York G.B.L. § 350 protect against false advertising. To make out a claim under New York G.B.L. § 350 a plaintiff is required to demonstrate that the advertisement was misleading in a material respect and that he suffered an injury as a result of the advertisement. *McDonald v. North Shore Yacht Sales, Inc.*, 134 Misc.2d 910, 513 N.Y.S.2d 590, 593 (1987); *Galerie Furstenberg v. Coffaro*, 697 F.Supp. 1282, 1291-92 (S.D.N.Y. 1988).

184.    As a matter of law, an injured person has been defined as one who was misled or deceived by such an advertisement." *McDonald v. North Shore Yacht Sales, Inc.*, 134 Misc.2d 910, 513 N.Y.S.2d 590, 593 (1987); *Galerie Furstenberg v. Coffaro*, 697 F.Supp. 1282, 1291-92 (S.D.N.Y. 1988).

185.    A competitor's right to sue under New York G.B.L. § 350 depends "on the nature of the primary injury, *i.e.*, whether the injury was to the public or consumers, including to a business in the role of consumer. . . . For that reason [T]rademark or 'trade dress' infringement claims or commercial disputes involving individually negotiated contracts . . . fall outside the original intent of [Section 350]." Practice Commentary to Article 22-A, *Consumer Protection*

*from Deceptive Acts & Practices*, p. 566, 569, 572; *Galerie Furstenberg v. Coffaro*, 697 F.Supp. 1282, 1291-92 (S.D.N.Y. 1988).

186.    Since the gist of JA Apparel's claim under New York G.B.L. § 350 is that, as Abboud's competitor, it will be injured if Abboud used his personal name in advertisements, as a matter of law, it may not recover under Section 350.  *Galerie Furstenberg v. Coffaro*, 697 F.Supp. 1282, 1291-92 (S.D.N.Y. 1988).

187.    Moreover, New York G.B.L. § 350 requires a showing of direct harm to consumers more than the consumer confusion found in trademark infringement actions. *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995); *SMJ Group, Inc. v. 417 Lafayette Rest. LLC*, 2006 WL 2516519, *4 (S.D.N.Y. Aug. 30, 2006); *Haritatos v. Hasbro, Inc.*, No. 6:05-Civ-930, 2007 WL 3124626, *8 (N.D.N.Y. Oct. 23, 2007).

188.    Accordingly, as JA Apparel has failed to allege any harm to consumers more than its allegations of consumer confusion in its Lanham Act claims, its claim under New York G.B.L. § 350 must, as a matter of law, be dismissed.  *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995).

## L.    JA Apparel's Claim That Abboud Breached The Personal Services Agreement Must Be Dismissed

189.    JA Apparel also alleges that Abboud is in breach of the restrictive provision of the Personal Services Agreement.

190.    The restrictive provision of the Personal Services Agreement provides that:

> For the two-year period immediately following the expiration of the Personal Services Period (the "Restricted Period") [*i.e.*, from July 13, 2005 - July 13, 2007], Abboud agrees that he will not, directly or indirectly through any partnership, corporation, limited liability company, trust or other entity, be associated as an owner, director, officer, employee, consultant or other participant with, any person, group, business enterprise or other entity which is engaged in or proposes to engage in the business of designing, licensing, manufacturing, marketing or distributing any products or services which are or would be competitive with the

business of [JA Apparel] as then conducted or as such business may be reasonably expected to be conducted in the future anywhere in the world.

Pl. Ex. 2 at ¶(2)(a) Abboud Tr. Testimony; Dinsmoor Tr. Testimony.

191.    Restrictive covenants, such as the one set forth in the Personal Services Agreement, must be strictly construed.  *American Inst. of Chem. Eng'rs v. Reber-Frid Co.*, 682 F.2d 382, 386 (2d Cir. 1982).

192.    As a matter of law, JA Apparel, having brought this claim, has the burden of proving, by a preponderance of the credible evidence, that Abboud is in breach of the restrictive provision of the Personal Services Agreement.  *In re Food Mgmt. Group*, LLC, 372 B.R. 171, 188 (Bankr. S.D.N.Y. 2007); *Millgard Corp. v. E.E. Cruz/Nab/Frontier-Kemper*, No. 99 Civ. 2952 (LBS) 2004 WL 1488534, at *4 (S.D.N.Y. July 2, 2004); *see also Republic Corp. v. Procedyne Corp.*, 401 F.Supp. 1061, 1068 (S.D.N.Y. 1975) (noting that under New York law, the elements of an action for breach of contract are "(1) formation of a contract between plaintiff and defendant; (2) performance by plaintiff of any dependent conditions or conditions precedent; (3) defendant's failure to perform; and (4) resulting damage to plaintiff"); *AIM Int'l Trading, L.L.C. v. Valcucine S.P.A.*, No. 02 Civ. 1363 (PKL) 2003 WL 21203503, at *8 (S.D.N.Y. May 22, 2003).

### 1.    Contract Interpretation — Generally

193.    As indicated above, the role of the courts in interpreting the language of a contractual agreement "is to ascertain the intention of the parties at the time they entered into the contract."  *Evans v. Famous Music Corp.*, 1 N.Y.3d 452, 458, 807 N.E.2d 869, 775 N.Y.S.2d 757 (2004); *see also Moncure v. N.Y. State Dep't of Env't Conservation*, 218 A.D.2d 262, 265-66, 639 N.Y.S.2d 859, 862 (3d Dep't 1996).  The parties intent must be gleaned from the agreement as a whole in order to avoid excessive emphasis being placed upon particular words

or phrases.  *South Rd. Assoc., LLC v. Int'l Bus. Machs. Corp.*, 4 N.Y.3d 272, 277, 826 N.E.2d

806, 793 N.Y.S.2d 835 (2005); *Empire Props. Corp. v. Mfrs. Trust Co.*, 288 N.Y. 242, 248, 43

N.E.2d 25 (1942).

194.    Here, the intent of the parties, as expressed by the clear and unambiguous

language contained in the Personal Services Agreement, was to restrict competition during

Abboud's two year Restricted Period, not afterwards.  Pl. Ex. 2 at ¶(2)(a).

### 2.    Contract Interpretation — Where Sophisticated Business People Negotiate at Arms Length With the Assistance of Counsel

195.    Further, as indicated above, where, as here, sophisticated business people

negotiate at arm's length and with the assistance of counsel, they will be held to the express

terms of their agreements.  *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.*, 22 F.3d

458, 462 (2d Cir. 1994); *Promotora De Navegacion v. Sea Containers, Ltd.*, 131 F. Supp. 2d

412, 417 (S.D.N.Y. 2000).  When an agreement is negotiated by sophisticated parties, "there is

no basis 'to interpret an agreement as impliedly stating something which the parties have

neglected to specifically include.'"  *425 Fifth Ave. Realty Assocs. v. Yeshiva Univ.*, 228 A.D.2d

178, 178, 643 N.Y.S.2d 542, 543 (1st Dep't 1996) (citation omitted); *Civil Service Employees*

*Assoc., Inc. v. Plainedge Union Free Sch. Dist.*, 12 A.D.3d 395, 396, 786 N.Y.S.3d 59, 61 (2d

Dep't 2004).

