**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x

JA APPAREL CORP.,                                      :

                  Plaintiff,               :     Civil Action No. 07 CV 07787 (THK)

          v.                                       :

JOSEPH ABBOUD, HOUNDSTOOTH CORP.,      :
and HERRINGBONE CREATIVE
SERVICES, INC.,                                        :

                Defendants.               :
-----------------------------------------------------------------x

JOSEPH ABBOUD, HOUNDSTOOTH CORP.,      :
and HERRINGBONE CREATIVE
SERVICES, INC.,                                        :

            Counterclaim Plaintiffs,      :

          v.                                       :

JA APPAREL CORP. and MARTIN STAFF,     :

            Counterclaim Defendants.      :

-----------------------------------------------------------------x


**DEFENDANTS AND COUNTERCLAIM PLAINTIFFS'**

**<u>REPLY MEMORANDUM OF LAW</u>**


EVA H. POSMAN, ESQ.
Attorney for Defendants/Counterclaim Plaintiffs
230 Park Avenue, Suite 2525
New York, New York 10169
(212) 661-9191

# TABLE OF AUTHORITIES

Cases:

1.  *Bock v. Perkins*, 139 U.S. 628 (1891) ……………………….……………… ..... ..4

2.  *Burrow v. Marcean*, 124 N.Y.S. 810 (Sup.Ct.. N.Y. Co. 1910)………...............5

3.  *Communications Satellite Corp. v. Comcet, Inc.,* 429 F.2d 1245 (4th Cir. 1970)….1

4.  *Courtenay Communications Corp. v. Hall*, 334 F.3d 210 (2d Cir. 2003) ………...7

5.  *Cox Broadcasting Corp. v. N.C.A.A.,* 297 S.E.2d 733 (Ga.1982) ………………2-3

6.  *Federal Ins. Co. v. Americas Ins. Co.*, 691 N.Y.S.2d 508
    (App.Div.1st Dept. 1999).............................................................................................4

7.  *Hensley Mfg. Co. v. Propride, Inc.*, 579 F.3d 603 (6th Cir. 2009)………………7-8

8.  *Hugo Boss Fashions, Inc. v. Federal Ins. Co.*, 252 F.3d 608 (2d Cir. 2001)……...4

9.  *J.A. Apparel Corp. v. Abboud*, 568 F.3d 390 (2d Cir. 2009) ………………..*passim*

10. *Jamie Securities Co. v. The Limited, Inc.*, 880 F.2d 1572 (2d Cir. 1989)……...3,4

11. *Kaslof v. Global Health Alternatives, Inc.*, 2000 U.S. Dist. Lexis 21053
    (E.D.N.Y. 2000)...............……………………………………………….......... 3

12. *KP Permanent Make-Up, Inc., v. Lasting Impressions I, Inc.*, 543 U.S. 111
    (2004) ......................................................................................................…7,10

13. *Madrigal Audio Laboratories, Inc., v. Cello, Ltd.,* 799 F.2d 814
    (2d Cir 1986)…………………………………………………………………….*passim*

14. *Main Street Outfitters, Inc., v.  Federated Dept. Stores, Inc.,* 730 F. Supp. 289
    (D. Minn. 1989)………………………………………………….........…......5

15. *Paolo Gucci v. Gucci Shops, Inc.*, 688 F. Supp. 916 (S.D.N.Y. 1988),
    judgment entered 1988 U.S. Dist. Lexis 7046..………..……………………..8,9

16. *Perry & Wallis, Inc., v. U.S.*, 427 F.2d 722 (Ct. Cl. 1970)………………….....2

17. *Poorman v. Julian*, 160 N.E.2d 169 (App. Ct.Ill. 1959)………………………. ..6

18. *Premminger v. Columbia Pictures Corp.*, 207 N.Y.S.2d 594
(Sup. Ct. N.Y. Co. 1966)…………….......................................................4

19. *The New Kids On The Block v. New America Publishing, Inc.,* 971 F.2d 302,
(9th Cir. 1992)……………………………………………………….................7

20. *U.S. Naval Institute v. Charter Communications, Inc.*, 875 F.2d 1044
(2d Cir. 1989)………………………………………………………...............3

21. *Venetianaire Corp. v. A&P Import Co.*, 429 F.2d 1079 (2d Cir. 1970) .................9

Statutes

1.  15 U.S.C. § 1056 .........................................................................................8

Miscellaneous:

1.  Restatement (Second) Contracts, §20(1)(a)………………………………..3

2.  Restatement (Second) Contracts, §20(1)(b)………………………………..2

3.  Restatement (Second) Contracts, §201(2)(b)……………………………...2

4.  Restatement (Third) Unfair Competition, §28………………………….....8

**THE EXTRINSIC EVIDENCE SHOWS THAT ABBOUD DID NOT INTEND
¶1.1(a)(A)  TO CONVEY AN EXCLUSIVE RIGHT TO HIS PERSONAL
NAME FOR ALL COMMERCIAL USES**

JA Apparel's submission as to the intended "scope of [its] right to use Abboud's name" under ¶1.1(a)(A) of the P&S is wholly refuted by the extrinsic evidence consisting of (i) the parties' Letter of Intent to purchase Abboud's existing "trade names, trademarks and service marks" (DX's – 11 and 164); (ii) Abboud's identification of the "names" in ¶1.1(a)(A) as his existing Marks on Schedule 1.1(a)(A) (DX – 185); (iii) Abboud's Assignment of his existing "Trademark/Service Mark Rights" at the Closing (DX – 180); and (iv) public policy prohibiting Abboud's sale of *exclusive* rights to his *personal* name for all commercial uses.

First, JA Apparel misreads *Madrigal Audio Laboratories, Inc. v. Cello, Ltd.*, 799 F.2d 814, 823,[1] which places the burden on JA Apparel to *clearly show* Abboud's "intention to convey an *exclusive* right to the use of [his] *own* name." Thus, *Madrigal* assigns the *burden of proof*; it establishes the *quantum of proof*; and, it identifies the *elements of proof* for JA Apparel to succeed on its contract claim.

Second, JA Apparel ignores the fact that, after Moss inserted the term "names" and other trademark designations[2] into ¶1.1(a)(A),  Abboud, by his attorney, then: (i) *identified* the "names" and all the trademark designations as the "Marks", i.e., the *brand* names, that are listed alphabetically in the "Trademark Report by Mark"; (ii) *designated*  the "Trademark Report by Mark" as Schedule 1.1(a)(A); and (iii) *notified* JA Apparel that he  understood  the "names"  in ¶1.1(a)(A) to mean the Marks, i.e., the *brand* names, on the Schedule, by sending the Schedule to JA Apparel's attorney.

---

[1] All jump cites are to Defendants' And Counterclaim-Plaintiffs' Second Supplemental Proposed Rulings of Law In Memorandum Form ("Def.'s 2nd Supp. RL").

[2] As set forth in *Communications Satellite Corp. v Comcet, Inc.,* 429 F.3d 1245,1249; and as explained by Dinsmoor at trial (Dinsmoor TT at 854-55), while a trade name may be a distinct form of intellectual property, i.e., the name for a business, it may also serve as a trademark designation and thus, as used in ¶1.1(a)(A), describe the Marks on Schedule 1.1(a)(A). However, the ambiguity is irrelevant here, because "trade names" like "names" and the other general terms Moss inserted into  ¶1.1(a)(A) are *identified* as Marks on Schedule 1.1(a)(A).  *See* note 7, *infra*.

