UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
JA APPAREL CORP.,                        :
                                         :
                        Plaintiff,       :
                                         :   07 Civ. 7787 (THK)
                 v.                      :
                                         :   **MEMORANDUM**
                                         :   **OPINION AND ORDER**
JOSEPH ABBOUD, HOUNDSTOOTH CORP., and    :
HERRINGBONE CREATIVE SERVICES, INC.,     :
                                         :
                        Defendants.      :
----------------------------------------X
JOSEPH ABBOUD, HOUNDSTOOTH CORP., and    :
HERRINGBONE CREATIVE SERVICES, INC.,     :
                                         :
                 Counterclaim-Plaintiffs, :
                                         :
                 v.                      :
                                         :
JA APPAREL CORP. and MARTIN STAFF,       :
                                         :
                 Counterclaim-Defendants. :
----------------------------------------X

**THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE.**

In this action, Plaintiff JA Apparel Corp. ("Plaintiff" or "JA Apparel") sues Defendants Joseph Abboud ("Abboud"), Houndstooth Corp. ("Houndstooth"), and Herringbone Creative Services, Inc. ("Herringbone") (at times, collectively "Abboud") for (1) breach of contract, (2) trademark infringement, false designation of origin, unfair competition, trademark dilution, false and deceptive trade practices, and (3) a declaratory judgment regarding the nature of its rights, stemming from a June 16, 2000 Purchase and Sale Agreement (the "Agreement"), and a related July 13, 2000 Side Letter Agreement (the "Side Letter"), between, on the one hand, JA

Apparel, and on the other, Abboud and Houndstooth.

Defendants assert counterclaims against JA Apparel and one of its principals, Martin Staff ("Staff"), for false endorsement, false advertising, violation of New York Civil Rights and General Business Laws, and common law unfair competition, stemming from activities in which JA Apparel and Staff allegedly engaged subsequent to the expiration of the Side Letter.

The parties consented to trial before this Court, pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. Following a bench trial, the Court issued a Memorandum Opinion and Order, concluding that the parties' Agreement clearly included the sale to JA Apparel of all of Joseph Abboud's trademarks, as well as his name for all commercial purposes. The Court, therefore, granted Plaintiff injunctive relief and dismissed all of Abboud's counterclaims. See JA Apparel Corp. v. Abboud, 591 F. Supp. 2d 306 (S.D.N.Y. 2008) ("Abboud I"). On appeal, the Second Circuit concluded that the language of the Agreement was ambiguous, and vacated this Court's decision and remanded for further proceedings. See JA Apparel Corp. v. Abboud, 568 F.3d 390, 403 (2d Cir. 2009).

Following remand, the parties submitted hefty briefs, containing their proposed findings of fact and conclusions of law with respect to those issues raised by the Second Circuit, namely, any extrinsic evidence of the parties' intent regarding the sale of Abboud's name, and whether Abboud's proposed advertisements for his

new clothing line, containing his name, constitute trademark fair use.  (See Plaintiff and Counterclaim-Defendants' Supplemental Proposed Findings of Fact and Conclusions of Law on Remand, dated Nov. 6, 2009 ("Pl.'s Post-Remand Mem."); Defendants and Counterclaim-Plaintiffs' Second Supplemental Findings of Fact, dated Nov. 6, 2009 ("Defs.' Post-Remand Mem. I"); Defendants and Counterclaim-Plaintiffs' Second Supplemental Proposed Rulings of Law, dated Nov. 6, 2009 ("Defs.' Post-Remand Mem. II"); Plaintiff and Counterclaim-Defendants' Reply Brief on Remand, dated Nov. 20, 2009 ("Pl.'s Post-Remand Reply Mem."); Defendants and Counterclaim-Plaintiffs' Reply Memorandum of Law, dated Nov. 20, 2009 ("Defs.' Post-Remand Reply Mem.").)  What follows are the Court's findings of fact and conclusions of law.

### FACTUAL BACKGROUND

The facts underlying this action are set out in more complete detail in the Court's initial Opinion.  See Abboud I, 591 F. Supp. 2d at 311-15.  The Court assumes the reader's familiarity with those facts, and, in this Opinion, includes only relevant background information, procedural history, and facts relating to any extrinsic evidence of the parties' intent and Abboud's proposed use of his name in promoting his new clothing line.[1]

---

[1] As noted by the Court in Abboud I, the parties have limited their arguments to "whether Abboud can use his name in advertising or marketing materials to promote his 'jaz' line" of clothing.  Abboud I, 591 F. Supp. 2d at 316 n.4.  Abboud is "not seeking to use the Joseph Abboud name on clothes, labels, or

3

## I.   The Purchase and Sale Agreement

At the heart of this litigation is the interpretation of the Purchase and Sale Agreement, executed on June 16, 2000, by and between JA Apparel, Abboud and Houndstooth.   In exchange for a payment of $65.5 million, which was to be "allocated 100% to Abboud," Abboud agreed to "sell, convey, transfer, assign and deliver" to JA Apparel "all of [his] right, title and interest in and to" the following:

> (A)   The names, trademarks, trade names, service marks, logos, insignias and designations identified on Schedule 1.1(a)(A), and all trademark registrations and applications therefor, and the goodwill related thereto (collectively, the "Trademarks") . . . and all other Intellectual Property (as hereinafter defined).

> (B)   All licenses to use the Trademarks granted by Houndstooth or Abboud . . . (collectively, the "License Agreements").

> (C)   All rights to use and apply for the registration of new trade names, trademarks, service marks, logos, insignias and designations containing the words "Joseph Abboud," "designed by Joseph Abboud," "by Joseph Abboud," "JOE" or "JA," or anything similar to or derivative thereof, either alone or in conjunction with other words or symbols (collectively, the "New Trademarks"), for any and all products and services.

> (D)   All books, financial records, invoices, and other documents, records and data files relating primarily to the Trademarks or the License Agreements.

> (E)   The goodwill of or pertaining to the Trademarks. (The items referred to in clauses (A) through (E) of this

---

hang-tags for the 'jaz' line;" nor is Plaintiff "seeking to prevent Abboud from being in business and competing, or personally presenting his new 'jaz' line to prospective purchasers."   Id.

Section 1.1(a) are collectively referred to as the "Assets").

(PX-1 ¶ 1.1(a)(A)-(E).)[2]   The Schedule attached as an exhibit to the Agreement is labeled "Trademark Report by Mark," and contains the name Joseph Abboud.

The Agreement also has an integration clause, which states:

9.9. <u>Entire Agreement</u>.  This Agreement, including the Exhibits and Schedules hereto and the documents, certificates and instruments referred to herein, embody [sic] the entire agreement and understanding of the parties hereto in respect of the transactions contemplated by this Agreement.  There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth or referred to herein.  This Agreement supersedes all prior agreements and understandings between the parties with respect to such transactions.

(<u>Id.</u> ¶ 9.9.)

## II.  The Side Letter

On July 13, 2000, the same parties entered into the Side Letter, pursuant to which Abboud agreed to serve as "Chairman Emeritus" of JA Apparel, and, for a period of five years, provide JA Apparel with, among other things, consulting services relating to fashion design and brand promotion of products sold under the Abboud marks.   The Side Agreement, therefore, was to expire on July 13, 2005, but the terms provided that upon expiration, Abboud would not compete with JA Apparel for a period of two years – until July 13, 2007 (the "Restricted Period").

---

[2] The Court will use the same citation formats designated in its original Opinion.  <u>See</u> <u>Abboud I</u>, 591 F. Supp. 2d at 311 n.1.

## III. The Underlying Dispute

Not long after the execution of the Agreement and the Side Letter, the parties' relationship soured. They fought over Abboud's role in the creative process at JA Apparel, and Abboud filed and later dismissed a lawsuit against JA Apparel. The parties temporarily resolved their differences in the summer of 2004 by way of a June 29, 2004 Letter Agreement, pursuant to which Abboud was given new responsibilities at JA Apparel. The following year, in the spring of 2005, Abboud informed JA Apparel that he would no longer continue in his position with JA Apparel. The Personal Services period terminated on July 13, 2005, thereby triggering the Restricted Period that was to run until July 13, 2007.

In early 2007, Abboud began plans to start his new "jaz" clothing line, which would compete in certain respects with the clothing and accessories sold by JA Apparel under the Joseph Abboud trademark.[3] But it was not until August 2007 that JA Apparel first learned of Abboud's intentions to use his name in connection with the new venture through an article published in DNR, a leading magazine of the men's fashion industry. (See PX-8.) The DNR

---

[3] In Abboud I, JA Apparel successfully argued that Abboud breached his obligation not to compete with JA Apparel during the Restricted Period, but no damages were awarded for that breach. See Abboud I, 591 F. Supp. 2d at 337-45. As none of the issues presently before the Court have any effect on that finding, the Court will not disturb its prior ruling on remand.

article initially stated that "Abboud, the person, is prohibited from using the Joseph Abboud name on any product or marketing materials." (PX-8.) The article's author, however, notified JA Apparel that Defendants had requested a correction (see PX-9), and DNR later ran a "Clarification," which stated that Abboud is "allowed to use his name on marketing and advertising materials for Jaz." (PX-10.) In August 2007, the Wall Street Journal ran a similar article announcing the new "jaz" line, and which reported that Abboud "plans to promote his new label with the tagline 'a new composition by designer Joseph Abboud.'" (PX-11.)

Subsequently, Abboud created several "mock-ups" of proposed ads for the new "jaz" clothing line. (See, e.g., PX-42, PX-43, DX-187, and DX-188.) Each of these ads includes the words "Joseph Abboud" in addition to Abboud's new trademark, "jaz." While the ads are similar in many respects, the font, size, and placement of the words differ in each of the ads, and are discussed in greater detail in this Opinion's fair use analysis.

JA Apparel maintains that while Abboud is free to compete in the menswear market, he sold all rights to use his name in connection with goods and services, and that his proposed uses of his name in connection with the "jaz" line would violate the Agreement, infringe JA Apparel's trademarks, and constitute unfair competition.

Defendants, conversely, maintain that Abboud merely sold the

use of his name as a trademark and did not sell the exclusive right to use his name for all commercial purposes.  Thus, they argue, the proposed use of his name in advertising constitutes trademark fair use.   In  furtherance  of  that  position,  Defendants  assert Counterclaims against JA Apparel and Staff for using the Joseph Abboud name in ways that they claim deceive consumers, trade on Abboud's personal reputation, and constitute unfair competition.