### 3.    Contract Interpretation — Ambiguity

196.    Moreover, the initial interpretation of a contract includes the threshold question of

whether the contract's terms are ambiguous, such that those terms could suggest more than one

meaning when viewed objectively by a reasonably intelligent person who has examined the

context of the entire integrated agreement.  *Alexander & Alexander Servs., Inc. v. These Certain*

*Underwriters at Lloyds, London*, 136 F.2d 82, 86 (2d Cir. 1998).

197.    Whether or not a contract provision is ambiguous is a question of law to be resolved by a court and "must be ascertained from the face of an agreement without regard to extrinsic evidence." *Reiss v. Fin. Performance Corp.*, 97 N.Y.2d 195, 199, 764 N.E.2d 958, 738 N.Y.S2d 658 (2001), quoting *Schmidt v. Magnetic Head Corp.*, 97 A.D.2d 151, 157, 468 N.Y.S.2d 649 (2d Dep't 1983); *Van Wagner Adv. Corp. v. S & M Enters.*, 67 N.Y.2d 186, 191, 492 N.E.2d 756, 501 N.Y.S.2d 628 (1986).

198.    Therefore, the Court's initial inquiry is to determine "whether the agreement on its face is reasonably susceptible of more than one interpretation." *Chimart Assoc. v. Paul*, 66 N.Y.2d 570, 573, 489 N.E.2d 231, 498 N.Y.S.2d 344 (1986).

199.    The Court may not, as a matter of law, "add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475, 775 N.Y.S.2d 765, 807 N.E.2d 876, quoting *Reiss v. Fin. Performance Corp.*, 97 N.Y.2d 195, 199, 738 N.Y.S.2d 658, 764 N.E.2d 958 (2001).

200.    As a matter of law, where intent is complete, clear and unambiguous as evidenced by the plain meaning of the language the parties chose to employ in the contract, the contract should be enforced as written. *Marks v. Carrier*, No. 90 Civ. 6714, 1992 WL 245684, at *3 (S.D.N.Y. Sept. 21, 1992).

201.    In such a situation, there is no need to look at extrinsic evidence and the rules of contract construction should not be applied. *Evans v. Famous Music Corp.*, 1 N.Y.3d 452, 458, 807 N.E.2d 869, 775 N.Y.S.2d 757 (2004); *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569, 780 N.E.2d 166, 750 N.Y.S.2d 656 (2002); *Consolidated Gas Supply Corp. v. Matula*, 36 N.Y.2d 790, 792, 330 N.E.2d 647, 369 N.Y.S.2d 698 (1975) (Jasen, J., dissenting).

202.    As a matter of law, contractual language is unambiguous if it has "a definite and precise meaning," "there is no reasonable basis for a difference of opinion" as to its interpretation and the court can interpret it without the aid of extrinsic evidence. *Sayers v. Rochester Tel. Corp. Supplemental Mgt. Pension Plan*, 7 F.3d 1091, 1094-95 (2d Cir. 1993), quoting *Breed v. Ins. Co. of North Am.*, 46 N.Y.2d 351, 413 N.Y.S.2d 352, 355, 385 N.E.2d 1280 (1978)); *Lucente v. IBM Corp.*, 310 F.3d 243, 257 (2d Cir. 2002); *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyds, London*, 136 F.2d 82, 86 (2d Cir. 1998).

203.    Conversely, contractual language is ambiguous if a reasonably intelligent and objective person who considers the language in the context of the entire agreement and who is aware of the general customs, practices, usages, and terminology of the industry can reach more than one interpretation. *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1192 (2d Cir. 1996); *Space Imaging Europe, Ltd. v. Space Imaging L.P.*, 38 F. Supp. 2d 326, 334 (S.D.N.Y. 1999).

204.    As a matter of law, the language of a contract is not made ambiguous simply because the parties urge different interpretations. Nor does ambiguity exist where one party's view "strain[s] the contract language beyond its reasonable and ordinary meaning." *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir.1989); *Bethlehem Steel Co. v. Turner Constr. Co.*, 2 N.Y.2d 456, 459, 161 N.Y.S.2d 90, 141 N.E.2d 590 (1957).

### 4.    The Personal Services Agreement is Clear as to the Scope of Abboud's Restrictive Covenant

205.    To determine whether Abboud has violated the Personal Services Agreement, the Court must examine the pertinent language of the Agreement. Under the Agreement, Abboud undertook that when his personal services commitment to JA Apparel ended on July 13, 2005, he

would be subject to a limited restriction on his ability to compete with JA Apparel for a two-year period. Pl. Ex. 2 at ¶2(a).

206.    Specifically, Abboud, either himself or "through any partnership, corporation, limited liability company, trust or entity" which he controls, agreed to refrain from being "associated" as an "owner, director, officer, employee, consultant or other participant" with "any person, group, business enterprise or other entity which is engaged in or proposes to engage in the business of designing, licensing, manufacturing, marketing or distributing any products or services which are or would be competitive" of JA Apparel. Pl. Ex. 2 at ¶2(a).

207.    The Personal Services Agreement clearly and unambiguously prohibits Abboud, either himself or through an entity which he controls, from being associated with a third party business with which he was not previously associated then in competition with JA Apparel or proposing to compete with JA Apparel during the Restricted Period. Pl. Ex. 2 at ¶2(a).

208.    Significantly, the Personal Services Agreement did not restrict Abboud from owning his own company during the Restricted Period, so long as he did not use *that company* to become "associated" as an "owner, director, officer, employee, consultant or other participant" with a third party business with which he was not previously associated, that competed with or proposed to compete with JA Apparel during the Restricted Period. Pl. Ex. 2 at ¶(2)(a).

209.    Accordingly, Abboud's ownership of Herringbone, a company which Abboud controls, in and of itself, does not constitute a breach of the Personal Service Agreement, as were it otherwise, Abboud would have ben in breach of the Personal Services Agreement by virtue of his mere association with Herringbone, which was clearly not the intention of Paragraph 2(a) of the Personal Services Agreement. Pl. Ex. 2 at ¶(2)(a).

210.    Further, the Personal Services Agreement specifically defines "associated" as "an owner, director, officer, employee, consultant or other participant" in a third party competitive business.  Here, as Abboud did not become "an owner, director, officer, employee, consultant or other participant" of a third party competitive business during the Restricted Period that was in competition with, or proposed to compete with JA Apparel during the Restricted Period, as a matter of law he did not breach the Personal Services Agreement.  Pl. Ex. 2 at ¶(2)(a).

### 5.    Contract Interpretation — *Ejusdem Generis* Doctrine

211.    In interpreting the language of the Personal Services Agreement, the Court should apply the doctrine of *ejusdem generis*, "the statutory canon that [w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Wojchowski v. Daines*, 498 F.3d 99, 108 fn.8 (2d Cir. 2007); *United States v. Turkette*, 452 U.S. 576, 581, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981) (holding that *ejusdem generis* is "an aid to statutory construction problems suggesting that where general words follow a specific enumeration of persons or things, the general words should be limited to persons or things similar to those specifically enumerated").