As the Second Circuit noted, "given that ¶1.1(a)(A) conveyed 'the names . . . identified on *Schedule 1.1(a)(A)*,' it is reasonable to read that paragraph as conveying those names in the context in which they were shown on that Schedule," *JA Apparel,* 568 F.3d 390, 399  (emphasis in original).  *See also*, Judge Sack's concurrence, *id.*, at 409 ("Schedule 1.1(a)(A) . . . does not support JA Apparel's reading, because the name 'Joseph Abboud' as a personal name, appears nowhere on the Schedule").  Thus, by means of Schedule 1.1(a)(A), JA Apparel had *reason to know* that Abboud did not intend "the names" to convey any *exclusive* right to use his *personal* name.  Restatement (Second) Contracts, § 201(2)(b); and Def's 2nd Supp. RL at 10-11.

At a minimum, such *notice* and *reason to know* put JA Apparel "on inquiry . . . to investigate such intended meaning."  Having failed to do so or otherwise object to the Schedule, JA Apparel "acquiesced in and is bound by the meaning . . . intended by [Abboud]" as evidenced by Schedule 1.1(a)(A). [3] *Perry & Wallis, Inc. v. U.S.,* 427 F.2d 722, 725 (Ct. Cl. 1970).

Third, although JA Apparel's submission is devoid of any extrinsic evidence showing that it communicated any intended meaning of the term "names," even were there such a communication, the obligation to assign  "names" would not be binding for lack of mutual assent to the term.  Restatement (Second) Contracts, §20(1)(b) ("There is no manifestation of mutual assent to an exchange if the parties attach materially different meanings to their manifestations and . . . (b) each party knows or has reason to know the meaning attached by the other").  *See also*, *Cox Broadcasting Corp. v. N.C.A.A.,* 297 S.E.2d 733 (Ga. 1982) (ruling that there was no mutual assent, when at the

---

[3] Although JA Apparel points to Abboud's and his attorney's communications *predating* the Letter of Intent as evidence of Abboud's interpretation of "names" in ¶1.1(a)(A), these communications, regardless of their meaning, which is in dispute, are irrelevant: (i) because they were *superseded* by the express terms of the Letter of Intent (which contained an integration clause) defining the "Assets to be Purchased" as Abboud's *existing* "trade names, trademarks and service marks"; (ii) because they *preceded* Attorney Moss's insertion of  "names" into ¶1.1(a)(A); (iii) because they were *superseded* by Abboud's identification of "names" as Marks on Schedule 1.1(a)(A); and, (iv) because ¶1.1(a)(A) obligates Abboud to convey the "names" that are *identified* on Schedule 1.1(a)(A), rather than the "names" *identified* in some previous correspondence.  Thus, there is no legal or logical connection between such prior communications and the term "names" that Moss – without any discussion with Abboud or his counsel -- inserted into ¶1.1(a)(A) and that Abboud  *identified* as "Marks" on Schedule 1.1(a)(A).

time of contracting each party knew of the other's contrary intended meaning).[4]

Fourth, JA Apparel's reliance on the term "names" to *control and expand* the substance of Schedule 1.1(a)(A), is misplaced, because it erroneously inverts the fundamental, dispositive New York rule of contract interpretation requiring that the *specific* Marks *identified* in the "Trademark Report by Mark", which is designated Schedule 1.1(a)(A), *control and limit* the *general* term "names" in the text of ¶1.1(a)(A). *Jamie Securities Co. v. The Limited, Inc.,* 880 F.2d 1572, 1577-78 (2d Cir. 1989); and *Kaslof v. Global Health Initiatives, Inc.*, 2000 U.S. Dist Lexis 21053, *12. Clearly, the *general* term "names"(which, standing alone, is wholly indefinite and meaningless)[5] cannot govern Schedule 1.1(a)(A), since ¶1.1(a)(A) only requires Abboud to assign the "names" that are "identified" on the Schedule. [6]

Rather, as a matter of law, Schedule 1.1(a)(A) governs the meaning of "names," because it is necessary to refer to Schedule 1.1(a)(A) to *identify* the "names;" and, in so far as the Schedule only *identifies* Abboud's existing Marks in alphabetical order, *i.e.*, his existing *brand* names, then those are the "names" that get assigned. *See* Judge Sack's concurrence, *JA Apparel, supra*, at 409 ("while

---

[4] Correspondingly, if neither party knew of the other's intended meaning, again there is no manifestation of mutual assent. Restatement (Second) Contracts, §20(1)(a). *See U.S. Naval Institute.*, 875 F.2d.1044, 1050.

[5] JA Apparel's assertion that the term "names" must mean "Abboud's names" is belied by the text of 1.1(a)(A), English syntax and the dictionary: (i) because ¶1.1(a)(A) refers to the "names" and the "trademark registrations and applications *therefor*", which clearly shows that the "names" were intended to mean *brand* names *for* which there are existing trademark registrations and applications, as per ¶3.6; (ii) because any intended transfer of "Abboud's *personal* names would syntactically require use of the *personal* possessive pronoun "my" before the singular noun "name", rather than the *impersonal* article "the" before the plural noun "names"; and, (iii) because the dictionary definition of "name" is not limited to the nominative identification for a person, much less the particular person known as Joseph Abboud.

[6] JA Apparel's assertion that because "the 'name' Joseph Abboud is used many times in Schedule 1.1(a)(A)" it might plausibly mean "all right to use Abboud's name commercially" is a contractual *non sequitor,* in the absence of any language in the P&S indicating that the "the 'name' Joseph Abboud" *embedded* in the "Marks" would be *removable* and *transferrable* to *all other non-trademark types of intellectual property.* Here there is no such language; and, there is no law that permits the assignee of a trademark to *remove* the "names", "elements" or "aspects" *embedded* therein for *transfer to all other types of intellectual property.* Indeed, such a proposition is antithetical to the Lanham Act; so it is surprising it would even be suggested. Moreover, this proposition, which is contrary to the Letter of Intent, the law and logic, was never communicated to Abboud. Otherwise, *see* Judge Sack's concurrence refuting the *plausibility* of JA Apparel's argument.

the Schedule contains the words 'Joseph Abboud' those words are mentioned only as a mark or part

of a mark, reflecting a trademark property").

Therefore, even if JA Apparel's interpretation of "names" were plausible, under New York

law such interpretation must be *rejected* as surplusage in so far as it is *inconsistent* with the "names"

*identified* as Marks on Schedule 1.1(a)(A), because the *identification* of the Marks *governs* the

meaning of the "names" in ¶1.1(a)(A). *See Preminger v. Columbia Pictures Corp.,* 267 N.Y.S.2d

594, 599.[7]

Fifth, JA Apparel ignores the fact that the Assignment prepared by JA Apparel's attorney

only assigned Abboud's existing trademarks and service marks at the Closing (DX – 180).  JA

Apparel's attorney did not prepare an Assignment of any *exclusive* right to Abboud's personal name

for all commercial uses.  See *Federal Ins. Co. v. Americas Ins. Co.,* 691 N.Y.S. 2d 508, 512

(App.Div. 1st Dept. 1999) (stating that the actual course of performance under a contract is

considered to be the "most persuasive evidence of the agreed intention of the parties").