### PROCEDURAL HISTORY

**I.   Abboud I**

At trial, both Defendants and Plaintiff argued that the Agreement was unambiguous.  Plaintiff contended that since the Agreement provided for the sale of the names - in addition to the trademarks, trade names, service marks, logos and designations - contained in the exhibit to the Agreement, and the name Joseph Abboud was in the exhibit, Abboud sold the right to the commercial use of his name.  Defendants, in turn, argued that the word "names" was merely one of several ways of describing the trademarks in the Agreement's exhibit, and, therefore, Abboud sold only trademarks containing his name.

In Abboud I, after determining that the relevant provisions of the Agreement were unambiguous, this Court agreed with Plaintiff and concluded that Abboud "sold, conveyed, transferred, assigned, and delivered to JA Apparel all of his right, title and interest to the use of his personal name, in addition to the trademarks, trade

names, and designations containing his name, for commercial purposes." Abboud I, 591 F. Supp. 2d at 326. Thus, Abboud's proposed use of his name in connection with his new "jaz" clothing line would constitute a breach of the Agreement. See id. As a result, the Court permanently enjoined Abboud from, inter alia, using the name Joseph Abboud "to sell, market, or otherwise promote goods, products, and services to the consuming public." Id. at 349.

Notwithstanding this interpretation of the Agreement, and "in the interest of completeness," the Court determined that "Abboud's proposed use of his name in connection with the 'jaz' line would also constitute trademark infringement." Id. at 327; see also id. at 328-32. In light of these findings, the Court dismissed Plaintiff's remaining claims as duplicative. See id. at 332. Finally, the Court dismissed all of Abboud's counterclaims, based primarily on Abboud's sale to Plaintiff of "the exclusive right to commercially use the Joseph Abboud name in connection with goods and services." Id. at 345; see also id. at 345-48.

## II. The Second Circuit's Decision

On appeal, the Second Circuit disagreed with this Court's conclusion that the word "names" in the Agreement unambiguously conveyed to Plaintiff the exclusive right to commercially use the Joseph Abboud name, and remanded for further consideration of any extrinsic evidence of the parties' intent. See JA Apparel Corp.,

568 F.3d at 399.    The Second Circuit agreed that JA Apparel's interpretation of the Agreement (as endorsed by this Court in Abboud I) was "a plausible reading of the word 'names' in ¶ 1.1(a)(A)," but also found Abboud's interpretation "reasonable in light of several aspects of the Agreement."[4]  Id. at 398.

Next, the Second Circuit stated that "[i]n the event that the district court does not rule in favor of JA [Apparel] on the contract claim on remand, it will be required to address the trademark issues."  Id. at 403.    This was due, in part, to the fact that this Court's analysis of trademark fair use relied on its findings with respect to the Agreement.    Furthermore, the Second Circuit determined that "individualized consideration of the various proposed advertisements is needed" to address Abboud's fair use defense.  Id. at 402.    The Court of Appeals declined to address any other issues decided by this Court, but noted that this Court "is free on remand to revisit" those issues.    Id. at 403.

### DISCUSSION

On remand from the Court of Appeals, this Court must first decide two narrow questions: (1) based on the Agreement's language and any extrinsic evidence of the parties' intent, did Abboud agree to sell his name, other than as a trademark or related intellectual

---

[4] Specifically, Abboud argued on appeal "that the word 'names' . . . was intended to mean only brand names."  Id. at 398.    However, Abboud never argued at trial that the word "names" was intended to mean "brand names," although he now embraces that interpretation.

property, to JA Apparel?; and (2) if Abboud sold his name only as a trademark or related intellectual property, do his proposed ads qualify as fair use under the Lanham Act?   Answering the first question in the affirmative disposes of the need to address the second, as well as the parties' other remaining claims and counterclaims.

## I.   Contract Interpretation

### A.   Legal Standard

Under New York law,[5] "the fundamental, neutral precept of contract interpretation is that agreements are construed in accordance with the parties' intent, and that the best evidence of what parties to a written agreement intend is what they say in their writing." Innophos, Inc. v. Rhodia, S.A., 10 N.Y.3d 25, 29, 852 N.Y.S.2d 820, 823 (2008) (internal citations omitted).   Where, as here, a contract is negotiated by sophisticated parties at arm's length:

> [C]ourts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include.   Hence, courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.

Vt. Teddy Bear Co., Inc. v. 538 Madison Realty Co., 1 N.Y.3d 470, 475, 775 N.Y.S.2d 765, 768 (2004) (internal citations omitted); see

---

[5] The parties agree that the Agreement is governed by New York law.

also <u>Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of
N.J., Inc.</u>, 448 F.3d 573, 580 (2d Cir. 2006) ("Under New York law,
.  .  .  [c]ourt[s] must enforce contract provisions clearly
expressing parties' intent."); <u>Terwilliger v. Terwilliger</u>, 206 F.3d
240, 245 (2d Cir. 2000) ("A court may neither rewrite, under the
guise of interpretation, a term of the contract when the term is
clear and unambiguous, nor redraft a contract to accord with its
instinct for the dispensation of equity upon the facts of a given
case."); <u>Belle Harbor Wash. Hotel, Inc. v. Jefferson Omega Corp.</u>,
17 A.D.3d 612, 612, 795 N.Y.S.2d 597, 598 (2d Dep't 2005) ("A
written agreement that is complete, clear, and unambiguous on its
face must be enforced in accordance with the plain meaning of its
terms.").

      The determination of "[w]hether or not a writing is ambiguous
is a question of law to be resolved by the courts."  <u>W.W.W.
Assocs., Inc. v. Giancontieri</u>, 77 N.Y.2d 157, 162, 565 N.Y.S.2d
440, 443 (1990).  A writing is not ambiguous simply because the
parties urge different interpretations in the litigation.  <u>See</u> <u>Hunt
Ltd. v. Lifschultz Fast Freight, Inc.</u>, 889 F.2d 1274, 1277 (2d Cir.
1999).  If a court makes a determination that the contract is
unambiguous, extrinsic evidence regarding the intent of the parties
is inadmissible and cannot be considered.  <u>See</u> <u>W.W.W. Assocs.,
Inc.</u>, 77 N.Y.2d at 162, 565 N.Y.S.2d at 443; <u>see also</u> <u>Terwilliger</u>,
206 F.3d at 245 ("[M]atters extrinsic to the agreement may not be

considered when the intent of the parties can fairly be gleaned from the face of the instrument."). On the other hand, if the words of a contract are ambiguous, extrinsic evidence is properly considered. See Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 429 (2d Cir. 1992).

If an ambiguity requires consideration of extrinsic evidence, a court must look to all "surrounding facts and circumstances" in order to ascertain the parties' intended meaning of the contract. See U.S. Naval Inst. v. Charter Commc'ns, Inc., 875 F.2d 1044, 1048 (2d Cir. 1989) (citing 67 Wall St. Co. v. Franklin Nat'l Bank, 37 N.Y.2d 245, 248, 371 N.Y.S.2d 915, 918 (1975)); see also Korff v. Corbett, 18 A.D.2d 248, 251, 794 N.Y.S.2d 374, 377 (1st Dep't 2005) ("[W]here words used in a written contract are susceptible of more than one interpretation, the courts will look at the surrounding circumstances existing when the contract was entered into, the situation of the parties and the subject matter of the instrument.") (internal quotation marks and citations omitted). This includes "any relevant course of performance, course of dealing, [and] usage of trade," Restatement (Second) of Contracts § 202, as well as "a party's own admissions, the party's actions or statements from which knowledge or reason to know may be inferred, and the usages and meanings of third persons with which the party probably was familiar." 5-24 Corbin on Contracts § 24.10. In resolving ambiguity, a court may also resort to "the common and

13

legal meanings of the terms involved, where such meanings are clear, and, of paramount significance, to the manifest purpose sought to be accomplished." <u>Teig v. Suffolk Oral Surgery Assocs.</u>, 2 A.D.3d 836, 837, 769 N.Y.S.2d 599, 600 (2d Dep't 2003). A court is prohibited, however, from considering the parties' "[u]ncommunicated subjective intent." <u>Wells v. Shearson Lehman/Am. Express, Inc.</u>, 72 N.Y.2d 11, 24, 530 N.Y.S.2d 517, 524 (1988); <u>see also</u> <u>First Montauk Secs. Corp. v. Menter</u>, 26 F. Supp. 2d 688, 689 (S.D.N.Y. 1998) ("[I]t is hornbook law that the uncommunicated subjective intent of a party is irrelevant in interpreting a contract."); <u>Padavano v. Vivian</u>, 217 A.D.2d 868, 869, 629 N.Y.S.2d 844, 846 (3d Dep't 1995) (same).

B.   <u>Application</u>

Although the parties previously maintained that the Agreement is unambiguous, and this Court agreed, we are nonetheless bound by the Second Circuit's conclusion that the Agreement is, in fact, ambiguous. Thus, the Court must consider both the plain language of the Agreement and any extrinsic evidence of intent in order to decide whether Abboud sold the exclusive right to use his name commercially to JA Apparel. Upon a careful review of the Agreement and all attendant circumstances to its execution, the Court concludes that he did not.

On November 11, 1999, after preliminary discussions regarding the transaction that would ultimately result in the Agreement and

14

the Side Letter, Abboud sent a "letter of understanding" to Mr. Roberto Jorio Fili, CEO of JA Apparel's then-owner, GFT. (See DX-161.) Specifically, Abboud noted as one of three "Points of Agreement," the sale of "all Joseph Abboud trademarks." (Id.) The letter made no mention of the sale of Abboud's personal name for commercial use, but concluded with Abboud's self-proclaimed ultimate goal: "to build the Joseph Abboud name into the successful global brand I know it can be." (Id.) On December 3, 1999, Mr. Paolo Vigitello of GFT, responded to Abboud, noting that "it must be defined that the acquisition target is represented by all Joseph Abboud trademarks personally owned by Mr. Abboud." (DX-2.)

On February 2, 2000, the parties met in Milan, Italy to discuss further details of the sale. In minutes from this meeting, Fili "stresses that GFT wants to buy only the trademarks and not the two companies currently owned by J[oseph] Abboud." (DX-162.) A letter outlining the "key points" from the verbal agreement reached at this meeting makes clear that the "[o]bject of the operation" is the "acquisition of trademarks." (DX-3.)

Two days later, on February 4, 2000, Vigitello sent a letter to Abboud confirming that the "[t]arget of the deal" is the "purchase of all the trademarks existing and worldwide registered plus exclusive and perpetual right to the buyer to use and apply for registration of whatever new denomination in association with the name 'Joseph Abboud' and/or using 'designed by Joseph Abboud'

15

or simply 'by Joseph Abboud' linked to automotive industries products, to clothing, casualwear, sportswear and furnishing products and/or accessories in the most wide meaning . . . and home products." (DX-4.) Vigitello continued, "[If JA Apparel intends to use] the name 'Joseph Abboud' in association with products different from the ones above mentioned[, it] must obtain the previous written consent [of Abboud] . . . , which consent cannot be unreasonably withheld."[6]   (Id.)