212.    Here, the general word "participant" follows the specific words "owner, director, officer, employee [and] consultant."  As a matter of law, the word "participant" must be construed to mean something similar to "owner, director, officer, employee [and] consultant", *i.e.*, someone who has *active involvement* in the business.  *Wojchowski v. Daines*, 498 F.3d 99, 108 fn.8 (2d Cir. 2007); *United States v. Turkette*, 452 U.S. 576, 581, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981); *see also* Pl. Ex. 2 at ¶2(a).

130

### 6. Contract Interpretation — Any Ambiguities are to be Resolved Against the Party Who Drafted the Agreement

213. Finally, as noted above, any ambiguities in the language of the Personal Services Agreement must be construed against JA Apparel, the party who drafted the agreement. *Jacobson v. Sassower*, 66 N.Y.2d 991, 993, 489 N.E.2d 1283, 1284, 499 N.Y.S.2d 381, 382 (1985); *General Venture Capital Corp. v. Wilder Transp., Inc.*, 26 A.D. 2d 173, 271 N.Y.S.2d 805 (1st Dep't 1966); *Rentways, Inc. v. O'Neill Milk & Cream Co.*, 308 N.Y. 342, 347, 126 N.E.2d 271 (1955); *Chatterjee Fund Mgmt., L.P. v. Dimensional Media Assoc.*, 260 A.D.2d 159, 687 N.Y.S.2d 364 (1st Dep't 1999).

### 7. Although Ultimately it is the Language of the Parties' Personal Services Agreement That Controls, the Case Law Also Supports Abboud on This Issue

214. The mere planning to compete during a parties' restricted period, as opposed to engaging in commercial activity, is not prohibited were the parties' restrictive covenant does not prohibit such activity. *Brooks Automation, Inc. v. Blue Shift Techs.*, No. 06-P-1063, 2007 WL 1713370 at *2 (Mass. App. Ct. June 14, 2007) (finding that a party who, in preparation for competing once his restricted period expired, had developed a business plan, began crafting an invention based on trade show presentations he observed, incorporated a business entity and filed a provisional patent application did not violate the parties' restrictive covenant); *Cowley v. Anderson*, 159 F.2d 1, 5 (10th Cir. 1947) (mere planning to compete during the parties' restricted period does not amount to competition); and *Keiser v. Walsh*, 118 F.2d 13, 14 (D.C. App. 1941) (noting that preparing and planning to compete did not constitute competition).

215. The instant case is in sharp contrast to the facts of *De Long Corp. v. Lucas*, 278 F.2d 804, 808-09 (2d Cir. 1960), a case relied on by JA Apparel. In *De Long*, defendant had entered into a restrictive covenant in which he agreed not to compete with plaintiff for two years,

or assist anyone else in competing with plaintiff during that period. Notwithstanding this covenant, during the restricted period he entered into an agreement with a competitor, developed devices and improvements on competitive products, and sought to build a "patent fence" around those devices. This allowed his new business partner to outbid the plaintiff on a very valuable construction contract, and, ultimately, to exclude plaintiff completely from an entire segment of business that plaintiff had pioneered. Here, Abboud did not associate with JA Apparel's competitors or prospective competitors during the Restricted Period. As such, nothing about the *De Long* case has anything to do with the situation here, other than the general proposition in *De Long* that preparation to compete does not violate an agreement not to compete. *De Long Corp. v. Lucas*, 278 F.2d 804, 808-09 (2d Cir. 1960).

216.    Similarly, this case in contrast to *World Auto Parts, Inc. v. Labenski*, 217 A.D.2d 940, 629 N.Y.S.2d 896 (4th Dept. 1995), another case that JA Apparel relies upon. In *World Auto Parts, Inc.,* the defendant entered into a "Retirement Agreement", so although the language of the restrictive covenant is not set out in the decision, obviously the parties' intention was that defendant would simply disappear from the landscape entirely. Further, before violating the restrictive covenant, defendant in *World Auto Parts* also leaked trade secrets he learned of when he worked for the plaintiff to competitors. *World Auto Parts, Inc. v. Labenski*, 217 A.D.2d 940, 629 N.Y.S.2d 896 (4th Dept. 1995).

217.    Here, what Abboud agreed to do, and all he agreed to do during his two-year Restricted Period, was to refrain from active participation in any third party business that competed with JA Apparel. Abboud did not agree to any restrictions on his ability to *prepare* to associate during the Restricted Period; and, nowhere does the Personal Services Agreement say that he cannot speak to third parties about future commercial activity once the Restricted Period

expired.  And, of course, there is no limitation on Abboud's right to work on sketches and designs during this period, or to purchase apparel during the Restricted Period, so long as he does not use them to engage in commercial activity during the Restricted Period.  Pl. Ex. 2 at ¶2(a).

218.    Abboud admits that while he made contact during the Restricted Period with several third parties, including Jack Victor Ltd., Merrill Sharpe, Ltd., Alden Street Shirt Co., Cardinal of Canada, Inc., and J.S. Blank & Co., about the possibility of doing business with them after his Restricted Period expired, he refrained from taking any active position with these entities during the course of the Restricted Period.  Abboud also admits that he worked on sketches and designs for his new clothing line during the Restricted Period and that he ordered certain clothing products for use at his January 31, 2007, press conference at which he announced the launch of his "jaz" line.  However, the record is clear that Abboud did not execute any agreements with any third parties or engage in any commercial activity during the Restricted Period.  Abboud Tr. Testimony at pp. 455:13 - 477:13; Dinsmoor Tr Testimony at pp. 869:13 - 874:5; 882:21 - 888:25; 893:19 - 898:10; 898:11 - 920:6; 1035:15 - 1041:2; 1060:1 - 1061:21; 1070:7 - 1072:24.

219.    Abboud's activity during the Restricted Period, taken as a whole constitutes the mere planning to compete and does not, as a matter of law, constitute competition.  *Brooks Automation, Inc. v. Blue Shift Techs.*, No. 06-P-1063, 2007 WL 1713370 at *2 (Mass. App. Ct. June 14, 2007); *Cowley v. Anderson*, 159 F.2d 1, 5 (10th Cir. 1947) *Keiser v. Walsh*, 118 F.2d 13, 14 (D.C. App. 1941); Abboud Tr. Testimony at pp. 455:13 - 477:13; Dinsmoor Tr Testimony at pp. 869:13 - 874:5; 882:21 - 888:25; 893:19 - 898:10; 898:11 - 920:6; 1035:15 - 1041:2; 1060:1 - 1061:21; 1070:7 - 1072:24.

220.    Moreover, Abboud acknowledges that he advanced his Merril Lynch line of credit through Herringbone to Alden Street during the Restricted Period, but, as a matter of law, the mere loaning of money does not constitute participation in the debtor business or competition with JA Apparel unless, as is not the case here, the restrictive covenant expressly prohibits the lending of money. *Salzman v. Siegelman*, 102 A.D. 406, 92 N.Y.S. 844, (2d Dept. 1905) (noting that a restrictive covenant does not prohibit the lending of money) compare *In re The Leslie Fay Cos., Inc*., 216 B.R. 117 (Bankr. S.D.N.Y. 1997) and *World Auto Parts, Inc. v. Labenski*, 217 A.D.2d 940, 629 N.Y.S.2d 896 (4th Dept. 1995) (unclear whether the restrictive covenant prohibited lending). Def. Exs. 113 - 140 & 159; Abboud Tr. Testimony at pp. 468:10 - 477:13; Dinsmoor Tr. Testimony at pp. 898:11 - 914:17; 1060:1 - 1061:21; 1070:7 - 1072:24; *see also*, Def. designations from Sopp Dep. Testimony.