Sixth, JA Apparel's argument that Abboud's assignment of the *business* goodwill attached to

his trademarks should somehow encompass the assignment of his *personal* goodwill as a designer is

simply wrong, as a matter of law.  As the Second Circuit ruled in *Madrigal*, *supra,* 799 F. 2d at 823-

24, even when a person sells his name as a trademark or trade name, he is not precluded from using

his *personal* name as a symbol of his own "personality, reputation and accomplishments as

distinguished from that of the business."

---

[7] With all due respect to the Second Circuit, it must be noted that the rule against surplusage simply does not apply to *general* terms, i.e., "names, trademarks, trade names, etc.", when they are *identified* by common reference to a *single specific* term, e.g., "Mark", because the *specific* term effectively supersedes the general terms and thereby makes them all surplusage. *See Bock v. Perkins*, 139 U.S. 628, 632-65; and *Jamie Securities Co., supra*, at 1577-78. Further, because the "names" are specifically *identified* as individual Marks on Schedule 1.1(a)(A), the appropriate definitional reference for "names" is *legal usage* under the Lanham Act, not *ordinary usage* in the dictionary. *See Hugo Boss Fashions, Inc. v. Federal Ins. Co.*, 252 F.3d 608, 618. Finally, ascribing *independent* meanings to *general* terms that are *inconsistent* with their *identification* by a *single specific* term subverts the parties' expressed intent and thereby turns contract interpretation upside down. This is why New York law *rejects* such an *independent* reading of *general* terms as surplusage when governed by a *specific* term.

4

Here, Abboud had established and maintained an independent *personal* reputation as a fashion designer with "a dedicated following among menswear consumers" (DX – 14) *prior* to assigning his trademarks.  Indeed, JA Apparel's own President admitted that "Abboud is a legend" (Staff TT at 16).  Further, while Abboud did design apparel products for JA Apparel prior to the sale of trademarks, he maintained his independence by means of the trademark Licensing Agreements pursuant to which he personally *approved* and thereby *controlled* the design of all apparel products that JA Apparel manufactured.  In this context, Abboud could assign to JA Apparel the goodwill attached to the *continued business of manufacturing apparel products* that had "substantially the same characteristics" as those it had previously produced under the trademark Licenses. *See Main Street Outfitters, Inc. v. Federated Dept. Stores, Inc.,* 730 F. Supp. 289 (D.Minn. 1989). But, the goodwill that goes with the trademarks is that attendant to *the continued business of manufacturing apparel products.*

Moreover, Abboud could not and did not assign to JA Apparel the *personal* goodwill that is attendant to his *personal* design services. *See Burrow v. Marcean*, 124 N.Y.S. 810 (Sup.Ct. N.Y. Co.1910) (distinguishing between the lawful sale of a trademark for "trade or mercantile" pursuits and the unlawful sale of a person's name for "professional" services); and *Madrigal*, *supra*, 799 F2d at 826 n.5 (proclaiming "a sort of fraud on the public" were defendant to sell his "personal name" after establishing "a reputation for skill as a designer of audio equipment"). *See also* Judge Sack's concurrence, *JA Apparel, supra,* at 410 (distinguishing the right to use Abboud's name as a trademark and the right to use it for all commercial purposes). Thus, having sold his trademarks, Abboud is not unlawfully arrogating to himself the *business* goodwill attached thereto by trading on his *personal* goodwill as a designer of apparel products.

Finally, the appropriate means for JA Apparel to protect itself against Abboud's *fair use* of his *personal* name would have been to obtain Abboud's *unlimited* commitment for personal services

and/or his *unlimited* covenant not to compete.  But, JA Apparel did neither.  Not only did JA

Apparel agree to a *limited* five year term for Abboud's personal services (DX -162 at 2), but it

agreed to a *limited* two year covenant not to compete (PX-2).[8]  Thus, having bargained for a *limited*

covenant, JA Apparel's litigious effort to by have this Court rewrite ¶1.1(a)(A) to serve the financial

interests of its new owners is disingenuous at best.  Here, the new owners clearly knew that JA

Apparel's intellectual property did not include the *exclusive* right to Abboud's pewrsonal name for

all commercial purposes. *See* Stock Purchase Agreement, Schedule 2.19(b) (DX – 24).

      In sum, the extrinsic evidence shows that Abboud did *not* intend to convey an *exclusive* right

to his personal name for all commercial uses by the terms set forth in ¶1.1(a)(A); so JA Apparel

cannot meet its burden of proving that Abboud breached the P&S.  *See JA Apparel*, *supra,* at 400.

### THE PHYSICAL CHARACTERISTICS ALONG WITH PRECAUTIONARY MEASURES SHOW THAT ABBOUD'S USE OF HIS NAME IS OTHERWISE THAN AS A TRADEMARK, IN THE MOCK-UP ADS

      The essence of JA Apparel's submission as to Abboud's fair use of his name is the erroneous

suggestion that the only fair use is no use –  a proposition antithetical to the Lanham Act, the First

Amendment and the Second Circuit's remand. *See JA Apparel*, *supra*, at 404 (rejecting this Court's

prior injunction as "inappropriately broad" with respect to trademark infringement). Otherwise, JA

Apparel's submission is fraught with the following fallacies.

      First, JA Apparel urges this Court to require Abboud to produce some sort of anti-confusion

analysis respecting the mock-up advertisements submitted to the Court, although this burden was

resoundingly rejected by the Supreme Court in *KP Permanent Make-Up, Inc. v. Lasting Impressions*

*I, Inc.*, 543 U.S. 111 (2004) (ruling that a party raising the fair use defense does not have a burden to

---

[8]  The limited two year covenant, of course, creates the *inference* that Abboud intended to use his name, otherwise than as a trademark, in future business activities and thus constitutes *notice* to JA Apparel that he did not intend to convey an *exclusive* right to his *personal* name in ¶1.1(a)(A). *See Poorman v. Julian*, 160 N.E. 2d 169 (Ill. 1959) (ruling that defendant's limited five year covenant not to compete, accompanying a sale of the right to use his name as a trade name, negated his intent that the sale encompassed the exclusive right to use his name for all commercial purposes).

negate any likelihood of confusion). *See JA Apparel, supra,* at 401 ("the defense of fair use . . . is not defeated by the existence of some confusion").

Second, Abboud never said he wanted to advertise himself as the "source" of his "jaz" products in any trademark sense of the word "source."[9]  Rather, Abboud said that he wanted to use his name *nominatively* to identify himself ("informationally") as the "owner" of his "jaz" brand and/or the "creator" of his "jaz" products (Abboud TT at 579-80). While such *nominative* usage may indicate that Abboud is the creative force for his brand of products in order to distinguish them from JA Apparel's products *(JA Apparel, supra*, at 402-03), such a *nominative* use of Abboud's name – the only word available to identify Abboud – "does not implicate the source-identification function that is the purpose of a trademark," because "it lies outside the strictures of trademark law." *The New Kids On The Block v. New America Publishing, Inc.*, 971 F.2d 302, 308-09, adopted by the Second Circuit in *Courtenay Communications Corp. v. Hall*, 334 F.3d 210, 215.