The following week, on February 10, 2000, the parties entered into a letter of intent, specifying the "[a]ssets to be [p]urchased" as all "right, title and interest in and to all trade names, trademarks and service marks existing as of the Closing (as defined below) and registered or used in any country in the world (collectively, the 'Trademarks'), together with all registrations and applications therefor, the goodwill related thereto and any and all claims for past infringement." (DX-5.) The letter of intent also denoted that JA Apparel was purchasing "all licenses to use the Trademarks" and "all of the right, title and interest . . . to use and apply for the registration of new trade names, trademarks and service marks containing the words 'Joseph Abboud,' 'designed

---

[6] The final Agreement did not specifically tie Abboud's trademarks to any one industry, as Vigitello purported to do in this letter. That said, the Court cannot ignore this letter's implications, as it clearly denotes an intent by the parties to reserve to Abboud certain rights with respect to the use of his name. Yet, neither party placed much, if any, weight on this letter at trial or on remand.

by Joseph Abboud,' 'by Joseph Abboud,' 'JOE' or 'JA,' or anything similar thereto or derivative thereof, either alone or in conjunction with other words or symbols (collectively, the 'New Trademarks')." (Id.)  The letter of intent did not include the sale of "names."

As discussions continued, the agreement not to compete became a point of contention for Abboud.  In a February 23, 2000 letter, Abboud's counsel, Mr. Theodore Dinsmoor, wrote to JA Apparel's counsel, Mr. Jeffrey LaGueux, alerting him that:

> [Abboud] wants to have the opportunity to pursue his trade as a designer of apparel [after the expiration of the five-year Personal Services period.]  In this regard, Mr. Abboud understands that any effort on his part to pursue his trade as a designer of apparel could not include his use of the name "Joseph Abboud" or any of the other trademarks conveyed to JA Apparel.

(PX-347.)

Concerned that the tension between the parties might derail the deal, Fili wrote directly to Abboud on February 25, 2000, and reiterated that "[r]ight from the initial steps of our negotiation I have always declared that our objective was and still is the acquisition of the trade marks."  (DX-8.)  In response, Abboud wrote to Fili:

> If, for whatever reasons, the corporation does not want to continue with my services after five years, I want the option to practice my skills should I choose to continue working in the future.  It goes without saying that at no time will I have any rights to any of the Joseph Abboud trademarks.  Here is where you must separate Joseph Abboud personally from the Joseph Abboud trademarks.

17

(DX-9.)   In conclusion, Abboud wrote that his decision is "emotional, because I am relinquishing my name (albeit for a large sum) which I have worked toward building since I entered this industry full time in 1972, 28 years ago." (Id.)

On March 17, 2000, the parties entered into a letter agreement, whose language mirrored that of the February 10, 2000 letter of intent. (DX-165.) Again, the letter agreement made no mention of the sale of "names."

JA Apparel, as agreed upon by the parties, prepared the first draft of the Agreement.[7] The draft Agreement, sent from LaGueux to Dinsmoor on May 3, 2000, described certain of the assets to be purchased as "[t]he names, trademarks, trade names, service marks, logos, insignias and designations identified on Schedule 1.1(a)(i)(A)."[8]   (PX-318 (emphasis added).)   This was the first time the word "names," standing alone as an asset to be purchased, appeared in any of the parties' correspondence. Dinsmoor wrote to LaGueux on May 19, 2000, proposing various changes to the draft Agreement, but did not comment on the newly inserted term, "names."

---

[7] Notwithstanding JA Apparel's role as the initial drafter, Section 9.8 of the Agreement expressly provides that "[i]f any ambiguity or question of interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumptions or burden of proof shall arise favoring or disfavoring any party by virtue of authorship of any provisions of this Agreement." (PX-1 ¶ 9.8.)

[8] Schedule 1.1(a)(A) was erroneously referenced in this earlier draft of the Agreement as "Schedule 1.1(a)(i)(A)."

(DX-163.)   As discussed by the parties, Dinsmoor compiled a listing of all trademarks owned by Abboud that was to be used as Schedule 1.1(a)(A), and sent it to LaGueux on May 23, 2000.   (DX-185.)   The parties exchanged a second draft of the Agreement in June (see DX-166), which continued to include the word "names," but Dinsmoor again did not address its inclusion or meaning.   (See DX-167.)

On June 16, 2000, the parties prepared a draft press release to accompany the acquisition.   (See DX-178.)   The release noted that "[o]n the basis of the signed contract, GFT Net will acquire the trademarks and licensing agreements registered in the name of Joseph Abboud."   (Id.)   A subsequent revised release contained similar language, referencing the purchase of "all existing trademarks and licensing agreements and all future trademarks bearing the Joseph Abboud name."   (DX-14.)   Neither version of the release indicated that the "name" Joseph Abboud, as anything other than a trademark, would be sold.

At the closing of the sale, Abboud assigned "all rights, title and interest in and to the Marks and registrations or applications associated with them, together with the goodwill of the business symbolized by and associated with the Marks and their respective registrations or applications."   (DX-180.)   Abboud did not assign any rights to his name, other than for use as a trademark.[9]

---

[9] The Court recognizes that it previously rejected Abboud's contention that the non-assignment of his name is dispositive as to whether he, in fact, sold his name to JA Apparel.   See Abboud

The final Agreement, as did the drafts, included the sale of "names," in addition to "trade names, trademarks, service marks, logos, insignias and designations identified on Schedule 1.1(a)(A)," but there is no evidence of any negotiations or discussions of the sale of Abboud's name as an asset distinct from the trademarks and related intellectual property. (PX-1.)[10]

Despite the "fairly extensive extrinsic evidence" submitted at trial, see Abboud I, 591 F. Supp. 2d at 318, this evidence sheds little, if any, light on the parties' intended meaning of the term "names." That said, the parties' communications indicated that from the outset of their negotiations they intended to buy or sell only trademarks and related intellectual property. (See, e.g., DX-161 ("letter of understanding" from Abboud to Fili denoting a "Point of Agreement" as the sale of "all Joseph Abboud trademarks"); DX-2 (letter from Vigitello to Abboud, noting that

_____

I, 591 F. Supp. 2d at 324. Abboud I, however, did not address the extrinsic evidence of the parties' intent. In this Opinion, the Court finds the assignment at least somewhat probative of intent when considered in tandem with the other extrinsic evidence submitted by the parties.

[10] The parties have also submitted extrinsic evidence in the way of trial testimony from a variety of witnesses as to their subjective interpretations of the contract. These post-hoc statements are most often self-serving, and of little value to the Court's present analysis of the Agreement. Accordingly, the Court has not summarized them here. In any event, and as both parties acknowledge, "subjective understandings a party may have had that it did not communicate to the opposing side" may not be properly considered by the Court as extrinsic evidence. (See Pl.'s Post-Remand Mem. at 37-38 & n.13 (collecting cases); Defs.' Post-Remand Mem. II at 6-7 (same).)

"the acquisition target is represented by all Joseph Abboud trademarks"); DX-162 (meeting minutes indicating that GFT "wants to buy only the trademarks"); DX-4 (letter from Vigitello to Abboud identifying the "[t]arget of the deal" as the "purchase of all the trademarks"); DX-5 (letter of intent specifying the "[a]ssets to be [p]urchased" as all "trade names, trademarks and service marks"); DX-8 (letter from Fili to Abboud reiterating that "our objective was and still is the acquisition of the trade marks").)  It was only at the drafting stage that the word "names" entered the picture as a term of the Agreement.  (See PX-318 (May 3, 2000 draft of the Agreement including, for the first time, the word "names").)  In fact, the word "names" as an asset to be sold is included only in the drafts and final version of the Agreement, and in no other correspondence relating to the transaction.  Indeed, neither party has been able to point the Court to any extrinsic evidence that evinces the reason for this word's inclusion or meaning in the Agreement.

JA Apparel focuses primarily on Abboud's failure to object to the term "names" in the draft Agreement to support its proposed interpretation.  The Court does not find such silence to constitute sufficient evidence of an intent to buy or sell an additional and distinct asset never discussed by the parties.[11]

---

[11] The parties were similarly silent regarding the sale of "logos, insignias, and designations."  These terms, however, fit squarely within the list of items sold in section 1.1(a)(A) as

JA Apparel does, however, emphasize two letters that it claims illustrate that "Abboud did not retain the right to use his name under the terms of the Agreement." (See Pl.'s Post-Remand Mem. at 16.)   The first is a letter written several months before the Agreement was executed, from Abboud's attorney to JA Apparel's attorney.   (See PX-347.)   In the letter, Dinsmoor writes, "Mr. Abboud understands that any effort on his part to pursue his trade as a designer of apparel could not include the use of the name Joseph Abboud or any of the other trademarks conveyed to JA Apparel." (Id. (emphasis added).)   Although at first glance this sentence appears to preclude "use of the name Joseph Abboud," it is followed by the phrase "or any of the other trademarks."   (Id.) The inclusion of the word "other" to qualify "trademarks" demonstrates that "Joseph Abboud" was also referenced as a trademark.   But the Court need not rely on this academic exercise of sentence deconstruction, because in the same letter, Dinsmoor writes, "technically JA Apparel is only acquiring Mr. Abboud's trademarks."   (Id.)

JA Apparel also relies heavily on a letter from Abboud to Fili in March of 2000, in which he characterizes his decision to consummate the sale as "emotional, because I am relinquishing my name (albeit for a large sum) which I have worked toward building since I entered this industry full time in 1972, 28 years ago."

---

subsets of trademarks or related intellectual property.

(DX-9.)   JA Apparel argues that Abboud could not be referring to only trademarks in this sentence, because "Joseph Abboud" was not used as a trademark until 1987.  (See Pl.'s Post-Remand Mem. at 16-17.)  At first blush, this document does lend some support to JA Apparel's position.  Nevertheless, in the same letter, Abboud writes, "It goes without saying that at no time will I have any rights to any of the Joseph Abboud trademarks."  (DX-9.)  And then, in a sentence that perhaps underscores the essence of this entire dispute, Abboud writes, "Here is where you must separate Joseph Abboud personally from the Joseph Abboud trademarks."[12]  (Id.)