221.    Further, since there is no evidence that Abboud made any managerial decisions of Alden Street during his Restricted Period, nor is there any evidence that Abboud participated in any commercial transaction involving Alden Street, or in the operation of Alden Street's day-to-day business transactions, as a matter of law, Abboud did not participate in the business. *J.H. Goldberg Co. v. Stern*, 53 A.D.2d 246 (4th Dept. 1976). Abboud Tr. Testimony at pp. 455:13 - 477:13; Dinsmoor Tr. Testimony at pp. 914:18 - 917:5; 917:13 - 920:6; 1035:15 - 1041:2; *see also*, Def. designations from Kidder Dep. Testimony.

222.    Moreover, Alden Street was not in competition with JA Apparel, because Alden Street manufactures private label shirts under contract, while JA Apparel wholesales its own shirt brand. Thus, the companies operate at different levels of the distribution chain. Dinsmoor Tr. Testimony at pp. 914:18 - 917:5; *see also*, Def. designations from Colucciello Dep. Testimony and Def. designations from Kidder Dep. Testimony.

8.    **The Equitable Relief Sought by JA Apparel In Connection with Abboud's Alleged Breach of the Personal Services Agreement Should be Denied as Oppressive**

223.    JA Apparel contends that in the event the Court concludes that Abboud is in breach of the restrictive provision of the Personal Services Agreement, the Court should enjoin Abboud from engaging in any business activity concerning his "jaz" menswear line for a period of ninety days.  It is, however, well-settled under New York law that "not every violation of a restrictive agreement entitles an aggrieved party to equitable relief."  *Forstmann v. Joray Holding Co.*, 244 N.Y. 22, 29, 154 N.E. 652, 654 (1926).  Indeed, injunctive relief should be withheld as oppressive where, as here, the injury to plaintiff resulting from the alleged violation of the restrictive provision is neither serious nor substantial, and to restrain the acts complained of would subject defendant to great inconvenience and loss.  *Forstmann v. Joray Holding Co.*, 244 N.Y. 22, 29-30, 154 N.E. 652, 654-55 (1926); *International Association of Machinists & Aerospace Workers v. Northeast Airlines, Inc.*, 473 F.2d 549, 553 (1st Cir. 1972) ("a court of equity must be concerned not only with possible injury to the plaintiff but also with whether an injunction would cause irreparable harm to the defendant, for it is obliged to choose the course likely to cause the least injury"); *Data Systems Computer Centre, Inc. v. Tempesta*, 171 A.D.2d 274, 566 N.Y.S.2d 955 (2d Dept. 1991) (denying injunctive relief where the parties to be enjoined "would be adversely affected economically by the issuance of an injunction" and plaintiff "would derive no benefit from it"); *Cf. Riter v. Keokuk Electro-Metals Co.*, 248 Iowa 710 (1957); *City of Harrisonville v. Dickey Clay Mfg. Co.*, 289 U.S. 334 (1933).

224.    Here, this balancing of the equities analysis tips sharply in favor of denying injunctive relief.  Whereas JA Apparel has failed to articulate how placing Abboud in a virtual "penalty box" for a period of 90 days will rectify the alleged breach or benefit them in anyway, it is clear that an injunction preventing Abboud from engaging in any business activity concerning

his "jaz" menswear line for any period of time will be fatal to Abboud's business and directly impact those employed by Abboud and his companies. (*see*, *supra* Def. Proposed Findings at ¶¶147 - 188).

225.    Moreover, the instant case is distinguishable from both *New York Real Estate Institute, Inc. v. Edelman*, 42 A.D.3d 321, 839 N.Y.S.2d 488 (1st Dept. 2007) and *J.H. Goldberg Co., Inc. v. Stern*, 53 A.D.2d 246, 385 N.Y.S.2d 427 (4th Dept. 1976), the two cases relied upon by JA Apparel.

226.    In *New York Real Estate Institute, Inc. v. Edelman*, 42 A.D.3d 321, 839 N.Y.S.2d 488 (1st Dept. 2007), defendant entered into a restrictive covenant which prohibited him from competing with the purchaser of his real estate school for a period of two years. Notwithstanding this covenant, at the very outset of the restrictive period defendant surreptitiously obtained a direct ownership interest in a real estate school in direct competition with the real estate school that he had just sold. Thus, unlike the alleged violation of the restrictive provision of the Personal Services Agreement here, defendant's violation was undeniably direct and occurred at the very outset of the restrictive period.

227.    JA Apparel's reliance on *J.H. Goldberg Co., Inc. v. Stern*, 53 A.D.2d 246, 385 N.Y.S.2d 427 (4th Dept. 1976) is misplaced for precisely the same reasons. In *J.H. Goldberg Co., Inc. v. Stern*, 53 A.D.2d 246, 385 N.Y.S.2d 427 (4th Dept. 1976), defendant, an experienced retail furniture salesman, entered into a restrictive covenant in connection with his employment with plaintiff. The restrictive covenant prohibited defendant from engaging in the retail sale of furniture for a period of one year following the termination of his employment with plaintiff. Approximately two months following the termination of defendants employment with plaintiff, defendant became the manager of a furniture company within the same geographic area that was

in direct competition with plaintiff's business. Again, contrary to the indirect violations of the restrictive provision of the Personal Services Agreement alleged here, the court found *J.H. Goldberg Co., Inc. v. Stern*, 53 A.D.2d 246, 249 385 N.Y.S.2d 427 (4th Dept. 1976) that defendant "undeniably violated the terms of the covenant."

## ABBOUD'S COUNTERCLAIMS — PROPOSED CONCLUSIONS OF LAW

### M.    Abboud's Counterclaims — Generally

228.    I rule as a matter of law that the evidence presented at trial, taken as a whole, is legally sufficient to support a general finding in favor of Abboud on Claims 1 - 5 of the Counterclaims; and, therefore, Claims 1-5 should be granted and judgment entered in favor of Abboud.

### N.    Abboud Will Prevail on His Right of Publicity Claim Under Section 43(a) of the Lanham Act

229.    As a matter of law, JA Apparel has violated Abboud's right of publicity by using Abboud's name in such a fashion as to mislead consumers into believing that Abboud is still associated with JA Apparel and/or sponsors and endorses JA Apparel's products. *See*, *supra* Def. Proposed Findings at ¶¶192 - 204.

230.    In Section 43(a) of the Lanham Act, 15 U.S.C.A. § 1125(a), Congress has fashioned a federal remedy against the use of a false designation of origin or any false description, representation or advertisement. 15 U.S.C.A. § 1125(a).

231.    Section 43(a) of the Lanham Act provides that:

> Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which — (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be

liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C.A. § 1125(a).

232.    Section 43(a) of the Lanham Act "is a remedial provision and should be broadly construed." *Geisel v. Poynter Prods., Inc.*, 283 F.Supp. 261, 267 (D.C.N.Y. 1968), citing *Maternally Yours, Inc. v. Your Maternity Shop, Inc.*, 234 F.2d 538, 546 (2d Cir. 1956) (Clark, C.J., concurring).