Moreover, contrary to JA Apparel's submission, many courts have approved a person's fair use of his name in advertising to *nominatively* identify himself as the "designer" of certain products. *See Madrigal*, *supra,* 799 F.2d at 824 (permitting audio designer Mark Levinson to "inform[] the public that he is now designing audio equipment for Cello"); *Hensley Mfg., Inc. v. Propride, Inc.*,

---

[9] Rather, this was a statement made by the Court, which apparently used "source" according to its ordinary meaning (Abboud TT at 581) to characterize Abboud's layman's testimony. Here, the transcript shows that the Court properly sustained an objection to the original question put to Abboud about "source," because it called for a legal conclusion. But, when the question was rephrased by the preface "As a layman," the Court then characterized Abboud's testimony as suggesting he wanted to be known as "the source of the product". Thus, when read in context, it is clear that the Court did not intend to indicate that Abboud wanted to advertise himself as the "source of the product", as "source" is legally used and defined in describing the function of trademarks under the Lanham Act. *See JA Apparel,* 568 F.3d at 402-03 (wherein the Second Circuit understood the Court's use of the word "source" in its ordinary sense –  not in its legal sense – as a means by which Abboud was trying to "*distinguish*" his products from JA Apparel's products).
Nevertheless, JA Apparel having *baited* the Court's characterization of Abboud's *layman's* testimony by the use of the word "source" in its ordinary sense, now tries to *switch* the meaning of "source" to its legal sense by arguing that Abboud was somehow testifying to a legal conclusion, which constitutes an admission that he intended the unlawful use his name as a trademark.  Not only is this unconscionable argument, but it flies in the face of Abboud's repeated testimony that he did not intend to use his name as a trademark and was seeking legal advice from his lawyers and judicial guidance from the Court as to how he could make a fair use of his name *otherwise* than as a trademark (Abboud TT at 502-03).

579 F.3d 603, 612-13 (6th Cir. 2009) (permitting Jim Hensley to publicly advertise himself "as the designer of trailer hitches"); and, *Paolo Gucci v. Gucci Shops, Inc.*, 688 F.Supp. 916, 928 (S.D.N.Y. 1988) (permitting Paolo Gucci to publicly advertise himself "as the designer of [leather] products"). Significantly, in *Hensley*, the Sixth Circuit expressly rejected the very same specious "source" argument that JA Apparel makes in this case, by stating that the "advertisements do not use the name 'Hensley' in the trademark sense; they use Jim Hensley's name only to identify him as a designer of trailer hitches [], describe his relationship to Propride and tell the story behind his success." *Hensley Mfg. Inc.,* 579 F.3d at 612 (see copy appended hereto).[10]

Third, notwithstanding Abboud's reliance on such solid precedent and his repeated assurances that he was only seeking to use his name otherwise than as a trademark – as permitted by the fair use defense, as approved by his attorneys, and, as declared by this Court – JA Apparel tries to impeach Abboud's good faith by belaboring his layman's inability to articulate the precise legal parameters pursuant to which he could use his name – other than as a trademark – in advertising. This is nonsense, as any such use otherwise than as a trademark is clearly a legal issue; and, as even the physical characteristics of such a use that are identified in the Restatement (Third) Unfair Competition, §28, require professional analysis of the prevailing case law referenced therein.

Fourth, JA Apparel's attack on the physical characteristics of Abboud's proposed use of his name, otherwise than as a trademark, is completely misguided. Certainly, Abboud does not intend to use his name on products, labels, hangtags or packaging; and, as to advertising, he has proposed well established precautions to minimize the risk that his name could be mistakenly understood as a

---

[10] JA Apparel's assertion that the phrase "designed by" somehow serves as the source identifier in a trademark, ala the Registered Trademarks set forth in PX – 223, is simply another attempt to confuse the meaning of "source," since the phrase "designed by" does not connote "source" in the trademark sense of the word. Rather, it is the entire Registered Trademark, including its words, shapes, symbols and other designations of distinctive matter that identifies the "source" of products as "source" is used in the Lanham Act, and not the *descriptive* phrase "designed by" embedded therein. Moreover, the phrase "designed by" is non-distinctive descriptive matter that must be disclaimed in the Registered Trademarks, or they would all be infringing one another. *See* 15 U.S.C. §1056. Thus the phrase "designed by" is in the public domain and freely available to Abboud, as long as he does not use it in a "trade name, trademark, service mark, logo, insignia or designation," as per ¶1.1(a)(C).

8

trademark, including: (i) the prominent display of his "jaz" trademark accompanied by the ™

symbol; (ii) the identification of "Joseph Abboud" as a person by the appellation "Award-Winning

Designer;" (iii) the use of "Joseph Abboud" in a declarative sentence in which all words are printed

in identical typestyle, size and color so that "Joseph Abboud" is no more conspicuous than its

surrounding text; and, (iv) the omission of any reference to JA Apparel, its products or Abboud's

prior affiliation with the company.

Fifth, Abboud's use of his name in a declarative sentence to inform consumers that the "jaz"

collection was "Created by Award-Winning Designer Joseph Abboud" does not constitute a use of

the words "Joseph Abboud" or "designed by" or "anything similar thereto" in a *trade name,*

*trademark, service mark, logo (short for "logotype"), insignia (a "badge" or "emblem") or*

*designation (distinctive matter in a trademark )*, as those terms are used, understood and/or defined

in the Lanham Act and the decisional law thereunder. *See Venetianaire Corp. v. A&P Import Co.,*

429 F.2d 1079, 1082 (2d Cir. 1970) (suggesting that use of the word "hygienic" in a sentence would

not constitute trademark use).[11]

Sixth, as for the exact physical comparison of the name "Joseph Abboud" with other

descriptive matter, suffice it to say that the physical use of "Joseph Abboud" in the mock-up ads is

equal to or more conservative than the physical use permitted by the *Paolo Gucci* judgment. *See*

*Paolo Gucci*, 1988 U.S. Dist. Lexis 7046.

---

[11] The converse, as well as the basis for Abboud's unclean hands defense and the gravamen of Abboud's counterclaims, is that JA Apparel's uses of "Joseph Abboud" and/or "Joe" in the interrogative sentence: "Hey Joseph, What Should I Wear?"; or, the declarative sentence: "Joe Has Been Known To Party With Royals;" or, the domain name: "doyouknowjoe.com" are unlawful because: (i) they are ultra vires of the rights Abboud assigned to JA Apparel, since "Joseph" and "Joe" are not "contained" in a trade name, trademark, service mark, logo, insignia or designation; (ii) they misappropriate Abboud's publicity rights, by using Abboud's *personal* name to identify him as a person or persona; and, (iii) they falsely advertise Abboud's personal endorsement and/or sponsorship of JA Apparel products by coupling his *personal* name with JA Apparel's trademark (DX's – 82, 84, 86, 146-52, 166-58 and Abboud TT at 443-45). *See JA Apparel, supra,* at 400 (ruling, as per *Madrigal's* quantum of proof that ¶1.1(a)(C) "did not clearly grant the right to use Abboud's name other than as it would be 'contained' in such trade names, marks and logos, etc."). Such blatant misconduct bars any relief in JA Apparel's favor, and triggers an accounting for profits on Abboud's counterclaims.

Seventh, although Abboud is amenable to the use of a disclaimer in the mock-up ads, as JA Apparel points out in its submission, because the disclaimer would mention JA Apparel, the disclaimer, itself, might lead to misunderstanding.  Therefore, in lieu of a disclaimer Abboud is also amenable to the addition of a qualifier in the mock-up ads which, by means of a further declarative sentence, could identify a distinct manufacturer for his "jaz" products, e.g., "The 'jaz' Collection of tailored clothing is manufactured by Jack Victor, Ltd.;" so as to avoid any misunderstanding that JA Apparel might be manufacturing the Collection.