Although JA Apparel has offered both a reasonable and persuasive interpretation of the Agreement - and one that the Court previously adopted - Abboud has offered a competing interpretation that the Second Circuit has concluded is equally reasonable.  See JA Apparel Corp., 568 F.3d at 398-99.  This fact, coupled with the extrinsic evidence that explicitly discusses the sale of trademarks and related intellectual property, and the absence of any extrinsic evidence that addresses Abboud's sale of his personal name for all other commercial purposes, compels the Court to conclude that section 1.1(a)(A) did not convey to JA Apparel the exclusive right to use Abboud's name for commercial purposes other than as a

---

[12] Given this acknowledgment of the thorny issues that could (and did) arise regarding Abboud's future use of his name, it is unfortunate that the poignancy of this statement did not prompt either party to more clearly delineate the parties' respective rights under the Agreement.

trademark, service mark, trade name, or brand name.

The Court, however, is mindful that such an interpretation might be construed as rendering the word "names" mere surplusage. See God's Battalion of Prayer Pentecostal Church, Inc. v. Miele Assocs., LLP, 6 N.Y.3d 371, 374, 812 N.Y.S.2d 435, 437 (2006) ("A contract 'should be read to give effect to all its provisions.'") (quoting Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 63, 115 S. Ct. 1212, 1219 (1995)); see also Two Guys From Harrison-N.Y., Inc. v. S.F.R. Realty Assocs., 63 N.Y.2d 396, 403, 482 N.Y.S.2d 465, 468 (1984) ("[O]ne of a court's goals is to avoid an interpretation that would leave contractual clauses meaningless."). Nevertheless, as Judge Sack noted in his concurring opinion in the Court of Appeals' remand decision:

> [T]he rule [against surplusage] should nonetheless be applied with a grain or two of salt when examining a list of words having similar or even overlapping meaning in a commercial agreement.  Such an itemization of terms may reflect an intent to occupy a field of meaning, not to separate it into differentiated parts.  Indeed, this is a common - perhaps all-too-familiar - technique used in drafting agreements, commercial and otherwise. With this technique, words are used more like the brush strokes of a house painter than of those of a portrait painter - each intended principally to ensure that the surface is covered, not to convey a separate piece of information.

JA Apparel Corp., 568 F.3d at 407 n.4 (Sack, J., concurring).

In memorializing their intent, the parties included what amounted to a laundry list of words that fell under the more general penumbra of "trademarks" and related intellectual property (which can include, e.g., brand names or commercial names).  That

24

the word "names" could bear a broader meaning, including one's personal name, cannot overcome the dearth of extrinsic evidence in support of JA Apparel's interpretation of the Agreement.   Thus, it is more reasonable to conclude that the word names was intended to mean something similar to the other assets sold in section 1.1(a)(A) of the Agreement - such as "brand names" or "commercial names" - and not the exclusive right to all commercial use of Abboud's personal name.   This is consistent with the language of section 1.1(a)(C), in which Abboud sold to JA Apparel the right to use and apply for new marks containing Abboud's personal name.

Because the Court concludes that Abboud did not sell the exclusive right to use his personal name commercially, the Court must continue with an analysis of JA Apparel's trademark claims.

## II.  Trademark Infringement

Based upon Abboud's proposed use of his name in advertising the "jaz" line of clothing, JA Apparel also asserts claims for trademark infringement under Section 32 of the Lanham Act, 15 U.S.C. § 1114(1), and New York common law.   In response, Abboud relies on the defense of "fair use" pursuant to Section 33(b)(4) of the Lanham Act, 15 U.S.C. § 1115(b)(4).   In addition, Abboud argues that his "proposed use is protected commercial speech under the First Amendment to the United States Constitution, and that JA Apparel is not entitled to equitable relief on its infringement

claims because of its own unclean hands."  <u>Abboud I</u>, 591 F. Supp. 2d at 327.

Before addressing the merits of the trademark claims and defenses, it bears noting the inherent relationship between the trademark and contract claims.  Despite the Court's conclusion that Abboud did not sell the exclusive right to commercially use his name, there is no question that Abboud sold his trademarks to JA Apparel, which include the mark "Joseph Abboud."  Thus, if JA Apparel prevails on its trademark claims, Abboud is not only liable for infringement, but also for breach of contract.

A.   <u>Legal Standard for Trademark Infringement</u>

In order to prevail on a claim for trademark infringement under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), a plaintiff is required to show that its marks are valid and entitled to protection and that a defendant's use of those marks is likely to cause consumer confusion as to the origin or sponsorship of the defendant's goods.  <u>See, e.g.</u>, <u>Virgin Enters. Ltd. v. Nawab</u>, 335 F.3d 141, 146 (2d Cir. 2003); <u>Time, Inc. v. Petersen Publ'g Co.</u>, 173 F.3d 113, 117 (2d Cir. 1999).[13]

_____

[13] "The standard for trademark infringement under the Lanham Act is similar to the standard for analogous state law claims." <u>Merck & Co., Inc. v. Mediplan Health Consulting, Inc.</u>, 425 F. Supp. 2d 402, 410 n.6 (S.D.N.Y. 2006) (Chin, J.); <u>see also</u> <u>Louis Vuitton Malletier v. Dooney & Bourke, Inc.</u>, 454 F.3d 108, 119 (2d Cir. 2006) ("We analyze claims under New York's unfair competition statute in a similar fashion to how we analyze claims under the Lanham Act."); <u>Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.</u>, 973 F.2d 1033, 1048 (2d Cir. 1992) (same).

In evaluating the likelihood of confusion, courts in this Circuit regularly apply what have become known as the <u>Polaroid</u> factors: (1) strength of plaintiff's mark; (2) degree of similarity between the two marks; (3) proximity of the parties' products or services; (4) likelihood that the prior owner will bridge the gap between the parties' products or services; (5) actual confusion; (6) defendant's bad faith in adopting its mark; (7) quality of defendant's products or services; and (8) sophistication of the relevant consumers. <u>Polaroid Corp. v. Polarad Elecs. Corp.</u>, 287 F.2d 492, 495 (2d Cir. 1961); <u>see also Natural Organics, Inc. v. Nutraceutical Corp.</u>, 426 F.3d 576, 578 (2d Cir. 2005).

B.   <u>Application</u>

As determined by the Court in <u>Abboud I</u>:

> Plaintiff put on competent evidence at trial demonstrating, among other things: (a) the strength of the Abboud marks (<u>see</u> TT at 30-41, 246, 257, 540-41); (b) the close proximity of the goods and services at issue (<u>see</u> <u>id.</u> at 72-73, 76, 87-88, 95-96, 610-614; PX 8, 11, 38); and (c) at least some instances of actual confusion within the industry (<u>see</u> <u>id.</u>, at 128-29, 276-280, 293-94, 300-03; PX 13, 187, 189), despite the fact that the "jaz" products have not even hit the market. Based on this evidence, the Court has no difficulty concluding that there exists a substantial likelihood of confusion between Abboud's proposed uses and Plaintiff's trademarks.

<u>Abboud I</u>, 591 F. Supp. 2d at 328.  Similarly, the Second Circuit concluded that, on appeal, "defendants effectively conceded that JA owned valid 'Joseph Abboud' trademarks and that it had made a <u>prima facie</u> showing under the <u>Polaroid</u> test, [and] that [Abboud's] use of

27

his name as a trademark would likely cause confusion." JA Apparel Corp., 568 F.3d at 400 (internal citations omitted). Despite Abboud's attempt to relitigate the likelihood of confusion on remand (see Defs.' Post-Remand Mem. I at 80-81), the Court sees no reason to revisit this issue. Accordingly, the Court need only address Abboud's fair use defense, and, if necessary, his First Amendment and unclean hands defenses.

C.  Legal Standard for Statutory Fair Use

The fair use defense, which allows for some level of confusion, is an absolute defense to claims of trademark infringement, trademark dilution, and false designation of origin. To successfully assert the fair use defense, an alleged infringer must demonstrate that:

> [T]he use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark, . . . of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin.

15 U.S.C. § 1115(b)(4). Thus, in order to determine whether the use of a term is "fair" under this defense, courts endeavor to assess whether the term is used (1) descriptively, (2) other than as a mark, and (3) in good faith. See, e.g., Car-Freshner Corp. v. S.C. Johnson & Son, Inc., 70 F.3d 267, 269 (2d Cir. 1995).

Abboud argues that he is not seeking to use his name as a trademark. By the use of such phrases as "by the award-winning designer Joseph Abboud" and "a new composition by designer Joseph

28

Abboud," Abboud argues that he is merely seeking to use his name descriptively to convey information to the public about the products sold under his "jaz" trademark.[14]

A use of a mark is descriptive where "the name or term is used 'to describe the goods.'" Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co., 125 F.3d 28, 30 (2d Cir. 1997) (quoting 15 U.S.C. § 1115(b)(4)). The Second Circuit has not limited the phrase "to describe the goods" to the description of a characteristic of the goods, but rather, allows for the use of words or images "in their 'descriptive sense.'" See id. (quoting Car-Freshner Corp., 70 F.3d at 269). "Descriptive use is evident in such situations '[w]here a mark incorporates a term that is the only reasonably available means of describing a characteristic of another's goods.'" Dessert Beauty, Inc. v. Fox, 568 F. Supp. 2d 416, 426 (S.D.N.Y. 2008) (quoting EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos, Inc., 228 F.3d 56, 65 (2d Cir. 2000)). Confusion that may result from a defendant's descriptive use of a plaintiff's mark is often viewed as "a risk entailed in

_____

[14] In his post-remand briefing, Abboud also improperly injects the doctrine of "nominative fair use." (See Defs.' Post-Remand Mem. II at 13-19.) As JA Apparel correctly points out, "this defense applies only where, unlike here, the defendant used the plaintiff's mark to describe the *plaintiff*'s product." (See Pl.'s Post-Remand Reply Mem. at 8.) See also 2 J.T. McCarthy, Trademarks and Unfair Competition § 11:45 (2009) ("McCarthy") (defining "nominative fair use" as "use of another's trademark to identify, not the defendant's goods or services, but the *plaintiff*'s goods or services").

29

the [plaintiff's] selection of a mark with descriptive attributes."[15]   Car-Freshner Corp., 70 F.3d at 270; accord Cosmetically Sealed Indus., 125 F.3d at 30.