233.    Section 43(a) of the Lanham Act allows individuals who have a public personality to "vindicate property rights in their identities against allegedly misleading commercial use by others." *Abdul-Jabar v. Gen. Motors Corp.*, 85 F.3d 407, 410 (9th Cir. 1996); *see also Vanderbilt v. Rolls-Royce Motor Cars, Inc.*, No. 88 CIV. 8263, 1990 WL 37825 (S.D.N.Y. March 28, 1990).

234.    Individuals who have achieved a public personality have standing to sue under Section 43(a) of the Lanham Act because such people "possess an economic interest in their identities" similar to that of a traditional trademark holder. *Abdul-Jabar v. Gen. Motors Corp.*, 85 F.3d 407, 410 (9th Cir. 1996); *see also Vanderbilt v. Rolls-Royce Motor Cars, Inc.*, No. 88 CIV. 8263, 1990 WL 37825 (S.D.N.Y. March 28, 1990).

235.    The thing at issue when an individual who has achieved a public personality sues under Section 43(a) of the Lanham Act is the individual's identity or persona. *White v. Samsung Elecs. Am. Inc.*, 971 F.2d 1395, 1400 (9th Cir. 1992).

236.    Section 43(a) of the Lanham Act "prohibits both literal falsehoods as well as innuendo, indirect intimation and ambiguous suggestions." *Vidal Sassoon, Inc. v. Bristol-Meyers Co.*, 661 F.2d 272, 277 (2d Cir. 1981); *see also Rostropovich v. Koch Int'l Corp.*, 34 U.S.P.Q.2d 1609 (S.D.N.Y. 1995) (involving the use of a performer's name and likeness on CD's he had not

138

authorized); *Geisel v. Poynter Prods., Inc.*, 283 F.Supp. 261 (S.D.N.Y. 1968), *Wildlife Internationale, Inc. v. Clements*, 591 F.Supp. 1542, 1548 (S.D.Ohio 1984).

237.    To prevail on a claim under Section 43(a) of the Lanham Act, the individual must show that the allegedly infringing use of his or her personal persona is likely to cause consumers confusion as to the affiliation, connection or association between the individual and the goods being marketed and/or sold by the defendant, or as to the individual's participation in the origin, sponsorship or approval of the goods being marketed and/or sold by the defendant.  15 U.S.C. § 1125.

238.    The individual must demonstrate that the likelihood that the defendant's use of the individual's personal identity will be confused with the individual's identity, such that consumers are, or are likely to be, mistakenly led to believe that the defendant's goods are approved by or sponsored by the individual.  *Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 753-54 (6th Cir. 1998).

239.    For injunctive relief to be granted, there is no requirement that plaintiff show that customers were actually deceived by the alleged misrepresentation or that there was an actual diversion of business.  Plaintiff need only demonstrate that the false representations have a tendency to deceive.  *Geisel v. Poynter Prods., Inc.*, 283 F.Supp. 261, 267 (D.C.N.Y. 1968), citing *Parkway Baking Co. v. Freihofer Baking Co.*, 255 F.2d 641, 648 (3d Cir. 1958); *Hesmer Foods, Inc. v. Campbell Soup Co.*, 346 F.2d 356 (7th Cir. 1965).

240.    Here, as noted above, by way of the Purchase and Sale Agreement, Abboud only conveyed or assigned to JA Apparel the trademarks and the goodwill pertaining thereto, as well as license agreements.  Abboud did not convey or assign to JA Apparel the "exclusive right" to use his name in any way, shape or form, nor did Abboud contract away his right to use his name

in connection with his future design efforts in the apparel industry following the expiration of his two year Restricted Period. Moreover, by virtue of the Personal Services Agreement, Abboud reserved his personal publicity rights to himself, and was specifically permitted to make media and celebrity appearances in his individual capacity, and to develop his personal reputation. Pl. Ex. 2 at ¶1(b).

241.    Despite the clear language in the Purchase and Sale Agreement and the Personal Services Agreement, and that Abboud is no longer associated with JA Apparel, and has not been associated with JA Apparel since July 13, 2005, and indeed, because of that fact, JA Apparel has deliberately engaged in a variety of advertising, marketing and promotional campaigns and initiatives, including promotional materials, public advertising, publicity campaigns, websites, sponsorships, and even its own answering service, intended to create the false impression that JA Apparel still possesses Abboud's individual reputation as a designer, as well as his unique talents, skills and artistic abilities to design menswear and other consumer products for JA Apparel, by usurping, misappropriating and converting to their own use and economic benefit Abboud's individual reputation as a fashion designer, his publicity rights, and his personal celebrity status in the fashion world. Def. Exs. 82, 84 - 86, 146-152, 154-158 and 169.

242.    These promotional and advertising campaigns include the following: "Hey Joseph, What Should I Wear?"; "Do You Know Joe?" and "Ask Joseph Abboud". Def. Exs. 82, 84 - 86, 146-152, 154-158 and 169.

243.    In connection with its "Do You Know Joe?" campaign, JA Apparel has used the following phrases to refer to an individual name "Joe": "Joe has been known to party with the royals"; Joe is irresistible to older women"; "Joe was a former child star. And he turned out all

right"; and "Joe has a drink named after him in Monte Carlo."  Def. Exs. 82, 84 - 86, 146-152, 154-158 and 169.

244.    Since Abboud left the company in July 2005, JA Apparel's use of the name "Joseph Abboud" and/or "Joe" has deceived and defrauded consumers into believing that Abboud is still affiliated with the company and/or that he is still designing apparel products for the company.  Def. Exs. 82, 84 - 86, 146-152, 154-158 and 169.

245.    Since Abboud left the company in July 2005, JA Apparel has benefited to Abboud's detriment by trading on Abboud's personal reputation, fashion expertise and celebrity status.

246.    Abboud, a famous fashion designer (*see*, *supra* Def. Proposed Findings at ¶¶192 - 204), has a legitimate property interest in his public personality, and thus the use of Abboud's name in a manner that is designed to mislead consumers into believing that Abboud is still associated with JA Apparel and/or sponsors JA Apparel's products, is an appropriation of Abboud's property rights in violation of Section 43(a) of the Lanham Act.  *Geisel v. Poynter Prods., Inc.*, 283 F.Supp. 261, 267 (D.C.N.Y. 1968); *Vanderbilt v. Rolls-Royce Motor Cars, Inc.*, No. 88 CIV. 8263, 1990 WL 37825 (S.D.N.Y. March 28, 1990); *see also Vidal Sassoon, Inc. v. Bristol-Meyers Co.*, 661 F.2d 272, 277 (2d Cir. 1981); *Rostropovich v. Koch Int'l Corp.*, 34 U.S.P.Q.2d 1609 (S.D.N.Y. 1995); *Abdul-Jabar v. Gen. Motors Corp.*, 85 F.3d 407, 410 (9th Cir. 1996)

247.    Moreover, as a matter of law, as defendant Staff, JA Apparel's Chief Executive Officer, was the moving, active and conscious force behind the infringing activities of JA Apparel, Staff is, as a matter of law, individually liable.  *Bambu Sales, Inc., v. Sultana Crackers, Inc.*, 683 F.Supp. 899, 913-14 (E.D.N.Y. 1988); *West Indian Sea Island Cotton Ass'n Inc. v.*

*Threadtex, Inc.*, 761 F.Supp.1941, 1054 (S.D.N.Y. 1991) ("The general rule is that a corporate officer who participates in a tort, even if it is in the course of his duties, may be held individually responsible"), citing *National Survival Game v. Skirmish, U.S.A., Inc.*, 603 F.Supp. 339, 341 (S.D.N.Y. 1985).