Abboud's fair use of his name, otherwise than as a trademark, is shown in the mock-up ads. To the extent there is any confusion or likelihood of confusion with JA Apparel's trademark, then that is the risk that JA Apparel assumed in purchasing a descriptive mark (*see KP Permanent*, *Make-up, Inc*., *supra,* 543 U.S. at 122), and negotiating away whatever protection it may have obtained against Abboud's commercial fair use of his *personal* name by means of an unlimited covenant not to compete.    In sum, Abboud's commitment to avoid any use of his name on products, labels, hangtags and packaging; his use of "jaz"$^{TM}$ to identify the source of his products; the precautions he has taken to minimize the risk that his name would be mistaken for JA Apparel's trademark; the physical characteristics of his proposed use of "Joseph Abboud;" and, his amenability to the addition of a disclaimer or qualifier, satisfy the requirements for the use of his name otherwise than as a trademark.

Dated:  New York, New York
          November 20, 2009                              Respectfully submitted,


                                            By:    _____
                                                   Eva H. Posman (EP-5813)
                                                   Attorney for Defendants/Counterclaim Plaintiffs
                                                   230 Park Avenue, Suite 2525
                                                   New York, NY 10169
                                                   (212) 661-9191

# APPENDIX



LEXSEE 579 F3D 613

**HENSLEY MANUFACTURING, INCORPORATED, Plaintiff-Appellant, v.
PROPRIDE, INCORPORATED; SEAN WOODRUFF; JAMES C. HENSLEY,
Defendants-Appellees.**

**No. 08-1834**

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

*09a0324p.06; 579 F.3d 603; 2009 U.S. App. LEXIS 19797; 2009 FED App. 0324P (6th
Cir.); 92 U.S.P.Q.2D (BNA) 1003*

**June 19, 2009, Argued
September 3, 2009, Decided
September 3, 2009, Filed**

**PRIOR HISTORY:** **[**1]**
    Appeal from the United States District Court for the
Eastern District of Michigan at Detroit. No. 08-10425--
Marianne O. Battani, District Judge.
*Hensley Mfg. v. ProPride, Inc., 622 F. Supp. 2d 554,
2008 U.S. Dist. LEXIS 58724 ( E.D. Mich., 2008)*

**COUNSEL:** ARGUED: Craig A. Redinger, YOUNG
BASILE, Ann Arbor, Michigan, for Appellant.

Josh J. Moss, BARRIS, SOTT, DENN & DRIKER,
PLLC, Detroit, Michigan, John F. Early, Jr., LAW
OFFICE, Fenton, Michigan, for Appellees.

ON BRIEF: Marshall G. MacFarlane, YOUNG BASILE,
Ann Arbor, Michigan, for Appellant.

Josh J. Moss, BARRIS, SOTT, DENN & DRIKER,
PLLC, Detroit, Michigan, John F. Early, Jr., LAW
OFFICE, Fenton, Michigan, for Appellees.

**JUDGES:** Before: McKEAGUE and WHITE, Circuit
Judges; MARBLEY, District Judge. *

    *    The Honorable Algenon L. Marbley, United
    States District Judge for the Southern District of
    Ohio, sitting by designation.

**OPINION BY:** McKEAGUE

**OPINION**

    **[*606]**    **[***2]** McKEAGUE, Circuit Judge.
Hensley Manufacturing, Inc. ("Hensley Manufacturing")
and ProPride, Inc., ("ProPride") both manufacture and
sell trailer hitches for "RVers" everywhere. And, more

importantly, both companies manufacture and sell trailer
hitches designed by the same man: James Hensley (also
known as "Jim Hensley"). Hensley Manufacturing claims
that ProPride's use of Jim Hensley's name in its
advertising material is likely **[**2]** to confuse consumers
and infringes upon Hensley Manufacturing's registered
trademark in the name "Hensley."

    Hensley Manufacturing sued ProPride, its founder
Shawn Woodruff, and Jim Hensley (collectively,
"defendants") in federal district court, asserting, *inter
alia*, a claim for trademark infringement under the
Lanham Act. Defendants filed separate motions to
dismiss the complaint, and Hensley Manufacturing filed
its own motion for a preliminary injunction. The district
court granted defendants' motions to dismiss and denied
Hensley Manufacturing's motion for a preliminary
injunction, holding that ProPride's use of Jim Hensley's
name fell under the fair use exception to trademark
infringement claims.

    On appeal, Hensley Manufacturing argues that the
complaint adequately stated a claim for trademark
infringement. It also argues that the district court
prematurely dismissed the complaint on the basis **[*607]**
of the affirmative defense of fair use and improperly
considered matters outside the complaint. We affirm the
district court's dismissal of the complaint.

**I. BACKGROUND**

    Hensley Manufacturing is a Michigan corporation
with its principal place of business in Davison, Michigan.
It designs, engineers, **[**3]** manufactures, and sells
trailer-towing products. ProPride is a Michigan
corporation with its principal place of business **[***3]**
in Grand Blanc, Michigan. ProPride also designs,
engineers, manufactures, and sells trailer-towing

products in competition with Hensley Manufacturing.

Hensley Manufacturing alleges that on February 22, 1994, it purchased the trailer hitch business of Jim Hensley--an inventor and designer of trailer hitches--as a going concern. [1] The company marketed and sold Jim Hensley's trailer hitch under the name "Hensley Arrow" or "Arrow." The company also registered a trademark for the name "Hensley" as well as the "Hensley Arrow" graphic design. [2] Hensley Manufacturing alleges that these trademarks have become widely known and respected in the marketplace for trailers and recreational vehicles, or "RVs."

> 1  As the district court noted, there is no proof that Hensley Manufacturing purchased Jim Hensley's business as a going concern. The record only reflects that Jim Hensley and Hensley Manufacturing entered into a Licensing Agreement. In this agreement, Jim Hensley agreed to grant Hensley Manufacturing the exclusive license to "practice, make, have made, market, advertise, use [**4] and sell" products made in accordance with two patents owned by him. In exchange, he received a one-time royalty payment, shares in Hensley Manufacturing, and a continuing royalty. Because this is an appeal from the district court's grant of a motion to dismiss, however, we accept all of Hensley Manufacturing's well-pleaded factual allegations as true.
>
> 2  The "Hensley Arrow" design trademark is not at issue in this case.

Sean Woodruff worked as a sales and marketing director at Hensley Manufacturing until July 2007, when he left and formed ProPride. At about the same time, Jim Hensley also split with Hensley Manufacturing. Jim Hensley designed a new trailer hitch and licensed the new design to ProPride. ProPride began marketing this hitch as the "ProPride Pivot Point Projection Hitch," or "3P Hitch."

On January 30, 2008, Hensley Manufacturing sued ProPride, Sean Woodruff, and Jim Hensley in the United States District Court for the Eastern District of Michigan. Hensley Manufacturing brought claims of trademark infringement and unfair competition in violation of the Lanham Act, common law trademark infringement, breach of contract against Jim Hensley, misappropriation of trade secrets against [**5] Woodruff and ProPride, and tortious interference with business relations. Specifically, Hensley Manufacturing alleged that defendants had "misappropriated the Plaintiff's registered trademark by offering for sale products and services utilizing the 'HENSLEY' trademark," such that there was a "strong likelihood of confusion in the marketplace as [***4] to the source of origin and sponsorship of the goods." In support of these allegations, the complaint referred to four attached examples of ProPride's promotional and advertising materials.