To determine if a defendant is using the challenged term or phrase "as a trademark," courts examine whether a defendant's use is designed to "indicate[] the source or origin of consumer products." Dessert Beauty, 568 F. Supp. at 424 (citing Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC, 221 F. Supp. 2d 410, 414 (S.D.N.Y. 2002)). Put another way, "the use of [a] term as a symbol to attract public attention" is generally considered "use . . . as a mark." Safeway Stores, Inc. v. Safeway Properties, Inc., 307 F.2d 495, 499 (2d Cir. 1962). When use of the challenged words or phrase is accompanied by a defendant's own, conspicuously visible mark, this generally does not constitute trademark use. See Cosmetically Sealed Indus., 125 F.3d at 30-31 (concluding that non-trademark use is "evidenced by the fact that the source of the defendants' product is clearly identified by the prominent display of the defendants' own trademarks"); see also Car-Freshner Corp., 70 F.3d at 270 (finding defendant's use did not constitute "use as

---

[15] Although JA Apparel may have taken on some risk by purchasing a surname trademark, this risk is likely de minimis given the uniqueness of the Joseph Abboud name. While "Joseph Abboud" is certainly descriptive of an individual bearing that name, it also carries with it a fanciful or arbitrary quality. There are likely very few individuals named Joseph Abboud, and even less who work as fashion designers. In contrast, there may be countless individuals with the surname "McDonald" who wish to open a restaurant that sells hamburgers.

a mark" when product was sold "in boxes prominently bearing [defendant's] trademark [and] corporate logo"); but see E. Gluck Corp. v. Rothenhaus, 585 F. Supp. 2d 505, 513 (S.D.N.Y. 2008) (stating that "multiple marks may be used together"); Quiksilver Inc. v. Kymsta Corp., 466 F.3d 749, 757 (9th Cir. 2006) ("A product mark like 'ROXY,' even if always displayed with a house mark like 'QUIKSILVER,' may acquire independent trademark significance."). Courts should also consider the "'physical nature of the use in terms of size, location, and other characteristics in comparison with the appearance of other descriptive matter or other trademarks,' as well as the 'presence or absence of precautionary measures such as labeling or other devices designed to minimize the risk that the term will be understood in its trademark sense.'" See JA Apparel Corp., 568 F.3d at 401 (quoting Restatement (Third) of Unfair Competition § 28 cmt. c).

With respect to the third factor, bad faith is often evinced by an "intent to confuse." See id. A defendant who "inten[ds] to trade on the good will of the trademark holder by creating confusion as to source or sponsorship" cannot claim that his use is employed in good faith. See EMI Catalogue P'ship, 228 F.3d at 66. This analysis is similar to the sixth Polaroid factor, which examines whether a defendant "intended to capitalize on plaintiff's good will." See id.; see also Fun-Damental Too, Ltd. v. Gemmy Indus., 111 F.3d 993, 1005 (2d Cir. 1997); Sports Auth., Inc. v.

Prime Hospitality Corp., 89 F.3d 955, 964 (2d Cir. 1996).  In this step, a court may also consider any likelihood of confusion.  See KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 543 U.S. 111, 123, 125 S. Ct. 542, 550 (2004) (noting that the fair use defense "does not foreclose the relevance of the extent of any likely consumer confusion"); Madrigal Audio Labs., Inc. v. Cello, Ltd., 799 F.2d 814, 823 (2d Cir. 1986) (permitting defendant to advertise with his surname, provided he does so "in a not overly intrusive manner"); see also 2 McCarthy § 11:47 ("I think it clear that traditional evidence of likely confusion is indeed admissible and relevant on the issue of classic fair use.").[16]

The fact that a defendant uses another's mark with knowledge of a plaintiff's federal registration or without consulting counsel does not preclude the fair use defense.  See Car-Freshner Corp., 70 F.3d at 270.  Nevertheless, some courts have found that an inference of a lack of good faith may be drawn from a defendant's breach of an agreement not to use the disputed trademark.  See Inst. for Scientific Info. v. Gordon & Breach, Sci. Publishers, Inc., 931 F.2d 1002, 1009 (3d Cir. 1991).

In the context of surnames, additional circumstances may warrant consideration.  While a surname may acquire secondary

---

[16] Abboud previously argued - incorrectly, in this Court's view - that because he is not "intending to use his personal name as a trademark, but otherwise in its descriptive sense . . . , as a matter of law, the likelihood of confusion test . . . is not applicable."  (See Defs.' Post-Trial Mem. at 63.)

32

meaning and become a trademark, it will generally "continue[] to serve the important function to its bearer of acting as a symbol of that individual's personality, reputation and accomplishments as distinguished from that of the business, corporation or otherwise, with which he has been associated." <u>Madrigal Audio Labs</u>, 799 F.2d at 822.  Historically, courts believed that "[e]very man has the absolute right to use his own name in his own business, even though he may interfere with or injure the business of another person bearing the same name." <u>Meneely v. Meneely</u>, 62 N.Y. 427, 427 (1875).  The more modern view, however, is that the "so-called 'sacred right' theory that every man may employ his own name in his business is not unlimited." <u>David B. Findlay v. Findlay</u>, 18 N.Y.2d 12, 19, 271 N.Y.S.2d 652, 655 (1966).

If an individual has previously sold "use of his name and its goodwill, to the plaintiff, . . . courts will be especially alert to foreclose attempts by the seller to 'keep for himself the essential thing he sold, and also keep the price he got for it.'" <u>Levitt Corp. v. Levitt</u>, 593 F.2d 463, 468 (2d Cir. 1979) (quoting <u>Guth v. Guth Chocolate Co.</u>, 224 F. 932, 934 (4th Cir. 1915)); <u>see also</u> <u>Equibrand Corp. v. Reinsman Equestrian Prods., Inc.</u>, No. 03-cv-0536, 2007 WL 1461393, at *13 (N.D. Tex. May 17, 2007) (finding that if an individual sells the right to use his name in connection with certain products, a subsequent attempt to use his name with different products "is not a 'fair use' . . . even if it is an

33

accurate description of the products"). If a court determines that an individual sold only the right to use his name as a trademark, as opposed to the exclusive right to use his name commercially, the seller may advertise his affiliation with a new company, but must do so "in a not overly intrusive manner." Madrigal Audio Labs., 799 F.2d at 823. Finally, in addressing whether use of a surname is in bad faith, there is certainly a distinction to be made between a defendant who happens to have the same surname as the plaintiff's trademark, and a defendant who has previously sold his surname-trademark to the plaintiff. See 2 McCarthy § 13:15 ("If a person whose surname has been legally adopted by a senior user, then severs his ties with that company and goes into business for himself, he has no unqualified right to use his own name, if the result is likelihood of confusion.").

D.   Application

Throughout the trial, Abboud waffled as to the precise manner in which he believes he can use his name under the Agreement. At the outset of the trial, JA Apparel introduced as evidence several "mock-ups" of proposed ads created by Abboud. (See, e.g., PX-42, PX-43.) Abboud, however, testified that these were only "potential layouts for a concept for advertising," and he had not yet "decided what he was going to do" with them.[17] (See TT 575-78, 596-601.)

––––––––––––––––

[17] Following remand, the Court held a conference with the parties to determine how they intended to proceed. Counsel for JA Apparel noted that "one of the problems the last time around,

Although Abboud is reluctant to commit to these earlier proposed ads, the Court will consider them as relevant to Abboud's intentions and potential uses of the Joseph Abboud name in advertising.  Towards the end of the trial, Abboud submitted two additional proposed ads that he believes will not infringe on JA Apparel's trademark rights, and to which he was willing to commit for purposes of this Court's fair use analysis.[18]  (See DX-187, DX-188.)  The Court has included as exhibits to this Opinion one of the ads contained in Plaintiff's Exhibit 42, Plaintiff's Exhibit 43, and Defendants' Exhibit 187.[19]

   1.   <u>Descriptive, Non-Trademark Use</u>

In the Court's view, the two proposed ads that Abboud believes qualify under the fair use defense, Defendants' Exhibits 187 and 188, do not use Abboud's name as a trademark.  A viewer of these ads is immediately drawn to the large, white scripted font,

_____

Your Honor, was it was very difficult to pin down Mr. Abboud's side on whether the [mock-up] ads were, in fact, exemplars of what he intends to do."  (See Transcript of Court Conference, dated Sept. 9, 2009 ("Conf. Tr."), at 5.)

[18] Counsel for Abboud has argued that "I don't think we want to be limited to the exemplars in the record. . . . We want to be limited . . . to what the law permits."  (Conf. Tr. at 8.)  To the extent that the Court is able to opine on such hypothetical, not-yet-established uses, it intends to do so.

[19] The remaining ads in Plaintiff's Exhibit 42 are similar enough to that used as an exhibit to this Opinion that their inclusion as additional exhibits is unnecessary.  Likewise, Defendants' Exhibit 188 is identical to Exhibit 187, but for the addition of the phrase "QUINTESSENTIALLY AMERICAN, JAZ IS AN EXPRESSION OF CLASSIC STYLE WITH PERSONALITY AND INNOVATION."

approximately four inches wide by two inches high, in which Abboud's duly owned trademark, "jaz," is displayed.  The words "Joseph Abboud" in these two exhibits appear in the context of a complete sentence, "JAZ IS A NEW LUXURY COLLECTION CREATED BY THE AWARD-WINNING DESIGNER JOSEPH ABBOUD."  This sentence is in a significantly smaller font than "jaz," roughly 3/16 of an inch high, and placed in the lower left-hand corner of the ad.  The ad also includes the words "FALL 2008" in the upper left-hand corner, and "NEW YORK" and "MONTREAL," each followed by a telephone number, in the lower right-hand corner.  All of these words are in the same font, color, and size as the tagline that includes Abboud's name.  As a result, Abboud's name is no more the focal point of the ads than the company's telephone number.  Nor is it positioned in such a way as to attract significant public attention.