248. For the reasons set forth above (*see*, *supra* Def. Proposed Findings at ¶¶192 - 204), as a matter of law, JA Apparel's conduct is in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and Abboud is entitled to damages in the amount of $37.5 Million.

### O. Abboud Will Prevail on His Right of Publicity Claim Under New York Civil Rights Law §§ 50, 51

249. As a matter of law, JA Apparel has violated Abboud's right of publicity by using Abboud's name in a non-trademark fashion in advertising and promotional materials without Abboud's consent.

250. New York Civil Rights Law §§ 50, 51 prohibits the use of a person's name, portrait, picture, or voice for advertising purposes or for the purposes of trade without his or her *written consent*. N.Y. Civil Rights Law § 51; *Haelan Labs., Inc. v. Topps Chewing Gum, Inc.*, 202 F.2d 866 (2d Cir. 1953), *cert. denied,* 346 U.S. 816; *Bi-Rite Enters. v. Button Master*, 555 F.Supp. 1188, 1198-99 (S.D.N.Y. 1983) (right of publicity grants celebrities an exclusive right to control the commercial value of their names and to prevent others from exploiting them without permission); *Cohen v. Herbal Concepts, Inc.*, 63 N.Y.2d 379, 384, 482 N.Y.S.2d 457, 459 (1984) (noting that Section 51 "is designed to protect a person's identity, not merely a property interest in his or her 'name', 'portrait' or 'picture', and thus it implicitly requires that plaintiff be capable of identification from the objectionable material itself"); *see also Vanderbilt v. Rolls-Royce Motor Cars, Inc.*, No. 88 CIV. 8263, 1990 WL 37825 (S.D.N.Y. March 28, 1990).

251.    A violation consists of only two elements:  the commercial use of a person's name or photograph and the failure to procure the person's written consent for such use.  *Shamsky v. Garan, Inc.*, 167 Misc. 2d 149 (Sup. Ct. 1995); *quoting Brinkley v. Casablancas*, 80 A.D.2d 428, 440 (1st Dept. 1981).

252.    The right of publicity under the New York Civil Rights Law, unlike a claim made under the Lanham Act, has no likelihood of confusion requirement.  *Cohen v. Herbal Concepts, Inc.*, 63 N.Y.2d 379, 384, 482 N.Y.S.2d 457, 459 (1984); *Vanderbilt v. Rolls-Royce Motor Cars, Inc.*, No. 88 CIV. 8263, 1990 WL 37825 (S.D.N.Y. March 28, 1990).

253.    Abboud, a famous fashion designer, has a legitimate property interest in his public personality, and thus the use of Abboud's name in a non-trademark fashion, in connection with advertising and promotional campaigns, is an appropriation of Abboud's property rights in violation of §§50, 51 of the New York Civil Rights Law.  *Rosemont Enters., Inc. v Urban Systems, Inc.*, 72 Misc. 2d 788 (1973), mod. on other grounds, 42 App. Div. 2d 544 (1st Dept. 1973).

254.    Plaintiff is entitled to injunctive relief and is entitled to actual and exemplary damages in an amount to be ascertained at trial.  N.Y. Civ. Rights Law § 51 provides that exemplary damages may be awarded if it is shown that the defendant shall have knowingly used such person's name, portrait or picture.  For recovery of exemplary damages under the statute, therefore, no more need be shown than knowing use.  *Welch v. Mr. Christmas*, 57 N.Y.2d 143, 149 (1982).

255.    In Spring 2005, shortly after Abboud informed JA Apparel that he was leaving the company in July 2005, Abboud's attorney, Theodore Dinsmoor, informed JA Apparel's counsel that once Abboud left, JA Apparel would have to stop any marketing and/or promotional

campaigns referring to "Joseph Abboud" as a person, rather than the JOSEPH ABBOUD brand of apparel.

256.    Here, as noted above (see, supra Def. Proposed Findings at ¶¶192 - 204), by way of the Purchase and Sale Agreement, Abboud sold or conveyed to JA Apparel only the trademarks and the goodwill pertaining thereto, as well as license agreements.  Abboud did not convey or assign to JA Apparel the "exclusive right" to use his name in any way, shape or form, nor did Abboud contract away his right to use his name in connection with his future design efforts in the apparel industry following the expiration of his two year Restricted Period.  In fact, by virtue of the Personal Services Agreement, Abboud reserved his personal publicity rights to himself, and was specifically permitted to make media and celebrity appearances in his individual capacity, and to develop his personal reputation.  Pl. Ex. 2 at ¶1(b).

257.    Despite the fact that Abboud did not convey to JA Apparel the right to use the words "Joseph Abboud" to refer to his person or to his reputation as a designer, JA Apparel has persistently, since Abboud left the company in July 2005, used promotional material, public advertising, publicity campaigns, websites, sponsorships, and even its own answering service to refer to Abboud, the designer, rather than its JOSEPH ABBOUD trademark, in an effort to deceive and mislead consumers that Abboud is still affiliated with the company and/or that he is still designing apparel products for the company.  As a matter of law, this flagrant misappropriation of Abboud's publicity rights is a violation of New York Civil Rights Act §§ 50 and 51.  Vanderbilt v. Rolls-Royce Motor Cars, Inc., No. 88 CIV. 8263, 1990 WL 37825 (S.D.N.Y. March 28, 1990).

258.    Moreover, as a matter of law, as defendant Staff, JA Apparel's Chief Executive Officer, was the moving, active and conscious force behind the infringing activities of JA

Apparel, Staff is, as a matter of law, individually liable. *Bambu Sales, Inc., v. Sultana Crackers, Inc.*, 683 F.Supp. 899, 913-14 (E.D.N.Y. 1988); *West Indian Sea Island Cotton Ass'n Inc. v. Threadtex, Inc.*, 761 F.Supp.1941, 1054 (S.D.N.Y. 1991) ("The general rule is that a corporate officer who participates in a tort, even if it is in the course of his duties, may be held individually responsible"), citing *National Survival Game v. Skirmish, U.S.A., Inc.*, 603 F.Supp. 339, 341 (S.D.N.Y. 1985).

259.    For the reasons set forth above (*see*, *supra* Def. Proposed Findings at ¶¶192 - 204), as a matter of law, JA Apparel's conduct is in violation of New York Civil Rights Law §§ 50, 51 and Abboud is entitled to damages in the amount of $37.5 Million.

**P.    Abboud Will Prevail on His False Advertising Claim Under Section 43(a) of the Lanham Act**

260.    As a matter of law, JA Apparel has committed acts of false advertising in violation of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a) (1)(B).

261.    Section 43(a)(1)(B) of the Lanham Act states in pertinent part that

> (a)(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-
>
> * * * *
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a).