Two of these attached examples are print advertisements by ProPride. Both advertisements state: "Only one man has ever designed a trailer hitch that effectively eliminates trailer sway before it begins. That man is Jim Hensley. NOW he has done it again and IMPROVED the PERFORMANCE of his old design." Both advertisements provide ProPride's telephone number. One advertisement directs the reader to "www.TrailerSwayControlFacts.com," which is part of ProPride's [*608] website, for a free report regarding towing safety. The other advertisement specifically identifies ProPride and provides its website address: "www.ProPrideHitch.com." Both advertisements also contain [**6] a disclaimer at the bottom, which states that Jim Hensley is "no longer affiliated with Hensley Mfg., Inc."

In addition to the two print advertisements, an excerpt from ProPride's website was also attached as an exhibit to the complaint. The website includes a link to "The Jim Hensley Hitch Story," which describes Jim Hensley's background, his design contributions to the RV industry, and his relationship to both Hensley Manufacturing and ProPride. The website refers to the 3P hitch as "Jim's new design."

The final attached example of ProPride's alleged trademark infringement is an eBay listing by ProPride entitled "Used Hensley Arrow(R) hitch? Buy NEW Jim Hensley Design." The body of the advertisement, which markets the 3P Hitch, states:

> Jim Hensley designed the original Hensley Arrow(R) towing system and it was the standard for over 13 years.
>
> NOW he has done it again with an updated and improved design for today's travel trailers.
>
> Jim is no longer affiliated with the company that was named after him. He chose ProPride, Inc. as the manufacturer of his new design.

On April 1, 2008, Jim Hensley filed a motion to dismiss the complaint for failure to state a claim pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure*, [**7] which [***5] was quickly followed by a motion to dismiss filed by ProPride and Sean Woodruff. Hensley Manufacturing opposed both motions. It also filed its own motion for a preliminary injunction, seeking to enjoin defendants from using Jim Hensley's name in connection with the sale or advertising of ProPride's products.

The district court granted defendants' motions to dismiss and denied Hensley Manufacturing's motion for a

preliminary injunction. It held that "[t]he use of an individual's name in a descriptive sense, as opposed to the use as a trade name is acceptable under" the fair use exception to claims of trademark infringement. *Hensley Mfg., Inc. v. ProPride, Inc., 622 F. Supp. 2d 554, 2008 WL 2514060, at \*4 (E.D. Mich. 2008)*. Because Hensley Manufacturing's claims were based upon ProPride's use of Jim Hensley's name in connection with his individual reputation, and not as a trade name, the district court held that the fair use exception applied and it accordingly dismissed the trademark infringement and unfair competition claims. Reasoning that a successful breach of contract action could have only been based upon a valid claim for trademark infringement, the district court also **[\*\*8]** held that Hensley Manufacturing had failed to state a claim for breach of contract against Jim Hensley. [3] Further, having dismissed Hensley Manufacturing's federal claims, the district court declined to exercise supplemental jurisdiction over the remaining state law claims. The district court then denied Hensley Manufacturing's motion for a preliminary injunction, which it found had been rendered moot in light of the ruling on the motions to dismiss. Hensley Manufacturing timely appealed the final judgment of the district court.

> 3    The complaint alleged that Jim Hensley agreed by his conduct over a period of ten years "that the Hensley trademarks would be the sole and exclusive property of Hensley Manufacturing" and that he would not "undertake any action to misappropriate or dilute the Hensley trademark."

## II. ANALYSIS

### A. Standard of Review

Whether the district court properly dismissed Hensley Manufacturing's claims **[\*609]** pursuant to *Rule 12(b)(6)* is a question of law, which we review *de novo. Bishop v. Lucent Techs., Inc., 520 F.3d 516, 519 (6th Cir. 2008)*. We may affirm the district **[\*\*\*6]** court's dismissal of a plaintiff's claims on any grounds, including grounds not relied upon by the district court. **[\*\*9]** *Zaluski v. United Am. Healthcare Corp., 527 F.3d 564, 570 (6th Cir. 2008)*.

Under *Rule 8(a)(2) of the Federal Rules of Civil Procedure*, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Although this standard does not require "detailed factual allegations," it does require more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. [4] Rather, to survive a motion to dismiss, the plaintiff must allege facts that, if accepted as true, are sufficient "to raise a right to relief above the speculative level," *id.*, and to "state a claim to relief that is plausible on its face," *id. at 570; see also Ashcroft v. Iqbal, 129 S.*

*Ct. 1937, 1949-50, 173 L. Ed. 2d 868 (2009)*. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal, 129 S. Ct. at 1949*. And although we must accept all well-pleaded factual allegations in the complaint as true, we need not "'accept as true a legal conclusion couched as a factual allegation.'" **[\*\*10]** *Twombly, 550 U.S. at 555* (quoting *Papasan v. Allain, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986)); see also Iqbal, 129 S. Ct. at 1949*.

> 4    The Supreme Court has recently clarified that its decision in *Twombly* "expounded the pleading standard for 'all civil actions,'" despite the fact that *Twombly* itself arose in the context of an antitrust suit. *Ashcroft v. Iqbal, 129 S. Ct. 1937, 1953, 173 L. Ed. 2d 868 (2009)*. The Court's decision in *Iqbal* made clear that the *Twombly* standard is not limited to "sprawling, costly, and hugely time-consuming" litigation, *Twombly, 550 U.S. at 560 n.6*, dispelling such speculation by courts both within and outside this circuit. *See, e.g. , U.S. ex rel. SNAPP, Inc. v. Ford Motor Co., 532 F.3d 496, 502 n.6 (6th Cir. 2008); Sensations, Inc. v. City of Grand Rapids, 526 F.3d 291, 296 n.1 (6th Cir. 2008); Commercial Money Ctr., Inc. v. Ill. Union Ins. Co., 508 F.3d 327, 336 n.4 (6th Cir. 2007); Iqbal v. Hasty, 490 F.3d 143, 155-58 (2d Cir. 2007), rev'd, Iqbal, 129 S. Ct. at 1954*.

### B. Trademark Infringement Claims

On appeal, Hensley Manufacturing argues that the district court improperly granted defendants' motions to dismiss because its complaint was sufficient to state a claim for trademark infringement. **[\*\*11]** [5] A trademark is "any word, name, symbol, or device **[\*\*\*7]** . . . used by a person . . . to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." *15 U.S.C. § 1127*. To state a claim for trademark infringement under the Lanham Act, a plaintiff must allege facts establishing that: (1) it owns the registered trademark; (2) the defendant used the mark in commerce; and (3) the use was likely to cause confusion. *Id. § 1114(1)*. Only the third requirement--likelihood of confusion--is at issue in this case.