Turning to the next factor in the fair use test, Abboud uses his name, at least in Defendants' Exhibits 187 and 188, in its descriptive sense.  The phrase "JAZ IS A NEW LUXURY COLLECTION CREATED BY THE AWARD-WINNING DESIGNER JOSEPH ABBOUD" alerts viewers that Abboud, the individual, is the designer behind the new "jaz" clothing line.  And indeed, Abboud is an award-winning designer who has created "jaz."  Furthermore, Abboud's use of his name is the only "reasonably available means" by which he can inform his potential customers that he is the designer of the "jaz" line.  See Dessert Beauty, 568 F. Supp. 2d at 426.  Thus, the Court concludes

that Abboud's proposed use of his name in Defendants' Exhibits 187 and 188 is a descriptive, non-trademark use.[20]

Certain of Abboud's other proposed uses, however, may not be so easily characterized as descriptive, non-trademark uses. For example, in several of the mock-ups to which Abboud refused to commit, "Joseph Abboud" is displayed in block letters, either just below or to the side of the only slightly larger trademark, "jaz." (See, e.g., PX-42.) Although Abboud's name is always preceded by the phrase "a new composition by," oftentimes that phrase is much smaller and/or in a different font than the words "Joseph Abboud." In addition, the words "Joseph Abboud," in some of these ads, are written in what appears to be the identical font as one of JA Apparel's federal trademark registrations. (See Pl.'s Post-Trial Mem. at 16 (Registration No. 2690336).) And while Abboud's trademark, "jaz," certainly grabs the viewer's attention, the words "Joseph Abboud," in at least some of the mock-ups, are similarly

---

[20] According to the Wall Street Journal, Abboud "plans to promote his new label with the tagline 'a new composition by designer Joseph Abboud.'" (PX-11.) While this phrase technically identifies Abboud as the designer of the new "jaz" line, Abboud's testimony that he intends to use this "slogan" or "tagline" in advertising begins to sound more like trademark use. (See TT 579.) There are theoretically countless ways in which Abboud could use his name in a sentence to describe himself as the designer of the "jaz" line, and Abboud would be well-served by utilizing a variety of different descriptive phrases as opposed to a "slogan" or "tagline." This is particularly so since he sold to JA Apparel the right to register as trademarks the expressions "by Joseph Abboud," "designed by Joseph Abboud," and anything similar. (See PX-1 ¶ 1.1(a)(C).)

eye-catching.  In the Court's view, such a use takes Abboud's name outside of the realm of descriptive, non-trademark use, because, while perhaps technically describing the authorship of the "jaz" line, the name is used more as an attention-grabbing symbol.  See Safeway Stores, 307 F.3d at 499.

On the other hand, Plaintiff's Exhibit 43 is clearly a descriptive, non-trademark use.  In that ad, Abboud's trademark, "jaz," is prominently displayed, in the same large, white scripted font used in Defendants' Exhibit 187.  Abboud's name is used only within a block of very small text in the lower right-hand corner of the ad next to Abboud's photo.  It is practically a strain on the eyes to read the miniscule text (approximately 1/16 of an inch high), which simply identifies Abboud as the model in the ad's photo and indicates he is the designer behind the "jaz" line: "DESIGNER JOSEPH ABBOUD IN A 2 BUTTON SUPER 120 S CHARCOAL CHALKSTRIPE FROM HIS FALL 2008 JAZ COLLECTION."  (Id.)  Further, those words are followed by a disclaimer that "DESIGNER JOSEPH ABBOUD IS NO LONGER ASSOCIATED OR AFFILIATED WITH JA APPAREL CORP., THE OWNER OF THE TRADEMARK 'JOSEPH ABBOUD.'™"  (Id.)  The disclaimer certainly assists in eliminating any confusion that might result.  In fact, JA Apparel all but admits that this ad would be a permissible use by Abboud.  (See Pl.'s Post-Remand Mem. at 22-23.)

2.   <u>Good Faith Use</u>

The more difficult question posed by Abboud's fair use defense, however, is whether Abboud intends to use his name in good faith.  Abboud argues primarily that his use is in good faith due to the fact that he has refrained from running any ads, sought guidance from counsel, and requested declaratory relief from the Court on the permissible fair use of his personal name.  (<u>See</u> Defs.' Post-Remand Mem. I at 69-72.)  While the Court appreciates Abboud's deference to the legal process, this reasoning is misplaced.  Because the Court is asked to consider Abboud's <u>proposed</u> uses, the analysis must look to whether, <u>if</u> the ad ran, Abboud is using his name with an intent to confuse.  <u>See JA Apparel Corp.</u>, 568 F.3d at 401.  If the Court concludes that Abboud, in fact, "inten[ds] to trade on the good will of [JA Apparel] by creating confusion as to source or sponsorship," he cannot meet the third factor of the fair use test.  <u>See EMI Catalogue P'ship</u>, 228 F.3d at 66.  Any likelihood of confusion that results - even unintentionally - is also relevant.  <u>See KP Permanent Make-Up</u>, 543 U.S. at 123, 125 S. Ct. at 551 ("[W]e do not rule out the pertinence of the degree of consumer confusion under the fair use defense.").

The Court is troubled by several of Abboud's admissions with respect to his intent to use his name in advertising.  First, Abboud testified that he intends to use "the <u>slogan</u> or <u>tagline</u> 'a

new composition by designer Joseph Abboud.'" (TT 579 (emphasis added).) Use of a "slogan" or "tagline" certainly suggests an intent to create an affiliation between "jaz" products and "Joseph Abboud." And, although Abboud's subjective intent might be "to inform the public that [Abboud the individual is] the creator of the product," (id.) as opposed to JA Apparel, absent a disclaimer, this seems likely to create significant confusion in certain of the proposed ads.

Further, Abboud testified that he wants his name to "[c]ertainly [be] large enough" for consumers to see and read. (TT 569.) This statement again suggests that Abboud, in effect, wants to promote his "jaz" line by using "Joseph Abboud" as a symbol to attract public attention. See Safeway Stores, 307 F.3d at 499.

Perhaps most telling, is Abboud's admission that he wants to inform the public that he is the "source" of the new "jaz" line. (See TT 580.) Trademarks are designed to identify the "source" of goods and services. See TCPIP Holding Co. v. Haar Commc'ns, Inc., 244 F.3d 88, 95 (2d Cir. 2001) (noting that "trademarks functions [sic] as source-identifiers"). While Abboud admittedly used the term "source" as a layman (see Defs.' Post-Remand Reply Mem. at 7 n.9), the Court cannot ignore the significance of this statement when coupled with the other evidence regarding Abboud's intentions.

Abboud's counsel has argued on remand that "Abboud's identification by *personal* name enables consumers to assess his

40

talent, skill, artistic ability and reputation and thereby discern the quality, proficiency, suitability and safety of his 'jaz' collection." (Defs.' Post-Remand Mem. I at 73.)  This is, again, precisely what trademarks are designed to protect.  See TCPIP Holding Co., 244 F.3d at 95 (noting that trademark law "'helps assure a producer that it . . . will reap the financial, reputation-related rewards associated with a desirable product'") (quoting Qualitex Co. v. Jacobsen Prods. Co., 514 U.S. 159, 164, 115 S. Ct. 1300, 1303 (1995)); see also Levitt Corp., 593 F.2d at 468 ("When a business purchases trademarks and goodwill, the essence of what it pays for is the right to inform the public that it is in possession of the special experience and skill symbolized by the name of the original concern, and the sole authority to market its products."); 1 McCarthy § 3:1 (stating that trademarks "identify" and "distinguish" goods, alerting consumers that they come from a single "source" and are of a particular "quality").[21]

   As Abboud sold the goodwill of the Joseph Abboud trademark to JA Apparel - for $65.5 million - he cannot now claim fair use based on his desire to capitalize on that reputation.  (See PX-1

---

   [21] The Second Circuit, in vacating Abboud I, mischaracterized this Court's assessment of Abboud's use of his name to "distinguish" his goods.  See JA Apparel Corp., 568 F.3d at 401.  This Court never suggested that Abboud intends to use his name to "'distinguish' his clothing from that of JA [Apparel.]"  Id.  Rather, in the Court's view, certain of Abboud's proposed uses are attempting to distinguish his clothing from other competitors by capitalizing on the goodwill inherent in the Joseph Abboud trademark.

¶ 1.1(a)(A) (selling the trademarks "and the goodwill related thereto").)  See also In re The Leslie Fay Cos., Inc. ("Nipon"), 216 B.R. 117, 124 (Bankr. S.D.N.Y. 1997) ("The sale of a trademark includes the sale of the mark along with the goodwill and tangible business assets that go along with the trademark.").  Although it may seem unfair to Abboud, because he "worked toward building [his name] since . . . enter[ing] th[e] clothing industry full time in 1972" (see DX-9), New York law is clear that the seller cannot "attempt[] to arrogate to himself the trade reputation for which he received valuable consideration." Levitt Corp., 593 F.2d at 468.

In sum, Abboud may alert consumers that he is the designer behind the new "jaz" line, but he cannot do so in an "overly intrusive manner," Madrigal Audio Labs., 799 F.3d at 823; nor can he do so in a way that is utterly confusing.  See KP Permanent Make-Up, 543 U.S. at 123, 125 S. Ct. at 550.  The Court is mindful that "[t]his is not a case where a first comer seeks to save himself a place in a new market he has not yet entered by denying to a man the use of his own name in exploiting that market." Taylor Wine Co., Inc. v. Bully Hill Vineyards, 569 F.2d 731, 733 (2d Cir. 1978).  Rather, this is a case in which an individual elected to use his name for many years as a trademark, building up substantial goodwill; he then sold the same, but intends to continue to commercially exploit his name by designing clothes in competition with the purchaser of the trademark.   This case

42

therefore presents an inherently difficult scenario, because Abboud's use of his name in the sale of clothing will inevitably lead to consumer confusion.

Defendants' Exhibits 187 and 188 - while a close call - satisfy all of the elements of the fair use defense, provided that Abboud includes a disclaimer as discussed below.  Abboud has used his name in its descriptive sense, embedded in a complete sentence that identifies Abboud the individual as the designer of the "jaz" line.  Further, Abboud's name is accompanied by the more prominently displayed "jaz" trademark.

Nevertheless, in view of the fact that the average consumer would have great difficulty discerning a difference in sources between clothes marketed under the Joseph Abboud mark and clothes designed by Joseph Abboud the person, Abboud's use of his name is not unlimited, and must yield to such consumer confusion.  See Levitt Corp., 593 F.2d at 469-70 (upholding injunction of individual's use of his name in advertising "to prevent confusion and to protect the value of plaintiff's goodwill").  Thus, Abboud may not use his name in Defendants' Exhibits 187 and 188 or anything similar absent a disclaimer of his affiliation with JA Apparel and products sold under the Joseph Abboud trademarks.  See Joseph Scott Co. v. Scott Swimming Pools, Inc., 764 F.2d 62, 69 (2d Cir. 1985) (permitting defendant's use of his surname, provided he "make perfectly clear that his firm is no longer associated with,

43

and is not a successor to, [plaintiff]"); <u>Taylor Wine Co.</u>, 569 F.2d at 736 (requiring similar disclaimer); <u>but see Soltex Polymer Corp. v. Fortex Indus., Inc.</u>, 832 F.2d 1325, 1330 (2d Cir. 1987) (noting that disclaimers "may not always provide an effective remedy against an infringing use"). Any disclaimer must be no smaller than the accompanying text in which Abboud uses his name.