262.    Under the plain language of Section 43(a), any person who believes that he or she is or is likely to be damaged by the false or misleading representations may bring suit under the

Lanham Act. *Societe Des Hotels Meridien v. LaSalle Hotel Operating P'ship, L.P.*, 380 F.3d
126, 130 (2d Cir. 2004).

 263. In order to prevail on a claim for false advertising under the Lanham Act "a
plaintiff must demonstrate the falsity of the challenged advertisement, by proving that it is either
(1) literally false, as a factual matter; or (2) implicitly false, *i.e.*, although literally true, still likely
to mislead or confuse consumers." *McNeil-PPC, Inc. v. Pfizer Inc.*, 351 F. Supp. 2d 226, 248
(S.D.N.Y. 2005), citing *Societe Des Hotels Meridien v. LaSalle Hotel Operating P'ship, L.P.*,
380 F.3d 126, 132 (2d Cir. 2004).

 264. As a matter of law, the false or misleading statement must be material. *S.C.
Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 238 (2d Cir. 2001); *National Basketball Assoc.
v. Motorola, Inc.*, 105 F.3d 841, 855 (2d Cir. 1997); *see also* J. Thomas McCarthy, *McCarthy on
Trademarks & Unfair Competition* § 27:35 (4th ed. 2004) (there must be "some showing that the
defendant's misrepresentation was 'material' in the sense that it would have some effect on
consumers' purchasing decisions").

 265. When the challenged statement is literally or explicitly false, as a matter of law,
the Court may grant relief "'without reference to the advertisement's impact on the buying
public.'" *McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co.*, 938 F.2d 1544, 1549 (2d Cir. 1991),
quoting *Coca-Cola Co. v. Tropicana Prods., Inc.*, 690 F.2d 312, 317 (2d Cir. 1982), *abrogated
on other grounds* by Fed. R. Civ. P. 52(a).

 266. Here, as set forth more fully above (*see*, *supra* Def. Proposed Findings at ¶¶192 -
204), JA Apparel has engaged in a number of advertising and promotional campaigns and
initiatives which are, as a matter of law, explicitly false in that they create the false impression
that Abboud is still associated with JA Apparel and that JA Apparel still possesses Abboud's

individual reputation as a designer, as well as his unique talents, skills and artistic abilities to design menswear and other consumer products for JA Apparel.

267.    Even if this Court was to find that JA Apparel's complained-of advertising and promotional campaigns and initiatives are not explicitly false, these advertising and promotional campaigns and initiatives are, as a matter of law, implicitly false.

268.    Where a plaintiff proceeds on a claim of implied falsehood, the plaintiff must demonstrate that the challenged advertisement tends to mislead or confuse consumers. *Johnson & Johnson * Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 298 (2d Cir. 1992) (noting that the inquiry is: "what does the public perceive the message to be").

269.    As a matter of law, the Court must first determine "what message was actually conveyed to the viewing audience," and then it must determine the truth or falsity of the message. *Johnson & Johnson * Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 298 (2d Cir. 1992); *Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 34 (1st Cir. 2000).

270.    While, generally, a plaintiff must demonstrate the implied falsity by extrinsic evidence, where the plaintiff "'adequately demonstrates that a defendant has intentionally set out to deceive the public,' and the defendant's 'deliberate conduct' in this regard is of an 'egregious nature'", the plaintiff need not rely on extrinsic evidence to prove his implied falsity claim and, in these circumstances, "a presumption arises 'that consumers are, in fact, being deceived.'" *Johnson & Johnson * Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 298-99 (2d Cir. 1992); *Resource Developers, Inc. v. Statue of Liberty-Ellis Island Found., Inc.*, 926 F.2d 134, 140 (2d Cir. 1991).

271.     Here, as set forth more fully above (*see*, *supra* Def. Proposed Findings at ¶¶192 -

204), despite the fact that Abboud is no longer associated with JA Apparel, and has not been

associated with JA Apparel since July 13, 2005, and indeed, because of that fact, JA Apparel has

deliberately engaged in a variety of advertising and promotional campaigns and initiatives

which, as a matter of law, implicitly create the impression that Abboud is still associated with JA

Apparel and that JA Apparel still possesses Abboud's individual reputation as a designer, as well

as his unique talents, skills and artistic abilities to design menswear and other consumer products

for JA Apparel. *Johnson & Johnson * Merck Consumer Pharms. Co. v. Smithkline Beecham

Corp.*, 960 F.2d 294, 298-99 (2d Cir. 1992); *Resource Developers, Inc. v. Statue of Liberty-Ellis

Island Found., Inc.*, 926 F.2d 134, 140 (2d Cir. 1991).

272.     As a matter of law, JA Apparel's conduct, as set forth more fully above (*see*,

*supra* Def. Proposed Findings at ¶¶192 - 204), demonstrates that JA Apparel has intentionally set

out to deceive the public into believing that Abboud is still associated with JA Apparel and that

JA Apparel still possesses Abboud's individual reputation as a designer, as well as his unique

talents, skills and artistic abilities to design menswear and other consumer products for JA

Apparel. *Johnson & Johnson * Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.*, 960

F.2d 294, 298-99 (2d Cir. 1992); *Resource Developers, Inc. v. Statue of Liberty-Ellis Island

Found., Inc.*, 926 F.2d 134, 140 (2d Cir. 1991).

273.     JA Apparel's acts of usurping, misappropriating and converting to their own

unlawful use and economic benefit Abboud's individual reputation as a fashion designer, his

publicity rights, and his personal celebrity status in the fashion world, is, as a matter of law,

egregious conduct. *Johnson & Johnson * Merck Consumer Pharms. Co. v. Smithkline Beecham

*Corp.*, 960 F.2d 294, 298-99 (2d Cir. 1992); *Resource Developers, Inc. v. Statue of Liberty-Ellis Island Found., Inc.*, 926 F.2d 134, 140 (2d Cir. 1991).

274.    Moreover, as a matter of law, as defendant Staff, JA Apparel's Chief Executive Officer, was the moving, active and conscious force behind the infringing activities of JA Apparel, Staff is, as a matter of law, individually liable.  *Bambu Sales, Inc., v. Sultana Crackers, Inc.*, 683 F.Supp. 899, 913-14 (E.D.N.Y. 1988); *West Indian Sea Island Cotton Ass'n Inc. v. Threadtex, Inc.*, 761 F.Supp.1941, 1054 (S.D.N.Y. 1991) ("The general rule is that a corporate officer who participates in a tort, even if it is in the course of his duties, may be held individually responsible"), citing *National Survival Game v. Skirmish, U.S.A., Inc.*, 603 F.Supp. 339, 341 (S.D.N.Y. 1985).

275.    For the reasons set forth above (*see*, *supra* Def. Proposed Findings at ¶¶192 - 204), as a matter of law, JA Apparel's conduct is in violation of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a) (1)(B), and Abboud is entitled to damages in the amount of $37.5 Million.

### Q.    Abboud Will Prevail on His Claim Under New York G.B.L. § 349

276.    As a matter of law, JA Apparel's are in violation of New York G.B.L. § 349.

277.    New York G.B.L. § 349 protects against "[d]eceptive acts and practices in the conduct of any business, trade or commerce or in the furnishing of any service" in New York. N.Y. G.B.L. § 349.