> 5    Although Hensley Manufacturing only asserts a claim of error with respect to its federal trademark infringement claim, we assume that this argument also refers to Hensley Manufacturing's claim of unfair competition under the Lanham Act, *15 U.S.C. § 1125(a)*, and its claim for common law trademark infringement, which both employ the same

"likelihood of confusion" test as a claim for trademark infringement. *See Audi AG v. D'Amato, 469 F.3d 534, 542 (6th Cir. 2006); Leelanau Wine Cellars, Ltd. v. Black & Inc., 502 F.3d 504, 521 (6th Cir. 2007).*

**[\*610]  1.  [\*\*12] *Likelihood of Confusion***

"The touchstone of liability [for trademark infringement] is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr., 109 F.3d 275, 280 (6th Cir. 1997).* In determining whether a likelihood of confusion exists, a court will typically weigh the following eight factors: (1) strength of the senior mark; (2) relatedness of the goods or services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) the intent of defendant in selecting the mark; and (8) likelihood of expansion of the product lines. *Id.; see also Interactive Prods. Corp. v. A2Z Mobile Office Solutions, Inc., 326 F.3d 687, 694 (6th Cir. 2003).* But the likelihood of confusion analysis also involves a preliminary question: whether the defendants "are using the challenged mark in a way that identifies the source of their goods." *Interactive Prods., 326 F.3d at 695.* If they are not, then the mark is being used in a "non-trademark' way" and trademark infringement laws,  **[\*\*13]** along with the eight-factor analysis, do not apply. *Id.* In *Interactive Products*, for example, this court concluded that the appearance of the plaintiff's trademark in the post-domain path of the defendant's website would not cause consumer confusion regarding the source of the website or the products on it. *Id. at 698.* Because there was no likelihood of confusion as to the source of the products, it was "unnecessary for the  **[\*\*\*8]** district court to examine the eight factors traditionally used to determine likelihood of confusion between two source-signifying marks." *Id.*

The Second Circuit has applied essentially the same logic in a case, like this one, involving an individual's use of his personal name. In *Madrigal Audio Laboratories v. Cello, Ltd., 799 F.2d 814, 816 (2d Cir. 1986),* the defendant, Mark Levinson, granted Mark Levinson Audio Systems, Inc., ("MLAS") the right to use "Mark Levinson" as a trade name. Levinson eventually left MLAS and founded another company, Cello, Ltd. ("Cello"). *Id. at 817.* Cello issued a promotional brochure entitled "Cello by Mark Levinson," which contained a one-page "Note from Mark Levinson" and several photographs of Levinson. *Id.* Madrigal Audio Laboratories,  **[\*\*14]** Inc. ("Madrigal") acquired the trademark and trade name rights of MLAS in bankruptcy and subsequently sued Levinson and Cello for trademark and trade name infringement. *Id.* The Second Circuit held that "[w]hen an individual sells no more than the

right to use his name as a trade name or trademark," he is not precluded "from taking advantage of his individual reputation (as opposed to the reputation of the company which bore his personal name as a trade name) by establishing a company which competes against the purchaser of the trade name" or "from advertising, in a not overly intrusive manner, that he is affiliated with a new company." *Id. at 823.* He is only prohibited from "using his name in such a way as to mislead the public into believing that those products are produced by the company which purchased the trade name." *Id.* Because the use of Mark Levinson's name in Cello's materials was not likely to confuse consumers regarding the origin of Cello's products, the Second Circuit reversed the district court's order barring Levinson and Cello from advertising Levinson's relationship to Cello. *Id. at 824.*

Here, the complaint does not allege facts sufficient to show that ProPride's use  **[\*\*15]** of the "Hensley" name creates a likelihood of confusion as to the source of its products. Hensley Manufacturing does not claim that ProPride has marked its trailer hitch  **[\*611]** products with the trademarks "Hensley," "Hensley Arrow," or even "Jim Hensley." The name of ProPride's product, the "Pivot Point Projection Hitch" or "3P Hitch," is not even remotely similar to the "Hensley" trademark. Instead, the complaint challenges  **[\*\*\*9]** ProPride's use of Jim Hensley's name in connection with its advertising of the 3P Hitch. Although Hensley Manufacturing alleges that this creates "a strong likelihood of confusion in the marketplace as to the source of origin and sponsorship of the goods of the Plaintiff and the Defendant," such a conclusory and "formulaic recitation" of the elements of a trademark infringement cause of action is insufficient to survive a motion to dismiss. *See Iqbal, 129 S. Ct. at 1954* ("*Rule 8* does not empower respondent to plead the bare elements of his cause of action . . . and expect his complaint to survive a motion to dismiss."). The exhibits attached to the complaint also indicate that Jim Hensley's name does not signify the source of ProPride's products. The two attached print  **[\*\*16]** advertisements identify Jim Hensley as the designer of the new 3P Hitch, as well as an earlier hitch that is not named. Each print advertisement states (albeit in smaller, but still noticeable, font) that Jim Hensley is "no longer affiliated with Hensley Mfg., Inc." Moreover, one of the print advertisements clearly identifies ProPride as the source of the advertised product by providing the domain name for ProPride's website: "www.ProPrideHitch.com." Another exhibit, the printout of ProPride's website, also clearly identifies ProPride as the source of the 3P Hitch. The website refers readers to "The Jim Hensley Hitch Story" for "the facts about a man who has made an enormous contribution to RVers and the RV industry," but ProPride's name appears on the page over ten times; there is absolutely no confusion as to the source of the product being advertised. Finally, ProPride's eBay advertisement encourages buyers to "Buy NEW Jim Hensley Design," but it also states that "Jim is no longer

affiliated with the company that was named after him. He chose ProPride, Inc. as the manufacturer of his new design." This advertisement clearly identifies ProPride as the seller of the 3P hitch.

Ultimately, **[**17]** the exhibits attached to the complaint describe Jim Hensley's association with ProPride, his design of the ProPride 3P Hitch, and his former association with Hensley Manufacturing. They do not identify Hensley Manufacturing, or even "Hensley," as the source of ProPride's products or suggest any current association between Hensley Manufacturing and Jim Hensley or ProPride. In fact, the advertisements make clear that Jim Hensley is no longer associated with Hensley Manufacturing. Moreover, they always refer to "Jim Hensley" and never simply use the **[***10]** word "Hensley" in connection with the 3P Hitch. [6] For all of these reasons, we conclude that they do not create a likelihood of consumer confusion regarding the source of ProPride's products.

> 6  Hensley Manufacturing points out that "The Jim Hensley Hitch Story" on ProPride's website includes a reference to the "Hensley Hitch" without using Jim Hensley's first name. Specifically, the website states: "This was the beginning of the Hensley Hitch concept." Aside from the fact that a printout of that particular portion of the website was not attached as an exhibit to the complaint, "The Jim Hensley Hitch Story" gives a detailed explanation of Jim **[**18]** Hensley's relationship to both Hensley Manufacturing and ProPride and, viewed as a whole, does not create any likelihood of confusion regarding the source of the products on ProPride's website.

### 2. Fair Use Defense

Even if Hensley Manufacturing's complaint somehow cleared the hurdle of showing a likelihood of confusion, however, the affirmative defense of fair **[*612]** use applies to bar the trademark infringement claims. A defendant may raise the affirmative defense of fair use by establishing that:

> the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark, of the party's individual name in his own business, or of the individual name of anyone in privity with such party, or of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin.

15 U.S.C. § 1115(b)(4); see also KP Permanent Make-

Up, Inc. v. Lasting Impression I, Inc., 543 U.S. 111, 118-22, 125 S. Ct. 542, 160 L. Ed. 2d 440 (2004); Audi AG v. D'Amato, 469 F.3d 534, 547 (6th Cir. 2006). Under the fair use doctrine, "the holder of a trademark *cannot* prevent others from using the word that forms the trademark in its *primary* or *descriptive* **[**19]** sense." *Herman Miller, Inc. v. Palazzetti Imports and Exports, Inc., 270 F.3d 298, 319 (6th Cir. 2001).* Rather,

> [t]he only right of exclusion that trademark law creates in a descriptive word is in the secondary, new, 'trademark' meaning of the word that plaintiff has created. The original, descriptive primary meaning is always available for use by others to describe their goods, in the interest of free competition.