The decision of the Court would be easier if Abboud were to embrace the mock-up proposed in Plaintiff's Exhibit 43. In that ad, Abboud's use of his name unquestionably qualifies under the fair use defense. In fact, the placement, size, and usage of Abboud's name in Plaintiff's Exhibit 43, together with the disclaimer, arguably removes the likelihood of any confusion, and abrogates the need to even discuss the affirmative defense of fair use.

The Court cannot conclude, however, that the ads in Plaintiff's Exhibit 42 constitute fair use. As noted above, the size and font of "Joseph Abboud" - virtually identical to the Joseph Abboud trademark - remove it from the realm of descriptive, non-trademark use. And by doing so, Abboud creates utterly confusing ads that cannot withstand scrutiny under the fair use test, even if a disclaimer were included. Although the "jaz" trademark is also displayed in each of these ads, consumers might be led to believe that "jaz" is simply a sub-line of clothing created by the rightful owner of the "Joseph Abboud" trademark - JA

44

Apparel.  This is particularly so given the prominence of the name "Joseph Abboud" in each of these ads.   Together with Abboud's admissions noted <u>supra</u>, the Court concludes that these ads (PX-42) evince an intent to confuse and do not constitute fair use.

E.    <u>Abboud's Remaining Defenses</u>

To the extent that Abboud's proposed uses are "fair," as discussed above, the Court need not address his remaining defenses. On the other hand, any proposed uses that are in bad faith or create considerable confusion would constitute trademark infringement and a breach of the Agreement, and foreclose Abboud's First Amendment defense.   See <u>Abboud I</u>, 591 F. Supp. 2d at 331-32 (rejecting Abboud's position that "a party cannot contract away his right to engage in what otherwise might be considered protected commercial speech"); <u>see also</u> <u>United We Stand America, Inc. v. United We Stand, America New York, Inc.</u>, 128 F.3d 86, 93 (2d Cir. 1997) (rejecting First Amendment defense where defendants used a slogan as a mark to suggest the same source identification as plaintiffs); <u>Pfizer Inc. v. Sachs</u>, No. 08 Civ. 8065 (WHP), 2009 WL 2876255, at *8 (S.D.N.Y. Sept. 8, 2009) (no First Amendment defense to trademark infringement where "a defendant's use is likely to cause confusion").   The defense of unclean hands need not be addressed in light of the Court's dismissal of Abboud's counterclaims.   See <u>infra</u>, Section V.

45

III. **Plaintiff's Remaining Claims: Dilution, False Designation Of Origin, Unfair Competition, And False And Deceptive Trade Practices**

Plaintiff also asserts claims for false designation of origin, unfair competition, and dilution in violation of Sections 43(a) and (c) of the Lanham Act, 15 U.S.C. §§ 1125(a), 1125(c), New York General Business Law ("N.Y. Gen. Bus. Law") § 360-1, and the common law, as well as false and deceptive trade practices under N.Y. Gen. Bus. Law §§ 349-350, all of which relate to Abboud's proposed uses of his name in connection with his new "jaz" line. Plaintiff does not seek different or additional relief in connection with its remaining claims. Thus, with respect to those ads that do not reflect fair use, further discussion of these claims, vis-a-vis Abboud's proposed uses of his name, is unnecessary. See, e.g., Morningside Group, Ltd. v. Morningside Capital Group, L.L.C., 182 F.3d 133, 143 (2d Cir. 1999) ("We need not address the [dilution claim] because Morningside Group - having already succeeded on its infringement claim - has neither requested, nor could it receive, any further relief based on dilution."); Utah Lighthouse Ministry v. Found. For Apologetic Info. & Research, 527 F.3d 1045, 1050 (10th Cir. 2008) ("trademark infringement is a type of unfair competition; the two claims have virtually identical elements and are properly addressed together"). Furthermore, because fair use is also a defense to Plaintiff's remaining claims, Abboud may use his name in accordance with the Court's fair use analysis without

46

incurring liability for these claims.  <u>See</u> <u>TCPIP Holding Co.</u>, 244 F.3d at 104 n.12 (fair use a defense to federal dilution claims); <u>McGraw-Hill Cos. v. Int'l Sec. Exch.</u>, No. 05 Civ. 112 (HB), 2005 WL 2100518, at *9 (S.D.N.Y. Sept. 1, 2005) (fair use a defense to New York dilution and common law trademark claims); <u>Wonder Labs, Inc.</u> <u>v. Procter & Gamble Co.</u>, 728 F. Supp. 1058, 1067 (S.D.N.Y. 1990) ("the defense that the defendant's use of the mark is purely descriptive and not as a trademark equally precludes recovery for common law unfair competition"); <u>see also</u> <u>William R. Warner & Co.</u> <u>v. Eli Lilly & Co.</u>, 265 U.S. 526, 529, 44 S. Ct. 615, 616 (1924) (establishing fair use defense under the common law long before the passage of the Lanham Act).

## IV.  Permanent Injunctive Relief

On appeal, the Second Circuit did not address the injunctive relief awarded by this Court "except to note that an injunction of scope similar to that originally entered would seem to be inappropriately broad if based solely on trademark infringement rather than on breach of contract." <u>JA Apparel Corp.</u>, 568 F.3d at 403.  Because the Court on remand has determined that Abboud did not sell the exclusive right to commercially use his name, the original injunction must be modified to address only those proposed uses that would constitute trademark infringement, not otherwise protected by the fair use defense, and, thus, breach the Agreement. The Court will not go through the redundant exercise of fully

47

explaining the standard for injunctive relief. The standard remains the same as that set forth in Abboud I. See Abboud I, 591 F. Supp. 2d at 334-37. Several points, however, are worthy of note.

First, as a general matter, injunctions in trademark cases involving use of an individual's personal name should be narrowly tailored. See, e.g., Joseph Scott Co., 764 F.2d at 67; see also Taylor Wine Co., 569 F.2d at 735 ("[w]hen the defendant demonstrates a genuine desire to build a business under his own name, courts have generally been reluctant to proscribe all surname use"). Notwithstanding the general rule, "[w]here, as here . . . the infringing party has previously sold his business, including use of his name and its goodwill, to the plaintiff, sweeping injunctive relief is more tolerable." Levitt Corp., 593 F.2d at 468. In framing an injunction, the Court must seek to "avoid confusion in the marketplace, protect a prior company's property interest in its name, and permit an individual to exploit his own identity and reputation in a legitimate manner." Gucci v. Gucci Shops, Inc., 688 F. Supp. 916, 927 (S.D.N.Y. 1988) (quoting Joseph Scott Co., 764 F.2d at 67).

In line with these principles, the Court concludes that Plaintiff JA Apparel is entitled to a permanent injunction prohibiting Abboud - personally, through Houndstooth, or through any other entity with which he is affiliated - from using his name

48

as a trademark, service mark, trade name, or brand name.  Abboud
may not use his name in any manner on "jaz" clothes, labels, hang-
tags, or product packaging.  Should Abboud choose to use his name
in promotional and advertising materials, he must do so in a way
that is not inconsistent with this Court's fair use analysis.
Abboud's name must be used descriptively, in the context of a
complete sentence or descriptive phrase, and must be no larger or
more distinct than the surrounding words in that sentence or
phrase.  Abboud is to prominently display his trademark "jaz" (or
any other trademark) elsewhere in the advertisement, both to alert
consumers that "jaz" is the source - in the trademark sense - of
the new clothing line, and to minimize any resulting confusion.
Finally, should Abboud use his name as proposed in Defendants'
Exhibit 187 and 188 or anything similar, he must include a
disclaimer of any affiliation with JA Apparel and products sold
under the Joseph Abboud trademarks.   The disclaimer must be
displayed in a font that is no smaller than the accompanying text
in which Abboud uses his name.[22]

## V.  Abboud's Counterclaims

Defendants assert counterclaims against JA Apparel and Staff
for false endorsement, false advertising, violation of New York
Civil Rights and General Business Laws, and common law unfair

---

[22] The Court notes that Abboud proposed many of the above
limitations on the use of his name in his post-trial briefing.
(See Defs.' Post-Trial Mem. at 61.)

competition, stemming from activities in which JA Apparel and Staff engaged subsequent to the execution of both the Agreement and Side Letter.  Essentially, Defendants contend that Plaintiff exploited the name and reputation of Joseph Abboud the individual by using, in connection with its products under the "Joseph Abboud" and "JOE" labels, promotional and advertising campaigns with slogans such as "Hey Joseph, What Should I Wear?" "Do You Know Joe?" and "Ask Joseph Abboud."  Under all five counterclaims, Defendants seek the same damages – $37.5 million – which they contend equates to a 10% royalty on Plaintiff's wholesale sales from July 2005 until the present.

In Abboud I, this Court concluded, "[d]ue to the fact that all of the[] [counter]claims . . . are premised, either explicitly or implicitly, on a position that the Court has already rejected – specifically, that Plaintiff did not purchase the exclusive right to commercially use the Joseph Abboud name in connection with goods and services – these claims must be dismissed . . . ." Abboud I, 591 F. Supp. 2d at 345.  Although the Court on remand has drawn a different conclusion with respect to the Agreement, much of the analysis in Abboud I remains valid, and the counterclaims must still be dismissed for the reasons set forth below.

As an initial matter, even if Defendants had prevailed on their counterclaims, they did not adequately establish any damages. Under all five counterclaims, Defendants seek $37.5 million, which

they contend equates to a 10% royalty on Plaintiff's wholesale sales from July, 2005 until the present. Defendants did not, however, establish what profits, if any, resulted from the campaigns which they claimed were objectionable. Because such profits surely count for a small percentage of Plaintiff's overall profits, the Court could not accept Defendants' damage calculations in any event.

    A.   <u>Violations of Abboud's "Right Of Publicity" Under 15 U.S.C.A. § 1125(a) & §§ 50-51 of N.Y. Civil Rights Law</u>

In his first counterclaim, under Section 43(a) of the Lanham Act, Abboud claims that Plaintiff violated his right of publicity "by using Abboud's name in such a fashion as to mislead consumers into believing that Abboud is still associated with JA Apparel and/or sponsors and endorses JA Apparel's products." (<u>See</u> Defs.' Post-Trial Mem. ¶ 229.) Similarly, in connection with his third counterclaim, under New York Civil Rights Law §§ 50 and 51, Abboud argues that Plaintiff violated his right of publicity "by using Abboud's name in a non-trademark fashion in advertising and promotional materials without Abboud's consent." (<u>See</u> <u>id.</u> ¶ 249.) As stated in <u>Abboud I</u>,

> Defendants did not present credible evidence, as they were required to do for their Lanham Act claim, that consumers have been or are likely to be misled into believing that the "Do You Know Joe?" "Hey Joseph, What Should I Wear?" or "Ask Joseph Abboud" campaigns indicated an association with Joseph Abboud the individual, as opposed to Joseph Abboud, the brand. <u>See</u> 15 U.S.C. § 1125(a).