278.    To assert a claim under New York G.B.L. § 349, a plaintiff must prove that (1) the act or practice was consumer oriented; (2) the act or practice was misleading in a material way; and (3) the plaintiff suffered an injury as a result of the deceptive practice.  *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29, 731 N.E.2d 608, 709 N.Y.S.2d 892 (2000); *see also Conboy v. AT&T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001).

279.    It has been held that commercial plaintiffs can only state a claim under New York G.B.L. § 349 where injury to consumers at large is alleged.  *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264-65 (2d Cir. 1995).

280.    Injury or harm that satisfies this standard includes "potential danger to the public health or safety."  *Gucci Am. v. Duty Free Apparel, Ltd.*, 277 F. Supp. 2d 269 (S.D.N.Y. 2003).

281.    Where the substance of the claim is harm to another business, the harm to the public may be deemed too insubstantial to constitute a claim under New York G.B.L. § 349.  *Excellus Health Plan v. Tran*, 287 F. Supp. 2d 167, 180 (N.D.N.Y. 2003).

282.    In fact, as a matter of law, New York G.B.L. § 349 requires a showing of direct harm to consumers more than the consumer confusion found in trademark infringement actions.  *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995); *SMJ Group, Inc. v. 417 Lafayette Rest. LLC*, 2006 WL 2516519, *4 (S.D.N.Y. Aug. 30, 2006); *Haritatos v. Hasbro, Inc.*, No. 6:05-Civ-930, 2007 WL 3124626, *8 (N.D.N.Y. Oct. 23, 2007).

283.    Moreover, as a matter of law, as defendant Staff, JA Apparel's Chief Executive Officer, was the moving, active and conscious force behind the infringing activities of JA Apparel, Staff is, as a matter of law, individually liable.  *Bambu Sales, Inc., v. Sultana Crackers, Inc.*, 683 F.Supp. 899, 913-14 (E.D.N.Y. 1988); *West Indian Sea Island Cotton Ass'n Inc. v. Threadtex, Inc.*, 761 F.Supp.1941, 1054 (S.D.N.Y. 1991) ("The general rule is that a corporate officer who participates in a tort, even if it is in the course of his duties, may be held individually responsible"), citing *National Survival Game v. Skirmish, U.S.A., Inc.*, 603 F.Supp. 339, 341 (S.D.N.Y. 1985).

284.    For the reasons set forth above (*see*, *supra* Def. Proposed Findings at ¶¶192 - 204), as a matter of law, JA Apparel's conduct is in violation of New York G.B.L. § 349 and Abboud is entitled to damages in the amount of $37.5 Million.

### R.    Abboud Will Prevail on His Common Law Unfair Competition Claim

285.    As a matter of law, JA Apparel's conduct constitutes unfair competition.

286.    A claim of unfair competition under New York Law is analyzed in the same manner as a trademark infringement claim under the Lanham Act.  *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 119 (2d Cir. 2006); *Information Superhighway, Inc. v. Talk Am., Inc.*, 395 F. Supp. 2d 44, 56 (S.D.N.Y. 2005) (noting that the "[t]he elements necessary to prevail on common law causes of action for trademark infringement and unfair competition mirror Lanham Act claims").

287.    In addition, to succeed on the merits of a "common law claim of unfair competition, [a plaintiff] must couple its evidence supporting liability under the Lanham Act with additional evidence demonstrating [the defendant's] bad faith."  *Computer Assocs. Int'l, Inc. v. Computer Automation, Inc.*, 678 F.Supp. 424, 429 (S.D.N.Y. 1987) ("stating that "[t]he essence of [an unfair competition claim] is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of goods"); *see also Eagle Comtronics, Inc. v. Pico Prods., Inc.*, 256 A.D.2d 1202, 682 N.Y.S.2d 505, 506 (4th Dep't 1998).

288.    Here, as set forth more fully above (*see*, *supra* Def. Proposed Findings at ¶¶192 - 204), JA Apparel has engaged in conduct in order to falsely mislead the consuming public into believing that it still possesses Abboud's individual reputation as a designer, as well as his unique talents, skills and artistic abilities to design menswear and other consumer products for JA Apparel under the JOSEPH ABBOUD trademark, and thereby they have unlawfully traded

upon and commercially exploited Abboud's individual reputation as a fashion designer, his

publicity rights, and his personal celebrity status in the fashion world, for their own profit. As a

matter of law, JA Apparel's conduct constitutes unfair competition under the common law. 15

U.S.C. § 1125; *Geisel v. Poynter Prods., Inc.*, 283 F.Supp. 261, 267 (D.C.N.Y. 1968); *Vanderbilt*

*v. Rolls-Royce Motor Cars, Inc.*, No. 88 CIV. 8263, 1990 WL 37825 (S.D.N.Y. March 28,

1990); *see also Vidal Sassoon, Inc. v. Bristol-Meyers Co.*, 661 F.2d 272, 277 (2d Cir. 1981);

*Rostropovich v. Koch Int'l Corp.*, 34 U.S.P.Q.2d 1609 (S.D.N.Y. 1995).

289.    Further, JA Apparel's Chief Executive Officer, in an effort to impede the launch

of Abboud's new venture, and otherwise injure Abboud, contacted Richard Baker, the President

and Chief Executive Officer of NRDC, the owner of Lord & Taylor, in an effort to impair or

prevent Abboud from entering into or maintaining his new business relationship with NRDC. In

making such contact, Staff employed dishonest and unfair means to dissuade Mr. Baker from

maintaining his business relationships with Abboud, all in a deliberate attempt to injure Abboud

with respect to his lawful business activities, his professional reputation, his personal character,

and his ability to engage in his chosen profession by exercising his unique design talents, skills

and artistic abilities for his own financial benefit and well being. As a result of the contacts

made by Staff, Richard Baker proceeded more cautiously with respect to NRDC's relationship

with Abboud, causing Abboud to suffer a loss of revenues.

290.    Moreover, as a matter of law, as defendant Staff, JA Apparel's Chief Executive

Officer, was the moving, active and conscious force behind the infringing activities of JA

Apparel, Staff is, as a matter of law, individually liable. *Bambu Sales, Inc., v. Sultana Crackers,*

*Inc.*, 683 F.Supp. 899, 913-14 (E.D.N.Y. 1988); *West Indian Sea Island Cotton Ass'n Inc. v.*

*Threadtex, Inc.*, 761 F.Supp.1941, 1054 (S.D.N.Y. 1991) ("The general rule is that a corporate

officer who participates in a tort, even if it is in the course of his duties, may be held individually responsible"), citing *National Survival Game v. Skirmish, U.S.A., Inc.*, 603 F.Supp. 339, 341 (S.D.N.Y. 1985).

291.    For the reasons set forth above, as a matter of law, JA Apparel's conduct constitutes unfair competition and Abboud is entitled to damages in the amount of $37.5 Million.

Dated: New York, New York
         April 4, 2008

                                        ARNOLD AND PORTER LLP

                            By:    _____/s_____
                                    Louis S. Ederer (LE 7574)
                                    John Maltbie (JM 3658)
                                    399 Park Avenue
                                    New York, New York 10022
                                    (212) 715-1000