*Id.* (quoting J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 11:45 (4th ed. 1996)); see also **[***11]** *Car-Freshner Corp. v. S.C. Johnson & Son, Inc., 70 F.3d 267, 270 (2d Cir. 1995)* ("[F]air use permits others to use a protected mark to describe aspects of their own goods, provided the use is in good faith and not as a mark."). The fair use defense contemplates and tolerates "some possibility of consumer confusion." *KP Permanent, 543 U.S. at 121.*

"In evaluating a defendant's fair use defense, a court must consider whether [the] defendant has used the mark: (1) in its descriptive sense; and (2) in good faith." *ETW Corp. v. Jireh Pub., Inc., 332 F.3d 915, 920 (6th Cir. 2003).* In *ETW Corp.*, this court held that an artist's use of Tiger Woods's name on the back of the **[**20]** envelope containing the artist's print and in the narrative description of the print was "purely descriptive," and that there was "nothing to indicate that [it was] used other than in good faith." *Id. at 920-21.* Woods's name, the court noted, was used only to describe the content of the print, and all of the materials accompanying the print clearly identified the artist himself as the source of the print. *Id.* Accordingly, the plaintiff's claim for violation of its trademark "Tiger Woods" was "barred by the fair use defense as a matter of law." *Id.*

At oral argument, counsel for Hensley Manufacturing conceded that the law permitted ProPride to use Jim Hensley's name in a descriptive sense to advertise his association with the company. That is exactly what ProPride did. The company's advertisements do not use the name "Hensley" in the trademark sense; they use Jim Hensley's name only to identify him as a designer of trailer hitches (including the ProPride 3P Hitch), describe his relationship to ProPride, and tell the story behind his success. To the extent they cause some level of consumer confusion, Hensley Manufacturing assumed that risk by trademarking Jim Hensley's own personal last **[**21]** name. *See KP Permanent, 543 U.S. at 121.* Because the complaint and

attached exhibits show that ProPride's uses of Jim Hensley's name are descriptive, and because Hensley Manufacturing did not allege facts from which any inference of bad faith can be drawn, we hold that the fair use defense applies in this case as a matter of law.

**[*613]   [***12] C. Procedural Arguments**

In its final argument in support of reversal, Hensley Manufacturing challenges the district court's dismissal of its trademark infringement claims in the procedural posture of a motion to dismiss. First, it argues that the district court prematurely granted the motions to dismiss based upon the affirmative defense of fair use. Generally, "dismissal for failure to state a claim upon which relief can be granted is appropriate in only the most extreme trademark infringement cases, such as where goods are unrelated as a matter of law, since the likelihood of confusion is generally a question of fact." 32 *Federal Procedure, Lawyer's Edition* § 74:507 (2008). But there is no reason not to grant a motion to dismiss where the undisputed facts conclusively establish an affirmative defense as a matter of law. *See In re Colonial Mortgage Bankers Corp., 324 F.3d 12, 16 (1st Cir. 2003)* **[**22]** (holding that a suit can be dismissed on the basis of an affirmative defense if the facts establishing the defense are "definitively ascertainable from the allegations of the complaint" and they "conclusively establish the affirmative defense"); *Tregenza v. Great Am. Commc'ns Co., 12 F.3d 717, 718 (7th Cir. 1993)* (noting that if a plaintiff "pleads facts that show that his suit is time-barred or otherwise without merit, he has pleaded himself out of court"). Here, the facts Hensley Manufacturing alleged in its complaint, as well as the attached exhibits, demonstrated that there was no likelihood of confusion and that the fair use defense conclusively applied as a matter of law. *See In re Dual-Deck Video Cassette Recorder Antitrust Litig., 11 F.3d 1460, 1467 (9th Cir. 1993)* (affirming district court's grant of motion to dismiss trademark infringement claim because defendant's use was fair use as a matter of law). Hensley Manufacturing contends that "facts *may exist* that establish a level of consumer confusion" and that "facts *may exist* that establish that 'Hensley' is not being used fairly and in good faith." Appellant's Br. at 13 (emphasis added). But mere speculation is insufficient;   **[**23]** it was Hensley Manufacturing's burden to allege those facts, if they indeed exist, in the first instance. Simply put, Hensley Manufacturing failed to state a claim for relief that is "plausible on its face." *Twombly, 550 U.S. at 570; see also Iqbal, 129 S. Ct. at 1949* (noting that the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully").

**[***13]**   Second, Hensley Manufacturing argues that the district court improperly considered facts that were outside the complaint without giving it adequate notice and a reasonable opportunity to respond. When reviewing a motion to dismiss, the district court may not consider matters beyond the complaint. *Winget v. JP Morgan Chase Bank, N.A., 537 F.3d 565, 576 (6th Cir. 2008)*. If the district court does consider evidence outside the complaint, "it effectively converts the motion to dismiss to a motion for summary judgment." *Id.; see also Kostrzewa v. City of Troy, 247 F.3d 633, 643 (6th Cir. 2001)*. It then must give the parties "a reasonable opportunity to present all the material that is pertinent to the [summary judgment] motion." *FED. R. CIV. P. 12(d)*.

Hensley Manufacturing offers only one example in support   **[**24]** of its argument that the district court considered matters outside the complaint: the district court's discussion of ProPride's use of a domain name, "jimhensleyhitch.com," which redirects users to ProPride's website. [7] Indeed, we are unable to find any **[*614]** indication of this domain name in the complaint or the exhibits attached to the complaint. Evidence of ProPride's ownership of the domain name appeared first in Hensley Manufacturing's motion for a preliminary injunction. Even assuming that the district court's consideration of this domain name was sufficient to convert the motions to dismiss into motions for summary judgment, however, Hensley Manufacturing cannot demonstrate that it was prejudiced by the district court's failure to notify it of the conversion. "[A] party cannot raise for the first time on appeal an argument that [it] was surprised by the conversion of the motion to dismiss into a motion for summary judgment when the party was aware that materials outside the pleading had been submitted to the court before the court granted the motion." *Song v. City of Elyria, 985 F.2d 840, 842 (6th Cir. 1993)*. That is especially true in this case, where Hensley Manufacturing itself   **[**25]** submitted evidence of the "jimhensleyhitch.com" domain name to the court. It cannot now complain that the district court considered what it had asked the court to consider. And even if the **[***14]** summary judgment standard of review applies to the district court's dismissal of the complaint, the trademark infringement claims still fail as a matter of law. [8]

---

7    The exhibits attached to the complaint are considered part of the complaint for purposes of a motion to dismiss. *See FED. R. CIV. P. 10(c)*.

8    As the district court noted, the "jimhensleyhitch.com" domain name consists of Jim Hensley's entire name. This descriptive use distinguishes the domain name from Hensley Manufacturing and does not create a likelihood of confusion as to the source of the website or its products.

**D. Remaining Claims**

After dismissing the trademark infringement claims, the district court did not err in dismissing Hensley Manufacturing's remaining claims. First, the district court concluded that a successful breach of contract claim

would require a successful trademark infringement claim. Hensley Manufacturing does not challenge that conclusion on appeal. The breach of contract claim, then, fell along with the trademark **[\*\*26]** infringement claims. And, having dismissed all of the federal claims, the district court did not abuse its discretion in declining to exercise supplemental jurisdiction over the remaining state law claims. *See Grace v. USCAR, 521 F.3d 655, 679 (6th Cir. 2008)*. It also did not err in denying Hensley Manufacturing's motion for a preliminary injunction, which was rendered moot in light of the court's dismissal of the complaint.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the decision of the district court.