51

Abboud I, 591 F. Supp. 2d at 346.  Nothing in the instant Opinion renders that conclusion invalid.  Thus, Abboud's first counterclaim must be dismissed.

To succeed on his state law publicity claim, Abboud was required to show that JA Apparel "use[d] for advertising purposes, or for the purposes of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person."  N.Y. Civ. Rights Law § 50.  Abboud has presented no evidence to support his claim that anyone actually believed that the "Joe" or "Joseph" referenced in these ads was a real individual, let alone Joseph Abboud.  See Cohen v. Herbal Concepts, Inc., 63 N.Y.2d 379, 384, 482 N.Y.S.2d 457, 459 (1984) (noting that a plaintiff cannot recover under N.Y. Civ. Rights Law §§ 50-51 without proving that he "is capable of being identified from the advertisement alone and that plaintiff has been so identified").  In fact, responses to questions generated by the "Hey Joseph, What Should I Wear?" campaign, after Abboud left JA Apparel, began with, e.g., "We recommend," and "We think."  (See TT 51-52, 200; PX-173 (emphasis added).)  Viewers of the ads were clearly informed that their questions were being answered by "The Joseph Abboud Design Staff," and not any single individual.  (See TT 51-52, 200.) Similarly, the "Joe" contained on websites, billboards, posters and digital on-line banners was a fictitious character promoting the "JOE Joseph Abboud" brand, which is geared toward a younger male

consumer than "Joseph Abboud" brand clothes.  (See TT 27, 59-61, 206-08.)   Thus, Abboud has not proven his state law publicity claim.

Notwithstanding the foregoing, Abboud sold the right to "use and apply for . . . trademarks containing the words 'Joseph Abboud,' 'designed by Joseph Abboud,' 'by Joseph Abboud,' 'JOE' or 'JA,' or anything similar thereto or derivative thereof . . . for any and all products and services," thereby giving JA Apparel the requisite written consent.  (PX-1 ¶ 1.1(a)(C).)  And indeed, JA Apparel both used and applied for the registration of "Ask Joseph Abboud," and "Hey Joseph, What Should I Wear?"  (See DX-30.) Although JA Apparel ultimately abandoned these applications (and all of the allegedly offending ad campaigns), it is difficult to imagine how Abboud can credibly claim that JA Apparel's use of the Abboud name in the form of new trademarks is anything other than what JA Apparel expressly purchased.   Thus, Abboud's third counterclaim must also be dismissed.

B.   False Advertising Under 15 U.S.C. § 1125(a)(1)(B)

In his second counterclaim, under Section 43(a)(1)(B) of the Lanham Act, Abboud seeks relief based on his assertion that the advertising and promotional campaigns set forth above either explicitly or implicitly "create the false impression that Abboud is still associated with JA Apparel and that JA Apparel still possesses Abboud's individual reputation as a designer, as well as

his unique talents, skills and artistic abilities to design menswear and other consumer products for JA Apparel." (Defs.' Post-Trial Mem. at 146-47.) For much the same reasons outlined in Abboud I, the second counterclaim must be dismissed. See Abboud I, 591 F. Supp. 2d at 347 (concluding that Abboud failed to prove the statements by JA Apparel were "explicitly" or "implicitly" false, and, even if they were, "Defendants have not made a sufficient showing of consumer confusion").

C. Deceptive Acts and Practices Under New York G.B.L. § 349 & Common Law Unfair Competition

In his fourth and fifth counterclaims, Abboud argues, based on the same conduct set forth above, that Plaintiff engaged in deceptive business practices and unfair competition, respectively. Again, nothing has changed from the Court's original conclusion in Abboud I, that (1) "the complained of campaigns [do not] constitute misleading practices," (2) Defendants have "failed to submit credible evidence that the campaigns caused the requisite injury to consumers at large," and (3) JA Apparel did not act "in bad faith by creatively using the Joseph Abboud name and trademarks that it owns to promote its brand." Id. at 347-48.[23]

Abboud failed to prove that JA Apparel "engag[ed] in an act or practice that is deceptive or misleading in a material way and that

---

[23] For these reasons, the Court also rejects Defendants' defense of "unclean hands" in connection with JA Apparel's advertising and promotional campaigns using the Joseph Abboud name. (See Defs.' Post-Trial Mem. at 116-19.)

[Abboud] has been injured by reason thereof." Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20, 25, 623 N.Y.S.2d 529, 532 (1995) (emphasis added). Further, General Business Law § 349 "was enacted to provide consumers with a means of redress for injuries caused by unlawfully deceptive acts and practices." Goshen v. Mutual Life Ins. Co. Of N.Y., 98 N.Y.2d 314, 323, 746 N.Y.S.2d 858, 863 (2002) (emphasis added). As a commercial plaintiff, Abboud was therefore required to show "that the acts or practices have a broader impact on consumers at large," and he fell woefully short of doing so. See Oswego Laborers Local 214, 85 N.Y.2d at 25, 623 N.Y.S.2d at 532. The New York statute is simply not designed to remedy contract disputes between private parties. See id. at 25, 623 N.Y.S.2d at 532 ("Private contract disputes, unique to the parties, for example, would not fall within the ambit of the statute."); Elacqua v. Physicians' Reciprocal Insurers, 52 A.D.3d 886, 888, 860 N.Y.S.2d 229, 231 (3d Dep't 2008) ("A claim brought under [Gen. Bus. Law § 349] must be predicated on an act or practice which is 'consumer-oriented,' that is, an act having the potential to affect the public at large, as distinguished from merely a private contractual dispute."). And, since JA Apparel believed in good faith that it had the contractual right to use the Joseph Abboud name in advertising, Abboud cannot recover on his counterclaim for unfair competition. See Abe's Rooms, Inc. v. Space Hunters, Inc., 38 A.D.3d 690, 692, 833

55

N.Y.S.2d 138, 140 (2d Dep't 2007) (precluding recovery absent a showing that defendants "displayed some element of bad faith").

Finally, the Court again rejects that portion of Defendants' fifth counterclaim related to JA Apparel's and Staff's alleged wrongful contact with "individuals in the industry in an attempt to prevent or impede the launch of Abboud's new 'jaz' line, and otherwise injure Abboud." <u>Id.</u> at 348.   As the Court has already made clear:

> The evidence presented to support this claim was thin, and, in all events, these allegations are not the proper basis for an unfair competition claim because (a) unfair competition claims under New York law are analyzed in the same manner as a trademark infringement claim under the Lanham Act, <u>see e.g.</u>, <u>Louis Vuitton Malletier v. Dooney & Bourke, Inc</u>. 454 F.3d 108, 119 (2d Cir. 2006), and (b) Defendants provided no legal support for the position that interference with existing or prospective business relations constitutes unfair competition, as opposed to tortious interference, a claim Defendants did not assert. (<u>See generally</u> Defs.' Post-Trial Mem., ¶ 289.)

<u>Abboud I</u>, 591 F. Supp. 2d at 348.

*     *     *

For all of these reasons, Defendants' counterclaims are dismissed in their entirety.

<strong>CONCLUSION</strong>

For all of the foregoing reasons, the Court concludes:

1)   In the June 16, 2000 Purchase and Sale Agreement, Abboud did not sell, and JA Apparel did not purchase, the exclusive right to use the "Joseph Abboud" name commercially.   Rather, Abboud sold, and JA Apparel purchased, the "Joseph Abboud" name as a trademark

56

and related intellectual property (which can include brand names or commercial names);

2)   Abboud's proposed uses of his name in connection with his new "jaz" line, as shown in Defendants' Exhibits 187 and 188, and Plaintiff's Exhibit 43, would qualify as fair use under Section 33(b)(4) of the Lanham Act, 15 U.S.C. § 1115(b)(4), provided Abboud includes a disclaimer of any affiliation with JA Apparel and products sold under the Joseph Abboud trademarks on Defendants' Exhibits 187 and 188 or any similar ads.  Such disclaimer shall be no smaller than the accompanying text in which Abboud uses his name;

3)   Abboud's proposed uses of his name in connection with his new "jaz" line, as shown in Plaintiff's Exhibit 42, would constitute trademark infringement under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), not otherwise insulated by the fair use defense, and thus, a breach of the June 16, 2000 Purchase and Sale Agreement;

4)   Plaintiff's claims for (a) dilution, unfair competition, and false designation of origin under Sections 43(a) & (c) of the Lanham Act, 15 U.S.C. §§ 1125(a) (1) & (c)(1), N.Y. Gen. Bus. Law §§ 360-61, and the common law, and (b) false and deceptive trade practices under N.Y. Gen. Bus. Law §§ 349-50, are hereby dismissed; and

5)   Defendants' counterclaims for (a) right of publicity,

false designation of origin and false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), (b) right of publicity under N.Y. Civil Rights Law §§ 50-51, (c) false and deceptive trade practices under N.Y. Gen. Bus. Law § 349, and (d) unfair competition under the common law, are hereby dismissed.

It is hereby ORDERED that Abboud is permanently enjoined from the following conduct:

1)   Abboud may not use his name - either personally, through Houndstooth, or through any other entity with which he is affiliated - as a trademark, service mark, trade name or brand name;

2)   Abboud may not use his name in any manner on "jaz" clothes, labels, hang-tags, or product packaging;

3)   Abboud may not use his name in promotional and advertising materials, unless his name is used descriptively, in the context of a complete sentence or descriptive phrase, and it must be no larger or more distinct than the surrounding words in that sentence or phrase;

4)   Abboud must prominently display his trademark "jaz" (or any other trademark) on any ad containing his personal name as discussed above; and

5)   Should Abboud use his name as proposed in Defendants' Exhibit 187 and 188 or anything similar, he must include a disclaimer of any affiliation with JA Apparel and products sold

under the Joseph Abboud trademarks.   Such disclaimer shall be no smaller than the accompanying text in which Abboud uses his name.

The Clerk of Court shall enter Judgment consistent with the terms of this Memorandum Opinion and Order.

_____
THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated: January 12, 2010
       New York, New York

PLAINTIFF'S EXHIBIT 42



PLAINTIFF'S EXHIBIT 43





NEW YORK 212 399-0020
MONTREAL 514 866-4891

FALL 2008

JAZ IS A NEW LUXURY COLLECTION CREATED
BY THE AWARD-WINNING DESIGNER JOSEPH ABBOUD.

DEFENDANTS' EXHIBIT 187